1  ADAM GORDON
   United States Attorney
2  JOHN PARMLEY, CBN 178885
   Assistant U.S. Attorney
3  880 Front Street, Room 6293
   San Diego, California 92101-8893
4  Telephone: (619) 546-7957

5  Attorneys for Plaintiff
   United States of America

6              **UNITED STATES DISTRICT COURT**

7              **SOUTHERN DISTRICT OF CALIFORNIA**

8  UNITED STATES OF AMERICA,              Case No. 23CR1471-H

9              Plaintiff,

10        v.                              **GOVERNMENT'S SENTENCING
                                          MEMORANDUM**
11 JINCHAO WEI, a.k.a. Patrick Wei,
                                          Date: January 12, 2026
12           Defendant.                   Time: 1:30 p.m.

13
                                          The Honorable Marilyn L. Huff
14

15 *"Espionage, spying, is not a game.  It costs our country secrets and millions of dollars*
16 *in stolen technology.  It can also cost lives and threaten our national survival."*

17                                        *~ President Ronald Reagan[1]*

18

19      For $12,000 and a friend, Defendant Jinchao Wei betrayed his country.  For nearly

20 two years, he sold thousands of pages of sensitive and export-controlled technical and

21 national defense information about U.S. Navy warships to the Chinese Government.

22 Defendant sold these secrets willingly, repeatedly, and for cold, hard cash.  From the very

23 first moments of meeting his spy handler, Defendant knew that what he was doing was, in

24 his own words, "quite obviously fucking espionage."  After hearing and seeing the

25 evidence at trial, a jury convicted Defendant of espionage and Arms Export Control Act

26

27 ---
[1] Presidential Radio Address to the Nation on Efforts to Prevent Espionage Against the United States
28 (November 30, 1985), *available at* https://www.reaganlibrary.gov/archives/speech/radio-address-nation-
   efforts-prevent-espionage-against-united-states.

                                        1

1   violations.  Accordingly, for the reasons outlined below, Defendant should be sentenced to

2   262 months in prison.

### I.

### APPLICABLE SENTENCING GUIDELINES

5       The Government agrees with the Sentencing Guidelines calculations in the

6   Presentence Investigation Report ("PSR").  A jury convicted Defendant of six counts: (1)

7   conspiracy to commit espionage, in violation of 18 U.S.C. § 794(c), espionage, in violation

8   of 18 U.S.C. § 794(a), conspiracy to violate the Arms Export Control Act, in violation of

9   22 U.S.C. § 2778, and three substantive violations of the Arms Export Control Act, in

10  violation of 18 U.S.C. § 2778.  Those counts can be broken into two groups under U.S.S.G.

11  §§ 3D1.2(a), (b), or (c) – one for the espionage counts and one for the export counts.  PSR

12  ¶¶ 114-120.[2]  Under Guideline 3D1.3(a), the base offense level for the espionage group

13  (Counts 1 and 2) is 37 and the base offense level for the export violation group (Counts 3,

14  4, 5, and 6) is 26.  *Id.* ¶ 120.

15      The PSR also recommends a two-point abuse of position of trust enhancement under

16  Guideline 3B1.3.  While the PSR discusses this enhancement only in the context of the

17  espionage group of counts, the enhancement should apply to both count groups.  Defendant

18  was an active-duty sailor in the U.S. Navy with a SECRET security clearance.  He was

19  given a great deal of trust in that role, including access to the thousands of pages of U.S.

20  Navy technical and operational manuals that he sold to the Chinese Government.  Many of

21  those manuals also contained technical information controlled under the Arms Export

22  Control Act and the International Traffic in Arms Regulations, including the manuals that

23  form the basis of Counts 4 (Boiler Water/Feedwater Manual), 5 (Propulsion Operating

24  Guide), and 6 (Weapons Control System Manual).  Defendant's access to those manuals

25  was based on his role as a Machinist's Mate in the U.S. Navy on the U.S.S. Essex.  Without

26

---

[2] Alternatively, all six counts could be grouped together into a single group under Guidelines 3D1.2(a)
27  and (b) because they involve the same criminal scheme with Defendant and the Chinese intelligence
officer and involve the same victim, the United States Government.  Regardless of how the grouping
28  occurs, the combined offense level is 39.

1    physical access to the manuals stored on the Essex, Defendant would not have been able

2    to steal and sell them to the Chinese intelligence officer.

3        As a clearance holder and sailor, Defendant abused his position of public trust in a

4    manner that significantly facilitated the commission of his crimes.  He had access to the

5    information that he passed to his Chinese handler because of his role in the U.S. Navy and

6    security clearance.  *See also* Gov. Response to Def. Objections to PSR (ECF No. 166) at

7    5-8; Addendum to PSR (ECF No. 163) at 3.  Therefore, Guideline 3B1.3 applies and the

8    offense level for both count groups should be increased by two more levels to 28 and 39,

9    respectively.  *See* PSR ¶ 111; *see also United States v. Kingsbury*, 107 F.4th 879, 881-82

10   (8th Cir. 2024) (upholding application of § 3B1.3 to clearance holder convicted of violating

11   18 U.S.C. § 793); *United States v. Ford*, 288 F. App'x 54, 60-61 (4th Cir. 2008) (per

12   curiam) (same); *United States v. Pitts*, 176 F.3d 239, 245-48 (4th Cir. 1999) (affirming

13   *three*-level upward adjustment under 3B1.3 where FBI agent was convicted of espionage).

14   Under Guideline 3D1.4, the combined adjusted offense level is 39 (262 to 327 months).

15   PSR ¶ 123.

16       The PSR also recommends a two-point downward adjustment under Guideline

17   4C1.1 because Defendant is a zero-point offender.  PSR ¶ 124.  The Government does not

18   object to the application of 4C1.1, but notes that applying the adjustment to an espionage

19   conviction that carries a maximum penalty of life in prison or death seems incongruous

20   with the other types of aggravating factors that the Sentencing Commission expressly

21   excluded from 4C1.1.  *See* § 4C1.1(a)(2) – (9) (excluding application of 4C1.1 when

22   conviction involves terrorism, use or threat of violence, death or serious bodily injury, sex

23   offense, substantial financial hardship, use of firearm or dangerous weapon in connection

24   with the offense, civil rights violation, or hate crime).  Espionage is a similarly serious

25   offense that can cause significant damage to U.S. national security, including loss of life;

26   however, tracing how a particular piece of secret information passed to a foreign

27   government was used is often difficult based on the international and clandestine nature of

28

espionage.  Nonetheless, the Government does not object to applying 4C1.1, so the total adjusted offense level is 37 (210 to 262 months).

Lastly, the Government does not object to the PSR's recommendation that a $50,000 fine be imposed against Defendant.  PSR ¶¶ 212-216.  At a minimum, the Court should impose a money judgment against Defendant ordering him to forfeit the $12,816.59 that he received from the Chinese intelligence officer.  PSR ¶11.  Under 18 U.S.C. §§ 794(d)(1) and (2), the court "shall order that the defendant forfeit to the United States all property described" earlier in the statute, including "any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as a result of" a § 794 violation. Therefore, at a minimum, the Court *must* impose a $12,816.59 money judgment against Defendant.

## II.

## ARGUMENT

When considering the factors enumerated in 18 U.S.C. § 3553(a), Defendant should receive a high-end sentence of 262 months.

### A.    Nature and Circumstances of the Offense

Defendant is, in his own words, "no idiot."  Gov. Ex. 123.  When he was initially approached online by the Chinese intelligence officer in February 2022, Defendant almost immediately recognized that what he was being asked to do was "quite obviously fucking espionage." *Id.*  But instead of heeding his friend's advice to cease contact with the Chinese intelligence officer, Defendant chose a different path.  He decided to continue his relationship with the Chinese intelligence officer and to switch to a different encrypted messaging application per the Chinese intelligence officer's instructions.  Then, for the next several months, Defendant responded to his handler's taskings by taking photographs of U.S. military equipment, sharing information about U.S. military exercises, and, in June 2022, sending his first tranche of restricted export-controlled U.S. military documents to his handler.  For this act of betrayal, Defendant was paid $5,000.

After this first payment, Defendant's espionage activities expanded.  He began exfiltrating sensitive documents relating to the national defense from restricted U.S. Navy computer systems and then sent those documents to the Chinese intelligence officer using a digital "drop site" that the intelligence officer gave to Defendant.  This "drop site" was an encrypted website that disappeared after a set amount of time and required a passcode to transfer documents.  At first, Defendant provided only the information that his handler requested.  After a few months, however, Defendant began offering his handler restricted documents and information that Defendant thought would be "useful" to the Chinese Government.  *See* Ex. 120. (Aug. 14, 2022 message from Defendant to handler stating, "I have something useful.").  In other words, within a few months of beginning his conspiracy with the Chinese intelligence officer, Defendant was proactively searching for U.S. military information that he believed his handler would want.

The sensitive and restricted nature of the documents that Defendant sold to his handler was not a surprise.  Most of the documents that Defendant stole had a warning on the cover page that alerted Defendant to the sensitive and export-controlled nature of the technical information contained in each document:

> DISTRIBUTION STATEMENT C: DISTRIBUTION AUTHORIZED TO U.S. GOVERNMENT AGENCIES ONLY; THIS PUBLICATION IS REQUIRED FOR OFFICIAL USE OR FOR ADMINISTRATIVE OR OPERATIONAL PURPOSES: 30 SEPTEMBER 2007. OTHER REQUESTS FOR THIS DOCUMENT MUST BE REFERRED TO THE NAVAL SEA SYSTEMS COMMAND (SEA-09T).
>
> WARNING: THIS DOCUMENT CONTAINS TECHNICAL DATA WHOSE EXPORT IS RESTRICTED BY THE ARMS EXPORT CONTROL ACT (TITLE 22, U.S.C., SEC. 2751 ET SEQ.) OR EXECUTIVE ORDER 12470. VIOLATIONS OF THESE EXPORT LAWS ARE SUBJECT TO SEVERE CRIMINAL PENALTIES.
>
> DESTRUCTION NOTICE: DESTROY BY ANY METHOD THAT WILL PREVENT DISCLOSURE OF CONTENTS OR RECONSTRUCTION OF THIS DOCUMENT.

Gov. Ex. 201.  Defendant had also received training from the U.S. Navy on how foreign governments, like China, could use the type of restricted technical information contained in the U.S. Navy manuals.  Just a few weeks before the Chinese intelligence officer initially contacted Defendant, Defendant had received U.S. Navy training on insider threat awareness and reporting.  Gov. Ex. 4.  The training explained, among other things, how the "[l]oss of critical information and technology dramatically decreases the United States' ability to maintain battlefield superiority, strategic and tactical advantages, and our forces'

ability to protect themselves." *Id.* at WEI-DISC16-00436.  It also warned Defendant that foreign intelligence services could target Defendant online for recruitment.  *Id.* at WEI-DISC16-00445-449.  It even provided Defendant with a case study of a former U.S. Navy civilian engineer, Mostafa Awwad, who was convicted of espionage after attempting to steal and pass sensitive unclassified schematics about another U.S. Navy warship to an FBI agent he believed worked for a foreign government.  The training warned Defendant that "[i]f disclosed, the schematics would have exposed potential life-threatening vulnerabilities and cost billions in research." *Id.* at WEI-DISC16-00456.

Unlike in *Awwad*, however, the harm here is not hypothetical.  Defendant compromised U.S. Navy documents and schematics relating to the national defense by passing them to a foreign government.  Defendant passed thousands of pages of technical and operating manuals to a Chinese intelligence officer and many of the Government's witnesses at trial, including U.S. Navy Captain Taylor and Commander (Retired) Caldwell, explained how sharing those documents with the Chinese Government would be potentially damaging to the United States and useful to China, especially the People's Liberation Army Navy ("PLAN").  Captain Taylor and Commander Caldwell testified that the documents that Defendant compromised represented the U.S. Navy's "know how" of how to operate and maintain amphibious assault ships like the Essex.  Commander Caldwell explained in detail how the U.S. Navy spent billions of dollars and years of man-hours to develop that "know how" and that, unlike the PLAN, the U.S. Navy has been operating amphibious assault ships for decades.  Commander Caldwell went on to explain that with such information, the PLAN could "leapfrog" the development of its own amphibious assault capabilities that could have dramatic consequences for the PLAN's ability to project and use military power.  He also testified that with some of the information that Defendant provided, the PLAN could more effectively target U.S. Navy amphibious assault ships for potential military attack.  U.S. State Department director Catherine Hamilton also testified about why the State Department regulates the export of technical information related to surface warfare ships like the Essex, and that Defendant would not have received a license

6

1  to export the technical information to China had he applied for one because the U.S. has

2  effectively had an arms embargo on China since the Tiananmen Square Massacre in 1989.

3       At bottom, Defendant's crimes were deliberate, continuous, and deeply damaging.

4       **B.    The Need for Adequate Deterrence and Protecting the Public**

5       "China presents the most comprehensive and robust military threat to U.S. national

6  security." Annual Threat Assessment of the U.S. Intelligence Community (Mar. 2025) at

7  10. "China seeks to displace the United States in the Indo-Pacific region, expand the

8  reaches of its state-driven economic model, and reorder the region in its favor." National

9  Security Strategy (Dec. 2017). In addition to the first-order effects that Defendant's crimes

10 have had on his fellow sailors and others serving on amphibious assault ships, there are

11 second- and third-order effects that impact the U.S. military and national security.

12 Defendant's crimes damaged the national security of the United States by providing China

13 with sensitive and restricted documents relating to U.S. Navy ships that China can now use

14 in its own military planning and operations. The cascading effect of Defendant's crimes

15 warrants a significant sentence to deter other U.S. service members and clearance holders

16 who may be tempted to jeopardize U.S. military secrets and information for quick money.

17      Protecting America's military secrets is also critical to protecting the American

18 public. The type of operational and technical know-how about U.S. Navy ships that

19 Defendant sent to the Chinese intelligence officer is the exact type of information that the

20 PLAN could use to close the U.S. military's advantage in any future conflict by learning

21 how to operate its own amphibious assault ships more effectively and identify weaknesses

22 or gaps in the U.S. Navy's operations and equipment. This hurts the U.S. military's

23 readiness and ability to deter foreign aggression and maintain peace.

24      A significant sentence also is warranted because Defendant, who still has sensitive

25 and non-public U.S. military information in his head, needs to be deterred from sharing

26 that information in the future with unauthorized recipients, including foreign intelligence

27 services or anyone else who might entice him with money, attention, or anything else of

28 value.

### C.    Defendant's History and Characteristics

According to the PSR and the Psychological Evaluation submitted by the Family Violence and Sexual Assault Institute, Defendant experienced some adversity during his childhood that may have led to his current psychological state.  There is no indication, however, that any of those experiences led Defendant to choose to commit espionage.  To the contrary, Defendant's own electronic messages and phone calls show that he knew that what he was doing was wrong and that he took elaborate steps to conceal his conduct from the Government.  The U.S. Navy was an opportunity for Defendant to work hard and establish an independent life for himself in his new country.  It offered him training, education, a steady salary, and a fast-track to U.S. citizenship.  Despite these privileges, Defendant quickly grew to despise the U.S. Navy and thought that he was better than his fellow sailors.  During a February 2023 phone call with his mother, Defendant bragged that while "[o]ther Chinese serving in the US Navy are still trying to figure out how to make extra money, and driving cabs," Defendant was "just leaking secrets." Ex. 131.  Instead of discouraging Defendant, his mother responded, "That's called making money with talent. No need to drive a cab anymore.  Your money came easy.  Knowledge is power." *Id.* Whatever Defendant's background, it is not an excuse for what he did.

The Government does not disagree, however, with the Psychological Evaluation Report's recommendation that Defendant could benefit from therapy and a peer support program.

### D.    Seriousness of the Offense, Just Punishment, and Respect for the Law

"Espionage is one of this nation's most serious offenses." *United States v. Whitworth*, 856 F.2d 1268, 1289 (9th Cir. 1988).  It is a betrayal of America and its people, and it often puts real lives at risk.  It also can cost the Government huge amounts of money when it must adjust its military planning, operations, and tactics to account for compromises in informational security.  Here, Defendant compromised the U.S. Navy's entire fleet of amphibious assault ships by sending the Chinese Government thousands of pages of technical information about the fleet's complex ship systems and how the U.S.

Navy operates and maintains those systems.  The maximum penalty for espionage is life in prison or, in certain enumerated circumstances, capital punishment.  By permitting the most severe criminal punishments possible, Congress made clear that espionage is among the most serious crimes in the U.S. Code.

### E.    Avoid Unwarranted Sentencing Disparities

A sentence of 262 months would be consistent with sentences that have been imposed in similar cases.  According to the U.S. Sentencing Commission's Interactive Data Analyzer, between 2015 and 2024, 11 cases were sentenced using Guideline § 2M3.1.[3] The average sentence from those cases was 193 months.  The median sentence was 228 months.

Two specific aspects of Defendant's case, however, warrant a higher sentence than the average 794 sentence reflected in the Sentencing Commission data.  First, unlike many other 794 defendants, Defendant passed national defense information to a foreign intelligence service.  In many of the recent 794 cases, the defendants attempted to commit espionage, but, in fact, passed secrets to undercover FBI agents they believed were foreign government agents.  *See, e.g.*, *United States v. Dalke*, Case No. 1:22-cr-00313 (D. Colo.) (sentenced to 262 months after guilty plea); *United States v. Rowe*, Case No. 2:21-cr-00474 (E.D. Pa.) (sentenced to 126 months after guilty plea); *United States v. Hansen*, Case No. 1:18-cr-00057 (D. Utah) (sentenced to 120 months after guilty plea); *United States v. Awwad*, Case No. 2:14-cr-00163 (E.D. Va.) (sentenced to 120 months after guilty plea); *United States v. Nozette*, Case No. 1:09-cr-00276 (D.D.C.) (sentenced to 156 months after guilty plea); *but see United States v. Hoffman*, Case No. 14-4136 (E.D. Va.) (sentenced to 360 months after trial for attempted espionage), *affirmed on appeal*, 612 F. App'x 162 (4th Cir. 2015).  Hence, the harm that these defendants caused was hypothetical and, unlike Defendant, they were convicted for *attempting* to commit espionage.  Notably, except for Hoffman who was sentenced to 30 years, all the defendants cited above also pleaded guilty via plea agreements, which means that they further received lower sentences because they

---

[3] *See* ida.ussc.gov.

accepted responsibility.

Second, defendants who committed espionage by collecting or sharing national defense information (or conspiring to do the same) with a genuine foreign government have faced significantly higher sentences. For example, in *United States v. Mallory*, a jury convicted the defendant, who was a former U.S. intelligence officer, of conspiring to transmit national defense information to the Chinese Government. Case No. 1:17-cr-00154 (E.D. Va.), *affirmed on appeal*, 40 F.4th 166 (4th Cir. 2022). The judge sentenced Mallory to 240 months in prison. *Id.* Similarly, in *United States v. Lee*, the defendant, another former U.S. intelligence officer, pleaded guilty to conspiring to transmit national defense information to the Chinese Government and was sentenced to 228 months in prison. Case No. 1:18-cr-00089 (E.D. Va.); *see also United States v. Thompson*, Case No. 1:20-cr-00067 (D.D.C.) (defendant, aged 62, sentenced to 276 months for 794 conviction via guilty plea); *but see United States v. Ma*, Case No. 1:20-cr-00083 (D. Haw.) (defendant, aged 71, sentenced to 120 months for 794 conviction via guilty plea).[4] Here, Defendant believed he was, and was in fact, working with someone affiliated with the Chinese intelligence services. Despite this knowledge, Defendant sold the Chinese intelligence officer thousands of pages of U.S. Navy national defense information until he was arrested in August 2023. A sentence of 262 months is warranted and would be consistent with similar cases of espionage.

## III.

## CONCLUSION

This recommendation is at the high end of the guidelines range. This is sufficient, but not greater than necessary to comply with the sentencing guidelines and to promote just punishment. This sentence needs to deter both Defendant and other sailors who contemplate committing espionage. This sentence needs to promote respect for the law. This was a serious offense warranting a serious punishment. Finally, although the zero point offender

---

[4] It is worth noting that nearly all the 794 sentences described in this section were imposed before November 2023 when the zero-point offender reduction went into effect.

1  guideline technically applies in this case, it is also true that espionage is of the same caliber

2  of offenses which are excluded from this guideline. A sentence at the high end of the

3  guidelines would be a recognition that this windfall is not appropriate in this case.

4      The record shows that Defendant was in this for the long haul. He was committed to

5  spying for the duration of a planned lengthy career in the Navy. He was interested in

6  promoting quickly (which his handler was encouraging) which would give him more access

7  to more sensitive information. The only reason he stopped was because he got caught.

8  Accordingly, for the reasons stated above, the United States recommends that the Court

9  impose a sentence of 262 months in prison.

10

11  Dated:  January 5, 2026                              Respectfully submitted,

12

13                                                       ADAM GORDON
                                                         United States Attorney

14

15                                                       /s/ *John N. Parmley*
                                                         JOHN N. PARMLEY

16                                                       Assistant United States Attorney

17

18

19

20

21

22

23

24

25

26

27

28