UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | Case No. 23CR1471-H |
|---|---|---|
| Plaintiff, | ) | San Diego, California |
| vs. | ) | Monday, |
| | ) | January 12, 2026 |
| JINCHAO WEI, | ) | 1:30 p.m. |
| Defendant. | ) | |

TRANSCRIPT OF SENTENCE W/PSR
BEFORE THE HONORABLE MARILYN L. HUFF
UNITED STATES DISTRICT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | JOHN N. PARMLEY, ESQ. |
| | ADAM P. BARRY, ESQ. |
| | United States Attorney's Office |
| | 880 Front Street, Suite 6293 |
| | San Diego, California 92101 |
| | (619) 546-6750 |
| For the Defendant: | SEAN M. JONES, ESQ. |
| | Jones Trial Attorneys |
| | 401 B Street, Suite 2010 |
| | San Diego, California 92101 |
| | (619) 732-6332 |
| | MICHAEL J. BERTOLA II, ESQ. |
| | Rudolph Baker & Associates |
| | 419 19th Street |
| | San Diego, California 92102 |
| | (909) 499-3465 |
| Transcript Ordered by: | THE HONORABLE JILL BURKHARDT |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

ii

Court Recorder:                    L. Lawrence
                                   United States District Court
                                   333 Broadway, 15th Floor
                                   San Diego, California 92101

Transcriber:                       Jordan Keilty
                                   Echo Reporting, Inc.
                                   9711 Cactus Street, Suite B
                                   Lakeside, California 92040
                                   (858) 453-7590

1

SAN DIEGO, CALIFORNIA MONDAY, JANUARY 12, 2026 1:30 P.M.

--oOo--

THE CLERK:  Calling Case CR 1471, United States of America versus Jinchao Wei, for sentencing.

MR. PARMLEY:  John Parmley for the United States, your Honor.  Good afternoon.

THE COURT:  Good afternoon.

MR. JONES:  Afternoon, your Honor.  Sean Jones on behalf of Mr. Wei.

MR. BERTOLA:  Good afternoon, your Honor.  Michael Bertola on behalf of Mr. Wei.

THE COURT:  Thank you.  We're getting him set up.

(Pause.)

THE COURT:  We're here for the sentencing of Jinchao Wei.  Have you reviewed the Pre-Sentence Report and sentencing information with your client?

MR. JONES:  Yes, your Honor.

THE COURT:  Is he prepared to be sentenced today?

MR. JONES:  Yes.

THE COURT:  Did you review the standard and special conditions of supervised release with him?

MR. JONES:  Yes.

THE COURT:  Does he have any objection?

MR. JONES:  No, your Honor.

THE COURT:  Thank you.

2

So, there are two legal issues.  The Court had set -- after receiving the Defense sentencing information, the Court sent some additional orders to the parties, and the Government has responded.  One is concerning the application of the Guideline.  Under the law, the Court is required to accurately calculate, first, the Sentencing Guidelines and then is free under 3553(a) to factor in all relevant information, mitigating and aggravating.

And, so, one of the issues is whether the Defendant is prepared to accept responsibility.  In response to the Government -- to the Defense submission, the Court asked the Government to provide each element of the offense and the factual basis for the offense.  The Defendant's letter does not accept responsibility as to each element of the offense, and the Government opposes the adjustment for acceptance of responsibility, and the application notes in the Guideline, the commentary, states it's a rare case, although in Ninth Circuit case law, it is possible for a defendant to accept responsibility prior to sentencing.

And, so, I'll ask you in your presentation to address that.  You don't have to do that right now.

The second was concerning abuse of a position of trust.  Both U.S. Probation and the Government asked for a two-level increase under 3B1.3 for abuse of position of trust. The Court cited a case to the parties, non-9th Circuit case,

3

and the Government has responded with respect to that.

It appears that for abuse of a position of trust, there has to be some discretionary function of the Defendant, although the Government then distinguishes not only the case the Court cited but another case that's cited in the commentary to the guidelines.  So, in your overall sentencing, you can address those points as well.

You may proceed.

MR. JONES:  Yes, your Honor.  Does the Court have a preference of order of addressing the issues?  Mr. Bertola is prepared to respond to the acceptance of responsibility and abuse of position of trust matters, and I was going to be addressing the 3553(f) as a general --

THE COURT:  All right.  Since we go chronologically, since we first do the calculation of the Guidelines and then the 3553(a) factors, it makes sense that we can address those.

MR. JONES:  Sure.

THE COURT:  Unless you have a different way of proceeding.

MR. JONES:  That's fine.  The Court's pleasure.

THE COURT:  Thank you.  You may address that.

MR. BERTOLA:  Yes, your Honor.

In regards to the acceptance of responsibility, I believe we are withdrawing our recommendation for that to

4

apply.  We could not come to a factual basis that I believe would be amenable to the Court, and I apologize.  The letter submitted on Mr. Wei's behalf was not meant to establish that factual basis.  That is just Mr. Wei's statements to the Court that he wanted the Court to -- to know.

THE COURT:  So, you're withdrawing your request for the two levels for acceptance of responsibility?

MR. BERTOLA:  Yes, your Honor, because we were not prepared to put forth a factual basis that -- that's amenable to the Court's request.

THE COURT:  All right.  So, it could be -- it's not -- it would have to go with each element of the offense.  It doesn't have to be everything the Government wants, but it does have to address each element, and one of the elements is willfulness, and the Defendant's letter at least says he was foolish and --

MR. BERTOLA:  Yes.

THE COURT:  -- regrets it, but does not say that he willfully did this.

MR. BERTOLA:  Yes, your Honor, and that is -- we are standing by that.  So, that's why the -- the request is withdrawn.

THE COURT:  All right.  So, the request being withdrawn, does that then moot out that issue?

MR. PARMLEY:  It does, your Honor.

5

THE COURT:  Thank you.

All right.  Then you can address abuse of a position of trust.

MR. BERTOLA:  Yes, your Honor.  We maintain our objection to the two-level enhancement for abuse of position of trust.  We believe that the case we cited in our PSR objections, U.S. v. Contreras, holds against applying it in Mr. Wei's case.

I read the Government's objection to that case applying here, and their main argument was that she was a prison cook, which is vastly different from the position Mr. Wei held in the military as a machinist's mate.  But we hold that it -- his position in the military is very comparable to the Defendant's in Contreras.  The Court pointed out in there she did hold a position of trust because her position at the prison gave her the freedom to commit a difficult type of wrong, which the same can be said for Mr. Wei's position.  In the military as a machinist's mate, his access to the information did give him the ability to send that information.  Just like the Defendant in Contreras has unmonitored contact with the inmates and was not thoroughly searched upon entering the prison, thus, her job helped her conceal the crime, but the enhancement still did not apply to her because she was not a supervisor, professional or manager, which the -- which is the kind of -- the basis for the enhancement to apply.  She

6

had no significant position of authority at the prison and exercised no professional or managerial discretion.  Her position was closer to that of an ordinary bank teller or hotel clerk.

Mr. Wei lacked that professional or managerial discretion in a similar manner to the Defendant in Contreras.

THE COURT:  Does it matter that he had a security clearance from the Government as a machinist's mate, and is that equivalent to a fiduciary duty like a position that would be akin to discretionary or manager or supervisor --

MR. BERTOLA:  Well, your Honor --

THE COURT:  -- supervisory position?

MR. BERTOLA:  I would argue in the context of the military as a whole and that security clearance being a pretty standard clearance that most military members have and in the context of a bank, the teller is the lowest position where they're basically just following orders of their superiors, Mr. Wei similarly was in the lowest position of his ship and didn't --

THE COURT:  Except that he went around his lowest position and passed on military secrets.

MR. BERTOLA:  Yes, your Honor, but I don't think that that was connected to his manage -- to any managerial authority that he had.  I -- I do believe he lacked that managerial authority.  And the case that they cited, U.S. v.

7

_Pitts_, which, again, is not controlling.  It's a Fourth Circuit case, unlike _Contreras_, which is in the Ninth Circuit, they said the Defendant in that was a junior FBI agent.  So, the question was actually to apply not -- he -- and the Defendant in _Pitts_, he conceded that the enhancement applied to him.  The issue is whether there should be an upward variance on that enhancement as well.  And the Government cites that he was a junior FBI agent and that's why -- that was his argument of why the upward vary (sic) shouldn't apply.

But the Court clearly said he was a supervisory -- a supervisory agent of the FBI, and he worked in foreign counterintelligence.  So, that position is vastly different than Mr. Wei's position in the Navy.  This was an FBI agent who had significant managerial authority and freedom to basically take information and do what he wanted with it, and he worked in foreign -- foreign counterintelligence, which positioned him -- which gave him the best position possible to commit espionage and cover up his tracks and actually know how to commit espionage in a secretive and productive way.

The District Court found in _U.S. v. Pitts_ that the Defendant -- that the level of trust placed into the Defendant was nearly unmatched.  Again, this is vastly different from Mr. Wei's position, which was basically the lowest level on the ship, and, yes, Secret information was entrusted to him, but in a vastly different way than the Defendant in _Pitts_.  He

8

was not a working counterintelligence or -- the main goal of his job was not dealing with the -- the secretive information that he is accused of passing along.

And with that, your Honor, I would submit.

THE COURT:  Thank you.  Do you also contend or do you not contend that the base offense level for the espionage case already assumes some level of trust?

MR. BERTOLA:  Yes, your Honor.  And, again, like in Contreras, he did assume a position of trust.  It's just for the enhancement to apply, there has to be that discretion, which he did not have.  We concede that there was a level of trust there.  He had a -- a Secret Security Clearance, but he did not have the discretion for the enhancement to apply.

THE COURT:  It's also -- it's two prong.  It's abuse of a position of trust or use of a special skill.  Does use of a special skill apply here?

MR. BERTOLA:  No, your Honor.  I, again, say it doesn't.  Him receiving the -- the training on how to safely handle information, I believe at trial it was -- it was shown that that training was not good enough to really say somebody had a specialized skill after receiving that training.  There was no safeguards to even make sure the participants were really learning the information or consuming of it.  They could just click -- they could just click all the way through it without anything being done to assess their knowledge of

9

it.

And, again, he didn't have a specialized skill in comparison to anybody else working on that ship.  He -- he had the lowest level of skill on the ship.

THE COURT:  If you asked a member of the public, Do you think that a defendant in the military who passes on military secrets is abusing a level of trust, I would think that members of the public would say unequivocally, yes, he's abusing a level of trust.  But under the Guidelines, it's technical under 3B1.3.

"If the defendant abused a position of public or private trust or used a special skill in a manner that significantly facilitated the commission or concealment of the offense, increase by two levels.  This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristics.  If this adjustment is based upon an abuse of position of trust, it may be employed in addition to an adjustment under aggravating role."

Nobody's asking for aggravating role here.

Anything further on the application of 3B1.3?

MR. BERTOLA:  Yes, your Honor.  To -- to the Court's point of asking an average person if they would believe that abuse of position of trust, yes, I do believe an average person would say that.  But I also believe an average person would say a prison cook that used their position to sneak drugs into a prison facility also abused their position of trust and would apply the enhancement on that too.  The important thing in this enhancement and which the comment note is trying to do is separate it from this enhancement being applied to any employee of -- of an industry where there are specialized skills involved and they do have some duty of handling people's money and important documents and to not let this enhancement apply to every employee in the chain and reserve it for people who are more in a managerial role that really have more power to decide what they do with information and use that to commit their crimes.

And with that, your Honor, I'll submit.

THE COURT:  "Special skill" -- and I'm quoting from the Guidelines:

-- "refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing."

He did have substantial training.

"Examples, however, would include

11

pilots, lawyers, doctors, accountants, chemists and demolition experts."

And, certainly, they could put in -- they knew how to write it.  They could put in "and members of the military" but did not include that as an example.

MR. BERTOLA:  Yes, your Honor.

THE COURT:  So, it's a very close call.

Let me hear from the Government on the abuse of position of trust.

MR. PARMLEY:  Thank you, your Honor.  Appreciate it.

Respectfully, I don't think it's a close call at all.  I think it's two things, whether or not it was, you know, this position of trust and whether or not there's a special skill.  I've heard from counsel that this was he's the lowest of the low who couldn't get in the one ship, he had no authority at all.  That's not accurate.  He was trained as a -- to go to become an engineer.  He spent months training to become an engineer, to work on the power plant, the most important part of the ship, the heartbeat of the ship where, as we learn that you could drop a wrench into the reduction gear where he had access to, it disables the whole ship, the propulsion, the power, the power to the information systems, the power to the flight deck, the power to the weapons systems.  He was in the heartbeat of the ship.  He had

12

training.  The -- the only reason he was in that was because of the training he had had.

As far as the position that he is in, he is a member of the United States military who had sworn an oath to uphold and defend the Constitution of the United States, who had sworn to die if necessary -- it's in the paperwork -- for the United States of America.  That's part of his role.

The only reason he is on that ship in that very limited ability to access the engineering space was because he had the position as a machinist's mate.  So, he couldn't -- if you're just a member of the ship, you can't get back there unless you are part of the engineering crew.  Others didn't have access to it.  It's because he had access to that, he had the access to get the documents he needed and exfiltrate them off the ship.  If he was just, you know, swabbing the deck or whatever the most menial task you can think of, he would never have had access to that.

As the Court learned, not only do you have to get on the ship, you have to get into the secure space, and the secure space is the (indiscernible), once you get in the secure space, you still need a card that's attributed to you to get onto the system.  So, he had access that only he could have because he was trusted, and he abused that trust.

The FBI agent, the issue on that case was not whether or not he should get the -- the abuse of position or

13

trust.  That was given.  It's whether or not he should get minus three or not because it was beyond what you would normally see, an -- an FBI agent working counterintelligence, and the Court agreed it -- it was beyond so they should give minus three.  We're not asking for that.  It's minus two.

So, did he abuse the trust that was given him?  He did.  Did he have a special skill?  Yes.  Did he have discretion?  Absolutely.  He was a mid-level enlisted officer. He was the equivalent --

THE COURT:  E-6.

MR. PARMLEY:  -- E-6, E-5 by the time he -- he left.  He was the equivalent of a sergeant in the Army.  Of course he had to follow orders all the way down, but he also had people reporting to him.

So -- and I'd even say he was a rising star.  He had risen to the point where he could now supervise other people and tell them what to do and tell them, Hey, clear out of the room so I can view this.  So, to say that he didn't abuse his position of trust, this is not -- you know, and, to be clear, the Ninth Circuit did say -- well, let me back up.

Security clearance in those Ninth Circuit cases has meant security clearance to go to secure areas of the airport, meaning the general public can't go there.  You have to use a badge to get back there.  That's vastly different than going onto a billion-dollar warship and getting past armed guards to

14

get into the Secret spaces of the ship to get access to that information.  That's totally different.  And the Secret Clearance here is the confidence that we gave him, that we said, We're going to share this information because we trust you.  That's the only way the Navy can work is they give you information, they give you discretion.  They can't lock everything up because you have to use it.  It's on a warship.

So, those cases were a -- and there's the Ninth Circuit case we cited.  I don't recall the name at the time, but that is one where the Court did give the plus two for abuse of position of trust, and it was affirmed.

So, here, I -- I don't -- respectfully, I don't think it's a close call at all.  I think that is an appropriate addition to the Guideline calculations, and then it, of course, comes down to the 3553(a) factors.

THE COURT:  Thank you.

So, on the issue of the Guideline, the Court does believe that a plus two for abuse of position of trust is warranted under the Guidelines.  You're free to then argue under 3553(a) all other factors mitigating that you think apply in this case.

You may proceed.

MR. JONES:  This -- this is a tragic case.  It's a very sad case.  In the span of time awaiting up to trial and getting to know Mr. Wei and going through all the discovery,

15

it's -- it's frustrating, and it's -- it's sad.  This is a young man that loves America.  This is his country.  Throughout the course of trial, in the millions of pages of documents, text messages, wiretaps, all of that, there's not one iota of evidence showing that he has loyalties to communism or to China or that he has a hatred of America.

THE COURT:  He didn't like the Navy.

MR. JONES:  There were times his job frustrated him and he felt that he -- his talents, his abilities were not fully utilized or respected.  He did say, Sometimes I -- sometimes I hate this job or I hate the Navy.  But as far as America, the country that he moved to with his mom, with nothing, the country that they put their hopes and dreams on and that he still does, that's America.  And there's -- there's nothing showing that he was wanting to empower China or to empower communism or that he had any sympathies whatsoever for -- for communism versus capitalism.  There's -- there's none of that.

What we have is a young man desperate for acceptance, for recognition, to feel important, to feel valued.  And, sadly, that made him a -- a perfect target for -- for Andy, whoever -- whoever Andy was.  And I believe that it's -- it's evident and that everything that came out at trial made it evident that there was no malice behind Jinchao's activity.  It just -- but, rather, foolishness,

16

naivete, stupidity --

THE COURT:  Greed.

MR. JONES:  -- greed, absolutely, yes.  And he acknowledges that and admits that and accepts that he put himself in this position, that he made bad decisions, stupid, selfish, misguided decisions, but ones that were not motivated by any kind of political ideologies.

This man has no criminal history.  And while the subject matter of this case is serious, the actions that he took and the -- the potential consequences that -- that were discussed I -- I think it speaks volumes that rather than making any effort to shut down his communications with Andy, to stop him from getting more records, to sending more records to Andy, rather than, you know, exhibiting any kind of an emergency, the Government, instead, decided to -- to surveil him for about a year, to wiretap, to look over all of his messages, follow him around.

This is not an emergency.  What he was doing was not dangerous to homeland security.

THE COURT:  I disagree on that under the evidence at trial.  He may say, Oh, it's sort of minor, but it's one piece of the puzzle that we had an expert testify from the War College, and he testified that for the United States and the Chinese government, they are both engaged in Naval operations. The Chinese government has surpassed the United States in

17

building the ships.  The ship that he was on is equivalent, although it's a steam-based ship, to a ship that the Chinese are developing the same genre and that for the Chinese government to have affirmation that our mechanical ITAR or protected information is accurate is useful information.

I don't know of any authority where he could send the sleeping berths of the officers to the Chinese representative or to someone who he thought he was doing espionage by his own admission.  So, while you say it's not serious, I think the trial record disagrees with that fact.

MR. JONES:  There's certainly -- I -- I don't contend that this isn't one piece of the puzzle.  However, it remains -- the fact remains that the Chinese equivalence of the LHD that we had discussed at -- at trial, the Chinese fleet was already completed.  It was more advanced.

THE COURT:  They're good at building, but what about the knowhow of how to repair systems, where your vulnerabilities are, all of that information?  The expert said that part they don't have.  They're just getting started on that brand of vessel.

MR. JONES:  I -- I don't dispute that that was the testimony that was taken.  However, what we're talking about here, these operations manuals that were leaked, 20, 30 years old and, as -- as the Government witnesses acknowledged, many of them you can find on public websites, on social media

18

websites like Facebook.

THE COURT:  I don't think they acknowledged that.

MR. JONES:  Not -- not all of them but many of them.

MR. PARMLEY:  I think we would say some of them. We've acknowledged some of them.

THE COURT:  Okay.

MR. JONES:  Some of them.  And, so, these are -- these are old materials.  They're not particularly secretive, and they pertain to a decommissioned ship which is still in -- in dry dock, has not seen any kind of active duty during Mr. Wei's time there.

THE COURT:  That's the ESSEX?

MR. JONES:  The ESSEX, correct.  And -- and utilizing a propulsion technology that's -- that's no longer in use.

So, I -- nobody on this side of the aisle here is arguing that this was meaningless, that it was harmless, that it was insignificant, that it -- it's excusable, not in any way.  But the -- the fact of the matter is had this been a -- a clear and present danger, a matter of homeland security that if Mr. Wei were to send more files to Andy, that it could cripple our Naval program or harm the United States, there was actions that could have been taken.  They knew what was going on.  They knew where Mr. Wei was.  They knew what he was

19

doing.  And instead of stopping him, they spent a year surveilling him and building a case against him.

THE COURT:  Partially in the scope of many types of investigation, not specifically looking at this, I think the FBI agent said they wanted to know what else was going on, is this a one off, is this just Mr. Wei, is it just these things or is there something else going on.

MR. JONES:  Sure.  And to really concede that point, what I'm trying to highlight is that there's a -- a choice between do we shut this down immediately because this is an emergency, what he's doing is going to kill Americans, or is it more important to -- to see what else is going on, see if we can gather some additional information, see if we can tighten our case on this.  And, obviously, the -- the decision was made for the latter, to -- to explore to see what else comes in through these communications and whether there's something else going on rather than to immediately shut it down because it's -- sorry -- jeopardizing American lives.

And, finally, I'd ask the Court not to penalize Mr. Wei for taking his case to trial.

THE COURT:  The Court won't do that.

MR. JONES:  All right.

THE COURT:  Any defendant has the right to take the case to trial, and the Court will not penalize him in any respect for taking the case to trial.

20

What often happens as a practical matter is the Court hears a lot more evidence about what's going on than just the summary in the plea -- a factual basis in a plea agreement and the information in the Pre-Sentence Report.  The Court heard all of the testimony at trial and can evaluate the attitude and credibility of each witness that testified.  But the Court will not punish him for taking the case to trial.

MR. JONES:  So, with that said, the general facts of this case are not disputed, and they weren't disputed at trial.  It's understood Mr. Wei was using his security clearance, going in the room, downloading the files, sending them to Andy.  I think the big -- the big question was whether he knew with any kind of certainty who Andy was.  Messages showed that he had a -- a belief at one point that he could be Chinese intelligence, a belief at another point that he was a professor or worked with the -- the Navy.

There was also substantial evidence showing that Mr. Wei believed Andy was anti-communist, just like him.  And -- and, so, there was -- there was absolutely a -- a question of whether Mr. Wei knew or how strongly he suspected Andy was tied to the Chinese government.  But as far as the actual actions taken, very little dispute about that.

And, so, while Mr. Wei has acknowledged that what he did was absolutely wrong and problematic and potentially harmful to the United States, what we have here is a 25-year-

21

old-man with a -- a ton of potential, hard working, intelligent, and made some extremely poor decisions, and he'll have to live with that for the rest of his life.  If you go on Reddit or Facebook or any of these forums with military members, there is other members in the military calling for him to be hanged, for him to be shot, calling him a traitor. And, understandably, he -- he brought that on himself, but this is a -- this is a case, this is a brand that's going to live with him for the rest of his life, a reminder of the consequences of foolish and selfish decisions.

So, I ask the Court to not just look at the mistakes he made or the potential consequences that were highlighted by the Government but to look at this -- this young man as a human being, at his heart, at the struggles he had trying to find acceptance and respect and trying to fit in and -- and see that, yes, he made terrible mistakes.

THE COURT:  Undoubtedly, he had a very tough upbringing.  His father left him, unfaithful to his wife.  His wife was given a job in Nigeria, as far away from China as you can imagine.  She's in China.  His father's not there.  He's in a Chinese boarding school at age nine or so, very young, and -- and his grandmother and uncle are bizarre, maybe with emotional or mental issues on their own.  So, he didn't have a lot of -- I think he qualifies for lack of youthful guidance.

And then he's brought to this country in high

22

school or junior high -- I think it's high school -- and he's a fish out of water, but he adopts his new country, but then he betrays his country.  There's really not a good explanation of why all of this happened.

MR. JONES:  I a hundred percent agree, and -- and throughout the course of the trial, there were more for me -- and I'm not trying to testify here, but there's -- there were more -- it felt really more questions than there were answers of why, why would you do this, why would you --

THE COURT:  For money.

MR. JONES:  This --

THE COURT:  He said in his own -- in his own statement other Chinese serving in the United States Navy are trying to figure out how to make extra money and driving cabs. Defendant says he's just leaking secrets.

MR. JONES:  Right.  Understood, financial motive. But why -- why take on such risk, such potential downside for a very small amount of money?

THE COURT:  Excitement, attention.

MR. JONES:  Right.  And --

THE COURT:  He -- he recognizes at the get go, he says, this is espionage.  He recognizes that, and yet then he takes all these steps to hide the -- the transactions, to hide the communications, to continue to speak with him.  He gets dribs and drabs of money but continues on and escalates his

23

behavior.  Now he sends written reports to them.  Then, as I said, I think the most scary part for me was when he sent the ship and where each person was berthed on the ship.  I don't think that's public information.  I don't think that's public information, and I don't think that anyone would think that that should not be shared with outside entities or individuals.

MR. JONES:  Agreed.  Agreed.  And, so, wondering why -- why put himself in that position and how that desire for -- for excitement or recognition or acceptance could -- could take this -- this intelligent young man into such a -- into this courtroom.  I -- and that's why we had the psych evaluation, psychological evaluation conducted, because it -- it struck me that there was just -- there was something else going on, trying to understand what's going on in this young man's mind that would make this make sense.

And I -- I think the results are -- are significant, showing that he was particularly susceptible to this influence and -- and willing and able to set aside any kind of bad judgment.

THE COURT:  But so many individuals in our military are young.  So many individuals have their own life stories. The military then trains individuals.  He got specific training on how to identify if somebody approaches you.  And it may seem innocuous at first, but someone approaches you,

24

you are supposed to report it.  And, by all accounts, he's very bright, and he was a rising star.  The -- his supervisor said he's almost too good to be true.  He gets awards for being so good.  He knew what was going on.  He should have reported it.

MR. JONES:  I -- I think if you asked him right now, he'd agree that he should have reported it, that he should have done a lot of things very differently. Ultimately, though, this is a man that loves his country, that has on criminal record, that has the ability to embark on a much brighter future and who will never -- I hope the Court can -- can -- would agree with me that the concern of him doing something like this, recidivating, is extremely low given what he's -- what he's been through, the amount of time already that he's spent in federal custody, the stigma associated with these charges and the conviction and the -- the toll that it's had not just on him but on his -- his mother, his only real support person for the last 15 plus years.

So, I -- I ask the Court --

THE COURT:  You're asking for 30 months?

MR. JONES:  Correct, your Honor.

THE COURT:  That's a very low sentence given the gravity of the offense.

MR. JONES:  I understand, and I respect that, your

25

Honor.  And, again, I'm -- I'm not discounting -- Defense is not discounting the actions taken and the possible potential consequences, rather, focusing on this man as a human.

THE COURT:  He did -- you submitted all the classes that he's taken --

MR. JONES:  Yes.

THE COURT:  -- in custody?  I'm -- I am impressed with the classes that he's taken.  So, hopefully, during his time in custody, he can continue to take classes and better himself so that when he gets out, he's a better person and is able to then assimilate to the United States.

MR. JONES:  Yes.  And I --

THE COURT:  I don't think his immigration consequences are over, notwithstanding the acquittal on the last count.  I'm not sure what will happen on that.

MR. JONES:  Right.  I'd ask the Court to consider not just the charges, the elements, but to consider this man, who he is, what he's capable of going forward, his potential and -- and his love for this country.

Thank you.

THE COURT:  Thank you.

MR. PARMLEY:  Thank you, your Honor.  I've been appearing before your Honor for -- for many many years.  I would say since the 1900s.  So, I want you to know I don't -- I don't use this word lightly, but the Defendant's a traitor.

26

He betrayed the United States of America.  He had a mildly difficult upbringing compared to some of the Defendants we see.  He had some difficulties.  There's no question about it, but a mildly difficult -- I would say difficult upbringing. He had some issues.  And then he comes to the United States. He's in high school.  He does well.  He joins the United States Navy who gives him the gift of citizenship.  He's got a place to live.  He's got a job.  He's advancing quickly, and he betrayed them.

I -- I walked through the ESSEX through the Engineering Department.  I had an opportunity to speak with his coworkers, and I can tell you the level of sadness and rage about one of their fellow Sailors had done this to them, somebody that they sat next to had done this to them. Francisco Ceja, who you heard from, he was embarrassed.  He's like, I can't believe I didn't see it.  I can't believe I promoted him.  I can't believe that I thought that he was something else than what he was.  And he feels guilty, like he somehow contributed to the spying.  And I assured him that it's not his fault.  But it was a betrayal to the men and women of the United States military, to the Navy, especially to the ESSEX specifically, and more specifically, to the people of the Engineering Department that he worked with.

This was not a false flag where we get word that somebody is interested in passing information, so the FBI

27

agent comes undercover and pretends to be Russian or pretends to be Chinese and takes information, and this was not an attempt, where we caught him before he could pass the information.  This was a complete act of espionage and a complete and total betrayal.  He's a traitor.  And -- and, you know, I know that word is harsh, and we didn't use it in front of the jury, but it is adequately capture -- adequately captures what he did.

I want to talk about three things, your Honor, the seriousness of the offense, the deterrence issue, and that warrants some disparities.

The seriousness of the offense, counsel talked about the consequences here were minimal.  He has no idea, and I have no idea.  I have no idea what the consequences of his actions were.  This information which was protected as best we could by trusting people to take -- to do their jobs as Sailors is gone.  It is now in the hands of the -- of the Chinese Navy and will be used for whatever purposes it's going to be used for.  We had an expert tell us as to what it could be used for, but we don't know.  It's gone.  And, so, that damage is done, and that was a serious offense.

And there's also this complaint that, well, you know, if it had been such a -- if it hadn't been such a big deal, then why didn't they shut it down faster?  Respectfully -- and I wouldn't expect counsel to know this -- but counsel

28

has no idea how difficult it is to prosecute a national security case, has no idea how difficult it is to get the ducks in a row, to get an ability to find out what was going on.  And, even then, we don't have a full picture.  There's lots of communication that we don't have, things that I can speak about on the record.  And there's also things that we never were able to replicate.  For example, the website that he used to download the documents, we were never able to find that.  We had it described to us.  We'd go to the website, it's gone.  These are people who were trying to hide their activities, and they successfully hid their activities.

So, it's a little unfair to say that this wasn't done quickly enough.  And over that, there is zero evidence that this was stopping.  There is no evidence whatsoever that this was ever going to stop.

THE COURT:  I thought it was escalating.

MR. PARMLEY:  Well, certainly his handler wanted him to escalate.  (indiscernible), and the Defendant offered to go work on a ship that had nuclear power.  He wanted to go work on a ship that was being used overseas.  He wanted to get more and more and more information, all this so it could be shared.  Why he did it?  I -- I still don't know.  I don't think we'll ever know, but one of the reasons why we do know that this -- this information had value is because he was paid for it.  So, we know at least it was worth something.  And

29

there's also, as I said, this was on for the long haul. There's no indication that it was going to stop at all.

And then there's this -- also this kind of -- you know, kind of backhanded attempt to kind of like say this isn't a big deal. This is just a ship. It's in dry dock. It's not going anywhere. This is a billion-dollar asset of the U.S. Navy. This is something that is used to project force in the United States. It might be in dry dock now, but it's not going to be in dry dock next year. It's going to go off. That type of ship, believe it or not, was a ship that they flew the President of Venezuela, Maduro, out to pick him up, billion-dollar (indiscernible) ship, as they brought him in. And I'm not going to comment on how -- on that prosecution, but that's what was used. This is an active ship, a billion-dollar asset of the U.S. Navy. It has value. It is not a HMMWV that's been sitting rusting on the dock for years that's never going to be used. So, to suggest this is not, you know, an important thing is -- is kind of unfair.

I also -- you know, I want to talk, you know, this deterrence. I want to talk about deterrence now. I want to talk about how all this started.

Defendant gets a communication out of the blue, and immediately he was asked, you know, I'm a Chinese -- part of a Chinese shipbuilding corporation. Can you walk the dock of the pier where you are working? Can you let me know which

30

ships are coming and going?  Keep a spreadsheet for me, and I'll pay you.  It's ludicrous to suggest that this was anything other than espionage, and the Defendant knew it.  He knew it when he said to his friend, I'm no idiot.  This is quite obviously espionage.

So, the Defendant, for whatever reason -- and I don't understand why -- he can't accept the responsibility.  In his letter that was filed yesterday or on Saturday, he can't get there.  And that's okay.  That's what -- what the majority of the work was for, but -- but that's how it started.  And that's how another Sailor's going to be approached.  Some other Sailor, someone else is going to be approached.  They're probably approached every day.  The Chinese government has dedicated resources to stealing our information.  And if the Defendant is let off with a light sentence, that is not going to deter other Sailors from going down this road.  If he's given a 30-month sentence, which is, frankly, insulting, but if he's given a light sentence, other Sailors will look and say, You know what?  It wasn't that bad.  He made some money.  He was stupid enough to get caught.  I won't get caught.

So, obviously, he's got some information in his head.  We have to deter him specifically.  A lengthy sentence will deter him specifically.  He'll be in prison.  He won't be able to have access to the systems.

31

But there's also a general deterrence and specific deterrence for other Sailors and other members of the military.  If they look at this and say, Well, you know what? He went to trial, and he got this little sentence and has never accepted responsibility.  We don't know the damage, that's a problem, your Honor.  So, I'd ask to impose the sentence that we've asked for.

And then on the other one, to sentencing disparity, your Honor, we submitted some -- some kind of comparison, those other cases that have gone through.

THE COURT:  And the Defense has submitted some --

MR. PARMLEY:  Right.

THE COURT:  -- other ones.

MR. PARMLEY:  So, with that particular guideline, the sentences are, you know, between 193 and I think 227 months, somewhere in that range.  But the vast majority of those cases were with a plea agreement, somebody who's entered a plea and has not accepted -- or has accepted responsibility. This is different here.  It's just he hasn't accepted responsibility, and, so, he's not entitled to the same benefit that those get.  So --

THE COURT:  Can you talk about the Orange County case?

MR. PARMLEY:  Sure.  So, now, that's been a problem since the beginning of this case, your Honor, because they

32

were arrested on the same day at the same time.  But they were charged with two totally different offenses.  He didn't have the same access that the Defendant did, and he wasn't charged with espionage because they couldn't prove that he committed espionage.  That was -- so, this is a -- it's a -- and it's not those guidelines.

THE COURT:  It's apples and oranges?

MR. PARMLEY:  What's that?

THE COURT:  It's apples and oranges?

MR. PARMLEY:  Yes, I would say so, your Honor.  So, I mean, they're both serious offenses.  They both involve military members.  And, also, I think he pled guilty within 90 days or so and quickly resolved the case, and I'm sure -- I don't know, but my suspicion would be that there was something wrapped into that, like if you resolve this very very quickly, before we have to go through a FISA motion, which we did here, or through -- we have to go through Secret proceedings, which we did here, well, there'd be a benefit to that.

Now, I don't know the specifics of that, but I also know that it wasn't the same case and it wasn't the same charges.  The Department of Justice in its infinite wisdom decided to hold a press conference bringing them both, at the same time announcing them, but the reason -- there's a reason that  the press conference was here in San Diego, your Honor, because this was the more serious offense.  He was the one

33

charged with and convicted of espionage.

Just a couple more comments, your Honor.  You know, counsel says that, you know, he loves America and there's nothing to show that he empowered China and that he has no malice, except for what the jury found.  The jury had to find by -- unanimously by beyond a reasonable doubt that he did this with the intent to either harm the United States or benefit China.  So, we know that that's nonsense.

THE COURT:  Was it benefit China or benefit a foreign entity?

MR. PARMLEY:  To benefit a foreign country.

THE COURT:  To me, if he thought he was benefitting somebody who's working with Taiwan versus China, it doesn't matter under the elements of the offense.

MR. PARMLEY:  It doesn't matter under the elements, but all of the evidence in this case, including the fact that he had Andy Li's picture and the fact that he was a member of the Chinese Navy, I think that was helpful to show the jury they knew that this was going to China.  I don't think there's any doubt about that.  But in this case, the jury found necessarily that he either intended to help China or betray the United States.  And, so, to say that there's no malice and that he loves America, I just -- I just think those are empty words.

Your Honor, I -- I recognize this is a lengthy

Case 3:23-cr-01471-H Document 186 Filed 01/15/26 PageID.1376 Page 36 of 77

34

sentence. I recognize that. I recognize that this is a serious sentence. We're calling for the high end.

THE COURT: I would not do high end.

MR. PARMLEY: And I recognize that that's a --

THE COURT: Under 3553(a).

MR. PARMLEY: And the only reason we're asking for that, your Honor, is --

THE COURT: He's a zero point offender.

MR. PARMLEY: -- is the zero point offender, which we, frankly, think is ludicrous, but that applies. It doesn't apply for a murder, for sexual assault or for other serious offenses where life in prison or a potential death penalty are possible, but it applies here. I think it's an oversight by the Commission. We live with it. So -- but, regardless, the Court needs to impose the type of sentence that not only recognizes what the conduct was, recognizes the nature of the betrayal here, deters others from following down these footsteps, and is not -- you know, is not disparate from other counts in other cases that are like this.

So, if the Court is not willing to go the high end, the low end is -- is reasonable. In this case, I think the -- the low end was -- I think we're asking for 262 months, and the low end in this case -- one moment, please. I apologize. The low end is 210 months, your Honor. We're asking for -- you know, in my view, that's too low. A 20-year sentence is -

35

- is appropriate in this case given the nature of the offense, the ongoing nature of it, the need to deter others.  That's what's appropriate here.  There is no question that he's a traitor.  There's no question that he betrayed his -- his fellow men and women in the Armed Services.

And these are rare cases, a rare serious case that will be looked at as -- as what is appropriate -- what's the appropriate sentence when these come once again, maybe once every two years, maybe across the Department and across the country.  And I would urge the Court to impose a -- a 20-year sentence, and that would be a measure of justice in this case. And I thank you.

THE COURT:  Thank you.  We have some technical issues that we have to address.  There are objections to the Pre-Sentence Report, some factual objections and some legal objections.

First, he objects to page five, paragraph six.  The PSR states:

"Conspirator A told Wei he was a Naval enthusiast who was working for the state-owned China Shipbuilding Industry Corporation.  This statement is referring to the February 15, 2022 communication between Conspirator A -- that's Andy -- and Mr. Wei.  In that  communication,

36

Conspirator A only said that he was with the China Shipbuilding Industry Corporation."

Should we treat that as a clarification?

MR. PARMLEY:  That's fine, your Honor.

THE COURT:  All right.

MR. PARMLEY:  I don't think it affects the sentence or the Guidelines.

THE COURT:  We'll treat that as a clarification.

Page five, paragraph seven, the Pre-Sentence Report states:

"Wei transitioned his communications with Conspirator A to a different messaging application which he believed would be more secure and began spying for Conspirator A."

And he objects to that.

MR. BERTOLA:  Only objects to that -- that the statement makes it seems that Mr. Wei transitioned to the platform because he believed it to be more secure.  He transitioned because he was asked for Andy, and I don't believe that  there was evidence showing that Mr. Wei was the one trying to secure their tracks.  He was asked multiple times to switch over and stop messaging on the original platform by Andy.  So, I feel like it unfairly

37

mischaracterizes the switch to the other messaging platform.

THE COURT:  Do you want to treat that as a clarification?  I mean, he did switch to another platform --

MR. PARMLEY:  He did.

THE COURT:  -- which disappeared the communications, but it was at the rest of his -- what I call his handler.

MR. PARMLEY:  It definitely was at the request of his handler.

THE COURT:  So, is that sufficient?

MR. BERTOLA:  Yes.  Yes, if it does not -- if it's not indicating that the switch was made because of Mr. Wei's belief that it was more secure or that it was his desire to do that.

THE COURT:  Well, I don't think it's more secure, but I do think that Mr. Wei fully knew that these messages were disappearing and were not likely to be found.

MR. BERTOLA:  Yes, your Honor.  Just my point is -- is that the PSR makes it seem that the switch occurred because of Mr. Wei wanting the -- their messages to be more secure.

THE COURT:  So, it is true that Conspirator A told Mr. Wei that he should not tell him anything on WeChat because he can see it on Telegram, is that right?

MR. BERTOLA:  Yes.  But I don't think that that goes to Mr. Wei's -- that doesn't show Mr. Wei's belief --

38

THE COURT: One way or the other?

MR. BERTOLA: -- one way or another, and it's --

THE COURT: However, I do think that the -- the circumstantial evidence shows that Mr. Wei also benefitted from the fact that these were on a secure application that could not easily be retrieved.

MR. BERTOLA: Yes, your Honor. But, again, I don't -- I don't feel that that goes to his belief. And in support of our argument that he was asked multiple times by his handler to switch to the other platform and stop messaging on that platform, he started using the other platform, and he was still messaging on the other one, to which his handler said, Stop doing that. Just message me no here. So I --

THE COURT: The Court --

MR. BERTOLA: -- believe --

THE COURT: The Court grants in part and denies in part the objection. The Court will treat this as a clarification, but I don't think that -- and, so, there's no direct evidence that Mr. Wei was the motivator for the switch, but I do think that the circumstantial evidence shows that Mr. Wei was aware that these were secured ways of communication.

MR. PARMLEY: Your Honor, I don't want to belabor something that I don't have any effect on the Sentencing Guidelines. There's no question that -- that his handler asked him to transition to these communications. But, of

39

course, he knew that they were doing it for security reasons. He told his handler, Thank you for the reminder.  For the sake of security, I deleted y WeChat sessions.

He also --

THE COURT:  Thank you.  So --

MR. PARMLEY:  -- sent codes on one, and then the -- the links were sent on another.  So, it was there -- you know, so, this is not -- there's truth to what -- both of what Mr. Bertola says.

THE COURT:  The Court grants in part and denies in part the objection, and I don't think that it changes the Guideline calculations.

Page five, paragraph eight, the Pre-Sentence Report states:

> "Wei sent -- also sent thousands of
> pages of technical and other operational
> information about U.S. Navy Surface
> Warfare Ships like the ESSEX which he
> took from restricted U.S. Navy computer
> systems."

And you said that he didn't send thousands of pages of documents?

MR. BERTOLA:  Just the amount of the thousands of pages.  We're objecting that it was thousands of pages, not that he sent documents, but just the -- the amount of pages,

40

the actual --

THE COURT:  I think --

MR. PARMLEY:  In our response, your Honor, which was filed as Document 166, I think we lay out it's fair to characterize it as thousands of pages.  That's what the evidence shows either directly or circumstantially.  That's a fair inference in what's accurate.

THE COURT:  The Court denies that objection.  You still have your objection that if we rank this on a hierarchy of Highly Sensitive, Top Secret, Classified to information, it's somewhere in that curve.  It's not classified, correct?

MR. BERTOLA:  Right.  It's national defense information.

THE COURT:  It's national defense information.

MR. BERTOLA:  Not classified as Secret or Top Secret.

THE COURT:  It's still important information, and it should not be shared.

Page -- number four, page five, paragraph eight.  The Pre-Sentence Report states:

"In exchange for the information, Wei was paid thousands of dollars."

The specific amount is I believe 12 thousand something.

MR. PARMLEY:  Yes.

41

THE COURT:  Twelve thousand what?

UNIDENTIFIED SPEAKER:  (Indiscernible.)

THE COURT:  And that is thousands of dollars.  So, the Court grants in part and denies in part.  I think the amount that they know of --

MR. BERTOLA:  Yes, your Honor.  And I wasn't objecting to the amount of money, that it was thousands, just that he was paid for the information.  The argument is that he didn't send the information expecting payment but here -- Mr. Wei didn't exchange the information with the intent to get paid is the -- the objection.  I think it fits better when we talk about the -- it being sold, because the -- we're not objecting that information was sent and he received payment, just that he didn't sell the information in the common sense of the term, and we point to the evidence that Mr. Wei never directly asked for payment.

THE COURT:  He couldn't -- so, I agree he didn't directly ask for payment, but his own statement was that other Sailors do things --

MR. BERTOLA:  Yes, your Honor.

THE COURT:  -- for money, but I sell Navy secrets. I think that's circumstantial evidence that he was selling information.

MR. BERTOLA:  Yes, your Honor.  But I would say that that statement was made to his mother, and, given the

42

other statements he made to his mother, he was -- clearly wanted for his mom to be proud of him.  This was -- money in their culture is -- it's a big deal.  His whole -- he went through his whole life up until that point being very self-conscious about the lack of money he had.  He was very proud of himself that him joining the military gave him some financial freedom, and then this extra money he was receiving from Andy, while it didn't -- we're arguing that he did not give the information in return for money, he was never asking for money, there was no agreement beforehand, You send this document, and I'll pay you this X dollar amount.  It was more of Andy asking him for things, complimenting him, establishing rapport, Mr. Wei sending documents, sending reports, and then Andy sending the money afterwards, without any discussion of what the information he was sending would cost, if it would be rated hourly for his work on the reports.  It was just kind of, Send me stuff, and then he got money in return.

I think it's notable that Mr. Wei didn't send his PayPal information to Andy until June 5th, 2020, months after this relationship started.

THE COURT:  But only after he got his U.S. citizenship.

MR. BERTOLA:  Yes, your Honor, which I would say --

THE COURT:  In May.

MR. BERTOLA:  -- is coincidental and not strategic

43

on Mr. Wei's part because he was already sending him information before that.  If the -- logically -- but if he believed that sending the payment was the -- him receiving payment was the -- the bad part in this exchange, not the sending the information itself, which I'd argue is worse than receiving payment for it, and this was after Andy asked him multiple times for his PayPal information, did Mr. Wei actually send it months after the -- the relationship started. I think it just shows Mr. Wei's lack of doing this out of greed or financial concerns.

THE COURT:  The statements he made to his mother, again, I -- I would chock that up to him bragging to her that he doesn't have to do jobs like driving a cab or stuff that they look down upon to make extra money, and it was just to elicit pride from his mother.

THE COURT:  I have the specific amount, $12,816.59. So, the Government's response?

MR. PARMLEY:  It's just semantics, your Honor. It's kind of ridiculous.  First of all, he did slow down because of the naturalization thing.  He said, I'm concerned about that.  Let's wait till this blows over.

Yes, he did not say, Here is my bill for services for spying for you.  He also didn't send any money back.  His mom sent him $1,000.  He said, I don't need it.  He sent it back to her.  So, he accepted the money.  He also recognized

44

as -- as his handler told him, I'll pay you for this, but this isn't that great.  What I need from you is nonpublic information.  I need originals.  I need blueprints.  That's what I'm going to pay you the big money for.

So, yes, he sold it.  Maybe he didn't expect a certain dollar amount, but it's semantics to say he didn't sell it.  Of course he sold it.

THE COURT:  The Court denies the objection.  The Court agrees with the Defense that he didn't bill for a specific amount, but he was paid $12,816.59 over the course of the activity.

Number five, page five, paragraph nine.  The Pre-Sentence Report states:

"Wei sold Conspirator A at least 30 technical and operating manuals about the U.S.  Navy systems."

And then you're objecting to sold?

MR. BERTOLA:  Yes, right.

THE COURT:  I think that's -- you can then argue that as a part of the circumstantial evidence says that he was getting paid for the information that he exchanged.  It wasn't tit for tat.  It wasn't as if he says this manual, okay, that's going to cost you $500.  But he was getting paid over times.

MR. BERTOLA:  Yes, your Honor.  And the only thing

45

I would like to add from the argument from the previous objection is that there is no evidence showing that Mr. We wouldn't have sent the information if Andy ceased payment, which is what I believe is like the distinction between an exchange of this information basically because of his personal relationship he established with Andy versus him doing it to sell the information.  I don't believe there's anything in -- presented in the evidence that's showing he would have stopped sending the information if the money would have stopped, because Andy did manipulate him in such a way to keep receiving the information from him.

THE COURT:  I think that that is incorrect. There's no information to -- to say one way or the other what would happen.

MR. PARMLEY:  What would happen if what?  I'm sorry.

THE COURT:  If -- I don't think that we could say if Andy didn't continue to pay him --

MR. PARMLEY:  We don't know.

THE COURT:  We don't know.

MR. PARMLEY:  What we do know is he sent him receipts every time, and he also bought a car with it and told his mom he bought a car.  He did not donate the car to charity.

THE COURT:  The Court agrees with the Government on

46

that.  You can -- then I'll treat your characterizations as to sold as clarifications.

Number six, page five, paragraph 10, the PSR states:

"In total, Wei sold" -- same issue -- "Conspirator A approximately 60 technical and operating manuals."

You don't agree -- you disagree to the approximately 60 manuals?

MR. BERTOLA:  Yes, your Honor.  I don't believe that the approximation -- that it was shown that it was close to 60.

THE COURT:  Counsel, refresh my recollection.

MR. PARMLEY:  So, from June 2022 Andy Li told the Defendant he looked up the 30 things that Wei had sent him, and he paid him $5,000 and then asked him to write a receipt for consulting.  During a search of his iCloud, we found a photograph on the laptop screen with some 30 technical and mechanical manuals for LHD, including the (indiscernible), technical manual which was 208 pages in Count 4.  Those 30 manuals were almost 6,000 pages.

So, again, we didn't see the transaction because it was through this disappearing website, but that is circumstantial evidence that he passed thousands of pages. That was just that one instance.

47

In August, he emailed 26 technical manuals totaling 4200 pages from his military account to his personal account, including the Propulsion Operating Guide, which was subject of Count 5 in the indictment.  He told -- the Defendant told Andy Li, I have something useful for you, and Andy Li replied that he had went through it and that it was very professional.

And, remember -- as the Court remembers, we looked at Andy Li's Google account, Google searches, and that's when he had searched for the Propulsion Guide online, which you can't find.  At least we couldn't find it.

In October of 2022, he paid Wei for work in October.  In a search of his account, we found a paper written in Chinese, as well as the Weapons Control System Manual, 120 pages, the subject of Count 6, as well as many other multiple papers written on the hard drive found in his apartment.

In other words, to say that he was paid thousands of dollars for selling thousands of pages of manuals is an accurate statement.

THE COURT:  He's talking about 60, but it's approximate.

MR. PARMLEY:  Approximately 60.

THE COURT:  And the Court denies that under the facts received at trial.

Page 22, paragraph 99, the PSR states:

"By the end of the interview, Wei

48

admitted he regularly spoke with Conspirator A.  He knew he was in China and sent him thousands of pages of technical and operating manuals and export control data about the U.S. Navy Surface Warfare Ships.  Wei stated he had been paid thousands of dollars for these materials.  The Defendant stated he knew his actions were wrong, and he tried to hide his activities."

You say the quote contains a number of factual errors.  First, during this interview, Mr. Wei admitted to sending technical and operating manuals but did not admit the quantity.  The Court agrees he didn't admit the quantity, but there is evidence of the quantity.

MR. BERTOLA:  Yes, your Honor.

THE COURT:  Second -- so, I'll treat that as a clarification.

Second, Mr. Wei did not state during this interview that he was paid thousands of dollars for these materials.

I agree he didn't state that in his post-arrest interview.

Then during the interview, instead, Mr. Wei maintained that Conspirator A randomly sent him money and that the money he received was not payment for specific pieces of

49

work.

The Court agrees with that characterization of the evidence.

Lastly, Mr. Wei did not admit during the interview that he knew his actions were wrong while he was doing them and tried hiding his activities during -- due to the wrongfulness. During the interview, Mr. Wei expressed remorse after federal agents informed him of the seriousness of his actions. Mr. Wei consistently told the interviewing agents that he did not understand the gravity of his actions at the time of the commission.

The Court agrees that's what he said, but given the totality of the evidence, including the fact that he admitted at the very beginning to his friend that this was espionage, that he -- the Court believes that the circumstantial evidence supports the fact of the jury's determination.

MR. PARMLEY: I apologize, your Honor. The only thing I would add to that is that, you know, this is a summary of the post-arrest statement. The Court viewed it. Like, he's all over the place. Sometimes he's going with it. Sometimes he's not going with it. You can see him pause and weigh it before he lies, but in the end, he is asked, What do you think -- what would you characterize what you have done? And he said, Espionage.

THE COURT: So, the court will treat it as a

50

clarification.

Then on the legal objections, we have already discussed the two-level enhancement under 3B1.3 of use of a position of trust. After carefully evaluating the arguments of counsel, the application of the Guideline, the commentary, the case law and the facts of this case, the Court concludes that the abuse of position of trust does apply.

And I think that takes care of all of the objections to the Pre-Sentence Report. Agreed?

MR. BERTOLA: Agreed, your Honor.

MR. PARMLEY: Yes.

THE COURT: Okay. Next issue, grouping. So, there are counts of conviction, and the Court has to come up with a base offense level.

Do the parties agree that under the application of the Guidelines that a Level 37 is the base offense level at the get to under conspiracy to transmit national defense information?

MR. PARMLEY: Yes.

THE COURT: Whether it be grouping or not?

MR. PARMLEY: Correct.

MR. JONES: Yes, your Honor.

THE COURT: And do the parties also agree that with the abuse of position of trust and zero point offender, that we end up at a total adjusted offense level of 37, whether

51

grouping or not?

MR. PARMLEY:  Yes.

MR. JONES:  Yes.

(Pause.)

THE COURT:  And do the other counts of conviction also have as an available Guideline the 210 to 262 months?

MR. PARMLEY:  The only difference being that Counts 3 through 6 would have that 240-month cap.

THE COURT:  Okay.  But the low end is available?

MR. PARMLEY:  210 to 240 months would be more accurate.

THE COURT:  All right.  So I've taken care of the technical issues.

Do you want to respond in general to any of the discussion here before we ask the Defendant whether he wishes to say anything to the Court?

MR. JONES:  Yes, your Honor, I wanted to -- two points Mr. Parmley raised.

Yes, the conviction on the espionage did require finding either an intent to harm the United States or an intent to benefit either a -- a foreign nation or a member of a foreign nation.  And it was established -- the People presented evidence that Andy was a member of the Chinese government in some capacity.  But the evidence showed that -- that Mr. Wei -- there's no evidence showing Mr. Wei was trying

52

to support China or support the Chinese Navy to the detriment of the United States Navy.  The evidence is that he was trying to help out Andy.  He was saying, I'm going to help you out. I'm going to find something that you like.  Oh, you didn't like that?  I'll -- I'll show you I can -- I can get you something that -- that you like.  He was trying to help Andy. And, unfortunately, by virtue of Andy being associated with China, that checked the boxes.  But I think it's an important distinction that the jury wasn't able to convict on that but not because Mr. Wei was trying to support China or trying to harm the United States.

The other was with regards to inconsistent or disproportionate sentence, the -- the sister case to this that's been talked about is People v. Mr. Jao (phonetic) out of Orange County, and Mr. Parmley has stated these are apples and oranges, but if the Court just reads the indictment, it's really similar.  We've got two young Sailors in their early to mid 20s, approached by a Chinese handler -- I believe the same handler actually -- asked to take photos and videos in restricted areas, sending non-classified but sensitive materials.  Mr. Jao was charged with sending operational plans for a large-scale exercise in the Indo-Pacific Region for entering restricted installations, military installations, taking pictures and videos to send to the Chinese handler and exporting training and critical infrastructure information to

53

the handler.

Mr. Jao was paid approximately $15,000 for the materials he sent.  As we established earlier, Mr. Wei received about $12,000, almost $13,000.

Really, the biggest distinction I would argue is that Mr. Jao had the benefit of entering a plea very early on, which I understand saves an enormous amount of time, energy, stress and money, and there is value to that, and I can't speak to everything that transpired in Mr. Wei's case before Mr. Bertola and myself came on, but what I do know is that there had been no legitimate settlement negotiations.  Now, I don't know what had or had not been presented by the Government, but I know that in speaking to formal counsel, that there had been no discussion of -- of any kind of settlement.  And Mr. Wei --

THE COURT:  As you know, the Court does not get involved at all in settlement, but I do know -- I can report what is -- what had been represented in open court is that the Government was going to give what's called a reverse proffer early on to the Defendant and his lawyer.

Is that correct?

MR. PARMLEY:  What -- what counsel said is inaccurate because I looked at that, and, yes, the Court -- they did a reverse proffer.  Offers were made to the Defendant to his face.  We had some settlement negotiations --

54

THE COURT:  With him in the room?

MR. PARMLEY:  -- with him in the room.

THE COURT:  And --

MR. PARMLEY:  He was aware of it.  I've got emails showing this offer has been conveyed.  That was a long time ago, years ago, yes.  So, I -- it's not -- this is not the appropriate time or venue to get into what is basically a backhanded attempt to get into an ineffective assistance of counsel claim, but it's not accurate.  And the Defendant may tell his new counsel whatever he wants to tell him.  He may have forgotten things.  But that's not accurate.

THE COURT:  And then also in the -- in the course of -- in the course of the litigation, the Court appointed Federal Defenders to assist his first counsel, and then the Court appointed Federal Defenders, and the person who was appointed is the most senior litigation counsel for him and had associate counsel.

So, I can't speak to any of that.  And, as he said, that's for a different time and a different issue.

MR. JONES:  I understand, and what I was going to say is that Mr. Wei, given the -- the language barrier, has been extremely dependent on his attorneys to explain things to him.  And whether or not he understood what the reverse proffer meant or what the -- the negotiations were, I -- I don't want to get into the details of settlement or anything

55

like that, but I think it's an important distinction if we're looking at the Jao case and the Wei case side by side and how Jao was able to get 27 months and Mr. Wei is now looking at 20 plus years, and it's -- I think it's significant that there were good reasons why this case could not be settled as expeditiously as -- as Mr Jao's.  And a key one is the naturalization fraud.  As far as I'm aware, any plea for Mr. Wei the Government would only accept if it involved conviction on the naturalization fraud, which Mr. Wei would not agree to and which it was demonstrated that it would have been inappropriate given that the jury acquitted on that.

THE COURT:  I think -- I think you misunderstand. As I said, I'm not punishing him for going to trial.  Anybody can go to trial.  I've had other counsel who have said, Here's five counts.  My client agrees he's guilty of Counts 1 through 4.  So, I'm doing an open plea because I don't agree with the Government.  They're asking for way too much.  So, there are other avenues that could be of -- and then throw yourself on the mercy of the Court on the rest of that.

So, we're not here to talk about plea negotiations other than on the language issue, he was a member of the

56

United States Navy.  He communicated in English as a member of the United States Navy.  He was promoted because he was recognized as a valuable member of the United States Navy.  I do understand that people feel more comfortable in their native language, but there was never any request by anybody, including yourself, to have a Mandarin interpreter at trial to assist in any -- or any of the proceedings except for today.  And, of course, I granted it.

MR. JONES:  A hundred percent agree on all of that, your Honor.  I was only responding to Mr. Parmley's comment that Jao and Wei are apples and oranges and that a reason -- one of the reasons that Jao received 27 months is because of a speedy plea.

THE COURT:  All right.  Thank you.

Any response?

MR. PARMLEY:  On the naturalization fraud, your Honor, he wasn't originally charged with that.  He -- that's in a -- in a superseding indictment, and the Court can intimate after plea negotiations broke down.  So, the offer was made.  He declined it.  A superseding indictment was sought.

Two things, that he never wanted to harm America.  The first statement he made was, I think I'm on the radar of a China intelligence organization.  He knew exactly what was going on.

57

And then the Jao versus Wei thing, I can tell this. The Guidelines are calculated correctly in this case.  He was charged with espionage because he committed espionage, and the jury found him -- that he had committed espionage.

Mr. Jao was never charged with that.  He was never found guilty of that because he was never charged with that because he didn't commit that crime to the best of my knowledge.  So, it is apples and oranges.  Of course, they're similar.  They're both Chinese nationals.  They both were in the Navy.  They both committed crimes.  This is the more serious one.

THE COURT:  Thank you.

Anything further from either side before I ask the Defendant if he wishes to say anything to the Court?

MR. PARMLEY:  No, your Honor.  Thank you.

MR. JONES:  No.  Thank you.

THE COURT:  Thank you.

Mr. Wei, do you want to say anything to the Court before the Court imposes sentence on you?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  You may.

THE DEFENDANT:  Your Honor, thank you for allowing me the opportunity to speak today.  I truly appreciate it.  I want to begin by taking full responsibility for my actions.  I -- I did something seriously wrong.  Like, there's no arguing

58

that.  That's -- it's something I deeply regret every day. There's no excuse for what I did.

I would also like to sincerely apologize to the United States Government, the federal agents, the Court, and my chain of command and my shipmates for the disruption, harm and shame my actions caused.

At the time of this offense, I was young and immature.  I have come to -- I failed to understand the consequences of my choices.  Over the past two years, I have had to live with the reality of those choices, and they have transformed me in a positive way I never expected.

During my time in custody, I have had long periods of reflection.  I have come to understand not only how wrong and foolish my actions were but how they affected others who trusted me and depended on me.  I -- I love my shipmates. Just -- I hate myself for all this, and this awareness is something I will carry with me for the rest of my life.

I -- I do not stand before the Court as a dangerous person.  I stand here as someone who made a serious mistake and has learned from it in the hardest way possible.  I -- I remain committed to being a disciplined, hard working and law abiding member of society.  If given the opportunity, I will use what I have learned to live responsibly, to follow the law, and to contribute positively to my community.

Your Honor, I respectfully ask that you consider

59

mercy and leniency in your judgment.

Thank you for listening.

THE COURT:  Thank you.

The Court begins with the consideration of the Advisory Guidelines and then each of the 3553(a) factors in order to fashion a fair and just sentence under the law that is sufficient but not greater than necessary to achieve the purposes of sentencing.

We start out with a base offense level of 37 under the Advisory Guidelines.  And that's under U.S. Sentencing Guideline 2M3.1.  And then plus two under 3B1.3 for abuse of a position of trust.  I do think, Mr. Wei, in looking at your behavior over time, I think you did abuse your position of trust as a -- as an engineer with -- you needed a card with special access to get into the information that -- that then you transmitted, unfortunately, to Andy.  And, so, I do believe that that is warranted under the case law.

Your counsel disagrees, and that can be an appellate issue.  And then the reviewing court will review all the facts and circumstances to see if the Court is accurately calculating the Advisory Guidelines.

And then, to your credit, minus two for zero point offender, leaves an adjusted offense level of 37.  There's no adjustment for acceptance of responsibility, but the Court will take your comments into consideration, that you now agree

60

that you acted improperly under the law in fashioning a fair and just sentence that is sufficient but not greater than necessary to achieve the purposes of sentencing.

The criminal history is Roman Numeral I, and the Advisory Guideline Range is 210 to 262 months.

And, next, the Court considers each of the 3553(a) factors.

The Court has reviewed your letter.  The Court has reviewed the psychological report.  The Court has reviewed all of the sentencing information, and the Court has had you in court before me for a considerable period of time.  You've always been very respectful to the Court.  You've always been respectful to your counsel, and the Court appreciates that.

The Court also notes that you had a difficult life, that you went to boarding school at a young age, that your mom was employed in Nigeria, so far away, and your father was non-existing.  Your uncle and grandma had difficulties also.  So, I've seen many people like yourself that are conflicted, are conflicted with how you're raised, what you're supposed to do. You're given the wonderful benefit of coming to the United States, and you excelled in high school.  You excelled in the Navy.  You excelled in the other jobs that you had, and if you were in China, this would be a summary proceeding with very little due process on your side.  Here you are, and the Court has tried to make sure that you are given all of the rights of

61

a United States citizen, including the right to go to trial and to present your case. I understand that at points of time you didn't think this information was that secret, but that's beside the point. It is national defense information that was going to a foreign entity or actor, and it's very dangerous to the United States.

And on the circumstantial evidence from the beginning of the case, you recognized that it was espionage and yet continued to do activities that were in furtherance of that. And that's so sad that you succumbed to Andy for who knows what benefit, $12,000 approximately? But it got you a car. It got you status. Unfortunately, at -- many people in your -- in your state, as members of the military, are very young, are very vulnerable. We trust them. We -- we depend upon them to make sure that they are acting in the -- in the best of light to support the United States.

When you took your immigration oath, you took an oath to support and defend the Constitution of the United States against all enemies, foreign and domestic. I do think that the -- the jury acquitted you on the immigration charge. I thought it was convoluted to have you confess to something that you hadn't yet been charged with, but I think that you violated your oath from the get go because you did things that were not in the best interest of the United States and were in the interest of a foreign entity or actor.

62

So, it's very sad, but we expect more of people who are in the United States military, from the low level people up to officers.  We expect them to support and defend the Constitution of the United States and to support and defend the United States.  And, unfortunately, you've failed in that respect.

So, after considering all of the relevant factors, the Court will then recognize that your acceptance of responsibility is imperfect.  We'll give you some consideration for that and recognize that the abuse of position of trust is mitigated.

The Court will sentence you to 210 months -- to two -- excuse me -- 200 months.  So, I'm giving you some consideration for both of those, both of which I think are imperfect on your defense.

And then to -- to encourage a law abiding behavior, we need to do targeting -- targeted supervised release evaluation.

So, what is the Government's position, and what is the Defense position?  And the 200 months is concurrent all counts.

MR. PARMLEY:  Right.  And I think for the supervised release, your Honor, it's up to five years for Counts 1 and 2 and three years for Counts 3 through 6.  We would recommend --

63

THE COURT:  Are you satisfied with three years?

MR. PARMLEY:  I would recommend five years supervised release, your Honor, and three years on the other counts, all to run concurrent with each other.

THE COURT:  How old will he be if he serves his full time when --

MR. PARMLEY:  You're asking me --

THE COURT:  -- he gets out?

MR. PARMLEY:  -- to do math, your Honor.

THE COURT:  Yes, math.

(Pause.)

THE COURT:  How old are you now?

MR. JONES:  25 years old right now.

THE COURT:  25.

MR. PARMLEY:  So --

THE COURT:  So, do you think impose five years of supervised release on Counts 1 and 2?

MR. PARMLEY:  I think -- I think -- yes, I think that's sufficient.

THE COURT:  As protection?

MR. PARMLEY:  Yes.

THE COURT:  To encourage a law abiding behavior.

MR. PARMLEY:  Yes.

THE COURT:  He's very technologically savvy.

MR. PARMLEY:  So, are you asking -- you're asking

64

if the Court -- if you should impose consecutive supervised release, is that what you're asking?

THE COURT:  I'm asking if three years would be enough.

MR. PARMLEY:  Well, I think five years.  Now, I don't know that he's going to be -- in the nature and circumstances of the offense, he's going to be a target for people to go look to him as somebody who's already betrayed once.  Why not do it again?  So, I think five years to deter him from future conduct, to protect the public and to just also give him some resources to get back on track.  I don't know what his --

THE COURT:  I do think counseling in his psychological evaluation will be warranted.

MR. PARMLEY:  Right.  And I don't know what's going to happen.  I know that he's going to be discharged from the Navy.  There's no question about it.  That's -- those proceedings are ongoing, and I don't know what's going to happen with his citizenship.  My suspicion is it's going to be -- he's going to be denaturalized civilly, and whether or not he'll be deported is impossible to know, but that's years down the road, but I think to protect the public, to deter him, and to give him the guidance he needs, I think more time is better.  Five years would be appropriate in this case.

THE COURT:  Thank you.

65

And what is the Defense position on supervised release?

MR. JONES:  Your Honor, I think three years would be sufficient.  This man has no criminal history.  He's learning a huge lesson from this one case.  He's expressed remorse.  I think -- I don't think that the claim that he's going to be a target for additional campaigns.

THE COURT:  Well, and if he is, they can bring a new crime -- I mean, they can bring a new matter.

MR. JONES:  I'm sorry?

THE COURT:  If he -- if he recidivates, then they can bring new charges as well, but they'll have --

MR. PARMLEY:  My point wasn't that he's more likely to recidivate.  My point was that he's somebody that his name is know, that they -- other foreign intelligence officers from China or elsewhere might be, you know, approaching him again.  And, so, there's a level of having a little bit more scrutiny of him when he gets out I think is appropriate.

THE COURT:  You submit?

MR. JONES:  I'd submit, yes.

THE COURT:  All right.  So, I think I'll do 200 months plus three years of supervised release.

The Court notes the comments of the Government, that they can do civil denaturalization as well.  So, he's got some other issues to address in the 200 months he would be

66

spending quite a bit of time in custody, subject to an appeal, of course, and subject to  post-conviction remedies if available.

And then the three years of supervised release will be concurrent all counts.  And a couple of the counts only permit three years of supervised release.

Is that correct, Counsel?

MR. PARMLEY:  Yes.

THE COURT:  So, concurrent all counts.

And then the Government was asking for a fine, the $12,000, but I don't think he has the ability to pay a fine.

MR. PARMLEY:  We'll submit.

THE COURT:  The Court will not impose a fine as he's affirmatively demonstrated an inability to pay a fine, but I will impose a $100 penalty assessment per count.  And, so, that is a total of --

MR. PARMLEY:  Six hundred dollars I believe.

THE COURT:  Pardon me?

MR. PARMLEY:  Six hundred, is that right?

THE COURT:  Six counts?

MR. PARMLEY:  Six counts, yes.

THE COURT:  Six counts, for a total of $600. That's due and payable forthwith or through the Inmate Financial Responsibility Program at the rate of $25 per quarter, with the balance thereafter to be collected by the

67

United States in accordance with the law.

You have 14 days -- oh, and then on the terms of supervised release, the Court orders you to abide by the standard conditions of supervised release. This includes the condition that you not violate any federal, state or local law and that you abide by special conditions of supervised release. These are listed in your Pre-Sentence Report at page --

(Pause.)

THE COURT: Do you have it?

MR. PARMLEY: Are you talking about the mandatory or the recommended?

THE COURT: No, no. We've already done the standard. The --

MR. PARMLEY: The recommended are on page --

THE COURT: -- the special.

MR. PARMLEY: -- 33, beginning at paragraph 210.

THE COURT: Oh, here. I've got it.

MR. PARMLEY: I'm sorry. The special is on page 34.

THE COURT: Thirty-four.

(Pause.)

THE COURT: One, you're to report all vehicles owned or operated or in which you have an interest to the Probation Officer.

68

Two, you're to submit your person, property, house, residence, vehicles, papers, computers, other electronic communications or data storage devices or media or office to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation. An officer must warn other occupants that the premises may be subject to searches pursuant to this condition.  An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that the offender has violated a condition of his supervision and that the areas to be searched contain evidence of this violation.  Any search must be conducted at a reasonable time and in a reasonable manner.

Three, you're to provide complete disclosure of personal and business financial records to the Probation Officer as requested.

Four, you're prohibited from opening checking accounts or incurring new credit charges or opening additional lines of credit without approval of the Probation Officer.

Five, do not associate with foreign nationals, foreign intelligence officers or other individuals involved n the disclosure of national defense information, espionage or other spying activities against the United States.

And, finally, you're not to use or possess any computer, computer-related devices without prior approval by the Court or a Probation Officer, all of which are subject to

69

search and seizures.

And, as to this, it's hard to live in society without access to these, but you can discuss this with your Probation Officer, and then they can make reasonable accommodation to make sure that any communications are secure.

And, finally, it wasn't here, but I was purporting -- I was suggesting that we might add a condition that if you're deported, excluded or allowed to return to your country of origin or some other country, you're not to reenter the United States illegally.

Any objection to that?

MR. PARMLEY:  No objection to that.

THE COURT:  Any objection?

(Pause.)

THE COURT:  We don't know what's going to happen, but in case in the interim period he is ordered removed to somewhere, then that would be in place.

Any objection to that?

MR. JONES:  No, your Honor.

THE COURT:  All right.  We have that.  We're going to add that as a condition.

The Court has said it's not including a fine but does the penalty assessment, and you have 14 days from today's date to file an appeal.

Are you going to handle the appeal or should he go

70

down to the Magistrate for appointment of appellate counsel?

MR. JONES:  Unknown.  I think appellate counsel.

THE COURT:  So, within 14 days, there has to be a notice of appeal.

MR. JONES:  Understood.

THE COURT:  Will you file that and then when you -- and then can we arrange for him to go to the Magistrate Judge for appointment of appellate counsel?

MR. PARMLEY:  I think the Court can issue a -- I don't know how appellate counsel work.  I think the Court can issue a minute order.

THE COURT:  Appellate counsel is by the --

MR. PARMLEY:  A Magistrate.

THE COURT:  -- designated Magistrate Judge for appellate counsel.

MR. PARMLEY:  Right.

THE COURT:  Is there an objection to Federal Defenders or should they not appoint Federal Defenders?  You would need to advise them.  So, why don't we set a status hearing before the Magistrate Judge.

MR. PARMLEY:  For appointment of counsel?

THE COURT:  And then you can appear and then advise the Magistrate Judge what should happen, and that should be the next available date.

(Pause.)

71

THE COURT:  One week?  Can you do one week?

THE CLERK:  One week would be a holiday.

THE COURT:  Oh, the holiday.  How about Friday duty -- Friday Magistrate Judge calendar unless otherwise noticed.

THE CLERK:  Okay.

MR. JONES:  This Friday?

THE COURT:  This Friday, does that work for you?

MR. JONES:  Yeah, that's perfect.

THE COURT:  But what we have to do is find out the Magistrate Judge who is assigned by the Ninth Circuit to assign appeals.  We'll have to find out who that is and then make sure that that's available on the calendar.  So, as of now, it would be 9 a.m. Friday, and then we'll let you know if that date changes.

MR. PARMLEY:  And I would just request that counsel file a notice of appeal before then so that it doesn't fall through the cracks as they go through the appointment process.

MR. JONES:  Yes.  That's fine.

THE COURT:  All right.  Thank you.

Finally, this is a very sad case, but it illustrates that we require members of the military to adhere to their oath and not to transmit secret defense information outside of the United States.

And I commend both the Government and the Defense for the professionalism that you have shown before the Court.

72

And, to Mr. Wei, I'm sorry that you are suffering the consequences of your own foolish behavior, and you will have to live with that for a long period of time, but you will have time in custody to reflect on the seriousness of your behavior and to continue to take classes to better yourself.

Thank you.

Anything further?

MR. PARMLEY:  Your Honor, I'm not sure if --

THE COURT:  Oh, designation --

MR. PARMLEY:  -- if you can provide a copy of the supervised release conditions on the record.

THE COURT:  We have the conditions.  So, these are in English.  Do you wish one to be translated into Mandarin or not?

MR. JONES:  Yes, please.

THE COURT:  All right.  So, could you first translate these into -- transfer these to your client.  These are in English.  And then we'll give the Mandarin interpreter a copy of these.  So, can you print out another copy, and we'll ask the Mandarin interpreter to provide a -- a translation in Mandarin to the Defendant.

Will you do that?

THE INTERPRETER:  Yes, your Honor.

THE COURT:  Okay.  Anything further from either side?

73

MR. PARMLEY:  No, your Honor.  Thank you.

THE COURT:  Thank you.

MR. JONES:  No, thank you, your Honor.

THE COURT:  Thank you.

MR. PARMLEY:  Oh, I think the Court said designation.  I'm not --

THE COURT:  Oh, designation.  I'm sorry.  Is there a recommended designation for the Bureau of Prisons, Western Region, Southern California?

UNIDENTIFIED SPEAKER:  (Indiscernible.)

THE COURT:  They're going to have to take a look at it.

MR. JONES:  Yeah, that had not been discussed.

THE COURT:  Where is his mother located?

MR. JONES:  She moved out to San Diego for -- during the pendency of the case.

THE COURT:  Where is her regular location?

MR. JONES:  Well, she'd been in Wisconsin prior to moving to San Diego.  I think she's --

THE COURT:  Is she likely to be in Wisconsin or --

MR. JONES:  -- planning to -- to remain here or essentially go wherever --

THE COURT:  Do you want to talk to her?

(Pause.)

THE INTERPRETER:  I think that it will be good to

74

put him close to San Diego before --

THE COURT:  Okay.  So, the Court -- there's not too many places in San Diego.  The Court will recommend placement in Southern California, but they're going to have to take a look at all of the considerations.  And that's a designation only.  It is not binding on the Bureau of Prisons.

Anything else?

MR. PARMLEY:  No, your Honor.

MR. JONES:  No, your Honor.

THE COURT:  Thank you.

MR. PARMLEY:  All right.  Thank you very much.

THE COURT:  Thank you.

(Proceedings concluded.)

75

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Jordan Keilty                      1/15/2026
Transcriber                          Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.

*Echo Reporting, Inc.*