UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 23CR1471-H |
| | ) | |
| Plaintiff, | ) | San Diego, California |
| | ) | |
| vs. | ) | Tuesday, |
| | ) | August 12, 2025 |
| JINCHAO WEI, | ) | 9:00 a.m. |
| | ) | |
| Defendant. | ) | |
| | ) | VOLUME I |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARILYN L. HUFF
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | JOHN N. PARMLEY, ESQ. |
| | ADAM P. BARRY, ESQ. |
| | United States Attorney's Office |
| | 880 Front Street, Suite 6293 |
| | San Diego, California 92101 |
| | (619) 546-6750 |
| For the Defendant: | SEAN M. JONES, ESQ. |
| | Jones Trial Attorneys |
| | 401 B Street, Suite 2010 |
| | San Diego, California 92101 |
| | (619) 732-6332 |
| | MICHAEL J. BERTOLA II, ESQ. |
| | Rudolph Baker & Associates |
| | 419 19th Street |
| | San Diego, California 92102 |
| | (909) 499-3465 |
| Transcript Ordered by: | TODD W. BURNS, ESQ. |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

I-ii

Court Recorder:                    Lynnette Lawrence
                                   United States District Court
                                   333 Broadway
                                   San Diego, California 92101

Transcriber:                       Jordan Keilty
                                   Echo Reporting, Inc.
                                   9711 Cactus Street, Suite B
                                   Lakeside, California 92040
                                   (858) 453-7590

I-iii

INDEX

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Christopher Christian | I-129 | I-195 | -- | -- |
| Aaron Taylor | I-205 | I-246 | I-254 | |
| Patrick O'Brien | I-255 | I-265 | -- | -- |
| Rebekah Frank | I-267 | I-283 | I-297 | -- |

| EXHIBITS: | | IDENTIFIED | IN EVIDENCE |
|---|---|---|---|
| Plaintiff's | | | |
| 1 | Military record | I-132 | I-133 |
| 2 | SF-86 | I-142 | I-143 |
| 3 | Electronic training file Documents | I-148 | I-149 |
| 4 | Threat awareness Training | I-154 | I-155 |
| 5 | Video - award | I-177 | I-178 |
| 6 | Google Map | I-182 | I-182 |
| 7 | Google Map | I-182 | I-182 |
| 8-20 | Photos | I-184 | I-185 |
| 21 | Photo RIMPAC | I-232 | I-232 |
| 22 | Stipulation re evidence | I-288 | I-288 |
| 24 | Photo at sea | I-282 | I-283 |
| 24B | Demonstrative | I-282 | I-283 |
| 25 | Photo Warrior of the Day | I-242 | I-242 |
| 26 | Ship's movements | I-227 | I-227 |
| 26A | Demonstrative | I-226 | -- |

I-iv

| EXHIBITS: | | IDENTIFIED | IN EVIDENCE |
|---|---|---|---|
| Plaintiff's | | | |
| 27 | Photo BAE entrance | I-193 | I-193 |
| 50 | Video SD airport | I-260 | I-260 |
| 51 | iPhone | I-277 | I-278 |
| 52 | iPhone Search 1 | I-277 | I-279 |
| 53 | iPhone Search 2 | I-277 | I-281 |
| 124B | Wechat | I-282 | I-283 |

I-1

SAN DIEGO, CALIFORNIA  TUESDAY, AUGUST 12, 2025 9:00 A.M.

--oOo--

THE CLERK:  Calling matter number one, 23-CR.-1471, United States of America versus Jinchao Wei, for jury trial day one.

MR. JONES:  Good morning, your Honor.  Sean Jones on behalf of Defendant Jinchao Wei, present before the Court.

MR. BERTOLA:  Good morning, your Honor.  Michael Bertola, also on behalf of Jinchao Wei, present before the Court.

THE COURT:  Good morning, and welcome.

MR. PARMLEY:  John Parmley and Adam Barry for the United States.  Good morning, your Honor.

THE COURT:  Good morning.  And can you introduce the case agents?

MR. PARMLEY:  Yes.  I'd be happy to.  Laura Wetterer from the FBI, Rebekah Frank from the FBI, and Chris Christian from NCIS.

THE COURT:  Thank you.

All right.  So, first, the Court has noted that 56 jurors came.  And, so, after conferring with counsel, we've elected, now that the case appears to be shorter than we had originally anticipated, we'll have two alternates.  So, we'll seat 32 jurors.  The alternates come from the last set that are set, and each side has one challenge to the alternate.

I-2

The Defense has 10 challenges to the regular, and the Government has six challenges.

Does everybody agree on that?

MR. PARMLEY:  Yes, your Honor.

MR. JONES:  Yes.

THE COURT:  And then the Government has provided an exhibit list which has been shared with defense counsel, is that -- and the Court, is that right?

MR. PARMLEY:  That's correct.

MR. JONES:  Correct.

THE COURT:  And then I've asked the Government to provide a hard copy binder for the Defense.  I have one, and then there may be some additional exhibits, is that right?

MR. PARMLEY:  Yeah, there are some physical exhibits, and those are available for review at any time, and that -- that binder should be here probably this afternoon, maybe late morning.

THE COURT:  All right.  Thank you.

And then are there any of these exhibits that are not to be shown to the gallery?

MR. PARMLEY:  No.  All of those are printed out separately I believe, with maybe one exception.

MR. BARRY:  Your Honor, there's maybe two or three within that binder that we will have to do limited publication, but --

I-3

THE COURT: All right. So --

MR. BARRY: -- the majority.

THE COURT: -- will you then alert the Court --

MR. BARRY: Right.

THE COURT: -- and court staff when that occurs?

MR. PARMLEY: And our plan is to say, Could you please publish that for the witness only is how we're going to do that.

THE COURT: All right. Thank you. And for the witness only first and then the jury?

MR. PARMLEY: Right. And then, so, that will be kind of a cue that -- that she's going to turn off the monitors for the --

THE COURT: Right.

MR. PARMLEY: -- for the -- the gallery.

THE COURT: All right. Thank you.

And then, also, since there are voluminous exhibits, I've asked each side to appoint an exhibit coordinator who will -- one or more but one from the Government, at least one from the Defense, who will meet daily at the end of the day with my courtroom deputy to make sure that we all agree on which exhibits have been -- have been identified and have been received.

MR. PARMLEY: Yes, your Honor.

THE COURT: Okay.

I-4

MR. JONES:  Understood.

THE COURT:  Thank you.

And then I did receive the clean copy of jury instructions from the Defense.  I already had that from the Government.  I'll ask you to also e-file the clean set, and that will be done later.  And I did receive the proposed voir dire.

What we will do is I will do the initial voir dire and then determine based on the responses whether the Court gives attorney voir dire.  I'll first bring you to sidebar to ask about challenges for cause and any additional questions that you want the Court to then ask.

MR. PARMLEY:  Okay.

THE COURT:  All right.  And then we've discussed the Arizona -- what I call the Arizona Blind Method that at the end of the questioning, then my courtroom deputy will present sheets to you, and then there will be simultaneous strikes.  The Government will do its six strikes and any alternate strike, and you'll do your 10 strikes and any alternate strike.

Any questions about that?

MR. PARMLEY:  No.  Thank you.

THE COURT:  Anything that we have to discuss about trial procedure or any special issues that you anticipate?

MR. PARMLEY:  I don't believe so.  And I guess

I-5

we'll just see how quickly jury selection goes and play it from there.

THE COURT:  All right.

MR. JONES:  Two items I wanted to address.  One is I don't believe Mr. Wei has been formally transferred to MCC. As of yesterday, he was still at El Centro.  Obviously, he's here now.  I anticipate he'll be staying, but I want to make sure that that happens.

THE COURT:  So, I'll, as the Marshals to make sure -- he was supposed to have been transferred three days prior to the trial, but it's important that he stays at MCC.  So, can you arrange that?

MARSHAL:  Yes, your Honor.

THE COURT:  Thank you.

MR. JONES:  And then the other is that Ms. Mingli Wei will be a potential witness.  And, so, I'd ask that she be excluded from the courtroom.

THE COURT:  All right.  Do you want to exempt her from that or think that she should be subject to --

MR. PARMLEY:  I think that's a Defense decision, your Honor.  I think --

THE COURT:  All right.

MR. PARMLEY:  I think it's appropriate to exclude her as a potential witness.  If they intend on calling her, I think she should be excluded.

I-6

MR. JONES:  I understand that's testimony.  She would like to be in the courtroom in support of her son, but I'll submit to your Honor on that.

THE COURT:  She is a potential witness?

MR. PARMLEY:  Yeah.

MR. JONES:  Correct.

THE COURT:  All right.  So, then you are excluded.

MR. JONES:  And is that starting right now or as soon as the -- do you want her to step out right now?

THE COURT:  Yes.

MR. JONES:  All right.  Thank you.

THE COURT:  And then we did arrange for a witness room for both the Government and the Defense.

MR. PARMLEY:  Yes.

THE COURT:  We'll see if the jury is here.  They're not here.

(Pause.)

THE COURT:  So, it will take a little bit of time for them to get here.

(Proceedings recessed briefly.)

THE CLERK:  Jury entering.

(Prospective jurors enter courtroom.)

THE CLERK:  Calling matter number one, 23-CR-1471, United States of America versus Jinchao Wei for a jury trial day one.

I-7

THE COURT:  Thank you.

State your appearance for the Government.

MR. PARMLEY:  John Parmley and Adam Barry for the United States.  Good morning, your Honor.

THE COURT:  Good morning.

And for the Defense?

MR. JONES:  Sean Jones for the Defense.

MR. BERTOLA:  Michael Bertola for the Defense.

THE COURT:  And you want to introduce your client?

MR. JONES:  And this is Jinchao Wei, our client.

THE COURT:  Thank you.

Please raise your right hand to be sworn.

THE CLERK:  Prospective jurors, please raise your right hands.

Ladies and Gentlemen, you and each of you do solemnly swear or affirm that you will true answers make to such questions as may be put to you touching upon your qualifications to serve as trial jurors upon the trial of the cause now before this Court, so help you God?

PROSPECTIVE JURORS:  I do.

THE COURT:  Thank you.

We'll now call the jurors, and then my assistant will help you to be seated in the correct order.

THE CLERK:  Potential Juror Number 1 (name redacted).

I-8

THE COURT:  Come forward.  And then you can just go get her and help her where she should go.

THE CLERK:  Juror Number 2 (name redacted).

THE COURT:  The rest can be seated while -- while we're here, other than the ones that are still standing.

THE CLERK:  Potential Juror Number 3 (name redacted).  Potential Juror Number 4 (name redacted).  Potential Juror Number 5 (name redacted).

Potential Juror Number 6 (name redacted).  Potential Juror Number 7 (name redacted).  Potential Juror Number 8 (name redacted).

THE COURT:  It was poorly designed.

THE CLERK:  Okay.  Next row, Juror Number -- Potential Juror Number 9 (name redacted).

THE COURT:  Thank you.

COURTROOM DEPUTY:  Sir, you can sit in the first row.

THE CLERK:  Potential Juror Number 10 (name redacted).  Potential Juror Number 11 (name redacted).  Potential Juror Number 12 (name redacted).  Potential Juror Number 13 (name redacted).  Potential Juror Number 14 (name redacted).  Potential Juror Number 15 (name redacted).  Potential Juror Number 16 (name redacted).

THE COURT:  You have to go around the other way.  Okay.

I-9

(Pause.)

THE CLERK:  The next juror is going to sit at that far seat over there.

Potential Juror Number 17 (name redacted).

THE COURT:  And then, as we call the next ones, then you can then go back in the back.

THE CLERK:  Potential Juror Number 18 (name redacted).  Potential Juror Number 19 (name redacted).  Potential Juror Number 20 (name redacted).  Potential Juror Number 21 (name redacted) --

THE COURT:  Help us out.

PROSPECTIVE JUROR 21:  (Name redacted).

THE COURT:  Okay.  Thank you.

THE CLERK:  Potential Juror Number 22 (name redacted).  Potential Juror Number 23 (name redacted).  Potential Juror Number 24 (name redacted).  Potential Juror Number 25 (name redacted).  Potential Juror Number 26 (name redacted).

PROSPECTIVE JUROR 26:  It's (name redacted).

THE CLERK:  (Name redacted.)

THE COURT:  (Name redacted), thank you.

THE CLERK:  Potential Juror Number 27 (name redacted).  Potential Juror Number 28 (name redacted).  Potential Juror Number 29 (name redacted).

PROSPECTIVE JUROR 29:  (Name redacted.)

I-10

THE COURT:  Say it again.

THE CLERK:  (Name redacted.)

PROSPECTIVE JUROR 29:  (Name redacted), yes.

THE COURT:  Thank you.

THE CLERK:  Potential Juror Number 30 (name redacted).  Potential Juror Number 31 (name redacted). Potential Juror Number 32 (name redacted).

THE COURT:  And then the remaining jurors, now you can fill in the seats.

Well, thank you for coming.  I'll bet you're wondering why we're here.  You've been screened for three weeks.  We have good news for you.  After conferring with counsel, we think it will be shorter than that.  But thank you for coming.

Does anybody have an irreconcilable conflict with time?  When -- when we get to you, then bring it up, and we'll see what it -- what's it's about.

All right.  Thank you.  So, let me first start with Juror Number 1.

PROSPECTIVE JUROR 1:  Good morning.

THE COURT:  You could sit if you want or you could stand if you want.

PROSPECTIVE JUROR 1:  Good morning.  This is (name redacted).  I'm just like -- I don't (indiscernible) because I'm having health issue.

I-11

THE COURT:  You -- what is your health issue?

PROSPECTIVE JUROR 1:  I have HRE (phonetic).

THE COURT:  Oh, all right.  Well, so, tell us what you --

PROSPECTIVE JUROR 1:  And this is more close than that coming here.

THE COURT:  Okay.  Tell us what you do?

PROSPECTIVE JUROR 1:  What's that again?

THE COURT:  What do you do for work?

PROSPECTIVE JUROR 1:  A CNA and a caregiver.

THE COURT:  Okay.  And have you ever served in the military?

PROSPECTIVE JUROR 1:  No.

THE COURT:  Do you know anybody that's served in the military?

PROSPECTIVE JUROR 1:  No.

THE COURT:  Do you feel reluctant to be a fair and impartial juror on this case because of your hand or do you think you could handle it?

PROSPECTIVE JUROR 1:  Can you say it again?

THE COURT:  Do you think you could be a fair and impartial juror on this case because of your hand issue or any other issue?

PROSPECTIVE JUROR 1:  I -- it --

THE COURT:  Are you a little nervous?

I-12

PROSPECTIVE JUROR 1:  Yes.

THE COURT:  Do you know, in November, I was Juror Number 1 over in State Court, and the lawyers got to ask me questions too.  And, so, it can be a little nerve-racking, but what we're trying to do is find 12 fair and impartial jurors who could try this case.

The Government has filed certain charges against the Defendant, and the Defendant has pleaded not guilty to these charges and is presumed to be innocent.  Do you --

PROSPECTIVE JUROR 1:  (Indiscernible.)

THE COURT:  So, you don't understand the process?

PROSPECTIVE JUROR 1:  (Indiscernible) I'm so nervous.

THE COURT:  All right.  Why don't you pass the mic to Juror Number 2.

Tell us about yourself.

PROSPECTIVE JUROR 2:  Hi.  My name is (name redacted).

THE COURT:  What do you do?

PROSPECTIVE JUROR 2:  I'm a nurse.

THE COURT:  Oh, all right.  Where do you work?

PROSPECTIVE JUROR 2:  I work at Tri City Medical Center in the ER.

THE COURT:  All right.  Have you ever served in the military?

I-13

PROSPECTIVE JUROR 2:  No, ma'am.

THE COURT:  Are you married or single?

PROSPECTIVE JUROR 2:  Single.

THE COURT:  Is there anybody in your family or close to you that's in law enforcement?

PROSPECTIVE JUROR 2:  No, not really.

THE COURT:  No.  You might be wondering about the nature of the charges here.  This is a very interesting case, and I think if you're selected as a trial juror, you will find it very interesting.  The Defendant is charged with certain crimes.  One is espionage.  One is conspiracy to commit espionage, unlawful export and conspiracy to export technical data related to defense articles, in violation of the Arms Export Control Act and the International Trafficking Arms Regulations and Naturalization fraud.

But, as I said, he's presumed to be innocent, and he is.  He remains innocent unless and until the Government proves each element of the crimes by proof beyond a reasonable doubt.

You've been trained as a nurse.  You're sympathetic to patients.  And, so, do you think that you could fairly listen to the evidence and render a fair judgment in this case if called to do so?

PROSPECTIVE JUROR 2:  Absolutely.  I don't see why not.

I-14

THE COURT:  All right.  Thank you.

So, let's talk about immigration.  There's much discussion about immigration in the nation.  Some people think that there's too many.  Some people think there's not enough.  Some people have strong feelings about the Administration.  That's not what's here.

The Defendant was a member of the United States military, and he then went through the process of naturalization.  One of the things that I get to do as a District Judge is swear in people who went through the naturalization process to become a citizen.

Is there anything about that that would cause you an issue?

PROSPECTIVE JUROR 2:  No, there would be no issue.

THE COURT:  He is -- he was born in China, the People's Republic of China.  But I believe the evidence will show that he was brought here in high school I think, in high school, and then joined the military.

Is there anything about that process that would lead you to conclude that you couldn't be a fair and impartial juror?

PROSPECTIVE JUROR 2:  None whatsoever.

THE COURT:  Do you have any members of your family that have been in the military?

PROSPECTIVE JUROR 2:  Yeah.  I have an uncle that

I-15

was on an aircraft carrier.

THE COURT:  Okay.  Has anybody in the panel served at 32nd Naval Base?  Okay.  Let me get to you.  Then we'll ask you about that.

Has anybody ever served on the USS ESSEX?

No.  All right.  Thank you.

So, we'll hear some testimony about what happened and various technical data and the allegations that the Government is making about what the Defendant did or did not do.

So, let's shift a little bit, and let's talk about China.  Has anybody -- have you traveled to China?

PROSPECTIVE JUROR 2:  No, ma'am.  I've only been out of the United States once.

THE COURT:  Okay.  Has anybody traveled to China?

Would you remind us when we get to you.

It's a very beautiful country.  I've had the privilege of going there.

And does anybody here speak, read or write Chinese, specifically, Mandarin?

PROSPECTIVE JUROR:  (Indiscernible).

THE COURT:  All right.  Thank you.

Does -- has anybody here been naturalized?  Ah, okay.  So, when I get to you, would you remind me to talk about that.  It's a wonderful process.

I-16

Do you -- does any -- has anyone known someone who's been deported from the United States?

PROSPECTIVE JUROR 2:  One of my close friends and coworkers, their mother has been deported back to Mexico.

THE COURT:  I see.  Recently?

PROSPECTIVE JUROR 2:  I think it was like two years ago.

THE COURT:  Okay.  Do you have any strong feelings one way or the other?  This case doesn't involve deportation. It involves a claim of naturalization fraud.

PROSPECTIVE JUROR 2:  I mean, not towards naturalization.  I have strong opinions about our immigration system and everything and how it could be improved, but, you know, not about naturalization.

THE COURT:  Do you think you could be fair and impartial to both the Government and the Defense in this case?

PROSPECTIVE JUROR 2:  Absolutely.

THE COURT:  So, if -- for those of you who have served in the Armed Forces, you may now more than your fellow jurors about military jargon or technical data or acronyms. Can -- those of you who have some familiarity with that, can you judge this case based on the evidence that you hear in the courtroom and not on your own personal knowledge?  Can you do that?

(No audible response.)

I-17

THE COURT:  Has anybody had a security clearance? Did I ask that?

Okay.  Let's talk about that when we get to you as well.

This case was investigated by the FBI and Naval Criminal Investigative Service or NCIS.  Does anyone have any experience working with those agencies?

Okay.  Why don't you pass the mic, and we'll talk about that now.  Tell us your name.

PROSPECTIVE JUROR 9:  (Name redacted.)

THE COURT:  And what do you do?

PROSPECTIVE JUROR 9:  I'm an investigative technical specialist for the Drug Enforcement Administration.

THE COURT:  Oh, okay.  So, do you work on task forces with FBI and NCIS?

PROSPECTIVE JUROR 9:  Every day.

THE COURT:  You have a security clearance?

PROSPECTIVE JUROR 9:  Yes, Top Secret.

THE COURT:  Top -- you have Top Secret.  In this case, you may hear testimony that the FBI obtained court authorization for permission to tap the Defendant's phone and put a microphone in his apartment, commonly called a wiretap.

PROSPECTIVE JUROR 9:  T3.

THE COURT:  Have you -- have you ever dealt with that?

I-18

PROSPECTIVE JUROR 9:  T3's, yes, ma'am.

THE COURT:  Okay.  And do you have any issue with the Government being able to get court authorization for that?

PROSPECTIVE JUROR 9:  Not without court authorization.

THE COURT:  Have you ever testified in court before?

PROSPECTIVE JUROR 9:  No.

THE COURT:  No.  And how do you feel being a government investigator working with a Top Secret clearance about a case where the Defendant is accused of violating his security clearance and providing material to another country?

PROSPECTIVE JUROR 9:  Without knowing the facts, I can't really say.

THE COURT:  Would you judge it based on the evidence that you hear?

PROSPECTIVE JUROR 9:  The facts.

THE COURT:  All right.  Thank you.  Let's pass the mic to our other person.

Tell us your name.

PROSPECTIVE JUROR 15:  (Name redacted.)

THE COURT:  What do you do?

PROSPECTIVE JUROR 15:  I'm currently retired from the military.

THE COURT:  Okay.  And what level did you reach?

I-19

PROSPECTIVE JUROR 15:  Just Secret.

THE COURT:  Okay.  So, you had a Secret clearance. And what branch of the military were you in?

PROSPECTIVE JUROR 15:  The Navy.

THE COURT:  In the Navy?

PROSPECTIVE JUROR 15:  Yes, ma'am.

THE COURT:  And you were on 32nd Street?

PROSPECTIVE JUROR 15:  Yes, ma'am, at the Reserve Center's Office, and I also -- I was a paralegal for the LCS1.

THE COURT:  Tell me what that is.

PROSPECTIVE JUROR 15:  The (indiscernible) current legal signs around the waterfront space of the ship.

THE COURT:  Okay.  So, you've worked as a paralegal, is that  right?

PROSPECTIVE JUROR 15:  Yes, ma'am.

THE COURT:  And would you be able to set aside your training as a paralegal and then judge this case based on the evidence that you hear?

PROSPECTIVE JUROR 15:  Yes, ma'am.

THE COURT:  Do you have any concerns or issues with the nature of the charges?

PROSPECTIVE JUROR 15:  No, ma'am.

THE COURT:  Do you think you could be a fair and impartial juror?

PROSPECTIVE JUROR 15:  Yes, ma'am.

I-20

THE COURT:  Okay for time?

PROSPECTIVE JUROR 15:  Yes, ma'am.

THE COURT:  All right.  Thank you.  Let's go back -- oh, yes.  What else did you want to say?

PROSPECTIVE JUROR 15:  I was also a supervisor for my Security Office at the LCS while in the command.  That was for roughly eight months.

THE COURT:  Did you ever turn anyone in for potential violations of security clearance?

PROSPECTIVE JUROR 15:  We did reports, yes, ma'am.

THE COURT:  And then what happened on those?  Do you know?  Somebody else takes over?

PROSPECTIVE JUROR 15:  Yes, ma'am.

THE COURT:  All right.  Thank you.

Then let's go back.  Is there anything else that you think you should let us know about your ability to be a fair and impartial juror in this case?

PROSPECTIVE JUROR 9:  No, ma'am.

THE COURT:  Okay.  Thank you.

Good morning.  Tell us about yourself.

PROSPECTIVE JUROR 3:  My name is (name redacted).

THE COURT:  What do you do?

PROSPECTIVE JUROR 3:  I am the owner/CEO of a IT consulting company.

THE COURT:  I see.  So, you work with a lot of

I-21

cyber security, IT issues?

PROSPECTIVE JUROR 3:  IT, yes.  We don't do much cyber security.

THE COURT:  Okay.  And how long have you done that?

PROSPECTIVE JUROR 3:  Way too long, 28 years.

THE COURT:  Okay.  All right.  Who are your typical clients?  Are they private?  Are they Government?

PROSPECTIVE JUROR 3:  The bulk of our customers are private.  We did one job for the LHS right before the Pandemic.

THE COURT:  Okay.  Speaking of the Pandemic, does anybody feel that because there was so much publicity about the Wuhan Lab, that that would in any way interfere with your ability to be fair and impartial on -- on this case?

(No audible response.)

THE COURT:  And is that true for everybody?

(No audible response.)

THE COURT:  All right.  Thank you.

Do you have any concerns with the nature of the charges or your ability to be fair and impartial?

PROSPECTIVE JUROR 3:  No, ma'am.

THE COURT:  Will you follow the law as I give it to you, whether you agree with it or not?

PROSPECTIVE JUROR 3:  Yes.

THE COURT:  Have you or any member of your family

I-22

ever served in the military?

PROSPECTIVE JUROR 3:  I have not.  My brother-in-law and my sister-in-law were both in the Navy for four years each.

THE COURT:  And were they based here?

PROSPECTIVE JUROR 3:  She was based up in Washington, and his last billet was at the Pentagon.

THE COURT:  And did he have a -- did they both have security clearances?

PROSPECTIVE JUROR 3:  He did.  I do not know if she did or not.

THE COURT:  Okay.  Have you traveled to China?

PROSPECTIVE JUROR 3:  No.

THE COURT:  No.  Do you have any issues with the claim of naturalization fraud?

PROSPECTIVE JUROR 3:  No.  My dad's naturalized.

THE COURT:  Okay.  And where did he come from?

PROSPECTIVE JUROR 3:  The UK.

THE COURT:  Okay.  Are you okay on time?

PROSPECTIVE JUROR 3:  Yes, I'm fine.

THE COURT:  Is there anybody in your family or close to you in law enforcement?

PROSPECTIVE JUROR 3:  My father-in-law when he retired was Chief (indiscernible) for Lancaster State Prison. My sister-in-law was a correctional officer at most recently

I-23

Tehachapi State Prison.

THE COURT:  Okay.  Did you ever go there and visit any --

PROSPECTIVE JUROR 3:  No.

THE COURT:  -- correctional facility?

PROSPECTIVE JUROR 3:  No.  (Indiscernible) worked for the State.

THE COURT:  And are they still working there or not anymore?

PROSPECTIVE JUROR 3:  My father-in-law has passed. My sister-in-law is retired.

THE COURT:  All right.  Thank you.  Anything else you want to share?

PROSPECTIVE JUROR 3:  I don't believe so.

THE COURT:  Okay.  You may pass the mic.

Good morning.  Tell us about yourself.

PROSPECTIVE JUROR 4:  Good morning.  My name is (name redacted).  I'm an analytical chemist.

THE COURT:  And where do you work?

PROSPECTIVE JUROR 4:  At Easy Labs, LLC in Sorento Valley.

THE COURT:  Okay.  Is there anybody in your family or close to you in the military?

PROSPECTIVE JUROR 4:  No, ma'am.

THE COURT:  Is there anybody in your family or

I-24

close to you in law enforcement?

PROSPECTIVE JUROR 4:  No, ma'am.

THE COURT:  I didn't ask, are you married or single?

PROSPECTIVE JUROR 4:  I'm in a domestic partnership.

THE COURT:  Okay.  Thank you.  And how about you?

PROSPECTIVE JUROR 3:  I'm married.  I forgot to say my uncle was also a Navy Seal.

THE COURT:  Okay.

PROSPECTIVE JUROR 3:  He was based down here somewhere.  I don't know where.

THE COURT:  All right.  And does your wife work outside the home?

PROSPECTIVE JUROR 3:  No.  She works at the same company that we own.

THE COURT:  Okay.  All right.  Thank you.

And does -- what does your domestic partner do?

PROSPECTIVE JUROR 4:  She's a scientist.

THE COURT:  Keep it in the family?

PROSPECTIVE JUROR 4:  Yes.

THE COURT:  All right.  So, you've heard a little bit about this discussion.  Is there anything about the nature of the charges that makes you conclude that you could not be fair and impartial?

I-25

PROSPECTIVE JUROR 4:  No, ma'am.

THE COURT:  Will you listen to the evidence and then decide this case based on the law?

PROSPECTIVE JUROR 4:  Yes, ma'am.

THE COURT:  Do you have any legal training?

PROSPECTIVE JUROR 4:  No.

THE COURT:  Do you have any experience with the FBI or NCIS?

PROSPECTIVE JUROR 4:  No.

THE COURT:  Anyone watch the show?

(No audible response.)

THE COURT:  I guess I'm too old.  The TV shows are not reflective of what actually happens in -- in cases, and we'll hear from the case agents about what actually happens.

Are you okay on time?

PROSPECTIVE JUROR 4:  Yes.

THE COURT:  And do you think you could be fair and impartial in this case?

PROSPECTIVE JUROR 4:  Yes.

THE COURT:  All right.  You may pass the mic.

Good morning.

PROSPECTIVE JUROR 5:  Good morning.

THE COURT:  Tell us about yourself.

PROSPECTIVE JUROR 5:  (Name redacted.)  I'm a mechanical engineer.

I-26

THE COURT:  Okay.  And are you married or single?

PROSPECTIVE JUROR 5:  Married.

THE COURT:  Does your spouse work outside the home?

PROSPECTIVE JUROR 5:  Yeah.  She's a special education teacher.

THE COURT:  Okay.  Is there anybody in your family or close to you in the military or working for the government?

PROSPECTIVE JUROR 5:  No.

THE COURT:  You've heard the Court's questions to the other jurors.  Is there anything that you think you would want to share?

PROSPECTIVE JUROR 5:  Just that I have gone to China.

THE COURT:  Okay.  And then when did you go?

PROSPECTIVE JUROR 5:  July of last year.

THE COURT:  And did you also go to Hong Kong or just China?

PROSPECTIVE JUROR 5:  I've been to Hong Kong in the past and McCaw.

THE COURT:  And was it just for vacation, pleasure?

PROSPECTIVE JUROR 5:  Yeah, a tour of Disneyland.

THE COURT:  Okay.  All right.  Thank you.  When I went, I think Taylor Swift was there.  And the whole Fast Train was full of Swifties.

All right.  Is there -- do you have any training in

I-27

the law?

PROSPECTIVE JUROR 5:  No.

THE COURT:  No security clearance?

PROSPECTIVE JUROR 5:  No.

THE COURT:  No.  Is there anything that you -- that the Court's questions you thought that you should then share with us?

PROSPECTIVE JUROR 5:  Both my parents were naturalized.

THE COURT:  Okay.  And where did they come from?

PROSPECTIVE JUROR 5:  Mom from Mexico, Dad from Kuwait, but (indiscernible).

THE COURT:  Okay.  All right.  And do you have any concerns about someone who's -- as I said, many people, many of the people that we swear in are in the military and go through the national -- naturalization process and then become citizens without any issue.  But in this case, the Government has charged the Defendant with naturalization fraud.

Would you be able to listen to the evidence and then judge the case based on the evidence that you hear?

PROSPECTIVE JUROR 5:  Yes, ma'am.

THE COURT:  All right.  Anything else?

(No audible response.)

THE COURT:  All right.  You may pass the mic.

Good morning.

I-28

PROSPECTIVE JUROR 6:  Good morning.

THE COURT:  Tell us about yourself.

PROSPECTIVE JUROR 6:  My name is Ashley Parker. I'm a special ed teacher.  I do know law enforcement, and I know quite a few Marines.

THE COURT:  Okay.  Does -- do you think that would in any way impact your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 6:  No.

THE COURT:  Okay.  Do you have any concerns about the Government getting court authorization to use surveillance techniques to look at a phone or the apartment?

PROSPECTIVE JUROR 6?  No.

THE COURT:  Okay.  Do you have any reason to believe you could not be fair and impartial?

PROSPECTIVE JUROR 6:  No.

THE COURT:  Are you okay on time?

PROSPECTIVE JUROR 6:  It is the beginning of the school year.  So, that would be difficult.

THE COURT:  Oh, I see.

PROSPECTIVE JUROR 6:  But it is what it is.

THE COURT:  And when does it start?

PROSPECTIVE JUROR 6:  It started last Wednesday.

THE COURT:  Oh, I see.  And, so, how many are in your class?

I-29

PROSPECTIVE JUROR 6:  I'm a special ed teacher. So, I have 28 students on my caseload, but they're not all in my class at one time.

THE COURT:  Okay.  And if you were selected, then would you be able to serve?

PROSPECTIVE JUROR 6:  Yeah.

THE COURT:  And the -- the parties can take that into consideration as well.

All right.  Thank you.

Good morning.

PROSPECTIVE JUROR 7:  Good morning, ma'am.

THE COURT:  Tell us about yourself.  What's your name?

PROSPECTIVE JUROR 7:  My name's (name redacted).

THE COURT:  And what do you do?

PROSPECTIVE JUROR 7:  I'm a retired City of San Diego employee, heavy equipment operator, retired 30 years.

THE COURT:  Okay.  Good.  How do you spend your time?

PROSPECTIVE JUROR 7:  Just retired, in the garage, you know, fiddle around with hobbies, working on my cars.

THE COURT:  Okay.

PROSPECTIVE JUROR 7:  Maintaining them.

THE COURT:  Are you married or single?

PROSPECTIVE JUROR 7:  Never married.  No kids that

I-30

I know of.

THE COURT: Okay.

PROSPECTIVE JUROR 7: Single -- single currently.

THE COURT: In recent years, there's been increased public attention on political military and economic relations between the United States and China. Do you have any feelings positive or negative about that that you think would impact your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 7: No, ma'am.

THE COURT: Is -- have you or anybody in your family served in the military or in law enforcement?

PROSPECTIVE JUROR 7: My dad, he was in Pearl Harbor. He's deceased.

THE COURT: Oh.

PROSPECTIVE JUROR 7: My oldest half brother was in the Marines. He's deceased. And I think that's it.

THE COURT: Okay. Do you have any strong feelings about the nature of the charges? The Defendant is accused of espionage, but it will be up to the Government to prove each element of the offense by proof beyond a reasonable doubt, and the Defendant has pled not guilty. And, so, that's why we're having this trial.

PROSPECTIVE JUROR 7: Yeah. I'll just evaluate the facts and make a decision.

THE COURT: You're okay on time?

I-31

PROSPECTIVE JUROR 7:  Yes.

THE COURT:  All right.  Thank you.  You may pass the mic.

Good morning.

PROSPECTIVE JUROR 8:  Good morning.  My name's (name redacted).  I work for the VA.

THE COURT:  You work for the what?

PROSPECTIVE JUROR 8:  The VA.  I'm sorry.

THE COURT:  Oh, the VA.  Okay.  So --

PROSPECTIVE JUROR 8:  Department of Veterans Affairs.

THE COURT:  So, you do work for the government?

PROSPECTIVE JUROR 8:  Yes, ma'am.

THE COURT:  Okay.  What do you do?

PROSPECTIVE JUROR 8:  Well, I'm in charge of housekeeping.

THE COURT:  Okay.

PROSPECTIVE JUROR 8:  Um-hmm.  So, I'm -- I'm prior military.  I'm married, four kids.

THE COURT:  So, what -- what branch did you serve in the military?

PROSPECTIVE JUROR 8:  I was in the Navy, and I served on 32nd Street.

THE COURT:  Ah, okay.  Not on the ESSEX?

PROSPECTIVE JUROR 8:  No, ma'am.

I-32

THE COURT:  I forget what type of ship it is, LH --

MR. PARMLEY:  LHD, amphibious assault ship.

THE COURT:  Okay.  What kind of ship were you assigned to?

PROSPECTIVE JUROR 8:  I was on the DEEDE, which is a DE destroyer.

THE COURT:  Oh, okay.  All right.  How do you feel about serving on a case where the Defendant is accused of violating his military oath and sharing information with another country?

PROSPECTIVE JUROR 8:  I just follow the facts.

THE COURT:  All right.  Thank you.  Are you okay on time?

PROSPECTIVE JUROR 8:  Yes, ma'am.

THE COURT:  And do any of your children work outside the home?

PROSPECTIVE JUROR 8:  I have -- I have teenagers. So --

THE COURT:  Oh, okay.  Not.

PROSPECTIVE JUROR 8:  So, they're working like little odd jobs like Chipotle or things like that.

THE COURT:  Okay.  Did you ever have a security clearance?

PROSPECTIVE JUROR 8:  No, ma'am.

THE COURT:  No.  Do you know people who did?

I-33

PROSPECTIVE JUROR 8:  I have some friends that was in the Navy that did, yes.

THE COURT:  Okay.  Is there anything that the Court's questions has touched on here that you think you should share with the rest of us?

PROSPECTIVE JUROR 8:  No, nothing that I can think of.

THE COURT:  Do you think you can be fair and impartial on this case?

PROSPECTIVE JUROR 8:  Most definitely.

THE COURT:  All right.  Thank you.

(Pause.)

THE COURT:  Did I ask you whether you were married or single?

PROSPECTIVE JUROR 9:  I'm married.

THE COURT:  And does your wife work outside the home?

PROSPECTIVE JUROR 9:  Yes.  She's an insurance executive.

THE COURT:  Okay.  Is there anything about the Court's questions that would lead you to conclude that you couldn't be fair and impartial in this case?

PROSPECTIVE JUROR 9:  No, but I was a Marine Corps officer.  I don't know.

THE COURT:  Oh, okay.  So, you were in the military

I-34

as a Marine Corps officer?

PROSPECTIVE JUROR 9:  Yes.

THE COURT:  Yes.  And where did you serve?

PROSPECTIVE JUROR 9:  Here in San Diego and some WESPAC training, Western Pacific training.

THE COURT:  Okay.  Did you have a security clearance in the military as well?

PROSPECTIVE JUROR 9:  Yes, Top Secret as well.

THE COURT:  Oh, I see.  All right.  Thank you.  Is there anything else you would like to share?

PROSPECTIVE JUROR 9:  No.

THE COURT:  All right.  Thank you.

Good morning.

PROSPECTIVE JUROR 10:  Good morning.

THE COURT:  Tell us about yourself.

PROSPECTIVE JUROR 10:  My name is (name redacted). I'm a middle school teacher.

THE COURT:  Okay.  And, so, are you in the same situation that school's just starting or not, you're okay?

PROSPECTIVE JUROR 10:  My school has not started yet.

THE COURT:  Oh, okay.  Good.  Are you okay on time?

PROSPECTIVE JUROR 10:  Yeah.

THE COURT:  Okay.  Is there anybody in your family or close to you in the military or in law enforcement?

I-35

PROSPECTIVE JUROR 10:  No.

THE COURT:  No.  Are you married or single?

PROSPECTIVE JUROR 10:  I'm married.

THE COURT:  And does your spouse work outside the home?

PROSPECTIVE JUROR 10:  Yes.  He's a high school teacher.

THE COURT:  Oh, okay.  Staying in the family too. Is there -- do you have any training in the law?

PROSPECTIVE JUROR 10:  I do not.

THE COURT:  Will you listen to the evidence and judge the case based on the evidence that you hear?

PROSPECTIVE JUROR 10:  Yes.

THE COURT:  Do you know anybody who's been in the military?

PROSPECTIVE JUROR 10:  I think a couple of my uncles were but are not anymore, and I am not close with them.

THE COURT:  Okay.  So, it wouldn't make any difference in this case?

PROSPECTIVE JUROR 10:  No.

THE COURT:  Can you think of any reason why you could not serve?

PROSPECTIVE JUROR 10:  No, ma'am.

THE COURT:  You may pass the mic.

Good morning.

I-36

PROSPECTIVE JUROR 11:  Good morning.

THE COURT:  Tell us about yourself.  What's your name?

PROSPECTIVE JUROR 11:  My name is (name redacted).

THE COURT:  Okay.  What do you do?

PROSPECTIVE JUROR 11:  I'm retired.

THE COURT:  What did you used to do?

PROSPECTIVE JUROR 11:  I worked for Qualcomm.

THE COURT:  Okay.  And what did you do for Qualcomm?

PROSPECTIVE JUROR 11:  Engineering support.

THE COURT:  Okay.  Engineering support?

PROSPECTIVE JUROR 11:  Yes.

THE COURT:  Did you ever work in IT?

PROSPECTIVE JUROR 11:  No.

THE COURT:  No.  Or cyber security?

PROSPECTIVE JUROR 11:  No.

THE COURT:  No.  Anything with a security clearance?

PROSPECTIVE JUROR 11:  No.

THE COURT:  I forgot if I asked you, are you married or single?

PROSPECTIVE JUROR 11:  I'm married.

THE COURT:  And does your wife work or is she retired?

I-37

PROSPECTIVE JUROR 11:  She's retired.

THE COURT:  What did she do?

PROSPECTIVE JUROR 11:  She (indiscernible) with a bio company.

THE COURT:  Okay.  Are you okay on time for this case?

PROSPECTIVE JUROR 11:  (Indiscernible) Thursday I have to go to the hospital to do biopsy on my liver.

THE COURT:  Oh, I'm so sorry.

PROSPECTIVE JUROR 11:  I got a blood disorder.

THE COURT:  And that is on Thursday?

PROSPECTIVE JUROR 11:  On Thursday, the 14th.

THE COURT:  At what time?

PROSPECTIVE JUROR 11:  At -- I have to check in at 7.

THE COURT:  A.m.?

PROSPECTIVE JUROR 11:  At 7 a.m. and surgery at 9 a.m.

THE COURT:  So, Thursday will be a problem for you?

PROSPECTIVE JUROR 11:  Yes.

THE COURT:  All right.  Thank you.  You can pass the mic.

Good morning.  Tell us your name.

PROSPECTIVE JUROR 12:  My name is (name redacted).

THE COURT:  What do you do?

I-38

PROSPECTIVE JUROR 12:  I'm currently a freelance graphic designer, so artist and child caretaker.

THE COURT:  Okay.  And what have you done before?

PROSPECTIVE JUROR 12:  Previously I was a teacher, but budget cuts.  I got -- I got cut.

THE COURT:  Oh, okay.  Are you married or single?

PROSPECTIVE JUROR 12:  I'm currently single.

THE COURT:  Okay.  Is there anybody in your family or close to you in law enforcement or the military?

PROSPECTIVE JUROR 12:  I have a distant uncle but no one close enough to really know.

THE COURT:  So, it wouldn't make any difference?

PROSPECTIVE JUROR 12:  No.

THE COURT:  You've heard the brief discussion about the nature of the case.  Is there anything about this case that would give you concern about your ability to serve?

PROSPECTIVE JUROR 12:  No, ma'am.

THE COURT:  Are you okay on time?

PROSPECTIVE JUROR 12:  The only issue is the childcare part, and my sister is currently injured and there's no one else to watch the baby.

THE COURT:  Okay.

PROSPECTIVE JUROR 12:  So, other than that --

THE COURT:  Do you think you could work around it if you are selected?

I-39

PROSPECTIVE JUROR 12:  Yes, I think I can.

THE COURT:  Okay.  Thank you very much.

Good morning.  Tell us your name.

PROSPECTIVE JUROR 13:  Good morning.  My name is (name redacted), and I work at HD Supply inside sales.  My wife is also there at the same company.

THE COURT:  Okay.

PROSPECTIVE JUROR 13:  We're new grandparents.

THE COURT:  Oh, congratulations.  I was just with my two grandchildren and then with my other two grandchildren, and they're wonderful.  And they like Grandma and Grandpa.

Have you ever served in the military?

PROSPECTIVE JUROR 13:  I have not.  My father did.

THE COURT:  Okay.

PROSPECTIVE JUROR 13:  And he retired probably 1970, right around there.

THE COURT:  Okay.  And how about law enforcement?

PROSPECTIVE JUROR 13:  No.

THE COURT:  Do you have any concerns about the FBI or NCIS using a wiretap?

PROSPECTIVE JUROR 13:  No.

THE COURT:  Do you have any concerns about the naturalization process:

PROSPECTIVE JUROR 13:  No.  I don't completely understand it, but I'll be objective.

I-40

THE COURT:  It will be the parties' opportunity to provide you with the evidence about what happened.

PROSPECTIVE JUROR 13:  Okay.

THE COURT:  And can you listen to the evidence and then decide the case based on the evidence that you hear?

PROSPECTIVE JUROR 13:  Absolutely will do my best.

THE COURT:  Any problems with time?

PROSPECTIVE JUROR 13:  No.

THE COURT:  All right.  Thank you.

Good morning.

PROSPECTIVE JUROR 14:  Good morning.  I'm (name redacted).  I have -- I wear two hats.  I am a freelance editor for children's books and writer.

THE COURT:  That sounds like fun.

PROSPECTIVE JUROR 14:  I love it.  And I am also the administrative coordinator of student conduct at San Diego State, overseeing the young people living in the dorms.

THE COURT:  Oh.  All of them?  That's a job.,

PROSPECTIVE JUROR 14:  8500 of them right now.  I have three young people of my own, 20 year old triplet sons.

THE COURT:  Are they working?

PROSPECTIVE JUROR 14:  They are all -- they work odd -- yes.  One is an EMT, training to be a firefighter.  The other two are full-time students at San Diego State but also one scoops ice cream, and the other is a lifeguard.

I-41

THE COURT:  Okay.  Is there anyone in your family in the military or in law enforcement or somebody close to you?

PROSPECTIVE JUROR 14:  My father retired from the Air Force as a Chief Master Sergeant.  He retired when I was about five or six.  So, it's been a long time.

My brother-in-law was in -- he was a Marine and then a police officer in San Antonio.  He passed away unrelated to his work 15 years ago.

THE COURT:  Are you okay on time?

PROSPECTIVE JUROR 14:  Yes.

THE COURT:  And is there anything that you've heard about this case that gives you pause for you to be a fair and impartial juror?

PROSPECTIVE JUROR 14:  No.

THE COURT:  All right.  Thank you.

Tell us a little bit more about you.

PROSPECTIVE JUROR 15:  My husband is also a paralegal.

THE COURT:  Oh.

PROSPECTIVE JUROR 15:  He works as an instructor currently for the Naval Justice School Detachment on 32nd Street.

THE COURT:  Okay.

PROSPECTIVE JUROR 15:  He also worked on the -- on

I-42

32nd Street as well.

I have a son wh is a land assessor who currently is 22.  Currently residing in Twinsburg, Ohio.  What else would you like to know?

THE COURT:  You're okay on time?

PROSPECTIVE JUROR 15:  Aside from a doctor appointment on Friday.

THE COURT:  What time is that?

PROSPECTIVE JUROR 15:  It's around 1 o'clock.  It would be just for a couple of hours.  I get (indiscernible) every four weeks.

THE COURT:  Is there any way you can rearrange that?

PROSPECTIVE JUROR 15:  At my last one about two and a half weeks.  So, I can maybe push it a little longer.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR 15:  Yes, ma'am.

PROSPECTIVE JUROR 16:  Good morning.

THE COURT:  Good morning.  Tell us about yourself.

PROSPECTIVE JUROR 16:  I am (name redacted).  I'm a retired County employee.

THE COURT:  What did you do for the County?

PROSPECTIVE JUROR 16:  I'm a document services coordinator/HSSA records manager.

THE COURT:  Okay.  And did you work with litigators

I-43

there at the County or something else?

PROSPECTIVE JUROR 16: One time I got -- send me to the -- the place for child support, Children's Services.

THE COURT: I see.

PROSPECTIVE JUROR 16: (Indiscernible.)

THE COURT: Okay. Are you married or single?

PROSPECTIVE JUROR 16: I'm single.

THE COURT: Okay. Is there anything about this case that makes you think that you couldn't be fair and impartial?

PROSPECTIVE JUROR 16: I have a retired brother from the Navy and two active in the Navy nephews.

THE COURT: Okay. Do they have security clearances?

PROSPECTIVE JUROR 16: I don't think so.

THE COURT: Okay. Other than that, does that -- the fact that they either have been or are in the military make you think that you would not be fair to both sides in this case?

PROSPECTIVE JUROR 16: I would be very very strict, though, because being a records manager, I adhere -- you know, I make sure that all my employees are abiding all the laws and regulations. So --

THE COURT: Okay.

PROSPECTIVE JUROR 16: I would be very strict.

I-44

THE COURT:  And you understand the Defendant is presumed to be innocent?

PROSPECTIVE JUROR 16:  Yes, I do.

THE COURT:  And then it's up to the Government to present evidence?

PROSPECTIVE JUROR 16:  Yes.

THE COURT:  Would you be able to evaluate that evidence?

PROSPECTIVE JUROR 16:  I will try my best.

THE COURT:  Okay.  Thank you.  Okay on time?  Okay on time?

PROSPECTIVE JUROR 16:  Okay on time.  I have problem from the parking going here, walking with my cane.

THE COURT:  I see.  So, it would be inconvenient for you to serve?

PROSPECTIVE JUROR 16:  Yes.

THE COURT:  All right.

PROSPECTIVE JUROR 16:  Because I know I was huffing and puffing on the way here, and my heartbeat is racing.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR 16:  Thank you.

THE COURT:  Tell us your name.

PROSPECTIVE JUROR 17:  My name is (name redacted). I work in retail, Lowe's Home Improvement Store.

THE COURT:  Okay.  What do you do for them?

I-45

PROSPECTIVE JUROR 17:  I work in the Receiving Department.  So, I unload a lot of the trucks, driving like the heavy equipment, forklifts, driving.

THE COURT:  Are you married or single?

PROSPECTIVE JUROR 17:  I'm single.

THE COURT:  Is there anyone in your family or close to you in law enforcement or the military?

PROSPECTIVE JUROR 17:  My father works as a deputy sheriff.  Also he worked as a correctional officer at Donovan State Prison for about 15 years.  And then --

THE COURT:  Did you ever visit there?

PROSPECTIVE JUROR 17:  Just outside like in the parking lots.  I never actually went in.

THE COURT:  Okay.

PROSPECTIVE JUROR 17:  My father is also retired Navy, 20 years, and my brother just recently got out of the Army after nine years.

THE COURT:  Okay.  did your father have a security clearance, if you know?

PROSPECTIVE JUROR 17:  Not that I'm aware of.

THE COURT:  All right.  Is there anything about your connection with your family to military that would make you think that you couldn't be fair to either side?

PROSPECTIVE JUROR 17:  I don't believe so, o.

THE COURT:  Are you okay on time?

I-46

PROSPECTIVE JUROR 17:  Yes.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR 17:  Okay.  Thank you.

THE COURT:  Good morning.

PROSPECTIVE JUROR 18:  Good morning.

THE COURT:  Tell us about yourself.

PROSPECTIVE JUROR 18:  Okay.  My name is (name redacted).  I am retired.  I was an electrical engineer for 35 years.

THE COURT:  Okay.  Where did you work?

PROSPECTIVE JUROR 18:  My last employment was at Jet Propulsion Lab for a short period of time.

THE COURT:  Oh.

PROSPECTIVE JUROR 18:  Worked on the Mars Lander (indiscernible), and before that I was at General Atomics for a very short period of time, and the bulk of my time was at General Dynamics Electronics/BAE Systems.

THE COURT:  Um-hmm.  Are you married or single?

PROSPECTIVE JUROR 18:  I'm married.  My wife is also retired.  She was a real estate agent.  I have one daughter.  She is 40.  We've got one granddaughter.  She's got her own business.

THE COURT:  What does she do?

PROSPECTIVE JUROR 18:  She coordinates remodeling of homes.

I-47

THE COURT: Oh, okay. all right. You've heard the allegations in this case. Do you think you could be fair and impartial?

PROSPECTIVE JUROR 18: Oh, yes.

THE COURT: All right.

PROSPECTIVE JUROR 18: I -- I did have a security clearance.

THE COURT: Oh. And was that through JPL or --

PROSPECTIVE JUROR 18: No, no. It was through General Dynamics --

THE COURT: Okay.

PROSPECTIVE JUROR 18: -- Electronics.

THE COURT: And what level?

PROSPECTIVE JUROR 18: It was at Top Secret with some compartments for customers.

THE COURT: Okay. So, you understand for those people that do have a security clearance, it's important that they abide by the security requirements?

PROSPECTIVE JUROR 18: Yes.

THE COURT: Yes. Do you have any problem if somebody is sharing non-classified information, just general public -- publically available information?

PROSPECTIVE JUROR 18: I'm sorry. Could you say that again?

THE COURT: Maybe I wasn't very clear. So, the

I-48

Defendant is charged with providing Secret materials.

PROSPECTIVE JUROR 18:  Right.

THE COURT:  The Government will have to show that they're Secret --

PROSPECTIVE JUROR 18:  Correct.

THE COURT:  -- and not otherwise just available --

PROSPECTIVE JUROR 18:  right.

THE COURT:  -- on the Internet or somewhere else.

PROSPECTIVE JUROR 18:  Well, I have no problem with people discussing things that are unclassified, no.

THE COURT:  Okay.  All right.  So, do you think you could be fair and impartial in this case?

PROSPECTIVE JUROR 18:  Oh, yes.

THE COURT:  All right.  Thank yo.

Good morning.

PROSPECTIVE JUROR 19:  Good morning.  My name is (name redacted).  I am a project assistant for Apton (indiscernible) Services.

THE COURT:  Oh, what does that -- what do you do?

PROSPECTIVE JUROR 19:  I work with the government on helping work -- work orders and administration stuff.

THE COURT:  Do you work with the FBI or NCIS?

PROSPECTIVE JUROR 19:  No.

THE COURT:  No?

PROSPECTIVE JUROR 19:  No.

I-49

THE COURT:  You're more on the human resources side?

PROSPECTIVE JUROR 19:  No.  I work -- we help -- we work with the Army, Navy, and Marines at sites to clean up waste and fuel and things like that.

THE COURT:  I see.  I see.

PROSPECTIVE JUROR 19:  Yeah.

THE COURT:  Do you have a -- a security clearance?

PROSPECTIVE JUROR 19:  A low level.  We -- we deal with proprietary items and things like that.

THE COURT:  And, so, you know the importance to make sure that you're compliant?

PROSPECTIVE JUROR 19:  Yes.

THE COURT:  Do you have any reservations about serving on this trial?

PROSPECTIVE JUROR 19:  No, not at all.

THE COURT:  Do you think you could be fair and impartial?

PROSPECTIVE JUROR 19:  Yes.

THE COURT:  I forgot if I asked, are you married or single?

PROSPECTIVE JUROR 19:  I'm single.

THE COURT:  Okay.

PROSPECTIVE JUROR 19:  Divorced.  I have seven grandchildren.

I-50

THE COURT:  Oh.

PROSPECTIVE JUROR 19:  Yeah.  But I also have good friends in law enforcement and family in the military and retired military.

THE COURT:  Having those relationships, do you think you would be more inclined to view the Government's evidence more favorable -- more favorably and not be fair to the Defendant?

PROSPECTIVE JUROR 19:  Because I also have family members that are naturalized.

THE COURT:  I see.

PROSPECTIVE JUROR 19:  Yes.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR 19:  Thank you.

THE COURT:  Good morning.

PROSPECTIVE JUROR 20:  Good morning.

THE COURT:  Tell us about yourself.

PROSPECTIVE JUROR 20:  My name is (name redacted).  I'm a retired biomedical engineer.  I'm currently single, and nobody in my family has served in the military.

THE COURT:  How about law enforcement connections?

PROSPECTIVE JUROR 20:  No law enforcement connections either.

THE COURT:  Is there any problem with time?

PROSPECTIVE JUROR 20:  No problem with time.

I-51

THE COURT:  Is there any reservation about the nature of the charges in this case?

PROSPECTIVE JUROR 20:  None whatsoever.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR 21:  Hello.

THE COURT:  Tell us your name.

PROSPECTIVE JUROR 21:  My name is (name redacted).

THE COURT:  Are you married or single?

PROSPECTIVE JUROR 21:  Married.

THE COURT:  What does your spouse do?

PROSPECTIVE JUROR 21:  He's a detective for the State of California.

THE COURT:  For the State of California?

PROSPECTIVE JUROR 21:  Yes.

THE COURT:  So --

PROSPECTIVE JUROR 21:  At the Department of Insurance.

THE COURT:  I see.  All right.  So, he's in law enforcement.  Has he ever worked in any other capacity in law enforcement?

PROSPECTIVE JUROR 21:  No.

THE COURT:  No.  And what do you do?

PROSPECTIVE JUROR 2:  I'm a database administrator for the International Rescue Team.  It's a nonprofit.

THE COURT:  What -- what is it's mission?

I-52

PROSPECTIVE JUROR 21:  Mainly refuge resettlements.

THE COURT:  Okay.  So, do you get contracts for that from the government?

PROSPECTIVE JUROR 21:  There -- there is a contract with the government for refugee resettlement.

THE COURT:  Okay.  How do you feel about someone who's charged with naturalization fraud?

PROSPECTIVE JUROR 21:  I don't feel any way in particular.

THE COURT:  So, do you think you could be fair and impartial given the nature of the charges in this case, to both sides?

PROSPECTIVE JUROR 21:  Yes.

THE COURT:  Any problems with time?

PROSPECTIVE JUROR 21:  No.

THE COURT:  Okay.  Thank you.

Good morning.

PROSPECTIVE JUROR 22:  Good morning.

THE COURT:  Tell us about yourself.

PROSPECTIVE JUROR 22:  I'm (name redacted).  I work for UC San Diego Health.  Single, have a cousin who's in the Navy, nobody in law enforcement.

THE COURT:  Any reservations about serving on this case?

PROSPECTIVE JUROR 22:  No.

I-53

THE COURT:  Any problems with time?

PROSPECTIVE JUROR 22:  No.

THE COURT:  Okay.  And what do you do for UC Health?

PROSPECTIVE JUROR 22:  I run some of our very random programs.  I run our pet therapy program.  I run our family fusion advisory councils.  I run our clinical observer program, run a lot of the random programs that are in hospitals.

THE COURT:  And how long have you done that?

PROSPECTIVE JUROR 22:  Three years.

THE COURT:  What did you do before that?

PROSPECTIVE JUROR 22:  Before that, I was a coordinator for organ donation.

THE COURT:  Oh.

PROSPECTIVE JUROR 22:  And, so, I worked with families at -- when a patient was at end of life and they were moving forward with organ donation.

THE COURT:  So, primarily, you've been in the health field?

PROSPECTIVE JUROR 22:  Always been in the health field.

THE COURT:  All right.  Any concerns about serving on a case like this?

PROSPECTIVE JUROR 22:  No.

I-54

THE COURT:  There might be some publicity, might not be publicity.  I'll instruct if you are selected to be serving on this jury for you to only follow the evidence in this case and ignore anything else that may or may not come up in the -- in the media.  Will you do that?

PROSPECTIVE JUROR 22:  Absolutely.

THE COURT:  And will everybody do that?

(No audible response.)

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR 23:  Hello.  I'm (name redacted).

THE COURT:  Tell us about yourself.

PROSPECTIVE JUROR 23:  I'm a senior manager of product management at a software company here in San Diego.

THE COURT:  Okay.  And do you work on any secured matters?

PROSPECTIVE JUROR 23:  No.  We have a compliance aspect to our product rights for sales.

THE COURT:  I see.

PROSPECTIVE JUROR 23:  Yeah.

THE COURT:  Are you married or single?

PROSPECTIVE JUROR 23:  I'm married.  My wife is an investigator with the Public Defender's Office for San Diego County.

THE COURT:  So, she's on the Defense side?

PROSPECTIVE JUROR 23:  Yes, she is.

I-55

THE COURT:  Okay.  How do you feel about serving on a case where it's the Government's burden to -- to prove the case?

PROSPECTIVE JUROR 23:  I'm well versed in the workings of the court, and I definitely believe in innocent until proven guilty.

THE COURT:  Okay.  All right.  Do you think you would be fair to both sides?

PROSPECTIVE JUROR 23:  Yes.

THE COURT:  Yes.  Any problems with time?

PROSPECTIVE JUROR 23:  It's a very busy time for my job, but I can make it work if needed.

THE COURT:  All right.  I do think it will be faster than the three weeks that we have screened people for. Thank you.

PROSPECTIVE JUROR 23:  Thank you.

THE COURT:  Good morning.

PROSPECTIVE JUROR 24:  My name is (name redacted). I'm a geologist.  I do environmental consulting work.  My husband is a CFO for MCCS, which is Marine Corps Services at Camp Pendleton.

THE COURT:  Ah, okay.

PROSPECTIVE JUROR 24:  I have a brother who was in the Navy and several close friends.

THE COURT:  So, is the -- is that a civilian job?

I-56

PROSPECTIVE JUROR 24:  Yes.

THE COURT:  Yes, it's a civilian.  And were they in the military before?

PROSPECTIVE JUROR 24:  No.

THE COURT:  No.  Okay.

PROSPECTIVE JUROR 24:  I have a brother who was Navy and close friends who were Coast Guard, Army and Marines. So --

THE COURT:  Okay.  How do you see about serving on a case like this?

PROSPECTIVE JUROR 24:  I think I could be impartial.

THE COURT:  Okay.  Any problems with time?

PROSPECTIVE JUROR 24:  Yes.

THE COURT:  Oh, you're the one that said --

PROSPECTIVE JUROR 24:  Yeah.  Since the form came out, we've purchased a home in Louisiana and are closing on the 22nd which is next Friday.  So, I have to go.  I'm -- my plan is to leave on Monday to do the, you know, walk throughs and everything for closing on the house.  I could delay my going, but I have to be there --

THE COURT:  You have to be there.

PROSPECTIVE JUROR 24:  -- on Friday, the 22nd.

THE COURT:  Friday the 22nd?

PROSPECTIVE JUROR 24:  Correct.

I-57

THE COURT:  So, if we're set before like the 21st, my court reporter wants to --

PROSPECTIVE JUROR 24:  I have to fly out the 21st

THE COURT:  -- bring her son to college on the 21st.

PROSPECTIVE JUROR 24:  And not a lot of flights leave late.

THE COURT:  Okay.

PROSPECTIVE JUROR 24?  So, I would need the 21st and the 22nd.

THE COURT:  Okay.  We'll --

PROSPECTIVE JUROR 24:  At a minimum.

THE COURT:  We'll keep that in mind.

PROSPECTIVE JUROR 24:  Okay.

THE COURT:  All right.  Which town?

PROSPECTIVE JUROR 24:  Lake Charles, Louisiana. That's where I'm from.

PROSPECTIVE JUROR 24:  Oh, okay.  All right.  Thank you.

THE COURT:  Good morning.

PROSPECTIVE JUROR 25:  Hello.  My name is (name redacted).  I'm a custodian at the San Diego Unified School District.  I also am the curator for Mexican antique jewelry from Mexico.  I am married.

THE COURT:  Tell me about your curator business.

I-58

PROSPECTIVE JUROR 25:  I started collecting Mexican jury about five years ago when I saw they actually exist.  So, I now collect them and sell them specifically to Barrio Logan for a spiritual environment and identity crisis.

THE COURT:  Okay.  Is there anybody in your family or close to you in the military or law enforcement?

PROSPECTIVE JUROR 25:  I have a couple of friends who've gone through the military, but that's about it.

THE COURT:  Okay.  Any concerns about serving on a case like this?

PROSPECTIVE JUROR 25:  I do believe in decolonization and going back to (indiscernible).  So, no, I do not have any (indiscernible) in the United States of America.

THE COURT:  Not very positive because you think they stole the country?

PROSPECTIVE JUROR 25:  There's various ideas, yeah.

THE COURT:  Okay.  Could you think you could set that view aside and then judge this based on the evidence that you hear or do you think that you have such strong views that this might --

PROSPECTIVE JUROR 25:  I usually can, but depending on the evidence and how they're attacking the Defendant, my biases might come into play.

THE COURT:  All right.  And any -- other than those

I-59

concerns, any problems with time?

PROSPECTIVE JUROR 25:  No.  Except for the end of the month which I have a retreat I have to go to (indiscernible).

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR 26:  Hello.  My name is (name redacted).  I'm currently unemployed.  I just graduated college this past month.

THE COURT:  What was your major?

PROSPECTIVE JUROR 26:  Business marketing.

THE COURT:  And that's what you would --

PROSPECTIVE JUROR 26:  Yes, I want to work in PR.

THE COURT:  All right.  Good.  Are you married or single?

PROSPECTIVE JUROR 26:  I'm currently single.

THE COURT:  And is there anybody in your family or close to you in the military or law enforcement?

PROSPECTIVE JUROR 26:  No, ma'am.

THE COURT:  Do you have any concerns about the nature of this case?

PROSPECTIVE JUROR 26:  No, ma'am.

THE COURT:  Or your ability to serve?

PROSPECTIVE JUROR 26:  No.

THE COURT:  Do you think you could be fair and impartial on this case?

I-60

PROSPECTIVE JUROR 26:  Yes.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR 26:  Thank you.

PROSPECTIVE JUROR 27  Good morning.  My name is (name redacted).  I am an accountant.

THE COURT:  Put it -- put the mic a little closer.

PROSPECTIVE JUROR 27  I'm an accountant.

THE COURT:  Oh, okay.  And are you married or single?

PROSPECTIVE JUROR 27  Divorced.

THE COURT:  Okay.  Do you have any children that are working outside the home?

PROSPECTIVE JUROR 27  No children.

THE COURT:  Do you have anybody in your family or close to you in the military or in law enforcement?

PROSPECTIVE JUROR 27:  Neither, no.

THE COURT:  Do you have any concerns about the government using surveillance techniques such as a wiretap or a phone authorization?

PROSPECTIVE JUROR 27: Court ordered, right?

THE COURT:  Court ordered.

PROSPECTIVE JUROR 27:  No, no problem.

THE COURT:  All right.  Okay.  Does anything about the questions that you have heard me ask the other jurors or their responses give you any pause about serving on this case?

I-61

PROSPECTIVE JUROR 27:  No problem.

THE COURT:  And you're okay on time?

PROSPECTIVE JUROR 27:  Yes.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR 28:  Hi.  Good morning.

THE COURT:  Good morning.

PROSPECTIVE JUROR 28:  I'm (name redacted).  I'm a licensed vocational nurse.  My husband is a licensed vocational nurse as well.  We work with Kaiser.  We have nobody in the military.

THE COURT:  How about law enforcement?

PROSPECTIVE JUROR 28:  No.

THE COURT:  No.  Any concerns about serving on this kind of case?

PROSPECTIVE JUROR 28:  No.

THE COURT:  Okay.  And no problems with time?

PROSPECTIVE JUROR 28:  No.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR 29:  Good morning.  My name is (name redacted).  I am a recently retired event planner.  I'm married, and my husband has his own business as a social media management company.  I have two children that work out of the home.  My son is a documentary film maker, and my daughter is a social worker.

I have no issues with time.  My nephew is in the

I-62

military.  And no connections to law enforcement.  Both my father-in-laws were in the military but both retired, and now she's retired.

THE COURT:  And do you think you could be fair and impartial?

PROSPECTIVE JUROR 29:  Yes.

THE COURT:  Thank you.

PROSPECTIVE JUROR 30?  Good morphing, your Honor. I'm (name redacted).  I am an IT specialist for (Indiscernible) Pacific here in San Diego.  Soon to be retired.

THE COURT:  As an IT specialist, do you work on any security matters?

PROSPECTIVE JUROR 30:  No, I do not.

THE COURT:  No.  Okay.  And soon to be retired. What are you going to do then?

PROSPECTIVE JUROR 30?  I'm not sure.

THE COURT:  Are you married or single?

PROSPECTIVE JUROR 30:  I am no longer married.

THE COURT:  Okay.

PROSPECTIVE JUROR 30:  I served 10 years active duty Navy, another 13 years in the Reserves.

THE COURT:  Oh.  Okay.  And were you ever at 32nd Street?

PROSPECTIVE JUROR 30:  Not 32nd Street.  No.  I was

I-63

at several commands here in San Diego, though, Third Fleet, Naval Air Station.

THE COURT:  Did you ever serve on a ship similar to the ESSEX?

PROSPECTIVE JUROR 30:  I was on a carrier, the LINCOLN.

THE COURT:  Okay.  How do you feel about somebody who's accused of being in the military but then providing sensitive information to another country?

PROSPECTIVE JUROR 30:  I recognize the seriousness of that, but presumed innocent, and I can be fair and impartial.

THE COURT:  Okay.

PROSPECTIVE JUROR 30:  Also, my little brother is currently a Federal Land Marshal in law enforcement.  So --

THE COURT:  Okay.

PROSPECTIVE JUROR 30:  -- there's that.

THE COURT:  All right.  Thank you.  Ever worked with the FBI or NCIS?

PROSPECTIVE JUROR 30:  If he did, he did not tell me.

THE COURT:  And you -- you have not?

PROSPECTIVE JUROR 30:  I have not, no.

THE COURT:  No.  All right.  Thank you.

I think we had another comment that you -- or

I-64

something you wanted to add.  Tell us your name again.

PROSPECTIVE JUROR 27:  I'm naturalized.  (Name redacted.)  I was 12 years old.

THE COURT:  When you were naturalized from where?

PROSPECTIVE JUROR 27:  And, so, I don't really remember much of it.

THE COURT:  From where?

PROSPECTIVE JUROR 27:  Cairo, Egypt.

THE COURT:  Oh, okay.  All right.  Thank you.

I got to take all of the naturalized children and go to Lego Land, and we had the ceremony at Lego Land, and they were not interested in the ceremony, but they were interested in the rides.

PROSPECTIVE JUROR 31:  Good morning.

THE COURT:  Good morning.

PROSPECTIVE JUROR 31:  Excuse me.  My name is (name redacted).  I am -- excuse me -- married.  My husband and I are both retired.  I have two nephews.  One is in the Navy and one is in the Army.  My dad has since passed, and he was in the -- the Navy.

No, I don't know anyone in law enforcement.

THE COURT:  Okay.  And do you have any issues with time?

PROSPECTIVE JUROR 31:  No.

THE COURT:  Do you have any issues with the nature

I-65

of this case?

PROSPECTIVE JUROR 31:  No.

THE COURT:  No.  All right.  Thank you.

PROSPECTIVE JUROR 32:  (Name redacted.)  I'm a security project manager.  My husband works for Costco, and I have a daughter who's in law enforcement and another daughter who's a nurse.

THE COURT:  Oh.  What does the daughter in law enforcement do?

PROSPECTIVE JUROR 32:  She's a street cop.

THE COURT:  Okay.  And where, in San --

PROSPECTIVE JUROR 32:  In Bend, Oregon.

THE COURT:  Oh.  Given her background with law enforcement, do you think you would be more inclined to favor the Government?

PROSPECTIVE JUROR 32:  Yes, I would.

THE COURT:  You do?  You do think you would?

PROSPECTIVE JUROR 32:  Um-hmm.

THE COURT:  All right.  Thank you.

Could I see counsel?

(Sidebar discussion on the record.)

THE COURT:  Make sure you speak into the mic.

Are there any jurors that you'd like to excuse?

MR. PARMLEY:  (Indiscernible) with the hardship, given there --

I-66

THE COURT:  You have to say who they are.

MR. PARMLEY:  Okay.

THE COURT:  So --

MR. JONES:  The first --

THE COURT:  Juror Number 1?

MR. JONES:  Yes.

MR. PARMLEY:  Juror 1 I'm concerned about language issues as well.

MR. JONES:  Yeah.

THE COURT:  The Court will excuse Juror Number 1 (name redacted).

MR. JONES:  (Name redacted.)

THE COURT:  (Name redacted) has the biopsy.

MR. JONES:  Yeah.

THE COURT:  Any objection?

MR. PARMLEY:  No.

THE COURT:  The Court will excuse Juror Number 11.

What about Juror Number 16?

MR. JONES:  15 also had a medical --

THE COURT:  She said she could work around it.

MR. JONES:  Yeah.

MR. PARMLEY:  And I think if we're dark on Monday, maybe she could reschedule if she needed to.

THE COURT:  Right.

MR. JONES:  Yeah, 16 I would ask to excuse for

I-67

cause.  She's huffing and puffing with a cane.

THE COURT:  Oh, yes.  Any objection?

MR. PARMLEY:  No.

THE COURT:  No.  So, we will excuse 16.  I do not excuse 15.

MR. JONES:  25?

MR. PARMLEY:  Ask (indiscernible) for cause.

THE COURT:  25 the Court will.

MR. JONES:  I'd rather you do it for cause.

THE COURT:  Interesting.  Interesting, but honest.

MR. PARMLEY:  I appreciate the honesty.

MR. JONES:  24 (name redacted), she's the one who needed to leave on the 21st.  And, so, I think she might be preoccupied with -- I think --

THE COURT:  I believe we have enough.

MR. PARMLEY:  I think that the --

MR. JONES:  (Indiscernible.)

THE COURT:  Let's -- let's hold off on her right now.

MR. JONES:  32.

MR. PARMLEY:  32.  We don't have an objection for cause.

MR. JONES:  Given her take --

THE COURT:  32?

UNIDENTIFIED SPEAKER:  (Indiscernible).

I-68

THE COURT:  All right.  Then what we'll do is take our morning recess and before the recess we'll reseat them so that they can go, the replacement ones for those.  And then I'll ask you when we take the recess for any more questions.

MR. PARMLEY:  Okay.

MR. JONES:  Thank you.

THE COURT:  Okay.  Thank you.

(End sidebar discussion.)

THE COURT:  Thank you.  We'll excuse Juror (name redacted).  You're to go back -- should they go to the jury lounge?

Go downstairs to the jury lounge.  You go out this door.  Where you came in and you were screened first, that's where you go back, on the first floor.

And we'll do a replacement.

THE CLERK:  (Name redacted.)

(Pause.)

THE COURT:  Thank you.  And we'll thank and excuse (name redacted).  I hope your biopsy goes well.  Okay.  You're to go back down to the jury lounge as well.

THE CLERK:  (Name redacted.)

THE COURT:  And we'll thank and excuse (name redacted).  Yes.  Thank you.  Good luck on getting back to the parking.

PROSPECTIVE JUROR:  Thank you.

I-69

THE CLERK:  (Name redacted.)

THE COURT:  And (name redacted), we'll thank and excuse you.

THE CLERK:  (Name redacted.)

THE COURT:  And (name redacted), we'll thank and excuse you.

THE CLERK:  (Name redacted.)

THE COURT:  We're going to take our morning recess at this time.  We'll be in recess for 15 minutes, till quarter to, and then we'll do some more questioning.  So, there is -- you can use the restroom in the jury room there, but there's -- there's only two, and then there's restrooms outside.  And then you can come back here to resume at quarter to.

And remember where you're seated.  That's where you should go.

(Prospective Jurors exit courtroom.)

THE COURT:  We're in recess.

(Proceedings recessed briefly.)

THE COURT:  I counsel could approach, I just want to ask what other questions you want me to ask.

(Sidebar discussions on the record.)

MR. PARMLEY:  What's the Court's thinking about allowing us to question -- question the --

THE COURT:  I'm not sure yet.

MR. PARMLEY:  Okay.

I-70

(Pause.)

THE COURT:  I think I generally covered the scope of what you had both proposed, not exactly in the same precise language.

MR. PARMLEY:  I would agree with that, but because the Court kind of singled out some people and understandably kind of asked them questions later, I think it would be certainly helpful to sort of go back and say, no, I didn't ask you every single question I asked everybody, but you've all heard all the questions.  Does anybody have anything they'd like to add?

MR. JONES:  There are a couple of follow-up questions that I would ask if I had --

THE COURT:  Okay.

MR. JONES:  -- my chance.  Number 7 mentioned his dad was at Pearl Harbor.  I'm guessing that wasn't the attack, but I'd be curious to know was he stationed at Pearl Harbor.

THE COURT:  No, I think he was.  I thought he was.

MR. JONES:  So, I'd want to know about that (indiscernible).

THE COURT:  Oh.

MR. JONES:  And then one of the recent ones, she just said that her -- she and her husband were retired but didn't say what they did.

THE COURT:  The number?

I-71

MR. JONES:  number 31 I think.

MR. PARMLEY:  I didn't catch what she did.

MR. JONES:  Yeah, she said she and her husband are retired.

MR. PARMLEY:  If you can ask Juror Number 30, he's the one that served on the LINCOLN he said, but if you could ask him what job he had in the military, I'd appreciate that. (Indiscernible).

MR. JONES:  And the one question that I -- I might take the Court on that proposal.  I don't know if it's too late to add is if does anybody feel the use of encrypted technologies like Telegram or Signal suggests --

THE COURT:  Nefarious?

MR. JONES:  -- nefarious activity.

THE COURT:  Or could I just say --

MR. JONES:  (Indiscernible) experience using those apps.

THE COURT:  -- Telegraph or Signal?

MR. JONES:  Telegram.

THE COURT:  Telegram.

MR. JONES:  And I have to apologize --

THE COURT:  Or Signal.

MR. JONES:  -- for admitting that to be honest.

THE COURT:  Any thoughts I guess pro or con?

MR. PARMLEY:  Whether an encrypted application -- I

I-72

don't have any problem with that.

MR. JONES:  Do you have any follow ups --

THE COURT:  And then we'll circle back on the juror who's going to Louisiana.

MR. JONES:  Louisiana.

THE COURT:  Assuming that we've got plenty, and I'm likely to let her go.

MR. PARMLEY:  That's fine, your Honor.  A question I would like to ask if I was given the opportunity is we're going to ask the jury to make a decision in this case.  Is there anybody for whatever reason, hasn't heard everything, if they just feel like they'll have a difficulty making a decision, whether this is a criminal case, whether -- for whatever reason.  And --

MR. JONES:  Sitting in judgment.

MR. PARMLEY:  -- similarly, sitting in judgment on another person.

MR. JONES:  Might be the time to reiterate that they aren't supposed to think about the actual consequences, just about guilt or innocence.

THE COURT:  Okay.

MR. PARMLEY:  And the question (indiscernible).

MR. BERTOLA:  Sorry.  Would like the sensitive document?

MR. PARMLEY:  That's it.

I-73

MR. BERTOLA:  -- would like to ask is to sort of emphasize that while the allegations or the documents that were disclosed were sensitive but unclassified, the jurors will be shown that sensitive national defense information, and we would -- they would be instructed --

THE COURT:  Ordered to --

MR. BERTOLA:  -- to protect that or ordered to protect that information and not share it outside of the jury room.

THE COURT:  Um-hmm.

MR. BERTOLA:  And does anybody have a concern with being able to abide by that order.

THE COURT:  Um-hmm.  I've had a concern about sending the thumb drive with a bunch of stuff to the jury room for that reason.

MR. BERTOLA:  Yeah.

THE COURT:  So, you can think of how you'll --

MR. PARMLEY:  We can print it out.  We could -- we can do that.

MR. JONES:  Yeah, we'll -- we'll admit the physical records so we'll be -- if they want it to be available to them, they'll certainly be able to  have it.

THE COURT:  And the ones that are sensitive, there's only three or -- or there's more?

MR. JONES:  There are -- there are dozens.  There's

I-74

about 50 that will be -- be printed on one copy that's on the cart, and then --

THE COURT:  So, as to those, sometimes what we've done in drug cases is we just show them, but we don't send them back.  So, it give that procedurally some thought.  That would be much later.

MR. JONES:  Yeah.  And I would ask if there is a situation where we don't want to provide the whole thing, that we kind of explain that it's -- it's so voluminous, you'd be overrun, and we're not going to give you the whole thing, rather than suggest that like, we don't trust you to see these because I think that would give an inference or like that it's super super sensitive or it contains something really --

(Simultaneous speaking.)

MR. BERTOLA:  I mean, we'll talk about this later, but we will -- we're planning to admit all of them into evidence.  We'll have to talk through -- I think we're going to probably want to use the HSD process in light of some of the --

MR. PARMLEY:  Do those exhibits separately.

MR. BERTOLA:  Yeah, but the jurors would be able to see --

THE COURT:  So you can meet and confer on that. You can come up with something.

MR. PARMLEY:  Assuming (indiscernible) --

I-75

THE COURT:  Correct.

MR. PARMLEY:  -- (indiscernible) --

THE COURT:  All right.  Any other questions?

MR. PARMLEY:  So, one other thing, your Honor.  If you're not going to have us ask questions (indiscernible) maybe have the witnesses --

THE COURT:  Yes, thank you.

MR. PARMLEY:  Would you -- (indiscernible).

THE COURT:  No.  I'll ask you to do that.

MR. PARMLEY:  Sure.

THE COURT:  Thank you.

MR. JONES:  And then (indiscernible).

THE COURT:  And the (indiscernible).

(Simultaneous speaking.)

THE COURT:  All right.  Okay.  Thank you.

(End sidebar discussion.)

(Prospective jurors enter courtroom.)

THE COURT:  You may be seated.

Welcome back.  Thank you for coming back.

I had neglected to have the -- the parties say who the witnesses will be in this case in case you know them.  So, I'll ask the Government to list the witnesses.

MR. PARMLEY:  Plaintiff's witnesses for this case, your Honor, are FBI Special Agents Laura Wetterer, Rebekah Frank, Nicholas Reed, FBI Linguist Jayne Liu, former FBI

I-76

Special Agent Patrick O'Brien, NCIS Special Agent Chris Christian, USCIS Senior Immigration Services Officer Natasha Flores, former USCIS Immigration Services Officer Reem Younis, U.S. Navy Captain Aaron Taylor, U.S. Navy Chief Petty Officer Jonathan Palis, U.S. Navy Chief Petty Officer Francisco Ceja, U.S. Navy civilian employee, Lisa Gilroy, Retired Navy Commander Daniel Caldwell, U.S. State Department employee Catherine Hamilton, and potentially as a Defense Witness Mingli Wei -- Mingli Wei, excuse me.

THE COURT:  Does anybody know any of those witnesses?

(No audible response.)

THE COURT:  Okay.  Thank you.

Does anybody -- has anybody had any experience with using a program such as Telegram or Signal?  It's an encrypted application, phone system?  Okay.  Raise your hand, and then we'll have you -- tell us your name.

PROSPECTIVE JUROR 9:  (Name redacted).

THE COURT:  And what have you used?

PROSPECTIVE JUROR 9:  I use Signal on a daily basis.

THE COURT:  And do you think there's anything nefarious about using Signal?  It could be used for legitimate reasons, and it can be used to protect information.

PROSPECTIVE JUROR 9:  Just another app for

I-77

communication.  Nothing --

THE COURT:  All right.  Thank you.

Who else?

PROSPECTIVE JUROR 3:  I've used several of them, and I don't think there's anything specifically nefarious about any of them.

THE COURT:  Okay.  And tell us again your name.

PROSPECTIVE JUROR 3: Excuse me?

THE COURT:  Your name.

PROSPECTIVE JUROR 3:  Oh, sorry.  (Name redacted.)

THE COURT:  Thank you.  Another hand?

PROSPECTIVE JUROR 5:  (Name redacted.)  I use Signal just because I like it better than WhatsApp for security purposes, but --

THE COURT:  Okay.

PROSPECTIVE JUROR 5:  -- nothing nefarious.

THE COURT:  Thank you.

Anybody else?

PROSPECTIVE JUROR 7:  I've used --

THE COURT:  Tell us your -- tell us your name.

PROSPECTIVE JUROR 7:  (Name redacted.)

THE COURT:  Yes?

PROSPECTIVE JUROR 7:  I've used WhatsApp and Telegram.  I guess it's an encrypted platform.  I don't know.

THE COURT:  Okay.  All right.  Thank you.

I-78

And we had one more.

PROSPECTIVE JUROR 19:  My name is (name redacted). I use Signal and WhatsApp just because there's less ads and --

THE COURT:  Okay.

PROSPECTIVE JUROR 19:  -- things like that.

THE COURT:  And, so, nothing -- there's nothing negative about that?

PROSPECTIVE JUROR 19:  No, nothing negative.

THE COURT:  All right.  Thank you.

Then -- we have a couple more.

PROSPECTIVE JUROR 30:  (Name redacted.)  I've used WhatsApp just as a convenient text application while I was overseas.

THE COURT:  All right.  Thank you.

And while we're there, Juror Number 30, you were on the LINCOLN?

PROSPECTIVE JUROR 30:  That's correct.

THE COURT:  What did you do?

PROSPECTIVE JUROR 30:  I was a Naval flight officer.

THE COURT:  Okay.  Thank you.

And, Number 31, you're retired?

PROSPECTIVE JUROR 31:  Yes.

THE COURT:  What's -- what did you do?

I-79

PROSPECTIVE JUROR 31:  I was in real estate for just a few years, and now I've retired from it.

THE COURT:  And your spouse?

PROSPECTIVE JUROR 31:  My spouse was -- he's also retired, and he was in commercial finance.

THE COURT:  Okay.  Thank you.

PROSPECTIVE JUROR 31:  Um-hmm.

THE COURT:  And then, Juror Number 7?

PROSPECTIVE JUROR 7:  Yes, ma'am.

THE COURT:  Is that the right one?  It was the -- that is the person?

MR. PARMLEY:  I think so.

THE COURT:  Okay.  Did you have somebody in Pearl Harbor?

PROSPECTIVE JUROR 7:  Yes.  My dad was in Pearl Harbor.  He survived.  He was on the USS PHOENIX.

THE COURT:  At the time?  Wow.  That's amazing.  Okay.  Thank you.  That was just curiosity.

Now, at the end of the trial, the Government will be asking you to render a verdict in this case.  Is there anybody that because of your background just feels that you couldn't possibly make a decision or a judgment in this case?

No.

Okay.  So, now, let me ask (Name redacted), tell us about yourself?

I-80

PROSPECTIVE JUROR 33:  My name is (name redacted).  I'm a computer science engineer.

THE COURT:  Where do you work?

PROSPECTIVE JUROR 33:  I work at Apple in San Diego, UTC Mall.

THE COURT:  Okay.  Are you married or single?

PROSPECTIVE JUROR 33:  Yeah, I'm married.  I have one kid.  My wife doesn't work.

THE COURT:  Okay.  You've heard the Court's questions to everybody else.  Is there anything about the nature of this case that would give you pause?

PROSPECTIVE JUROR 33:  Sorry.  Can you repeat your question?

THE COURT:  Is there -- you heard what I asked everybody else:

PROSPECTIVE JUROR 33:  Yes.

THE COURT:  Do you have anything to add or share?

PROSPECTIVE JUROR 33:  No.

THE COURT:  Do you think you could be fair and impartial in this case?

PROSPECTIVE JUROR 33:  Yeah, I think I could.

THE COURT:  Do you have reservations?

PROSPECTIVE JUROR 33:  I have a bit of reservations, the client being from -- from China.  So --

THE COURT:  Where are you from?

*Echo Reporting, Inc.*

I-81

PROSPECTIVE JUROR 33:  I'm originally from -- from France.

THE COURT:  Okay.  You understand he came in high school?

PROSPECTIVE JUROR 33:  Yes, I understand that, yes.

THE COURT:  Okay.  Do you think that you would maybe hold that against him?

PROSPECTIVE JUROR 33:  I think I maybe have a couple of problems I would say.  I mean, he's technology and exchanges and espionage cases.  So, I don't know if I wouldn't be biased.

THE COURT:  Okay.  All right.  Thank you.

And let's talk to Juror Number 34 (name redacted).  Hi.

PROSPECTIVE JUROR 34:  Hi.

THE COURT:  Tell us about yourself.

PROSPECTIVE JUROR 34:  I am (name redacted).  I am an event and meeting planner, currently looking for full-time employment.  So, I'm not working.

My wife works for -- she's the Chief Marketing Officer for an insurance based publishing company.

THE COURT:  Okay.  Is there anybody in your family or close to you in the military or in law enforcement?

PROSPECTIVE JUROR 34:  No.

THE COURT:  Do you have any concerns about law

I-82

enforcement using surveillance techniques that are court authorized?

PROSPECTIVE JUROR 34:  No.

THE COURT:  Do you have any concerns such as the previous juror who has some reservations about our relationships with China and some of the things that are going on?

PROSPECTIVE JUROR 34:  No, no.

THE COURT:  Will you listen to the evidence and judge the case based on the evidence that you hear?

PROSPECTIVE JUROR 34:  Absolutely.

THE COURT:  Do you have any problems making a decision in the case?

PROSPECTIVE JUROR 34:  I don't believe I do.

THE COURT:  All right.  Thank you.

And any problems with time?

PROSPECTIVE JUROR 34:  No.

THE COURT:  No.  All right.  Thank you.

Juror Number 25 -- 35 (name redacted).

Tell us about yourself.

PROSPECTIVE JUROR 35:  Good morning.  My name (name redacted).  I'm divorced.  I used to work in the Superior Court.

THE COURT:  Oh.

PROSPECTIVE JUROR 34:  Across the street.

I-83

THE COURT:  What did you do?

PROSPECTIVE JUROR 34:  I was a court declarations clerk.  But presently I am working at the San Diego Sheriff's Department at the San Diego Central Jail as a (indiscernible) assistant.  So, my main job was just to process bonds, and I get in touch with the (indiscernible) or the incarcerated person's attorneys and their families, and IP have a good friend who is a veteran of the Air Force.

THE COURT:  Okay.  How do you feel about serving on a case like this?

PROSPECTIVE JUROR 34:  I believe that I can be impartial.

THE COURT:  You've had a lot of experience in the court system.

PROSPECTIVE JUROR 34:  I believe so, yes, ma'am.

THE COURT:  Okay.  So, you could be fair to both sides?

PROSPECTIVE JUROR 34:  I will be (indiscernible).

THE COURT:  Okay.  Any problems with time?

PROSPECTIVE JUROR 34:  No, ma'am.

THE COURT:  All right.  Anything else you want to share with us?

PROSPECTIVE JUROR 34:  I can't think of anything.  But, okay.  I have one.  I am (indiscernible) San Diego.  So, my family, my parents, my siblings are all in the Philippines.

I-84

THE COURT: Okay. Okay. All right. Thank you. And how do you communicate with them? Do you use Signal or What's App?

PROSPECTIVE JUROR 34: Messenger.

THE COURT: Messenger?

PROSPECTIVE JUROR 34: (Indiscernible.)

THE COURT: Okay. All right. Thank you.

PROSPECTIVE JUROR 34: Thank you.

THE COURT: And Number 36 (name redacted). Did I say it correctly?

PROSPECTIVE JUROR 36: You did.

THE COURT: Good.

PROSPECTIVE JUROR 36: (Name redacted). I am the Chief Business and Strategy Officer of a -- a medical device company. It's a big title, a small company. So --

THE COURT: What kind of device?

PROSPECTIVE JUROR 36: It's a molecular diagnostic device.

THE COURT: Oh.

PROSPECTIVE JUROR 36: It's sort of like PCR.

THE COURT: Okay. All right.

PROSPECTIVE JUROR 36: I am married.

THE COURT: Are you in Sorrento Valley?

PROSPECTIVE JUROR 36: We are based up in Alameda outside San Francisco.

I-85

THE COURT:  Oh.

PROSPECTIVE JUROR 36:  So, I'm a remote employee.

THE COURT:  Oh, okay.

PROSPECTIVE JUROR 36:  I am married, have been married 26 years.  I have a daughter and a son going into college, one in college.

Based on the questions that you've asked other people, I have a law degree from back east.  I clerked for Paul Kennison (phonetic) decades ago.  I don't know if you and he ever crossed paths.

THE COURT:  Yes.

PROSPECTIVE JUROR 36:  Was a very mediocre tax attorney.  So, I quite that 30 years ago and have been doing business every since.

THE COURT:  Okay.  So --

PROSPECTIVE JUROR 36:  I think I'm a little better at that.

THE COURT:  You have knowledge of the law.  Would you listen to the evidence and then apply the law?

PROSPECTIVE JUROR 36:  Absolutely.

THE COURT:  As the Court gives --

PROSPECTIVE JUROR 36:  Absolutely.

THE COURT:  -- it to you?

PROSPECTIVE JUROR 36:  Yeah.  I know my own legal limitations.  And, so, that's -- that's not a problem.

I-86

THE COURT:  Any problems with time?

PROSPECTIVE JUROR 36:  No more so than anyone else. And then my brother-in-law was a Naval doctor for 20 years. He's retired.  I think he had a good experience with it, and I -- I think I'm unbiased, and it sounds like a very interesting case.

THE COURT:  All right.  Thank you.

And let me question -- have (name redacted).

PROSPECTIVE JUROR 32:  My name is (name redacted). I'm a recent graduate and currently unemployed.

THE COURT:  What did you graduate in?

PROSPECTIVE JUROR 32:  Computer interaction at UCSD.

THE COURT:  Okay.  And you're looking for a job right now?

PROSPECTIVE JUROR 32:  Yes.

THE COURT:  Okay.  Married or single?

PROSPECTIVE JUROR 32:  I'm single.

THE COURT:  Single.  Is there anybody in your family or close to you in the military or in law enforcement?

PROSPECTIVE JUROR 32:  No.

THE COURT:  Do you think you could be fair and impartial in this case?

PROSPECTIVE JUROR 32:  I do, yes.

THE COURT:  Are you okay with time?

I-87

PROSPECTIVE JUROR 32: Yes, I am.

THE COURT: All right. Thank you.

Let me ask everyone, there will be some documents that are shown to you that are sensitive but not classified, and the Court will instruct all of you if you're selected to be a juror that you have to retain the sensitive nature of those documents. You can't take pictures with your phone. You can't publish them anywhere else. You have to protect the integrity of the court process.

Will all of you do that?

JURORS: Yes.

THE COURT: All right. Thank you.

Could I see counsel?

(Sidebar discussion on the record.)

THE COURT: So, I'm inclined to let (name redacted) go. That is Juror Number 24. She has to close her house. Just in case. Any objection?

MR. PARMLEY: No.

MR. JONES: No.

THE COURT: Okay. And then any challenges for cause to the new ones?

MR. JONES: (Indiscernible.)

THE COURT: Oh, Mr. (name redacted)?

MR. JONES: Yeah.

THE COURT: Yes. Any objection?

I-88

MR. PARMLEY:  No.

THE COURT:  The Court will excuse Number 33.  And then we'll replace 24 with 38, and we'll replace Number 33 with 39.

Any other questions?

MR. PARMLEY:  Your Honor, Number 15, she's talking about having three triplets who are 20 years old and she works at San Diego State.  If I were going to follow up with her, I would -- I would follow up that the Defendant in this case appears to be in his 20's.  You have a lot of experience in -- is there anything about the Defendant's age.

THE COURT:  Okay.  You would have no objection to that?

MR. JONES:  Of course not.

THE COURT:  And what was her number?

MR. PARMLEY:  I think it was Number 15 -- no, I'm sorry.  Let me make sure I get this right.  She's 14.

MR. JONES:  (Indiscernible.)

THE COURT:  All right.  Thank you.

(End sidebar discussion.)

THE COURT:  Okay.  I will thank and excuse Juror 24 (name redacted).  Good luck with your house.

And we will replace her with Juror 38 (name redacted).

And I will thank and excuse Juror Number 33 (name

I-89

redacted), and we'll replace (name redacted) with Juror 39.

Anyone who is excused should go back to the jury room.

THE CLERK:  (Name redacted.)

THE COURT:  While they're coming up, let me ask Juror 14, you had quite an experience raising triplets.  Could we pass the mic down to her.

And this applies to any parent who has children that are you.  The Defendant's in his 20's.  Is there anything that would give you pause about judging somebody who's relatively young, in his 20's but is accused with very serious matters?

PROSPECTIVE JUROR 14:  No, ma'am.

THE COURT:  No.  All right.  Thank you.

Does anybody have -- anyone else have any reservations about that?

(No audible response.)

THE COURT:  Okay.  So, now let's go to (name redacted).  Good morning.  Tell us about yourself.

PROSPECTIVE JUROR 38:  Good morning.  I'm currently working part time as an event staffer.  So, I'm there.  We use Signal for bus transportation, timing of routes.

THE COURT:  Okay.

PROSPECTIVE JUROR 38:  Things like that.

THE COURT:  What did you do before that?

PROSPECTIVE JUROR 38:  So, before that, I was a

I-90

student, trying to major in computer science.  I've had student employee not contracts but like civilian terms with the Navy.

THE COURT:  Oh, okay.

PROSPECTIVE JUROR 38:  So, I worked with NIOC right here in Point Loma.

THE COURT:  What did you do for them?

PROSPECTIVE JUROR 38:  Programming.

THE COURT:  Programming.  Okay.

PROSPECTIVE JUROR 38:  Yeah.

THE COURT:  How do you feel about serving on a case like this?

PROSPECTIVE JUROR 38:  Comfortable.  I know the severity of, you know, classified material.  I had a Secret clearance.  So, I've had to navigate my way around documents and, you know, knowing how tedious it can be.

THE COURT:  To protect them?

PROSPECTIVE JUROR 38:  Yeah.

THE COURT:  Okay.  Is there anybody in your family or close to you aside from your contract work with the Navy that's in the military or law enforcement?

PROSPECTIVE JUROR 38:  No.

THE COURT:  Do you think you could be fair and impartial on this case?

PROSPECTIVE JUROR 38:  Yes.

I-91

THE COURT:  Any concerns about the claim of naturalization fraud?

PROSPECTIVE JUROR 38:   No.

THE COURT:  No.  Okay.  And you're okay with time?

PROSPECTIVE JUROR 38:  So, the only thing I had on that was that there's a career fair, and it ends at 1 p.m. today.  Obviously I don't see the chances of making that, you know, being here, right.  That's the only thing.

THE COURT:  Well, you never know.  And are you married or single?

PROSPECTIVE JUROR 38:  Single.

THE COURT:  Single.  Okay.  Thank you.

PROSPECTIVE JUROR 38:  Thank you.

THE COURT:  And let me also ask Juror Number 39 (name redacted), did I say that right?

PROSPECTIVE JUROR 39:  Hi, good morning.  My name is (name redacted).

THE COURT:  What do you do?

PROSPECTIVE JUROR 39:  So, I'm a student for -- I'm going to be an interpreter for American Sign Language.

THE COURT:  Oh.

PROSPECTIVE JUROR 39:  But I also work at Papa Johns as assistant manager just for money right now.

THE COURT:  Okay.

PROSPECTIVE JUROR 39:  Yeah.

I-92

THE COURT:  Where do you go to school?

PROSPECTIVE JUROR 39:  At Palomar College.

THE COURT:  Okay.  Are you married or single?>

PROSPECTIVE JUROR 39:  Engaged.  Yeah.

THE COURT:  What does fiancé do?

PROSPECTIVE JUROR 39:  He's a retired -- or he's a veteran for the Marines.

THE COURT:  So, having some connection with the military in your future and perhaps at present, how do you feel about serving on a case like this?

PROSPECTIVE JUROR 39:  Well, I also have other family that's also in other military branches and close friends that are also in the military.  I have no other -- I have no issues with this.

THE COURT:  Okay.  Do you have any problems with time?

PROSPECTIVE JUROR 39?  The only issue I do have is my dog has a surgical procedure on -- tomorrow actually. That's the only issue I really have.

THE COURT:  Okay.  All right.

Could I see counsel.

    (Sidebar discussion on the record.)

THE COURT:  Do you want to let the dog go?

MR. PARMLEY:  I think it would be hard for her to concentrate on this case.  I think Seat Number 1 is a little

I-93

bit cursed right now.

THE COURT:  All right.  Thank you.

Any other questions?

MR. JONES:  I felt bad for the career fair guy.

THE COURT:  He might make it.  He might make it, given how the numbers -- the blind draw.

MR. JONES:  12 is the baby -- we want to just confirm that he has somebody that could be -- his sister --

MR. PARMLEY:  He said he had some childcare issues.

MR. JONES:  I just want to make sure --

THE COURT:  But he said that it could work.  Yeah.

(Simultaneous speaking.)

(End sidebar discussion.)

THE COURT:  -- go to surgery -- to go down to the jury room.  That's (name redacted).

And then replace (name redacted) with (name redacted).

(Pause.)

THE COURT:  Good morning.  Tell us about yourself.

PROSPECTIVE JUROR 40:  Good morning.  My name is (name redacted), and I'm a medical biller with UCSD Health.  I am married.

THE COURT:  Do you know our other UCSD healthcare person?

PROSPECTIVE JUROR 40:  No.  I was kind of looking

I-94

at their faces, but I don't recognize them, no, ma'am.

THE COURT:  All right.  Are you married or single?

PROSPECTIVE JUROR 40:  I am married.

THE COURT:  And does your wife work outside the ohm?

PROSPECTIVE JUROR 40:  Actually, he does.  He's a hair stylist, and his salon is in Mission Valley.

THE COURT:  Okay.  Thank you.  Is there anybody in your family or close to you in law enforcement or in the military?

PROSPECTIVE JUROR 40:  I have two uncles that are retired from the military, and I have three cousins that are active in the military right now.

THE COURT:  You've heard the Court's questions to the other jurors.  Is there anything about the nature of this case or th charges or the situation, political situation that would give you pause about serving as a juror in this case/

PROSPECTIVE JUROR 40:  No, ma'am.

THE COURT:  Are you okay on time?

PROSPECTIVE JUROR 40:  I am, yes, ma'am.

THE COURT:  Okay.  Have you used Signal or WhatsApp or --

PROSPECTIVE JUROR 40:  Yes, ma'am.  I use both for mainly business purposes and communication.

THE COURT:  Okay.  And you understand that it's a

I-95

recognized way of doing it even though it's encrypted?

PROSPECTIVE JUROR 40:  Yes, ma'am.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR 40:  Thank you.

THE COURT:  Could I see counsel one more time.

(Sidebar discussion off the record.)

THE COURT:  (Audio glitch).  This is your last opportunity after this with this said, Oh, I wanted to say one more thing.  Does anyone want to say one more thing?

What will next happen is we'll pass out the sheets to the counsel, and then they'll make their peremptory challenges, and then we'll announce who the jurors are.

(Sidebar discussion on the record.)

THE COURT:  Nothing else?  No challenges for cause?

UNIDENTIFIED SPEAKER:  (Indiscernible.)

THE COURT:  And so you understand the -- you get one challenge for the alternate, and it's the last jurors -- and you get one --

MR. JONES:  Yes, your Honor.

THE COURT:  Okay.

MR. PARMLEY:  Are you going to excuse them while we do this or are they going to be sitting for --

THE COURT:  They'll be sitting.

MR. PARMLEY:  Okay.

THE COURT:  And I tell them that if they stare --

I-96

if you need to communicate, you can also go outside and come back in.

(End sidebar discussion.)

THE COURT:  Well, we're done with the initial, and now my clerk will give out the challenge sheets to the lawyers, and they will be conferring with each other and staring at you and making their notes, and they may go outside, and then once it's done, my excellent courtroom deputy will do the magic of figuring out who's left, and then we'll announce who the jurors are.

(Pause.)

THE COURT:  And when counsel gets done, just verify that it's correct.

(Pause.)

THE COURT:  Just verify we have the people in the right order.

MR. PARMLEY:  Appears to be correct, your Honor.

THE COURT:  Okay.

MR. JONES:  Yeah.

(Pause.)

THE COURT:  Done?

MR. JONES:  Oh, were we waiting on me?

(Pause.)

(Sidebar discussion on the record.)

THE COURT:  Without showing this, there's two

I-97

alternates.  You get one challenge.  You get one challenge. That means that you take it frm the last four.

MR. JONES:  Got it.

THE COURT:  So, you get one -- one challenge from the last four and then 10 from the others.

MR. JONES:  Okay.  Understood.  Thank you.

THE COURT:  Okay.

(End sidebar discussion.)

(Pause.)

THE COURT:  Counsel can come forward.

(Sidebar discussion on the record.)

MR. JONES:  I thought we were doing the alternates after the --

(Pause.)

THE COURT:  Are there any constitutional challenges?  Do you want to explain your rationale for striking the African-American?

MR. BERTOLA:  Has military.

THE COURT:  I think that provides a fair basis.

MR. JONES:  I'm not making a challenge.

THE COURT:  Okay.  So, no constitutional challenges?

MR. JONES:  No.

THE COURT:  All right.  We'll announce the jury. This is the result.  These are the two alternates.  Okay?

I-98

MR. PARMLEY:  All right.  Thank you, your Honor.  Appreciate it.

THE COURT:  All right.  Thank you.

(End sidebar discussion.)

THE COURT:  All right.  Finally.

THE CLERK:  Okay.  Juror Number 1 is -- Juror Number 1 (name redacted).  Juror Number 2 (name redacted).  Juror Number 3 (name redacted).  Juror Number 4 (name redacted).  Juror Number 5 (name redacted).  Juror Number 6 (name redacted).

THE COURT:  We'll thank and excuse.

THE CLERK:  Thank and excuse (name redacted).

THE COURT:  You have to go down to the jury lounge.

THE CLERK:  The Court would like to thank and excuse (name redacted).

THE COURT:  You're to go to the jury lounge.

THE CLERK:  The Court would like to thank and excuse (name redacted).

Juror Number 10 (name redacted) --

THE COURT:  It's not Juror Number 10.

THE CLERK:  I'm sorry.  The new number is seven.

THE COURT:  You just say the next juror is.

THE CLERK:  The next juror is (name redacted).

THE COURT:  (Name redacted), I'll have you move over to this front one.  Not that, the front one.  They're six

I-99

and six.

The next juror moves over one (name redacted).

THE CLERK:  The Court would like to thank and excuse (name redacted).  The Court would like to thank and excuse (name redacted).

The next juror is (name redacted).

The Court would like to thank and excuse (name redacted).  The Court would like to thank and excuse (name redacted).  The Court would like to thank and excuse (name redacted).

The next juror is (name redacted).  The Court would like to thank and excuse (name redacted).  The next juror is (name redacted).  The next juror is (name redacted).

THE COURT:  Just a second.  Yeah.

THE CLERK:  The next juror is (name redacted).

THE COURT:  We'll learn your name by the end.

THE CLERK:  The Court would like to thank and excuse (name redacted).  The Court would like to thank and excuse (name redacted).  The Court would like to thank and excuse (name redacted).  The Court would like to thank and excuse (name redacted).  The Court would like to thank and excuse (name redacted).  The Court would like to thank and excuse (name redacted).  The Court would like to thank and excuse (name redacted).

THE COURT:  And this will be our first alternate.

I-100

THE CLERK:  Alternate number one (name redacted).

THE COURT:  Say it again.

THE CLERK:  (Name redacted.)

(Pause.)

THE COURT:  And then you'll be in the top row.

THE CLERK:  The Court would like to thank and excuse (name redacted).  The next alternate is (name redacted).

THE COURT:  And you'll be in the bottom row.

THE CLERK:  The Court would like to thank and excuse (name redacted).

THE COURT:  Thank you.

Do the parties agree on the selection?

MR. PARMLEY:  Yes, your Honor.  Thank you.

MR. JONES:  Yes, your Honor.

THE COURT:  And I'd like to thank and excuse all remaining jurors.  You are to go back to the jury lounge.  We really do appreciate you coming here today.  Thank you.

And would the jurors please stand to be sworn.

THE CLERK:  Please raise your right hand.

Ladies and Gentlemen of the Jury, you and each of you do solemnly swear you will well and truly try the cause now before the Court and a true verdict therein render according to the evidence, so help you, God?

JURORS:  I do.

I-101

THE COURT:  Thank you.  Well, congratulations.  You are now the jurors in this case.  And then under your seats there should be -- but we might have to give the alternates -- a notebook and pen or pencil.

Does everybody have one?  You're welcome to take notes.  Don't let note taking distract you from seeing and observing the attitude and demeanor of the -- of the witnesses who testify.

So, you're about to go to lunch.  I'll have you come back at 1 o'clock.  And then the attorneys will give their opening statements.  The opening statements are not evidence, but it's intended to give you an overview of what they believe the evidence will show.

And, so, we'll see you at 1 o'clock.  That means that if you're going out, the you have to get back into security, which can take a little bit of time.

For the remainder of the trial -- and you can also go in the jury room, and there's a refrigerator.  Some jurors like to bring their lunch.  Some jurors like to go out.  But make sure that you get back here on time so we can timely proceed.  So, congratulations again.

And then, important admonition.  You're the jurors in this case.  It's a very serious undertaking.  I want you to comply with all of the Court's instructions on the law. You're not to use social medica or say, Hi, I'm a juror in

I-102

this case.  You can tell your employer or your loved ones that you're a juror on the case, but don't talk about the case until the end of the case.

We're saying this to social media, but we do everything on the phone.  No, we're not supposed to do that. We're supposed to wait until the end of the case where we are -- where we've heard all the evidence.  And don't do any outside research either.

I had one nice little grandma go to the County Law Library and look up rooms in the build-out (phonetic), and -- and it caused a big problem in the case.  So, we will give you everything that you need.

And then when -- oh, if you're going to the jury room, then stay there.  If you go outside, then stay there until we reassemble because sometimes we're going things in court in the -- in the meantime outside the presence of the jury.

Okay.  Any questions?  Any -- I think that's it. Any -- any comments?  No.

And then when we get back, we'll have opening statements.  Thank you and congratulations.

You can leave your stuff here, and you can leave your notebooks here.

(Jury exits courtroom.)

THE COURT:  1 o'clock.

I-103

So, you'll be ready to go at 1?

MR. PARMLEY:  Yes, your Honor.

THE COURT:  And we'll get the notebooks to them as soon as possible.

MR. PARMLEY:  They already have them.

THE COURT:  Oh, okay.

MR. JONES:  That's impressive.

THE COURT:  All right.  Thank you.

Anything from either side?

MR. JONES:  I hope I'm not expected to produce binders that quickly.

MR. PARMLEY:  Your Honor, I know -- and I apologize.  I think you said one day you might be leaving early.  Is that today or just sometime later this week or is that --

THE COURT:  Well, no.  It's okay.  So far, so good.

MR. PARMLEY:  Plan on going till 5?

THE COURT:  We'll see -- we'll see how it goes, whether we stop at 4:30 or 5.

MR. PARMLEY:  And potentially a break in there somewhere?

THE COURT:  And a break at 3.

MR. PARMLEY:  Okay.  Sounds great.  Thank you.

THE COURT:  Unless we're like finishing up a witness.

I-104

MR. PARMLEY:  Sure.  Great.  Thank you.

MR. JONES:  Thank you.

(Proceedings recessed to reconvene.)

I-105

AFTERNOON SESSION

--oOo--

(Jury enters courtroom.)

THE COURT:  Thank you for being so timely.  Welcome back.  We're now ready to proceed with opening statement.  The Government will go first.

Mr. Parmley.

(Pause.)

OPENING STATEMENT ON BEHALF OF PLAINTIFF

MR. PARMLEY:  This is quite obviously fucking espionage.  Those aren't my words, Ladies and Gentlemen.  Those are the Defendant's words.  Jinchao Wei, a Sailor in the U.S. Navy, what did he say when he came to San Diego, he had met somebody online, somebody who wanted some information, somebody that the Defendant sold information to.

And in the course of this case, Ladies and Gentlemen, you're going to hear that Defendant, Jinchao Wei, sold thousands of pages of technical documents to a Chinese intelligence officer, a person you're going to come to know as Andy Li.  Andy Li.  And how do we know about this conversation?  You're going to see it, and you're going to hear it.

In February of 2022, the Defendant met somebody online, like I said, Andy Li, on a website that's similar to Reddit called Tieba.  They began to communicate with each

I-106

other.

And the Defendant immediately told his friend about it. He texted him, and they sent him a voice mail on an encrypted application called WeChat. And months later, the FBI found that communication, and you're going to hear it. Now, it's in Chinese, but there is going to be a rolling translation for you to follow, and here's how it went, something like this. I think I'm on the radar of a Chinese intelligence organization. I met somebody who's very interested in the name and cycle of ships. He has asked me to walk the port every day to see which ships are coming, which ships are going, take some photos, take some videos, keep a spreadsheet, and he'll pay me $500. I'm no idiot. This is quite obviously fucking espionage.

His friend said to him, This is so suspicious. You must delete it -- delete it at once. The Defendant agreed. But he didn't delete his contact with Andy Li. If he had done that, we wouldn't be here. There would be no case.

Instead, over the course of the next 18 or so months, as I mentioned, he sold thousands of pages of technical documents to Andy Li. He sold -- he sent him photographs. He sent him videos. He discussed the conditions on his ship, the problems with his ship, the problems with other ships, his -- his time at Fleet Week, his time at the RIMPAC exercise. It's a multi-national Naval exercise, from

I-107

February 2022 until August of 2023.

And that's what this case is about, Ladies and Gentlemen. It's quite simple. It's betrayal and espionage, betrayal of the United States of America and espionage for and on behalf of The People's Republic of China, betrayal of his new country, the United States, the one that gave him citizenship, and we'll talk about that in a moment, and espionage for China.

I appreciate your attention today. I'd like to cover four things over the course of this afternoon. I'd like to talk first about who Mr. Wei is, a little bit of background, how he got to this point, a little bit what he did in the Navy, things of that nature, give you a little bit of a timeline coming up to February 2022.

The next thing I want to do is briefly discuss the charges here. There are seven counts charged in the indictment.

The third thing I want to do is talk about the different types of evidence you're going to hear because there's a lot of different types of evidence, and why that matters.

And the last thing I want to do is kind of lay out for you how we expect this trial to go, kind of the -- the themes that are going to go forward, the witnesses that you're going to hear from, and it's kind of broken up into a few

I-108

parts.  And I hope you bear with me as I go through that.

Who is Mr. Wei?  Who is the Defendant in this case? He's also known -- we're going to hear that he's also known as Patrick Wei in this case.  That's what other Sailors knew him by.  He was born in China.  He came to the United States in 2016 as a teenager, and he went to high school in Wisconsin. A couple -- graduated about 2019.  A couple of years after that, he joined the U.S. Navy.  He joined it out in the Midwest, in Wisconsin.

He did his training out there and eventually made his way to San Diego.  While he was waiting for his assignment to San Diego, he applied for U.S. citizenship.  And the United States is not alleging there's anything wrong with that.  He was a Sailor.  He was entitled to the fast track.  He had -- he had taken up arms for our country.  He was entitled to the fast track of citizenship, and he applied.  And that was in January 2022.

In February of 2022 is when he got here.  Naval Base San Diego is about three miles that direction, three miles south of where we're standing right now.  And he was assigned to the USS ESSEX.

He met somebody we're going to talk about in a moment named Andy Li.  He met him online.  And they carried on a long, long relationship over the course of the next 18 months.  And then in March 2022, he was officially assigned to

I-109

the ESSEX and served on the ESSEX until his arrest in August of 2023.

That is a picture of the ESSEX. You're going to see and hear a little bit more about it. You're going to hear about what its capabilities are and what it's for, what his job was on this ship. He was a machinist's mate on the ship, which is basically a mechanic. He was working in the Engine Room, and the kind of information he had access to, the kind of information that he was provided as a -- as part of his training, the information he was required to protect. He had a Secret clearance, and he was under obligation to protect that information that was on the ship.

You're going to also hear that he was a good Sailor. That's a picture of Captain Taylor, who's handing him an award. The award is for the Warrior of the Day. We're going to hear from Captain Taylor later in this case, and you're going to hear that he was an excellent Sailor. In fact, as one witness might tell you at the end of the case, he may be a little bit too good to be true. He is constantly trying to learn information, constantly doing much more above and beyond what other Sailors in his range were doing, promoting quickly, always going above and beyond. And at the end of the case, we're going to argue that there is a reason for that, and the reason was the more information he got, the more information he could sell to Andy Li.

I-110

That's a picture of Mr. Li.  We obtained some information from him through searches of an iCloud account and a Google account.  He's based in China.  As far as the Government knows, those two have never met in person, although there was offers to meet in person, as you're going to see during the course of this case.  You're going to hear more about him.  You're going to hear -- you're going to see and hear the communications with each other.

What are the charges in this case, Ladies and Gentlemen?  There are seven counts.  The first count is a conspiracy to commit espionage.  And, just so you know, there will be much more detailed instructions at the end of the case.  So, you're certainly welcome to take notes, but you don't have to.  The Judge will give you the final instructions explaining all the law.  This -- the purpose of me speaking today about this is just so you know, just so you have a -- an idea of what the Government intends to prove before the case goes forward.

So, there are seven counts.  The first count is conspiracy to commit espionage.  You're going to hear later that conspiracy is a criminal agreement, an agreement between two or more people to commit a crime and that at least one person does something to advance the crime.

In this case, the crime is espionage, and this time -- place, time, the co-conspirators are Andy Li and the

I-111

Defendant, Jinchao Wei.

The second count is that he actually did commit espionage.  He not only conspired to do it, but he actually did it.  And we're going to have to prove that he sent technical data, information, photos, et cetera, that was related to the national defense, that was closely held, that he knew or should have known would have caused harm to the United States or would have benefitted China or both.  And in this case, at the end -- at the end of the case, we're going to argue that it was both, that he both harmed the United States and he benefitted China, and that he acted willfully.

The third count relates to violating the Arms Export Control Act.  It's another conspiracy.  You're going to hear that the State Department can put things on something called the United States Munitions List, and that requires a license if you're going to send it overseas.  So, technical data related to defense articles, you can't just send it anywhere.  You have to have a license to export it.

And, so, the conspiracy here would be an agreement between two people, again, Andy Li and the Defendant, to violate the statute.

And Counts 4, 5 and 6 are specific times the Defendant, we will allege and prove, violated that statute, and these are three specific manuals that you're going to see. As I mentioned before, the Defendant sent thousands of pages

I-112

of technical manuals to Andy Li.  These are three specific ones that the Department of State will say was on the United Stations Munitions List, and there was no approval to send it overseas.  And, of course, there was no approval.  He didn't seek a license because this was all hidden.  This was espionage.  But it's three specific manuals, the Boiler Technical Manual from the ESSEX, the Compulsion Operating Guide to the ESSEX, and the Weapons Control System Manual of the USS ESSEX.

And the last count is naturalization fraud, Ladies and Gentlemen.  As I mentioned to you, he applied for naturalization when he became a Sailor.  However, during the course of his application process, before his interview is when he met Andy Li.  He met Andy Li in February, and the Government's going to argue and prove to you that the espionage conspiracy started almost immediately.  And then the Defendant went in for an interview, and he swore his hand -- and he raised his hand to tell the truth, and he was interviewed about all of the things on his naturalization application, which, as you might imagine, it's who you are, where you're from, who your parents are, where you've lived. One of the questions that was asked is is there anything -- any criminal conduct for which you have not been arrested.  In other words, are there things we don't know about that you need to tell us.  And, of course, the Defense -- the Defendant

I-113

answered no, and you're going to hear that, because this was hidden.  This was espionage.  He did not say, Oh, yes, I was speaking with somebody named Andy Li, and I am selling him technical manuals, and he's in China.  He didn't mention that.  And, so, he became a U.S. citizen shortly thereafter.  And you're going to see the communications with Andy Li where he says right before his naturalization issue, I may need to slow down a little bit.  They're investigate -- they might investigate me, and what I'm doing might be considered espionage.

And you're going to see the comments from his handler, Andy Li, he says to him after he gets his naturalization, Congratulations, and gives him a little gift of about $100.

Those are the charges in this case, Ladies and Gentlemen.  There's seven counts.

One of the types of evidence in this case -- this is important for you to understand I think.  Even though I said with authority that this happened on February 2022, this first contact between the Defendant and Andy Li, the investigating agents did not know that then.  This was discovered much much later.  And the evidence that came in came in from different times, from different places.  Most of it was in Chinese.  It had to be translated to try to figure out and put together a picture of what had happened.

I-114

So, these are the types of evidence you're going to see, and I'm just going to go through a brief example of each one, but keep in mind, for example, that February 2022 conversation with the other Sailor where he talked about this is obviously espionage.  The FBI and NCIS didn't learn about that until December or January of 2023, when they were able to search his phone and find this encrypted application, download it, translate the messages on it, and learn what was actually in his phone.

So, just some types of the things you're going to hear.  You're going to see some phone records, some bank records, some PayPal records.  Andy Li paid the Defendant using PayPal.  For example, this is one page, a $5,000 credit -- excuse me -- a $5,000 debit from the Defendant's credit union to go purchase a car in National City.  You're going to hear about that.  You're going to see the PayPal transaction of the $5,000 from Andy Li before that.

As I mentioned before, we searched both the Defendants and Andy Li's iCloud account, which is basically the Apple account, which everything is kind of stored somewhere else, so if you lost your phone, if it's backed up, and Google accounts.  We searched both of those.  We searched An -- excuse me.  We searched the Defendant's twice and Andy Li's.  And some of the information we found from simple searches.

I-115

So, the Defendant, right when he was in the thick of it, in April of 2022, he did a search, a search of 075 versus Wasp.  I wouldn't expect you to know what that means. You're going to hear during the course of the trial that the 075 is the Wasp class, the USS ESSEX, the ship that he was assigned to.  And the 075 is the new Chinese amphibious assault ship that China is desperately trying to catch up to U.S. technology to try to compete.

ESSEX 075 versus Wasp, USS ESSEX versus Chinese amphibious assault ships.

We also searched his military email.  For example, here is a -- an example of what he sent in August of 2022 when he sent three PDF's, including the Propulsion Operating Guide I mentioned earlier to himself, to his personal email, his gmail account.  And we're going to argue at the end of the case this is how you get information outside the military system so you can get it overseas (indiscernible).

And, as I mentioned before, most of the evidence in this case is going to come from a search of the Defendant's phone.  It was searched on two occasions.  Once was without his knowledge.  As the Judge mentioned to you during jury selection, there were some techniques used to hide information form him so he didn't know he was being investigated.  For example -- I'll talk about this in a moment -- a microphone put in his apartment.  But this was a surreptitious search of

I-116

his phone.  It was searched without his knowledge in January of 2023.  You're going to hear evidence of how we got his PIN code to get that because we did not have his PIN code, how it was separated.  He was separated from his phone while he was at work, and how the FBI downloaded it quickly and got it back to him before he knew, and then imaged it, analyzed it, translated it and tried to figure out what was on it.

But the vast majority of the evidence you're going to see in this case came from two encrypted applications that were on his phone, WeChat and Telegram.  Here are some examples.  This is a -- an example of a Telegram communication from June of 2022 where Andy, Andy Li says, "I will send you $5,000 tomorrow.  It can be at your account probably the day after tomorrow.  I'll talk to you about the specifics tomorrow or the day after when we have time."  And then later, at the bottom of it, you can see Andy Li telling the Defendant, "Don't worry.  I will keep my promise.  We'll meet up in America or China in the future."

One of the interesting aspects about this case is the use of receipts.  Andy Li being a professional intelligence officers, asks for receipts whenever he sends the Defendant money.  This is an example of when he's asked for a receipt, and we can see on the right-hand side of the screen the handwritten note that was attached to this Telegram conversation where it says "Received $5,000 for consulting,"

I-117

signed by the Defendant otherwise known as Patrick Wei, on June 11th, 2022, sent to Andy Li via Telegram.

You're also going to hear one recorded phone call. The phone call is in Mandarin.  It was translated.  You will be able to listen to it and follow along on the English translation.  The translation -- this phone call was with his mother.  When he says to his mother, "Do you remember I once mentioned that I was in contact with a person who worked for the Chinese Navy?"  Why?  Got Comp, his mother replies.  He says $7,000, $7700 of my $10,000 was sent by him.  Why did he give you money?  You are considered insider for him.  The Defendant saying, Of course, it's leaking secrets, and my work is not the secret kind.

You're also going to see at ext message with his mother, a text screen that was translated from Mandarin into English.  Well, this is just a portion of it where it says from then on, Do you still have contact with that person, that person in China?  Yes, I do.  And the Defendant saying, He sends me 300 bucks every month, laugh emoji, and I write some of the materials for him.

You're going to see much more of these conversations with Andy Li in a longer excerpt from that text message.

As I mentioned before, there was a microphone put in his apartment.  On occasion, he would speak to Andy Li on

I-118

the phone on the speaker phone so then the microphone can record both sides of the conversation.

You're going to hear about four of those and read the excerpts of about four of those and the translations of those.

Here's one example where the Defendant says, "So, do you want me to pay attention and see if there are any alterations to the flight deck?"  And UM in this case is Andy Li, "Right, right, right, right, right.  I feel these kind of modifications would be quite interesting.  That is what I meant.  Please keep an eye out then.  All right?"  And the Defendant, "Yes, yes.  No problem.  No problem."  You're going to hear a few of those recordings and see the translation.

His apartment was searched at the time of his arrest and, for example, found a notebook where some of the receipts were handwritten.  They were sent over Telegram. You're going to see the notebook.  You're going to see some excerpts from the notebook.  This particular one the Defendant wrote "Received $1300 for port in May," signs his name, gives a 06 June 2023 date.

Technical manuals.  Some of the manuals -- you're going to see the technical manuals that the Defendant sent, that we are going to allege that he sent, and we're going to -- this is one example.  This is just the cover page of one. This is the ESSEX's Weapons Control System.  The document

I-119

itself is about 120 pages.  This is one of the documents that the Defendant passed.

He also wrote original papers.  He wrote them in Chinese using information he had gotten from the Navy, including photographs from his phone apparently and the information taken from the technical manuals.  Here is an example.  We will have this translated for you.  This is an example of the original in Chinese with a photograph and a schematic from the ship and some information that was written. You'll see some of his papers that he wrote, and you'll see the translations as well.  Those were found -- you'll hear during the course of the case they were found in the Defendant's home on a hard drive in his home.

He was also interviewed at the end of the case, and you'll be able to see and hear excerpts of that interview. You'll see multiple excerpts to give you a flavor of what the Defendant said at the time of his arrest.  Towards the conclusion of the interview, the agents asked him, Well, what would you make of all this?  What would you call what you did? And the Defendant looked at them and said, "Espionage".  And then he said it again, "Espionage".

We're also going to introduce immigration documents.  Ladies and Gentlemen, as you might imagine, you're going to see the documents he signed, the documents that he filled out to become a U.S. citizen, including the oath of

I-120

allegiance that he signed right after he -- right before he became a U.S. citizen, and we're going to allege while he's in the thick of it, while he was speaking with Andy Li, while he was in the middle of this conspiracy.

How is this trial going to go, Ladies and Gentlemen? As the Court said, this is not going to last three -- three weeks I hope. This is not going to last for three weeks. We hope to do this in the most efficient way we can. Like I said, because the evidence came from different places, it's going to take a little bit of time to put in the evidence, and then we can talk about it, and this is how we plan on doing it.

First you're going to hear some background information about the Defendant. You're going to hear from an NCIS agent who's going to talk about what it takes -- what he did to -- to join the Navy, the fact that he's got a Secret clearance and the counterintelligence training that he received. He's going to talk about the security on the base.

You're going to hear from Captain Taylor, his captain on the ship. He's going to talk about what the ship does, what it is, and his brief interaction with the Defendant, what a machinist's mate does and things of that nature.

Then we're going to go into how he found stuff. We're going to talk about how he got his electronics. We're

I-121

going to hear from a number of witnesses involved in searches, talking about (indiscernible) phones.  We're not going to talk about the contents of those at the time.  We're just going to talk about where they came from so you have a better understanding.  And then we're going to have a linguist testify who translated all this material.  You'll be able to -- to listen to her with a background in Mandarin and how she translated this into English, and then you're going to hear from one -- another one of the case agents, Laura Wetterer. She's going to admit even more evidence like some of the documents we just showed and some of the recordings we just showed that were translated, and that's going to take some time, and I anticipate she's going to be on the stand for a fair amount.  And it's with her we're going to walk through the case.

After all the evidence is in, we're going to walk through the case starting basically in February of 2022 all the way to August of 2022, and she's going to explain what she found in chronological order all the way up to his post-arrest interview on August 2nd of 2023.

After that, we're going to hear from a couple more Navy personnel, including his direct supervisor, Francisco Ceja, about his interactions with him and things about the security of the space that he was working at.  Then we're going to pivot to the naturalization fraud aspect of this

I-122

case.  You're going to hear from two witnesses from the SCIS, one who's got a little bit more broader knowledge base who's going to explain the naturalization process to you and the one who actually did the naturalization interview.

And, finally, we're going to end with two experts. One is going to be from the State Department.  She's going to explain the licensing portion of -- of this case, the Arms Export Control Op and the U.S. Munitions List, and she's going to explain that to you and also testify that she searched the databases, and he did not apply for a license for this information to export, which is, as I mentioned before, not surprising.

And then the last witness we intend to call is a retired Navy Commander named Dan Caldwell, teaches at the Naval War College part of the China Maritime Institute, and he's going to explain what all this means.  He's going to put it into perspective, and in his expert opinion, he's going to talk about the harm that came to the United States from the Defendant's actions and the benefit to China because that's one of the elements we need to prove.

And that will be the conclusion of the case, Ladies and Gentlemen.  And another excerpt of something.  One of the things the Defendant said was, Other Chinese serving in the Navy are still trying to figure out how to make extra money driving cabs, and I'm just leaking secrets.

I-123

This case is betrayal and espionage, betrayal of the United States of America and espionage for and on behalf of China.

And at the conclusion of the case, it will be no secret. We're going to ask you to return a guilty verdict on all counts, and I'm confident, we are confident that after you've heard all of the evidence, you will come to the same conclusion the Defendant did in February of 2022. This is quite obviously espionage.

Thank you.

THE COURT: Thank you. Can you pass the mic.

MR. PARMLEY: Be happy to.

(Pause.)

THE COURT: Mr. Jones?

OPENING STATEMENT ON BEHALF OF DEFENDANT

MR. JONES: Yes.

"My work is not the secret kind," those are words from Mr. Wei that the Government showed you earlier and is a key element of this case. Throughout his time in the U.S. Navy, Mr. Wei did not believe that the documents he was handling, the information that he was transmitting was secret or important.

In this case, intent is everything. The Government must prove beyond a reasonable doubt every single element of the charges, including the element of intent that Mr. Wei

I-124

intended to harm the United States and aid a foreign power or was operating with the belief that that harm was likely.

Jinchao Wei, who I have the privilege of representing in this case, was born in Taiwan, China.  For 2016, for a number of reasons but including opposition to the Chinese government, his mother who had been raising him alone since his birth moved to Wisconsin, to the United States, and found everything that they wanted that they didn't have in China.  They completely left behind their Chinese heritage, identity and any ties to that country.

And the United States supported them, helped educate Mr. Wei's mother, accepted Mr. Weih into high school and then into the Navy.

Now, throughout this case, you're going to see a lot of technical data, the operations manuals, systems manuals.  Some of it's probably going to be pretty exciting.  A lot of it might be boring.  And quite a bit of it I believe will support many of the elements that the Government has to prove.

But when it comes to the element of intent, I argue that the Government will have to ask you to make certain assumptions, dangerous assumptions, because the facts simply do not exists.  We know based on what Mr. Parmley just explained, that for months and months the Government was watching Jinchao Wei.  They had microphones in his rooms.

I-125

They were listening to every conversation he was having on his phone.  They were monitoring his emails, his text messages, his telegram messages.  They were getting everything.  There's a mountain of evidence -- this isn't even all of it -- for months and months and months.  And what you'll see is that they cannot prove that element of intent.  You will not see -- anything unless something shocks me here, I believe that shows that Jinchao Wei had any loyalty to the People's Republic to China, that he wanted to harm the United States, that he hated the U.S. Government, that he wanted to somehow benefit People's Republic of China.  It's -- it's not there, for months and months of listening to him.

You'll see that he has no loyalty or allegiance to China.  You'll also see, as I mentioned, that he did not have access to critical documents.  He had a Secret security clearance, which is pretty standard for anybody in the military.  He did not have Top Secret clearance, which would allow him to -- to view additional documentation and information.  He did not have access to anything that was classified, which brings me to my next point.

Much of the documentation that was transmitted in this case, these technical manuals, D.C. books, damage control books, things like that, are readily accessible through public forums like Reddit and Facebook.  And you'll see that anybody essentially can go onto Facebook and join some of these study

I-126

groups where people trade information to help people study for their exams, and while there's not classified information on there, which we're not even going to be getting into classified information in this case, there is material that could be determined defense articles or sensitive information, and that's not something that you need to break onto amphibious assault vessel to obtain.  It's not something you have to have security clearance to obtain.  It simply requires an internet connection.

Mr. Parmley brought up a number of points on his opening statement I'd like to directly address.  One is that he routinely referred to Mr. Wei selling secrets or selling documents.  And what you'll see is that he did receive money. He never asked for money.  He never stated, I'll give you this if you pay me.  It was always, as you'll see, a relationship that developed between two people that worked in the ship building, ship maintenance filed and that Mr. Wei enjoyed discussing the more exciting aspects of his job, and it -- it did ultimately roll into receiving money and providing details, which are obviously regrettable, but it's -- you'll see that there was never an effort by Mr. Wei to -- to which -- for quid pro quo, of saying, I've got some -- some juicy information.  I'll sell it to you.  That never -- you'll see it never happened.

Mr. Wei was an excellent Sailor.  He was an over

I-127

achiever.  And you'll see that -- well, the Government thinks that that's because he wanted to gather more information. You'll also see that Mr. Wei was frustrated in his job.  He was bored by his job.  He joined the Navy hoping to go out to sea, to do exciting work, to be a functional part of the U.S. military, and instead, he got stuck on a decommissioned ship that had been in the dry dock for a couple of years and had no future plans of going out to sea.  And his job mainly consisted of sanding off the rust and repainting it.

Bored with doing that and looking for more exciting, more meaningful work and also having the opportunity presented by this -- this individual that he met online to engage in more detailed, exciting discussions about his work, he -- he did continue to -- to seek out other -- other more -- more exciting details, more exciting functions of his job.

Finally, I want to bring you right back to where we started.  "This is quite obviously fucking espionage."  That is a direct quote.  That is something that Jinchao Wei said in connection with saying, "and that's why I won't do it".  And, again, when he relayed that he felt that certain activities would be viewed as espionage, he said, I will not do that.  He did not want to commit espionage.

What he did was regrettable, stupid, misguided.  We don't contend that.  That's not what we're here to prove. That is not what the Government has to prove beyond a

I-128

reasonable doubt.  They must prove Jinchao Wei's intent, that he intended to harm the United States, he intended to support a foreign power or that he believed that such harm was likely. And, despite the mountain of evidence in this case, you will see that that intent cannot be proved because Mr. Wei, as the evidence will show, did not believe that what he was doing could have any real effect, did not believe the information was that important and did not have a clear understanding of even who the information was going to.

Intent is everything.  I ask you as members of the jury to respect the special position of trust that you've been placed in, to hold the Government to its burden of proof, to demand that every element is proved to you beyond a reasonable doubt.  I submit that at the close of evidence, when we come back on closing argument, you will see that it is impossible to prove what Mr. Wei actually intended or believed would happen as a result of his actions.

And I will ask you to find him not guilty.  Thank you.

THE COURT:  Thank you.  If you can return the mic.

We'll call our first witness.

MR. BARRY:  The Government calls NCIS Special Agent Chris Christian as its first witness.

CHRISTOPHER CHRISTIAN - PLAINTIFF'S WITNESS - SWORN

THE CLERK:  Please state your name for the record

I-129

and spell your first and last name.

THE WITNESS:  My name is Christopher.  My last name is Christian.  First name C-H-R-I-S-T-O-P-H-E-R.  Last name Christian, C-H-R-I-S-T-I-A-N.

THE CLERK:  Thank you.

MR. BARRY:  Is everybody's screens working, before we get started?

(No audible response.)

MR. BARRY:  Okay.

DIRECT EXAMINATION

BY MR. BARRY:

Q    Special Agent Christian, where do you work?

A    I work here in San Diego at the Federal Bureau of Investigation.

Q    Sorry.  Can you say that again?

A    Sure.  I work here in San Diego with the Naval Criminal Investigative Service as a representative with the Federal Bureau of Investigation.

Q    Okay.  So, you work for the Naval Criminal Investigative Service?

A    That's correct, yes.

Q    And is that sometimes referred to as NCIS?

A    Yes, it is.

Q    Okay.  How long have you worked with NCIS?

A    I've been a special agent with NCIS since September of

I-130

2013, so right about 12 years.

Q   And you said a minute ago that you often work with the FBI or the Federal Bureau of Investigation?

A   Yes, that's correct.  I do.

Q   Do you work in a particular group or office of NCIS?

A   I do.  I work for NCIS's Office of Special Projects.

Q   What's that?

A   The Office of Special Projects is the specific branch of the -- the NCIS chartered with investigating national security crimes such as espionage.

Q   And you said you've been an NCIS special agent for about 12 years?

A   That's correct, yes.

Q   What did you do before then?

A   I've worked also in industry.  I worked for a company known as SAIC for a little while doing counterintelligence technology development as a project engineer, but the bulk of my career was served in the U.S. Army, both active duty and reserves, as a counterintelligence officer.

Q   So, before you joined NCIS, you had been in the Army?

A   Yes, that is correct.

Q   Are you still in the Army?

A   I am.  I'm still a Reservist in the Army.

Q   What's your job in the Army?

A   I am a counterintelligence officer.  My current duties

I-131

and responsibilities right now, I'm the Commander of a -- an innovation command out of Austin, Texas in the grade of O-6 or Colonel.

Q    You used a phrase a couple of times so far, counterintelligence?

A    Yes.

Q    Can you describe for the jury what that means generally?

A    Sure.  Counterintelligence is a subdiscipline of intelligence that is designed to identify vulnerabilities and prevent information from finding its way into the hands of a foreign government or terrorist organization or potentially even cartel type activities.  It's also designed too to look for vulnerabilities as well that protect servicemembers' lives when they're overseas.

Q    So, you said that's counterintelligence?

A    That's correct.

Q    And then when you say "intelligence", does that mean like what the Central Intelligence Agency or other sort of organizations like that?

A    Yes.  That's correct.

Q    Okay.  So, it's the gathering of intelligence that governments are involved in?

A    Yes.  The intelligence arm is the gathering of intelligence, and then counterintelligence is countering the outflow of U.S. intelligence to a foreign government.

I-132

Q     Were you involved in the investigation of the Defendant, Mr. Wei?

A     Yes, I was.

Q     During that investigation, did you work with the U.S. Navy and obtain certain documents having to do with his background?

A     Yes, I did.

Q     Were some of those documents part of his Navy personnel file?

A     Yes, they were.

Q     So, I'd like you to -- you'll see there are some binders up there at the witness stand with you, and if you wouldn't mind please just first turning to what's been premarked as Government Exhibit 1, and tell me when you're there, please.

A     Okay.  I'm there.

Q     Do you recognize this document?

A     Yes, I do.

Q     What is this?

A     This is his -- Mr. Wei's Record of Emergency Data which is a part of his official military personnel file.

Q     And if you flip through what's been premarked as Government's Exhibit 1, are there some other documents in there?

A     Yes, there are.

Q     Can you just generally talk about what the titles of

I-133

those documents are?

A    Sure.  One is his Drug and Alcohol Abuse Statement of Understanding.  We also have his enlistment and reenlistment documents with the Armed Forces of the United States.  And we also have his evaluation reports as well.

Q    Are these all excerpts or portions of the Defendant's personnel file that you pulled from the U.S. Navy?

A    Yes, they are.

        MR. BARRY:  The Government moves to admit Government's Exhibit 1 into evidence.

        THE COURT:  Any objection?

        MR. JONES:  No objection.

        THE COURT:  1 is received.  Do you want to publish it?

        MR. BARRY:  Yes, your Honor.

        THE COURT:  You may.

BY MR. BARRY:

Q    In reviewing the Defendant's personnel record, did you learn a little bit about his background?

A    Yes, I did.

Q    Where was he born?

A    He was born in China.

Q    And when did he immigrate to the United States?

A    Sometime in 2016 is when he immigrated here.

Q    Where did he move when he first arrived?

I-134

A    When he arrived here in the United States, it was to Wisconsin.

Q    And approximately what year did he join the United States Navy?

A    He joined the United States Navy in May of 2021.

Q    So, I'd like to draw your attention to the first page of what's been marked -- or what's been entered into evidence as Government's Exhibit 1.

MR. BARRY:  And, Ms. Blake, if we could please highlight the portion at the bottom that's 7A and says "Mother's Name".

BY MR. BARRY:

Q    Is Mr. Wei's mother named Mingli Wei?

A    Yes, it is.

THE COURT:  Is that showing on the jurors' screens?

MR. BARRY:  Can you all see that?

THE COURT:  Okay.  It can also be shown on the big screen.

MR. BARRY:  And if you have any issues with seeing something, please just raise your hand and let us know.

BY MR. BARRY:

Q    When Sailors like the Defendant join the United States military, do they usually complete a series of onboarding documents?

A    Oh, absolutely, yes, they do.

I-135

Q     And do some of those documents include what you mentioned earlier, the Drug and Alcohol Abuse Statement?

A     Yes, they do.

Q     Why does the Navy have Sailors fill out this Drug and Alcohol Abuse Form?

A     They want servicemembers to understand that drug -- illegal drug use in the United States military will not be tolerated and that there are ramification of those given their -- given their positions.

Q     Is part of that because when people join the United States Navy, it's not like joining a -- having a regular job, it's sort of considered a -- a special job or a sensitive job?

A     Yes, that is correct.

Q     And this is a form -- the forms that we're going through, these are all forms that the Defendant signed and agreed to, is that right?

A     Yes, by way of his initials, then later signature.

MR. BARRY:  So, Ms. Blake, if we could please go to page three near the top, question one.

BY MR. BARRY:

Q     Is this the Drug and Alcohol Form?

A     Yes, it is.

MR. BARRY:  Okay.  Did every -- my screen went out. Did everybody else's screen go out?  Yeah.

THE COURT:  It always happens.

I-136

MR. BARRY:  Okay.  We can go without it.

THE COURT:  There we go.

MR. PARMLEY:  It's back.

BY MR. BARRY:

Q    All right.  Special Agent Christian, would you please read that first bullet point on that Drug and Alcohol Form?

A    Yes.  Absolutely.  It says:

        "Service in the United States Navy or
        Naval Reserve places me in a position of
        special trust and responsibility."

Q    So, for --

MR. BARRY:  Oh, yes, sir.

JUROR:  (Indiscernible.)

MR. BARRY:  Okay.  Is that on everybody's monitor?

JUROR:  (Indiscernible.)

THE COURT:  How many -- how many can't see?

JURORS:  (Indiscernible.)

THE COURT:  How about the big screen?

(Pause.)

THE COURT:  How about the ELMO?

MR. BARRY:  This one is working.

THE COURT:  There --

MR. PARMLEY:  Now it's back.

THE COURT:  And is it back?

JUROR:  Yes.

I-137

THE COURT: Okay. Thank you.

MR. BARRY: All right. If we need to, we'll go hard copy.

BY MR. BARRY:

Q    Special Agent Christian, I believe you were just testifying that from the beginning, people who join the United States Navy are told that joining the military places them in a position of special trust. Is that correct?

A    That is correct, yes.

Q    When people join the military, they only have to be 18, correct?

A    That's correct.

Q    And are they sometimes given a great deal of responsibility even at a relatively young age?

A    Yes, absolutely they are.

Q    Can you give some examples based on your experience at NCIS as well as as an Army Colonel in terms of an 18 or 19 or 20 year old in the U.S. military maybe getting some responsibility that a typical 18, 19 or 20 year old wouldn't get?

A    Absolutely. Everything from intelligence specialist, they're granted Top Secret clearances upon coming on. There is a program even in the United States Army called High School to Flight School where you could take a young 18 year old and put them in the cockpit of an Apache helicopter at 18 years

I-138

old.

Also, the information that they come in contact with on a daily basis has its potential to -- if it got out, to cause potential harm within the commands that they work for.  Many of the jobs are all sensitive.  Even jobs that may not seem from the out -- out take to be sensitive, for example, we -- we warn our culinary specialists that even the information they have as cooks on how they handle and process food for masses on ships could be desired by a foreign country because they don't know how to do things the way we do.  Also, how the Navy conducts replenishment at sea, not many other countries have that capability to do that, and it gives the U.S. military a certain advantage on a -- a battlefield in the past as well as in the future.

Q   Going back to Government's Exhibit 1, are those the Defendant's initials next to that first bullet point?

A   Yes, they are.

MR. BARRY:  And then, Ms. Blake, if we could go to the bottom of page four please, right in the middle.

BY MR. BARRY:

Q   Is that also, Special Agent Christian, his -- the Defendant's signature on that form?

A   Yes, it is.

Q   Let's go to page six of this exhibit.  What is this portion of his personnel file?

I-139

A     This is his enlistment documentation when he first joined the Navy.

          MR. BARRY:  If we could please highlight the upper left corner of the date of enlistment.

BY MR. BARRY:

Q     When did the Defendant join the United States Navy?

A     According to this document, May the 4th, 2021.

Q     And then if we could go a little bit further down to the portion that says for -- or the portion that says -- under "Agreements".  What was the service commitment that the Defendant made when he joined the United States Navy?

A     It was going to be a total of eight years total, with four of those done in the active service.

Q     Does the rest of this form, his enlistment form, lay out some of his other responsibilities in joining the United States Navy?

A     Yes, it does.

          MR. BARRY:  And then if we could go to page nine, please, Ms. White.

BY MR. BARRY:

Q     And, just sort of on the first third, is that the Defendant's signature on that form as well?

A     Yes, it is.

Q     And that's him, again, acknowledging that he understands the sensitivity of his position and is agreeing to the

I-140

commitments in these forms?

A    Yes, he does.

Q    And if we could just go a little bit down under the oath under bullet point 15, when people join the United States military, do they take an oath?

A    Yes, they do.

Q    Why?

A    It's to, in a sense, begin bringing them into the culture of the United States military and letting them know and understand the level of trust that they have of the people of the United States and that it's not to be taken lightly.

Q    And is the first portion of this oath under bullet point 15 of Government Exhibit 1, is that the oath that the Defendant took when he joined the United States Navy?

A    Yes, it is.

Q    Would you please read that for the jury?

A    I will.

        "I, Jinchao Wei, do solemnly swear or
        affirm that I will support and defend the
        Constitution of the United States against
        all enemies foreign and domestic, that I
        will bear true faith and allegiance to
        the same, and that I will obey the orders
        of the President of the United States and
        the orders of the officers appointed over

I-141

me according to regulations and the Uniform Code of Military Justice. So help me, God."

Q    And the Defendant signed this form at the bottom as well, right?

A    Yes, he did.

Q    The last few pages of his -- of the Defendant's personnel file, I think you said earlier that those were evaluation reports?

A    Yes.  They're evaluation reports for him in there.

Q    Okay.  We're going to talk about those later with a different witness, but were those also evaluation reports of the Defendant that you pulled as part of his personnel file?

A    Yes, they were.

Q    Was the Defendant a U.S. citizen when he joined the United States Navy?

A    No, he was not.

Q    So, how was he able to join?

A    There are special programs within the military where an individual can gain their citizenship by joining any branch of the military service.

Q    In joining the United States military, was the Defendant's citizenship process accelerated?

A    Yes.  That's one of the benefits there.  The process can be accelerated.

I-142

Q    I'd like you to please turn to what's been premarked as Government's Exhibit 2 in that binder.  Were there other documents other than Defendant's personnel file that you pulled during this investigation?

A    Yes, there were other documents that were pulled for this investigations.

Q    Do you recognize the documents that have been premarked as Government's Exhibit 2?

A    Yes, I do.

Q    What is that?

A    This is  his electronic questionnaire for investigations processing, also known as a Standard Form SF86, for --

JUROR:  (Indiscernible) the document?

THE COURT:  Not yet.  It's not -- it's not been admitted.

MR. BARRY:  Yeah, it will be -- once it's in evidence you all will be able to see it on the screen.  So, there'll be a little bit of perfunctory language first.

THE WITNESS:  Sure.  It's his Standard Form 86 or what we typically refer to as the SF86.

MR. BARRY:  The Government moves to admit Exhibit Number 2 into evidence.

MR. JONES:  No objection.

THE COURT:  All right.  Now you may publish it.

//

I-143

BY MR. BARRY:

Q      Special Agent Christian, is this the form that you were referencing?

A      Yes, it is.

Q      And is -- is this a form that people complete when they're applying for a United States security clearance?

A      Yes, it is.

Q      You said it's sometimes called a Standard Form or SF86?

A      Yes, that's correct.

Q      So, if I refer to it as an SF86 moving forward, you'll understand that I'm talking about this document?

A      I will, yes.

Q      Generally describe what an SF86 asks for?

A      SF86 asks for a lot of information.  It's going to ask about prior employers.  It's going to ask about different places that you've lived.  It's going to ask about your criminal history.  It's going to ask questions about your drug use.  It's going to ask you questions about foreign contacts, not just in person but also foreign contacts as it pertains to financially as well, also about your involvement in other types of illicit activity such as compute intrusions or even about your involvement with, say, extremist organizations as well.

Q      Why does the Government want this information when deciding whether to give someone a security clearance?

I-144

A    The Government needs this information to establish a clear picture of the individual so they can note -- best understand the risk the government might be taking by providing them a security clearance, and then they use this whole picture to make a determination or what they call an adjudication to grant or deny a security clearance.

MR. BARRY:  Ms. White, can we please go to the -- page two, and if we could please highlight for the jury that first paragraph under "Purpose of This Form".

BY MR. BARRY:

Q    Does that sentence at the beginning, Agent Christian, kind of summarize what you were just testifying about in terms of why the Government seeks this information?

A    Yes, it does.

Q    So, it's not only to potentially grant someone access to classified information, it's also if someone's going to be under what's called a National Security Position?

A    That's correct, yes.

Q    And this is on the form that the Defendant filled out, right?  It's sort of the instructions portion?

A    It is, yes.

MR. BARRY:  Let's go to page three, please.  If we could go to the top portion of this under "Investigative Process".

//

I-145

BY MR. BARRY:

Q     Could you read that first sentence for the jury, please, Special Agent Christian?

A     Sure.

        "The background investigations for
        national security positions are conducted
        to gather information to determine
        whether you are reliable, trustworthy, of
        good conduct and character and loyal to
        the United States.

Q     Did the Defendant ultimately fill this form out, sign it, submit it?

A     Yes, he did.

        MR. BARRY:  And if we could just go to page 42, please, Ms. White.

BY MR. BARRY:

Q     Is that the Defendant's signature at the back?

A     Yes, it is.  And, also, throughout there is his Social Security Number that identifies him as well.

Q     And it has a little date on there.  Can you read that for the jury?

A     Yes.  That would be May the 4th, 2021.

Q     Is that the same date that he enlisted in the United States Navy?

A     Yes, it is.

I-146

Q    So, on the same day that the Defendant swore an oath, enlisted in the United States Navy, he also filled out a background investigation or SF86 Form?

A    That is correct, yes.

Q    Was the Defendant ultimately given a security clearance?

A    Yes, he was.

Q    At what level?

A    At the Secret level.

Q    Are there different levels of classification in the U.S. Government system?

A    Yes, there are.

Q    Can you just generally describe sort of each level?

A    Sure.  You have the bottom level, which is Controlled Unclassified Information.  Then you have Confidential.  Then you have Secret.  Then you have Top Secret, and then you have other compartments that go beyond that as well.

Q    And in terms of security clearances, are there three levels, sort of Confidential, Secret and Top Secret?

A    As far as clearances go, yes, that's correct.

Q    And the Defendant had that middle level, the Secret level?

A    Yes, he had a Secret clearance.

        MR. BARRY:  Okay.  We -- we can take that down.

BY MR. BARRY:

Q    I want to talk a little bit about the -- what happened

I-147

after the Defendant joined the Navy.  So, he enlisted in May 2021, right?

A    That's correct, yes.

Q    And then where did he go to begin his Navy career?

A    He went to Naval Station Great Lakes where he attended basic training.

Q    And is that something that everybody who joins the Navy in a service warfare capability or capacity goes to start their basic training?

A    They do.  The enlisted members do such as Mr. Wei.

Q    And then where did he go after he finished basic training?

A    After that, he would have gone to his specialized school, also at Great Lakes Naval Station, where he would ultimately get the education pertaining to his job in the Navy.

Q    So, when you say specialized school, can you explain a little bit more what that means?

A    Yes, sure.  So, he was a machinist's mate aboard the USS ESSEX.  So, he would have attended the Surface Warfare Engineering Developmental Training Command I believe where they'll undergo several months of additional training so they know how to do their jobs as a machinist's mate aboard the ship, which is going to include things like maintenance, as well as, you know, various systems on board Naval vessels.

I-148

Q     So, is that second school, the specialized school, is that a school that's based on what the specific servicemember's job is going to be?

A     Yes, that's correct.

Q     So, the Defendant you said was a machinist's mate?

A     That's correct, yes.

Q     And -- and that's sort of like an engineering role?

A     It is.  It falls under the engineering Department on the Naval vessels.

Q     And then would there be a difference advance school for someone who's on the flight deck doing the --

A     Yes.

Q     -- you know, the things for the planes?

A     Correct.

Q     Okay.

A     There would be another school for that.

Q     And then there'd be another school maybe for someone who works on the intelligence side of the ship?

A     That's correct, yes.

Q     Okay.  All right.  I'd like you to just turn in your binder to what's been premarked as Government's Exhibit 3. And can you -- do you recognize this document or series of documents?

A     I do.  This is his Electronic Training Jacket.

Q     Was this also a portion of the documents that you pulled

I-149

from the Defendant's Navy records?

A    I did.  I actually pulled this from a -- a separate system that has this called -- we also known it as FLTMPS.

MR. BARRY:  The Government moves to admit Exhibit -- Government Exhibit 3 into evidence.

MR. JONES:  No objection.

THE COURT:  It's received.  You may show the jury.

MR. BARRY:  And if we could please publish the first page, and then, Ms. White, if you wouldn't mind just highlighting that text on the top.

BY MR. BARRY:

Q    I want to call out a few things here.  So, the first is before Defendant's name it says MM3 at the top.  What does that mean?

A    That means -- that's a description of both his job, what he does, as well as his rank.  So, he's a machinist's mate third class.

Q    And then on the right-hand side, it says "Clearance eligible favorable".

A    Yes.

Q    What does that mean?

A    That means that he received favorable review in his adjudicative process to receive a Secret clearance.

MR. BARRY:  Let's go to page eight, please.  And if we could highlight the text in the bottom, the personnel

I-150

qualification standard and below that.

BY MR. BARRY:

Q    What is this showing, Agent Christian?

A    These are the -- all of the various qualifications that he held aboard the USS ESSEX.

Q    So, are these qualifications or programs that the Defense had -- or the Defendant had to follow to get qualified, and then there's a date showing when he completed that training or those qualifications?

A    Yes, that's correct.

Q    And it looks like all of these qualifications the Defendant obtained them in the second half of 2022, is that right?

A    Yes.  In looking at those dates, from about June 2022 to December of 2022.

MR. BARRY:  All right.  Let's go next to page 14, and let's highlight that top part, please.

BY MR. BARRY:

Q    Can you explain to the jury what this is showing?

A    This is a listing of his career history.  At the bottom there is his training at Great Lakes.  Sorry for the -- this is how the military does business with these kind of acronyms, but it's -- that's his initial basic training at Great Lakes is the bottommost entry.  The next one would be his Surface Warfare Engineering School that we -- we spoke about.  The

I-151

next can be a little confusing, but when he arrived in San Diego, this is a -- in a sense a transient unit while he's waiting to be assigned.  So, he's there only temporarily.  As you can see, he was only there from February until March.  And then after that is -- March 4th is when -- of 2022 is when he was assigned to the USS ESSEX.

Q    So, this is a -- a record of the Defendant's career in the Navy that we summarized in the beginning?

A    Yes, it is.

Q    And he came to San Diego beginning in early February 2022?

A    That is correct, yes.

Q    And then he was officially assigned to the ESSEX about a month later, right?

A    That's correct, yes.

Q    And did he serve on the ESSEX until he was arrested in August 2023?

A    Yes, he did.

Q    You've mentioned a couple of times I think in describing some of these acronyms the phrase Surface Warfare?

A    Yes.

Q    Can you describe for the jury what that means?

A    Sure.  Surface Warfare is going to refer to any of our Naval Surface vessels that are operating as the -- this is going to have everything from cruisers to destroyers to LHD's,

I-152

landing helicopter docks such as the ESSEX, as well as aircraft carriers.

Q    So, Surface Warfare for a non-military person like me just means above the ocean?

A    That's right.

Q    Okay.  Or the -- the waterline I guess?

A    There you go.

Q    All right.  Let's go to page 10, please.  What -- what is this showing, Agent Christian?

A    Yes.  This is a listing of all of his various trainings that he has taken and that have been recorded.

Q    And when you say he, this is -- these are the Defendant's trainings that he took while in the United States Navy?

A    Yes, that's correct.

Q    And does that column on the far right, Grad Date, is that the date that he completed those trainings?

A    Yes, that is correct.

Q    And then are the other columns just sort of columns describing how he took the training and the title of the training?

A    Yes.  That -- that's correct.

Q    Okay.  I want to draw your attention to one specific training.

        MR. BARRY:  So, if we could go to the next page on

I-153

page 11, and then the training near the bottom third that in the left-hand column, it says DON-CIAR, if we could please highlight that.

BY MR. BARRY:

Q    Do you see that, Agent Christian?

A    I do, yes.

Q    And the title of the training is NCIS Counterintelligence and Insider Threat Awareness and Reporting Training?

A    Yes, that is correct.

Q    Are you familiar with that training?

A    Yes, I am.

Q    Can you describe what it involves?

A    Yes.  I've actually given this course.  It's -- prior to -- prior to the Pandemic, it was typically given in person, and then it's been offered online as an alternative since post-COVID.

     But the nature of the training is -- is to bring awareness to a lot of the threats that may be out there that folks may not be aware of such as foreign -- what we call foreign intelligence entities that are out there with the desire to collect information for -- on behalf of their organization or behalf of their country.

     It's also to talk to us a little bit about the insider threat as well, individuals that may not be witting in their

I-154

provision of information overseas, such as people -- we want to bring servicemembers' awareness to talking about their jobs outside of the confines of their work environment because certain things could be overheard by somebody who's not with -- doesn't have the best intentions for the United States.

Q    Okay.  Did the Defendant complete this training on February 5th, 2022?

A    Yes, he did, according to the record.

Q    And it says "Web" under one of the other columns.  What does that mean?

A    It was completed online.

Q    So, at the time this training was given in a Web-based format?

A    Yes, it was.

Q    And is it sometimes also given in person?

A    Yes, it is.

Q    All right.  I want to look at the training that the Defendant took.

So, if you would please turn to what's been premarked as Government's Exhibit 4, Agent Christian.  Do you recognize this document?

A    Yes, I do.

Q    What is this?

A    This is the NCIS Counterintelligence and Insider Threat Awareness and Reporting Training.

I-155

Q     So, this is the training that the Defendant took in February of 2022?

A     Yes, it is.

Q     And did you create Government Exhibit 4?

A     I did.  Yes, I created it.

Q     Is it a series of excerpts from that training?

A     Yes, it's excerpts.

          MR. BARRY:  The Government moves to -- the Government moves to admit Exhibit 4 into evidence.

          MR. JONES:  No objection.

          THE COURT:  It's received.

          MR. BARRY:  All right.  If we could please publish that first page.

BY MR. BARRY:

Q     You said this was a Web-based training, right?

A     That's correct, yes.

Q     And in creating the version of the exhibit that we're going to look at today, did you scroll through the Web-based training and take screenshots of certain portions of it?

A     Yes, I did.

Q     So, is the -- the page that we're looking at right now with the Sailor and Marine Corps member, is that the first page of the training?

A     Yes, it is.

          MR. BARRY:  Okay.  Let's go to the second page,

I-156

please.

BY MR. BARRY:

Q    So, from a counterintelligence perspective, what's the risk of an insider stealing or sharing critical technology? Why does the Navy care about that?

A    The Navy cares about it -- not just the Navy but the entire Department of Defense cares about that.  And the reason is any kind of loss of information can be used even in the smallest capacity to in a sense put together various puzzle pieces in somebody's greater picture that could jeopardize our advantage on battlefields, both at sea and also at land, air, space, cyber domain, across all spectrums.  And the concern there is too against the taxpayer, because any vulnerabilities that get exploited, companies have to come along that -- that are working for the Government to develop some of these technologies, and it costs more money to shore up those vulnerabilities because certain leaks have happened.  And the -- when it boils down to it at the bottom line, if we lose superiority, we risk losing lives on the battlefield both ashore -- ashore and afloat.

        MR. BARRY:  Let's go to the next page of the training, please.

BY MR. BARRY:

Q    Are these some of the sort of potential damages -- types of damage or types of harm that a counterintelligence or

I-157

insider threat can cause the U.S. military?

A    Yes, they are.

Q    I want to talk a little bit about that second one.  You said loss of military superiority.  So, for someone who's not familiar with the military, why would, just hypothetically, giving information about something that a foreign military or a terrorist organization or drug cartel gets, how could that -- how could that lead to the loss of U.S. military's sort of advantage or superiority vis-a-vis that adversary?

A    In certain circumstances, U.S. military, because of the superiority, likes to keep some of that information close hold on he inner workings of certain vessels, because if that information were to get out, it -- it can -- it has two-fold consequences.  One, it can identify specific vulnerabilities that could be attacked by a foreign adversary.  Also, it gives information to a -- a foreign government that may be behind the engineering power curve, behind the United States.  It can kind of give them the upward leg that they may not already have to help them strive to be better than the United States on -- on a battlefield.

        MR. BARRY:  Let's go to the next page of the training, please.

BY MR. BARRY:

Q    I think you talked a little bit earlier about different types of insider threats or counterintelligence training.  So,

I-158

can you just for the jury, those five bullet points on the right, can you just kind of summarize the first few in terms of the distinctions there?

A    Yeah, absolutely.  Unauthorized disclosure, this would be somebody in a sense talking about sensitive topics in a public forum and they're being overheard.

Next would be data modification where they're changing information that could potentially corrupt online systems.

Espionage, of course, is the knowing -- knowingly providing sensitive government information to an entity not authorized to receive it.

Terrorism, of course, being terrorism, wide open for attack such as like the USS COLE bombing.  And then also any kind of kinetic actions, which is -- would be in a realm of like a combat scenario.

Q    Let's take a step back.  You said this is a training that NCIS is providing to members of the Navy, right?

A    Yes, it is.

Q    And is part of that because they're trying to teach members of the Navy how to protect themselves?

A    Not only just to protect themselves but also their buddies as well as also how to report that information should they come across it.

Q    Let's go to the next page, please.  So, this is the next sort of section of the training that the Defendant took in

I-159

February of 2022?

A      Yes, it is.

MR. BARRY:  All right.  Next page, please.

BY MR. BARRY:

Q      And you said earlier that this was a Web-based training, and you sort of took screenshots while you were scrolling down?

A      That's correct, yes.

Q      Okay.  So, this -- the page that we're looking at right now, that's the first portion of the screenshot that you took?

A      It is, yes.

MR. BARRY:  All right.  Let's go to the next page.

BY MR. BARRY:

Q      So, you mentioned this phrase earlier "foreign intelligence entity".  Describe for the jury what that means.

A      Sure.  It can be anything from an organization, a person, group, that is out to collect information on behalf of their government.  They don't necessarily have to be an employee of said government.  They could be somebody who's been recruited to work on behalf of that government.

Q      It talks on the right about some of the different types of foreign intelligence entities that you've mentioned, drug cartels, organized criminal groups.  I want you to talk a little bit about the one at the top, foreign intelligence service or foreign intelligence.  What is -- what is a foreign

I-160

intelligence service?

A    A foreign intelligence service is any service that is working on behalf of a foreign government to collect information for that government, typically on other nations. Everything within -- and it's not just military.  It's across, in a sense, four areas, what we consider the DIME, diplomacy, information, military and economic.  And, so, that's what a foreign intelligence entity's job typically is, to collect that kind of information for the benefit of their nation.

Q    Okay.  So, like one of the United States foreign intelligence services is the CIA?

A    Yes, that's correct.

Q     The Soviet Union had the KGB?

A    Yes, that's correct.

Q    Okay.  Let's go to the next page, please.  So, this is -- I want you to talk a little bit about why this little factoid is highlighted in the training.

A    So, the reason this is important is even though information might be deemed necessarily unclassified as -- as we might here, bits and pieces of information as it's added on kind of creates a whole picture, and the foreign intelligence services throughout the United States, they may have bits and pieces of information.  Some of that information could have been found on the Internet, and then other pieces they try to fill in in other gaps.  They just take these little bits and

I-161

pieces that create a larger scale picture that gives them a -- a much greater picture, which sometimes that, even though it might be in little bits and chunks of -- of maybe unclassified information, all that information may have been correlated to provide higher level products at security levels of Secret, even Top Secret depending on how they put that information together.

Q    So, is part of the point of this slide from a training perspective that when you're talking about an adversary or foreign intelligence service, you don't know what information they have or don't have?

A    That's correct.  You do not.

Q    And, so, something that you may view as less harmful than something else, once you give it to a foreign intelligence service, they might be able to partner it up with other things that make it much more damaging?

A    Absolutely.  They can partner it up with information they got from somewhere else.

Q    And the training points this out in part to warn Sailors or members of the Marine Corps that that's something that intelligence services do, right?

A    Yes, that's correct.

Q    Let's go to the next slide and talk about the types of information sought.  So, you -- you mentioned some of these, but I just want to highlight a couple of them.

I-162

So, the first is on the upper left-hand corner, when it talks about project information on policies and intentions of the DOD worldwide, why would a foreign intelligence organization be interested in the Department of Defense's intentions?

A    It's almost kind of like the nosy neighbor approach. They're curious what you're doing on the other side of your fence so they can potentially counter that information, potentially even change information that can mislead us and also influence our -- our national leaders' decision making.

Q    Let's talk about another one, the one below that, scientific military industrial technology.  Why would a foreign intelligence service be interested in scientific military and industrial technology?

A    One piece would be to further their own advances.  They may not be necessarily at the level of, say, the United States.  So, they're seeking to up their -- in essence, up their game and what they do.

The other aspect of that too is to look for vulnerabilities in our scientific areas and the information gaps that we have to potentially exploit both the information or even kinetically the, you know, weapons or munitions.

Q    Let's look at the second column, the one at the top, names, positions, phone numbers, email addresses, and PII or personally identifiable information.

I-163

Why would a foreign intelligence service be interested in the names, positions, phone numbers, email addresses, and personally identifiable information of U.S. servicemembers?

A    So, they're looking for individuals -- there's a couple of reasons.  One reason is they're looking for people with what we call placement and access, individuals that have placement and access to the information that a foreign intelligence organization would want to gather on their country.

They can also collect that information for potential targeting, not just targeting it to potentially collect intelligence, but it can also be used to collect information for potential targeting to do -- to actually do physical harm to them or their families.

Q    So, I think you -- it sounded like you were talking about two different types of targeting?

A    That's correct, yes.

Q    So, one is targeting in a sense of, Hey, these people may be other people that I as the intelligence officer should try to recruit?

A    That's -- that's a potential, yes.

Q    And then the other is the more traditional kind of military targeting like I want to attack this part of the military and this is how I might do it?

A    Yes, absolutely.

I-164

Q    The last one on this slide I want to just get your view on is the missions, time table, strengths, destinations and readiness.  Why would a foreign intelligence service be interested in the missions, time tables, strengths, destinations and readiness of the United States military?

A    Again, this goes back to a couple of things that we've spoken about already.  They want to know what we're doing both potentially just to further their own aims for their country or it could be used in a more nefarious capacity for potential targeting.  So, in the realm of a Naval vessel, they would be very curious as to where a ship's going to be in advance of it arriving in order to potentially conduct attack or potentially also knowing where people are going to be for further information gathering if they need.

One example of this, of course, is the USS COLE bombing back in 2000.

Q    And that was an attack on a U.S. Navy vessel off the coast of Yemen?

A    Yes, that's correct.

Q    Let's go to the next page.  So, this section, Methods of Operation, does this section describe for servicemembers how foreign intelligence organizations gather information and recruit people?

A    Yes, it does.

Q    Let's go to the next page.  This says FIE -- that's the

I-165

Foreign Intelligence Entity definition we talked about earlier, right?

A    That's correct, yes.

Q    FIE methods of operation are all about spotting and assessing a potential target.  What do the words spotting and assessing mean in this context?

A    So, in this context, it's spotting, finding the individual and then assessing them for what we call their placement and access, do they have placement to the information that I want and can they access it and how easily can they access it.  So, those are some of the pieces.  And also the information they have, will it benefit what I'm trying to find out, and that's the assessing piece.

MR. BARRY:  Let's go to the next page, please.

BY MR. BARRY:

Q    So, this is talking about different ways that foreign intelligence organizations can spot and assess potential assets or spies?

A    Yes, it is.

Q    And one of the bullet points says open source?

A    Yes.

Q    Can you describe what -- what that means?

A    Oh, absolutely.  That's anything from just a standard Google search or Yahoo search, pick your search engine.  Also, that can be any -- anything found in newspaper articles, even

I-166

like print media, and but a bit one right now, of course, open sources we're all familiar with is -- is social media.

Q    So, is this saying that one of the ways that foreign intelligence organizations might spot and assess somebody to decide whether they're ripe to recruit is by gathering information about them from the Internet like social media networks?

A    Yes.  It's a definite baseline to get started.

MR. BARRY:  Let's go to the next page, please.

BY MR. BARRY:

Q    What's this second bullet point, elicitation, what's that talking about?

A    So, this talks about how a foreign intelligence entity will collect the information from an individual that they've spotted and assessed.

Q    So, this is -- is this sort of like part of that recruitment cycle that you're talking about?

A    Yeah.  It's -- it's definitely part of the -- of the recruitment cycle and talks a little bit about how the foreign intelligence entity will operate to conceal who they are to get the information that they want to get.

Q    And is -- it looks like in here the training is trying to tell servicemembers and Marines different ways that a foreign intelligence service might try to elicit information from you.  Is that right?

I-167

A     Yes, it does.

Q     Okay.  And one of them at the top, it says FIE's operate under the guise of and then lists a bunch of things like think tanks, research organizations, official delegations.  What does that mean?

A     So, they're -- they're going to use disguises, if you will, for -- to mask who they are.  If they came outright and told you, I'm working for a foreign -- foreign government, you're going to be like, No, I'm not going to tell you anything.  But this is in a way to kind of mask who they are and to begin that initial recruitment cycle earlier.  It's kind of like in a sense like a frog in a frying pan.  You know, you're slowly going to turn on the heat.  You know, if you go in fully hot, you know, that frog is going to jump right out.  But if you slowly turn the heat up over time, then that frog's ultimately going to suffer as a result of it, unfortunately.  Sorry for the -- the description, but that's in a sense how this works.  They start small, hide, mask who they are to make it seem a little less conspicuous and less concerning.

Q     Is another reason why foreign intelligence services sort of have this gradual approach is because it's harder for law enforcement to identify what's going on?

          MR. JONES:  Objection.  Leading.

          THE COURT:  Sustained.  Rephrase.

I-168

BY MR. BARRY:

Q    Are there any other reasons why foreign intelligence services would use cover organizations as part of their recruitment?

A    Sure.  They know that organizations such as the NCIS, such as the FBI, are looking to identify them and stop them. And, so, they can use that to try to fly under the radar.

            MR. BARRY:  Let's go to the next page, please.

BY MR. BARRY:

Q    Is this page and the following page, are these -- tell me what these are describing.

A    So, this is just additional ways that a foreign intelligence entity will attempt to collect intelligence or information, and they can do that through just basic eavesdropping such as a couple of servicemembers at a local coffee shop talking, and they can be potentially overheard or everything up to tapping their phone lines and listening into their conversations.

            MR. BARRY:  And let's go to the next page, please.

BY MR. BARRY:

Q    And this is a summary of what you were just talking about, some of the other ways a foreign intelligence organization might try to gather information on a potential recruit?

A    Yes, that is correct.

I-169

MR. BARRY:  Next page, please.

BY MR. BARRY:

Q    So, this is titled "Step 4 Recruitment".  This is -- this is -- is this describing sort of the process that NCIS was trying to train Sailors and Marines on how an intelligence organization might start a relationship and then recruit them?

A    Yes, it is.

Q    And I want you to talk a little bit about a few of those bullet points at the bottom.  So, why would a foreign intelligence organization try to build a personal relationship or befriend someone to gain trust as part of their job?

A    It's all about rapport.  You know, you're not going to -- you're not going to share things about you, personal things about you or what you do with a complete stranger.  So, over time, they'll build a relationship to in a sense become your friend and garner that trust with you so you trust them, and then that provision of information becomes a little bit easier.

Q    What about two bullet -- three bullet points down, starting with small requests, then making bigger demands, why would an intelligence service use that technique to try to recruit someone?

A    First off, it's -- it's testing your ability to see how willing are you to even provide me any information.  And it starts small.  It might be something that's, you know, tell me

I-170

about your -- your vacation and the trip you took to Hawaii, and then it just grows and grows over time.  You know, it starts small, and then they add on and they add on and they add on.  And it's kind of, again, that slowly turning up the heat before you kind of realize what's actually happened.

Q    What about that second to the last one, praising and rewarding for accomplishments, why would a foreign intelligence organization use praising and rewarding someone for accomplishments as a recruitment methodology?

A    Again, it -- it goes back to the rapport piece, and it also -- I mean, we're human beings.  We want to be validated sometimes and -- and praised for the things that we do.  And it just kind of makes you feel good.  It's kind of that feel good high that you get, that dopamine hit that -- that says, Hey, I did -- I did a good thing here, and I got rewarded for it, makes you want to continue doing it and do it again.

Q    To summarize, are these bullet points, the seven bullet points on this slide, are these, in your experience, well known methods that foreign intelligence organizations use to recruit people?

A    Yes, they are.

Q    And these are -- are these methods that NCIS tries to train Sailors and Marines on to ensure that they protect themselves?

A    Yes, we do.

I-171

Q     And, also, do -- did you testify earlier that in addition to the sort of defensive part, another reason why NCIS trains Sailors and Marines on this is to also sort of flag for them when they should be reporting things?

A     That's correct, yes.

          MR. BARRY:  Let's go to the next page, please.

BY MR. BARRY:

Q     What does this slide summarize?

A     This just talks about the intelligence adversary is not just restricted to their -- their country.  They use the Internet to -- to both reach out to do their research and begin the process of finding an individual that gets back to the spotting and assessing.

          MR. BARRY:  Let's go to the next page, please.

BY MR. BARRY:

Q     And this is part of the end of -- is this part of the end of the training?

A     Yes.  It's close to the end, yes.

Q     And you said earlier that this Exhibit Number 4 is a -- this -- these are excerpts from the training, correct?

A     That's correct, yes, actually.

          MR. BARRY:  Okay.  Let's go to the next page, please.

BY MR. BARRY:

Q     Why is it important for servicemembers to report when

I-172

they see something suspicious?

A     Because the faster we know about it, the quicker we can get our vulnerability shored up and then begin the process of mitigating any risk to the U.S. military.

          MR. BARRY:  Let's go to the next page, please.

BY MR. BARRY:

Q     Is that duty to report emphasized in the training?

A     Yes, it is.

Q     And is it sort of like the old see something say something training?

A     That's correct.  It is.

          MR. BARRY:  Let's go to the next page, please.

BY MR. BARRY:

Q     What is the document on the left of this page?

A     This is what's called a Department of Defense Directive, meaning there's no option.  You -- you have to report.  So, the -- each of the elements that are in this portion of the training are the foreign intelligence contacts, activities, indicators.  If you see any of these that are in this list described, you are mandated by the Department of Defense to report that information.

Q     In the training, is this like a scroll-down document where you can scroll through a number of bullet points other than what's visible on the slide right now?

A     Yes, it is.  And once you're in that document, you can

I-173

scroll through and see all the -- each of the elements that are within the Department of Defense Directive.

Q    And these are things that if somebody who's taking this training sees, they have a duty to report those to an authority within the Navy?

A    Yes, they do.

Q    And is one of those that second bullet point -- or I guess it's not a bullet point, but can you read number two?

A    Sure.

"Contact with an individual who is known or suspected of being associated with a foreign intelligence or security organization."

Q    So, if the Navy -- if a Sailor or a Marine sees that, they're required to report it, right?

A    Yes, they are.

Q    Okay.  What about the -- can you please read number five?

A    "Attempts to obtain classified or sensitive information by an individual not authorized to receive such information."

Q    So, a similar question.  If a Sailor or Marine sees that, are they required to report it?

A    Yes, they are.

I-174

MR. BARRY:  Let's go to the next page.

BY MR. BARRY:

Q    And then what about number 13, can you read that for the jury, please?

A        "Removing or sending classified or
            sensitive material out of secured areas
            without proper authorization."

Q    If a Sailor or Marine removes or sends classified or sensitive material out of a secured area without proper authorization, are they required to report that to their -- to the authorities?

A    Yes, they are.

MR. BARRY:  Let's go to the next page, please.

BY MR. BARRY:

Q    Did the end of the training include a number of case studies?

A    Yes, it did.

Q    Were the -- were each of those photographs at the bottom of this page a different case study that the Sailor or Marine could watch?

A    Yes.  They could pick one of the three case studies and watch them.

Q    The -- I want to focus on that photograph in the middle. Was that a case study relating to somebody named Mussafa Award (phonetic)?

I-175

A     Yes, it was.

Q     And did it describe a past case involving the Navy that it was trying -- a -- a past case involving a Navy civilian?

A     Yes, it was.

Q     And it was sort of describing an insider thread or counterintelligence issue related to that?

A     Yes, it did.

          MR. BARRY:  Okay.  Let's go to the next page, please.

BY MR. BARRY:

Q     What's this showing?

A     This is the -- a case study that kind of gives an overall kind of summary of what the case was about or what the case study was about, and then at the bottom it goes into each of the elements which were potential indicators in this case, and then the ones that are highlighted were the elements that were reportable indicators that should have been reported in that case.

Q     So, this is something that a trainee like the Defendant would have seen when he was taking his training?

A     Yes.

Q     And if you look at the little blurb talking about the case in the top, it uses the phrase "Egyptian Intel Officer"?

A     Yes, that's correct.

Q     What's -- does intel officer also -- does that stand for

I-176

intelligence officer?

A    Yes, it does.  It stands for intelligence officer.

Q    And I know -- I know we've had a lot of lingo, but, you know, we've talked about counterintelligence.  We've talked about insider threat.  What's an intelligence officer?

A    An intelligence officer is someone working on behalf of a foreign government whose job is to collect intelligence or information that answers what we call our intelligence requirements for that foreign government.  So, their job is to collect bits and pieces of information to fill gaps in the intelligence a foreign government many have.

Q    And for the Awad (phonetic) case, you said that that highlighting
-- is that highlighting from the training itself?

A    Yes, it is.

Q    So, these are sort of lessons learned that the trainee is supposed to take away from this case?

A    That's correct.  It's a combination of, Hey, here were the indicators.  Here were the red flags that we saw, and then of those red flags, the ones that are highlighted are the ones that should have been reported when observed.

Q    And it describes the case as involving someone who disclosed sensitive but unclassified documents without elicitation?

A    That's correct.

I-177

Q     And that Mr. Awad received $3,000 for sharing that national defense information?

A     That is correct.

Q     Did the -- the case study that the Defendant too, also include an embedded video about the case?

A     It did, yes.

Q     And is that little video that has the two minutes and eight second shot, is that a still shot of that video?

A     Yes, it is.

          MR. BARRY:  Your Honor, may I approach the witness?

          THE COURT:  You may.

BY MR. BARRY:

Q     I'd like you to look at what's been premarked as Government's Exhibit 5, and if you would please tell me if you recognize that, Agent Christian?

A     Yes, I do.

Q     What is that?

A     It's -- it's -- it's a thumb drive that contains this video.

Q     And did you --

A      From training.

Q     So, that thumb drive contains the video from the Defendant's training of the Awad case?

A     That's correct, yes.

Q     And is it an excerpt of the video?

I-178

A     Yes, it is.

Q     Okay.  And are your initials on that thumb drive?

A     Yes.  Those are my initials.

Q     Did you review the video on that thumb drive before initialing it?

A     I did, yes.

          MR. BARRY:  The Government moves to admit Government Exhibit 5 into evidence.

          MR. JONES:  Your Honor, I would request a limiting instruction as I believe it's appropriate for the effect on the viewer, but it does contain hearsay.

          THE COURT:  Any objection?

          MR. BARRY:  No objection, your Honor.

          THE COURT:  All right.  The Court will receive that with that limiting instruction.

          MR. BARRY:  All right.  Ms. White, if we could please play Exhibit 5 for the jury.

     (Video played.)

          MR. BARRY:  All right.  If we could take that down, please.  Let's go to the next page, page 25 of Exhibit 4.

BY MR. BARRY:

Q     At the end of the training, after the case studies and the videos, did NCIS emphasize the reporting obligations?

A     Yes, it does.

          MR. BARRY:  And if we could go to the next page,

I-179

please.

BY MR. BARRY:

Q    Did it also emphasize that if you have a security clearance, there are additional reporting obligations that you have?

A    Yes, it did.  If you -- you have a Confidential, Secret or Top Secret clearance, you must report any foreign connections including those of your family, a cohabitant or other persons, any financial interest you might have in another country and any personal foreign travel that you might have.

           MR. BARRY:  And let's go back actually to page 25.

BY MR. BARRY:

Q    I want you to read that section of text on the left if you would, please.

A    Sure.

           "All personnel must report to NCIS any
           contact with a person, regardless of
           nationality, whether within or outside
           the scope of your official activities in
           which illegal or unauthorized access to
           classified or otherwise sensitive
           information is sought and you suspect you
           may be the target of exploitation by a
           foreign entity.

I-180

MR. BARRY:  Let's go to page 27.

BY MR. BARRY:

Q     Does this explain the various ways that a Sailor or Marine can report any of the flags that they were trained on?

A     Yes, it can.  It -- it highlights you can go in -- walk into any of your NCIS offices.  You can also make a report online via the NCIS website, and there's also an NCIS app via both the Android and iPhone where you can submit the information even anonymously.

Q     Does the training also instruct Sailors and Marines that if they don't want to contact NCIS, they can also contact their security officer, supervisor or command?

A     Yes, that's correct, at the bottom right.

MR. BARRY:  Let's go to the next page, please.

BY MR. BARRY:

Q     And then that's that phone number at the bottom that someone can call?

A     That's correct.  That's also the tip line as well.

Q     And then the next two pages, is this what the Defendant would have seen when he completed the training?

A     Yes.  That's the end of the training.

Q     Okay.  And then I -- I just want to ask you a few things about the last two pages.

MR. BARRY:  And if we could go to 31, please, and then 32.

I-181

BY MR. BARRY:

Q    What are these showing?

A    So, within the training, there's a separate link inside. it's like an embedded link that you can click on, and it will bring up in a sense this tri-fold document.  The Navy -- not just the Navy, but all branches of the Service love their quick tip sheets, and that's what this is.  This is something that they could print off that kind of gives an overarching summary of this training to keep handy if they don't have the Internet to refer to in the event something happens to them and it's like, Hey, what was that training?  Hey, here's a reference that I can pull out to figure out what I need to do.

Q    Is this sort of like a cheat sheet that someone can take afterwards?

A    Yes, it is, absolutely.

Q    Going back to your testimony a little bit earlier, the Defendant completed this training on February 25th, 2022, is that right?

A    That's correct, yes.

Q    Before he was arrested in August of 2023, did the Defendant ever report his contact with a Chinese government agent to the authorities?

A    No, he did not.

          MR. BARRY:  Now we can take that down, please.

//

I-182

BY MR. BARRY:

Q    Now I want to talk about Naval Base, San Diego.  During this investigation, did you take photographs of the Naval Base that's a few miles south of here?

A    Yes, I did.  With -- with permission from the Base Security I did.

Q    Did you also go on Google Maps and screenshot some Google Map satellite imagery of the base?

A    I did.  Yes, I did.

Q    I'd like you to first just look through in your binder what's been premarked as Government's Exhibits 6 and 7, and if you could tell me what -- if you recognize those exhibits?

A    Yes.  Exhibit 6 is an overview which shows --

Q    Well, I just -- I just -- sorry to interrupt you.  I just want you to tell me if you recognize them.

A    Oh, sorry.  Yes, I do.

Q    Okay.  And did you create Exhibits 6 and 7 from Google Maps?

A    Yes, I did.

        MR. BARRY:  The Government moves to admit Government's Exhibits 6 and 7 into evidence.

        MR. JONES:  No objection.

        THE COURT:  They're received.  You may show the jury.

        MR. BARRY:  All right.  If we could please publish

I-183

Government's Exhibit 6 to the jury.

BY MR. BARRY:

Q      What is this showing, Agent Christian?

A      This is an overview satellite image from Google of Naval Base, San Diego, which is kind of to that right portion. You'll see the -- the pier jutting out, and just northwest of there, you'll see what's called the BA shipyards.  Of course, you got the Coronado Bridge there, and then just to the west, you have Naval Amphibious Base, Coronado, and then another portion of Naval Base, Coronado.  Some portion is also known as Naval Air Station North Island.

MR. BARRY:  Let's go to Exhibit 7, please.

BY MR. BARRY:

Q      What is this showing?

A      This is an overhead shot of the BA shipyards.

Q      And this is just a couple of miles south of here, south of the Coronado Bridge?

A      Yes, it is.

Q      During Defense -- Defendant's alleged illegal activity, was his ship anchored at Naval Base, San Diego for a portion of that?

A      It was, yes.

Q      Was it anchored anywhere else?

A      Yes.  It -- it had -- it transited and conducted operations up in Los Angeles for -- I'm sorry.  I'm drawing a

I-184

blank -- for Fleet Week, sorry, Los Angeles Fleet Week, and then it also conducted what's called RIMPAC in Hawaii later on that year before returning back to Naval Base, San Diego, and also it -- it was then transferred over to the BA shipyards for maintenance.

Q    Are Naval Base, San Diego and the BA shipyards just a couple of miles south of here adjacent to each other?

A    Yes, they are.

Q    Now, I want you to look at what's been premarked as Government Exhibits 8 through 20, and once you've had a chance to just look through those, tell me when you're ready.

(Pause.)

A    Okay.  I'm ready.

Q    What are Government -- or do you recognize Government's 8 through 20?

A    Yes, I do.

Q    Government's Exhibits 8 through 20?

A    Yes, I do.

Q    What are they?

A    They are various photos that I obtained of security of Naval Base, San Diego, photographs of the BA shipyards, photographs going aboard the ESSEX as well, the security measures required to get access to the ship.

Q    Did you take these photographs?

A    Yes, I did.

I-185

Q    Do Government's Exhibits 8 through 20 fairly and accurately depict the scenes that you photographed?

A    Yes, they do.

MR. BARRY:  The Government seeks to admit into evidence Exhibits 8 through 20.

MR. JONES:  No objection.

THE COURT:  They're received.  You may show the jury.

MR. BARRY:  Let's first publish Exhibit 8.

BY MR. BARRY:

Q    And I just want you to walk me through what each of these is showing.  So, Agent Christian, what does Government Exhibit 8 show?

A    This shows the front gate of Naval Base, San Diego. It's called the Nimitz Gate, also known as Gate 6.  As soon as you're coming off of Interstate 15, it will dump you out right here.

Q    Is this the gate that someone has to go through in order to enter the base?

A    It -- it's one of the gates, yes.

Q    Okay.  And in order to enter the base, does someone need to show any kind of identification to get on?

A    Yes, they do.  They'll usually present their Common Access Card or their military identification.

Q    Is the base publically accessible?

I-186

A     No, it is not.

          MR. BARRY:  Let's go to the next page, please -- or the next exhibit.

BY MR. BARRY:

Q     What is this showing?

A     This is just a wider shot of the same gate but also shows some of the security members that are there checking ID's coming aboard.

Q     Are the security members armed?

A     Yes, they are.

Q     And you say that they scan people who want to access the base's ID's.  Why do they do that?

A     So it verifies it's a valid identification, and also it logs who is coming on board the base.

Q     Are there also physical barriers that limit access to the base?

A     Yes.  They can also employ physical barriers to get on as well such as barricades.

          MR. BARRY:  Let's go to the next exhibit, please.

BY MR. BARRY:

Q     Is this one of the security personnel who you mentioned?

A     Yes, it is.

Q     And is that in his left hand an ID scanner or some sort of device to check ID's?

A     Yes, it is.

I-187

Q    And he's one of the armed guards that you mentioned or an example of one of the armed guards?

A    Yes, he is.

MR. BARRY:  Let's go to Exhibit 11, please.

BY MR. BARRY:

Q    Is this showing the exchange of some sort of identification document?

A    Yes, it is.

MR. BARRY:  Now let's go to 12.

BY MR. BARRY:

Q    What is this?

A    So, this is the -- what's called an entry -- one of the entry control points to get on the pier on Naval Base, San Diego where the USS ESSEX was ported at one time.

Q    So, this is after you've gotten onto the base?

A    Yes, that's correct.

Q    And this is trying to get to the pier where the ESSEX was anchored?

A    That's correct, yes.

Q    Is there any kind of physical barrier limiting access to the pier?

A    Yes, they -- as you can see there, there is the fence there as well as they -- they can put additional barricades in place, as you can see there, the yellow and orange kind of HESCO type barriers.

I-188

Q    What are those two Navy personnel doing who are at the gate to the pier?

A    They're controlling access.  They're also doing additional checks of identification cards there.

Q    Are they armed as well?

A    Yes, they are.

Q    Are they there to ensure that only people who are authorized to access that pier actually access it?

A    That's correct.

MR. BARRY:  Let's go to Exhibit 13, please.  And if we could just zoom in on that sign on the right-hand side.

BY MR. BARRY:

Q    It looks like there's also signage notifying members that this is a restricted area?

A    Yes, that's correct.

Q    And that only authorized personnel are allowed access to that pier?

A    That's correct, yes.

MR. BARRY:  Let's go to 14.  And if we could just zoom -- well, we don't need to zoom in.

BY MR. BARRY:

Q    Does that sign also notify people who go onto that pier that there's video monitoring or video surveillance in use?

A    That's correct.  It does.

Q    Is that video surveillance another mechanism to control

I-189

access to that pier?

A    Yes, it does.

MR. BARRY:  Show them Government Exhibit 15, please.

BY MR. BARRY:

Q    Where is this?

A    This is actually a photograph of the USS ESSEX.

Q    And what type of ship is the ESSEX?

A    It's an LHD or Helicopter Landing Dock.

Q    How big generally speaking is it?

A    Oh, they're very large.  I mean, kind of give you some perspective there, if you take a look, there is a -- a gentleman standing there, to kind of give you some perspective on the -- the mass size of this thing.

MR. BARRY:  So, let's actually, if we could just zoom in onto that man who's standing there and sort of zoom in at the top of the flight deck.

BY MR. BARRY:

Q    So, it looks like from the water -- or from the dock, you still have a couple of stories till you get to that flight deck?

A    That's correct.  You do.

MR. BARRY:  Could we go to Government's Exhibit 16, please.

//

I-190

BY MR. BARRY:

Q     What's this?

A     This is a picture of the miracle marking on the USS ESSEX, the number 2, and it's taken from the flight deck of the USS ESSEX.

Q     Is the ESSEX also referred to as LHD-2?

A     Yes, it is.

Q     And you said this is the flight deck?

A     Yes, this picture was taken from the flight deck, yes.

Q     So, if you think about the prior picture, this is sort of at the top of that ship?

A     Yes, although -- that's pretty much on the top.  You're standing on the flight deck.

          MR. BARRY:  Let's go to Exhibit 17.

BY MR. BARRY:

Q     What is this showing?

A     It is one of the access points to get on board the USS ESSEX, and what you see there is another individual who is controlling access at the bottom.

Q     Is this after you get through that base gate checkpoint?

A     Yes.  So, once you got through the front gate of Naval Base, San Diego, then you have to get access onto the pier. And then once you're on the pier, then you would find this individual or somebody of a similar nature.

          MR. BARRY:  Let's go to the next exhibit, please,

I-191

18.

BY MR. BARRY:

Q     What is this showing?

A     So, this is -- if you would have gone up that ramp from the last picture, this is on the top, and there's another individual, as you can see there, checking identification going on board the ship.

Q     And due to your great photography, does this actually show what appears to be someone showing their identification to the person checking?

A     Yes, it does.

        MR. BARRY:  Okay.  Let's go to 19.

BY MR. BARRY:

Q     What is this?

A     This is an additional security measure.  So, it's a little further inside the ship, but they're there in the event that there's any problems.  You'll see they're wearing a body armor.  They also have zip flex cuffs, and they're also armed as well.  And they're also there to assist anybody that's coming on board if they need to -- if they're a guest or -- or looking for somebody to get them properly logged in.  They also have a measure there to conduct additional searching because there's a metal detector wand on the desk as well.

        MR. BARRY:  Let's go to 20.

//

I-192

BY MR. BARRY:

Q     What's this showing?

A     This is another entry point on USS ESSEX, and it's depicting another armed guard that's there to check and validate that people coming on board are supposed to be there.

Q     So, to summarize, you said that to -- when the ESSEX was anchored at Naval Base, San Diego, if someone wanted access, they first would have to get through the gate?

A     Correct.

Q     And then they'd have to get through the pier sentries, right?

A     That's correct, yes.

Q     And then they'd have to get -- go through this ship checkpoints?

A     Yes, that's correct.

Q     And that's just to get onto the ship?

A     Yes, that's just to get on the ship.

Q     At some point during the investigation, was the ESSEX moved from Naval Base, San Diego to another location in San Diego?

A     Yes, it was.  It was moved over to the BA Shipyards for maintenance.

Q     Approximately when did that happen?

A     Oh, my goodness, kind of about midway towards the investigation.  So, they had just returned from RIMPAC and

I-193

then -- then were moved over there.  I want to say sometime like late '22 I believe.

Q    Okay.  When the ship was undergoing repairs in late 2022 and it was at the BA Shipyard, were there similar security controls in place?

A    Yes, there were.

Q    I'd like you to turn in your binder to what's been premarked as Government's Exhibit 27.  Do you recognize this document?

A    Yes, I do.

Q    What is it?

A    It's a picture of the entry control point at the BA Shipyards, and I took this picture myself with permission from BA Systems Security Officer.

Q    Does Government Exhibit 27 fairly and accurately depict the scene that you photographed?

A    Yes, it does.

        MR. BARRY:  The Government would move to admit Government's Exhibit 27 into evidence.

        MR. JONES:  No objection.

        THE COURT:  It's received.

        MR. BARRY:  All right.  If we could publish that, please.

BY MR. BARRY:

Q    You said that this is the entry point to the BA Systems

I-194

Shipyard?

A     Yes.  It's the -- the pedestrian gate.

Q     And this was the location of the ESSEX from later in 2022 until the Defendant was arrested in August of 2023?

A     That's correct, yes.

Q     And, similar to the Navy Base, were there physical barriers limiting access to the BA Systems Shipyard?

A     Yes, there were.  So, in the pedestrian gate, there was a metal turn style that only allows one person through each of the -- I believe it was three gates, and in order to get through one of those gates, you had to present an ID card to the scanner, and if your ID card was properly entered into the BA Shipyard security system, it would then unlock the gate and let one individual pass through.

Q     Was there also signage at the BA Shipyards notifying members of the public that the shipyards were a restricted area?

A     Yes.  It is -- yes, there were warning signs.

Q     Did the shipyards also have armed guards who limited access?

A     Not depicted here, but, yes, they -- they did have guards.

Q     Was there also video surveillance at the shipyard?

A     Yes, there are.

        MR. BARRY:  One moment, please, your Honor.

I-195

(Pause.)

BY MR. BARRY:

Q    I want to go back to something we talked about earlier. You testified that the Defendant submitted an SF86 for a security clearance?

A    Yes, he did.

Q    Did he ultimately receive a security clearance?

A    Yes, he did.

        MR. BARRY:  No further questions, your Honor.

        THE COURT:  Thank you.

        Cross?

                    CROSS EXAMINATION

BY MR. BERTOLA:

Q    Good afternoon, Mr. Christian.

A    Good afternoon.

Q    Going back to Exhibit 1 --

A    Okay.

Q    -- to the Drug and Alcohol Statement page, and it's page four --

        THE COURT:  And do you want it displayed or not displayed?

        MR. BERTOLA:  Yes, could it be displayed, please.

        THE COURT:  Page four, please.

    (Pause.)

//

I-196

BY MR. BERTOLA:

Q      So, question one, when Mr. Wei put his initials down, that is only in relation to drug and alcohol, correct?

A      Yes, that's correct.

Q      This has nothing to do with giving information or disclosing any protected information, correct?

A      No, it does not.

Q      And you said Mr. Wei has a Secret clearance, correct?

A      Yes, that's correct.

Q      And he passed the background check to obtain a Secret clearance, correct?

A      That would have been correct, yes.

Q      And you don't know of any information that arose during his background check that would have been significant to the determination of whether he should receive the clearance, correct?

A      No, not that I recall, no.

Q      And, to your knowledge a Secret clearance is common for Navy personnel, correct?

A      Yes, it is.

Q      And is it required to be a Machinist's Mate Level 3?

A      I don't know the full answer to that.  I know in the case of Mr. Wei, it was required.

Q      Okay.  Moving on to Exhibit 4, the counterintelligence and insider threat training.  That training isn't required,

I-197

correct?

A    It is required.

Q    It is required?

A    Yes, it is.

Q    Is it required just to a Machinist's Mate Level 3 or is it required for all Navy personnel?

A    For all Navy personnel.  It's an annual training requirement.

Q    So, they have to take this exact training every year?

A    It gets updated from year to year.  But, yes, they have to take whatever version is out there for that given year, yes.

Q    And he completed this one online?

A    Yes, he did.

Q    This exact training?

A    This exact training, yes.

Q    And do you know how interactive this exact training is?

A    Absolutely, I do, yes.

Q    Do you know if it contains features that make sure participants are following along?

A    Yes, it does.  So, if you take a look at the top, you'll see items 1, 2, 3, 4, and 5.  As you're scrolling through each of the trainings, there's certain elements along the way that are in a sense tests that you have to take before it would let you go to the next module.

I-198

Q    So, you basically just click a button, and then it lets you go to the next module?

A    Once you pass the test --

Q    Once you pass the --

A    -- and you -- you've answered each of the questions appropriately ands the appropriately feedback's been given, then, yes, it lets you advance to the next module.

Q    So, it quizzes participants after each of -- it's labeled one through five.  So, there's five quizzes?

A    Yes, that's correct.

Q    But these quizzes weren't shown right now, correct?  It was just showing the slides that contain the information on, correct?

A    That's correct.  The test questions were not presented there, no.

Q    So, you don't know what the test questions are in relation to the information we just saw?

A    I -- as I put this together, I had to answer the test questions to move through the training myself.  I don't recall what they are off the top of my head, but they're usually the key summary, key points of what they observed to ensure that they have the critical learning objectives completed for that -- that block.

Q    But you don't know the exact test questions to each slide, correct?

I-199

A      Sitting here today, no.  I'd have to go back and reference them.

(Pause.)

Q      Is there anything that displays the amount of time it took Mr. Wei to complete this exact test?

A      Not that I'm aware of, no.

Q      So, you don't know how long it took from the time he started the -- the program to the time he finished the program, correct?

A      No, I do not know that amount of time.

Q      Is there any safeguards -- or let's say is there any limit of how many times he can take each quiz after each lesson?

A      From my experience, you can take it as many times as you need to.

Q      So, and how are these set up?  Is it just one single test question, like it has one question, five multiple choices and then they just have to get one question right to move on to the next one or is it multiple questions with multiple choices for each question?

A      No.  Good question.  It's -- it's multiple test questions that are provided multiple choice.

Q      So, how many test questions per section are there?

A      It varied between each section anywhere from I would say two to five.

I-200

Q    Two to five, with multiple -- each one's multiple choice?  You don't type in the answer ever?

A    No, you do not.  It was multiple choice where you would click.

Q    And there's an unlimited amount of times you could take each quiz?  It doesn't count that for you, correct?

A    That's correct.  You could take it and let's say you're incorrect.  It would then provide you the correct answer.  You then move to the next question, and then it would allow you to -- to move through from there.

Q    Do you have to get 100 percent on each quiz to move to the next session or is it just over 50 percent or 80 percent?

A    No, there's no set percentage.

Q    So, you could fail every question and then move to the next section?

A    That's correct.

Q    So, by quiz, it just presents questions as you answer, but it doesn't lock the next section from coming up?  You don't have to pass the quiz?

A    No, you do not.

Q    Okay.  So, theoretically, somebody could just go through the slides, select answers randomly and then move to the next question and get every one wrong?

A    They can, but the -- it would provide them with the correct answer and an explanation of why their -- their choice

I-201

was incorrect, and it would provide information as to why the correct answer was the correct answer.

Q     And then you could just click next and then go to the next slide?

A     That's correct.

Q     It presents what the answer should have been?

A     Yes, that's correct.

Q     And at the end, is there anything -- is there a main test at the end that's separate from these quizzes?  Like is there a quiz after five or is it like a bigger test?

A     No.  It was no -- no bigger test at the end on this one.

Q     Is it a quiz after five?

A     I believe -- I don't remember.

Q     Okay.  So, but it's at least four quizzes?

A     That's correct.

Q     Do applicants have to sign anything at the end showing that they've read and understood the information given to them?

A     No.  The information's actually recorded.  So, they get access to the training.  They use their Common Access Card which has their identification information on it.  So, it uses that information to record the completion of the training.

Q     So, what I mean is is there anything at the end that would -- participants have to confirm that they understood the information just presented to them?

I-202

A    No, there's not.

Q    So, since there's nothing at the end and the quizzes you can answer incorrect, there's no way of knowing how much information the participant's actually consumed, correct?

A    That's correct.

MR. BERTOLA:  No further questions, your Honor.

THE COURT:  Thank you.

May he be excused?

MR. BARRY:  No -- no redirect from the Government, your Honor.

THE COURT:  Thank you.  You may step down.

We'll take our afternoon recess.  We'll be in recess until 3:15.  Please remember the admonition I gave to you earlier.

And then if you go in the jury room, stay there. If you go outside, stay there until then we reassemble.

(Jury exits courtroom.)

THE COURT:  Who will be your next witness?

MR. PARMLEY:  Captain Aaron Taylor.

THE COURT:  All right.  Thank you.

MR. PARMLEY:  Your Honor, briefly?

THE COURT:  Yes.

MR. PARMLEY:  You didn't provide any preliminary instructions to the jury?

THE COURT:  No.  I do it as necessary.

I-203

MR. PARMLEY:  I would appreciate at some point an instruction to the jury about we're not ignoring them on purpose if we see them out in the hall.

THE COURT:  Oh, okay.

MR. PARMLEY:  That we're instructed not to talk to them, just to --

THE COURT:  I'll do that.

MR. PARMLEY:  So they're not implied rudeness for all of us.

THE COURT:  All right.  Thank you.  And if there's any other specific ones, I find it's rather boring at the beginning to give them a bunch of instructions, but when it's relevant to give them a targeted instruction is appropriate.

MR. PARMLEY:  That sounds good.

THE COURT:  Thank you.  And that one is excellent.

(Proceedings recessed briefly.)

THE COURT:  So, one of the jurors asked my courtroom deputy what time we would be leaving for transportation.  So, I thought we'd go to 5 o'clock tonight.

Would that work with your schedule with your witnesses?

MR. PARMLEY:  Sure.

MR. JONES:  Sure.

THE COURT:  Okay.  So, what I'll do is tell them now, and then if they have to make a phone call now, let them

I-204

do that.

(Jury enters courtroom.)

THE COURT: You can sit down. Everybody can sit down.

(Pause.)

THE COURT: Welcome back. We had an inquiry about how long we would go today for transportation reasons. And, so, we'll go to 5 o'clock. Is there somebody that needs to make a text or something for transportation?

Can you do it now?

(No audible response.)

THE COURT: Okay. Great. And would that work for everybody's schedule?

(No audible response.)

THE COURT: Thank you.

(Pause.)

THE COURT: Okay. And you can call your witness.

MR. PARMLEY: Yes. The United States calls Captain Aaron Taylor to the stand.

AARON TAYLOR - PLAINTIFF'S WITNESS - SWORN

THE CLERK: Please state your full name for the record and spell your first and last name.

THE WITNESS: Aaron Taylor, A-A-R-O-N T-A-Y-L-O-R.

THE CLERK: Thank you.

//

I-205

DIRECT EXAMINATION

BY MR. PARMLEY:

Q     Good afternoon.

A     Good afternoon, sir.

Q     Could you please tell us, Captain Taylor, who's your current employer?

A     The U.S. Navy.

Q     And how long have you been in the United States Navy?

A     Over 27 years.

Q     And your current rank, please?

A     Captain.

Q     And can you just briefly walk through for the jury your Naval career up to your current assignment?

A     Sure.  I was commissioned in the Navy in 1998.  I got my commission through the ROTC Program at Tufts University.  For the next couple of years, I did some primary flight training and was ultimately rated as a helicopter pilot.

      After that, I spent time in various helicopter squadrons, some of which were here in San Diego.  I was also an instructor pilot in Corpus Christi, Texas.  Most recently, I had command of a helicopter squadron in Norfolk and then an assignment up in the Pentagon doing some budget development for acquisition programs.  Had command of the USS ESSEX, and now I am at the Pacific Fleet Headquarters in Hawaii where I'm the Director of Operations.

I-206

Q       We'll talk about the ESSEX in a moment.  So, you're the Director of Operations at Pacific Fleet Headquarters, is that what you said?

A       Yes, that's correct.

Q       Can you generally briefly describe the duties you have there?

A       Ultimately, my -- I coordinate the employment of our forces that operate from the West Coast of the United States out to the Indian Ocean.  So, that involves force generation, which means, you know, the training and the -- the exercises that we need to do to create the combat readiness that we need to deploy those forces into the -- the forward theater.

        For those forces that are forrad deployed, I do some planning, some coordination and direct the execution of the employment of those forces, and that includes submarines, surface ships, aircraft and all the associated support services and personnel associated with that.

Q       When did you take that position roughly?

A       About two years ago.

Q       And prior to that, was that when you were assigned to the USS ESSEX?

A       That is correct.

Q       Okay.  Let me show you what's been previously admitted as Government's Exhibit Number 16.

        MR. PARMLEY:  If you could publish that for me,

I-207

please.

BY MR. PARMLEY:

Q     Do you recognize that?

A     Yes, I do.

Q     And what's that?

A      That's the flight deck of the USS ESSEX.

Q      Let me also show you -- could you flip open to your book that's in front of you.  It should be a tab that's Government's Exhibit Number 24.

        Do you recognize that?

A     Yes, I do.  That's the USS ESSEX underway.

Q     Is that a fair and accurate photograph of the ESSEX, the ship that you served on?

A     Yes, absolutely.

        MR. PARMLEY:  I'd move to admit Government's 24, please.

        THE COURT:  It's -- any objection?

        MR. JONES:  I'd object under 403.

        THE COURT:  Overruled.  It's received.

        MR. PARMLEY:  Thank you.

BY MR. PARMLEY:

Q     So, let's talk about your assignments to the ESSEX. When were you assigned to the ESSEX?

A      I reported in December of 202 as the Executive Officer. I served in that capacity for about a year and a half, until

I-208

May of 2022, and then I took command as the Commanding Officer from May of 2022 until August of 2023.

Q     So, what's the difference between the Executive Officer and the Commanding Officer?

A     Essentially, the Executive Officer is the -- the number two, second in command.  So, in the absence of the Commanding Officer, the Executive Officer would take over those responsibilities.

Practically, the Executive Officer handles the business that's sort of done and within the command.  So, there's administrative functions.  There's good order and discipline functions.  There's administrative functions that -- that are certainly important and require executive-level oversight but -- but don't necessarily need the commander -- the Commanding Officer to be involved with, and this allows the Commander to be involved in sort of the up and out responsibilities, coordinating with, you know, adjacent, coordinating with higher and really having that overall supervisory role for the ship.

Q     Is that a traditional way to do it is first to become a commanding -- excuse me -- an Executive Officer and then you become the Commanding Officer?

A     Yes.  In many Navy communities, that's -- that's the way we do it.  It provides continuity of command.  It allows you to serve as the Executive Officer, gain experience, learn

I-209

personnel, understand the processes on board, and really become familiar with everything -- everything about the ship before you step into that command leadership role.

Also, in the case of USS ESSEX, it is a -- it's an aviation ship. And -- and, so, we alternate between an aviator and a surface warfare officer as -- as the Commanding Officer. So, when I was the Executive Officer as an aviator, my Commanding Officer was a surface warfare officer, and then when I became the Commanding Officer, the Executive Officer was a surface warfare officer, and what that brings is some of that balance and expertise from -- from our various communities.

Q    And when you say the aviator, that's because of your work as a helicopter pilot?

A    That's correct.

Q    And surface warfare officer, what's that?

A    That's -- that's an officer who through their career has spent time operating surface and guidance, Navy ships.

Q    Okay. And, so, you got to the ESSEX as the Executive Officer in December of 2020 and then by May of 2022, that's when you took command, is that correct?

A    I took command in May of 2022, yes, that's correct.

Q    So, I want to talk about the ESSEX for a minute. What is it? What kind of ship is it?

A    It's an amphibious assault ship. So, it's designated an

I-210

LHD, but functionally, it's an amphibious assault ship, and it's intended to deliver sustained combat operations at sea as well as ashore.

Fundamentally, it carries Marines, and it provides a platform for Marines to -- to move from the sea to the shore so that they can conduct operations ashore.  You see it's got a flight deck, and -- and that allows the -- the Marines to -- to fly off the ship for either an assault or an infiltration on the shore.  It's also -- what you can't see in this picture is it's got a well deck in the back.  So, we can ballast down the stern of the ship, and that allows landing craft or hovercraft to be launched from the stern of the ship to allow additional troops and Marine equipment to go ashore.

Q    Okay.  So, if I understand you correctly, it has the capacity for Marines to both take off from the landing -- what did you call that, the landing deck?

A    No.  It's the flight deck.

Q    The flight deck.  Excuse me.  And not depicted in this picture there's a way for how they exit from the ship from the -- I think you said well deck?

A    There is a well deck.  And, so, the ship has the capability to ballast down so it floods a portion of the ship, which then allows those landing craft that are in the -- in the well deck to float up and then launch from the stern of the ship.

I-211

Q    And those would be amphibious assault ships that contain Marines, is that correct?

A    Landing craft and -- and hovercraft, and, yes, they're intended to -- to move Marines and their equipment from the ship to the shore.

Q    And you also used a -- an acronym I think LHD. What -- what does that mean?

A    That's the designation of the ship.  I think it's Landing Helicopter Dock ship.  It's a little bit obscure, but that is the class of ship.  That's the designation.

Q    And you can see on the flight deck in 24 there's a number.  What number is that?

A    The number 2.

Q    And what is that?  Does it have any significance?

A    It does.  It's the second ship in the Wasp class.

Q    So -- so, the Wasp class is what?

A    That is this class of ship.  There are a number of them that are -- that are in the inventory, and ESSEX is the second one.

Q    Approximately how long has the ESSEX been in service with the U.S. Navy?

A    A little over 30 years.  I think she entered service in 1992.

Q    So, can you give me some examples of what the purpose of the ship would be from a U.S. Navy standpoint?

I-212

A    Yeah.  It's -- it's -- it's a ready response sort of a platform.  So, we will embark a full compliment of Marines. We will go to sea in a group.  So, it's an amphibious ready group.  A ship like ESSEX would be the flagship of that group, and it would be supported by two smaller amphibious ships, also carrying Marines and their unique capabilities.  And it would be postured in a position where if there is crisis or a contingency, we'd be able to -- to take appropriate action in our -- in our nation's interest.

Q    Roughly, setting aside how many Marines it can carry when it's going to do that type of operation --

A    Yes.

Q    -- roughly how many Sailors serve on a ship this size?

A    Approximately 1200.

Q    And when it's fully loaded with a compliment of Marines, how many Marines can you carry?

A    Around 1300.

Q    Let's talk about that flight deck for a moment.  I take it it's -- this is smaller than a traditional aircraft carrier, is that correct?

A    It is a bit smaller than your traditional nuclear powered aircraft carrier, yes.

Q    What are the capabilities it has as far as aircraft?

A    About 30 aircraft of mixed type model series.  So, reference in the picture here you see a large number of

I-213

helicopters.  Those are CH53's there on the bow.  There's also an F35 Joint Strike Fighter towards the stern there.  So, it's -- it's a mix of approximately 30 aircraft consisting of helicopters, tilt rotary aircraft like the B22 Osprey an fixed-wing aircraft that are capable of launching on a very short runway and landing vertically, like the Marine Corps variance of the F35.

Q     And that's basically a fighter jet, is that right?

A     Absolutely.

Q     And the -- the -- I think you said vertical takeoff and landing, that's the Osprey, is that correct?

A     Well, really, everything -- everything that's embarked on the ESSEX needs to be able to land vertically.  It does not have an arresting gear system like a nuclear powered aircraft aircraft carrier does.  So, helicopters land vertically.  Tilt rotor aircraft like a B22, they land vertically.  And then the fixed-wing aircraft such as an F35 would also land vertically.

Q     So, they take off like a normal plane, but they'd have to land kind of -- when you say vertically, kind of straight down, is that what you mean?

A     That's correct.

Q     Okay.

A     And -- and they take off vertically or they can take off using sort of a short runway, but they do not have a catapult system.  So, a traditional nuclear powered aircraft carrier

I-214

does have a catapult system.  An amphibious assault ship does not have a -- a catapult system.  So, the aircraft has to generate their own forward thrust in order to get airborne.

Q     Have you heard in the context of the ESSEX and the Wasp class ship, have you heard of a concept called the Lightning Carrier Concept?

A     Yes, I have.

Q     What does that mean?

A     That is a -- a concept where the composition of the embarked aviation element consisted entirely of F35's.

Q     So, fighter jets basically?

A     Correct.

Q     So, when you say -- when the phrase is Lightning Carrier, what does that mean?

A     It means that the ship is -- is -- it's configured for the tactical employment of those fighter aircraft.  So, it would lack the ability to put Marines ashore using aircraft, but it would gain the ability to project more combat power through fighter or attack aircraft.

Q     So, is that fair to say that would be basically kind of a different way to configure the ship?

A     Yes.

Q     Okay.  So, for a different purpose, for example?

A     Yes, that's correct.

Q     Okay.  Can you give me some examples of public

I-215

deployments of the ESSEX or other LHD's?

A    When I was on board, we did a -- a regularly scheduled deployment for routine operations in what we call the Fifth Fleet area of operations.  So, that was in the Middle East, the Red Sea, the Arabian Sea, the Gulf of Oman we transited, of course, the South China Sea, the Philippine Seat as we were outbound and then our return trip the majority of that deployment consisted of operations in -- in the Middle East.

Q    Switching gears a little bit, do the Chinese -- do you know do the Chinese have a similar type of ship?

A    I believe they do.

Q    What do you know about that?

A    I -- I believe that it has similar characteristics.  I believe that -- that the ships are -- well, the -- the Chinese ability to -- to produce ships is -- is impressive.  And, so, I believe that probably many of their ships in their inventory are newer, but I don't know specifically about their capabilities compared to the ships that we've got.

Q    Is it fair to say that this type of ship, amphibious assault ship with a shorter flight deck, that's now in the Chinese Navy?

A    Yes, it is.

Q    And is that a relatively recent development or have they had it for as many years as the United States has had theirs?

A    No, I don't think it's -- I don't think they've had that

I-216

capability as long as we have.  I think it's a relatively recent development.

Q    I want to talk about the security of the ESSEX and the security of the base of the ESSEX when it's at port.  Is making sure the ESSEX's secure part of your responsibilities as its Captain?

A    Yes, it is.

Q    And do you take steps to keep unauthorized people off your ship?

A    Yes, I did.

Q    Can you talk about what types of steps -- let's talk about first when it's out floating out performing operations.  I take it that's different than when it's at the base, is that correct?

A    The threats are different, yes.  But -- but, nonetheless, you know, we do have security patrols, armed security personnel that -- that, you know, will patrol the ship and make sure that -- that we're able to maintain good order and discipline on board.  I mean, every once in a while, there is some -- some behavior that -- that, you know, we try to prevent.  And, so, there is -- there is some security measures in place there.

Q    Even while it's out at sea?

A    Correct.

Q     Okay.  And what about when it's at the base?  Can you

I-217

talk about the security measures you take while it's sitting at the port?

A    I would describe it as a layered defense approach.  And, so, that security perimeter really begins with the base.  Everybody who comes on base needs to show a valid ID.  Everybody is, you know, subject to running security measures at the -- at that entrance to the base.  That's kind of the first level.

Beyond that, in order to gain access to the pier, there's a turn style.  And, so, you have to -- you have to have the right -- the right badging in order to get through the turn style and get access to the pier.

In order to go onto the ship, you have to pass through some additional levels of -- of security.  Typically, we'll -- we'll check bags to -- to make sure that there's no contraband that's being brought on board.  We've got armed security at the quarterdeck, which is that main entrance point where all of the foot traffic will enter or exit the ship.  We've got sort of heightened in-port security teams that are roving and patrolling the ship.  We've got Sailors that are armed and trained in security that are manning different positions to keep a watch on the ship, specifically, rovers on the flight deck who would be looking at the water line, looking at personnel that may be approaching on the pier, and then there are people that are -- that are up higher on the ship in the

I-218

super structure kind of keeping an eye on everything as well.

Q     Okay.  Let's -- I appreciate that.  Let's -- let's back up for a second.  So, you said there's security just to get onto the base?

A     Correct.

Q     If I have access to the base generally, does that give me access to the pier where the ESSEX is on?

A     No, it does not.

Q     Okay.  So, even if I got onto the base with some kind of authorization, I still need a different authorization to get onto the pier?

A     That's correct.

Q     And is that the same answer for if I was trying to get from the pier onto the ship?

A     Yes.  I think -- you would need -- you would need -- we've got either a manned gate at the entrance to the pier or we've got an automatic turn style where your -- your ID card is coded so that you can -- you know, you can enter without having to go through a security -- a security guard.

Q     Is that called -- is that sometimes called a CAC card or a Common Access Card?

A     Yes, it is.

Q     Can you just briefly tell me what that is?

A     Sure.  It's an identification card, but it's got some features in it.  You know, it can be used as a security token

I-219

I guess.  So, I use it to log into my computer.  It knows who I am.  I use it to -- you know, to swipe into a building because it's able to recognize me based on, you know, the -- the way that the chip is coded and also my PIN, and the same works with the turn style.

Q    Okay.  So, your name's on it, and your photo's on it?

A    Yes.

Q    Why do you take so many steps to protect the ESSEX?

A    Because it's a -- it's a national asset.  You know, the ship has tremendous value not just in terms of monetary value, although I think it would probably be in the order of billions to replace, but also because it is capable of delivering some real -- real capability, and there's been significant investment in generating and maintaining that capability.

Q    It's a functional warship?

A    Yes, it is.

Q    And is it part of your security also to protect the people who work on that warship?

A    Absolutely.

Q    What about the systems that are on the ship and the information that's included?

A    Yes, definitely for the same reasons, we want to -- we want to preserve the information.  We want to preserve the technology of those combat systems.  We want to preserve and protect the tactics, techniques and procedures that we use to

I-220

employ them.

Q    Let me show you just a couple more exhibits that have been previously admitted.  Let me show you Government's Exhibit 9.

A    Okay.

Q    Is that -- is that what we were just talking about?

A    Yes.  That is -- that's a gate that you would have to go through in order to get onto Navy Base, San Diego.

Q    You have to show your ID, et cetera?

A    Yes.

Q    Okay.  Let me show you 71, please, which has been previously admitted.  What are we looking at here?

A    This is a Sailor who's screening foot traffic to come on board ESSEX.

Q    This is once you've made it to the pier and you're trying to get onto the ship itself?

A    That's correct.

Q    Let's talk about the security of the information on the ESSEX, and I mean things like technical manuals, ship documents things like that.  I take it that there are some documents that are -- and you tell me.  Are there some documents that are so sensitive that they are kept on different systems, classified systems, for example?

A    Yes, they are.

Q    I'm not going to ask you what they are.  Can you explain

I-221

why -- to the jury -- well, do you lock up all of the information in -- well, tell me about that.  Generally speaking, if there's classified information, I mean, level Classified, Secret or Top Secret, is that stored differently on the Essex?

A     Yes, it is.

Q     Without getting into the specifics as to how it's stored, can you just generally tell me how access is prevented even above and beyond once you're on the ship?

A     I'll try to answer the question --

Q     Yes

A     -- and if -- I may need you to rephrase.

Q     Sure.

A     Essentially, the -- the most sensitive information is protected with the highest levels of security.  So, it would only be accessible to somebody with the appropriate clearance and also the appropriate -- and a bona fide need to know that information.  We keep it in very secure spaces on the ship, and there are very, you know, limited folks that are able to -- to access, view that information.

Q     So, once you're on the ship with a -- with a real reason to be on there, you're a Sailor assigned to the ship and you have access, that doesn't give you access to that information or those systems, correct?

A     That's correct.

I-222

Q    Okay.  But why don't you just lock up everything?
There's -- there's manuals on the ship, correct?

A    Yes.

Q    There's technical information on the ship?

A    Yes.

Q    Why don't you just lock it up with the exact same
security you just described?

A    There is information that we need -- that Sailors need
to perform their day-to-day responsibilities.  So, for
example, there are maintenance manuals, technical manuals that
would tell a Sailor how to operate a system, how to perform
emergency procedures if the system wasn't functioning as
intended, how to trouble shoot the system if there was
something wrong with it, how to perform maintenance on the
system to ensure that it continues to operate normally or how
to repair the system if there's something that's damaged that
needs to be replaced.  So, that information needs to be
accessible to the individuals who need that information in
order to perform their day-to-day job.

Q    So, if I understand your testimony, as an example, if
there's some system on the ship where something goes wrong,
that that Sailor doesn't have to go into some kind of
classified space to get the information they need to deal with
that specific emergency.  Is that accurate?

A    In some cases, yes, and there may also be some cases.

I-223

Q    But those documents we're talking about were not necessarily in the most secure space, are they sensitive?

A    Yes, they are.

Q    Do you still have to be a member of the United States Navy to have access to them?

A    Yes.

Q    Do you still have to have a need to know?

A    Yes, you do.

Q    And are they -- are they protected from disclosure?

A    Yes, they are.

Q    Would it concern you as the Captain of the USS ESSEX if documents were removed from a shared drive of the computers in the Engineering Department and sent to China?

A    Yes, it would.

Q    Why would that concern you?

A    For a few reasons.  First, technical information could enable an adversary to advance the development of their systems, could give them the opportunity to improve their designs and speed up the -- the development and the building of their -- of their combat systems.  Information could also expose vulnerabilities.  So, it could show areas where we may be targeted or we may be exploited for -- you know, for hostile actions.  And then, finally, the technical information could reveal some details that could be used for, you know, nefarious type of actions like sabotage.  If you know enough

I-224

about the system, then you probably have some understanding of how you might disable the system, which would also concern me.

Q    Thank you.  As part of your job now, how much of it is dealing -- with the Pacific Fleet, how much of that is dealing with China and the threat that China poses?

A    Every day.

Q    And what's your biggest concern about the Chinese Navy?

A    The -- the scale, the growth, the rapid development of capability, and I guess intentions.

Q    Okay.  And when you talked about kind of potential vulnerabilities, you're also talking about potential aid that could be given to China on -- on catching up with -- with where the U.S. Navy is now?

A    Yes.

Q    Is it fair to say that with the experience the United States Navy has with this type of ship for years, that there's an advantage of having actually sailed that ship versus brand new ships that are coming out of China?

A    Yes.

Q    Could you talk about that for a moment?

A    Yes.  These ships have been in the inventory for sometime, and -- and, you know, the procedures that we use to -- to design, to manufacture and to operate them have been developed and refined and improved over a significant amount of time.

I-225

Q    And, so, that's basically experience?

A    Correct.

Q    And if, for example, technical manuals were sent from your ship to China, that -- are those manuals basically kind of a distillation of all that experience?

A    Yes, it is.  And those documents are not static, right.  So, as we learn, the documents will be updated.  So, it -- it continues to I guess be refined over time as we become more proficient and more -- and more knowledgeable about how to operate them.

Q    So, speaking about updating documents then, so, some of the documents in this case are going to have a date of publication, and they might be from 15 years ago or something like that.  Are you telling me that that's not necessarily the state of the document?

A    I would suspect that there are changes in that document that are -- that are more recent than that.

Q    As -- as you learn more information, you learn from mistakes or whatever?

A    Yes.

Q    I want to talk about where the ESSEX was in between March of 2022 and August of 2023.  We learned from our last witness that the Defendant in this case, Jinchao Wei, was assigned to your ship in March of 2022.  I want to show you --

         MR. PARMLEY:   May I approach, your Honor?

I-226

THE COURT:  You may.

BY MR. PARMLEY:

Q     (Indiscernible) a demonstrative exhibit, Exhibit 26 in the binder.  I'd like to just show you the big poster.  Do you recognize that?  Do you recognize that?

A     Yes, I do.

Q     And what is that?

A     This is essentially a -- a schedule, a list of the -- you know, the activities of the ESSEX from the period of time between March --

MR. PARMLEY:  I'm sorry?

THE COURT:  Speak into the mic.

MR. PARMLEY:  Yes, your Honor.

THE COURT:  And you both -- both need one.

MR. PARMLEY:  I'll speak much louder (indiscernible).

BY MR. PARMLEY:

Q     And is this a -- a document that was created from -- by our office with input from you?

A     Yes, it is.

Q     Is it a fair and accurate description of where the ESSEX was during the time frames (indiscernible)?

A     Yes.

MR. PARMLEY:  Permission to show that to the jury as a demonstrative exhibit?

I-227

THE COURT:  Any -- any objection?

MR. JONES:  No objection.

MR. PARMLEY:  If you pull it up on 26 on your screen, you might be able to see it better.

THE COURT:  So, are you offering 26 as an exhibit?

MR. PARMLEY:  I can offer it into evidence.  It would be a little long.

THE COURT:  Any objection?

MR. JONES:  No, your Honor.

THE COURT:  Okay.  So, 26, we'll mark that 26A is the chart, demonstrative, and 26 hard copy is received in evidence.

MR. PARMLEY:  All right.  Thank you, your Honor.

THE COURT:  Can you just add 26A.

(Pause.)

BY MR. PARMLEY:

Q    Now, let's talk about where the ESSEX was then between February 2022 or March of 2022 and August of 2023.  Let's start with March 5th of 2022.  Where was the ship then?

A    Naval Base, San Diego.

Q    And is that located about two or three miles south of where we're sitting right now?

A    Yes, it is.

Q    And, so, those photos we saw earlier, the base security and all of that information, that would all apply to the ship

I-228

when it was there?

A    Correct.

Q    Okay.  What about between March 28th -- so, it was at Naval Base, San Diego until the 27th of March?

A    Yes.

Q    What was next?  It says, At sea local area between the end of March and April 5th.  What -- what does that mean?

A    So, at that point, the ship was returned from deployment, and we were in a stage in our training cycle called sustainment.  So, you know, we've been through all of our training, all of our certification processes.  We've completed the deployment, but we're still able to -- you know, to -- to do other activity.  So, in this case, we did some local exercises just, you know, in and around the Southern California area.

Q    Okay.  And when you spoke that you had just come back from deployment, that was -- where were you deployed prior to March of 2022?

A    The -- the majority of the deployment was spent in the Middle East.

Q    Okay.  So, you made it back from the Middle East, and then you did it sounds like a short cruise somewhere off the coast of Southern California?

A    That's correct.

Q    Okay.  And from April 6th to April 10th, it was where?

I-229

A    Back to Naval Base, San Diego.

Q    And then April 11th, again, was that a one day basically exercise?

A    Yes.  These are -- it's just local exercises, local training.  Some of it is, you know, for our benefit.  Some of it's for the benefit of other units that we're supporting.

Q    Okay.  And then back to Naval Base, San Diego?

A    Yes.

Q    And then back again out at sea?

A    Correct.

Q    And ack again to Naval Base, San Diego in mid to late May?

A    Yes.

Q    And then May 23rd it says that the ship transited to Los Angeles, and then what's the next entry after that?

A    It is Los Angeles for L.A. Fleet Week.

Q    And what's Fleet Week?

A    Fleet Week is -- it's a -- an outreach opportunity.  So, it's -- it's a period where a ship, maybe several ships, go to a community and engage in some outreach activities.  There's recruiting that takes place.  There's education of the community on, you know, their Navy and the capabilities of their Navy.  We encourage interactions with -- with Sailors and members of the community.  We hosted a number of ship tours.  We did community relations events.  We went to some

I-230

sporting events.  It's really a celebration of the Navy, and it allows the -- the population at these, you know, ports that we go to to -- to feel a connection to their Navy.

Q    Okay.  And who participates in this?  Is this just the U.S. Navy or are there other nations invited?

A    No.  This is just the U.S. Navy.

Q    Okay.  And would it concern you if somebody assigned to your ship was taking photos of your ship, other ships and equipment involved in Fleet Week and sending them to  China?

A    Yes, it would.

Q    Why would that concern you?

A    Similar reasons, for, you know, the exchange of -- of sensitive information it would reveal about the ship's specific configurations, where our equipment is installed, how it's installed, what the condition of it is.  And, based on that, I think you could probably glean where there may be some vulnerabilities or where there may be some -- some -- some areas where we could be threatened.

Q    Okay.  Let's talk about after Fleet Week.  It says at some point you left to go to Pearl Harbor from June 15th to June 26th, is that right?

A    Yes, it is.

Q    And what was the purpose of going to Pearl Harbor?

A    We went to Pearl Harbor for an exercise called Rim of the Pacific.

I-231

Q    Is that sometimes known as RIMPAC?

A    Yes, it is.

Q    What is that?  What's the purpose of it?  What's involved?

A    That is -- I think it's the largest multinational Naval exercise in the world.  It happens every two years in Hawaii, brings in a number of navies from -- from allied partner nations, and, ultimately, you know, we -- we -- it's training for interoperability, and it's training to advance the capabilities of some of our allies and partner nations.

Q    Can you give me some examples of some of the nations that are involved besides the United States?

A    Sure.  Australia, Great Britain, Singapore, Philippines, South Korea, Chile, Mexico.  There are many many more, but those are the ones that kind of come to mind.

Q    Is China involved in this?

A    No, they were not participants.

Q    Okay.  And you said something about the training of the interoperability.  What did you mean by that?

A    I mean that a -- a big part -- an emphasis for RIMPAC is developing the -- the ability for navies to work together. So, there is some sharing of -- of warfighting techniques. There is, you know, communications drills that we do.  We stand in formation to demonstrate that, you know, we can safely operate together.  There's some, you know, various I

I-232

guess exercises that we do, war at seat type exercises, amphibious assault type exercises, and it's intended to enable navies to work together.

Q    To prepare for potentially future conflict or to deter a future conflict?

A    Yes.

Q    Okay.  Let me show you -- if you could flip in your binder to Government's Exhibit 21.  Let me know when you get a chance.  Do you see that?

A    Yes.

Q    What is that?

A    This is --

Q    Is that a photograph?

A    It's a photograph of the ships that were involved in RIMPAC 2022 standing in formation.  So, one of the culminating events is a large photo of a -- of a group sail, and ESSEX is in there.

Q    Is that a fair and accurate picture of this group sail that was part of RIMPAC?

A    Yes, it is.

        MR. PARMLEY:  Move to admit 21, please.

        THE COURT:  Any objection?

        MR. JONES:  No objection.

        THE COURT:  It's received.  You may show the jury.

        MR. PARMLEY:  If you could maybe zoom in on that a

I-233

little bit on that.

And I apologize to the jury. We did not introduce Ms. White. She is a paralegal involved in our office, and she's going to be assisting us with presentation.

BY MR. PARMLEY:

Q    What are we looking at in this photo?

A    This is a large formation of ships and, you know, steaming together, showing unity, showing a common purpose, and it's a culminating event for Rim of the Pacific exercise.

Q    And is the ESSEX in this photograph?

A    Yes, in the middle.

Q    Right in the middle somewhere?

A    Yes.

Q    What's -- what's the big ship out at the front? Is that an aircraft carrier?

A    It is. That's ABRAHAM LINCOLN.

Q    Would it concern you if someone on your ship after concluding RIMPAC exercises was sending information about RIMPAC to China?

A    Yes, it would.

Q    Why is that?

A    Similar reasons. You know, I think because purpose is about bringing interoperability and enhancing capabilities, I could see where the sharing of information could expose challenges within interoperability or limitations of either

I-234

U.S. Navy participants or allied partner participants as well.

Q     What about sending, for example, photographs or videos of -- of portions of the exercise, would that concern you?

A     It would.

Q     Is that for the same reason you've talked about a few times?

A     Yes.

Q     Okay.  What if -- let's say, for example, a Sailor on your ship -- you had a problem with the reduction gear and a Sailor on your ship spoke to an intelligence officer in China and talked about the failure or the difficulties with the reduction gear.  Would that concern you?

A     Yes, it would.

Q     Can you tell me first what the reduction gear is and then why that would concern you?

A     I think you're referring to the main reduction gear.

Q     I am, yes.

A     Which is really the heart of the drive train.  So, the purpose of that component is to take the -- is to, let's see, reduce the rotation of the shaft down to a level that's suitable for the propeller.  Steam comes out of the boiler. High pressure.  High temperature.  Turns turbines at very high speed, and that main reduction gear takes that high speed and reduces it to a low speed, high torque, which then gets transmitted to the propellers and ultimately provides

I-235

propulsion for the ship.

Q    And also for other systems in the ship, is that right?

A    That's correct.

Q    Okay.

A    It's --

Q    Go ahead.

A    It's a very large component.  There's no redundancy. And it's -- like IO said, it's large.  It's very valuable, and I think if there was a problem with our main reduction gear box, it -- it could disable the ship for a significant period of time.

Q    And you said just a moment ago there's no redundancy. What did you mean by that?

A    There's only one main reduction gear box per shaft.

Q    And, so, you don't have another one?

A    Correct.

Q    Okay.  So, if it breaks, then you've got a problem?

A    That's right.

Q    Okay.  And, so, is it for the reasons you've described previously if a Sailor sailing on your ship who's a part of RIMPAC exercises let a Chinese intelligence officer know, Hey, we had problems with the main reduction gear while we were participating in RIMPAC, would that concern you?

A    It would.

Q    And why is that specifically?

I-236

A      Well, because if there are -- if you disclose concerns about the combat readiness of the ship, then I think an adversary could use that as part of their calculus.  You know, maybe that's one ship that's not available to respond in times of crisis, and maybe that informs their risk determination.

Q      So, we can take that one off the board, it's got issues, we shouldn't worry about that one, for example?

A      Correct.

Q      Okay.  Let's go back to Government's -- I appreciate that.  Let's go back to Government's Exhibit 26 for a moment.  And that's -- we're going through -- eventually RIMPAC ends, is that right?

A      (No audible response.)

Q      Approximately how long do the exercises last?

A      RIMPAC is about a month.

Q      Okay.  And eventually, where did the ESSEX go?

A      Back to San Diego.

Q      And, so, it arrived in San Diego it looks like in August of 2022, is that accurate?

A      Yes, it is.

Q      Okay.  And then it was at Naval Base, San Diego until late September?

A      Correct.

Q      Can you look at that last entry for me, please, and says from September -- just for your -- for your information, the

I-237

Defendant was arrested in August of 2023.  Where was the ship between September 27th of 2022 and August 2nd, the day of his arrest of 2023?

A       BA Shipyards.

Q       What is that, and where is that located?

A       It is a -- it's a shipyard that we use for major maintenance availability, major maintenance periods on -- on our warships, and the shipyard is located right down here adjacent to the Naval Base.

Q       It's right next to the Naval Base?

A       Correct.

Q       Let me show you what's been previously admitted as Government's Exhibit Number 27.  What is that?

A       That is the entry point to the BAE Shipyard.

Q       Does it have the same security measures or similar -- better or worse, you tell me, than -- than the Naval shipyards?

A       It's -- it's equivalent.  They take security on BAE Shipyard very seriously.

Q       Let's talk about the Defendant for a moment.  Have you met him before?

A       Yes, I have.

Q       Would you be able to identify him if you saw him again?

A       Yes.

Q       Is he seated in the courtroom?

I-238

A    Yes, he is.

Q    Would you mind pointing him out and identifying him by an article of clothing he's wearing?

A    Black suit, white tie.

MR. PARMLEY:  All right.  Let the record reflect the witness has identified the Defendant in this case, Jinchao Wei.

THE COURT:  Yes.

MR. PARMLEY:  Okay.  Thank you.

BY MR. PARMLEY:

Q    Did you have much contact with him when he was on the ship?

A    No, I did not.

Q    Did you know what his position in the ship was?

A    Yes.

Q    And what was it?

A    He was a machinist's mate in the Engineering Department.

Q    Can you just briefly describe for me what -- what is the role of a machinist's mate?

A    It's a Sailor who is responsible for operating the equipment in the engineering spaces, responsible for performing maintenance on that equipment, responsible for emergency procedures when necessary, trouble shooting, prepare -- ultimately, you know, an expert in the engineering equipment that we've got on the ship.

I-239

Q    And why is the Engineering Department important, if it is?

A    The engineering systems on the ship provide everything that enables the other elements of the ship to function.  So, propulsion, of course.  You got to have mobility, power, water, electricity, air.  All of those -- all of those, you know, necessary, you know, services are provided by the Engineering Department.

Q    It's the power plant for the ship, is that right?

A    It is.

Q    It powers virtually everything, is that accurate?

A    I would say everything, everything.

Q    Okay.

A    Yeah.

Q    All right.  And the Defendant was part of that Engineering Department as a Machinist's Mate?

A    That's correct.

Q    Okay.  I want to show you Government's Exhibit 28.  If you could look at that in your binder in front of you.

A    (Reviewing document.)

Q    Do you recognize that?

A    Yes, I do.

Q    Could you tell me briefly what that is?

A    Yes.  This is a document that -- that promoted Fireman Wei to Third Class Petty Officer Wei.

I-240

Q     And is that -- is your signature on that letter?

A     Yes, it is.

Q     Is that a letter you signed relating to the Defendant's promotion in the Navy?

A     Yes, it is.

Q     And that's a fair and accurate photograph of that letter?

A     Yes.

MR. PARMLEY:  I'd move to admit 28.

THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  It's received.

MR. PARMLEY:  Could you zoom in, please, Ms. White, on the top half of that.

BY MR. PARMLEY:

Q     What's the purpose of this letter?

A     It formally documents the promotion, and it -- it also serves as some motivation and guidance as the Sailor promotes to, you know, a position of greater responsibility.  It captures some of the -- some of the expectations for that promotion.

Q     What's the date of the letter?

A     30 July 2022.

Q     Okay.  And I think you already said it, but what's the new rank that he was advanced to?

I-241

A    Third Class Petty Officer.

Q    Would you mind reading for the jury section two, please?

A    Sure.

"Your appointment carries with it the obligation that you exercise increased authority and willingly accept greater responsibility.  Occupying now a position of greater authority, you must strive with a renewed dedication toward the valued ideal of service with honor."

Q    And that's what you -- is that what you meant when you talked about trying to educate Sailors as they advanced?

A    It's a -- it's a motivation piece.  It's a reminder, and, yes, it -- it provides guidance for expectations of future -- you know, future leadership.

Q    Okay.  I want to ask you about a program called Warrior of the Day.  Do you know what that is?

A    Yes, I do.

Q    And what's that?

A    It's a bit of an ad hoc recognition program that we used on ESSEX when we were underway.

Q    What was the purpose of it?

A    To motivate, to inspire, to recognize Sailors who were superior performers.

Q    When you say ad hoc, that's something -- what does that

I-242

mean?

A    Doesn't come with a medal or a ribbon, doesn't come with any sort of other incentives other than some recognition for a job well done.

Q    Okay.  So, let me show you, if you wouldn't mind looking at Government's Exhibit 25 in the binder.

A    (Reviewing document.)

Q    Do you have that in front of you?

A    Yes, I do.

Q    Do you recognize that photo?

A    Yes, I do.

Q    What is that a photo of?

A    This is a photo on the bridge of USS ESSEX, of me presenting at that time Fireman Wei with a certificate as -- well, recognizing him as the Warrior of the Day.

Q    Is that a fair and accurate picture of you --

A    It is.

Q    -- awarding the Defendant?

A    Yes.

        MR. PARMLEY:  I'd move to admit 25, please.

        MR. JONES:  No objection.

        THE COURT:  It's received.

        MR. PARMLEY:  Can we publish that, please?

        THE COURT:  You may.

//

I-243

BY MR. PARMLEY:

Q    So, who nominates somebody for an award like this?

A    It's the Sailor's chain of command, namely, supervisor, Division Officer, Department Head.  It comes up -- it's -- it's organic I guess.  It's -- it's nominated from the Department who the Sailor is a part of, and -- and essentially they should know that their Sailor is deserving of the recognition.

Q    And you said when -- when you were underway.  Is that when this is given out?

A    Underway.  We -- we wouldn't do it in port, but we would do it when the ship was -- was out sailing.

Q    And, so, this would have been -- this nomination would have come up through a -- from a direct supervisor or somebody like that, is that right?

A    I don't know the exact mechanics of how it works.

Q    This just comes to you eventually?

A    Yeah, eventually.  Really, I mean, I think the -- the program was -- was managed through our chief petty officers, through the senior enlisted on board.  And -- and I believe it was, yeah, a nominative process coming up through the Department of -- of the Sailor.

Q    Okay.  So, you don't -- there's no money attached to it?

A    No.

Q    There's no metals?

I-244

A     Correct.

Q     So -- so, what do you get?

A     What do you get?  A couple of nice little benefits.  As I recall, you'd have breakfast with the chief petty officers, and they would, you know, pump a Sailor up and tell them how great a job they're doing.

My role would be to facilitate a tour of the bridge for the Sailor.  We tried to kind of organize it so it was during flight operations so a Sailor who maybe spends the majority of their -- of their -- their workday in Engineering spaces could come up and see what the ship does from a different perspective.  And, so, when the Sailor comes up to the bridge, we take the opportunity to present that Sailor with a certificate of recognition.  They wear -- you can see there's a lanyard, and he's got a placard on there that says Warrior of the Day so that everybody who comes across him throughout the -- the course of his day will know that this Sailor is the Warrior of the Day.  He'll get an opportunity to drive the ship, get an opportunity to -- you know, to look out at, you know, where we are and, you know, maybe some other ships that we might be, you know, nearby.

And then it -- it sort of wraps up with a member of the -- the Sailor's chain of command, normally Division Officer, so, a junior officer jumps on our intercom system.  It's the 1MC, and gives a spiel about why this Sailor is so deserving

I-245

of being the Warrior of the Day, and it's something that can be heard throughout the ship.

Q    Okay.  And is that part of that is taking this photo?

A    Yes.

Q    And is that given to the Sailor?

A    The -- the certificate?

Q    The photo.

A    The photo?  I think so.

Q    Okay.  And the certificate certainly is?

A    Yes.

         MR. PARMLEY:  Would you mind zooming in on the -- on the photo.  See if you could -- on the certificate, just so we can see the date.

BY MR. PARMLEY:

Q    And what's the date on that?

A    It's 19 July 2022.

Q    Okay.  Would it surprise you to know that this photograph was emailed from -- or, excuse me, sent by telegraph to a Chinese intelligence officer by the Defendant?

A    Yeah, that's surprising.  That's not what it's intended for.

         MR. PARMLEY:  I don't have any other questions. Thank you.

         THE COURT:  Thank you.

         Cross?

I-246

CROSS EXAMINATION

BY MR. BERTOLA:

Q     Good afternoon, Captain Taylor.

A     Good afternoon.

Q     Sir, in the beginning of your questioning, you talked about the security guarding the ESSEX, correct?

A     Yes.

Q     And you mentioned that it's basically a two-tier security system with a gate and then a guard protecting the entrance of the ship, correct?

A     There are multiple layers of security.  It starts with the gate on the outer perimeter of the base.  There is a -- a layer of security at the entrance to the pier, and then there are multiple layers of security as you approach the ship and then come aboard.

Q     And you said at the gate it's either a turn style or a -- or a manned gate with a guard, correct?

A     This is the -- as I recall, that's the -- that's the gate to get onto the pier.  There's -- you know, there are -- there are manned guards, security guards there, but there's also a turn style that -- that can be activated with your CAC card.

Q     So, sometimes there aren't security guards and they just go through the turn style, correct?

A     As I recall, yes.

I-247

Q    Do you know the dimensions of the turn style?

A    The dimensions?  It's large enough to let a person pass through.

Q    Understood.

A    Yeah.

Q    Could somebody hop over the turn style theoretically?

A    No, I don't think so.

Q    There is protection overhead at the turn style that would prevent somebody from entering it without actually pushing themselves through the turning apparatus?

A    I don't -- I don't know the answer to that.

Q    And the security guard manning the entrance to the ship itself, do you know the protocol that guard's supposed to follow in letting in people to the ESSEX?

A    Essentially they're looking for either is the -- the person who's looking to gain access a member of the crew or is it a person who, if not a member of the crew, has a -- a valid reason to be on board.

Q    And are there people making sure that security guard is following protocol and doing their job correctly?

A    Yes.

Q    And then you went to talk about Fleet Week in L.A.  And you mentioned how Fleet Week is meant to promote community engagement with the Navy?

A    Yes.

I-248

Q     That's the overall theme of Fleet Week?

A     That's correct.

Q     So, Navy personnel -- there's a large amount of interaction between Navy personnel and members of the public during that week?

A     Yes.  It's specifically encouraged.

Q     Are members of the public invited to Navy facilities?

A     We -- we host numerous tours for large numbers of people from the community who are interested in seeing the warship.

Q     So, they're invited onto the ESSEX itself?

A     That's correct.

Q     Are they allowed to take pictures on board the ESSEX?

A     I don't recall specifically.  The -- the route is -- is very intentional, you know.  It's -- the -- the route doesn't take them anywhere near any sort of, you know, sensitive material, information, systems.

Q     Do they have to follow a guide while they're touring the ship?

A     Yes.

Q     And then if somebody breaks free from the crowd following the guide, they'll be reprimanded and told to go back, follow the group I'm assuming?

A     Correct.  Yes.

Q     But their phones or any video cameras or cameras aren't confiscated from them or searched going in?

I-249

A    There is -- there is a screening process to -- to make sure that people aren't bringing, you know, dangerous items on board.  But, as I recall, they were permitted to bring phones, cameras, and I believe -- I mean, the -- the tour takes you up to the flight deck, and I think that we allowed people to take photos up on the flight deck for personal use.

Q    But photos weren't allowed on the inside of ESSEX?

A    I can't say for sure.

Q    So, you don't know if -- if people were allowed to take photos inside the ESSEX?

A    That's right.

Q    And, sorry, going back to the security measures outside of Fleet Week, do security guards check Sailors' phones when they're entering and leaving the ship?

A    In what way?  For content?

Q    Are they allowed to bring their personal phones on board the ship?

A    Yes.

Q    Do they -- yes, do they check them leaving the ship, if there's any content on their phones that they shouldn't have?

A    No, not -- not usually.

Q    So, there's like no standard checks of digital information on any of the devices leaving the ship, correct?

A    That's correct.

Q    And are there security measures to prevent photographs

I-250

of the exterior of the ship in general when it stops at its normal docking area?

A    I would say that generally people are conscientious or sensitive to suspicious sorts of photography.  But I think that, sure, photos are taken of ships when they're in port.

Q    But can the public take pictures of the exterior of the ship while it's in its normal docking area at bay?  So, not inside the ship but away from the ship on -- are they allowed to take pictures of the outside or is that prohibited in any way?

A    No.  they can take pictures.

Q    It's not prohibited in any way?  There's no rules against that?

A    Not that I know of.

Q    And assuming if like a bay door is open or something like that, they could then take pictures inside the ship from outside, and it's not prohibited or no one would tell you not to do it?

A    I think that if it was suspicious, and, you know, by that I mean intentionally taking photos of things that -- that the general population wouldn't be interested in or high powered, you know, cameras with, you know, the ability to -- to see a long way at high resolution might be considered suspicious, but the general public or -- or Sailors in general are permitted to take photos on their phone.

I-251

Q    And do you know of any protocol there is to prevent, like you said, suspicious people from taking pictures of the outside of the ship?  Do you know of any protocols in place to prevent that?

A    That's -- I mean, the -- the base security, that's one of their functions would be to investigate suspicious sorts of behavior.

Q    And, sorry, going back to Fleet Week, is the ship prepared before Fleet Week happens to do these tours throughout the ship?

A    Very much so.

Q    And, now, going to the RIMPAC exercise you mentioned, so, it's generally an exercise with joint allied forces to conduct joint missions, correct?

A    Yes.  So, there is a harbor phase or an in-port phase where they have, you know, training events where maybe they'll discuss search and rescue or maybe they'll discuss, you know, mine countermeasures or -- or something like that.  So, there is a -- a harbor phase where there is that kind of interaction that occurs, and that's also an opportunity for the ships to host different events on board.  So, you know, ships will have a -- you know, an evening social.  They'll invite participants from other nations to -- to come on board, and they can kind of showcase not only their ship and the crew but some of their unique culture.

I-252

After the harbor phase, it moves to an at sea phase where they do some kind of episodic training in isolation, and then towards the end, it becomes much more integrated based on sort of the -- the building blocks or the foundation that was laid in the earlier stages of the exercise.

Q    And these members of allied forces that are allowed on the ships, is there additional security screening procedures to clear those people to board the American ships or do we rely on those nations' screening procedures?

A    No.  The -- as I recall, it was a similar screening process.  So, you know, bag checks, looking for hazardous material, making sure that they have a valid reason to be there.  And then also they don't just have access, complete access to the ship, limited access based on, you know, if it's a social, for example, it's probably contained to a hangar bay or a flight deck.  You know, we'd also host tours.  But, again, those tours are designed to showcase the ship and some of the capabilities but not disclose anything that was sensitive.

Q    Are you aware that China used to participate in the RIMPAC activities?

A    I do think that's the case, yes.

Q    Until about 2018, does that sound right?

A    I'm not for sure.

Q    And the information that's -- the U.S. shares a lot of

I-253

information with allied forces during this -- during this exercise, right?

A     (No audible response.)

Q     Are there any safeguards put in place that protect information given to those allies once it's in their hands or are they free to do with it what they wish?

A     Well, the interoperability training when we're doing it is not the most high end.  So, candidly, some of the nations, some of the -- you know, the allies and partnership we work with are not quite as sophisticated or advanced as -- as our Navy is.  So, much of the training that we're doing is sort of -- sort of baseline.  For us, you know, it's -- it is not particularly stressing tactically.  It's -- it's more about just sort of the -- the participation to enhance capability.  So, I think that the -- the -- the -- the capabilities that we're demonstrating, the information that we're sharing is strictly controlled so that we're not over sharing, recognizing that, you know, there is some -- some risk when we work with allies and partners that some of that information may end up, you know, in a place that we don't desire.

          MR. BERTOLA:  Understood.  Thank you.  No further questions.

          THE COURT:  Thank you.

          Any redirect?

          MR. PARMLEY:  Very briefly, your Honor.  Thank you.

I-254

REDIRECT EXAMINATION

BY MR. PARMLEY:

Q    Speaking about Fleet Week, you invite people onto the ship, yes?

A    Yes.

Q    Are they free to wander around?

A    No.

Q    Are they free to access the computers -- the computers on the ship?

A    No.

Q    Take photographs of technical manuals?

A    No.

Q    You said the Sailors are allowed to bring their personal phones on the ships.  That's accurate, correct?

A    Yes, it is.

Q    Do you trust Sailors to follow their oaths and protect security?

A    Yes, I do.

        MR. PARMLEY:  Okay.  I don't have any other questions.  Thank you.

        THE COURT:  Anything else?

        MR. BERTOLA:  No, your Honor.

        THE COURT:  All right.  You may step down.

        Is he excused?

        MR. PARMLEY:  Yes.

I-255

THE COURT:  Thank you.

You may call your next witness.

MR. PARMLEY:  The United States calls former FBI Special Agent Pat O'Brien.  If you can just give me one moment, your Honor.

(Pause.)

PATRICK O'BRIEN - PLAINTIFF'S WITNESS - SWORN

THE CLERK:  Please state your full name and spell your first and last for the record.

THE WITNESS:  Patrick O'Brien, P-A-T-R-I-C-K O-B-R-I-E-N.

DIRECT EXAMINATION

BY MR. PARMLEY:

Q    Good afternoon.

A    Good afternoon.

Q    What's your current employment, Mr. O'Brien?

A    Currently I work for Caesar's Entertainment.

Q    In what capacity?

A    I'm their Corporate Director of Security Intelligence Center and Regional Investigations.

Q    And where are you based out of?

A    Las Vegas, Nevada.

Q    And when did you start that?

A    In February of this year.

Q    And prior to working in that -- Las Vegas, what was your

I-256

employment?

A    I retired from the FBI in February of this year.

Q    And when did you become an agent, roughly?

A    2002.

Q    Okay.  And you retired this year?

A    Correct.

Q    Just briefly give us an outline of your career in the FBI.

A    I started in October of 2002.  I worked organized crime, drug, counterintelligence, counter terrorism cases.  I was stationed in Hawaii, New York City, overseas and here in San Diego.

Q    And speaking of San Diego specifically, when were you assigned to San Diego?

A    In 2016.

Q    And directing your attention specifically to December of 2022, what was your assignment then?

A    I was a supervisory special agent for the Violent Crime Task Force Gang Group.  It was a gang task force here in San Diego.

Q    Okay.  And did there some a time when you were asked to assist another squad, a counterintelligence squad in an operation at the airports?

A    Yes, there was.

Q    Tell me how you got involved in that?

I-257

A      Some members of the squad had asked if I could participate in a cameo undercover operation, and I had done some undercover work previously.  So, I agreed.

Q      What do you mean when you say cameo undercover?

A      Undercover operations here and there, not long-term undercover operations.

Q      Okay.  So, something very quick?

A      Correct.

Q      Okay.  What was your understanding of the purpose of this operation?

A      My understanding of the purpose was that we were going to try to observe the Defendant or the subject of the -- of the investigation, observe him put in his code for his phone.

Q      Is it accurate to state that the government had permission to search the Defendant's phone but did  not have his PIN code, is that accurate?

A      That's my understanding, correct.

Q      Okay.  So, what was the plan?  How -- how were you going to get access to his PIN code?

A      We were hoping that he would turn his phone on at some point in view of one of the agents or officers' camera so that we could view his PIN code.

Q      Let me back up for a second.  You just -- I take it you weren't wandering around following him, hoping he'd turn on his phone?

I-258

A     That's correct.

Q     Okay.  So, what -- where was the operation and how was it that it was supposed to go?

A     The operation was at the security checkpoint of the San Diego International Airport.  I was posing as a TSA agent.  As Mr. Wei was walking through TSA and he puts his items on the conveyor belt to be screened, I would then ask him to -- if these were his items.  He would say yes.  I would then direct him to a location, ask him to turn his phone off so that I could do a simulated swab of his devices, and then we would hope that he would turn his devices back on once he received the devices again.

Q     So, what happens?  Do you know what happens when you turn it off and on, an iPhone?

A     When you turn the iPhone back on, you have to put in your PIN code.

Q     Okay.  I want to direct your attention specifically to December 13th of 2022.  Can you tell me what -- what do you do that day?  How did you get to this point where you're going to actually do this operation?  Did you get permission from anybody?  What did you do?

A     Working with the case team, we worked with the San Diego International Airport and the TSA officers there so that I could pose as a TSA agent.  I then got permission to go in the area behind security where they're doing the screening so that

I-259

I could observe Mr. Wei when he would walk through the security checkpoint.

Q     And did you know what he looked like?

A     I had a photograph of him at that time.

Q     Okay.  Let me show you what's been previously marked --

        MR. PARMLEY:  If I may approach, your Honor?

        THE COURT:  You may.

        MR. PARMLEY:  This is marked as Exhibit 50, five zero.

BY MR. PARMLEY:

Q     Do you recognize that?

A     Yes, I do.

Q     Is that (indiscernible)?

A     Yes, it's a --

Q     DVD?

A     -- DVD, correct.

Q     Do you know what's on that DVD?

A     It's a video of the undercover operation at the San Diego International Airport.

Q     Taken from what perspective?

A     From a top down perspective.

Q     Okay.  And those are TSA cameras?

A     Correct.

Q     Is that a fair and accurate video of the events as they unfolded on that day, on December 13th of 2022?

I-260

A     Yes, they are.

Q     And how do you know that particular disk is associated with that?

A     Because I initialed the disk here.

Q     After you reviewed it?

A     Correct.

        MR. PARMLEY:  I'd move to admit Government's Exhibit Number 50.

        MR. JONES:  No objection.

        THE COURT:  It's received.

        MR. PARMLEY:  We're going to -- we're going to play that, and I'm just going to let it run for a little bit and pause it a few times.  Let's just let it go for a moment, and then I'm going to pause it.

     (Video played.)

        MR. PARMLEY:  Could you pause it right there, please.

BY MR. PARMLEY:

Q     Okay.  What am I looking at generally speaking?

A     You're looking from the -- you're looking at the entrance to the security checkpoint at the airport.  So, we're behind the security checkpoint.  These are the magnetometer as passengers walk into the security checkpoint.

Q     So, this is from the point of view if somebody were looking at people as they're walking through security at the

I-261

-- at the airport?

A     That's correct.

Q     Okay.  And is that -- are you in this video somewhere?

A     Yes, I am.

Q     And where are you in the video?

A     I'm on the lefthand side, in the gray suit.

Q     And you've got some kind of lanyard on, is that right?

A     Correct.

Q     And is the Defendant in this -- in this video?

A     Yes, he is.

Q     And where is he located?

A     He's in the foreground in the gray sweatshirt.

        MR. PARMLEY:  Okay.  Let's go ahead and play that for a moment.

     (Video played.)

BY MR. PARMLEY:

Q     And what are you doing right now in the video?

A     Right now I am observing items coming through the security checkpoint.  I'm simulating looking at the monitor to see the items that are coming through.

Q     You're pretending to be a TSA agent?

A     Correct.

Q     And at this point, the Defendant is waiting for his materials to come through, is that right?

A     That is correct.

I-262

MR. PARMLEY:  Okay.

(Video played.)

BY MR. PARMLEY:

Q    Okay.  Can you tell me about the interaction you're having right now with the Defendant?

A    I'm asking the Defendant whether those are his items. He answered in the affirmative.  I said, "Can you follow me? We're going right over here.  We're going to do our secondary screening."

Q    And that's when he's put his items, is that right, on the screen?

A    That's correct.  I instructed him to sit in that chair. I asked him if he could turn his phone off.

Q    Did he comply with you?

A    Yes, he did.

Q    Okay.  And then what did you do after that?

A    I simulated swabbing his phone with one of the swabs that they have at TSA.

Q    Is this is something that TSA officers do?

A    Correct.

Q    Swabbing for -- for what?

A    They're swabbing for explosive residue or any kind of narcotics.

Q    So, if we're looking at the top right of the video right now, is that you swabbing the phone?

I-263

A    That's correct.

Q    And you handed it back to him?

A    I said -- I said, Yeah, I'm done with your phone.  You can put your phone in your pocket.

Q    Okay.  And he complied?

A    Correct.

Q    Okay.  And then what did you do?

A    I simulated taking the -- the swab and putting it into the machine, which would then test the swab for any explosive residue.

Q    And then you were going to wait until either you had fast results or it was just too long or what was the plan?

A    So, the plan was just see if Mr. Wei would then turn his phone back on.  At this point, I'm letting Mr. Wei know, Sorry it's taking a little moment.  If you want, I'm not interested in the rest of your personal items.  You can put them in your pocket, put on your belt and whatnot.  If you'd just give me another minute.

Q    So, you let him grab his other materials?

A    That's correct.

Q    And, so, he grabbed them?

A    Correct.

Q    Okay.  And that's what we're seeing on the video?

A    That's correct.

        MR. PARMLEY:  Okay.

I-264

(Video played.)

BY MR. PARMLEY:

Q     And now the hope is what?

A     The hope is that he would turn his phone back on.

Q     In view of the camera?

A     Correct.

Q     Did you direct him to turn his phone on?

A     I did not.  At that point, I did walk away and talk to somebody just to make it look as if the machine was malfunctioning -- malfunctioning for a minute.

Q     And then you had FBI permission to search his phone to search his phone but did not have the PIN code, is that correct?

A     That's correct.

Q    And court authorization to do so?

A     Correct.

        MR. PARMLEY:  Okay.

    (Video played.)

BY MR. PARMLEY:

Q     At this point, what happened?

A     At this point, it looks like Mr. Wei is taking his phone out and then turning it back on, which will then make him put in his passcode.

Q     Were you able to see the passcode in the video?

A     At that moment I was not able to, but after reviewing

I-265

the video, I was.

Q    And what was it?

A    It was zeroes.

Q    Okay.  And what did you do next?

A    At that point I was informed that we could let Mr. Wei continue on to his -- his gate.  And, so, I let him know that he's free to leave.

Q    And he left shortly thereafter?

A    Yes, he did.

MR. PARMLEY:  Thank you.  I have no other questions.

THE COURT:  Cross?

MR. JONES:  Sure.

CROSS EXAMINATION

BY MR. JONES:

Q    Good afternoon, former FBI Agent O'Brien.

A    Good afternoon.

Q    This will be brief.  How many sting type operations have you done during your career as an FBI agent?

A    How many have I been an undercover agent or how many have I been involved in?

Q    An undercover agent like this.

A    Probably half a dozen.

Q    All right.  Are you involved in the process of gathering information after this or do you just do your charade and then

I-266

let other people take it over?

A    If it's my investigation, I would not be involved in an undercover capacity.  So, I just do the one undercover operation or two, whatever is deemed necessary, and then I step back from the investigation.

Q    Were you involved in the Wei investigation after the -- your involvement at the TSA checkpoint?

A    Not before the prosecution phase, no, or the arrest phase.

Q    When was the -- again, maybe a better way to ask it is what was the total duration of your time on -- on the investigation related to this case?

A    I was just involved in the investigative phase just in this phase.

Q    And, so, for how long, days, weeks?

A    Maybe one day.

Q    In your experience, does somebody having a passcode of all zeroes indicate any level of sophistication?

A    I think any passcode would be a level of sophistication, but, yeah, zeroes is not the most sophisticated, correct.

            MR. JONES:  That's all I've got.  Thank you.

            MR. PARMLEY:  I don't have any other questions.

            THE COURT:  Thank you.  You may step down.

            THE WITNESS:  Thank you.

            THE COURT:  Do we have another witness?

I-267

MR. PARMLEY:  We do.  The United States calls Special Agent Rebekah Frank.

REBEKAH FRANK - PLAINTIFF'S WITNESS - SWORN

THE CLERK:  Please state your first and last name for the record and spell both.

THE WITNESS:  My name is Rebekah Frank.  Rebekah is R-E-B-E-K-A-H.  Frank, F-R-A-N-K.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. PARMLEY:

Q     Good afternoon, Agent Frank.

A     Good afternoon.

Q     Who's your current employer?

A     The Federal Bureau of Investigation.

Q     And how long have you been an agent with the FBI?

A     Six years.

Q     And prior to that FBI, did you have any work experience?

A     I did.  I worked for a former attorney.  I worked as a law clerk to a judge in Minnesota, and I also was a civil litigator attorney for about four years.

Q     Prior to joining the FBI?

A     Yes.

Q     So, can you briefly outline your educational background for me?

A     Yeah.  I have a Bachelor of Arts, and I have a Juris

I-268

Doctorate Degree.

Q    And tell me about your -- well.  I'm sorry. Could you remind me as to what year you joined the FBI?

A    I joined the FBI January of 2019.

Q    Can you briefly describe what type of training does a special agent with the FBI --

A    As a special agent, you go to Quantico for about five months, and you have firearms training.  You have defense tactics training.  You have legal training.  I particularly am a counterintelligence agent.  So, I had specialized counterintelligence training at Quantico as well.

Q    And where are you currently assigned?

A    San Francisco FBI.

Q    Were you previously at the San Diego FBI?

A    I was.

Q    What are you doing now with the San Francisco FBI?

A    Currently, I'm an Associate Division Counselor and Supervisory Special Agent with FBI San Francisco.

Q    What does an Associate Division Counsel do?

A    So, I work with case agents, and I review their cases, work with case agents reviewing, make sure they're following legal policy, following constitutional -- making sure they don't violate any constitutional rights violations, and making sure that regulations are being followed as well.

Q    So, you are a lawyer for the FBI now?

I-269

A      Yes.

Q      Prior to being this Associate Division Counsel job, you were in San Diego?

A      That is correct.

Q      For how long?

A      I was in San Diego for a little bit over five years.

Q      And what was your assignment while you were in San Diego?

A      I was a counterintelligence special agent.

Q      The entire time you were there?

A      I was.

Q      Can you tell me what's the purpose of the Counterintelligence Squad?

A      So, the Counterintelligence Squad investigates all crimes related to national security threats in the United States.

Q      Can you give me some examples?

A      Yes.  One would be clearly espionage investigations. Another would be economic espionage investigations, counter-proliferation cases, and then cases have a foreign nexus or a foreign power somehow involved.

Q      What do you mean by economic espionage?

A      Economic espionage could be a foreign national or a foreign government is interested in certain economic proprietary information, anything that could give them an

I-270

economic advantage.

Q      So, that's totally different than military --

A      Yes.

Q      -- espionage?  This is stealing private company's data --

A      Correct.

Q      -- information, et cetera, is that correct?

A      That is correct.

Q      And you said something about counter proliferation.

A      Yes.

Q      What is that?

A      That could be like similar to like theft of trade secrets where you have a company, someone who works for a company is providing information to a Chinese competitor company for the benefit of that country's government.

Q      Did you receive specific training related to counter-espionage?

A      I did.

Q      Can you tell me about that training, please?

A      Yes.  So, that training talks about -- it goes through the elements of all the crimes related to national security defense information, including like espionage -- what elements of crime constitute espionage and some of the other ones I mentioned, but it talks about just steps you go to safeguard and protect the United States information.

I-271

Q      Did you have to learn about different types of investigative techniques you could use, for example?

A      We do.

Q      Okay.  And is that just while you're training to become an FBI agent or is that ongoing training as you are an agent?

A      It's an ongoing training.

Q      Okay.  Are you familiar with the case of United States versus Jinchao Wei?

A       I ma.

Q      How are you familiar with that case?

A      I was one of the case agents who investigated Mr. Wei.

Q      You were assigned to this case before you transferred to San Francisco, is that right?

A      That is correct.

Q      What's a case agent?  What does that mean?

A      A case agent is somebody who is responsible for the investigation of the case.  You're usually responsible for any legal process.  You're responsible for the pace of the case. You are the primary person who is responsible for investigating the -- the case against an individual.

Q      So, you're involved in collecting evidence?

A      That is correct.

Q      Analyzing evidence?

A      Yes.

Q      Making investigative decisions?

I-272

A     That is correct.

Q     And did you do that by yourself or were you the only case agent in the case?

A     I was not.  I had an additional co-case agent, Laura Wetterer.

Q     Was Chris Christian also a case agent on the case?

A     Yes, he was.

Q     He's from a different agency?

A     Yes, he's with NCIS.

Q     And we've already heard from him.  Okay.  I want to talk to you about some of the evidence that was obtained in this case.  I'm want to direct your attention to January 2023.  You just heard the testimony -- you were in court -- of Mr. O'Brien, correct, about the PIN code?

A     Yes.

Q     Were you working on the case in January of 2023 or December of 2022?

A     I was.

Q     Did receive any court order authorizing you to search the Defendant's phone?

A     I did.

Q     Were you aware of his passcode when you received that order?

A     Say that --

Q     Did you know what his passcode was on his phone?

I-273

A    Yes.  When we searched his phone, we knew what his passcode was.

Q    And how did you get that?

A    From the airport operation which you just saw.

Q    So, prior to that, you did not have it?

A    That is correct.

Q    And what is -- what was the concern about not having the passcode?  You had authorization to search his phone.  Why didn't you just search it?

A    We might not have been able to get into it.  We had in this case a surreptitious court order to surreptitiously search his phone.

Q    What do you mean by surreptitious?

A    A surreptitious search means we had a court -- we were court authorized to go into his phone and review the contents of his phone without him knowing that we had searched his phone.

Q    Okay.  So, you had permission from a court to search his phone without him knowing about it, correct?

A    That is correct.

Q    You didn't have his PIN code initially?

A    Initially, we did not have his PIN code.

Q    And then you got it?

A    That is correct.

Q    So, what was the plan -- now you've got the PIN code,

I-274

what's the plan to get access to the phone?

A      So, at the point we knew where -- at the time when we were trying to search his phone, the ship was docked at BAE Systems, which you have heard -- which you heard about.  And we knew that if we went on the ship and we went as FBI, that would be news to the whole ship, and that would potentially compromise our investigation into the conduct.

So, we dressed as contractors, and we were let onto the ship by members of the Navy personnel, and we got on the ship that way, and we had worked with Navy personnel beforehand where when Mr. Wei was on duty, Navy personnel was going to give us his phone.

Q      Okay.  So, you had a plan to separate him from his phone?

A      That is correct.

Q      And if I understand what you just testified to, that other Navy personnel were going to separate him from his phone?

A      That is correct.

Q      You had a reason they were going to give him as to why he couldn't have his phone with him?

A      I think at the time he was on duty, and they had told everybody who was on duty you had to provide your phone.

Q      Do you mean like a watch duty?  Is that what you mean?

A      That is correct.

Q      Okay.  And, so, let me direct your attention to -- to

I-275

the 12th of January 2023.  That was the plan you had to separate from his phone?

A    That is correct.

Q    So, tell me what happened?

A    So, we dressed as contractors.  We went on the ship with myself, Special Agent Wetterer and other FBI agents, and we were put into a room.  And at that time, Navy personnel had provided us Mr. Wei's phone, and we wanted to assure that this was Mr. Wei's phone.  So, what we did is we had a burner phone.  For you w ho don't know, a burner phone is an unattributed phone that does not go back to the FBI.  It's an unattributed number.  And we went and called -- with the burner phone, we called Mr. Wei's phone, and the phone lit up in our hand, showing that that was Mr. Wei's phone, and then we performed to image his phone.

Q    Okay.  So, let's back that up for a second.  So, did you know his phone number in the investigation?

A    We did.

Q    Prior to this, I take it you needed to know his phone number on his phone to get the search authorization?

A    We had -- yes, we had -- we knew his phone.

Q    Okay.  And, so, did you have any timing concerns about how long it would take you to -- to perform this?

A    Yes.  We knew this could potentially take a while because we were essentially imaging his phone, and it can take

I-276

a while.  So, that is why we did it while he was doing watch duty, because that can take a significant amount of time.

Q    And when you say a while or a significant amount of time, what do you mean?

A    Several hours.

Q    Hours?

A    It could be several hours, yes.

Q    Does that mean 20 hours?  Does that mean 5 hours?  What does --

A    In this case it was not 20 hours.  It was our hope it was never going to be 20, but it can take significant time. It could be a couple of hours up to five hours.

Q    Okay.  So, specifically, you got on the ship posing as contractors?

A    That is correct.

Q    And you'd asked somebody in advance to separate the Defendant from his phone?

A    Yes.

Q    And somebody walked in and handed you a phone?

A    That is correct.

Q    Okay.  Can we just walk through again what you did once you were handed this phone to confirm that it was actually the Defendants?

A    Yep.  So, once we received his phone, we had a burner phone that we used to call his phone, and when we called the

I-277

number that we knew to be Mr. Wei's, the phone in our hand lit up.  So, we knew that was his cell phone.

Q    And then you plugged it into some machine, is that what you did?

A    Yeah.  We plugged it into a machine that did an image of his phone.  And, so, we then had a thumb drive image of his phone that we later used.

Q    So, you took that off the ship and returned -- you returned the phone?

A    Yes.  So, we returned Mr. Wei's phone back to Navy personnel, and I assume that's where they later gave it back to Mr. Wei.

Q    Did you take any steps to make sure that Mr. We knew that you had not searched his phone?

A    We did because we had court authorized for a surreptitious search of his phone.  That means we -- so, when we called it, it would have shown activity.  So, we deleted the fact that we used a burner phone to call his phone.

Q    You deleted that call from the call log?

A    That is correct.

Q    You just went into the phone and deleted that call?

A    Yep.

Q    Okay.

A    That's correct.

Q    Let me show you a couple of exhibits.  Show you what's

I-278

been previously marked for identification as Government's 51, 52, 53, and I'm also going to hand you 124B.  Let's talk about 51 first.

Do you know what that is?

A    I do.

Q    What is that?

A    This is Mr. Wei's iPhone.

Q    Was that the phone handed to you on the ship?

A    This is.

Q    And how do you know that?

A    I know it because I recognize the phone, and I have previously reviewed this phone, and my initials are on the bag.

MR. PARMLEY:  Okay.  I'd move to admit Government's exhibit 51, your Honor.

MR. JONES:  No objection.

THE COURT:  It's received.

BY MR. PARMLEY:

Q    Looking in front of you, you have Government's Exhibit 52.  It looks like a thumb drive.  Is that accurate?

A    52, yeah, I have it right in front of me.  This is a thumb drive.

Q    Okay.  Have you had an opportunity to review the contents of Government's Exhibit 52?

A    I have.

I-279

Q    And what's on Government's Exhibit 52?

A    This is a copy of the information that was on his iPhone.

Q    At what time period?

A    This would have been the January of 2023 search.

Q    So, that's the image that was taken from the phone covertly on the ship on that day?

A    That is correct.

Q    And how do you know that?

A    I know this because I have previously reviewed this as well.

Q    Okay.  And initialed it?

A    Yes.

        MR. PARMLEY:  Move to admit Government's 52.

        MR. JONES:  No objection.

        THE COURT:  It's received.

BY MR. PARMLEY:

Q    And, presumably, the phone was handed back to the Defendant and it made its way back to him, is that correct?

A    Yes, that's correct.

Q    And then what did you do, you left the ship?

A    And then we left the ship.

Q    And eventually you analyzed the contents of the phone?

A    Yes, that is correct.  We analyzed everything that was on his phone.

I-280

Q    Okay.  Let me fast forward again to eight months later to August 2nd, 2023.  Were you involved in the arrest of the Defendant?

A    I was.

Q    What was your assignment on that day?

A    I was part of the arrest team, and I was the person that seized Mr. Wei's phone from him.

Q    So, at some point you were -- after the Defendant was arrested, you were with him?

A    Um-hmm.

Q    And you said you seized his phone from him?

A    At the time of the arrest, he had his phone on him, and I took his phone.

Q    Can you tell me where it came from?

A    It was in his duffle bag.

Q    Okay.  And is that the same phone that's marked for identification -- well, that's been admitted as Government's Exhibit 51?

A    Yes, it is.

Q    Okay.  What did you do with the phone at that point?

A    At that point, I handed it to a member of FBI personnel.

Q    And was that later imaged?

A    It was.

Q    And looking at Government's Exhibit Number 53, and this I take it, was this a surreptitious or he --

I-281

A    No.

Q    -- knew about it?

A    At this point, he knew I had seized his phone off of his -- his person.  So, he was well aware that I had his phone.

Q    He had been arrested.  You had identified yourselves as FBI agents?

A    That is correct.

Q    Okay.  And you took the phone from him, and you did a second image, is that correct?

A    That is correct.

Q    And, looking at Government's  Exhibit 53, do you recognize that?

A    I do.

Q    What is that?

A    This is also an image of his phone.  So, this is the second image of his phone from his arrest.

Q    And how do you know that?

A    I know this because I also had initialed this as well.

Q    And, so, that's a true and accurate copy of an image of his phone as taken on the date of his arrest?

A    Yes, it is.

        MR. PARMLEY:  I'd move to admit Government's Exhibit 53.

        MR. JONES:  No objection.

        THE COURT:  It's received.

I-282

MR. PARMLEY:  This -- these two exhibits, 52 and 53 are the subject of a stipulation, but we can do that later.

THE COURT:  All right.

MR. PARMLEY:  We'll do that in a bit.

BY MR. PARMLEY:

Q     Okay.  I'm going to show you a final exhibit.  124B is in front of you?

A     Yes, it is.

Q     And what is 124B?

A     124B is a thumb drive of what I know to be a WeChat push to talk conversation between the Defendant, Mr. Wei, and a Navy friend of his.

Q     Okay.  So, we're going to talk about what a WeChat is a little bit later, but could you just briefly describe for me what WeChat is?

A     Yeah.  WeChat is -- predominantly it's a People's Republic of China based communications app that you can download on your phone.

Q     And, so, what is -- 124B is -- comes from where?  What's the origin?

A     It is from his phone.

Q     So, from those images on his phone?

A     That is correct.

Q     Okay.  And that is a fair and accurate copy of what, one, push to talk audio from WeChat that was on his phone?

I-283

A    Yes.  It's a push to talk conversation he had with a fellow Navy Sailor.

Q    And how do you know that that's accurate?

A    I know this because I reviewed it, and my initials are on this thumb drive as having reviewed it.

Q    Was that in English or in Chinese?

A    It's in Chinese.

          MR. PARMLEY:  I would move to admit 124B.

          MR. JONES:  No objection.

          THE COURT:  It's received.

          MR. PARMLEY:  And I don't have any further questions for Agent Frank.

          THE COURT:  Thank you.

          Cross?

                    CROSS EXAMINATION

BY MR. JONES:

Q    Just briefly.  What was the total time that you were involved in the Wei investigation, do you recall?

A    The entirety of the investigation.

Q    So, starting what date would you say?

A    I'd say spring, summer of 2022.

Q    And then going until --

A    His arrest and then --

Q    -- August?

A    -- after, yeah.

I-284

Q    When you made the -- the copy of the phone, was that just a copy of the phone up to that date or did it clone the abilities of the phone going forward as well?

A    (No response.)

Q    Like if -- if a -- let me rephrase.  If additional messages came into Mr. Wei's phone, would you be able to see on the device that you had created?

A    From this extraction, what I could see was up and to that point.

Q    And, so, anything that happened on Mr. Wei's phone after that point, you didn't have access to on that device?

A    On this thumb drive I could only see up until that search, the point of that search.

Q    Were you involved in subsequent searches or -- or subsequent surveillance of phone calls or chats after that point?

A    What do you mean?

Q    After the point when you copied the phone, were you able to listen in on conversations after that point?

A    Yes.

Q    And how did you do that?

A    So, we had a court authorized searches later.

Q    So, in addition to the searches that you just described here, there were additional searches in the future for -- that allowed for wiretaps and things like that?

I-285

A    I (indiscernible) what I can get into.

Q    So, beyond what you testified to, though -- so, you -- you've testified so far about the work up to this operation date to get Mr. Wei's phone away from him on the -- on the ship, right?

A    Yep.

Q    And then you copied it, and you were able to see everything that had -- that he had on his phone up to that point, right?

A    (No audible response.)

Q    And then --

THE COURT:  Is that right?

THE WITNESS:  That is correct.

BY MR. JONES:

Q    Sorry.  And then after that, there were -- you were involved in additional efforts to -- to listen in on phone calls that you haven't previously testified to, right?

A    That's correct.

Q    When you imaged his phone and went into it, there -- there was a substantial amount of messages still on the phone, right?

A    That is correct.

Q    Going back several months, right?

A    That is correct.

Q    And that was on WeChat as well as Telegram?

I-286

A     That is correct.

Q     And then also traditional messaging applications?

A     That is correct.

Q     So, it didn't appear to you that Mr. Wei was routinely deleting messages, right?

A     At that time, it wasn't apparent.

Q     All right.  So, it appeared to you that everything -- all of his communications over the last couple of months were intact, right?

A     At that time, for the first time I have his phone, yes.

Q     Is that typical with somebody that's committing espionage to be maintaining months' worth of chat records on their phone?

A     Actually, in my experience, it can be.  It's not always typically best practice, but it can be.

Q     Not best practice, but it -- it's possible, right?

A     It's possible.

Q     And you were here when Officer O'Brien or Agent O'Brien testified about the passcode?  You obviously know what the passcode was, right?

A     Yes, at this point we did.

Q     Does that also surprise you, somebody allegedly committing espionage to have their phone password just be 00000?

A     As Mr. O'Brien said and I agree, it's not the best

I-287

passcode to have, but there are certain protections on your phone, and a passcode -- having a passcode is certainly one of them.

Q    Would you agree that a spy that has all zeroes for the passcode and retains all of their messages on their phone is a pretty terrible spy?

A    Maybe a very confident one.

MR. JONES:  All right.  No further questions.  Thanks.

THE COURT:  Thank you.

MR. PARMLEY:  Very briefly, your Honor.  Thank you.

REDIRECT EXAMINATION

BY MR. PARMLEY:

Q    Could you ask -- could you access the phone without the passcode?

A    No.

Q    So, regardless of whether the passcode was 123456789 or 00000, could you access without that?

A    I could not.

Q    Talking about the WeChat and Telegram messages that were found on that phone, did the FBI at that point have any access or insight into any of those chats until the phone was searched?

A    No.

Q    And do you know whether or not any of the information

I-288

had been deleted from your phone?

A      I don't know.

Q      Is that something that somebody could have deleted and you would have no idea?

A      That is potential.

MR. PARMLEY:  Okay.  I don't have any other questions.  Thank you.

THE COURT:  Anything else?

MR. JONES:  No recross.

THE COURT:  All right.  Thank you.

You're excused.

So, we'll end now.

MR. JONES:  Okay.

THE COURT:  Unless you want to read the stipulation?

MR. PARMLEY:  I think that that would be great because that will only take five minutes.

THE COURT:  Okay.

MR. PARMLEY:  And then we could start with our witness first thing in the morning.

THE COURT:  All right.

MR. PARMLEY:  This is Government's Exhibit 22. We'd move to admit that as a stipulation in this case.

THE COURT:  Any objection?  It's a stipulation.

MR. JONES:  No objection.  Of course.

I-289

THE COURT:  It's received.

MR. PARMLEY:  It's going to take me a moment to read through it, your Honor.  It's kind of lengthy.  If you don't mind.

THE COURT:  You may.

MR. PARMLEY:  Thank you.

"The United States by and through its undersigned counsel and Defendant Jinchao Patrick Wei by and through his undersigned counsel agree and stipulate that in lieu of live testimony at trial, the following is true and correct:

The parties stipulate to the foundation of the Google records marked as Exhibits 35, 36 and 38.  In other words, the parties agree that a custodian of records from Google will testify that these documents are true and accurate copies of Google business records and that they can be admitted without requiring the custodian of records to appear at trial.

Number two, the parties stipulate to the foundation of the Apple Records marked as Government's Exhibit 33, 34,

I-290

and 37.  In other words, the parties agree that a custodian of records from Apple will testify that these documents are true and accurate copies of Apple business records and that they may be admitted into evidence without requiring the custodian of records to appear at trial.

Physical or electronic device exhibits.  The parties stipulate that Government Exhibits 40 -- excuse me -- Government Exhibit 40 contains a true and accurate of the contents of Government's Exhibit 103, a Samsung portable 7 Shield Hard drive.  In other words, the parties agree that this is a true and accurate digital image of the contents of Exhibit 103 and may be admitted into evidence without requiring the forensic examiner who may be needed to appear at trial."

And, just for the jury's information, we have not heard about 103 yet -- well, these other exhibits.

"The parties stipulate that Government's Exhibits 52 and 53, which we just heard about, contain true and

I-291

accurate forensic extractions of Government's Exhibit 51, an Apple iPhone. In other words, the parties agree that these are true and accurate digital extractions of data from Government's Exhibit 51 and may be admitted into evidence without requiring the forensic examiners who made the extractions to appear at trial.

The parties stipulate that the foundation of the Alien File, also known as the A File, records found in Government's Exhibits 160 through 169, in other words, the parties agree that a custodian of records from the United States Citizenship and Immigration Services will testify that these documents are true and accurate copies of Government immigration records and that they will be admitted into evidence without requiring the custodian of records to appear at trial.

Audio and video recording exhibits. Government Exhibit 70 includes a true and accurate copy of an audio recording of a

I-292

phone call intercepted by the Federal Bureau of Investigation over cellular telephone number 216-745-0679 on July 15th, 2023 pursuant to a court order.  In other words, the parties agree that an FBI special agent would testify that this is a true and accurate copy of the phone call made on that phone on that date and that it may be admitted into evidence without requiring that agent to testify.

Government's Exhibit 60 through 64 contain true and accurate copies of audio recordings collected at Naval Base, San Diego, Midway Inns and Suites, Room 424, 2450 McKinley Street, San Diego, California, on January 9th, 2023, January 21st, 2023, February 5th, 2023, March 4th, 2023 and March 19th, 2023, pursuant to a court order.  In other words, the parties agree that an FBI special agent would testify that these are true and accurate copies of sound captured from those dates at that location and they may be admitted without requiring that specific agent to testify.

I-293

Business records exhibits.  The parties stipulate to the foundation of the PayPal records marked as Government's Exhibits 31 and 31.  In other words, the parties agree that the custodian of records from PayPal will testify that these are -- documents are true and accurate copies of PayPal business records and that they may be admitted into evidence without requiring the custodian of evidence -- custodian of records to appear at trial.

The parties stipulate to the foundation of the T-Mobile records marked as Government's Exhibit 30.  In other words, the parties agree that a custodian of records from T-Mobile will testify that these documents are true and accurate copies of T-Mobile business records and will be -- may be admitted into evidence without requiring the custodian of records to appear at trial.

The parties stipulate to the foundation of the Navy Federal Credit Union records marked as Government's

I-294

Exhibits 32 and 32B.  In other words, the parties agree the custodian of records from Navy Federal Credit Union would testify that these documents are true and accurate copies of Navy Federal Credit Union business records and may be admitted into evidence without requiring the custodian of records to appear at trial.

And the Plaintiffs reserve all other rights to object to the admission of these documents, recordings and records, including but not limited to objections based on relevance, and this may be marked as an exhibit and admitted into evidence."

And that is Government's Exhibit 22.

THE COURT:  And read to the jury.

MR. PARMLEY:  Yes.  And thank you, and --

THE COURT:  All right.

MR. PARMLEY:  -- appreciate that from defense counsel.

THE COURT:  Thank you.

So, with that, we'll end for the day.  I remind you that you must not discuss the case with anyone or talk to

I-295

anybody about the case or post on social media or otherwise do any investigation in the case.

I also want to remind you that often when you come -- when you come and go from the Court, you may be in the same hallway with the lawyers who are involved in the case. And they're not allowed to say hi to you or interact with you in any respect.

If anybody in any way tries to approach you, you should report that to the Court. And, so, we'll see you here tomorrow at 9 o'clock.

Can you remind me for them to get their car paid or what do they have to do or did you already get that?

THE CLERK: (Indiscernible.)

THE COURT: Have all of you received whatever you received to get reimbursement for -- for parking your car?

(No audible response.)

THE COURT: Okay. So, we'll see you tomorrow. You can come -- you don't have to stop Jury. You can come directly out here. And leave your notebooks underneath your chair.

Oh, if you need to get a parking ticket -- parking voucher, apparently you need to stop in Jury. But be up here at 9 o'clock.

Thank you very much.

JURORS: Thank you.

I-296

(Pause.)

THE COURT:  We're outside the presence of the jury.

I remind each side to have an exhibit coordinator meet with my courtroom deputy to make sure that the document is properly labeled.  I think we're using the Government's --

MR. PARMLEY:  Yes.

THE COURT:  -- exhibit list -- and that we agree on those that have been admitted.  There -- the demonstrative should also then be listed on here, but it won't be received in evidence.  It will just be a demonstrative.

Do the parties agree on that?

MR. PARMLEY:  Yes, we do.

THE COURT:  Then one other thing.  In the -- I noted on the Government's jury instruction something I should have caught a little bit earlier.  The Government just elected to say, Please give the standard instructions.  You need to print them out --

MR. PARMLEY:  Okay.

THE COURT:  -- and have both the printed out version and the clean copy version.

MR. PARMLEY:  Do you want those filed separately as well or --

THE COURT:  And filed, yes.

MR. PARMLEY:  File them and email a clean copy?

THE COURT:  Yes.  And the reason being I'm on the

I-297

Jury Instruction Committee.  A lot of times there's changes, and we want to make sure that we're all in sync on what it is, and it creates a burden for the Court to then go find them rather than for the parties to submit them to the Court in the form that they want.

MR. PARMLEY:  Okay.  We'll do that.

THE COURT:  All right.  And --

MR. PARMLEY:  If we don't get to this this evening, we'll certainly get to it before the jury --

THE COURT:  The only ones that if you wanted any preliminary ones, just print out the preliminary ones for --

MR. PARMLEY:  I'll get it done tomorrow.

THE COURT:  -- now, and then you can get -- the rest can go much later.

MR. PARMLEY:  Okay.

THE COURT:  Okay.  And what witnesses do we anticipate tomorrow?

MR. PARMLEY:  That's a good question.

THE COURT:  Can you just let counsel know?

MR. PARMLEY:  I've let them know before, and I'll let them know -- I'll talk to them right after.

THE COURT:  Okay.  Thank you very much.  Anything further from either side?

MR. JONES:  No, your Honor.

THE COURT:  Okay.  We'll see you tomorrow.

I-298

(Proceedings recessed.)

I-299

I certify that the transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Jordan Keilty                    3/2/2026
Transcriber                         Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.