UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

--oOo--

UNITED STATES OF AMERICA,      )  Case No. 23CR1471-H
                               )
          Plaintiff,           )  San Diego, California
                               )
vs.                            )  Friday,
                               )  August 15, 2025
JINCHAO WEI,                   )
                               )
          Defendant.           )
_____)  VOLUME IV

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARILYN L. HUFF
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

| For the Plaintiff: | ADAM PATRICK BARRY, ESQ.<br>United States Attorney's Office<br>601 D Street, NW<br>Washington, DC 20579<br>(202) 233-0788 |
| | JOHN N. PARMLEY, ESQ.<br>United States Attorney's Office<br>880 Front Street, Suite 6293<br>San Diego, California 92101 |
| For the Defendant: | SEAN MICHAEL JONES, ESQ.<br>Jones Trial Attorneys<br>401 B Street, Suite 2010<br>San Diego, California 92101<br>(619) 732-6377 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

IV-ii

APPEARANCES:  (cont'd.)

For the Defendant:          MICHAEL JOSEPH BERTOLA, ESQ.
                            Rudolph Baker & Associates
                            419 19th Street
                            San Diego, California 92102
                            (909) 499-3465

Transcript Ordered by:      TODD W. BURNS, ESQ.

Court Recorder:             Lynnette Lawrence
                            United States District Court
                            333 Broadway
                            San Diego, California 92101

IV-iii

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Catherine Hamilton | IV- 3 | IV- 24 | -- | -- |
| Daniel Caldwell | IV-35 | IV-101 | IV-122 | -- |

| EXHIBITS | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| Plaintiff's: | | | |
| 201 | Weapon Control Systems Manual | IV- 17 | -- |
| 202 | Damage Control Engineering Casualty Control | IV- 80 | -- |
| 206 | Boiler Water/Feedwater Test and Treatment | IV- 14 | -- |
| 208 | 600 150 Dry Reducer | IV-138 | -- |
| 212 | LHD2 Propulsion Operating Guide | IV- 16 | -- |
| Defendant's: | | | |
| 53-4 | iMessage Chats – 3/28/2022-7/19/2023 | IV-147 | IV-190 |
| 53-6 | Facebook Messenger Chats – 5/6/2022-6/12/2023 | IV-187 | IV-190 |
| 53-10 | iMessage Chats – 8/18/2023-7/29/2023 | IV-187 | IV-190 |
| 53-12 | iMessage Chats – 6/7/2023 | IV-188 | IV-190 |

IV-1

SAN DIEGO, CALIFORNIA  FRIDAY, AUGUST 15, 2025  9:00 A.M.

--oOo--

(Call to order of the Court.)

THE COURT:  Okay.  We're outside the presence of the jury.  I had invited the parties to submit revised copies of the jury instructions.  I've been here early, and I've checked and had my staff check the Court's e-file and filings and not -- neither side has submitted anything yet.

MR. BARRY:  I'm sorry, your Honor.  I may have misunderstood.  I thought that yesterday you were open to proposals that we would make during the conference.

THE COURT:  Well, I also invited you to submit them in writing, even handwritten, so that we have them in advance for the Court's consideration.  In any event, I didn't receive anything.  And then there was also an issue with the suit which is just brought in now.  Had you e-mailed the court staff, we could have perhaps facilitated it, but for security reasons there's a protocol in doing that.  So for -- if we go for Tuesday, we can work that out.

MR. BARRY:  Understood.  And we can get something submitted.  We have a few proposed -- there's a couple of typos, and then there are a few proposed substantive changes on the ITAR discussions.

THE COURT:  If you could -- yes.  If you could simply submit those, it can just be the copy of it with your

IV-2

handwritten notation so that we get them correct.  There's a few brackets that are in there that probably shouldn't be in there, but in any event, I'd invite both sides to submit something.

MR. JONES:  Of course.

THE COURT:  All right.  Are we ready for the jury?

MR. BARRY:  One other thing I wanted to note is per the Court's indulgence, yesterday, the parties have reached an agreement that after the Government rests today, and depending on whether the Defense puts on a case, we've agreed that we would request that the instructions be given Tuesday morning and with closing arguments immediately after that.

THE COURT:  I think that makes sense.  Then you can regroup and get prepared and be fresh.

MR. BARRY:  Thank you, your Honor.

MR. JONES:  I appreciate that, your Honor.  Thank you.

THE COURT:  Thank you.  Hopefully, we won't be done at 10:30.

Are we ready for the jury?

MR. BARRY:  Yes.

MR. JONES:  Yes.

THE CLERK:  Jury entering.

(Jury enters courtroom.)

IV-3

THE COURT:  Okay.  Good morning and welcome back. We're ready to proceed.

You may call your next witness.

MR. BARRY:  The Government calls as its next witness U.S. State Department employee, Catherine Hamilton.

THE CLERK:  Please raise your right hand.

CATHERINE HAMILTON - PLAINTIFF'S WITNESS - SWORN

THE CLERK:  Thank you.  Please take the stand. Please state your first and last name, and spell each for the record.

THE WITNESS:  Catherine Hamilton. C-A-T-H-E-R-I-N-E, Hamilton, H-A-M-I-L-T-O-N.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. BARRY:

Q    Good morning.

A    Morning.

Q    Where do you work, Ms. Hamilton?

A    I work for the Department of State.

Q    What do you do there?

A    I am the Director of Licensing.

Q    Do you work in a specific department or division or office of the Department of State?

A    Yes.  Within the State Department, there's the Political/Military Bureau.  And underneath of that is the

IV-4

Directorate of Defense Trade Controls.

Q    Okay.  Is the Directorate of Defense Trade Controls sometimes called DDTC?

A    Yes, that's correct.

Q    So if I refer to it as DDTC moving forward, you understand that's what I'm talking about?

A    Yes.

Q    Okay.  I know there's a lot of acronyms in the Government.

    What does DDTC or the Directorate of Defense Trade Controls do at the State Department?

A    The Directorate of Defense Trade Controls' mission is to ensure that commercial exports both provide a foreign policy and national security that it's advancing both of those.

Q    So, DDTC deals with commercial exports?

A    Yes.  That's correct.

Q    Does it deal with exports of everything or specific types of material or information?

A    No.  It's very discreet in terms of defense related items.

Q    You said your title within DDTC is the Director of Licensing?

A    Yes.  That's correct.

Q    What do you do as the Director of Licensing?

IV-5

A    I lead a $200 billion enterprise that's charged with keeping regulated community, both internationally and domestic, abreast of the regulations.  I manage the day-to-day operations of my team.

Q    Are there specific regulations that, kind of, provide the bounds or guidance on how DDTC executes its mission?

A    Yes.  The International Traffic and Arms Regulation sets the policies.  It also defines what articles are subject to the control of the ITAR, as they are called, as well as that criminal and civil penalties.

Q    So you said ITAR.  Is that another one of those acronyms?

A    It is.

Q    And what's that stand for?

A    International Traffic and Arms Regulations.

Q    So those are some sort of Government regulations that controls these defense articles that your office is in part responsible for regulating?

A    That is correct.

Q    And is there a law that kind of creates that structure for those regulations?

A    Yes.  The Arms Export Control Act of 1976 is where the -- is the -- what sets the implementing regulations.

Q    And is that sometimes called the AECA?

A    Yes, that's correct.

IV-6

Q    Okay.  So the AECA is the law.  Is that right?  And then the ITAR is the regulations?

A    Is the implementing set of regulations.

Q    And then the DDTC, that's your office?

A    That is correct?

Q    How long have you worked at the State Department?

A    I have been there for 18 years.

Q    What have you done there?

A    I was a junior analyst when I onboarded.  I was a senior analyst, then I was the division chief of one of the teams.  And then for the last seven-and-a-half years, I've been the director.

Q    During your time there, what portion of that did you spend working with the International Traffic in Arms Regulations and the licensing process related to those?

A    The entire 18 years.

Q    Can you give some examples of the types of defense articles or services or other things that your office helps regulate?

A    The regulations set forth the -- what's called the U.S. munitions list.  And in that list, it's a wide range of defense related material to include anything ranging from firearms to submarine technology, including technical data.

Q    What is technical data?

A    Information that is related to the design, operation,

IV-7

maintenance, repair, testing of a defense article or related service.

Q    So you said firearms to submarines, it's sort of the entire gamut of things that your office helps regulate.

In the submarine context, can you give just a hypothetical example of the type of technical data related to a submarine that your office might regulate?

A    For submarine technology or --

Q    Yeah.  For submarine --

A    -- for category 20?

Q    For submarine technology.

A    Anything related to the platform itself.  So the vessel itself to any of the weapon systems that may be included on that platform, and then parts and components that are specially designed for those various parts and components of that vessel.

Q    Based on your experience, how would you characterize your familiarity with the International Traffic in Arms Regulations?

A    I'm considered an expert in that regard.

Q    And you've worked in licensing related to that regulatory structure for at least two decades, it sounds?

A    Yes, almost two decades.

Q    Do you ever speak at conferences or lecture about this topic?

IV-8

A    Yes, very frequently.  I lead, participate, run those conferences to the regulated community, both domestic and international.

Q    You sometimes speak to industry who's involved, like defense contractors who might be subject to this regulatory structure?

A    Anybody that's in the regulated community.  And that could include defense contractors, but also U.S. persons that may not be related to a defense contractor.

Q    Do you ever train people on these topics?

A    Frequently.  I train -- not only do I train our new officers coming in and have established our own training program, but I do that for the regulated community both domestic and abroad.

Q    And you said -- I'm not sure if you testified about how big is your team in the office of licensing?

A    We're authorized 60 people.  That includes contractors, military detailees from the Pentagon, as well as our civil service cadre.

Q    And you're kind of at the top of that 60-person --

A    I am at the top.

Q    -- organization?  Okay.

     You testified earlier that there's something called the U.S. munitions list?

A    That is correct.

IV-9

Q    What is that?

A    It's the defense articles.  It sets the defense articles including technical data and defense services that the International Traffic in Arms regulates.

Q    Is that list publicly accessible?

A    Yes, it is.

Q    So could someone go online and look up what categories are in -- on the U.S. munitions list?

A    Yes.  They can go to our website, they can do a normal search to find out anything that's included in the International Traffic in Arms Regulations.  And if there's discrete questions, if they're -- we don't engage in hypotheticals, but if there are routine questions, we have a response team, which is a hotline that we offer to the regulated community to the extent that they have questions.

Q    So it sounds like it's not as if there's some secret list of what's regulated.  It's all publicly available?

A    It's publicly available.

Q    And is the list -- how is the list organized, the U.S. munitions list?

A    So it's order by U.S. -- the category starts with firearms, it ends with the submarine technology and then any other weapons of war in between.  So it starts off in each category with major systems, and then it leads into the various mission systems or sub-assemblies that are attached

IV-10

to that platform.  And then all categories have a catch-all category for parts and components that are specially designed for any of those defense articles.

Q     You mentioned firearms, and you've mentioned submarines.  Are there also categories dealing with armaments like grenade launchers and mortars?

A     Yes, missile technology.

Q     Are there also categories dealing with aircraft like fighter jets and attack helicopters?

A     Yes.  That's correct.

Q     And are there also categories dealing with surface vessels of war?

A     Yes.  That's correct.

Q     Why does the United States regulate the export of these defense articles and the technical data related to them?

          MR. JONES:  Objection, relevance.

          THE COURT:  Overruled.

          THE WITNESS:  Export controls are key enablers. They set the framework for protecting our national security while advancing our foreign policy and also making sure that we remain competitive from an economic standpoint.

BY MR. BARRY:

Q     Does your office regularly work with the Department of Defense to determine what should be on the U.S. munitions list?

IV-11

A    Yes.  That's correct.  The regulations are often updated for those technology advances.

Q    Why?  Why do you work with the Department of Defense?

A    For national security reasons.  They perform our technical review.

Q    You mentioned that part of the reason why the U.S. Government regulates the export of these types of materials and information is to maintain some sort of advantage?

A    Yes, that's correct.

Q    Can you elaborate on that, please?

A    It's really important that, not only our warfighter be armed with the appropriate weapons, but that the folks that are operating beside us in theatre, our allies and partners also have that same equipment for interoperability.

Q    What do you mean when you say, "warfighter?"  What are you talking about?

A    The warfighter is our soldier.

Q    So our soldier, our sailor, our marine?

A    That is correct.

Q    I want to talk a little bit about the actual licensing process, okay.

    How does someone apply for a license or authorization from DDTC if they want to export a defense article or technical data related to a defense article outside of the United States?

IV-12

A    There is, first, a prerequisite that all exporters or manufacturers are required to register with the department. And once they have that registration, they are able to submit electronically a license application to our office.

Q    Can someone register online?

A    Yes.

Q    So I can just go to the DDTC website and register?

A    That is correct.

Q    Once someone registers and they submit an application or a request for a license, what happens next?

A    It's routed to my team for final adjudication, and that is based on what type of export authorization or temporary import authorization that that might be.  So there's a different form for different uses.

Q    When your office is reviewing that application or request for a license, what types of factors do you consider?

A    So taking for example a permanent export, all licenses are going to come in and we're going to perform a case-by-case review, looking at that license type and then the supporting documentation that might be required with that.

So, for example, on a permanent export we would look at the end use, the end user, the specific platform or USML category that's involved, and then the ultimate destination.

IV-13

Q    You're using the phrase, "permanent export."  What's that mean?

A    A permanent export is something that is permanent in nature to include technical data.  It's not something that you can retrieve on the back end.  We do offer a temporary export, something that's going to go out and then come back in, for example, for a trade show or demonstration.  But most of our licenses are permanent exports, so ultimately going to an end user.

Q    You testified earlier that the ITAR also regulates technical data related to defense articles?

A    That is correct.

Q    And remind me, what does technical data mean in this context?

A    This is information that is for the design, operation, the maintenance, the repair, testing of a defense article.

Q    Is there any other -- is there kind of like a more colloquial way to describe what technical data is?

A    Yeah.  It's information that you would not give to a competitor by and large, and this could come in the form of blueprints, it could be schematics, it could be photographs, for example.

Q    Is it fair to say it's sort of like the special sauce of a defense article?

A    It is, in fact, a secret sauce.

IV-14

Q    At some point, was DDTC asked to determine whether some technical and operational manuals from the U.S. Navy were controlled by the ITAR and required a license to go to China?

A    Yes.

Q    I'd like to pull up what's been exhibit -- and if we could just publish this for the jury please.  What's been marked as Exhibit 206.  Can you see that on the screen?

A    Yes.

MR. BARRY:  No?

THE COURT:  No?

MR. JONES:  Got it.

THE COURT:  Okay.  Thank you.

BY MR. BARRY:

Q    Was this one of the manuals that your office was asked to review?

A    Yes.

Q    And this is a boiler water, feed water, test and treatment manual for an amphibious assault ship?

A    Yes.  That's correct.

Q    Does Exhibit 206 contain technical data subject to the ITAR and Export Control?

A    Yes, it does.

Q    Where on the U.S. munitions list was this technical data located?

IV-15

A     USML category six, specifically related to a warship.

Q     And do you actually have -- I think I saw you take a note up there with you?

A     I took a note just of the manual titles.

Q     Okay.  So you said that Exhibit 206, the boiler water, feed water, test and treatment manual is in category six of the U.S. munitions list?

A     Yes, that's correct.

Q     And the U.S. munitions list covers -- is the title of category six, "Surface vessels of war and special naval equipment?"

A     Yes, that's correct.

Q     And is one of the sub-categories titled "Warships and other combatant vessels"?

A     Yes, that's correct.

Q     And then does it list series of warships and other combatant vessels?

A     Yes.

Q     Is one of the types of ships listed the amphibious assault ship?

A     Yes, that's correct.

Q     In June 2022, was a license required for the boiler water manual in Exhibit 206 to be exported to China?

A     Yes, it was.

          MR. BARRY:  And I'll just note for the record that

IV-16

as Agent Wetterer testified, Count 4 in the indictment relates to Exhibit 206.

BY MR. BARRY:

Q    In the course of its review, did your office search for the boiler water manual on the internet?

A    Yes.

Q    Was it able to locate it?

A    No.

Q    Let's go to -- all right.  If we could just publish, for the jury, Exhibit 212, please.

Do you recognize this document, Ms.  Hamilton?

A    Yes.

Q    Is this another one of the manuals that your office was asked to determine whether a license was required to export it to China?

A    Yes, it was.

Q    And this is the propulsion operating guide for LHD-2 USS Essex?

A    Yes, that's correct.

Q    Does the propulsion operating guide for LHD-2 USS Essex contain technical data subject to the ITAR and Export Control?

A    Yes, it does.

Q    Where on the U.S. munitions list was this item located?

A    USML Category six.

IV-17

Q    That's the same category for surface vessels of war --

A    That is correct.

Q    -- that we talked about for the prior exhibit or document?

In August 2022, was a license required for the propulsion operating guide to be exported to China?

A    Yes, it was.

MR. BARRY:  And I note for the record that the propulsion operating guide, Exhibit 212 is Count 5 in the indictment.

THE COURT:  So noted.

BY MR. BARRY:

Q    Did DDTC search the internet for the propulsion operating guide for the Essex?

A    Yes.

Q    Was it able to locate it?

A    No.

Q    Let's go to Exhibit 201, please.  And if we could just publish that for the jury and the witness.

Is this another one of the documents that the State Department was asked to review?

A    That is correct.

Q    And this is the weapons -- the weapon control systems manual for the USS Essex LHD-2?

A    Yes, it is.

IV-18

Q    Does the weapon control system manual, Exhibit 201, contain technical data subject to the ITAR, and is it export-controlled?

A    Yes, it is.

Q    Where on the U.S. munitions list was this data located?

A    USML category six.

Q    And that's the category we've already talked about?

A    That is correct.

Q    Is there also a sub-category in USML -- section -- Category 6 related to shipborne active protection systems?

A    Yes, there is, category F7.

Q    Is that defined as defensive systems that actively detect and track incoming threats and launch a ballistic, explosive energy or electromagnetic countermeasure to neutralize the threat prior to contact with the vessel?

A    Yes, that's correct.

Q    Was the weapon control system manual also regulated by the ITAR because it fit into that other subcategory in six?

A    Yes, that's correct.

Q    In October 2022, was a license required for the technical data contained in the weapons control system manual, Exhibit 201, to be exported to China?

A    Yes, it was.

Q    Did DDTC search for the weapons control system manual on the internet?

IV-19

A    Yes.

Q    Was it able to locate it?

A    No.

Q    And note for the record that Count six in the indictment relates to the weapons control systems manual, Exhibit 201.

THE COURT:  So noted.

BY MR. BARRY:

Q    We talked about three manuals.  Did the State Department, in the course of its assistance in this investigation, also review other manuals?

A    Yes.

Q    Did it conclude that some of those other manuals were also subject to the U.S. -- were on the U.S. munitions list?

A    Yes.

Q    Was it able to locate any of those other manuals on the internet?

A    No.

Q    Let's just say some of those manuals were located on the internet -- not the three that we're talking about, but other manuals, okay?  If they were located on the internet, does that mean they're not subject to the U.S. munitions list?

A    Potentially.  There is a category, a public domain, which is freely -- material information that would be freely

IV-20

disseminated.  It's considered a public domain.

Q    Is the site's public domain specifically defined in the ITAR?

A    Yes, it is.

Q    Does it mean anything that's on anywhere on the internet is no longer subject to the U.S. munitions list?

A    No.

Q    So it's more specific than that?

A    It's specific.

Q    Okay.  Can you -- do you have any examples from your work about the types of items that, even though they might be on the internet, are still considered subject to the U.S. munitions list and still subject to export controls?

A    Technical data are subject to the controls, where public domain information is the product brochures, as an example, that you would find at a trade show.

Q    Okay.  So product brochures, that's something that wouldn't be subject to --

A    That is correct.

Q    -- to the regulatory structure?

What if somebody, for example, posted online the blueprints for how to build an untraceable firearm?  Because that's posted on the internet, is it no longer subject to the ITAR, and is it no longer on the U.S. munitions list?

A    No, that's not correct.  To the extent that it was

IV-21

posted, it may not have been lawful posting of that information.  It still remains technical data.

Q    And if it still remains technical data, that means it still would be subject to the regulatory structure we've been talking about?

A    That is correct.

Q    Which could include the requirement for an export license, depending on where it's going and what's it's going to be used for?

A    Yes.

Q    You testified earlier that one of the things your office considers when it's deciding whether they're going to license is where the defense article or technical data is going, correct?

A    That is correct.

Q    I want to talk about China for a minute.

When you're reviewing applications to export defense articles or technical data related to defense articles, if the application is to send that information to China, is China treated somewhat differently than some other country like Canada?

A    Yes, it is.  It is considered prescribed destination.

Q    What does that mean, "prescribed destination"?

A    The regulations prohibit certain exports to certain countries.

IV-22

Q    So if a country is a prescribed destination, generally, exports there are prohibited?

A    It's a strong presumption of denial.

Q    Okay.  How long has China been a prescribed destination?

A    Since 1989.

Q    Is this prescribed destination characterization essentially an arms embargo?

A    That is correct.

Q    So if the Defendant had applied for a license to the State Department to exploit the three documents that I showed you, and he applied to export those to China, would the State Department have given him one?

A    No, we would have denied the license.

Q    Because China is a prescribed destination, right?

A    That's correct.

Q    And it has been since 1989, correct?

A    That is correct.

Q    Did you also check DDTC records to determine whether the Defendant had a license to export these three manuals to China?

A    I did.

Q    What did you find?

A    No records.

Q    So he didn't have a license?

IV-23

A    He did not.

Q    Did the Defendant have a license to export the boiler water manual to China?

A    No, he did not.

Q    Did the Defendant have a license to export the propulsion operating guide to China?

A    He did not.

Q    Did the Defendant have a license to export the weapons control system manual to China?

A    He did not.

MR. BARRY:  No further questions.

THE COURT:  Thank you.

Cross?

MR. JONES:  Yes.

Permission to approach.  I just want to check on if there's an exhibit here that I might use.

THE COURT:  You may.

MR. JONES:  And this is Exhibit -- it's A.  I'm just going to set it upside down on this table.

THE COURT:  Thank you.

MR. BARRY:  Do you have a copy for us?

MR. JONES:  I don't --

MR. BARRY:  We'd like to look at it, please.

THE COURT:  Defense A is not yet in evidence.

MR. JONES:  Understood.

IV-24

Your Honor, at this time, I'd offered A into evidence.  I apologize.  I thought we had addressed that yesterday.

THE COURT:  Any objection?

MR. JONES:  To be clear, I would not be publishing to the jury.  And I think we'd discussed some limitations or instructions on it.

THE COURT:  You'll have to lay a foundation.

MR. BARRY:  We would object to this being entered into evidence, especially through this witness, since this is not her work.  We would not object to her being shown or asked about it.

THE COURT:  Okay.  You can show it or ask about it, and we'll defer admission.

MR. JONES:  Understood.

CROSS EXAMINATION

BY MR. JONES:

Q    All right.  Good morning, Doctor Hamilton.

A    Good morning.

Q    Is that your appropriate title?

A    Yes.

Q    All right.  During direct exam, you were discussing the licensing process or the process to obtain an export license.  Do you recall that?

A    The license review, yes.

IV-25

Q    And can a whole entity, like a company, apply for a license to export materials?

A    A company is one that could register and export, yes.

Q    Once that company is registered, does every individual within the company that might be sending things, do they also need to get registered?

A    No.  There's an empowered official that represents the company.

Q    And is the actual export activity restricted to that official, or can they deputize people in the company?

A    No.  Anybody can export within that company.  It's -- the authorization is for the company or for the individual that is recognized as part of the registration.

Q    Are there any safeguards that are against secondary export?  Basically an authorized entity gets the license, exports something -- but does DDTC police whether that document then gets exported to a third user?

A    The International Traffic in Arms regulations covers the extraterritoriality of the export.  So as an example, if something is exported, and then subsequently needs to have additional parties, or a different end user, that requires State Department authorization as well.

Q    Does the DDTC require for that initial exporter to demonstrate that they have safeguards or restrictions in place to avoid a secondary export?

IV-26

A    Yes.  It's incumbent upon the company to exercise due diligence in making sure that the appropriate folks have access to the technical data, the defense articles for purposes of export.

Q    But they don't have to show that they maintain an ongoing relationship for a period of time with the recipient to govern its use or restrict subsequent export, right?

A    They could.  The regulations requires that to be produced to the government anytime that we ask for it.

Q    Ask for what to be produced?

A    Any other documents related to that transaction, any of the ongoing transactions related to that document or that export.

Q    And who's required to give proof of that?  The applying or registered party or the receiving party?

A    Both.

Q    And so the receiving party is to say that they, what, still have what they received in their possession -- or what are they proving?

A    They are proving anything that we're asking for.  So documents -- if we ask for a visit to put eyes on that particular document or that defense article, they are expected to comply with that request.

Q    When the exporting party applies for a license, do they have to specify who they're exporting to?

IV-27

A    Yes.  All parties to the transaction must be identified at the time of submission.

Q    And does the receiving party have to sign anything, as part of the application process?

A    They could, depending on the type of equipment or the type of information that are in use, assurances that are required as part of that export license.

Q    But that's sometimes, though?

A    For significant military equipment and any other time that we ask for that information, yes.

Q    What would be a piece of significant military equipment?

A    Anything in Category 6A, as an example, or F7 as an example.

Q    When you say, "military equipment," that, to me, suggests like a Hummer or a helicopter -- could it also be a document?

A    It could be.  A defense article includes technical data.

Q    Does the DDTC have any role in policing the inappropriate exports, or do they set the policy?

A    We do within the confines of the Arms Export Control Act.  We have end-use monitoring, where we work with our embassies abroad to make sure that we have access to that equipment to the extent that we need access.

IV-28

Q    If there were a website hosting restricted materials, stuff that might be in category six, does the DDTC take any action -- or are you aware of the DDTC taking action to shut down websites like that?

A    Yes, we have.

Q    I'd like for you to turn to Exhibit A, if you can.

A    Could you first show me?

Q    I don't know if I actually need that, but you can keep it as a reference.

    Are you familiar with the website Brainscape?

A    No, I'm not.

Q    How about Gov Tribe?

A    No, I'm not.

Q    Navy Tribe?

A    No.

Q    CourseHero?

A    No.

Q    Quizlet?

A    No, I'm not.

Q    Are you familiar with any United States universities hosting export-controlled documents that are available for free download?

A    Universities do have information subject to public domain that's been authorized by the U.S. Government for releasing to the public domain, yes.

IV-29

Q    Are you aware of universities hosting export-controlled material that does not qualify as being in the public domain?

A    No, I'm not.

Q    If you were to come across a university website that was hosting export-controlled, non-public domain documents, would the DDTC potentially take action against?

A    Yes.  We would send a directed disclosure to the university.

Q    Okay.  How about social media websites like Facebook or Reddit?

A    We have a team of compliance officers that will engage in the directed disclosure to the extent that they need to.

Q    You mentioned on direct exam that the DDTC attempted to locate the three documents that Attorney Barry discussed with you and couldn't find them on the internet, right? Were you personally involved in the search efforts?

A    No.  The RF policy handles that review.

Q    Were you connected to that effort directly?

A    No, not in the beginning, no.

Q    Do you know who that team -- I'm sorry.  Do you -- do you know how that team went about searching the internet?

A    I don't know how they conduct their analysis.  They determined that this information was not widely available on the internet.

IV-30

Q    Did they explain to you what was included in their search efforts?

A    They're not required to explain that to me, no.

Q    So maybe they're not required, but did they?

A    No.

Q    So to your knowledge, you -- sitting here today, you have no idea what they did to search for those records?

A    I have confidence in the analysis that they provided.

Q    Would you have confidence in the FBI's ability to search for similar records?

A    Yes.

Q    Would you be surprised if the FBI's search was limited to just Google?

A    No.

Q    Do you know if your team's search was more intensive than just Googling?

A    I have no idea.

MR. JONES:  No further questions.

THE COURT:  Thank you.

Any redirect?

MR. BARRY:  Just one or two quick questions, your Honor.

REDIRECT EXAMINATION

BY MR. BARRY:

Q    MR. Jones asked you in the beginning about the

IV-31

safeguards that a license applicant might be required to put in place if they're requesting a license.  You remember that?

A    Yes.

Q    What happens if someone who applies like a defense contract, or to DDTC applies to export defense articles or technical data and they get a license for specific use to a specific place for specific time frame, and then it turns out they have inadequate safeguards, or no safeguards at all, what happen -- what could happen to such a defense contractor like Northrop or General Dynamics?

A    It varies.  Our compliance team will look at systemic behavior within the company.  To the extent that there are systemic issues, we'll engage in what's referred to as a consent agreement where we'll go after them civilly.

Q    So going after them civilly, that means they might have to pay some money?

A    That is correct, per violation.

Q    Could their license for future exports be revoked?

A    Absolutely.

Q    Could you -- your office end up making a referral to the Department of Justice if you believe there might have been criminal conduct?

A    Yes, that's correct.

Q    Okay.  I just want to -- I want to clarify something

IV-32

from your earlier testimony.  I'd like, may I approach, your Honor?

THE COURT:  You may.

BY MR. BARRY:

Q    I'd like to show you what's been pre-marked as Government's Exhibit 54.  I'm not going to enter this into evidence.

I'd like you to look at what's been pre-marked as Government's Exhibit 54, Ms.  Hamilton.  Do you recognize that document?

A    I do.

MR. JONES:  Your Honor, I'd object.  This is outside the scope of cross.

THE COURT:  Overruled.

BY MR. BARRY:

Q    Is that -- you testified earlier when MR. Jones was asking you that you had confidence in your team's analysis as to whether or not something had been publicly found on the internet.  Is that correct?

A    That is correct.

Q    And is that document, Exhibit 54 that I've shown you, part of your team's analysis related to some of the manuals that were reviewed in this case?

A    That is correct.

Q    And I want to correct something.  I think you said, or

IV-33

you testified, when I was asking you questions on direct examination, that you believe that none of the manuals that the State Department reviewed related to this case were found online.  Do you remember that?

A    Yes.

Q    I want you to just turn to that tabbed page there.  I think it's the second page.  Upon reviewing that, does that reflect -- refresh your recollection that there were, in fact, some manuals that your team was able to locate online?

A    Yes, document 35, and they searched various websites.

Q    Okay.  But your testimony stands that for the three specific manuals that we looked at, the boiler water manual, the propulsion operating guide and the weapon control system manual, that no one on your team was able to locate any of those in any kind of public internet forum, correct?

A    That's correct.

MR. BARRY:  No further questions.

THE COURT:  Anything further?

MR. JONES:  I just want to check the exhibit.

THE COURT:  You may.

MR. JONES:  Can I approach?

THE COURT:  Sure.

MR. JONES:  Your Honor, may I approach the witness?

THE COURT:  You may.

IV-34

BY MR. JONES:

Q    So when I was up here a minute ago, I asked if you knew what your team -- what websites they had looked at, and you said you had no idea, right?

A    I was not part of their analysis, no.  It's a separate office.

Q    Okay.  Did you subsequently determine that some of the documents that had been discussed that were subject to export control had been found on various websites?

A    It appears from their analysis that some websites were checked, yes.

Q    And one of those is CourseHero.com?

A    Yes.

Q    And I believe on one of those, it notes that there's a paywall, right, that indicate that CourseHero.com is profiting from hosting these export control documents?

A    Yes.

Q    And has the DDTC taken any effort to shut down CourseHero for profiting from the hosting of restricted documents?

A    I don't know.

        MR. JONES:  No further questions.

        THE COURT:  Anything further?

        MR. BARRY:  No redirect.  The witness can be excused.

IV-35

THE COURT:  All right.  Thank you.  You may call your next witness.

MR. BARRY:  The Government calls as its next witness former U.S.  Navy Commander, Daniel Caldwell.

THE CLERK:  Please raise your right hand.

DANIEL CALDWELL - PLAINTIFF'S WITNESS - SWORN

THE CLERK:  Please state your first and last name, and spell each for the record.

THE WITNESS:  Daniel Caldwell, that's D-A-N-I-E-L, C-A-L-D-W-E-L-L.

DIRECT EXAMINATION

BY MR. BARRY:

Q    Good morning.

A    Good morning.

Q    Where do you work, Mr. Caldwell?

A    United States Naval War College in Newport, Rhode Island.

Q    What do you do there?

A    I'm a senior researcher for the China Maritime Studies Institute.

Q    What's that?

A    So that's an institute that was built by the War College approximately 20 years ago.  You can think of us as sort of the in-house United States Navy think tank on all things China in the maritime domain.  So we cover things

IV-36

like the Chinese navy, coast guard, maritime militia, scientific research claims, you know, that the Chinese make in the South China Sea and the oceans, you know.  So anything that deals with China in the maritime space, we will look at.

Q    How long have you been working there?

A    I've been with the Institute about seven years.

Q    What did you do before that?

A    So I was a career naval officer, surface warfare officer in the Navy.  I spent 28 years active duty.  Part of that was actually at the Naval War College.  I've been a military professor at the War College.  And then starting in 2018, I joined the China Maritime Studies Institute, and I was their director for about three years until I retired.

Q    So you used to be the director of the China Maritime Studies Institute?

A    That's correct.

Q    And now, you're a researcher?

A    That is correct.

Q    Let's talk about your Navy career for a minute.
    You said you served 28 years?

A    I did.

Q    What rank did you retire at?

A    The Commander, oh five.

Q    And when you say, "oh five," what is -- for folks who

IV-37

are not familiar with the rank system in the navy --

A    I want to say --

Q    Let me finish the question real quick.

A    Yeah.  That's a --

Q    MR. Caldwell --

A    Sorry.

THE COURT:  He wants to talk first.

MR. BARRY:  I know.

BY MR. BARRY:

Q    What does an oh five in the United States Navy mean?

A    So it depends on the job, right?  But you're essentially a middle to senior-ish officer as a career so, the executive officer, commander of a ship, that kind of thing.  So you've got relatively significant responsibility within the organization.

Q    And then after oh five is oh six?

A    It's oh six, correct, captain.

Q    A captain.  And then what comes after that?

A    Admiral.

Q    And I know Navy special has its special terms.

A    Right.

Q    When you compare that to the other services, like the Marine Corps, the Air Force, the Army, what does an oh five mean?

A    The lieutenant Cclonel in the other services.

IV-38

Q    And then an oh six, captain in the Navy is a what?

A    Would be a full colonel.

Q    Okay.  And then a --

A    And then a brigadier general or a rear admiral, lower half, of the Navy.  We're kind of unique.

Q    You said that you were service warfare officer in the Navy?

A    That's correct.

Q    What does that mean?

A    So in the United States Navy, you've got different -- there's different communities.  So you've got a submarine community, submarines.  You've got aviators, obviously, fly airplanes.  They have a special warfare which is where our SEAL teams are.  Surface warfare deals with our surface ships.  So you will learn to operate them, maintain them, you -- during your career path reach to become a captain of a ship, and then eventually at a flag officer level, as an admiral, you might command a number of those ships in a task force.

Q    What were your assignments in the Navy?

A    So on -- at sea, I was predominantly what's called an operations officer.  I had multiple tours as operations officer.  Essentially, that's a department on the ships that deals with the coordination of activities across not only the warship, but also other ships as well.  I was working

IV-39

within a task force.  Had responsibilities around communications departments, intelligence, electronic warfare, deck division, which is essentially our seamanship, running in small boats, that kind of thing.

When I wasn't on ships, I had a career as a Navy planner, so a strategic and operational planner at a number of different naval and joint staffs.  So I worked at Pacific Fleet.  I worked at what that time was CINCPAC, so Commander-in-Chief Pacific Fleet, which is now INDOPACOM, a major command out in the Western Pacific, located in Hawaii, the Joint Staff, which is the major -- it's the top military staff, and then out in Africa at Commander, Joint Task Force, Horn of Africa, as a planner.  So a lot of that time was dedicated to working in the Western Pacific.

Q    Can you just kind of give us a broad overview and chronology of your assignments from when you were commissioned to when you retired?

A    Sure.  So I was commissioned.  I was an NROTC, a Naval Reserve Officers Training Command candidate midshipman, basically -- that's at a regular college.  I was commissioned after a program at the College of the Holy Cross, Worcester, Massachusetts, in 1993.  From there, I went to Hawaii, and I worked at Submarine Force, Pacific Fleet as a staff officer there.  Then I went, after that, to CINCPAC and did a tour there as what we call the emergency

IV-40

operations officer, essentially working with nuclear strike planning. And then I started my career as a surface warfare officer. So a number of schools, while located -- happened to be at the Newport Naval Station, and then a succession of ships.

Q    So I think you used the phrase "CINPAC (sic)"?

A    CINCPAC. CINCPAC. Commander-in-Chief Pacific.

Q    What's that stand for?

A    So that was -- CINCPAC was the original command out in Hawaii that's now called Indo-Pacific Command, but that is a four-star theater headquarters, so they are responsible for the military breaks up theater responsibilities, or global responsibilities, In the theaters, INDOPACOM, then CINCPAC was responsible for planning and operations in the Pacific area.

Q    And you also testified that you served on a couple different ships while you were active-duty Navy?

A    Yeah.

Q    What were some of those ships?

A    USS Jarrett, which was a frigate. That was my first USS, Samuel B. Roberts, I was the ops boss on the on that ship. It was a -- another frigate. Both of those are decommissioned now. I was the operations officer on the USS Duluth, which was an amphibious assault ship, an LPD. I was an executive officer on the USS Pearl Harbor, which is a

IV-41

different class of amphibious ship.  And then I was, again, the operations officer on the USS Makin Island, which is an LHD.

Q    Were you retained as an expert in this case?

A    I was.

Q    Do you remember approximately when you were retained?

A    That was at least a year-and-a-half ago.  I believe we got a call from your office, because you got my name.  I had written a paper along with a colleague, Connor Kennedy, regarding the Chinese efforts to build their version of an LHD, LDA class vessel.  And that's where our conversation started.

MR. JONES:  Objection, non-responsive.

THE COURT:  Technically, yes.  So you can rephrase the question.

MR. BARRY:  Okay.

BY MR. BARRY:

Q    Do you know how we found you?

A    I'm assuming the Google search.  I'm assuming that.  I don't recall.

Q    Have you written on some of the topics that you're going to testify about today?

A    I have, but specifically the Chinese building of the type 075 with a co-author.

Q    And we're going to get in detail to what the type 075

IV-42

is, but can you just give the jury an overview right now of what that is?

A    Certainly.  That is a class of a very large amphibious vessel that the Chinese navy has built.  They have four of them.  Relatively recently, within the last, say, eight years or so, they've commissioned these ships.  We have similar types of ships, but this, for the Chinese navy, with sort of a new capability.  So that's why we were interested in it.

Q    I talked a minute ago about you being retained as an expert.  Are you charging the Government for your services?

A    I am not.  The only thing I'm getting was plane flight and hotel room.  Room and board, basically.  That's all.

Q    So I'm going to -- I'm going to ask you a lot.  We're going to talk a lot.  And first I'm going to go through your background a little bit more about the topics, and we're going to talk about the Essex, and we're going to talk about operational and technical manuals, and we're going to talk about the Chinese navy, and then we're going to talk about some of the consequences, in your opinion, that could happen from the --

A    Right.

Q    -- some of the allegations in this case.

You mentioned earlier that one of the ships you served on was a type of amphibious assault ship?

IV-43

A    That's correct.  I've served on three different types of amphibious ships.

Q    What does amphibious warfare mean?

A    Sure.  So that's the term that we use when you want to take forces from the sea to the shore.  So the idea of amphibious ships that were specifically built for that purpose actually stemmed from the Second World War as the British were the first ones to design those types of ships.  The U.S.  Navy has been building warships for a very long period of time.  So if you want to bring, whether your, you know, land forces, vehicles, personnel, to the shore from sea, that's the most efficient and effective way to do it.  And you can do that either with landing craft that those ships bring within themselves or by aircraft, which also are embarked on those classes of vessels.

Q    How long have you been studying amphibious warfare?

A    Like, in excess of 35 years.

Q    How do you study that style of warfare?

A    So there's a number of professional journals.  We have doctrine.  We have amphibious doctrine.  Obviously, what the military defines doctrine as it's a set of rules, essentially, of how you do a certain type of business so that you have rule sets of things to do and things not to do.  Those are basically produced in manuals that are evolved over time.  The Marine Corps has them.  The Navy has

IV-44

them.  All the services do have them.  And then, of course, extensive study in what other nations have done in their experiences, whether that's case studies in other amphibious operations, such as, like, the Falklands with the British in 1982 or our historical case studies, you know, going back many, many years, and then my personal experience of doing it, you know, many exercises, and then doing it in 2003 in Iraq.

Q    After your Navy career, you joined the China Maritime Studies Institute at the Naval War College?

A    Sort of.  My last three years as active duty, I was the director of CMSI, then I retired.  I came back about three months later, basically on contract with a company called Netsimco to fill that position as a senior researcher for that Institute.

Q    Do you have a specific area of research?

A    So my area of research is essentially mile surface warfare or naval warfare in general.  The folks I work with predominantly are civilian academics, the Mandarin speakers. The way CMSI works is we look at data mine, primary sourced materials, meaning materials that are published by the Chinese government or government entities, military, academic, sometimes industry journals dealing with the maritime space.  And then we'll conduct our analysis from those things.  So what are they saying?  What are they

IV-45

writing for their internal audiences?  And then we'll produce our analysis out of that.

My job as a former naval officer, a retired naval officer with that experience, is I'm kind of the one that synthesizes what the civilian researchers are seeing to what military planning staffs, military leadership would be interested in, and then so we can target our research that way.  So I kind of provide the bridge between those two worlds.

Q    So is it fair to say that in your current role and the role you've had for at least the last seven years, your focus has been the Chinese navy?

A    That's correct.  People's Liberation Army Navy.

Q    Sometimes called the PLAN?

A    The PLAN.

Q    How long have you been studying the People's Liberation Army Navy?

A    Well, my first, so my first experience with the PLAN goes back to the mid-90's, when I was at CINCPAC and was involved in the strait crisis back then, we sailed a couple of carrier battle groups through the Taiwan Strait as the Chinese were reacting to an election that was occurring in Taiwan.  So ever since then.

Q    Do you continue to consult on topics related to the Chinese Navy?

IV-46

A    I do.

Q    Can you give an example of the type of consultation work you continue to do?

A    Certainly.  We consult with fleet commanders, National Security Council, Secretary of Defense's Office, combatant commanders.  If there are entities within the national security establishment of the United States that are dealing with the PLAN, we'll be involved in advising and assisting them.

Q    This time, some of those organizations that you talked about -- I imagine some of those consultations are highly classified.

A    Many of them are.

Q    But you also write and speak on these topics in an unclassified form, right?

A    That's correct.

Q    And you mentioned one of the publications that you wrote on some of these topics?

A    That's right.  What we call a China Maritime Report.  It's one of the reports that we publish in the unclassified space.  We actually hang it on our website so people can access these things.  And we -- I co-authored a report about a specific type of amphibious vessel that the PLAN was building.

Q    Do you speak to others about these topics, either as a

IV-47

lecturer, a professor, or at conferences?

A    I do, quite often.

Q    You teach others at military institutions, including United States military institutions on these topics?

A    I do.

Q    Have you ever organized a seminar on -- let me finish the question.  I know it's exciting.

Have you ever organized a seminar on topics relating to the Chinese Navy and its capabilities?

A    We -- the institute -- our institute itself every two years has a major conference on different things regarding the PLAN.  This past May, we did one on personnel of the PLAN.  Two years before that, we did one on undersea warfare, and in 2021, we did one on Amphibious Warfare capabilities of the PLAN and the PLAN Marine Corps as well. That one, I specifically was the director for it.  So that was my particular interest item to organize that conference, and about 250, 300 people involved in that.

Q    Are you considered an export -- expert in amphibious warfare in the Chinese Navy?

A    Yes.

Q    So we're going to get into your opinions in this case, but before we do that, how would you describe the basis for your opinions in this case?

A    So I think it's both a mixture of personal, obviously,

IV-48

experience being an amphibious warfare officer, being through the amphibious warfare schools that we've gone through.  I know how we do this.  And then, of course, the analysis and the research that we've done specifically in the PLAN and about the PLAN and how they do their business over a number of decades.

Q    So it sounds like part of it's based on personal experience as a service warfare officer.

A    That is correct.

Q    And part of it's based on your academics work as a researcher and writer?

A    That is correct.

Q    Have you also had opportunity in the past to have direct interactions with members of the PLA Navy?

A    We have, actually.  So the Institute itself no longer but for many years, actually had contacts with the PLAN and we would host members of the PLAN from their Naval Academy at the War College and provide exchanges.  So there was some contact.  I wouldn't say it was close.

Q    During your expert work in this case, have you reviewed technical and operating manuals relating to United States amphibious assault ships?

A    I've reviewed the ones that were presented to me, yes.

Q    Okay.  I'd like to show you what's been admitted as Government's Exhibit 41, and it should pop up on that

IV-49

screen.  If it doesn't, there's a hard copy in front of you, and I want you to look at that left column.  Does this appear to be the titles of some of the manuals you reviewed?

A     It is.

Q     Were there other manuals in addition to these that you reviewed during your expert work?

A     There was a long list.

Q     And based on the titles of these types of manuals and some of the other ones you reviewed, how would you describe these types of technical manuals in terms of all the variety of operational technical manuals that exist in the U.S. Navy's repository related to its ships?

A     So these -- the manual I have in front of me here is for boiler water, feed water treatment.  These are our maintenance manuals, essentially.  In this particular one, how you operate pieces of equipment, how an operator would do maintenance on that equipment over time, observe it over time, make sure it won't fail, operate it properly within certain specifications that are laid out by Naval instruction.  So essentially, this is what our water standards and our sailors would go by as manuals to operate the equipment that they're dealing with.

Q     And I want to show you next what's been Government's Exhibit 24.  What's this?

A     It's a USS Essex.

IV-50

Q    And this is an amphibious assault ship?

A    That's correct.

Q    Can you generally describe just -- I know it's a little tiny picture on there, but --

A    That's okay.

Q    What's the size of this thing?  Like how long is it? How big is it?  What's the weight?

A    So she's a relatively large ship.  She's approximately about 40,000 tons.  I think she's about 108 feet wide, about 840 feet long.  These are akin to, say, a World War II-sized aircraft carrier, if people have seen old videos of those. So this is a large warship.  It's not as large as, say, a nuclear aircraft carrier, but it is a very large warship.

Q    So you said similar in size to a World War II aircraft carrier.  Would that be similar in size to, for example, the USS Midway that's a couple of miles south of here?

A    The Midway was a very large version of a World War II. She was actually designed at that time as kind of a super carrier on the World War II model.  So yes, these are a little bit different, but roughly.

Q    Okay.  How do Navies use ships like amphibious assault ships?

A    So specifically this class of ship, a landing helicopter dock, would be the centerpiece of something that we call an amphibious ready group.  So that's a teaming

IV-51

between the Navy and the Marine Corps.  You'll typically have three vessels, this being the largest one, and then two other smaller amphibious ships.  And embarked on this vessel specifically, you see that large flight deck will be the aviation component of the marine expeditionary unit which you're bringing.  So that's predominantly rotary wing aircraft that'll bring Marines to the shore.  You also have tilt rotor aircraft, what I'm referring to as the Osprey aircraft, the MV-22s up front.  And then fixed wing, there are a number of vertical takeoff and landing aircraft.  Now we use F-35s, the stealth fighter to do that.  Also within that ship, it's essentially hollow.  So we have what's called a Well Deck, which you can actually -- there's a stern ramp, you can drop the ramp, balance the ships down, water comes in, fills it up, you launch landing craft out of that, where you can put vehicles, personnel, that kind of thing on there, and then send that to the shore as well.  So it basically has those two functions, to bring Marines ashore from either air or on the surface using the landing craft.

Q    Is the type of ship that an Essex is also referred to as an LHD or a landing helicopter dock ship?

A    That is correct.

Q    And just generally speaking, how is an LHD -- and we talked -- it sounds like you talked about a little bit, but

IV-52

how does an LHD differ than like a frigate or a destroyer or guided missile cruiser?

A    So this ship is specifically designed to support the Marine Corps, to support large aviation component, specifically those, that rotary wing, like I said.  And then again, it's very unique to have that Well Deck be able to balance down and have landing craft that you can operate from the ship itself.  Other ships like frigates, destroyers, cruisers, those classes of ships don't have those types of capabilities because that's not their mission.  So they'll have other capabilities, but not that.

Q    Okay.  How long has the United States Navy and Marine Corps been operating ships like the Essex?

A    The aviation component ship, we had different classes of them going back to the early 70s.

Q    What about the Wasp-class?

A    The Wasp-class was originally designed in the eighties.

Q    And the Wasp-class is what the Essex is?

A    That is correct.  That is correct.  She's shipped two of the Wasp-class.

Q    How many Wasp-class ships does the United States Navy have?

A    We have seven.

Q    That's it?

A    We have seven Wasp-class ships.  We have two others

IV-53

that look a lot similar to this.  They're called the America class.  They basically have the same form, but interiorly, they don't have the well deck.  So they are specifically designed for aviation operations.  So all that space that's in say the Essex for landing craft and vehicles and that kind of thing are made up of machinery spaces to support the aviation component.  So you can do more aviation operations on those two ships.  We have another one, the USS Bougainville, which is being built now.  So we'll have -- but she's not in commission yet.  She'll be commissioned next year.

Q    Okay.

A    Or at least delivered next year.

Q    Let's talk a little bit about the actual building process for a ship like this.  Approximately how much does it cost the United States Government to build one of these Essex?

A    That's an excellent question because over time that fluctuates, because when you order a ship like this, obviously you're ordering it at a certain price point. Materials cost this much today, but in the six, seven years it may take to build a ship that can fluctuate, it always goes up.  It never goes down, right?  So anywhere between 3.3 to about $4 billion, looks like what we're spending now on the -- I would say on the Bougainville, which is our

IV-54

newest one.

Q    You said that it takes about six to seven years to build one of these things?

A    Yes, it does.

Q    And is the United States Navy still building this -- the Essex class ship?

A    Not the Wasp-class of which the Essex is one, but there's a follow on the USS Bougainville.  It's kind of a follow on class, very, very similar to this.

Q    Very similar.

A    Different propulsion plant, but essentially the same concept.

Q    So if there's a follow on class of a similar ship, does that mean that the United States Navy will just dry dock the seven LHDs that are currently in service and have seven new ships all at one moment?

A    No.  These ships will be with us for a very long period of time.  So average service length of a ship like this is approximately 30 years.  They can be extended.  You do something called a surface ship extension program, but where you bring a ship in and essentially renew its machinery and give it upgrades, but that's a pretty intrusive, expensive, and long process.  But 30 years is the typical length of a ship like this.  For an aircraft carrier, it might be 50 years.  So you replace them in time, but certainly not the

IV-55

whole class altogether.  It's a stepped process.

Q    So approximately how many more years do you think the United States Navy is going to be using LHDs?

A    For the foreseeable future, I don't have a date where we're not going to be using them.

Q    You mentioned something in your testimony about some of the newer ships having a different propulsion system?

A    Correct.

Q    Can you talk a little bit about that?

A    Certainly.  So a ship like this, the Essex has a steam plant, essentially boilers that create steam that provide power to the turbines to make the ship go through the water. Other ships and the newest class of ships have gas turbine engines.  You think of like a jet engine inside the ship that replaces the boiler system.  So it's a much more modernized, not necessarily as efficient, but more modernized system.  It has a lot more -- it's a lot more flexible, a lot more responsive for speed, maneuverability. So most of our ships now are gas turbine ships or diesel. We're getting away from the steam technology.

Q    Are the seven Essex class ships all steam propulsion?

A    The Wasp-class ships are all Wasp-class ships, six are. There's one, USS Makin Island, which was one of my former ships, which is actually the first model of LHD that had a gas turbine system for an engineering plant.

IV-56

Q    So six of the Wasp-class ships in service for the indefinite future are run on steam propulsion technology?

A    That is correct, and will remain so.  They will not be converted.

Q    How does the size of the United States Navy's LHD fleet compare to other Navy's fleets of similar classes of ships around the world?

A    So we have over LHDs -- we have the largest number of LHDs slash LHAs, the seven Wasp-class ships, the two America class ships.  The next largest group is the PLAN.  They've just commissioned their fourth LHA, and they're going to LHA, LHD, however they designate it, and they're going to have a follow-on ship shortly within the next, I would say, year-and-a-half of a new class of Amphibious assault ship.

Q    So currently, the U.S. Navy has the largest fleet of these types of ships in the world?

A    Of these types of ships, that is correct.

Q    How does the U.S. Navy use these types of ships?

A    It's a very flexible platform.  We use these things during what we would say phase zero day-to-day peacetime operations, things like humanitarian assistance, disaster relief, quite a bit.  We will use these for what we call NEOs, noncombatant emergency evacuations, so evacuating personnel, American civilians in places that security environment becomes pretty tenuous.  So we will go and

IV-57

extract our personnel.  These ships are critical for those kind of things.  We also use them in the course of exercises and training.  And then we've used them in real-world operations and amphibious strikes and raids and that kind of thing over the years.

Q    Can you give an example of the type of noncombatant mission that a ship like this has historically been involved in?

A    Certainly.  A number of years back, we had to evacuate American citizens from Lebanon.  These classes of ships were critical to doing that.

Q    From a U.S. military strategy perspective, do these ships play any sort of importance around the world during their deployments?

A    Yeah.  They're considered critical assets, both to show resolve, to hold other nations at risk at times, to project power, to provide deterrence.  They're actually in very, very high demand by what we call combat commanders.  I referenced CINCPAC and INDOPACOM before as a four-star military officer command.  So our most senior military leadership own those areas of responsibility, and amphibious forces are always in high demand by those individuals to conduct operations within their area of responsibilities.

Q    You testified that these ships are important for U.S. military force projection.  What does that mean?

IV-58

A    That's correct.  So ships like this can project power upon another nation's shore when required.  So you bring a ship like this, two other ships with it, and maybe other assets, and it's not just the ship.  It's what you're bringing with it, which is essentially a Marine infantry battalion plussed up with all its capabilities.  So that's a fairly significant military force that will arrive off an adversary's coast and could be anywhere moving at 20-plus knots at any particular time.  That's something to be concerned about if you're an opposing force.  So they provide a pretty good deterrent effect, and if deterrence fails, then they'll provide an operational effect.

Q    So let's talk about that in a military context.  You used the two phrases, "a deterrent effect" and "an operational effect."  What's the difference between those two concepts?

A    So deterrence is pretty simple.  You're going to try to keep someone or something, another force, from doing something you don't want them to do, and so this capability offshore is a way to show intent by policymakers in order to shape behavior.  And then, of course, if that does not work and you're called upon to conduct a mission, then you can conduct those missions depending on what your objectives are, military objectives, political objectives.

Q    Is it fair to sort of describe deterrence in this

IV-59

context as the old saying, "to carry a big stick"?

A    Yeah.  It's a pretty big stick.  It's 40,000 tons of stick.

Q    Okay.  Does the U.S.'s long operational history give it any kind of advantage vis-a-vis other countries in how it operates these ships?

A    I would say yes, of course.  I'm biased because I was part of that program for a long time.  But certainly a lot of the way we do our business is predicated on the lessons learned that we've learned over a very long period of time. So operating these ships -- operating ships in concert with one another and operating aircraft and coordinating that with the Marine forces is an extremely complex thing to do. Working all these people -- thousands of individuals working together to achieve an effect is very hard both with machinery and training of the personnel.  So it's something you have to do constantly and you have to continually build on that experience that you bring with you.

Q    How does the complexity of amphibious warfare stack up to other types of warfare?

A    It's been called the most complex.  Amphibious warfare operation, a large-scale Amphibious Warfare operation is considered the most complex military operation there really is.

Q    Why?

IV-60

A    Just because of so many moving parts.  So you need air superiority to conduct a proper amphibious assault.  You need the proper logistics to be able to support personnel and material when it gets ashore.  You need the proper command and control to coordinate all of those activities.  You need to be able to operate vessels in concert with one another.  You need to be able to get access to the place that you want to go to that maybe your adversary doesn't want you to have access to.  So you need to be doing -- conducting things like counter-mine operations or fire suppression.  So there are a million things that go into conducting a successful amphibious operation.  And then it's essentially a hard environment just to start with.  The sea is a difficult environment enough even when you're not trying to conduct any kind of operation.  Weather is a big deal, time, distance.

Q    How does the U.S. military stack up to other countries in terms of its reputation and capability in amphibious airfare?

A    I would say we're the gold standard, and other nations consider us the gold standard.

Q    Why?

A    Well, first of all, we bring the most capability, and then we bring the most professionalism.  So we've been doing this a very long period of time.  This is one of the core

IV-61

things that the Navy and Marine Corps certainly do.  This is a core mission area, and we work very, very hard to be very proficient at it.  And we have a long history of operational experience doing that, which many other nations do not.

Q    You said you bring capability, and "we bring professionalism."  It's "capability" like the thing -- the widget, the ship, the aircraft?  Is that what you mean?

A    Yeah.  So if I say, "capability," I mean material capability.  That means the widget, the machine, the airplane, and then there's obviously the operational proficiency.  Proficiency is the human element operating all those things in concert in order to get a positive effect.

Q    So when you use that phrase, "the human element," that means all the people, and what's in their heads, and what their experiences are on how to use that equipment that --

A    That is correct.  But we would consider that actually more important than the material aspect.

Q    Why?

A    You can have the best equipment in the world.  If you don't know how to operate, it's not going to do you much good.

Q    How does the U.S. military ensure that it remains the gold standard in amphibious warfare?

A    Training and education.  So we train very hard with this.  We have schools that, you know, sailors have to go

IV-62

through, Marines have to go through to become proficient. And then we exercise those quite a bit. You don't just show up on the ship and then deploy, right? So there's a long training package that goes with the individual ships and then bringing everyone together and the individual Marines. It's considered a building-block approach, you know, crawl, walk, run, and it takes quite a bit of time.

So workups for deployment could take over a year to bring all those assets together until you're considered certified to operate in conjunction with other ships as an amphibious task force.

Q    Does that concept of sort of "crawl, walk, run," apply to all the different components or departments of a ship like this? So the flight deck, the engineering, the Marine expeditionary unit -- each of those has its own sort of silo?

A    Certainly does.

Q    Okay. Is one of those areas something called damage control?

A    That's correct.

Q    What does that mean?

A    So damage controls is a function on a ship, on a warship that, you know, the crew has to be their own firefighting teams. They have to be their own flooding -- counter flooding teams. There's no one else to call. So if

IV-63

you have damage on the ship, no matter how that occurs, you need to be able to successfully combat that casualty.  And so that is both material and very important.

We have damage control equipment that we have to have on board.  You have to know how to operate that.  You have to know how to train your personnel in a lot of different functions to properly do damage control.  And we've seen what happens when you don't do damage control very well.  That's one of the things the United States Navy prides itself on is effective damage control, which I think we've proven in the world a number of times.

Q    So talk about that.  Talk about some real-life examples where, in your opinion, the U.S. military has shown that its training and capability in damage control is perhaps better than other countries or navy's --

A    Certainly.

Q    -- abilities.

A    So we've had -- going back, years, you know, we had incidents -- the USS Cole, you know, that was damaged by an explosive boom, obviously in a harbor in Yemen.  That ship very easily could have been lost had it not been for effective damage control procedures.

Going back further than that, the USS Stark that was hit by Iraqi missiles back in the 1980s.  Or the USS Samuel B. Roberts, which was -- hit a mine.  We've had actually a

IV-64

number of mine strikes on ships.  We have not lost a ship to sinking because of effective damage control.

And then in 2017, we unfortunately had several ship collisions in Seventh Fleet which is in -- located in Japan. Both those destroyers were significantly damaged, but they were able to be saved and returned into service.  So we've had a successful run at effective damage control where other nations -- some other nations have proven themselves not to be that way.

Q    Can you give us some other examples of other nations who have not been as effective at damage control?

A    In combat, over the last couple of years, the Russians have shown themselves to be very poor at it.  So they've actually lost a number of ships that were -- that were struck by, you know, Ukrainian fire.  And their damage control procedures were substandard, and those ships sank.

Q    In the marine environment -- strike that.  Let me rephrase that.

Is there anything about the marine environment as opposed to the land or air environment that makes damage control particularly important?

A    It does.  It's very unforgiving, right?  So regardless -- even in peacetime, if you have a grounding -- if you run into something -- a collision or something like that, number one, first of all, there's no one to help to come out by and

IV-65

large quickly.  There's no fire department you can call, or that kind of thing.

But also, you are at the mercy of the elements in a lot of cases.  You know, the sea, depending on what the environmental factors are of the location that you're in, can make things very difficult.  If you are, you know, in a storm, and then things are getting thrown around, the ship is getting thrown around, that can make things considerably worse.

Also, the environment just in general, with corrosion, is a huge issue for navies across the board, just because you need to stay on top of that, otherwise the material condition of your equipment will start to fail because of the salt water interaction with metal, which is not great.

Q    Does the Navy have a motto called "Float, fight, win"?

A    So we actually have taken that from the Royal Navy. But yeah, that's something we aspire to, so.

Q    Another thing we've borrowed from the British?

A    That's correct.

Q    What does that mean?  What does float, fight, win mean?

A    So essentially, it means you need to maintain resilience in a combat environment.  You don't do any good if you sink, right?  So to be able to take damage, be able to stay in the fight, prepare yourself to the point where you still have some capability to defend yourself or others.

IV-66

That's critical.

There are different kinds of damage that a ship can get.  You don't have to necessarily sink a ship to have it completely out of action.  You can damage its propulsion plant, which we call a mobility kill, so it can't move anywhere.  You can have damage to its combat systems, its critical systems, so it can't do its primary function, and we call that a mission kill.  So you need to prevent those things from happening, so that you can at least stay in the -- stay in the engagement.

Q    Is the maintenance of these ships important?

A    It's extremely important.

Q    Why?

A    Well, I mentioned the effect on the environment on the ships.  A ship essentially starts to degrade the minute that it's completed, just because of the environmental effects on it.  So material and maintenance, absolutely critical.  If you don't do continuous maintenance on a vessel like this with all the moving pieces on board, chances are things aren't going to work when you need them to work.  And we've had challenges with that.  It's very difficult to maintain effectiveness across every warfare area over time as -- especially as these vessels get older.  So it continues -- it takes continued attention literally every day by the ship's crew to ensure optimum effectiveness.

IV-67

Q    Is maintenance, at all, important to fulfilling that "float, fight, win" motto?

A    It's absolutely critical.  Without proper maintenance on a ship, the effect would be -- it will be that your critical capabilities will not be available or at least not 100-percent available or effective when you need them.

Q    In your opinion, does the Navy's decades of collective knowledge on how to operate and maintain ships like the Essex give it a comparative advantage?

A    I believe so.

Q    Is that collective knowledge memorialized in the operating and technical manuals of ships like these?

A    It is.

Q    And that's that non-material part of what you view as the U.S. Navy has managed the sailors and Marines, and what's in their head, and what they're capable of doing?

A    That's correct.

Q    Are you familiar with something called the lightning carrier concept?

A    I am.

Q    What is that?

A    So that's a concept where you essentially exchange the -- what you see in this picture here that's up there -- the picture there -- the rotary wing aviation onboard the ship rotary wing again, the helicopters, and the Osprey aircraft,

IV-68

the tiltrotor aircraft. You'll exchange them, you'll take them off the flight deck, and you'll replace them with approximately a 20 fixed-wing, so Joint Strike Fighters, F-35, at this point.

So that allows the carrier to essentially -- or the LHD to essentially act as a mini aircraft carrier with fixed-wing aviation. So it doesn't have all the capabilities of, say, a nuclear-powered Nimitz-class carrier, an enormous class aircraft carrier with an air wing, but it pluses up your strike capability from approximately six fixed-wing Joint Strike Fighters to essentially 20, and then you can operate those over time.

Q    So it's a -- this is a military concept?

A    It is. Military naval concept, yes.

Q    Okay. And --

THE COURT:  Is this a good place to break?

MR. BARRY:  Sure.

THE COURT:  Okay. We'll take our morning recess. We'll be in recess until 10:45. Please remember the admonition I gave to you earlier.

(Jury exits courtroom.)

THE COURT:  Anything to discuss right now?

MR. BARRY:  No, your Honor.

MR. JONES:  No.

THE COURT:  Okay. We're in recess.

IV-69

If you want him to work out with -- work it out with the -- to address today, you can now or just wait until Tuesday.

Tuesday?

MR. JONES:  Tuesday.

THE COURT:  All right.  Thank you.

(Proceedings recessed briefly.)

THE CLERK:  Jury entering.  Jury entering.

(Jury enters courtroom.)

THE COURT:  Welcome back.  We're ready to continue.  I remind you, you're still under oath.

You may proceed.

MR. BARRY:  Thank you, your Honor.

BY MR. BARRY:

Q    Commander Caldwell, before we broke, we were talking about something called the lightning carrier concept.  Is that accurate?

A    That's correct.

Q    And you said that it is -- or you testified that it's a military concept about how to change some of the capabilities of a ship like the Essex?

A    That is correct.

Q    That it increases the air power component?

A    That is correct.  The striking power -- the air power -- striking power from the -- from the flight deck.

IV-70

Q    So that instead of maybe six F-35 fighter jets, the ship can carry about 20?

A    That's correct.

Q    Does -- in this military concept, will the ship give anything up if it were to move from how it's configured, for example, in this photograph to being configured in the lightning carrier concept?

A    It will.  It will give up its wiggling wind capabilities.  So that's predominantly the ability to bring Marines by air to the shore.  So your aviation component that's built to transport Marines to the shore will be off the ship.

Q    Is it fair to describe the lightning carrier concept as kind of like a turning an amphibious assaults ship into a mini-aircraft carrier?

A    That's exactly correct.

Q    How is that concept discussed -- or why -- rather, why is the lightning carrier concept discussed in military circles?

A    So it's a concept that has been around for quite a while.  It kind of stems back to an argument about how to augment the carrier fleet, carrier force.  So we have 11 large nuclear-powered aircraft carriers, you know, kind of super carriers.  But you have 11 -- now, we have something called Navy maps.  So that's basically you divide everything

IV-71

by three, because not everything's available to you.  And for -- every one platform you have deployed, you'll have one in training and probably one in maintenance, so you've got one for three.

A lightning carrier concept is a way to augment the capabilities that you have with a limited number of, say, super carriers -- nuclear-powered super carriers.  So it's an ineffective way to augment that striking force because you can put more fixed wing out there with the platforms that you have ready.

Q    From a military planning perspective, are there -- is there any type of specific military engagement in which the lightning carrier concept would be particularly applicable?

A    So I think there might be a few.  Certainly any strikes at sea, the -- well, a lightning carrier will provide you a lot more capability to go after things like ships at sea or a adversary task force than, say, if you kept it in the amphibious capability, because that's not really what they do.

So now if you've got an augmented number of strike fighters on board, those aircraft can now strike surface targets from, you know, from distance, which you not necessarily can do that with the amphibious.

Also, you've got an increased capability for strike ashore, putting ordinance ashore via something like a

IV-72

stealth fighter.  So not -- you're trading Marine infantry for the ability to strike targets ashore from the air using air power.

Q    So, for example, in a naval battle where a battalion of Marines may not be as helpful, a lightning carrier concept, where you have more air power, would give the U.S. military greater firepower to attack --

A    That's --

Q    -- an adversarial surface fleet, basically?

A    That's the idea.  You will now have an advantage, as opposed to -- and the Marines are not -- would not really have a -- well, a part to play.

Q    Is there a particular area of the world currently in which this concept is getting a lot of discussion?

A    The Western Pacific, certainly.

Q    When you talk about the Western Pacific, for folks who are geographically challenged, can you specifically talk about maybe some of the countries or regions of the Pacific?

A    Certainly.  So when we talk about the Western Pacific, we talk -- in military parlance, you're talking about things like in the first island chain.  We call it the FIC.  That's the area -- Taiwan -- includes Taiwan, West of Japan, the Philippines, and then of course China, South China Sea, Yellow Sea -- those areas.

And then as you move out, it can be the second island

IV-73

chain -- Guam, Commonwealth of the Marianas, those places. So I think Hawaii and West.

Q    So, like, looking at that demonstrative exhibit that's next to you, do you see that little dot on the left, the one that says Hawaii?

A    Yep.

Q    So it would be sort of everything west to that?

A    Correct.  Correct.  We call Hawaii, that's the middle Pacific, Mid-Pac.  So West-Pac, everything to the west of that to Guam West.

Q    You testified earlier that in your engagement as an expert in this case, you reviewed a number of technical or operational manuals related to the WASP-class of U.S. Navy ships, correct?

A    That is correct.

Q    If those manuals were given to the -- let's just say, any foreign Navy, would they provide that Navy with any kind of insight or advantage into U.S. Navy capability?

A    I think it would do a couple things.  One, it will show someone exactly how those pieces of equipment are configured for U.S. use, what the-- what the training requirements are for our sailors to operate those equipment -- that equipment, and also what equipment is located on particular vessels, and maybe even where it is on those vessels, which may have some tactical application.

IV-74

Q    Let's go through an example.  If we could publish just for the jury and the witness Exhibit 201, please.

This is one of the manuals that you reviewed?

A    That's correct.

Q    Okay.  And if we could just zoom in on those warnings in the front.  Just typically, in your experience, do manuals of these type have these types of warnings about how a manual should be used and distributed or destroyed?

A    That's standard.  That is standard.

Q    Let's go to page nine of this manual, please.  And if we could highlight section two.

This is the index for the manual?

A    Correct.

Q    And this is a list of pages in the manual having to do with the close-in weapon systems for the Essex?

A    That is correct.  We refer to that as the CIWS.

THE COURT:  The what?

THE WITNESS:  That's the --

THE COURT:  The what?

THE WITNESS:  The CIWS.  It's just a -- the term that the Navy uses for it.  The CIWS close-in weapons system.  It's a 20mm Gatling gun.

BY MR. BARRY:

Q    Okay.  And if we can zoom out, please?

What about that next one, section three, the NATO

IV-75

Seasparrow Surface Missile System.  What's that?

A    That is a multiple-point defense.  A little bit longer than point-defense missile system -- defensive missile system that we use, that's onboard the Essex and a number of other naval vessels.

Q    All right.  Let's go to the next page, please, page 10. What about that bottom one, light machine guns?  That's -- what -- I mean, that sort of seems self-explanatory, but what is that?

A    Those are - crew-served weapons.  So there's several different kinds in there.  The .25mm, the .50 caliber -- these are just different types of what we would call crew-served automatic weapons, which means it requires more than one individual to fire it.

Q    And what about that last "category" weapon control switchboard?  What's that mean?

A    That's the actual control console and switchboard that the -- that those weapons -- not all those weapons, but that some of those weapons report to.

Q    So is that kind of like the central unit that the ship would use to control all those various weapon systems we talked about?

A    Some of that.  The switchboard itself -- electrical switchboard provides the commands to those mounts.  Not all those mounts -- not necessarily like machine guns, but

IV-76

certainly the automated mounts.

Q    So what could happen, for example, if someone disabled that weapon control switchboard?

A    If you -- you would have to switch to different control, like maybe local control your weapon systems, which makes it maybe a time delay, makes it more difficult to do that.

What you would like to do is centrally control obviously from a central location -- we call that a combat information center -- where your watch standers are going to defend the ship by using their defensive systems.  You would like to be able to that almost automatically.

If you start breaking those electric chains to the actual mounts themselves, that makes it harder to do.  And then that may delay you.  And in naval warfare, especially with anti-ship cruise missiles, time is of the essence.  You know, those things move very quickly.  If you -- there's not a whole lot of time to engage -- find the weapon -- or find a threat, track that threat, and engage that threat before it impacts your ship.

Q    Let's go to page 29, please.  And if we could highlight this, please.  Just generally speaking, what are we looking at?

A    So those look like -- that's a line diagram of the ship, looking at and showing where the close-in weapon

IV-77

systems are located on the USS Essex.

Q    Let's go to page 41, please.  Zoom in, please.  What about this one?  What's this showing?

A    That shows location of the Seasparrow missile system launchers.

Q    Let's take that down, please.

If an adversary were given the specific location of the Seasparrow launchers on the ship, how could they use that information?

A    So if you look at where the -- configure where the -- where the mounts are, you can tell what their -- we would call a range fan is, and where they can be employed.  You know, some areas, obviously, you can't employ them because there are super structure in the way, or they would be firing across the flight deck or something like that.  So we have what we call cutouts, areas where you want to -- or how you want to maneuver the ship, so you can put a threat in a fan of as many defensive systems as possible, so that you have a layered defense.

If you know where those mounts are located, potentially, I could configure an attack on a ship that actually navigate some of those cutouts.  So it makes it more vulnerable -- the platform that I'm trying to defend, it makes that more vulnerable, because I can't bring to bear all my defensive systems like I would like to.

IV-78

Q    So an adversary could use information like this to essentially improve their ability to attack a ship?

A    Yeah.  They would build a strike plan that would be advantageous to them.

Q    Let's go to page 79, please.  And if we could just zoom in on that.  Do you know what this is showing?

A    Yeah.  That's the -- that's the CIWS.  That's the mount itself -- is that thing with the dome on it and the weapon.  And then that is essentially the electronic configuration and the -- and the switchboards that it goes through on the fire control consoles.  It's essentially what we call a line diagram, showing where the electronics are coming out of the ship to control that weapon that's outside.  Those mounts are outside the skin of the ship.  Those consoles and the terminals are inside the skin of the ship.

Q    And you said the CIWS are these sort of high-speed Gatling guns that are --

A    Yeah.  It's a 20mm rotary cannon.  So it spins, and it has a very high rate of fire.

Q    If an adversary understood the electrical system of how these guns were set up or controlled, what could they do with that information?

A    You could potentially isolate the mount.  There's some of this -- you don't actually have to strike the ship with a missile.  You could potentially have an inside threat, too,

IV-79

where you can isolate the mount from using, you know, a capability to get at one of the consoles, and then having that cut out.  If that's cut out, then you have to go to kind of backup systems.  We have a number of different ones that can because you don't want to a point of failure.  But eventually, again, you'll lose time if you have to reconfigure your defensive systems.  So and time may be of the essence in an engagement.  It always is.  Things are coming at you at supersonic speeds.

Q    Let's go to page 91, please.  Is this another line diagram?

A    It is.

Q    Another weapon system?

A    Yeah, it looks like Seasparrow missile system.  NSSMS.

Q    And this is one of the defensive missile systems on the ship that you testified about earlier?

A    That is correct.  It can engage anti-ship cruise missiles, aircraft, and sometimes surface targets.

Q    What could an adversary do if they had the detailed wiring schematics for the Seasparrow missile system?

A    If you had -- an accurate onboard the ship, they can eventually -- they could interfere with the proper operation of the weapon system and the mount.

Q    Could they use some sort of electronic warfare potentially to also interfere with that system?

IV-80

A    It's possible.  Or cyber.

Q    Okay.  Let's go to 105, please.  Do you know what this shows?

A    That's a local interior communications switchboard.  So that's the location of that.  And it shows, I think, the computer room and the data processing center.  So that's where that equipment resides.

Q    And is that sort of like the central electronic command center for the weapon systems --

A    The CIC switchboard, that's correct.

Q    Okay.  So that is -- if an adversary were to strike that location, would they at least take out one of the layers of defense on a ship like the Essex?

A    You essentially take out the fusion center for that. You can still operate those things in local -- what we call local control, but it makes it much more difficult.  So you have to do it locally, manually sometimes from the mounts themselves or from the controlling consoles themselves instead of in a cohesive manner from a centralized location. So command and control becomes more difficult.

Q    Let's take that exit down, please.  I want to show you one other exhibit related to those.  Can we pull up Exhibit 202, please?

Is this another one of the manuals that you looked at?

A    That's correct.

IV-81

Q    Let's go to page 80.  And remind the jurors -- this is the damage control manual.  You testified about damage control earlier.  Remind the jurors, in the naval context, what that means.

A    So damage control is the ability to control cascading effects.  Essentially, anything that -- and it doesn't have to be by enemy action.  It can be a mass casualty to a propulsion plant or another piece of equipment.  And so these kinds of things, they dictate how you're going to behave to secure that piece of equipment and prevent further damage.

Q    So damage control doesn't just mean like a torpedo strike?  It can also mean, you know, a collision or a problem with one of the systems on the ship?

A    Sure.  Or a piece of, you know, machinery.  An engine seizes or flies apart, and you don't want cascading effects.  So you need to secure that casualty, and then you need to prevent that from getting worse -- fire, whatever.

Q    So looking at page eight of Exhibit 202, is this -- this is a table of contents, right?

A    Correct.

Q    And is this listing a number of casualties that could -- that the feed water system could encounter?

A    That is correct.

Q    What is a feed water system on 800-foot, 40,000-ton

IV-82

warship.

A    So this particular class of ship uses boilers as actually their means of power.  So this is feed water to the boilers.  So without that, you don't have steam.  And without steam, you're not going to have power specifically to propulsion in the rest of the electrical power plant too on a ship like this.

Q    Let's go to page nine, please.  And under the category boiler casualties, is this a list of the types of casualties that the boiler plant could encounter?

A    Certainly.  Yes, it is.

        MR. BARRY:  And if we could just slowly, Ms. Mullins, just kind of click through pages 10 through 18.

BY MR. BARRY:

Q    And as she's doing that, Mr. Caldwell, are these other types of casualty events that other systems on the ship could encounter?

A    They all are.  And if you look below the large -- the capital letters there, it says in each one, each column, it says, "remedial actions and possible additional casualties." So that's for the watch standard.  So as the watch standard sees something like this happen, boiler economizer fire, just take for that example, it'll say symptoms. That's how he can tell -- he or she can tell that something is wrong that may lead to that casualty, then what causes

IV-83

that casualty, then the remedial actions of the watch standard, what they can do immediately to prevent that from getting worse, maybe isolate it or prevent it from cascading to another piece of equipment.

And then finally, the last one, possible additional casualties, what things downstream may be affected by that particular type of failure?  Because especially in engineering spaces, things don't happen in isolation. Everything is pretty much connected to each other on a ship. So if one piece of equipment goes down and has a massive failure, you may have that -- other failures down the line, which just makes restoring that casualty much more difficult.

Q    All right.  If we could just click through to page 18, please.  In the naval warfare sense, what does battle damage mean?

A    So battle damage is that damage that's incurred, actually, in combat.  So that would be damage that's incurred by a kinetic action, or today, it actually could be defined as non-kinetic action.  So something like cyber, or like you mentioned, electronic warfare damage as well.

MR. BARRY:  Can we go to page 18, please?

BY MR. BARRY:

Q    Okay.  So you see the category on there called battle damage casualties?

IV-84

MR. BARRY:  And can we actually zoom out, please?

MS. MULLINS:  Zoom out?

MR. BARRY:  Yes, ma'am.

BY MR. BARRY:

Q    So I want you to focus on those bottom categories.  Are those some examples of the type of battle damage a ship could encounter, a torpedo hit, shell hit, near miss?

A    Yes.

Q    And then let's just briefly go to page 208, which is one of the specific sections in the index.  So this -- is this type of the top fire room explosion torpedo hit?

A    Uh-huh.

Q    And just generally speaking, is this an example of what you testified about earlier, where it's kind of like a step-by-step guide of identifying the problem, if this is the problem you see, here's what you do, here are the steps you take?

A    That's correct.  We call these, you know, immediate actions.  What you do immediately, and then what -- the steps you take as a watch standard to mitigate that casualty.  That's correct.

Q    And we're just looking at one example, the fire room explosion from a torpedo hit.  But is this step-by-step, sort of -- I don't know what to call it, like an owner's manual, is this the result of those decades of operational

IV-85

history that the United States Navy has with these ships?

A    It certainly is.  And we've been operating a plant like this for a very long period of time.  We would take those lessons, we would incorporate them into a manual like this, and then we were training to these things.  So these are the things that during our training periods, which we do constantly, a sailor would be consistently training to using a guide like this.  Okay.  We'll simulate this type of casualty.  These are the things you need to do.  And then that sailor will be evaluated as he or she did.  And then if there were steps missed or a training needs to be redone, there'll be remedial training.  So that's one of the ways that we maintain our operational effectiveness that I mentioned before on, kind of, crew proficiency.

Q    So is it fair to describe this as this is part of that know-how, part of that professionalism that gives the U.S. Navy an advantage?

A    Yes.  Yes, it is.

Q    How could a adversary of the United States Navy use information like this, this step-by-step guide?

A    So if we're considered the gold standard of damage control -- I think we discussed that earlier.  If we are the best at it, then basically, this allows someone else to recreate a similar manual and similar procedures for themselves.  So they don't have to do it out of thin air.

IV-86

They don't have to actually spend all the time and the effort and the study to be able to kind of create these things on their own, which can be a very laborious process. They already have something that's kind of handed to them if they have similar systems to this.  If you have a similar system of boiler, you know, firebox that works -- that's where you create the heat for the steam.  Every boiler has a firebox.  So if you have a similar capability on your ship, you would be able to take this and basically just lay it out on top.  Okay.  That's how we're going to do our casualty control on that piece of equipment.  And you'll know that it's correct because, you know, we've done this for a very long period of time.

Q    So it sounds like your testimony is that one of the ways an adversary could use this information is if they have similar capability, ships, but they don't have the know-how, this gives them a head start on the know-how?

A    That's correct.

Q    It also gives them assurance that they're doing things right.  Could this kind of information also be used for offensive capability or targeting?

A    It's possible that something -- as you showed before, like those line diagrams when you see the positions of certain equipment.  Modern weapon systems now are actually -- some, depending on the seeker types if you're talking

IV-87

about missiles, can actually take a visual of a target and decide where on that target they want to strike it.

So I mentioned before about a mission kill or a mobility kill.  Large ships like this are sometimes very, very hard to sink if they do damage control properly, if their crews are professional.  But that doesn't mean you can't do extreme damage to them if you hit them in the right place.  And something like those line diagrams can show you exactly where you want to hit the ship to do the most effective damage.

Q    You testified that one of the ways of another government or an adversary might use this -- this is just one example, right?  This type of information is to train up their own forces?

A    Correct.

Q    Does that in any way diminish the, sort of, U.S. military or U.S. Navy's comparative advantage?  Let's say if an adversary who has similar ships all of a sudden has all of that know-how, does that diminish some of those things you talked about earlier, like, deterrent capability, force projection?

A    I would say so.  Certainly, when you're dealing with a peer competitor, you may not have all of the advantages that you would have against someone that doesn't necessarily have the capacity or the size of a force that's in an adversary

IV-88

force.  If you can just overwhelm them, that's one thing.  But if you're dealing with a peer competitor, then the vantages such as operational proficiency of your crews and how you do your training is kind of critical to gain any kind of tactical or operational advantage.

Q    All right.  Let's talk about the Chinese Navy.  You've just used the phrase "peer competitor."  In naval warfare, is the Chinese Navy considered a peer competitor or near-peer competitor?

A    I would say the near-peer is past an opening.  They're peer.  In some cases, they're ahead.

Q    So let's talk a little bit big picture.  What is the People's Liberation Army Navy or the PLAN?

A    So the PLAN is -- that's their Navy.  They actually have three maritime forces, but the PLAN is now the largest, by numbers, Navy in the world, approximately 370 vessels and growing pretty much every day.  They may build another 100 in the next few years.  Juxtapose that with our numbers, we've got about 290 ships as of this morning.  So they have a numerical advantage.  They are under Xi Jinping.  They have been given an enormous amount of resources, which is a break from Chinese military strategy in the past.

Typically, the Army has been the military service that got the most resources.  But under Xi Jinping, starting about 12 years ago, that has changed and the Navy has gone a

IV-89

-- undergone a remarkable expansion, both in numbers, but also in sophistication.  So the ships now that they have are -- although they may not all be a 100-percent equal in capability as the United States Navy warship, they're getting very, very close.  And some of their weapon systems are actually, in some ways, more lethal than some of the things that we deploy.

Q    So I want to follow up on two things you said.  One is you said that currently, based on open-source information, the Chinese Navy numerically has more ships than the United States Navy, right?

A    That is correct.  It's the largest Navy in the world.

Q    So when you're talking about naval military planning, when you are outmatched numerically, does that change at all the way in which you have to engage in the fight?

A    It does.  You are not going to be able to win a contest of attrition with a force that outnumbers you exponentially, so you have to figure out other ways to do it.

Q    In that context, is that "float, fight, win" mentality particularly important?

A    It is.  It's absolutely critical because you're going to have to maintain the capacity that you have.  The platforms that you have are going to have to be able to fight even though it, at some point, may have taken some damage because you don't have the numbers essentially to

IV-90

make up that initially or maybe over a long period of time. So you have to get everything you can out of the platforms that you start with.

Q    So the simpler way to put that -- or is it fair to put that as, when you're talking about attrition, if one side has two ships and the other side has three ships for every two ships, to win that fight if you're the two-ship side, you need your two ships to last longer than their three ships.

A    That's correct.  In a simplified way, yeah.  That's correct.

Q    Second thing I want to follow up on is you testified that the ambitions of the Chinese Navy have changed.  How so?

A    So for many years, the Chinese -- the Maritime Forces Navy in particular, was given the task, essentially, of coastal defense.  So Chinese military leadership and national leadership considered their primary goal security issues to either be land borders or very close-in coastal defense issues, which meant that they concentrated on what we would call either brown or green-water defense, which means not big ships that go out into the oceans but smaller crafts that are able to conduct short-range coastal defense missions.

That has changed enormously under Xi Jinping.  He has

IV-91

discussed specifically that the Chinese security threats are at sea, and that their interests lie at sea, and that things like protection of sea lines of communication, which are those -- and you can think of them as roads through the ocean that merchant vessels travel back and forth, bringing materials back and forth to keep your economy going, that those sea lines of communication are absolutely critical to defend.  And for that, you need an expanded Navy, and you need a Navy that's able to go farther afield to defend those SLOCs.  We call them SLOCs, which may be out in the Indian Ocean, they may be throughout the Pacific, they may be in the Arabian Gulf, or even in the Mediterranean Sea.

Now, you're talking about forces that can go a lot farther.  You also need capabilities that are much more akin to what we call a blue-water navy, which are with larger ships, longer range and much more sophisticated missile systems, aircraft, and those kinds of capabilities.  So not only do you have more ships, but you've got larger ships, and each one of those platforms is more capable than the platforms that came before them.

Q    Based on your experience, do you have an opinion as to whether there was some sort of historical event that seemed to change part of this Chinese military strategy from a brown-water navy to a blue-water navy?

A    So there's a few.  There's actually a number of them,

IV-92

but there's a couple in particular.  For the amphibious force, one of the things that happened was -- if you recall the Arab Spring back in 2011, the Chinese did not have a good way to protect their interests abroad in places like, you know, Yemen, Tunisia, maybe Lebanon.

There was a lot of unrest during that time in that part of the world.  They also couldn't get their personnel out, to evacuate them.  That wasn't really something that they wanted to continue, so Xi Jinping himself gave the mission for power projection and protection of assets and personnel abroad, specifically to the PLAN and the PLAN-MC, the Marine Corps -- the Chinese Marine Corps, and said, you guys will have the capacity to go conduct those missions if you -- if required.  And then we've seen that exponential change in their amphibious capabilities.

Also, there's always the looming issues of Taiwan and then the sovereignty issues in the South China Sea, which require a much larger navy to go patrol and provide assurance for the Chinese that they have control over those waters.

Q     For people who aren't familiar, who is Xi Jinping?

A     Xi Jinping is the president of the People's Republic of China.  He took power in 2012.

Q     Does the Chinese Navy have its own version of a landing helicopter dock?

IV-93

A     They do.

Q     What's it called?

A     They have like a whole class of those ships called the Type 075.  There are four of them currently operating now.

            MR. BARRY:  Can we pull up Government's Exhibit 23, please?

BY MR. BARRY:

Q     Is that a Type 075?

A     That is.

Q     How long has the Chinese Navy operated the Type 075?

A     The first one was commissioned approximately six years ago, I would say.

Q     So a lot less than the U.S. Navy?

A     Certainly.

Q     So putting together your testimony about this sort of change in strategy from brown-water to blue-water Navy, how does the Type 075 fit into that PLAN?

A     So the Type 075 is a completely new type of warship for the PLAN.  Obviously, you can see it.  It looks a lot like the Essex.  It's the same, you know, but general class with the same general capabilities.  So it has rotary wing support, large flight deck to be able to do that.  You'll be able to utilize assault forces from the PLAN-MC onboard that ship and provide them airlift to go to target.

       Also, what you can't see in this picture, but just like

IV-94

the Wasp-class LHDs, it has a well deck has a stern gate. So in it, you can see it's -- the superstructure is very high.  There's multiple decks in there full of vehicles and personnel landing craft that can be deployed out of the stern of that ship that can also go ship to shore.  So a ship like this will be the center piece of the Chinese Navy's version of an amphibious ready group.  It may not look exactly configured like the way that we would do it, but it's going to look pretty close.

Q    So going now to the Chinese Navy specifically, would sharing technical and operational manuals about the Wasp-class ships in the U.S. Navy provide any benefit to the Chinese Navy?

A    I think it would.  One, it proves that they're on the right track when they're building something like this.  It also provides them an ability to -- kind of, like I mentioned before, they can accelerate the training, and they can accelerate the building of these ships because they know how we've already done it.  So there's no reason for them to reinvent the wheel.  When you saw those immediate actions and everything else that are in those tactical manuals, they can build their ship.  But then the issue is, you know, I've got to crew that ship, and I have to train the crew to safely operate that ship.  And those manuals allow them to do it much quicker than if they had to make it all up on

IV-95

their own.

Q    So is it fair to say that if the Chinese Navy had those manuals, they could sort of leapfrog the development cycle?

A    Certainly.  They could certainly condense it.

Q    Would they have to spend their own blood and treasure to develop those lessons learned?

A    No, we've already done it for them.

Q    And big picture, if they were able to, kind of, accelerate that process, in your opinion, would that improve their ability to operate militarily?

A    I think we've seen that it does.  They built four of these ships in like last six years.  That's a time period that we've been working on one of ours, the Bougainville, which we'll commission next year.  They have a Type 076 class, which it is building now and will probably be delivered within the next 18 months or so.  So their build rate is enormous.  Commensurate with that, they have to man these ships and they have to be able to operate them, so they would like to do that and condense that period into the shortest period of time.  And they've done that pretty successfully across the board with numerous classes of ships.  Not just this one, but others as well.

Q    That sounds like one of the things you're testifying about is sort of how the Chinese Navy would use that sort of information to improve their Navy?

IV-96

A    Certainly.

Q    What about how they could use it to improve their military planning or their tactics?  If the Chinese Navy was given access to some -- the technical and operational manuals for a ship like the Essex, including some of the information in that weapons control manual that I showed you, how could the Chinese Navy use that to improve its military strategy or tactics?

A    Well, on a tactical level, that's basically -- that's kind of defined as, you know, small unit on combat.  You could potentially design weapon systems that will operate in a manner which exploits the vulnerabilities that you see in those manuals.  Like I said, the cutouts on the ship, right?  Or be able to strike that ship -- program a weapon to be able to strike that ship in a specific place where that caused the most damage.

Q    Is there a -- you used the phrase strategic level, tactical level.  Is there a level below tactical level in military parlance?

A    There's strategic, operational, and tactical.

Q    Okay.

A    Yes.

Q    What about the ways that -- do you think that the -- in your opinion, would the sharing of the operational and tactical manuals, including the weapons control manual for

IV-97

the Essex with the Chinese Navy or the Chinese Government, would that hurt the United States in any way?

A    I think it -- again, I think it erodes some of the advantages that we have had in the past.  It's not the only reason that those things are being eroded, but it's certainly unhelpful.

Q    And tease that a little bit out.  Erode the advantages. Would it erode the U.S. military's deterrent capability?

A    So I believe that the more comfortable an adversary gets in knowing how his adversary operates, that always -- you know, that erodes deterrence, right?  Because you're becoming more confident in your own abilities.  For a long time, like I mentioned before, the Chinese, Chinese Government, certainly the PLAN, People's Liberation Army, and their associated other services, the Navy, the Air Force, they've viewed the United States military as the most capable and neutral military, on -- you know, in the world. As they have approached the similar capabilities we have in numbers of ships, maybe surpassed, and also in the development of weapon systems, the thing that they didn't know or weren't as confident about was the ability of their sailors to behave and train the same way to get the -- a similar level of proficiency.  This kind of thing allows them to do that in a much shorter period of time, which will increase their confidence in a potential engagement.

IV-98

Q    And in your opinion, based on your decades working with the military, can increased confidence in an adversary's force theoretically increase the risk that they might take combating action?

A    I think it's been historically proven that, you know, maybe too much confidence leads to miscalculation and then opportunism.  And sometimes it makes bad decisions.  So yeah.

Q    I kind of want to finish up with something we talked about in the beginning.  You said that in your current role, or at least since you've been at the China Maritime Studies Institute, you regularly advise and consult with other members of the U.S. Government?

A    Correct.

Q    And that some of those meetings, I imagine, are classified?

A    Many.

Q    Do you, in that role and in your role as a researcher, also kind of read or consume open source and classified intelligence about the things you're studying?

A    A great deal.

Q    And do you have some familiarity with how intelligence is evaluated based on who and where it comes from?

A    I do.

Q    So and you already testified that your -- in your view

IV-99

you're quite familiar with the Chinese Navy?

A    Correct.

Q    So let's just say that a member of the Chinese Navy were to receive intelligence about the U.S. military and Navy from someone who was in the U.S. Navy as opposed to someone who's not in the Navy.  Does the fact that that intelligence comes from an active-duty member of the U.S. Navy, in your opinion, affect how the Chinese military would value that intelligence?

A    I believe it would.  They would consider that an authoritative source as opposed to a non-authoritative source.  So authoritative being something that's from the interior, so much more truthful.

Q    In your opinion, would it affect the Chinese military's view of the information if the information were provided in an original document as opposed to someone just over the phone telling the Chinese Navy some sort of information?

A    Certainly.  They would be very confident in that information that was passed to them.

Q    What about if some of that information were available on some corner of the internet?  In your opinion, would the fact that that information was provided by an active-duty member of the U.S. Navy affect the Chinese Navy's view of that information versus information that they found on the Internet?

IV-100

A     I think it would verify the authenticity of the information that they were getting passed.  Who knows what the source is on the internet?  Sometimes it's -- we all know how that is.  But if you get handed something from someone on the inside, it's different.

Q     In your experience, do militaries also sometimes -- or maybe not even militaries.  Are there sometimes things on the internet about U.S. military capability that are not true?

A     Yes, there is.

Q     And are there sometimes -- say, in your opinion and experience, are there sometimes things on the internet about U.S. military capability that are intentionally put on there to be not true?

A     I wouldn't want to answer that.

Q     Okay.  Last question about this.  Same line of questioning.  So based on your opinion and experience, if a member of the Chinese Navy is receiving some of these technical and operational manuals, is the impact on U.S. Navy greater, the same, or less if that member of the Chinese Navy receives dozens of manuals as opposed to one manual?

A     Well, the amount certainly would affect the impact and the importance of the material being provided.  So more being turned over, obviously more damaging to the U.S. Navy

IV-101

and our interests, certainly.

Q    Based on your background, are you familiar with something called the mosaic theory of classification?

A    I believe so.

Q    Okay.  And just generally speaking, can you -- from an intelligence perspective, can you talk about what the mosaic theory is?

A    So essentially, you are building a picture out of smaller points of data. So it's cumulative. So individual documents, data points, however you gather that information, builds a much more coherent and cohesive picture than you would have than maybe just if you had one or two disparate data points.  And that is actually one of the things that open-source intelligence, when you fuse that, even if something's not saying classified on it, if you get enough unclassified material or beneficial material, you can build a picture that can mirror some of the things on the classified site.

            MR. BARRY:  No further questions.

            THE COURT:  Thank you.  Cross?

                        CROSS EXAMINATION

BY MR. JONES:

Q    Good morning.

A    Good morning.

Q    I apologize, was it Captain Caldwell?

IV-102

A    Commander.

Q    Commander.

A    Not anymore.  Retired.

Q    Understood.  Your current role is as the -- as a researcher for the Chinese Maritime Studies Institute.  Is that right?

A    China.  Yeah, China Maritime Studies --

Q    China?

A    Correct.

Q    So China Maritime Studies Institute -- is that a -- is that affiliated with the Chinese Government?

A    It is not.

Q    Does anybody ever think that it is based on the name?

A    I would certainly hope not.

Q    Are you -- in China, would you agree that most formal organizations are connected or run by the People's Republic of China?

A    Formal organizations?

Q    Correct.

A    If they are -- if there are formal organizations, they will have direct government -- certainly, government contacts.

Q    But your institute is totally separate?

A    Yeah.  We work for the -- well, we are part of the Naval War College -- United States Naval War College.

IV-103

Q    And so where is you institute located?

A    Newport, Rhode Island, on the Naval Station, at the United States Naval War College.

Q    Okay.  And is that considered a -- it's considered a research institute?

A    It is correct.  That is correct.

Q    It's a --you would call that -- it's a maritime -- fair to say it's a Maritime Research Institute?

A    Correct.  Actually falls under the Strategic and Operational Research Department of the War College.

Q    I'm not going to remember that, but thank you.

A    SORD.  Yeah, S-O-R-D --

Q    Okay.  Got it.  And your current role is a researcher, but before that, you were the director, right?

A    Right.

Q    And before that -- or during that, you were a professor?

A    Before that, I was a -- I was a Military Professor on the teaching side, yes.  I did a tour doing that as well.

Q    And so you were working at a research institute, serving as a professor and also working with the Navy?

A    I was still active duty at the time.

Q    Okay.

A    Yeah.

Q    And what was your role as an active duty naval officer?

IV-104

A    So I was a Surface Warfare Officer throughout my career.  So I was either embarked on ships, doing various jobs on those ships, or in shore duty.  The majority of my -- at least the last 20 years, I was in what they consider planning billets.  So those are jobs that develop contingency plans for a variety of different commands.  Commander, Pacific Fleet, INDOPACOM, Joint Staff, so on and so forth.

Q    All right.  INDOPACOM, is that Indian sea and Pacific Ocean --

A    You're right.  That's correct.  That is correct.

Q    We'll go back to -- I'll try not to jump around too much.  But going back to the Essex, you stated that ships like the Essex have an expected or average 30-year lifespan?

A    That's correct.

Q    And the Essex has been in service for 33 years, right?

A    Correct.

Q    Would you consider it to be at the end of its life?

A    She is not at the total end of her life.  She's been extended quite a bit, but she's not a new platform.

Q    Right.  She's actually gone beyond the average time which a similar vessel would be retired, right?

A    She has.  If -- larger ships can last longer, but her replacement has been long coming, correct.

Q    And she's one of seven active LHDs?

IV-105

A    Seven of her class.  There's two more that are very, very similar, that are also in service.  So essentially, we have nine.  There were eight originally built of her class.  One was lost in the fire.

Q    Right.  So the Bonehomme Richard was lost to the fire.  And then there's a newer one that uses diesel power?

A    Gas turbine?

Q    Gas turbine?  Is it strictly gas turbine, or is it a combined diesel/electric gas?

A    It's going to be gas.  So it's like -- think of it as a -- as a jet engine or as a prime mover.  However, it does have diesel plants on board for power generation.

Q    Okay.  And that's the newest LHD in the American fleet?

A    That will be the -- well, so we have one that's gas turbine powered today, the Makin Island.  Two are LHAs that are -- those other two ships are also gas turbine powered.  And then the one that would be delivered hopefully next year, the Bougainville, which is still on the shipyard, will be gas turbine as well.  So we've transitioned to gas turbine capabilities.

Q    And so steam is obsolete, right?

A    It's being -- it's being transferred kind of out of the Marine services, yeah.

Q    Are there any new ships being built using steam propulsion?

IV-106

A    There are not, to my knowledge.

Q    When was the last time a steam-propulsion ship was built for the U.S. fleet?

A    So that would have been the last of the Wasp-class, which would be approximately probably 15 years ago, 20 years ago.

Q    So let's take 15 years ago, just to be conservative. That would have been about 2010?

A    About right.

Q    And then China got into the LHD game, you said about six years ago?

A    Relatively, yeah, yeah.  When they started -- when they actually started commissioning those ships, correct.

Q    Right.  And so the first one I think they launched was the Hainan?

A    Yeah, Type 075.  Yeah, the first.

Q    And that went into the water into 2019.

A    Yep.

Q    That's a diesel-powered, right?

A    They used diesel plants.

Q    And now it's combined diesel and diesel or CODAD?

A    Right.  Correct.

Q    In fact, all the 075 vessels in the Chinese PLAN, they're all diesel, right?

A    That is correct.

IV-107

Q    All right.  Just to get things straight, we've talked about the LHD, and that's Wasp-class?

A    That's right.

Q    Talking about the United States.  And then in China, it's not -- or it's -- sorry, it's -- instead of -- those 075s and their classes, is it Yushen versus instead of Wasp?

A    Yeah.  They typically use the "Type" as a way to refer to it instead of the name of the ship.  U.S., we typically use the name of the first ship and class, and then say, "Okay.  All of those ship, we'll refer to them as the Wasp-class or whatever class it is after that.

Q    So fair to say that the Chinese fleets -- Chinese LHD fleet is newer than the United States?

A    The four ships that they have currently are newer than the last commissioned Big Deck from the United States Navy.

Q    And they're more modern, right?

A    I wouldn't necessarily say they're more modern.  I would say that they are newer in construction.

Q    With regards, that is, to their propulsion system, you would agree that they're more modern, right?

A    They are -- well, certainly not more modern than, say, the Makin Island.  They are diesel ships.  We have diesel -- you know, amphibious ships, too.

Q    None of them are using the obsolete steam-powered propulsion mechanism of the vast majority of the United

IV-108

States' LHD fleet, correct?

A    That is correct.

Q    Are you familiar with weapon systems control manuals?

A    I am.

Q    Do you know how often those are updated?

A    Well, it depends on the manual.  So it depends -- and it also depends on the service that actually is updating them.  Some of them can be fairly long in the tooth.

Q    When you say, "some of them," what -- can you give me a distinction of one type that would be updated annually versus one where we might use that 15-year-old one?

A    So when a weapon -- you know, you may have the same type of weapon that is on the -- you know, in the active force without a configuration change for a considerable length of time.  If that's the case, then you won't update the manual.

When you do have an update do that, sometimes we modify existing weapon systems to make them more current to a different threat.  In that case, you will update them annually.  But I can't give you a specific time as to when an update would be done for each particular system.

Q    You couldn't tell me, like, if they updated a certain gun on the ship, how -- what the latency -- or how much longer it'll be until the new manual is published?

A    I could not on every circumstance, no.

IV-109

Q    Still with the Essex -- as we mentioned, it's 33 years old.  What is it currently doing?

A    What she's doing today?

Q    Yeah.

A    I do not know what she's doing in her -- in her life cycle right now.

Q    Do you know whether she's in dry dock here in San Diego?

A    That's true.

Q    Okay.  Do you know the last time the Essex saw a combat mission?

A    A combat mission?

Q    Yeah.

A    That's a good question.  I do not know.

Q    Do you remember the last time it served a humanitarian rescue mission?

A    No.  I'm not familiar with her ship schedule.

Q    Got it.  So you're not familiar with any recent mechanical failures or anything with regards to the Essex.

You were familiar with the Bonehomme Richard?  Is that how --

A    I'm very familiar with the Bonehomme Richard, yeah.

Q    You're very familiar.  Were you involved in the investigation regarding the fire that occurred?

A    No.

IV-110

Q     But you're familiar with --

A     I'm familiar with the incident.

Q     How long ago was that?

A     That would have been about four years ago, five years ago.

Q     And can you just describe to the jury what that incident was?

A     She had a fire on board, which the circumstances of which are still a little bit murky.  There was an investigation done.  She was in a yard grid actually down here.  Some materials in her lower vehicle neck were on fire.  It seemed like the ship was a bit slow to respond to that.  And then once it was responded to, unfortunately, they had a mass conflag, and mass conflags are an issue, and the fire was out of control.  It did so much damage to the ship that she inevitably had to be decommissioned.

Q     And when you say, "decommissioned," that means that she's --

A     Out of service?

Q     So broken down and sold for scrap?

A     Correct.  Correct.

Q     Are you aware if the Bonehomme Richard had a damage control manual on board?

A     She would have had manuals on board.  She was in a separate status being in a shipyard.

IV-111

Q    Do you have an opinion as to why America's legendary damage control capabilities were not able to save that ship?

MR. BARRY:  Objection, scope.

THE COURT:  Overruled.  I would let him --

THE WITNESS:  Predominantly, because of the situation she was in, when she's in a shipyard, she does not have her full complement of sailors on board, and she does not have all of her -- or she didn't have all of her firefighting equipment activated as it should have been when you do as a -- as an -- operating a ship.

So in the status she was in, because of the work being done on her, the -- she was -- you know, the systems were partially off, you know, some are blanked off, and she didn't have a full complement of sailors on board.  In fact, not even close to be able to -- to be able to initially fight that fire.

And then my understanding is there was outside command and control issues that exacerbated that problem.

BY MR. JONES:

Q    Do you believe that those issues had to do with a failure to go down the checklist in the damage control book?

A    I believe that.  You know, I don't know specifically what the investigation found, so I probably can't comment on that intelligently to that level of detail.  I know there's an investigation out there.  There's a -- you know, a report

IV-112

that came out.  I can't remember the details of that.

Q    We looked at Exhibit -- I think it's 202, page 208. You went through talking about damage control for, say, a shell -- a fire and explosion, torpedo hit, and I think there was also a shell hit.  And you kind of -- do you recall discussing how it's a step-by-step procedure?

A    Correct.

Q    And the steps are, essentially, get to a safe place, shut down the system, put out the fire, plug the hole, right?

A    Essentially, depending on the damage.

Q    Do you think that that is a order of operations that would be completely foreign to the Chinese?

A    Depending on the specific equipment involved, the steps of how to secure that equipment might be.  I can't tell you.

Q    And in the manual we're looking at, it would say things like, "Secure by reasonable methods," right?

A    Sure.

Q    And so that's not super specific.  That's saying to be reasonable, right?

A    Right.

Q    And so at that point, it would come down to just general training, right?

A    A little bit more than that.  So I think in certain circumstances -- and, in fact, a lot of circumstances, our

IV-113

technical manuals are actually very direct about exactly what you have to do because if you don't do it in the proper sequence, you can actually do more damage to either that piece of gear or a gear down the line.

Q    So then are you saying that the -- part of the damage control book we looked at is just not the sexiest section of that book?  Or that there's a better version or a newer version out there somewhere that gives more detail?

A    There are dozens of technical manuals.

Q    Damage control manuals?

A    There are many different -- for individual classes of equipment, there are individual technical manuals.

Q    All right.  So if I'm in a boat, and we get hit by a torpedo, and everybody's wondering what to do -- I run over, I grab the manual, there might be dozens of damage control manuals that each lay out step-by-step procedures for what to do in that event?

A    You should be trained to control those cascading events.  Hopefully that's not the first time that you've seen or train to that event.

Q    Sure.  But in that instance, there could be multiple manuals that have slightly differing orders of operations?

A    There could be, depending on the gear that you're involved in.

Q    But you believe that the Chinese Government building

IV-114

much newer -- a much newer fleet using a different propulsion system might be aided by looking at a 20-year-old -- one of potential dozens of a 20-year-old damage control book -- that that would aid them in building their fleet?

A    At the very least, it verifies the information that they already possess.  They have a lot of ships.  So that is not a -- that is not an unusual occurrence for them -- building ships.  But interestingly, the diesel you're talking about, it's actually a Pielstick diesel.  It's a French diesel that's subcontracted to the Chinese.  We actually also use the same kind of diesel.  So it might behoove them to look at our technical manuals and how we deal with those, and, you know -- if -- for any other reason than to verify their own procedures, if they consider us the gold standard, which I believe they do.

Q    So because they use diesel and some of our boats use diesel, they could benefit from technical manual from a steamship?

A    Depending on what was in there.  There was more than just that steam manual.  There are many manuals.

Q    Do you think that the Chinese Government, six years into launching this fleet, building these boats, putting them on the water, they discover that our -- the United States has a different order of operations for putting out a torpedo fire, that they would halt production or change how

IV-115

they're building their boats based on that discovery?

A    Building their own training, yes.  We know that for a fact.

Q    Let's talk about training.  You said that education is an important -- I don't know the exact quote, but education is important to our Navy's abilities?

A    Certainly.

Q    And that education involves training and testing, right?

A    That's correct.

Q    In order for -- to stamp off that a sailor has been educated, they are tested on things, right?

A    That is correct.

Q    Do you know how -- you are a professor.  Do you know how sailors study for these tests -- the advancement tests?

A    U.S. or Chinese?

Q    U.S.

A    Yes, I do.

Q    Does that involve reviewing some of these technical manuals?

A    Certainly does.

Q    Are you aware of study groups devoted to preparing for these exams?

A    I am.

Q    And are you aware of the materials that are routinely

IV-116

shared by these study groups?

A    They can be shared sometimes electronically.

Q    And that would include on public forums like Facebook and Reddit, right?

A    I would imagine.

Q    And you would agree that the distribution restrictions imposed by, say, a Facebook group may not be the same as -- or be imposed by a naval military --

A    That would --

Q    -- outfit --

A    -- be correct.

Q    All right.  Does that -- are you concerned about that?

A    I would be, yes.

Q    Okay.  Are you aware of any ongoing efforts by the U.S. Navy to shut down the dissemination of tech manuals on Facebook groups?

A    So I can't speak for the Navy.  I can speak what we've advised, and I would say yes.

Q    And so --

A    We've advised those things to be taken down, but --

Q    You've advised --

A    -- I can't speak for the Navy.

Q    You've advised who?

A    So we actually do a lot of discussion with naval leadership.  So OPNAV is an organization that's the -- kind

IV-117

of the staff, Navy staff.  And when we've been asked, you know, "What are some of the vulnerabilities that you see?" Not particularly talking about Facebook sharing, but online sharing of information is an issue across the board.  So we've discussed that actually at length with senior leadership.  Where the Navy itself, I can't speak for the Navy with their policies.  I would leave that to them.

Q    So you are -- when you say that you advise, you're talking about your research institute?

A    That is correct.

Q    Has advised naval leadership about the dangers of online sharing of technical manuals?

A    Of online information in general, tactical manuals being part of it.

Q    I told you I was going to try not to jump around, and I'm going to do it.  So it's back to the Essex.  You talked about the lightning carrier concept?

A    Correct.

Q    Are you aware if the Essex has ever participated in a lightning carrier operation?

A    I don't believe she has.  I may be wrong about that.  I don't know.  The Essex was never a ship I was on, so I don't know her entire deployment history.

Q    When a carrier, or even a small carrier like an LHD, is carrying out a lightning carrier concept, that's -- would

IV-118

you agree that's conspicuous?

A    I would say it would be relatively.

Q    Because now you've got 20 F35s on deck.

A    The flight deck looks a little bit different.  Yes, it does.

Q    You talked about how understanding the guts of a boat, a ship, knowing where the different compartments are could aid an enemy in building a ship better suited to attack it, right?

A    A weapon.

Q    A weapon better suited to attack it.

A    Correct.

Q    And we looked at a bunch of diagrams.  And am I wrong, or were all of the sensitive areas just kind of pointing to the middle of the ship?

A    They were pointing to where those mounts were configured.  And I think the one with the switchboard, the IC switchboard, that IC switchboard room, I think, is basically in the center line.  That particular one was in the middle.

Q    Would you agree with me that it's a common tactic in naval warfare when attacking a ship at sea to aim for center mass?

A    Not necessarily, no.

Q    So in some cases, you would say try to aim for the

IV-119

propeller?

A    Propulsion, yeah.  Propulsion.  Or in the case of a torpedo underwater, obviously, you're trying to get an underwater detonation somewhere to break the keel or hull.

Q    But the propeller, everybody knows where the propeller is, right?

A    Yeah, we generally do.

Q    Is there a good part of the ship to get hit by a torpedo?

A    Not really.  Modern torpedoes don't detonate.  It's not like the movies where they detonate contact alongside the hull.  They're going to go ahead and detonate underneath the ship.  So you don't want to be hit by a torpedo at all. That's just, you know, basic seamanship.

Q    All right.  I think we got that on the record. You don't want to get hit by a torpedo.

A    That's unfortunate.  That'll be one day.

Q    You mentioned cutouts.

A    Correct.

Q    I was probably writing while you were talking.  Can you remind me what cutouts are?

A    So a cutout is a -- when you have a weapon mount, it's going to move, right? And it's going to go to -- it might spin.  A cutout is where it's no longer allowed to go any further.  It'll basically go to what we call the stops.  So

IV-120

it prevents, say, a weapon or an automatic cannon from pointing at your pilot house and unloading itself into your own ship if it sees a threat coming from a quadrant that, you know, it tracks that way.

Q    So it's essentially a window that a gun can stick out of?

A    Yeah.  A cutout is an area where it's not going to track through in order to prevent damage to your own vessel.

Q    You wouldn't need a diagram of a ship to know where the cutouts are, would you?

A    It would certainly help.

Q    Yeah.  But it would be visible from the surface, right?

A    It would be visible for other pictures, certainly.

Q    You could look at a ship and know there's the cutouts, right?

A    You wouldn't necessarily know exactly where that is, but you would have a general idea.  You would.

Q    And the concern there is that if somebody knew where the cutouts were, they could aim for that because it's a more vulnerable part of the ship?

A    It's a part of the -- it's a direction from which you can't necessarily place your defensive systems.  So you would -- as a defending ship, I would try to maneuver myself to limit that vulnerability, but sometimes I wouldn't be able to do it depending on speed or where I'm operating, if

IV-121

I'm going to drive myself up on a rock or something.  But that's essentially what it is.  But a picture, a line diagram from a technical manual, I think we were talking before, a line diagram from a technical manual is verification.  It's a little different than getting something, a picture that you got out of a magazine.  So that's -- that would be the difference.

Q    So you're saying that there might be different types of diagrams.  The ones that you would find in a tech manual are going to be more detailed or informative?

A    They may be.  They should be.

Q    There's a lot of naval enthusiasts out there, like bloggers, there's magazines.

A    Absolutely.

Q    Like Sea Power magazine.

A    Absolutely.

Q    And they've got tons of diagrams of boats.  They talk about their capabilities, right?

A    They do.

Q    There's also online.  Online websites.  There's websites that track where certain vessels are located, right?

A    There are.

Q    I think even the U.S. Navy itself --

A    U.S. Naval Institute puts out a vessel tracker?

IV-122

Q    I'm guessing it doesn't disclose clandestine missions?

A    No.  And the information you're seeing is all -- you know, it's a dot on a globe that doesn't tell you exactly where the ship is.  But if it's deployed, the vessel tracker will tell you, hey, this ship is deployed.  And they put it on their -- I think they put it on their website.

Q    I don't really know if other naval fleets for other countries have a similar degree of transparency about some of these things?

A    Most do not, I would say.

Q    Would you say that the U.S. Navy is the most transparent major maritime military operation?

A    I would say so.

          MR. JONES:  I have no further questions.

          THE COURT:  Thank you.  Any redirect?

          MR. BARRY:  Just a minute, your Honor.

                    REDIRECT EXAMINATION

BY MR. BARRY:

Q    MR. Caldwell.  Was there anything about any of the questions you were just asked by Mr. Jones that changes your prior testimony about the harm to the United States or benefit to China related to this case?

A    None at all.

Q    If the U.S. military were engaged in a military engagement today in the Western Pacific, would LHDs be part

IV-123

of that fight?

A    I can't answer that question.

Q    Okay.

MR. BARRY:  No further questions.

THE COURT:  Thank you.  Anything else?

MR. JONES:  No, Your Honor.

THE COURT:  Is he excused?

MR. JONES:  Yes.

THE COURT:  All right.  You may step down.

THE COURT:  So we'll take our lunch break at this time.  We'll be back at 1:00 o'clock.  Please remember the admonition I gave to you earlier.

(Jury exits courtroom.)

THE COURT:  We're outside the presence of the jury.  Did you want to clear up some of your exhibits?

MR. BARRY:  We will need to, yes.

THE COURT:  Do you rest subject to clearing --

MR. BARRY:  Yeah.  If we're going to rest in front of the jury, we are going to rest subject to cleaning up our exhibits and just having a moment to confer with the counsel.  But I think we're ready to rest.

THE COURT:  Okay.

MR. BARRY:  Was that your question?

THE COURT:  Yes.

And then are you making a Rule 29 motion?

IV-124

MR. JONES:  Yes.

THE COURT:  On all counts?

MR. JONES:  Yes.

THE COURT:  All right.  Thank you.  The Court believes it's factual for the jury.

MR. JONES:  Yeah.

MR. BARRY:  Just timing-wise, I've spoken to Defense counsel.  I don't know that there's going to be a Defense case.  I don't know if they've decided that.  My proposal is we'll give some jury instructions to you over the lunch break.  And then if there is a defense case, we'll just go forward.  And if there's not, I would suggest we at that time discuss jury instructions and then break for the day and then reconvene at Tuesday.

THE COURT:  What are your thoughts?

MR. JONES:  I agree with counsel.  We'll have a definitive answer as to whether we'll be presenting any affirmative evidence after lunch.

THE COURT:  Okay.

MR. BARRY:  But either way, we'll have time today for the jury instructions, and I agree. We'll have our proposed special instructions for the Court over the lunch hour, and we can discuss those regularly when we come back. I think that's an appropriate use of time.

THE COURT:  Okay.  Under Evidence Rule 611, the

IV-125

Court has the ability to control the nature and order of proof in a reasonable fashion.  And I've conferred with the Marshals.  The Marshals have indicated that the Defendant does not have access to the internet while in custody, not -- and that the Court -- I don't believe we have wifi here that's open.  And the court staff has been instructed not to go on platforms such as Facebook on court authorized things. If there were a work around, we would have to have advance notice of that ex-parte with the Court and figure out what we would do.  I still believe that because I don't think that we can replicate the circumstance and with all the other concerns.  And in the absence of any case authority, suggesting an online demonstration would be prohibitive or replicate what happened back at the time, then the Court denies your request.

MR. JONES:  Understood.  I didn't know that it was still under consideration.  I appreciate the additional thoughts.  But thank you.

THE COURT:  If there's any work around, then you have to let me know asap over the lunchtime.

MR. JONES:  Sure.

THE COURT:  But I think that it's just problematic.

MR. JONES:  The workaround would be probably giving him my cell phone and having him --

IV-126

THE COURT:  That's a problem, too.

MR. JONES:  Exactly.  So I doubt that ameliorates the Court's concerns.

THE COURT:  Yes.  And I think just giving him your cell phone doesn't then show how you can show the jury or show what Facebook had back at the time.  So I just think there's a lot of layers of problems to that.  Any comments?

MR. BARRY:  No, we concur with the Court.

THE COURT:  All right.  Thank you.  So we'll see you after lunch, 1:00 o'clock, and then you can let us know if there's any defense case.

MR. JONES:  All right.

THE COURT:  If not, make sure that you have your jury instructions ready to be discussed and the verdict form as well.

MR. JONES:  Do you -- I meant to ask this earlier. I know that the Court wants the clean copy of what we read the jury emailed in, but as far as --

THE COURT:  Now, you have the court set that I handed to you, which is a clean copy.

MR. JONES:  Yeah. Right.

THE COURT:  So now all you have to do is take a look at that and then give me any updates.

MR. JONES:  Got it.  But for any case law supporting proposed special instruction, would the Court

IV-127

want that included?

THE COURT:  That was supposed to be included way back when?

MR. JONES:  And so the Court flagged that there was an inappropriate citation to the good faith defense. And so --

THE COURT:  Correct.  You can provide a new update.

MR. JONES:  Okay.

THE COURT:  Or a new update on anything.  And you can do that both annotated or clean or simply hand scribbled on what the Court gave you.

MR. JONES:  That was my question.

THE COURT:  Any of the above.

MR. JONES:  Thank you.

MR. PARMLEY:  I think we're going to scribble and then scan it.  That's our plan.

THE COURT:  All right.  Thank you.

And then I did want to alert you.  One of the cases had the authority to what constitutes public information under the ITAR requirements.  And then the actual definition of -- let me get my glasses -- is now 22-CFR-120.33 and 120.34.  And I think that that definition of public information, it says, "Public domain means information which is published and which is generally

IV-128

accessible or available to the public through sales at newsstands and bookstores, through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information through second-class mailing privileges granted by the U.S. Government at libraries open to the public or from which the public can obtain documents, through patents available at any patent office, through unlimited distribution at a conference, meeting, seminar, trade show, or exhibition generally accessible to the public in the United States, through public release, unlimited distribution in any form, e.g., not necessarily in published form after approval by the cognizant U.S. Government department or agency.  See also 125. 4(b)13 of the subchapter. Or through fundamental research in science and engineering at accredited institutions of higher learning in the U.S.  Where the resulting information is ordinarily published and shared broadly in the scientific community, fundamental research is defined to mean basic and applied research in science and engineering where the resulting information is ordinarily published and shared broadly within the scientific community as distinguished from research, the results of which are restricted for proprietary reasons or specific U.S. Government access and dissemination controls.  University research will not be considered fundamental research."

IV-129

And then it has some exceptions for fundamental research.  One, "If the university or its researchers accept other restrictions on publication of scientific and technical information resulting from the project or activity, or the research is funded by the U.S. Government and specific access and dissemination controls protecting information resulting from the research are applicable."  In sum, I'm not seeing that a shared group on Facebook is within the definition of publicly accessible information, but I'll certainly permit you to argue that.

MR. JONES:  Can I get that site one more time?

THE COURT:  Yes.  22-CFR-120.33 and 120.34.

In the case that the Government cited, Chi Mak 683 F3d. 1126 from 2012.  It had the definition.  And I'm assuming that the CFR numbering has been updated because it defined the same thing and called it, at that time, 120.10(a)1.  So I wanted to flag that for both sides.

MR. BARRY:  We appreciate it, Your Honor.  I'm glad we were reading the same thing last night.  So just to give you a preview, I mean, we'll talk about this later.  I think, you know, it's we initially cited to the Chi Mak case we went back and reread it in light of the Court's comments and also in light of what the issues were at issue in that case.

THE COURT:  Uh-huh.

IV-130

MR. BARRY:  And we are going to be objecting to any sort of discussion of public domain and the instructions just because for the counts four, five, and six which are the only ITAR counts at issue our view is that there is no evidence that any of those documents containing technical information were in the public domain as defined by ITAR. Certainly, if the Court disagrees, I think we will want to make sure that there is an instruction, even though it may be a little laborious that specifically --

THE COURT:  Or maybe it would say the contrary of Facebook -- well, we don't know what the evidence is going to be.

MR. BARRY:  Right.

THE COURT:  So we'll see at the end of the case, and then we can discuss the instructions.

MR. BARRY:  Certainly, it depends on if they put on a case, but to sort of make sure that public domain in the colloquial sense is different than public domain in the ITAR sense.

THE COURT:  Yeah.  So you need to look at that.

MR. JONES:  Agreed.  Thank you, your Honor.

THE COURT:  All right. Thank you.

MR. BARRY:  Thank you, everyone.

THE COURT:  1:00 o'clock.

(Proceedings recessed briefly.)

IV-131

AFTERNOON SESSION

--oOo--

THE COURT:  Okay.  So we'll go on the record.  We are outside the presence of the jury.  The exhibits that you had proposed, they had been identified but not yet received, 34-4.

MR. JONES:  I believe the 34-4 --

THE COURT:  Is a "I'll try my best MM to LOL.  I hope they send me to boxer."

MR. JONES:  Right.  That was subject to subpoena.  That was that was from the subpoena.

THE COURT:  Okay.  Are you offering it in any objection?  Do you want to see it?

MR. PARMLEY:  I just -- yeah.  I think I have 34-4?

THE COURT:  Yes.

MR. PARMLEY:  And could you remind me, Counsel, which witnesses was discussed with this?  I'm going to object to hearsay.  The Defense is trying to put it in his own statement without taking the stand.  This is his own text message.

THE COURT:  From --

MR. PARMLEY:  Well, it's from the message.  It looks like it originates from -- the author's name is Patrick Wei.  This is a message he sent to somebody.  So

IV-132

this is him trying to put in affirmative -- some sort of affirmative defense about tech manuals and a success finder in a shared drive without taking stand.  We have no other evidence of this.

THE COURT:  So I'll defer that.  And then 53-4, is it from the phone that was received.

MR. JONES:  Right, Judge.

MR. PARMLEY:  There's no objection to the foundation of these.  These came from an exhibit.  These are part of that download of the phone, but it's the same objection.  These are text messages of the Defendant that we're not admitting and the --

THE COURT:  It doesn't say that.  It just says the source.

MR. PARMLEY:  The source, right.  The source just says, "My MacBook owner" on some of them.  That's the Defendant's phone.

THE COURT:  I'm inclined to receive these.

MR. PARMLEY:  I don't know if we heard any testimony about it, your Honor.

THE COURT:  No.  But you admitted the phone without reservation, and these are just timestamps from the phone not content.  And it would say -- so it does include a couple that I don't think -- from Facebook messenger, but only one that arguably could be helpful is from 5/6/2022 and

IV-133

5/7/2022.  And I don't know if those are relevant dates for the manuals.

MR. PARMLEY:  My argument is not to the foundation of them.  You and I agree that those are phone -- correct and true messages that came from that phone.  However, we are not introducing those statements of the Defendant.  We introduced some of the statements but not all of the statements.  The Defendant cannot put his own statements in without being -- subjecting himself to cross examination.  We would move to exclude those as hearsay.

THE COURT:  The only one that I see has content.  Your page four is a tricky one because only people with random access can print it and it needs to be signed by a DIVO.  Carrillo is not approachable chief at all.  Response to the hearsay within the document.  What about if he'd limit it to, for example, the source like "My MacBook or with Facebook"?  That's not hearsay.

MR. PARMLEY:  Well, it's still his statements here, Your Honor.  These are his messages.  For example, when he says, "So did you ever say anything about..."

THE COURT:  We could delete all of the messages.

MR. PARMLEY:  And then I don't see the relevance as to --

THE COURT:  Well, it goes to his Facebook argument.

IV-134

MR. PARMLEY:  The fact that he had a Facebook account, we would be willing to stipulate to that.

THE COURT:  I know, but this shows Facebook access at a certain date.  That may or may not be helpful.

MR. JONES:  I agree that there's relevance -- there's relevancy to that.  I would argue that the actual contents of it, though, serve a non hearsay value of the effect on the reader, viewer, or the failure to consider, in the constellation of evidence, that this witness admitted that these were part of the data dump download received and admitted by the people in the evidence.  And that part of the investigation into -- to Mr. Wei was formed -- was based on the review of that evidence and that because it contained information that supported things he said during his arrest interview about Facebook, and there was additional testimony about (indiscernible) to pursuit to look any of this stuff up on Facebook and so --

THE COURT:  Limiting instruction that it's not offered for the truth of the matter, but for what effect on the investigation.

MR. JONES:  Sure.

MR. PARMLEY:  In subject, I would recommend you give us an opportunity to -- I mean, all of it is --

THE COURT:  To look at it.

MR. PARMLEY:  Yeah.  There's --

IV-135

THE COURT:  No, no.  There's only this subset right here.

MR. PARMLEY:  Right.  It's about 30 pages, and the vast majority of it is completely irrelevant.  It's got like, "I'm a leave in.  me and Fernandez dipped.  I'm a dip as well.  I'm going to the base galley."  I mean, this is not relevant.  It's hearsay.

THE COURT:  No, I was --

MR. PARMLEY:  It's got specific messages that --

THE COURT:  I was suggesting that we delete the content of the --

MR. PARMLEY:  Okay.

THE COURT:  -- the things about my MacBook.  So you need to meet and confer and then just decide about that.

MR. JONES:  Right.  I agree there's a lot of irrelevant stuff in 34-4.  I just kept it intact out of -- for transparency.

THE COURT:  Not 34, it's 53.

MR. PARMLEY: 54.

MR. JONES:  53.4.

THE COURT: 53.

MR. JONES: 53.

THE COURT:  Four, six, ten, and twelve.

MR. JONES:  That contains a bunch of irrelevant stuff, but I wanted to preserve the full chat file just for

IV-136

transparency sake.  I have no problem with cutting out all the stuff about spilling appendix plus drink in his car.

THE COURT:  So why don't the two of you meet and confer?

MR. PARMLEY:  I'm unlikely to agree, but I think we could at least pare it down to a more reasonable approach.

MR. JONES:  Yeah.  I think the bigger issue is whether or not the contents of the messages will be left in with a limiting instruction for non-hearsay value.  I believe there was an objection raised and overruled.

THE COURT:  I thought we deferred it.

MR. PARMLEY:  You did defer it.  I have no objection --

THE COURT:  Because it's not received.

MR. PARMLEY:  I had objection to the witness reviewing it and testifying about she was the investigator on the case.  That seems eminently reasonable, but to put in his chats without him taking the stand, It's not reasonable.

MR. JONES:  I think it's critical to show the documentary evidence that was available to the investigators.  That was overlooked and the corroborative value with Mr. Wei's statements that was also ignored without knowing the contents.

MR. PARMLEY:  I think that was covered effectively

IV-137

on cross, but you know, we can discuss it.

MR. JONES:  I appreciate the compliment, but I disagree.

THE COURT:  What I would be inclined to consider is deleting the text but permitting the source data.

MR. PARMLEY:  I would have to see what that looks like, but I understand what the Court said.

THE COURT:  Okay.  You can review that, and then what about -- are you putting on a case or not?

MR. JONES:  I don't know.

THE COURT:  No.  Okay.  Do you want to bring the mom in too or not?

MR. JONES:  Did you see her outside?  Yeah.  We can bring her in when we open the doors.

THE COURT:  Okay.  And I'm just going through the exhibits.

MR. PARMLEY:  With regards to the exhibits, your Honor, because the Defense is resting, I think we'll have time immediately concluding Court to make sure that whatever's in the binder -- the only things that are in the binder have been admitted.

THE COURT:  Well, that's what I'm doing right now so that you will agree on it, not when I'm not here.

MR. PARMLEY:  Okay.

THE COURT:  And I'm almost done.  And then what

IV-138

about the exhibit that was the chart that the agent reviewed, but it wasn't her chart?  Is that what it was?

MR JONES:  That had initially been used with Agent Wetterer, who prepared that document and added the handwritten notes.

THE COURT:  Okay.  So I'm up to 200, and can you, Rhonda, go look at what 201, 202, they're in the -- they're in that thing, 203, 204, 205 was reserved.  Do you withdraw that?

MR. PARMLEY:  Yes.  That does not exist as an exhibit.

THE COURT:  We'll take that out, 207, 208, 209, 210.  Can the parties come and look at these from 206 through 237?  Are those all in there?  That's a lot.  If -- do you see a 238?  That should be removed if there's a folder.

MR. JONES: I think that --

MR. PARMLEY:  -- what we discussed.  It's 238, 242 --

THE COURT:  So you withdraw those?

MR. PARMLEY:  Yes, your Honor.

THE COURT:  And they're not in there?

MR. PARMLEY:  They are not.

THE COURT:  Okay, good.  And then the rest should have through row 249 all the way through 265.  Are all of

IV-139

those there?

MR. PARMLEY:  256.  258.

THE COURT:  258, we'll take out.

MR. PARMLEY:  242.

THE COURT:  I got that.  So what I propose to do is I've taken out of the first and second set of binders all of the empties that were not used.  There are a lot of empties that are videos or audios, and there's no description in this binder, but what I think would be useful for the jury is to give them the list as amended when we've taken out the reserved ones, which says what the empty ones are, such as video or thumb drive.

MR. PARMLEY:  I'll remember that.

THE COURT:  And then I changed -- if you look at the -- and then so we'll delete on this list the ones that have not been used.  For example, 42 through 49, we'll just remove it from the chart.  54 through 60, we'll remove it from the chart, and then I -- the parties earlier had said 32 was response from Navy, but it's really response from Navy Federal Credit Union.  So for the description, if they want to take this and then compare it to the binder, they'll know what it is.  Any objection?  Do you want to see what I'm talking about?

MR. JONES:  No.  I know what you're talking about.  No objection.

IV-140

THE COURT:  And then the demonstrative -- should the chart -- should be out.

MR. PARMLEY:  Yes.  I'll take it out the Court when we leave today.

THE COURT:  Pardon me?

MR. PARMLEY:  I'll take it out in the Courtroom when we leave today.

THE COURT:  Okay, good.  So we're all about 200 seats over there?

MR. PARMLEY:  Yes.  I'm going to triple check it once the jury's been released, but yes.

THE COURT:  Okay.  So Rhonda, what we could do right now is you can update this chart as I've done, and then have a next page for -- the transcript of this interview was not admitted?

MR. PARMLEY:  Correct.

THE COURT:  And so that's out.

MR. PARMLEY:  Correct.  That was 190A maybe.  And the only other one, the Court may have discussed it.  54 was marked.  It was not entered.  That was Government's 54.  That was this morning, and we're not intending to offer it.

MR. JONES:  What was 54?

MR. PARMLEY:  It was the document that she reviewed.

MR. BARRY:  Ms. Hamilton document.

IV-141

THE COURT:  We removed that.

MR. JONES:  We're not offering -- you're not offering those documents.

THE COURT:  So take a look at 53-12.  Do you have that?

MR. PARMLEY: That's the March 3, 2026 exhibit.

MR. BARRY:  That's their exhibit.

MR. PARMLEY:  Yeah, yes.  This is the one that's like --

THE COURT:  So do you have that in front of you?

MR. PARMLEY:  I'm sorry, what was the question?

THE COURT:  53-12.

MR. PARMLEY:  So you're asking my objection to it? Yeah.  I mean, this is another example of the Defendant's statement, "Here are all the tech manuals in joy, LOL." That is incredibly self-serving hearsay.  It's only offered for the truth of the matter, not subject to cross-examination.  He has constitutional right to testify. They haven't rested yet.  He's absolutely able to explain all this.  He could put this in, talk about it, say this corroborates what he says but as of right now, it would be impermissible hearsay to put in that statement.  If you took out the statements and it's just Facebook gobbledygook, I suppose I would have no objection to that except for relevance showing that the defendant did, in fact, have a

IV-142

Facebook group.  I would have no objection to that, but putting in a statement, that would be purely offered for the truth of the fact.

MR. JONES:  Your Honor, the Government was in possession of this.  In fact, they put it in the device itself containing this.  They put it in evidence.  They had it in their possession when Mr. Wei was questioned for hours.

THE COURT:  They didn't technically, because the laptop was over at the residence being searched, and they first questioned him without any benefit of what was from the laptop, and there's a lot from the laptop.  So they can't instantaneously figure it out.

MR. JONES:  They didn't have the laptop in front of them, but it was the same officers questioning him as arrest that subpoenaed and reviewed the subpoenaed records eight months earlier.

THE COURT:  Later?  You mean later or --

MR. JONES:  Eight months earlier.  Agent Wetterer testified that they had those documents in their possession as of January 2023.  She said she recognized some of them, and they asked Mr. Wei about his phones and sharing stuff, and he said Facebook.

THE COURT:  But -- so remind me of the time they covertly downloaded the phone.

IV-143

MR. JONES:  January 2023.

THE COURT:  But then they didn't have the phone until the date of the arrest.

MR. PARMLEY:  These are --

MR. JONES:  They didn't have.

THE COURT:  So they would not have 6/7/2023.

MR. PARMLEY:  And regardless, your Honor, he's not -- he's just saying that that means it was a bad investigation.  He can argue that.  He can say that they had an opportunity to look at all this, and they ignored it because they had blinders on, and they thought they had the right man, and they didn't explore other opportunities. That's a legitimate argument to make based on the evidence that's come into this case.  But to put this in as his statement, we have his post-arrest statement.  We didn't play all of it.

THE COURT:  So delete the body, "The tech manuals."  Do you have any objection to him -- the phone showing that he accessed Facebook?

MR. PARMLEY:  I have no objection to that.

MR. JONES:  For instance, on 53-12, would that include the links like https://facebook?  Would that remain intact and it would just be the verbal statements or the text statements by Mr. Wei that would be taken out?

THE COURT:  That's what I think.

IV-144

MR. PARMLEY:  Yeah.  I don't care about a Facebook login that says something that you can argue something from. That is fine.  It's just his statement should not come in.

THE COURT:  So on 53-12, we will delete body, "Here are all the tech manuals.  Enjoy.  LOL."  Next one, delete body, "Thank you."  Next one, delete body, "No problem."  Delete body "Loved https://facebook.com."

MR. PARMLEY:  If that's the way the court would like to do it, I don't see evidence of relevance.  I don't see any objection to this.

MR. JONES:  So I think deleting, "Loved," and then the link creates confusion.

THE COURT:  I don't think it creates confusion. It's consistently deleting hearsay statements from people that aren't here.

MR. PARMLEY:  I mean, that same website address is at the top.  It's identical when it says "body," but the Court is not going to delete the body of the first message, is that correct?

THE COURT:  You mean the body is the Facebook?

MR. JOHN:  Yeah.

MR. PARMLEY:  It says "Cody" and that's https://lm.facebook.com.  Those are identical links in all of the bodies, in the top body and the last body.  Although, one is obviously much more expansive.

IV-145

THE COURT:  I want to include -- because this isn't a statement.  It's just a source to include -- to let you have that.

MR. PARMLEY:  That's fine.  Just remove the word "Loved."

THE COURT:  Delete body, "Here are all the tech manuals."  Delete body, "Thank you."  Delete body, "No problem."  Do you have a sharpie?

MR. JONES:  I would leave -- I would agree suggest leaving the word "body," because that's not something provided by the user.  That's system.  It's just for consistency.  If we're going to leave -- I would leave "body colon" in.

THE COURT:  Any objection?

MR. PARMLEY:  No.

MR, JONES:  That's a minor.  Just keeping score.

THE COURT:  So what are we doing with 34-4?  That, I think, doesn't come in.

MR. PARMLEY:  34-4 is the single message?

THE COURT:  Yes, about the boxer.

MR. PARMLEY:  Right.  We're objecting to that. This is a statement from the Defendant.

THE COURT:  Yeah. That -- so 34-4, the Court denies, 53-12.

MR. PARMLEY:  That's the one we just talked about,

IV-146

right?

MR. JONES:  Yes.

THE COURT:  The Court is deleting the body, and we'll have to make sure that it's darkened.  53-10, the same.

MR. PARMLEY:  Deleting body, is that what you're doing?

THE COURT:  No, not deleting body.  Deleting the text underneath the body.

MR. PARMLEY:  Correct.  That's what I meant.  For all of them?

THE COURT:  Yes.  And at some point, we'll let the jury in, but I wanted to get this straight.

MR. JONES:  On 53-4, I think only page 19.

THE COURT:  Who's talking?  You?

MR. JONES:  That's me.

THE COURT:  Okay.  53-4, I'm not there yet.

MR. JONES:  Okay.

THE COURT:  Hold on.  Did you update it?  Can you show them?  Okay.  I'm now on 53-4.  What page do you want?

MR. JONES:  I think page 19 is the only one that contains a non-statement body.  So if we're doing it this way.

MR. PARMLEY: Give me that date and time with the message,  please.

IV-147

MR. JONES:  Oh sorry.

THE COURT:  Do you want the first page, the second page?

MR. JONES:  The timestamp is 2:25 2023 11:55.

THE COURT:  Can you come forward.  Can you come forward?

I'm giving 53-4.  Are you withdrawing some of these?

MR. JONES:  I don't think it make sense to have 20 pages of redactions and revisions.

THE COURT:  So you don't want these ones in at all?

MR. JONES:  Nothing from the other individuals.

THE COURT: I don't think that's a non-hearsay purpose.

THE JONES: How did you get the documents for it's showing what – it's providing a context what Jinchao or that his file was being provided in response

MR. PARMLEY:  He's offering it for the truth with this – whatever this is, there's JPEG.  JPEG involves documents.  That's it.  For the purposes of establishing a fact.

THE COURT:  The Court denies it.  I will be consistent on redacting the body.

MR. PARMLEY:  So we're just going to use that one

IV-148

page.  Is that accurate?

MR. JONES:  Well, let me clarify.  It's – this is just a text within the body that is being straightened.

MR. PARMLEY:  I want to ask to include the preceding question from the other individuals, right, for the non-hearsay folks of showing the effect on the reader and the response was to provide the following.

THE COURT:  I don't think that's a non-hearsay purpose.

MR. JONES:  How did you get the documents for it? It's providing the context.  It's showing that this file was being provided in response.

MR. PARMLEY:  He's offering it for the truth. Whatever this is, is JPEG.  JPEG involves documents.  That's for the purposes of establishing a fact.

THE COURT:  The court denies it.  I will be consistent on redacting the bottom.

MR. PARMLEY:  So we're just going to use that one page.  Is that accurate?

MR. JONES:  Let me clarify.  Is it just the text within the body that's being stricken?

THE COURT:  From 53.12 and 53.10.

MR. JONES:  And four and six?

THE COURT:  And 53.6.  And I haven't gotten to 53.4.

IV-149

MR. JONES:  Okay.  But the plan is to leave the from, timestamp, source app.

THE COURT:  Yes.

MR. JONES:  And then just take out the body?

THE COURT:  Yes.  And the question is, do you want all of 53-4 or a subset of 53-4?

MR. JONES:  I'm trying to visualize it, sanitize it.

MR. BARRY:  There is a statement in there that we have, but it's a statement of the Defendant that we elicited, but we don't need to put this document in.  I would recommend just putting in that one page.  It's page 19 of 53-4.  Redacted the same way the Court does.  It shows that an image was sent called MM2E5-BibList.  I think that accomplishes what the defendant is trying to do.  THE COURT: Okay.

MR. JONES:  Submit.

THE COURT:  All right.  Thank you.  So you want to hand that page?

MR. PARMLEY:  And if possible, at the Court's convenience, we can get a copy of what actually goes back to the jury.

THE COURT:  Well, I want it.  At the Court's convenience, I'm going to make copies for you so you can review it first.

IV-150

MR. PARMLEY:  I appreciate that.  Thank you.

THE COURT:  So with respect to 34-4 and 54-4, do you want to retrieve them, the remainder?

MR. JONES:  Sure.

THE COURT:  Okay.  So I'm giving you back.

MR. JONES:   Well, If we can just write them or trash them, I don't know.

THE COURT:  I'll just give them back to you.

MR. JONES:  Okay.

THE COURT:  That one and that.  And then I'll finish 53-4.  Okay.  So we now have these redacted.  And then, we had the originals somewhere.  Where are the originals with the stickers?  So we're giving back 34-4.  That one back.  And then we need to put these stickers on this one.

Can Counsel approach and review them?

THE CLERK:  Do you need more stickers?

THE COURT:  We need the stickers again.

THE CLERK:  Did you have --

MR. JONES:  And is it my understanding this is the entirety of the Defense exhibits that are being offered at this point?

THE COURT:  Yes.

MR. JONES:  Okay.

THE COURT:  So the Court denies to receive the

IV-151

unredacted 53-4 as it contains hearsay.  The Court will receive the redacted exhibits.

MR. PARMLEY:  I think the Court may have missed one page on 53-10, and one -- maybe one line on 53-4.

THE COURT:  Okay, thank you.    Keep them together.

MR. JONES:  Oh, that was a good one.

MR. PARMLEY:  It's a good one.

THE COURT:  I missed a whole page.

MR. JONES:  Can put the sticker on this one, then?

THE COURT:  Okay. then we just need to mark those.

MR. JONES:  I think I'll need at least one more sticker.  Thank you.

THE COURT:  Into the ones that are blank, say what it is.  The ones that are blank, say what it is, like video. And if you look in here, there's nothing in there.

THE CLERK:  The highlights.  I highlighted all the ones that are physical.

THE COURT:  Okay.  But we'll use this.  We'll use this.  No.   No, no, no, no.

THE CLERK:  Oh, I'm sorry.

THE COURT:  190-A.  That one's out.  We're almost there.  That's the only one I saw.  And then, except we need one for the Defense.

THE CLERK: I've already given them.

IV-152

THE COURT:  Pardon me?

THE CLERK:  I didn't type one.

THE COURT:  Yeah.

THE CLERK:  Okay.

THE COURT:  So, which would be 54.4, 53.6, 53.10, and 53.12.  He has listed -- well, that's what I don't know.

What would you name 53.4?

MR. JONES:  The Facebook Messenger Exchange.

THE COURT:  Is it Facebook?  The original description was iMessage Chat.

MR. JONES:  Your Honor, I wrote the original description, so I was probably incorrect with those.

MR. PARMLEY:  I think this is iMessage, because it's phone numbers?

THE COURT:  I have 53 --

MR. JONES:  I'm fairly certain these are Facebook messages.  If we go into the phone, it's in Facebook Messenger, and then it's called Chats within that.

MR. PARMLEY:  And it's probably stored from his phone.

MR JONES:  Yeah.  I don't even know.  Now that I'm --

THE COURT:  I have 53.6, Facebook Messenger, 53.10 iCloud Subpoena Chat, and 53.12 Facebook Chat.

MR. JONES:  Well, let me just -- let me pull up --

IV-153

THE COURT:  Okay.

MR. PARMLEY:  53-6 is clearly Facebook Chats.

THE COURT:  53-6?

MR. PARMLEY:  Clearly Facebook Messenger, yes.  I think the others are iMessages, but I need to look.

MR. JONES:  Which number again?

THE COURT:  53-4, we had iMessage Chat.  In 53-10, we had iCloud Subpoena Chat.  In 53-12, we had Facebook Chat Subpoena.

MR: JONES:  So one thing to just note for the record, I didn't realize that the description that the jury would see would say "subpoena."  These are not from a Subpoena response.

THE COURT:  Okay.  So it should not say "subpoena?"

MR. JONES:  Yeah, I apologize.  We've just spent half an hour on this.  But given the results of the document after the sanitization, I would ask to just withdraw these exhibits.  I know we just expended some time and energy on it.  I would just ask to withdraw them.

THE COURT:  You don't want to show that he was actually looking at Facebook?

MR. JONES:  I think it's so watered down as to make it appear to be more of a reach than it is.  And I disagree with the ruling.  I think it's given to

IV-154

Government's knowledge, ownership, use of it, the absence of any kind of concern about its legitimacy having been subpoenaed, imaged --

THE COURT:  Well, then can't you just show them?  Here's multiple pages where he is doing Facebook and you didn't even look at it.  Wouldn't you want that?

MR. JONES:  Doing Facebook and sharing links of, well, without the commentary, it's confusing and meaningless without the attached conversation.

THE COURT:  So you want to withdraw them?

MR. JONES:  Yes.

THE COURT:  Okay, they're withdrawn.  If you change your mind by Tuesday, let me know.  You'll have the weekend to think about it.  And then do we have the -- the only thing we were disputing -- we had the contents of it, we were just disputing what to call them.  So if you do wish to say something about it, then by Tuesday you have to let us know what we should put on the Defense list.

MR. JONES:  Got it.

THE COURT:  Okay.  Are we ready for the jury?

MR. PARMLEY:  We are.

THE CLERK: Jury entering.

(The jury enters the courtroom.)

THE COURT:  Thank you for your patience.  Welcome back.  What does the Government wish to do now?

IV-155

MR. PARMLEY:  The United States of America rests.

THE COURT:  Thank you.  And so we have been going over the final preparation for the arguments.  We've conferred with the parties on both sides and the Court agrees, we have to go over the Court's instructions on the law, we just went over the voluminous exhibits and made sure that only the ones that are received are in these binders that will go to you.  And then there's some additional physical evidence and some additional folders that will go to you.  And then so the parties and the Court agrees, since we have to go over the Court's instruction on the law, we'll let you go home early today, and then, I have other matters on Monday, so then we'll come back for the final argument on Tuesday.  I will first give you the Court's instructions on the law, and then the Government will go first on its final argument, and then the Defense, and then the Government has a right of rebuttal, and then the case will be submitted to you for your determination.

So over the weekend, please remember the admonition that I gave to you earlier, don't form or express any opinion about the case, or talk to anybody about the case, or permit anyone to talk to you about it.  We'll see you on Tuesday at 9:00 o'clock.  And you can -- you're free to leave your notebooks right where they are.

So before you go, as I said, I've removed the

IV-156

unused exhibits from the -- these two binders, and some are blank because they relate to physical evidence, but we'll send you the exhibit list for the provenance of the jury, so I'll also ask you to take a careful look at the exhibit list.

(The jury exits the courtroom.)

THE COURT:  Now, we'll go to jury instructions. If you could pull out your set of jury instructions, and then, you said you filed some.

MR. BARRY:  Yes, your Honor, so we -- well we sent them to the Court copying council, I also brought physical copies for everybody since --

THE COURT:  You brought some?

MR. BARRY:  Yes,

THE COURT:  Okay, thank you.

MR. BARRY:  May I approach?

THE COURT: You may.

MR. BARRY:  I apologize for my handwriting.

THE COURT:  No problem.

MR. BARRY:  I'll do this quickly.

MR. PARMLEY:  Thank you.

MR. BARRY:  And I also show the Government on the front page is the verdict form that we prefer.

THE COURT:  Which includes the boiler and water, count four, and the propulsion, count five, and the weapons,

IV-157

count six.

MR. BARRY:  Yes, your Honor.  It specifies the documents.

THE COURT:  Thank you.  And I had two versions of the verdict form, and one that included this.

MR. BARRY:  Correct.

THE COURT:  Any objection to the verdict form?

MR. BERTOLA:  No, your Honor.

THE COURT:  All right, we'll use that.

MR. BARRY:  And just to kind of guide you in terms of the Government's view, so in the upper left hand corner, we just tried to note whether the Government had any objection to each instruction, if it says, "No obj," that means no objection.  And then, if the Government was proposing any revision, we hand wrote the revision.  There is one instruction that we will get to that is a substantive instruction related to the Arms Export Control Act, where we didn't have time to write out the full proposal, but when we get to that, we can explain on the record what the proposal is.  And then, if that's something that the Court agrees to, or if we need to go amend it, we certainly, after the conference today, will send a clean word version set that has all the appropriate revisions to it that the Court can use.

THE COURT:  Thank you.  So we have the verdict --

IV-158

MR. BARRY:  And the first --

THE COURT:  The first one is -- see this is the preliminary instruction.

MR. BARRY:  So the first three pages, this is something that was taken out of the set that you provided to us yesterday.

THE COURT:  Yes, because this was intended to be given at the beginning of the case, not in the -- not at the end of the case.

MR. BARRY:  Okay, so --

THE COURT:  And so, the reason I didn't do it at the beginning is I don't know if the parties have settled on the elements of the offense.

MR. BARRY:  So we would ask -- that's the only proposed addition of those first three pages, and we've updated them to comply with, or to comport with the rest of the substantive instructions, which are the set that the Court provided yesterday.  The Government would request that -- because this instruction was not given at the beginning of the case, that to just sort of -- especially since the jury's not going to have any indictment in front of them, to explain to them what the counts are, and the elements, that this be given to them at the beginning of the final instructions.

THE COURT:  And did the Defense agree with each of

IV-159

the elements?

MR. BERTOLA:  One second.

THE COURT:  See, it's to help you follow the evidence, I'll give you a brief summary of what it is, and that's why I couldn't do it at the beginning, because I don't know if the parties agree on the elements.

MR. BARRY:  Okay.  The Government would not be opposed to the extent that you want to just omit these three pages to take those out.

THE COURT: What we could say is he's charged -- we could have an intro one after members of the jury.  We could say the indictment is not evidence, and then we could add in what he's charged with.

MR. PARMLEY:  Well, we don't have to add the elements --

THE COURT:  And we don't have to say the elements.

MR. PARMLEY:  No, that would be duplicate.

THE COURT:  Any objection to that?

MR. BERTOLA:  That's fine.

THE COURT:  Okay.

MR. BARRY:  So that would be striking the elements in that first instruction.

THE COURT:  So we would just say, "Members of the jury, we must do this.  And then, the Defendant is charged with the following crimes.

IV-160

MR. BARRY:  No objection from the Government.

THE COURT:  And I'd be happy to give it at the beginning of the case, if I had confidence then that we'd have to have an agreement about what the elements are at the beginning of the case when we haven't even heard all of the case.

MR PARMLEY:  And it's slightly unusual charges.

THE COURT:  Yes.  All right.  "So before the indictment is not evidence, the Defendant -- so before this, we'll say the Defendant is charged with conspiracy to commit espionage in count one," that would track the verdict form of the indictment.

MR. BARRY:  And just so we're clear, your honor, are you planning to insert this so that what I'm calling instruction two, I guess it's page one of the version you sent yesterday, which starts with, "Members of the jury --"

THE COURT:  What we would have is Court's instruction number, and then the Court's instruction number would be "The defendant is charged with the following crimes, count one, count two," okay?

MR. PARMLEY:  Yes.

THE COURT:  So can one of you help?  Yeah.  We'll try to get it.  Okay.  So we're adding a new instruction, and we'll have that momentarily.  Any objection to "the indictment is not evidence?"

IV-161

MR. BERTOLA:  No, your honor.

THE COURT:  Any objection to "a defendant has a constitutional right not to testify"?

MR. BARRY: No, your honor.

MR. BERTOLA:  No.

THE COURT:  Any objection to "proof beyond a reasonable doubt"?

MR. BARRY:  No, your honor.

MR. BERTOLA:  No.

THE COURT:  Any objection to, "The evidence you are to consider"?

MR. BARRY:  No, your Honor.

MR. BERTOLA:  No.

THE COURT:  Any objection to, "The parties have agreed to certain facts and witness testimony"?

MR. BERTOLA:  No objection.

MR. BARRY:  No objection, your Honor.

THE COURT:  You wanted me to take out the brackets.  The Court will do that.  And let me hand this to Rhonda.

Any objection?

MR. BERTOLA:  No, your Honor

MR. BARRY:  No, your Honor.

THE COURT:  "Evidence may be direct or circumstantial."  Any objection?

IV-162

MR. BERTOLA:  No objection.

MR. BARRY:  No, your Honor.

THE COURT:  Any objection to, "deciding the facts in this case"?

MR. BARRY:  No objection.

MR. BERTOLA:  No objection, your Honor.

THE COURT:  Any objection to, "You are here only to determine whether the Defendant is guilty or not guilty of the charges in the indictment"?

MR. BARRY:  No objection, your Honor.

MR. BERTOLA:  No, Your Honor.

THE COURT:  "A separate crime is charged in each count."  Any objection?

MR. BARRY:  No objection.

MR. BERTOLA:  No, your Honor.

THE COURT:  Do we need the "on or about a certain date"?

MR. BARRY:  Yes, your Honor.

THE COURT:  Okay.  Any objection?

MR. BERTOLA:  No, your Honor.

THE COURT:  "Defendant made a statement."  Any objection?

MR. BARRY:  No, your Honor.

MR. BERTOLA:  No, your Honor.

THE COURT:  Testimony from the experts.  Any

IV-163

objection?

MR. BARRY:  No objection from the Government.

MR. BERTOLA:  No, your Honor?

THE COURT:  And after listening to the testimony of the experts, the Court confirms that we did not need a Daubert hearing, and that they were fully capable of testifying, and that they complied with the Federal Rules of Evidence.

MR. BARRY:  Thank you, your Honor.

THE COURT:  Any objection -- I want to change this one, because our last witness also gave opinion and lay testimony based on his experience.  And so I was going to change "some law enforcement witnesses" to just "some witnesses."

MR. BARRY:  No objection from the Government.

MR. BERTOLA:  No objection, your Honor.

MR. BARRY:  Can we just flag the -- I think there's an extra word on the second page.

THE COURT:  Okay.  Okay.  Let me give you this one.  And then after we're done, I will copy these so that you have a clean set of what we're going to get.  And then you'll have another chance over the weekend to look at it.

Charts and summaries?

MR. BERTOLA:  No objection, your Honor.

MR. BARRY:  No objection from the Government.

IV-164

THE COURT:  Charts and summaries that were admitted?

MR. BERTOLA:  No objection.

MR. BARRY:  No objection.

THE COURT:  Mandarin dialect?

MR. BARRY:  No objection, your Honor.

MR. BERTOLA:  No objection.

THE COURT:  Count one.  There's a proposal.

MR. BARRY:  So the Government's proposal here -- and it's just correcting some language -- the way that the conspiracy is described, I think, is a pattern for a multi-object conspiracy.  And since the two conspiracy counts here are very specific conspiracies, we've made a proposed change to the instruction for count one and the instruction for count three.

THE COURT:  Okay.  So the last page.  Does the Defense have a benefit of your handwriting?

MR. BARRY:  Yes, I gave them a copy, your Honor.

THE COURT:  Good. Okay.  To change at least one of the crimes alleged in the indictment to commit espionage."  And that -- it's conspiracy to commit espionage.

MR. BERTOLA:  One second.

THE COURT:  As opposed to conspiracy to commit naturalization fraud that doesn't really apply.

MR. BERTOLA:  That's fine, yeah.  That's fine,

IV-165

yeah.

THE COURT:  Okay.  I will give you this one, Rhonda.

Now, we're on to count two.

MR. BARRY:  So for this one, because the jury will not have a copy of the indictment, and to be consistent with other portions of the instructions, we propose adding the specific timeframe for count two that's alleged in the indictment.  So --

THE COURT:  That makes sense to me.

Does that make sense to you?

MR. BERTOLA:  Yes, your Honor.

THE COURT:  Okay.  And it would say --

MR. BARRY:  We would propose it would say, first, "beginning in or about August 2022."

THE COURT:  "Year" or "on or about"?

MR. BARRY:  No preference.  Could be "on or about."  I guess that would be consistent with the prior instruction.

THE COURT:  "On or about."  August '22?

MR. BARRY:  Yes, your Honor?

THE COURT:  Is that right?

MR. BERTOLA:  I'm sorry, which page?

MR. BARRY:  It's the count two.

MR. PARMLEY:  That's all the indictment charges,

IV-166

your Honor.

THE COURT:  August.  It does?

MR. BARRY:  Yes.

MR. PARMLEY:  Yeah.  The conspiracy is bigger than the count two.

MR. BARRY:  The conspiracy is alleged to have started in February of 2022.  But for the substantive espionage count, it's a much narrower timeframe from August to October.

MR. BERTOLA:  That's fine.

THE COURT:  When did he -- when did he send the stuff?

MR. BARRY:  So he sent it during numerous periods of time.  There was a big send in June.  That's part of the conspiracy count.  It's part of the -- one of the Arms Export Control Act counts.  That is not part of the substantive espionage count.

THE COURT:  Okay.

MR. BARRY:  He also sent another tranche in August.  That is part of count two.

THE COURT:  Okay.

MR. BARRY:  He also sent another tranche in October.  That, as well, is part of count two.

THE COURT:  Okay.  You would put page numbers.  I do page numbers at the end, so that we know how many pages

IV-167

we have.

MR. BARRY:  Okay.

THE COURT:  "Willfully"

MR. BERTOLA:  No objection, your Honor.

MR. BARRY:  No objection.

THE COURT:  "Reason to believe"?

MR. BERTOLA:  No objection

MR. BARRY:  No objection.

THE COURT:  "Foreign nation."

MR. BARRY:  No objection.

MR. BERTOLA:  No objection.

THE COURT:  "National defense"?

MR. BARRY:  No objection.

MR. BERTOLA:  No objection.

THE COURT:  Okay.  Arms -- this is the Arms Export Control Act.

MR. BARRY:  Yes, your Honor.  So this is to deal with the definition of technical data.

THE COURT:  Okay.

MR. BARRY:  We would propose to add this paragraph on this instruction at the bottom.  And the language is pulled directly verbatim from the law -- from the regulations.

THE COURT:  So could we delete "and for purposes of this case"?

IV-168

MR. BARRY:  Sure.  I just wrote it that way to be consistent with the preceding paragraph, but you can do that.

THE COURT:  Any objection to the "addition"?

MR. BERTOLA:  It's the same language that's used later on in the Court-given instructions, correct?

THE COURT:  I'm not sure.

MR. BARRY:  It's slightly different.  And the Government is actually proposing to strike the next two instructions or object to them.  So this would be, in part, replacing that.  And the "addition" is this last sentence.  "This includes information," et cetera, which is also part of the regulations in that same exact paragraph in the regs.  And the regulation we're referencing is 22-CFR-120.33 that the Court mentioned yesterday and today.

THE COURT:  Okay. I missed that.  So let me -- first, there's no objection to this "addition," is that correct, as used in the Arms Export -- the definition of technical data?

MR. BERTOLA:  I'm fine with that addition.  I wouldn't strike the other sections, though.

THE COURT:  You can object to the "striking the public information."

MR. BERTOLA:  Yeah.

THE COURT:  Yeah.  Okay.  So first we'll add this

IV-169

-- "technical data."

And then you're objecting to the requirement that the Government prove, beyond a reasonable doubt, that it was not public information?

MR. BARRY:  Yes, your Honor.

THE COURT:  On what ground?

MR. BARRY:  Well, I think there's -- the Government certainly bears the burden of proof to prove that it's technical data.  If you look at the regulations, the -- whether something is in the public domain as defined by the ITAR, it's kind of a further clarification of the definition of technical data.

In this case, the three counts that involved technical data are counts four, five, and six.  And the Government's position is that at this point, where all the evidence has come in, there is no evidence that any one of those documents was in the public domain, regardless of what the definition is.  And so we don't think that that instruction would be appropriate in this case.

THE COURT:  Response?

That's why I think you would want your 53-46 and 12 and 10.

MR. BERTOLA:  Yeah, let me revisit that.  But I think there is an argument to be made that there's -- some of these online sources are analogous to a public library,

IV-170

and also fall within some of the other categories identified as being accessible through subscription, et cetera.

THE COURT:  And the Government's expert today acknowledged that --

MR. BERTOLA:  Correct.

THE COURT:  -- some are online.

MR. BERTOLA:  I think, you know, multiple witnesses acknowledged it.

THE COURT:  I'm reluctant to remove their defense.

MR. BARRY:  I don't think it's a defense.  I mean, I think -- it's -- the regulations have lots of definitions, and it's a question as to whether or not a particular document that the Defendant passed falls under this regulatory structure.  And the definition that we're proposing, which is information required for the design, blah, blah, blah, etcetera, that's the definition of technical data.  There's lots of exceptions, right?

If you look at the regulations, as your Honor mentioned, it can -- it says it does not include basic marketing information on function or purpose.  It does not include information concerning general scientific, mathematical, or engineering principles commonly taught in schools, colleges, and universities.  So the Government's -- and then it includes all information in the public domain as defined by Section 120.34.

IV-171

The Government's view is that there's no factual basis to include any of those definitions.

I think if the Court disagrees and wants to include something on public domain, our proposal would be that we add a paragraph at the bottom of this instruction that defines "public domain" under the ITAR, and it would need to include --

THE COURT:  And recite all those elements.

MR. BARRY:  Yes, your Honor.  It's have to include the definition verbatim from 120.34, just to make clear that "public domain" as it may be colloquially be used, or maybe Counsel has used, it is quite different than "public domain" as defined by the law applicable in this case.

THE COURT:  And what is the Defense position?

MR. BERTOLA:  I think that it appropriately shifts the burden to making it the Defense's burden to prove "public domain" versus the opposite of it.

THE COURT:  No.  What it does is define what is "public domain" under the regulation.  It doesn't shift it. It still would say it's the Government's burden to prove. So I would not strike the Government.

MR. BERTOLA:  Understood.  And that's fine.

THE COURT:  Let's see what we have here.

Where does this come from?  "This includes information in the form of blueprints, drawings,

IV-172

photographs, plans, instructions, and documentation."

MR. BARRY:  If you look at 22-CFR-120.33, that's the definition of technical data under the ITAR.

THE COURT:  Okay.

MR. BARRY:  It's basically that preceding sentence.  This is just the last sentence in the subsection.  And there haven't been any modifications or anything.  It's just straight from the regs.

THE COURT:  So we already defined the "technical data" in the last instruction.  Is that right?

MR. BARRY:  I think we're still on the one that starts with, "The Arms Export Control Act authorizes --"

THE COURT:  I added your "as used in the Arms Export Control Act, the term technical data means..." blah, blah, blah."

MR. BARRY:  Okay.  I thought we had -- if we're going to include the discussion about the public domain, we would propose that the end of this instruction, that's where we could say something like -- to make sure we mirror the language in the regulations -- "Technical data does not include information in the public domain as defined by the International Traffic in Arms Regulations."  And then under the international arms -- International Traffic in Arms Regulations, "Technical data means --" and then we would just take from the regs that definition in 120.34 -- sorry

IV-173

-- I'm sorry, what public domain means.

THE COURT:  So I included your extra paragraph. But I do think that we need a sentence to say, "All technical data is subject to export control."

MR. BARRY:  No objection to that, Your Honor.

THE COURT:  And then we already defined "technical data."  And then we would say, "Technical data does not include information in the public domain."  And then you want it as defined in the regulations?

MR. BARRY:  Yes.

THE COURT:  And then I do think that we should say, "The Government --" we haven't got to the definition. "The Government bears the burden of proving, beyond a reasonable doubt, that the information contained in the boiler water feeder technical manual, the propulsion operating guide, and the weapons control is not in the public domain."

MR. BARRY:  I think we would not object to that so long as there's something to clarify "is not in the public domain" as that phrase is defined above.

THE COURT:  "As defined -- well, we haven't defined it yet in the --

MR. BARRY:  In this instruction, yeah.

THE COURT:  -- regulations."  Okay.  Then --

MR. BERTOLA:  That's fair.

IV-174

THE COURT:  Then -- regulations.  Do you have a copy of the regulations that I cited earlier?

MR. BARRY:  I have a little booklet you could look at, if you'd like, your Honor.

THE COURT:  I think it's somewhere around here.  Uh-huh, got it.  Let me look at his book to see if it's consistent with mine.  Public domain.

Okay.  Then we'll have a separate instruction that defines this?

MR. BARRY:  No objection to that, your Honor.

THE COURT:  So I'll -- just to type.

And then ultimately, it's probably -- so this way, it preserves it as a factual issue for the jury, but also, the Court ultimately will make a determination.  And it's up to you, but given that you need to show something, you might want to have your Facebook reference.

MR. BERTOLA:  I agree.  I apologize going in circles on this, but can we revisit that after the jury instructions?

THE COURT:   Okay.

So what did he do in -- from August?  He sent the manuals in June?

MR. BARRY:  He sent multiple manuals on multiple dates.  And so part of the Government's case is he sent lots of different kind -- types of manuals.  Some of them you can

IV-175

find on the internet, some of them you can't.  Some are more sensitive than others.

THE COURT:  Okay.

MR. BARRY:  So the espionage count is limited to a narrower slice of what he said.  The conspiracy counts are obviously broader because they're about the conspiracies, not limited to the information that he compromised.

THE COURT:  Okay.  Are you saying that when I say, "You are to decide whether it is not in the public domain," that that's shifting the burden to you?  Or should I just take that out -- "The Government bears the burden of proving, but it's not in the public domain as defined in the regulations," and then delete the remainder of that paragraph?  And then we'll have a separate paragraph -- separate instruction on what is the public domain?

MR. BERTOLA:  Yeah, I think that makes sense.

MR. BARRY:  The Government's view -- I mean, this -- "regulations" are kind of complicated.

THE COURT:  Okay.

MR. BARRY:  Our burden is to --

THE COURT:  It's defined in the law.

MR. BARRY:  It's defined in the law, but our burden is to prove that the information is technical data. And then there's the sort of two subcomponents of what is technical data.

IV-176

Subcomponent one is it's required for the design, development, production, manufacturer, assembly, et cetera. And then the subcomponent two, which the Defense has raised -- and we're going to include an instruction on that -- is that it's also not in the public domain as defined by the regulations.

THE COURT:  I see what you're saying.

MR. BARRY:  So that's --

THE COURT:  It's whether it's technical data is your burden?

MR. BARRY:  Yes, your Honor.  Because if it's technical data, then it's subject to the regulations and the licenses required.

THE COURT:  So instead, should we say, "The Government bears the burden of proving beyond a reasonable doubt that the information contained in, blah, blah, blah, blah is technical data"?

MR. BARRY:  Yes, your Honor.

THE COURT:  And technical data has to be not in the public domain?

MR. BARRY:  As defined by the regs, yes.  Yeah.

THE COURT:  Okay.  So instead of saying, "is not in the public domain" -- "is technical data"?  And then the Defense can argue if it's in the public domain, it's not technical data.  If it isn't in the public domain, then it

IV-177

is technical data.

MR. BARRY:  Assuming that the other element is met that Ms. Hamilton testified about this morning.

THE COURT:  And what -- without a license, you mean?

MR. BARRY:  Just the -- it has to be technical data related to Defense article, right?  And that's that -- that's the language in the instructions having to do with it being required for the design, development, production, blah, blah, blah, blah, blah, of the Defense article.

So essentially, because the Defense articles at issue here are surface warfare ship and a defense and protective system on such ship, the technical data is related to the surface warfare ship, and therefore it's subject to the regs.

THE COURT:  Is there anything wrong with the second paragraph that says, "You're to decide whether these three things is required for the design, development, production, manufacture or testing of Defense articles and is not in the public domain"?

MR. BARRY:  We would just ask that's similar to the preceding sentences, "is not in the public domain as defined by the Arms Export Control Act" or the regulations

UNIDENTIFIED SPEAKER:  Or these instructions.

MR. BARRY:  Or these instructions.  Yeah, any of

IV-178

those would be appropriate.

THE COURT:  By "these instructions"?  Is it okay if -- or do you want to say, "regulations"?

MR. BARRY:  "By these instructions" is fine with the Government.

THE COURT:  So the first paragraph said technical data does not include information in the public domain as defined in the regulations.  And then should we say the regulations provide a definition of public domain as follows?

MR. BARRY:  No objection to that, your Honor.

THE COURT:  Okay.

MR. JONES:  No objection.

THE COURT:  We'll have to change.  While you're doing that, I'll have you first look at -- if you can show both sides -- first instruction, just show it to them.  Then we have another one about technical data subject to export control.

MR. BARRY:  No objection to the -- no objection.

THE COURT:  Okay.  That's out -- what I call our introductory instruction to these counts.  Is it the ITAR regulations that we're talking about?

MR. BARRY:  Yes, Your Honor.

THE COURT:  Okay.  Rhonda, tell me when you're done and then I have a change to the intro.  Is the 12c a

IV-179

physical document?  Did she know how to docket it or send it?

Okay.  We'll wait.  Let me just change this.

MR. JONES:  You want to keep it?  Thanks.

THE COURT:  I have my own copy of the regulation.

MR. BARRY:  The Government only has two minor proposed revisions.  For the instruction, defining technical data, we would just ask that in the very last sentence where it says, "And is not in the public domain as defined by these instructions..." we would just request changing by to elsewhere in these instructions for clarity's sake.

THE COURT:  Elsewhere?  Okay.

MR. BARRY:  Elsewhere in these instructions.  And then the second edit is just to on the definition of public domain, subsection five, it says through patents or available to any patent offices.  So just adding an "s" to the word patent.

THE COURT:  Okay.

MR. BARRY:  And we've made those proposed revisions.

THE COURT:  On there?

MR. BARRY:  Yes.

THE COURT:  Okay, good.  You agree?

MR. JONES:  Yeah, no objection, Your Honor.  Thank you.

IV-180

THE COURT:  And then the next one you're going to add, "or written authorization from the United States State Department."

MR. BARRY:  Yes, just to be consistent with the other instructions, Your Honor.  And then similarly --

THE COURT:  Wait, wait.  We have to catch up.

MR. BARRY:  Just that -- it's the same instruction.  It's just on the second page.  The same thing we spotted earlier about the multi-object.

THE COURT:  Here.  Do you have two pages?  You can work on these.  Okay.  Counts four, five, and six, you have some proposed changes.

MR. BARRY:  Yes, Your Honor.  So these are simply to clarify in part because, again, the jury's not going to have the indictment.  So there's two proposed edits here. And this is the one I flagged in the beginning where, unfortunately, we didn't have enough time to write everything out.

The first proposed edit would be after the first paragraph where there's a general description of the counts, we would just specify what each count alleges.  So we wrote out the first count that this would apply to.  So it said, "Specifically, count four of the indictment charges the Defendant with unlawfully exporting on or about June 5th, 2022, because there's nowhere else in the indictment that

IV-181

identifies the date alleged..." or "...nowhere else in the instructions, rather, that identifies the specific date..." which we think we need to include.  So on that -- or about that date, the boiler water feed water technical manual for LHD amphibious assault ships to China without first having obtained a license or written approval from the U.S. State Department.

Count five --

THE COURT:  Wait a minute.  I'm writing.

MR. BARRY:  Sorry?

THE COURT:  Do you want the date, June 5?

MR. BARRY:  June 5?  June 5, 2022.  And that's for count four.  Some more modifications.  This is my absolute best favorite part.

THE COURT:  And then you would say count five of the indictment charges the Defendant with unlawfully exporting on or about August 14, 2022.  The propulsion operating guide for LHD amphibious assault ships --

MR. BARRY:  Yes, your Honor.  To China.

THE COURT:  To China without having obtained a license or written authorization from the U.S. State Department?

MR. BARRY:  Yes, your Honor.

THE COURT:  Okay.  So we'll first get this one done and then she can clone it.

IV-182

Then count five of the indictment charges the Defendant with unlawfully exporting on or about August 14 the propulsion operating guide for LHD amphibious assault ships to China without first having obtained -- so you're cloning.

Okay.  You're going to do this one for count five, August 14, and then the next paragraph will be count six, blah, blah, blah, blah.  October 8th, the weapons control system manual.  Okay, yeah.

THE CLERK:  (Indiscernible).

THE COURT:  I know.  There may or may not.

Did you want "specifically, specifically, specifically" or just "specifically" for the first one?

MR. BARRY:  Just for the first -- just the first --

THE COURT:  Count 4?

MR. BARRY:  Yes.

THE COURT:  Okay.  Let's change that.  Okay.  And then at the end, must prove each of the following for each of the counts described above?

MR. BARRY:  Yes.  If the paragraph that we've added that starts with "specifically" goes after the first sentence in the instruction, then on that -- the instruction later down that says first, instead of saying on the dates alleged.  In the indictment it would say first for each of

IV-183

the counts described above, the Defendant exported or caused to be exported from the United States, et cetera.

THE COURT: Okay. There is one more. I'm confused. Okay. There you go.

MR. BARRY: Or it could say on the dates alleged in the counts described above or something along those lines, just to make sure the jury understands they need to make these findings for each of the counts.

THE COURT: For each. I've got that. We have the dates in that one.

Okay. Count seven. Any objection?

MR. BARRY: No objection, your Honor.

MR. JONES: No objection.

THE COURT: Unknowingly, you had some edits.

MR. BARRY: Just a typographical error, your Honor.

THE COURT: The Court will make. Then the Defense wanted to argue your good faith and lack of willfulness.

MR. JONES: Yes, Your Honor. We found a case, United States -- Gorin v. U.S. that it was a --

THE COURT: It was a citation?

MR. JONES: Yes. Now, do you want me to email these to the court's e-file or just read it off.

THE COURT: You can just give me the site, and we'll print it, and then I'll look at it.

IV-184

MR. JONES:  Okay.  <u>Gorin v. U.S.</u> 312, U.S. 19 and 1941.  Yes.

THE COURT:  Okay.  Do you need it?  I think we got it.  And while you're doing that, can you show the parties that?

MR. BARRY:  No objection to this instruction from the Government.

MR. BERTOLA:  Thank you.  No objection from the Defense.

THE COURT:  Okay.  And that's the one that we modified about four, five and six.  And now we've got count seven.  And now, we're making the changes to "knowingly." We also cited to <u>Miller</u>.  <u>Miller</u> is a later case?

MR. JONES:  Yes, your Honor.  <u>Gorin</u> is just -- it's an old admittedly which dealt with the precursor to the Espionage Act.  And it hasn't really been followed by too many cases.  But it essentially -- well, the issue in the case was that the petitioner said that they connected with the National Defense Language and the precursor to Espionage Act was unconstitutionally vague.  The Supreme Court rejected that argument and held that the vagueness was cured by the mens rea component in the Espionage Act, which required that the Defendant act with bad faith.

THE COURT:  But then <u>Miller</u>, 874 F. 2d 1255 (1989), says that that is not required, and that what is

IV-185

required is the required intent. And the required intent is defined as willfulness. And wilfulness is, in our instruction, "if done voluntarily and intentionally, and with the specific intent to do something the law forbids, that is, with the purpose to disobey or disregard the law."

MR. JONES: I didn't see that case in the West Law key site, but I --

THE COURT: Here, let me give it to you. Specifically, here, Miller asserted that the Government should be required to show that he acted with bad faith. And they said no. So I'll give this to you and the -- Now, you also -- so under the willfulness instruction, you could say he didn't know, he wasn't acting with the purpose to disobey or disregard the law. He thought it wasn't secret and was not acting --

MR. JONES: Yes, your Honor.

THE COURT: Yeah. The alternative would be some theory of the defense instruction.

MR. JONES: I think we're okay with willful, and yeah, we withdraw the bad faith instruction or good faith instruction.

THE COURT: Thank you. Then we just have the final concluding instruction, and then I'll have to keep these back. And tell Cassey (phonetic) we're done.

Any objection to the concluding instructions?

IV-186

MR. BARRY:  No, your Honor.

MR. JONES:  No, your Honor.

THE COURT:  There's a bracket.

MR. BARRY:  I'm sorry, I lost track.

THE COURT:  My gosh.  A mistrial could result -- I already told them that.

MR. BARRY:  Yeah.  You already instructed them on that in the matter.

THE COURT:  You corrected that I should take out the bracket.  Okay.  We'll take out the brackets.

MR. BARRY:  Here you go.  That's the last edit from the Government.

THE COURT:  Okay.  So what we'll do is give you a clean copy of these instructions.  We just have to do that remaining bracket so that you'll be able to get a fresh set to see if we've made any typos or omissions.  Then, are there any additional instructions that either the Government or the Defense wants the Court to give?

MR. BARRY:  Not from the Government.

MR. JONES:  No, your Honor.  Not unless you want to talk about exhibits again.

THE COURT:  So do you want to include the exhibit?

MR. JONES:  Yes.  And then I'm so sorry for making this more complicated than it needed to be.  On 52-4, it was the --

IV-187

THE COURT:  Now, first, I've got to find, since I put them away, where they are.  I've got the original set.  And let's see where -- who has my redacted set?

THE CLERK:  Is that your copy?

THE COURT:  One more.

MR. JONES:  On the larger one, I would ask that you look at the first and last page.  They show the date ranges.

THE COURT:  Let me first find where we --  It comes with the little stickers.  Okay.  I don't have them.  Do you have them, the redacted copies?

MR. JONES:  No.  I don't have the redacted ones.

MR. BARRY:  I have a copy.  Maybe it's the original one.  I don't know.

THE COURT:  That's the original.

MR. BARRY:  Somebody gave it to me.

(Pause.)

MR. JONES:  Okay.  53-6 is Facebook Messenger, and 53 is iMessenger.

THE COURT:  Okay.  53-6 is Facebook Messenger, and 53 is iMessenger?

MR. JONES:  iMessage.

THE COURT:  iMessage Chat?

MR. JONES:  Yeah.

THE COURT:  And 53-10?

IV-188

MR. JONES:  Also iMessage Chat.

THE COURT:  And 53-12?

MR. JONES:  iMessage Chat.

(Pause.)

THE COURT:  So let me first have --

MR. JONES:  This one had date ranges on them.

THE COURT:  Do you object to the date ranges?

MR. PARMLEY:  I'm not sure they're relevant.  But probably not.  And I think they requested additional pages and I'm not sure what --

MR. JONES:  On 53-4, in order to show the date range --

THE COURT:  Let me first confirm.  53-4 is -- where do I find the date range?

MR. JONES:  It was the -- it was the 33-page document.  I've got the first and last page here.

THE COURT:  So the date -- can I see the first and last page?  Is that from the original?

MR. JONES:  Yeah, unredacted.

THE COURT:  Okay.  So I've got this unredacted.  And where do I find the date range?  The start time, 328 through 719?

MR. JONES:  Yes.

THE COURT:  Okay.  Yes, okay.  That works.  And then Messenger, 53-6.  Okay.  Messenger would be 56 to 612,

IV-189

yes, 2023.  Yes.  iMessage Chat, 518 through 729.

Do you want those in the document or not?  Like you could -- you could copy that on, if you want.

MR. JONES:  I don't know what the rules are or the way to do this.  I do want to show that this is the right span for the dates, but I also don't want to make it look like it was manipulated in some way.  I'm happy if you want us to keep it all together.  I'm happy to do a redaction.  I don't know.  I'm agreeable to --

THE COURT:  I think it would --

MR. PARMLEY:  The first and last page, that's fine, with the same redactions for the text messages.

MR. JONES:  Yes.

THE COURT:  But I think the first -- why the last page?

MR. PARMLEY:  He just wants to show the range.  I don't have a problem.

THE COURT:  But it says first activity and last activity.

MR. JONES:  That's on the first page?  I didn't see that.

MR. BARRY:  Can I -- yeah, that's fine.

THE COURT:  That's what I was saying is that we could just copy that.

MR. PARMLEY:  Yeah, okay, just the first page.

*Echo Reporting, Inc.*

IV-190

MR. BARRY:  First page and the --

THE COURT:  Of each one.

MR. BARRY:  Yes.  It was -- I think, two of them are single-page documents.

THE COURT:  Okay.  Wait a minute.  So for 53-4, can I have you make a copy of this page?  And then we have date received, today's date.

MR. PARMLEY:  How do you want it?  On the exhibit list, I think?

(Pause.)

THE COURT:  Yes.  So this is what it would look like (indicating).

MR. PARMLEY:  Okay.

THE COURT:  And that would go on here.  And that would be stapled.  Could you staple it in?  Then 53-6, it says start time and last activity on the same page.

MR. BARRY:  Yes, it's the one pager.

THE COURT:  That's okay.  And then on 53-10, it says start time and last activity.  And then 53-12, it says --

MR. BARRY:  It's still a one pager.

THE COURT:  -- start time and last activity, it's also the same date.  Okay.

So any objection to listing those on the exhibit list?

IV-191

MR. PARMLEY:  No.  Just an opportunity to review specific ones with the languages and just one final check of the exhibits.  No objection at all.

THE COURT:  So, Rhonda -- and if it's this one, then for the record, you would put date received, today's date, for those.

THE CLERK:  Right.

THE COURT:  And then for your own records, you would have this, and then that one would not be received.

Then do you want to take a look at the final Government's list of exhibits?

MR. PARMLEY:  Is it the same one we already have a copy of?

THE CLERK:  I believe we took out one.

THE COURT:  We took out one.  We took out his transcript of his interview that was erroneously left in there.

Do you want me to make another copy for you now?

MR. PARMLEY:  I'd appreciate it.

THE COURT:  Yeah, that would -- can you make two copies of that one?  Give me two copies of that one.

Do you prefer that they go in like this, or do you want us to copy these so that the redactions don't --

MR. PARMLEY:  I think a copy is better.

THE COURT:  A copy would be better.  I thought so

IV-192

as well.  I'm trying to do it.

So do you want to read -- did you look at those exhibit binders?

MR. PARMLEY:  No, your Honor.

THE COURT:  Okay.  Do you want to do that?

MR. PARMLEY:  Do that?  No.  Now, you just -- And if the Court wants us to do that when we're done today, in the unlikely event there's some problems, maybe if you're still on table, you can do that.  How many do you want to do?

THE COURT:  Maybe we should label these, "jury exhibits."

Probably Tuesday, which is not ideal.

MR. PARMLEY:  All right.

MR. JONES:  Monday is the trial?

THE COURT:  No.  I'm here Monday morning, and Judge Curiel is here Monday afternoon.

MR. JONES:  Okay.

THE COURT:  So I am here Monday morning, but I have a full calendar, but if there was an emergency, I could probably squeeze you in.  Sure.

(Pause.)

MR. PARMLEY:  Your Honor, I want to get a copy of the final version.

THE COURT:  Yeah.  The only thing that's missing

IV-193

from there are those physical documents, and the question is whether you want -- so it's just blank where it's -- but it is referenced on the exhibit list, what it is.  Yeah.  I don't -- I think that would be easiest.

Counsel, did you want to lodge 53-4 and all the other ones under seal as exhibit for the record?

MR. JONES:  You know, that's -- the thing is I read those into the record when we were going through them, so the contents of the submitted portion were already in the transcript.

THE COURT:  They are.  So you don't need this. Okay.  Thank you.

(Pause.)

MR. JONES:  What was the last revision?

THE COURT:  I --

MR. JONES:  The last revision, like that you just did before.  Yeah, I've got two that are also equal except one.  I just have one more exhibit for you.  I just don't know which ones the -- okay, 190A.  I think this is the one.

THE COURT:  What does that binder say?  Should we have a nice little binder for the Defense exhibits?  Find a binder and then make a cover page that says "Jury," that looks like that one, a small one.

MR. BARRY:  Are we going to have to go back over? This kind of resolves all the exhibits that --

IV-194

MR. PARMLEY:  This is just so we know when we go back through the --

THE COURT:  Does it say Department of Justice?  It shouldn't say Department of Justice.

MR. BARRY:  I'll go ahead.

THE COURT:  We should take that out and then change that.

MR. BARRY:  What do you -- you want it to just say that basically?

THE COURT:  Yes.  And on the side, doesn't it say Department of Justice?  Yes.

MR. PARMLEY:  This is not one of the large part of the --

THE COURT:  Can we just do it right now so we all see it?  Yes.

MR. PARMLEY:  I'm taking out 31B.  It was inadvertently put in.

THE COURT:  Okay.  Let me -- Okay.

(Pause.)

MR. PARMLEY:  So, your Honor, on the binder, the certifications were left in, so they're not always in.  It was 31A, 31B, 36A.

THE COURT:  Let me look, 31.

MR. PARMLEY:  31B was a certification.  I've removed it.  33A is a certification.  I've removed it.

IV-195

THE COURT:  Okay.

MR. PARMLEY:  34A is a certification.  I've removed it.

THE COURT:  Okay.

MR. PARMLEY:  35A is a certification.  I've removed it.

THE COURT:  Okay.

MR. PARMLEY:  Did I say 36?  36A and 37A and 38A are all certifications that I've removed.

THE COURT:  Okay.  Perfect.  I have two copies of the -- All right.  Do you want to take back 190A, the transcript of the interview, or do you want it under seal or what?

And here were the unused number pages.  So are we pretty much done?

MR. PARMLEY:  I'm just finishing the sidebar.

THE COURT:  Okay.  And we're making a nice binder for --

MR. JONES:  Yeah.  I love just standing here and watching them --

THE COURT:  At least we took out DOJ from the official jury instructions -- the jury exhibits.

MR. JONES:  That was a good catch.  So do you have the next few days of next week cleared off?  Can you just pick up some free days?

IV-196

THE COURT:  I have to.

MR. JONES:  I know they have a way of filling up.

THE COURT:  I'm a Senior Judge.  I volunteer my time, and Lynette can do her thing.

We're giving you the clean copy of the Jury Instructions and verdict form.  You just got one?

MR. JONES:  Actually this is from before, yeah.

THE COURT:  Yes.  Or just keep that for your -- don't confuse it with the original.  I think so, with the other one.  With the big one the -- the big one with the "Government" that would say, "All of them."

MR. PARMLEY:  Give me the original.

THE COURT:  Go pick it up or what?

THE CLERK:  I told them.

THE COURT:  Okay.  Got it.  But to take it before Monday.  How about Monday?  Okay, good.  Yes.  I saw that, and one went away.  Okay.  No problem.  Okay.  Great.

MR. PARMLEY:  One, I believe.

THE COURT:  What number?

MR. PARMLEY:  We are placing them on --

THE COURT:  We have one that says "Government exhibit," and one that says "Defense exhibit", okay?

And then, all we need to clean one more -- Yeah.  That'd be great.  Okay.  Yeah.  I know.  We're on the record.  We're giving you the clean set of the Jury

IV-197

Instructions and Verdict Form.  So make sure that it's consistent with what we've discussed and there's no more typos in there.  Okay.  We're fixing that.

MR. PARMLEY:  For the record, I have reviewed the Defense exhibits, and I have no objection to the form.  After my previous objection, I have no objection.

THE COURT:  Okay.  That's great.  So we'll just get these three here.  That's correct.  So we now figured out all of the exhibits, correct?

MR. PARMLEY:  Your Honor, correct.  I'm still making sure to double check on all of the --

THE COURT:  Physical evidence.  Okay.  And then we've updated the Defense exhibit list and we've made a binder that says, "Defense exhibits."  And we've made a binder that says, "Government exhibits."  One of two and two of two.

MR. JONES:  Thank you, your Honor.

THE COURT:  Okay.  You can put those in.

MR. JONES:  Yeah.

THE COURT:  Right there.  Yes.  And we'll have those momentarily.  You already have a copy of the Defense exhibits?

MR. JONES:  Yes.

THE COURT:  And you do?  Okay.  So is there anything else that we have to discuss other than you're

IV-198

reviewing the physical evidence?

MR. PARMLEY:  I know the Defense counsel made Rule 29.  I think the Court ruled on it, but I'm not sure.

THE COURT:  I said it was factual, so I denied it.

MR. PARMLEY:  That's the only thing I have.  One other thing, we emailed you.

THE COURT:  He wants it for Tuesday.  Can't they just keep it or not?

MR. JONES:  I'm still not sure how this works.

THE COURT:  Can we ask the Marshals?  So he's going to be here for trial on Tuesday, and they don't want to have to -- can you keep it or not?

MR. JONES:  I can give my cell a call right now and see if we can go outside of that procedure.  I'll get you an answer shortly, your Honor.

THE COURT:  How else would they do it?

MR. BARRY:  Your Honor, I called the Marshals like a week before, and they told me to email them.  I emailed them and never received a response.  So it's just a thing of I can't get them to -- I can call them by phone, but I can't get them to answer the email.  We also couldn't get them moved to San Diego before the trial.

THE COURT:  I know, but in those circumstances, e-file something to us, and then we can get involved.

MR. JONES:  Got it.

IV-199

MR. PARMLEY:  The only other thing, your Honor, is that we emailed you those kind of scribbled-out instructions.  We don't have time to file anything else as far as jury instructions.

THE COURT:  You don't need to file anything else.

MR. PARMLEY:  All right.  Thank you.

THE COURT:  And even of those scribbled ones, you filed them or e-filed?

MR. PARMLEY:  All we did was mail them to your chambers on the e-file.

THE COURT:  Okay.  Do you want them filed or now that we've dealt with it in Court?

MR. PARMLEY:  I have nothing else filed, your Honor.

THE COURT:  All right.  Thank you.  Is it better doing it today or is it better doing it -—

MR. JONES:  You can just do it right now, your Honor.

THE COURT:  Do it right now.

MR. JONES:  It shouldn't take no more than a few minutes.

THE COURT:  Okay.

MR. PARMLEY:  Cool.

THE COURT:  Good, good.

MR. JONES:  Thank you.

IV-200

THE COURT:  Anything further?

MR. PARMLEY:  I don't have anything else, your Honor.  Thank you.

THE COURT:  Anything further?

MR. JONES:  No, your Honor.

THE COURT:  And we don't need the Defendant here further?

MR. JONES:  No.  Not until Tuesday.

THE COURT:  Okay.  Thank you.  Okay.

(Proceedings recessed.)

IV-201

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Sandra Dozie-Anyanwu          3/2/26
Transcriber                       Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/L.L.  Francisco
L.L.  Francisco, President
Echo Reporting, Inc.