UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

--oOo--

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 23CR1471-H |
| | ) | |
| Plaintiff, | ) | San Diego, California |
| | ) | |
| vs. | ) | Tuesday, |
| | ) | August 19, 2025 |
| JINCHAO WEI, | ) | 9:00 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | VOLUME V |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARILYN L. HUFF
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | ADAM P. BARRY, ESQ. |
| | United States Attorney's Office |
| | 601 D Street, Northwest |
| | Washington, DC 20579 |
| | |
| | JOHN N. PARMLEY, ESQ. |
| | United States Attorney's Office |
| | 880 Front Street, Suite 6293 |
| | San Diego, California 92101 |
| | (619) 557-5610 |
| | |
| For the Defendant: | MICHAEL J. BERTOLA, II, ESQ. |
| | Rudolph Baker & Associates |
| | 419 19th Street |
| | San Diego, California 92102 |
| | (909) 499-3465 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

V-ii

APPEARANCES:  (cont'd.)

For the Defendant:                SEAN M. JONES, ESQ.
                                  Jones Trial Attorneys
                                  401 B Street, Suite 2010
                                  San Diego, California 92101
                                  (619) 732-6377

Transcript Ordered by:            TODD W. BURNS, ESQ.

Court Recorder:                   Lynnette Lawrence
                                  United States District Court
                                  333 Broadway
                                  San Diego, California 92101

Transcriber:                      Jessica Reuter
                                  Echo Reporting, Inc.
                                  9711 Cactus Street, Suite B
                                  Lakeside, California 92040
                                  (858) 453-7590

V-iii

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (None.) | | | | |

| EXHIBITS: | IDENTIFIED | RECEIVED |
|---|---|---|
| Plaintiff's | | |
| (None.) | | |
| Defendant's | | |
| (None.) | | |
| Court's: | | |
| 1    Jury note | V-116 | -- |

V-1

SAN DIEGO, CALIFORNIA  TUESDAY, AUGUST 19, 2025 9:00 A.M.

--oOo--

(Call to order of the Court.)

THE COURT:  We're on the record outside the presence of the jury, is that correct?

THE CLERK:  Yes.  Let's just sit and make sure it's working.

THE COURT:  And this is 23-cr-01471.  State your appearances.

MR. PARMLEY:  John Parmley and Adam Barry for the United States.  Good morning, your Honor.

THE COURT:  Good morning.

MR. JONES:  Sean Jones and Michael Bertola for Defendant Jinchao Wei.

THE COURT:  Good morning.

So, yesterday I received an e-mail from Government counsel wanting to substitute the defense exhibits with prettier redactions.

MR. PARMLEY:  Yes.

THE COURT:  I'm aware of-- I don't know --

MR. JONES:  I did --

THE COURT:  -- if you've already incorporated the original ones in any sort of PowerPoint or anything.

Any objection to the substitution?

MR. JONES:  No objection, but I think we might be

V-2

missing one of the pages of 53-4.  I could be wrong.

THE COURT:  There's only one page of 53-4.

MR. JONES:  Yeah.  And I think we had done page one and page 19.

MR. PARMLEY:  I think we've talked about that, then changed our mind, because it was -- the time range was at the top of it, remember?

MR. JONES:  I think you're right.

MR. PARMLEY:  Yeah.

THE COURT:  Do you want to verify?

MR. JONES:  Yeah, let me just double check.

THE COURT:  And can I see the notebook -- the notebook of the defense ones, that has the defense ones in?

Yes.  You can turn that one around, too, instead of --

THE CLERK:  For the Government, for future cases, we did have all afternoon to get this done.

THE CLERK:  But that one's only to show the PowerPoint, so you're going to want that.

MR. JONES:  Go with the redactions, is that --

THE COURT:  Yes, I think.  Let me check.

MR. JONES:  It didn't occur to me until -- I apologize, your Honor.

THE CLERK:  Can I turn it around just for now?

THE COURT:  There's -- there's two pages of 54-4,

V-3

and I only have one page of 54-4.

MR. PARMLEY:  Well, then let's just go with the original exhibits then, your Honor.  That's fine.

MR. BARRY:  Which one?

MR. JONES:  I agreed with everything Mr. Parmley said about, you can make out maybe one or two words but none of the message or substance.

MR. BARRY:  54-4?

THE COURT:  Where are the words?  I could make it stronger.  If you can get your --

THE CLERK:  You want black to bring it down?

THE COURT:  -- 54-4 second page here on time, then we could substitute it in.

MR. PARMLEY:  Okay.  I'll work on that right now.

THE COURT:  So what we have is -- what we're missing --

THE CLERK:  You want me to go do it --

THE COURT:  -- is the first page.

THE CLERK:  -- because we're just doing jury.

MR. PARMLEY:  Let's call Vlad (phonetic).

THE COURT:  The first page that says, "start time," and "last activity."

MR. PARMLEY:  All right.  Just let me pull it up.

MR. BARRY:  These are the two pages I had, if you want them.  I don't need them.  I think this was the first

V-4

page.  It had start time and stuff, and then --

THE COURT:  And that's the problem with delayed --

MR. PARMLEY:  I think this is the one that was submitted --

THE COURT:  -- the last-minute switch --

MR. PARMLEY:  -- but I think --

THE COURT:  -- that mistakes can happen.

MR. BARRY:  This is 53-4.  Can I see this one?

MR. PARMLEY:  Yeah.

MR. BARRY:  There is no 54-4.

MR. PARMLEY:  It's 53-4?

MR. BARRY:  Yeah.  Okay.

THE COURT:  53-4.

MR. PARMLEY:  Okay.

MR. BARRY:  So he's saying this page is the one that's missing that needs to be --

MR. JONES:  It may not even matter.  Let me see which one I quoted.

THE COURT:  I know, but we should -- I'm not going to change the exhibits.

MR. PARMLEY:  I wouldn't change it, your Honor.  I just laid it --

THE COURT:  Why is this number the same as that number?

MR. JONES:  Okay.

V-5

THE COURT:  You could get it if they can do this one page.

MR. PARMLEY:  I will try, but it's --

THE COURT:  Because I'm going to instruct --

MR. PARMLEY:  Right.  I'll -- I think the (indiscernible) might have been -- it had exhibit stickers on both.

MR. BARRY:  This is the -- yeah.  So we may want to wipe this out, and then have one of two and two of two?

MR. JONES:  Yeah.

MR. PARMLEY:  Delete the meta?

MR. JONES:  Yeah.

MR. BARRY:  And this is -- if this is all he's adding, it's fine.  We can't see the text.

MR. BERTOLA:  Do you want me to --

MR. PARMLEY:  Is that the second page?

MR. BERTOLA:  -- pull this ledger, or do you have it in --

MR. BARRY:  This is the page that's missing, yes.  So it's the first page.

MR. PARMLEY:  Hey, Vlad, are you in the office yet?  Yeah.  There's -- there's two pages to 53-4 that's a little confusing because they both have an exhibit sticker on them.

THE COURT:  Rhonda could e-mail one to -- Rhonda

V-6

could e-mail the one.

MR. PARMLEY:  That'd be great.  If you could just e-mail to me and I'll just forward it.

THE CLERK:  Okay.

THE COURT:  Any objection to that?

MR. JONES:  No objection.

MR. PARMLEY:  We're missing a page on 53-4.

THE COURT:  Huh-uh.  Rhonda --

MR. PARMLEY:  So one page was redacted, and there's a second page that's not redacted, because they both have a sticker.

I'm going to get a e-mail, and I'll e-mail it to you shortly.  Okay.  All right.  Thank you.  Appreciate it.

THE COURT:  We'll e-mail it to both sides.

MR. PARMLEY:  Perfect.  Thank you, your Honor.  It should be -- I'll take care of it.

MR. BARRY:  Can I try it a little quicker?

THE COURT:  I already tried it.

MR. BARRY:  It works?

THE COURT:  You can try it.

MR. BARRY:  And that's just these ones?

THE COURT:  Yup, I think.

MR. BARRY:  All right.  And then I can --

THE COURT:  I'll turn this one around --

MR. BARRY:  Yeah.  If I can put --

V-7

THE COURT:  -- and put it over there.  Yeah.

MR. BARRY:  Perfect.  Thank you.

THE COURT:  Do you want these up on the table, John?

MR. BARRY:  Or do you want to address the --

MR. PARMLEY:  I took care of it -- I took care of it already.

MR. BARRY:  You already did?

MR. PARMLEY:  Yeah.

MR. BARRY:  Okay.

THE CLERK:  Where'd it go?

MR. PARMLEY:  I put it up there.

THE COURT:  I hope you had a nice weekend.

MR. PARMLEY:  I did.  I'm not going to do the closing.

Are we good with where the laptop's going to be?

MR. BARRY:  Yeah, we're going to put it -- let me just make sure.  Step to the --

THE COURT:  Yeah, we'll just turn both of them around.  We'll go off the record until 9:00.

MR. PARMLEY:  All right.  Thank you.

(Proceedings recessed briefly.)

THE CLERK:  Back on the record.

THE COURT:  All right.  The jury instructions are not numbered, but I will number them as we go.

V-8

Okay.  And so can you --

MR. PARMLEY:  Okay.  Thank you.

THE COURT:  -- make a copy?  We'll give -- I have the copy to substitute in, but I'm not substituting it in with a three-hole punch yet until we get it straight.  But I do have a copy for counsel without this page that we're awaiting.

So, could you give --

MR. JONES:  I'm going to step outside to see if I can get better reception with my phone, your Honor, to get that e-mail.

THE COURT:  Okay.  Can you make two copies of that?

UNIDENTIFIED SPEAKER:  Let's put it on here.

THE COURT:  Three copies.

THE CLERK:  We'll get ones through --

THE COURT:  What was this one there?

THE CLERK:  It's after these --

THE COURT:  Okay, we'll do that.  No, let me pre-instruct, and then we'll take the orders.  Yeah.

THE CLERK:  (Indiscernible).

THE COURT:  Okay.  Sure.  The delivery can be made, and then -- no.  No, just leave it like that.  Let me give -- this is the one for -- it's okay.  This is for the defense and this is for the Government.  And what is this --

V-9

where is -- where is one that was hole -- the one I was hole punched is right here.  Okay.

Now where is the one that is also -- this one with this one.  One for the Government, one for the defense.  We'll go back on the record.  Okay?

In the meantime, I have the first page of 53-4 with the new redactions remaining.  So we just need that one page to sub in if we can.  If we can't, then we'll just go with the originals as-is.

MR. PARMLEY:  I forwarded it to my office.  They hopefully should be able to get that taken care of.

THE COURT:  And then I have a set for the Government and a set for the defense.

MR. PARMLEY:  Thank you.

THE COURT:  And the one for the jury has the -- is in the binder.  Then we'll order lunch for the jury, but after I pre-instruct.

We could see -- on this, we could do it ahead of time, then we could bring them in, the ones that are here, and they can start ordering.

THE CLERK:  Right.

THE COURT:  Okay.  Why don't you see if they're ready.

(Pause.)

(Jury enters courtroom.)

V-10

THE COURT:  Good morning.

THE CLERK:  Good morning.

(Pause.)

THE COURT:  My courtroom deputy is going to pass out the lunch orders for you.  And, unfortunately, our alternates -- I checked to see if could order lunch for the alternates, and the answer was, no.  So, we'll get that done now.

Put one on his seat.

You brought your lunch?

THE CLERK:  Yes, some people brought their lunch.

THE COURT:  You could order and give to the alternates.

MR. PARMLEY:  Yeah.

THE COURT:  Or decide if you like this better.

For the ones that aren't here, put it on their seat.

Welcome back.  We have lunch orders on your seats.

(Pause.)

MR. PARMLEY:  Rhonda, there's one more out there.

THE CLERK:  Jury entering.

(Jury enters courtroom.)

(Pause.)

THE COURT:  There's -- there are -- for you that just came, there's a lunch order for you to fill out.

V-11

(Pause.)

THE CLERK:  Another call?

THE COURT:  It's one or the other.

Are we all set?  And then was there any in the -- anybody in the audience?  Okay.

THE CLERK:  Okay.  Everyone's welcome in.  Thank you for your patience.

(Pause.)

THE COURT:  Welcome to everyone.  We'll call the case.

THE CLERK:  All the matters under one, 23-cr-1471, United States of America versus Jinchao Wei, perjury trial.

THE COURT:  Thank you.

MR. PARMLEY:  John Parmley and Adam Barry for the United States.  Good morning, your Honor.

THE COURT:  Good morning.

MR. BERTOLA:  Michael Bertola on behalf Jinchao Wei.

MR. JONES:  Sean Jones as well.  Thank you.

THE COURT:  Thank you.

Members of the jury, I'm now going to give you instructions on the law.  I'll give you initial instructions and reserve the concluding instructions.  And then the Government will argue, and then the defense will respond, and then the Government will respond to the defense.  Then

V-12

I'll give you the final instructions, and then I'll explain what will be going back to the jury room for you.

Members of the jury, now that you have heard all the evidence it is my duty to instruct you on the law that applies to this case.  A copy of these instructions will be available in the jury room for you to consult.  Don't write on the original instructions.  If you need other copies, we can make them for you.

It is your duty to weigh and to evaluate all the evidence received in the case, and in that process, to decide the facts.  It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not.  You must decide the case solely on the evidence and the law.

You will recall that you took an oath promising to do so at the beginning of the case.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender or economic circumstances.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion or biases, including unconscious biases.

Unconscious biases are stereotypes, attitudes or preferences that people may consciously reject that may be expressed without conscious awareness, control or intention.

V-13

You must follow all these instructions and not single out some and ignore others.  They are all important.  Please do not read into these instructions or into anything I may have said or done as to any suggestion as to what verdict you should return.  That is a matter entirely up to you.

Two.  The Defendant is charged with the offense of conspiracy to commit espionage as alleged in count one of the indictment, the offense of espionage as alleged in count two of the indictment.

The offense of conspiracy to violate the Arms Export Control act as alleged in count three of the indictment.  The offense of violating the Arms Export Control act as alleged in count four of the indictment related to boiler water feeder technical manual.  The offense of violating the Arms Export Control Act as alleged in count five of the indictment related to propulsion operating guide.  The offense of violating the Arms Export Control Act as alleged in count six of the indictment relating to weapons control systems manual, and the offense of naturalization fraud as alleged in count seven of the indictment.

Three.  The indictment is not evidence.  The Defendant has pleaded not guilty to the charges.  The Defendant is presumed to be innocent unless and until the

V-14

Government proves the Defendant guilty beyond a reasonable doubt.  In addition, the Defendant does not have to testify or present any evidence.  The Defendant does not have to prove innocence.  The Government has the burden of proving every element of the charges beyond a reasonable doubt.

A defendant in a criminal case has a constitutional right not to testify.  In arriving at your verdict, the law prohibits you from considering in any manner that the Defendant did not testify.

Proof beyond a reasonable doubt -- this is five. Proof beyond a reasonable doubt is proof that leaves you firmly convinced the Defendant is guilty.  It is not required the Government prove guilt beyond all possible doubt.  A reasonable doubt is a doubt based on reason and common sense, and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence or from lack of evidence.

If after a careful and impartial consideration of all the evidence you are not convinced beyond a reasonable doubt that the Defendant is guilty, it is your duty to find the Defendant not guilty.  On the other hand, if after a careful and impartial consideration of all the evidence you are convinced beyond a reasonable doubt that the Defendant is guilty, it is your duty to find the Defendant guilty.

Six.  The evidence you are to consider in deciding

V-15

what the facts are consist first, the sworn testimony of any witness, second, the exhibits received in evidence, and third, any facts to which the parties have agreed or stipulated.

Seven.  The parties have agreed to certain facts and witness testimony that have been stated to you in a stipulation.  Those facts are now conclusively established.

Eight.  In reaching your verdict you may consider only the testimony and exhibits received in evidence.  The following things are not evidence, and you may not consider them in deciding what the facts are.  Questions, statements, objections and arguments by the lawyers are not evidence.  The lawyers are not witnesses.  Although you may consider a lawyer's questions to understand the answers of a witness, the lawyer's questions are not evidence.

Similarly, what the lawyers have - have said in their opening statements, will say in their closing arguments, and have said at other times, is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way that lawyers state them, your memory of them controls.

Any testimony that I have excluded, stricken or instructed to -- you to disregard is not evidence.  In addition, some evidence was received only for a limited purpose.  When I have instructed you to consider certain

V-16

evidence in a limited way, you must do so.

And anything you may have seen or heard when the court was not session is not evidence.  You are to decide the case solely on the evidence received at the trial.

Nine.  Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is indirect evidence.  That is, it is proof of one or more facts from which you can find another fact.

You are to consider both direct and circumstantial evidence.  Either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

Ten.  In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account the following.  First, the opportunity and ability of the witness to see or hear or know the things testified to.  Second, the witness' memory.  Third, the witness' manner while testifying.  Fourth, the witness' interest in the outcome of the case, if any.  Fifth, the

V-17

witness' bias or prejudice, if any.  Six, whether other evidence contradicted the witness' testimony.  Seventh, the reasonableness of the witness' testimony in light of all the evidence.  And, eighth, any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.

Also, two people may see the same event but remember it differently.  You may consider these differences, but not decide that the testimony is untrue just because it differs from other testimony.  However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.

On the other hand, if you think the witness testified untruthful about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

You must avoid bias, conscious or unconscious, based on a witness' race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender or economic circumstances in your determination of credibility.

V-18

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

Eleven. You are here only to determine whether the Defendant is guilty or not guilty of the charges in the indictment. The Defendant is not on trial for any conduct or offense not charged in the indictment.

Twelve. A separate crime is charged against the Defendant in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

Thirteen. The indictment charges that the offenses alleged were committed on or about a certain date. Although it is necessary for the Government to prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the dates alleged in the indictment, it is not necessary for the Government to prove that the offenses were committed precisely on the dates charged.

Fourteen. You have heard testimony that the Defendant made a statement. It is for you to decide whether the Defendant made the statement, and, if so, how much weight to give to it. In making those decisions you should consider all the evidence about the statement, including the circumstances under which the Defendant may have made it.

V-19

Fifteen.  You have heard testimony from Catherine Hamilton of the Department of State, Daniel Caldwell of the United States Naval War College, and Jayne Liu of the Federal Bureau of Investigation, who testified about their opinions and the reasons for these opinions.

This opinion testimony is allowed because of the specialized knowledge, skill, experience, training or education of these witnesses.  Such opinion testimony should be judged just like any other testimony.  You may accept it or reject it and give it as much weight as you think it deserves, considering the witness' knowledge, skill, experience, training or education, the reasons given for the opinion, and all the other evidence in the case.

Sixteen.  You have heard testimony from some witnesses who testified about facts and their opinions and the reasons for these -- those opinions.  Fact testimony is based upon what the witness personally saw, heard or did.  Opinion testimony is based on the specialized knowledge, skill, experience, training or education of the witness.

As to the testimony about facts, it is your job to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.  As to the testimony about the witness' opinions, this testimony is allowed because of the specialized knowledge, skill, experience, training or

V-20

education of this witness.

Opinion testimony should be judged like any other testimony.  You may accept all of it, part of it or none of it.  You should give it as much weight as you think it deserves, considering the witness' knowledge, skill, experience, training or education, the reasons given for the opinion, and all the other evidence in the case.

You also should consider whether the witness has testified to personal observations or involvement as a fact witness, or testified to an opinion based upon specialized knowledge, skill, experience, training or education.

When a witness provides opinion testimony based on knowledge, skill, experience, training or education, that person might rely on facts that are not based on his or her personal observations or involvement, but that opinion cannot serve as proof of the underlying facts.

You should also consider the factors discussed earlier in these instructions that were provided to assist you in weighing the credibility of witnesses.  Also, the fact that a witness is allowed to express opinions based on that person's specialized skill, knowledge, skill, experience, training or education, should not cause you to give that witness undue deference for any aspect of that person's testimony or otherwise influence your assessment of the credibility of that witness.

V-21

Seventeen.  During the trial certain charts and summaries were shown to you to help explain the evidence in the case.  These charts and summaries were not admitted into evidence and will not go into the jury room with you.  They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

Eighteen.  Certain charts and summaries have been admitted into evidence.  Charts and summaries are only as good as the underlying supporting material.  You should, therefore, give them only such weight as you think the underlying material deserves.

Nineteen.  During this trial you have heard sound recordings of certain conversations in the Mandarin dialect of the Chinese language.  The transcript is an English language translation of the recording.  This also applies to some text messages and other things, not strictly sound recordings.

Whether a transcript is an accurate translation and whole or in part is for you to decide.  In considering whether a transcript accurately describes the words spoken in the conversation, you should consider the testimony presented to you regarding how and by whom the transcript

V-22

was made.  You may consider the knowledge, training and experience of the translator, the audibility of the recording, as well as the nature of the conversation and the reasonableness of the translation in light of all the evidence in the case.

It is important that all jurors consider the same evidence.  Therefore, you must not rely in any way on any knowledge you may have of the language spoken on a recording.  Your -- your consideration of the transcript must be based on the evidence in the case.

Twenty.  The Defendant is charged in count one of the indictment with conspiracy to commit espionage in violation of Section 794.(c) of Title 18 of the United States Code.  In order for the Defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt.

First, beginning on or about February 2022 and ending on or about August 2023, there was an agreement between two or more persons to commit espionage.  Second, the Defendant became a member of the conspiracy, knowing of its object and intending to help accomplish it.  And, third, one of the members of the conspiracy performed at least one overt act on or after February 14, 2022 for the purpose of carrying out the conspiracy.

A conspiracy is a kind of criminal partnership, an

V-23

agreement of two or more persons to commit one or more crimes.  The crime of conspiracy is the agreement to do something unlawful.  It does not matter whether the crime agreed upon was committed.  For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy.  It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways or perhaps helped one another.  You must find that there was a plan to commit espionage.

One becomes a member of a conspiracy by knowingly participating in the unlawful plan with the intent to advance further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy.

Furthermore, one who knowingly joins an existing conspiracy is responsible for it as the originators.  On the other hand, one who has no knowledge of a conspiracy but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator.  Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators or merely by knowing that a conspiracy exists.

And overt act does not itself have to be unlawful.

V-24

A lawful act may be an element of the conspiracy if it was done for the purpose of carrying out the conspiracy.  The Government is not required to prove that the Defendant personally did one of the overt acts.

Twenty-one.  The Defendant is charged in count two of the indictment with espionage in violation of Section 794(a) of Title 18 of the United States Code.  In order for the Defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt.

First, beginning on or about August 2022 and continuing through in or about October 2022, the Defendant communicated, delivered or transmitted a document, sketch, plan, note or information to a foreign government, mainly the People's Republic of China, or to a representative, officer, agent, employee, subject or citizen thereof, either directly or indirectly.

Second, that such information related to the national defense of the United States.

Third, that the Defendant acted with the intent or reason to believe that such information was either to be used to the injury of the United States or the advantage of a foreign nation, that is, the People's Republic of China.

And, fourth, that the Defendant acted willfully in communicating, delivering or transmitting information

V-25

related to the national defense.

Twenty-two.  An act is done willfully if it is done voluntarily and intentionally and with a specific intent to do something the law forbids, that is, with the purpose to disobey or disregard the law.

Twenty-three.  A defendant has reason to believe if the defendant had facts from which he concluded or reasonably should have concluded that the information relating to the national defense was to be used for the prohibited purposes.

Twenty-four.  For the purpose of the charges in the indictment, the term "foreign nation" refers to any nation, country or government other than the Unites States.

Twenty-five.  The term "national defense" is a broad term which refers to the United States military and naval establishments, and to the related activities of national preparedness.  To prove that documents, sketches, plans, notes or information relate to the national defense, there are two things the Government must prove beyond a reasonable doubt.

First, it must prove that the disclosure of the material would either be potentially damaging to the United States or might be useful to a foreign nation.  Second, it must prove that the material was closely held by the United States Government.

V-26

Where the information has been made public by the United States Government and is found in sources lawfully available to the general public, it does not relate to the national defense.  Similarly, where the sources of information are lawfully available to the public, and the United States Government has made no effort to guard such information, the information itself does not relate to the national defense.

Twenty-six.  The Arms Export Control Act authorizes the President of the United States to place control on -- controls on the arms trade by declaring certain munitions, goods and information to be defense articles.  The items designated by the President or his authorized representatives as defense articles constitute the United States Munitions List.

The Arms Export Control Act includes and incorporates the International Traffic in Arms Regulations, which we've referred to ITAR, and technical data on the United States Munitions List.  These articles, services and technical data may not be exported from the United States without the permission of the United States Department of State.

As used on the Arms Export Control Act and for purposes of this case, the term "export" means sending a defense article out of the United States in any manner.  As

V-27

used in the Arms Export Control Act, the term "technical data" means information that is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles.  This includes information in the form of blueprints, drawings, photographs, plans, instructions and documentation.

All technical data is subject to export control. Technical data does not include information in the public domain as defined in the International Traffic in Arms Regulations.  The Government bears the burden of proving beyond a reasonable doubt that the information contained in the boiler water feed water technical manual for LHD amphibious assault ships, the propulsion operating guide for the LHD amphibious assault ships, and the weapons control system manual for LHD amphibious assault ships, is technical data.

You are to decide whether the information contained in the boiler water feeder technical manual for LHD amphibious assault ships, the propulsion operating guide for LHD amphibious assault ships, and the weapons control system manual for LHD amphibious assault ships is required for the design, development, production, manufacture, assembly, operation, testing or modification of defense articles, and is not in the public domain as defined

V-28

elsewhere in these instructions.

Twenty-eight.  The International Traffic in Arms Regulations, the ITAR, define public domain as follows. Public domain means information which is published and which is generally accessible or available to the public through sales at news stands and bookstores, through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information, through second-class mailing privileges granted by the U.S. Government, at libraries open to the public or from which the public can obtain documents, through patents available at any patent office, through unlimited distribution at a conference meeting, seminar or trade show or exhibition generally accessible to the public in the United States.

Through public release, unlimited distribution in any form, e.g., not necessarily in published form, after approval by the cognizant U.S. Government department or agency, or through fundamental research and science and engineering at accredited institutions of higher learning in the United States, where the resulting information is ordinarily published and shared broadly in the scientific community, as distinguished from research, the results of which are restricted for proprietary reasons, or a specific U.S. Government access and dissemination controls.

University research will not be considered

V-29

fundamental research if the university or its researchers accept other restrictions on publication of scientific and technical information resulting from the project or activity, or the research is funded by the U.S. Government, and specific access and dissemination controls protecting the information resulting from the research are applicable.

Twenty-nine.  Count three of the indictment charges the Defendant with conspiracy to violate the Arms Export Control Act in violation of Title 22, United States Code Section 2778, and the International Traffic and Arms Regulations.  In order for the Defendant to be found guilty of this charge, the Government must prove each of the following beyond a reasonable doubt.

First, beginning on or about February 2022 and ending on or about August 2023, there was an agreement between two or more persons to willfully export technical data related to defense articles to the People's Republic of China without obtaining a license issued or by written authorization from the United States Department of State.

And, second, the Defendant became a member of the conspiracy, knowing of at least one of its objects, and intending to help accomplish it.  A conspiracy is a kind of criminal partnership, an agreement by two or more persons to commit one or more crimes.

The crime of conspiracy is the agreement to do

V-30

something unlawful.  It does not matter whether the crime agreed upon was committed.  For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy.  It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways or perhaps helped one another.

You must find that there was a plan to violate the Arms Export Control Act.  One becomes a member of the conspiracy by knowingly participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy.

Furthermore, one who knowingly joins an existing conspiracy is as responsible for it as the originors -- originators.  On the other hand, one who has no knowledge of a conspiracy but happens to act in a way which further some object or purpose of the conspiracy, does not thereby become a conspirator.  Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators nor merely by knowing that a conspiracy exists.

Thirty.  Counts four, five and six of the indictment charge the Defendant with violating the Arms Export Control Act in violation of Title 22, United States

V-31

Code Section 2778 and the International Traffic and Arms Regulations.

Specifically, count four of the indictment charges the Defendant with unlawfully exporting on or about June 5, 2022, the boiler water feeder technical manual for LHD amphibious assault ships -- assault ships to China without first having obtained a license or a written approval from the United States State Department.

Count five of the indictment charges the Defendant with unlawfully exporting on or about August 14, 2022, the propulsion operating guide for LHD amphibious assault ships to China without first having obtained a license or written approval from the United States State Department.

Count six of the indictment charges the Defendant with unlawfully exporting on our about October 8, 2022, the weapons control system manual for LHD amphibious assault ships to China without first having obtained a license or written approval from the United States State Department.

In order for the Defendant to be found guilty of these charges, the Government must prove each of the following for each of the counts described above beyond a reasonable doubt.

First, the Defendant exported or caused to be exported from the United States technical data related to a defense article for which a license or written approval was

V-32

required.  Second, the Defendant failed to obtain a license or other written approval from the United States Department of State to export the technical data.  And, third, the Defendant acted willfully.

Count seven of the indictment charges the Defendant with naturalization fraud in violation of Title 18, Section 1425(a) of the United States Code.  In order for the Defendant -- this is 31.  In order for the Defendant to be found guilty of this charge, the Government must prove each of the following beyond a reasonable doubt.

First, the Defendant knowingly made a false statement.  Second, the false statement was material, that is, it concerned facts that would have mattered to an immigration officer or would have led a reasonable official to make such full -- some further investigation.  And, third, the true facts would have justified denying naturalization or would have predictably have led to other facts that would have justified denying naturalization.

The Government may not show definitively that its investigation would have unearthed a disqualifying fact. Rather, the Government need only establish that the investigation would predictably have disclosed some legal disqualification.

Thirty-two.  An act that's done knowingly if the Defendant is aware of the act and does not act through

V-33

ignorance, mistake or accident.  You may consider evidence of the Defendant's words, acts or omissions, along with all the other evidence, in deciding whether the Defendant acted knowingly.

I have some concluding instructions, but those will come after the parties have argued.

You may proceed.

MR. BARRY:  Thank you, your Honor.

THE COURT:  And I'll make a copy of these instructions that are numbered for counsel.

MR. BARRY:  Your monitor's on?

UNIDENTIFIED SPEAKER:  Yes.

CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

MR. BARRY:  I, Jinchao Wei, do solemnly swear to support and defend the Constitution of the United States against all enemies foreign and domestic.  To bear true faith and allegiance to the same, and to obey the orders of the President of the United States and the orders of the officers appointed above me, according to the regulations and the Uniform Code of Military Justice, so help me God.

That's what the Defendant thought about his oath. That's what he betrayed.  But he didn't just betray his oath, he betrayed those 2,500 sailors and marines who volunteered to bravely serve on the USS Essex alongside him. He betrayed the commanding officer of that ship, Captain

V-34

Aaron Taylor. He betrayed his supervisor, Chief Francisco Ceja, and he betrayed everybody else on that ship. But it wasn't just that ship, he betrayed the entire fleet of Wasp-class amphibious assault ships.

Those seven ships that are 800-feet long, that weigh 40,000 tons, that can move U.S. Marines and sailors around the world, that can carry dozens of aircraft and helicopters, that protect America's interests, the interests of our allies, and that deter conflict. But that's not all. The Defendant also betrayed his new home. He betrayed America, its people, you, its citizens.

Now this isn't a case about the Defendant's hate of America. It's not a case about his allegiance to China or his love of the Chinese Communist Party. This is not a case about political ideology. It's a case about an ideology of need. An allegiance to himself.

Jinchao Wei's allegiance was to Jinchao Wei. You heard the testimony. He's smart. He's ambitious. He was rocketing up the ranks in the military. And you saw the messages with his mother. His relationship with the Chinese intelligence officer was easy money. It was provided by the convenience of his job.

Now if you remember at the beginning of the trial, NCIS Special Agent Christian went up there and testified about the counter-intelligence that the Defendant got right

V-35

before he met that Chinese intelligence officer.  And maybe you remember this slide that asked him, why are you here?

So the question, why are you here?  You're here because the Defendant's choices.  Because after he met that Chinese intelligence officer and he told his friend, another U.S. Navy sailor, I think I've been hit up by Chinese intelligence.  I'm not idiot.  And his friend said, you should delete that guy right away, the Defendant chose a different path.

Every betrayal starts with a single step.  And when he chose to not listen to his friend, to as we'll review, instead start engaging in his first act of trade craft, his first act of secrecy, he started walking down the path of crime and betrayal.

The second question, why are you here?  Mainly because we live in America.  We live in a country that presumes defendants innocent until proven guilty.  And that is a great thing.  That is something that makes this country special.  But he is presumed innocent until proven guilty.  And as I will walk through with you, he has been proven guilty beyond a reasonable doubt.  And soon you will be called to follow your oath, your duty to hold him accountable.  The time will be the time for judgment.

Now I know you've been paying attention throughout last week.  You've heard all the evidence, and you'll get to

V-36

have a lot -- you'll get to have the evidence with you back there. You've listened to the Judge's instructions. So I'm not going to cover everything, but I'm going to go over the offenses, the charges, the counts. I'm going to go through their elements, and I'm going to just show you and remind about some of the pieces of evidence and how they satisfy the elements beyond a reasonable doubt.

So if you remember my colleague, Mr. Parmley, in the beginning he said there's seven counts. Count one, conspiracy to commit espionage. Count two, espionage. Count three, conspiracy to export defense articles to China without authorization. Counts four, five and six, those are the actual export to China of specific technical manuals. The boiler feed water manual, that's count four, the propulsion operating guide, that's count five, and the weapons control system manual, that's count six. And then the last count is naturalization fraud.

So, to put this in context, this is a chart that shows the span of his criminal activity. And I'm just going to remind you about a couple things from this. So if you -- if you recall, he joined the military in 2021. He went to Great Lakes, Illinois to do his training. He did his advanced training.

He got assigned to San Diego in February of 2022. That's when he took that NCIS counter-intelligence insider

V-37

threat training.  And then right after he took that training essentially, he got hit up on-line by someone who we know now is associated with the Chinese government, someone we've called Andy Li in this case.

It's after his friend Rafael Chang (phonetic) who said, this is quite obviously espionage.  I'm not an idiot. I know what this guy is doing.  And then he started -- instead of cutting off that communication, he started changing his communication style.  And the very same day that he talked to Mr. Chang, we know that he had a phone with the intelligence officer.  And as you heard the agents testify, we don't know what happened in that phone call, but we know that they had a call.  It lasted about 16 minutes.

And then what we know is the very next day the Defendant added Telegram to his phone and started using Telegram to communicate with that intelligence officer.  And then what you know is that once he got under a ship, he started sending photos and videos of the ship internal spaces, what the ship was doing, what other ships at the base were doing.

And then he had his naturalization interview in April of 2022, where he certified that he -- everything in the original application was true and accurate, including that he had not committed any offenses, attempted to commit any offenses or conspired to commit any offenses for which

V-38

he had not been arrested.  We know that's true.

And then he sends his first wave or batch of documents in June of 2022.  These -- part of that batch were some of these.  And then he gets paid.  He gets 5,000 bucks.  And then he keeps talking to that intelligence officer, keeps brain storming, what other kinds of information would you like?  What else can I get you?  What else would be helpful?  Sends another batch in August of 2022.  He gets paid.  Sends another batch in October 2022.  He gets paid.

And how is he sending these?  He's sending them through a secret website.  A website that you heard the testimony.  You go to the website.  It looks to be some news website in English.  You've got to scroll over a secret part of the page and then you click there, and then it allows you to put these documents in there.  And then they're exfiltrated outside the United States to China, and then that website disappears.  And when you send those documents you've got to put a passcode, so that the person on the other side of that, the Chinese government, can unlock those documents that you sent.  That's what the evidence shows.

And the evidence also shows that Defendant's criminal conduct was escalating.  That it was getting worse.  Now count two I want to point out, which is the espionage count, only pertains to a narrow time frame, and that's August of 2022 through October 2022.  That is the time

V-39

period in which he compromised and sent to China some of the most sensitive documents on that cart.  That's when he sent the propulsion operating guide, that's when he sent the weapons control systems manual.  So that's what the espionage count is about.

The conspiracy counts, as the Judge instructed you, that's the agreement to commit those criminal acts.  That spans the entire time from February 2022, when he took that step down that path of criminality, until the FBI and NCIS stopped him in August of 2023.

So let's go through the elements.  Count one, espionage, conspiracy.  It has three elements.  Element one, between February of 2022 and August of 2023, there was an agreement between two or more persons to commit espionage.  Element two, that the Defendant became a member of the conspiracy, knowing of its objects and intending to help accomplish it.  And element three, one of the members of the conspiracy committed at least one overt act in furtherance of the conspiracy after February 14th of 2022.

So those first two elements, you've seen the evidence.  The evidence is overwhelming of the conspiracy.  You've seen the payments, the thousands of dollars that he got paid for thousands of pages of sensitive U.S. Navy material.  You've seen the dozens of WeChat and Telegram messages with the Chinese intelligence officer.  You've seen

V-40

the papers the Defendant wrote.  You've seen the receipts that he wrote for the work he did, and you've heard the phone calls.

You've heard those calls with him with that Chinese intelligence officer talking about their criminal activity.  Planning it, talking about what types of information would be most valuable.  What they can do to cover their tracks.  What they should delete.  And you've also see the google searches, which are insightful.  You've seen the intelligence officer's google search for one of the manuals that the Defendant sent to him.  And you've seen the Defendant's google searches for other cases where sailors have been charged and prosecuted by the United States for espionage.

You also seen the Navy e-mails how he exfiltrated the documents between August 2022 and October 2022, that he then sent to that intelligence officer.  How he took them from that secure Navy shared drive that Chief Jonathan Palis was in charge of, the cybersecurity the ship told you about, and how he moved those to his personal Gmail account.  And then how he deleted the e-mails that he sent from the Navy account.

You've also seen and heard that phone call he had -- or the messages he sent rather with Mr. Chang.  I'm not idiot.  This is quite obviously espionage.  Yes, it is.  And

V-41

you saw the messages with his mother.  You don't have to speak Chinese to hear the arrogance in those calls.  The derision, the I know better.  The Defendant said, while other Chinese serving in the U.S. Navy are still trying to figure out how to make extra money and driving cabs, I am just leaking secrets.  Jinchao Wei's allegiance was to Jinchao Wei.

Now the third element of count one, overt acts, we only have to prove one of these.  There are dozens of them.  There's the sendings of the photo -- the sending of photographs and the videos.  There's the payments.  There's the deletions of communications.  There's the Defendant buying a new laptop and phone right before he was arrested with the intelligence officer's money, to continue their criminal activity.

This was use of encrypted communications.  It was use of the disappearing websites, which we'll go over.  When he sends the codes, he uploads -- he loads the package onto the disappearing website.  He sends the papers and the manuals.  He sends the manuals.  The thousands of pages of technical information about the United States Navy's landing helicopter doctrine previous assault ships.

Commander Caldwell told you how these were the result of blood and toil and treasure.  Decades of U.S. Navy operational history gone.  The damage is already done.  The

V-42

Chinese already have this.

Count two, espionage. First element, the Defendant communicated, delivered or transmitted a document, sketch, plan, note of information to a foreign government, or to representative, officer, agent, employee, subject or citizen thereof, either directly or indirectly.

Count two -- or element two, rather. That such information related to the national defense of the United States. Element three, that the Defendant acted with intent or reason to believe that such information was either to be used for the injury of the United States or to the advantage of a foreign nation. And element four, that he acted willfully. That he knew his conduct was illegal.

So the first element, again, count two relates to the documents that were sent between August 2022 and October 2022. If you remember the evidence, you remember this is when he starts sending documents from his U.S. military e-mail account to his Gmail account. This is uncontested. He admitted to this in his post-arrest statement.

And you could also see the conversations. He's telling the intelligence officer, I have something useful. It's about the ship's power structure. And then the next day he sends that code for that secret disappearing website. The dead drop is loaded. And then the intelligence officer says, received.

V-43

And then the intelligence officer searches for that alpha-numeric code for the propulsion operating guide. He looks on Google to see if it's there. And then he says, I like your stuff. Very professional. That praise, another thing that drove the Defendant, and then the Defendant was paid.

And then he did it again in October, he sent another batch of manuals. And this time they included the weapons control system manual. The document that included electrical schematics for how all the offense and defense weapons on that ship are set up. And we know that because the metadata of an outline that he wrote -- or a paper rather, that included excerpts from that manual, the metadata said it was last modified on October 7, 2022.

And then, guess what, the next day, he sends another code. Secret website loaded, ready to go. And the intelligence officer says, good to go. And then says, I just read it. You're so talented. It's a pity that you don't go to college. I will support you.

Again, uncontested. When asked his post-arrest interview, what about the weapons control system, the Defendant said, this one is from the shared drive. When asked, what about these weapons control did this one go over? Yup. And then he was paid.

And I also want to remind you that those papers

V-44

about the weapons control system manual, that's also the paper that had the exact location on that ship of where his fellow sailors and marines slept.  He sent them where his chief, Chief Ceja slept.  He sent them the information about where Captain Taylor, the commanding office of that ship slept.  He sent that information to somebody he knew worked for the Chinese government, and he did it for money.

Now what is a document related to the national defense?  You heard the Judge's instructions.  It's a broad term, but essentially the Government has to prove to sub-elements beyond a reasonable doubt.  Number one, that the material would either be potentially damaging to the United States or might be useful to a foreign nation.  That's the law.  And that that material was closely held.

So, again, this is count two, espionage.  Element two, these are the documents we're talking about.  It's a subset.  It's not the entire universe of documents, but what it does include is it includes that propulsion operating guide and it -- it includes that weapons control system manual.

You know that they were closely held.  You listened to the testimony.  You heard from Captain Taylor about all the security -- physical security checkpoints just to get on that ship where those men were -- lived.  You had to get through the gate, then you had to get through the

V-45

pier, then you had to get on the ship, then you had to get through the roving controls, then you had to get in the specific room where the manuals were kept.

And you also heard from Chief Palis who testified about the cybersecurities and protections that the Government put in place.  That those manuals are only accessible on the shared drive on that ship.  That's why the Defendant had to go there to get them.  And that the only people who have access to that shared drive on the ship not only do you have to physically be on the ship, but you have to have gotten approval to have access to particular compartments of that drive.  You have to have a security clearance.

You have to have your commanding officer or supervisor's approval when you submit that request for access to that specific compartment of the ship.  And if you have access to a specific compartment and then you no longer need access, you no longer have a need to know, guess what, the access goes away.

You also heard from Chief Palis, that he testified about how he tried after the fact to search for some of these manuals on the ship's hard drive, and he found some of them but not all of them.  But he testified that he found the propulsion operating guide in something called the "cross-departmental surface warfare officer folder."  A

V-46

folder that was accessible to other people just on the ship who were surface worker officers who were training and studying to become service worker officers.

And you heard from Chief Ceja who said there was no reason why the Defendant should have been in that folder. You also heard from Chief Ceja that he later found the weapons control system manual in that same folder. The element to be the potentially damaging to the United States are useful to China.

So first thing to note, damage was already done. This is not hypothetical. China has this. They have everything that the Defendant sent to them.

Second, you heard the testimony from Captain Taylor about how the information contained in these technical manuals could be used to target the ship. Could you used to develop offensive strike plans. Could you used to sabotage the ship, to understand its weak point. If you understand how the reduction gear works, you might be able to understand how a pinpoint action can disable the entire ship and all 2,500 marines and sailors onboard.

You also heard from Commander Caldwell, someone who is recognized as not only an expert in previous warfare, but in the Chinese Navy. Who echoed a lot of what Captain Taylor testified about in terms of the harm, and then who contextualized it. Who said, this is why Chinese Navy in

V-47

particular would be particularly interested in this information.  Here's why it could be useful to them.

They don't have our operational history.  They have similar ships, they have similar ambitions.  They want to move from a blue-water coastal force to a global blue-water force -- or a brown-water force to a blue-water force rather, and this is one of the ways that they would get there, because this is that two sides of the coin.  One side is the tech, the equipment, and the other side is the know-how.  The years of operational history, what's in the minds of our sailors and our marines and what we train them on, and that's what this represents.  That's what this represents, the lessons learned.

And you heard Commander Caldwell testify about now that they have this information, they could use it to leapfrog their own development, either from an offensive perspective or from a perspective of understanding how the gold standard in the U.S. Naval -- or in the global -- the global community does things.  They can just pick and choose what they want.

You also heard from State Department Director Katherine Hamilton who testified about the documents that were controlled under the Arms Export Control Act, that was counts four, five and six, and the reason that they were controlled is because we want to give our war fighters the

V-48

advantage and preserve that advantage.

You also heard about 074. This is not hypothetical. That is the ship, as Commander Caldwell told you, that the Chinese quite a few years ago, they don't have as many as us, but they likely will at some point. As he said, they had more ships than the U.S. Navy already. But what they don't have is the operational history. They don't have all the details of how we do things, how we got to be the best in operating in an incredibly austere and difficult environment, which is the maritime environment.

You also heard from Commander Caldwell that in this world having everything together, the sum was greater than its parts. Having all this together from one person who the intelligence knows is in the Chinese -- or in the United States Navy, how that in itself is valuable. That intelligence is more authoritative, and it allows the Chinese navy or the Chinese government to take all this information that they already got and fit in those puzzle pieces with all the other puzzle pieces that they have.

And the Defendant was trained on that. This is a slide from the training he took before he met that intelligence officer. This was not a new concept for him.

So count two, espionage. We've already gone through most of the elements. The third element, what does reason to believe mean? This is the intent only. A

V-49

defendant has reason to believe if the defendant had thoughts from which he concluded, or reasonably should have concluded, that the information relating to the national defense, a sub-set of those manuals, was to be used either to the injury of the U.S. or to the advantage of a foreign nation.

And the Defendant knew, he knew from the beginning that Andy Li, that intelligence officer, worked for the Chinese government. And how did he know that? Because he said it. He said, I think I'm on the radar of a Chinese intelligence organization. He said, you remember I once mentioned that I was in contact with a person who worked for the Chinese navy. He lives in Shanghai. He should be a public official. His mother later told him, maybe some day after you leave the military you could go and become an instructor at sea for the Chinese Communists or something.

And then he was asked eventually in that post-arrest interview, well, did you think he worked for the government? He said, yes. How do you know? Well, one reason is because he was trained on it. NCIS trained him on this exact issue. They trained him on how do foreign intelligence services, including the Chinese government, recruit people. They build personal relationships to gain trust. They use incentives. They start with small requests and then they make bigger demands. They praise you and

V-50

reward you for your accomplishments.  He was living the training that he got.

He also knew because of common sense.  Starting as early as March of 2022 once he got on the ship, his Chinese handler started asking him for information, and he started giving it to him.  He started giving him all those photos, all those videos.  He started giving them that insight.  He started about in his view some of the weaknesses of the ship.  It's still very difficult for this kind of air defense to deal with the anti-ship missiles.

And then the relationship evolved.  If you look at the Telegram and WeChat messages, start off causal, then they start using trade craft.  They start hiding their tracks, start using Telegram, start using their secret websites.  The intelligence officer starts telling him, make sure you delete what's going on with us.  Don't tell anybody about it.  Delete that Tieba website where we first met.  Defendant does it.

And then the Defendant starts offering his own opinions, things that he thinks would be useful.  I have something useful.  The plays, are you so talented it's a pity you don't go to college.  This was an investment for Chinese intelligence.  By November of 2022 the Defendant was calling the intelligence officer, "big brother Andy."

And he continued to offer, I have specialized

V-51

firefighting training next week.  I'll take a look and see if there's anything of substance.  Again the praise, I thought your writing is very good.  Of course, if they're originals, like all the documents you already sent me, that'd be even better.  The continued use of the secret websites.  And then right before he's arrested, that culmination of getting new phone, an untraceable phone, new computer, untraceable computer, new Telegram account.  Deleted all his prior Telegram chats.  You heard from Agent Wetterer, he deleted all his chats from January to August of 2023.  So we have very little insight from Telegram in terms of what he did then.  But what we do know is that he got paid, that he continued working with that intelligence officer.

And that he was brainstorming things -- this is from one of the calls with the intelligence officer where the Defendant's volunteering, I'm going to keep an eye out.  And the intelligence officer is saying, hey, if you see any blueprints, make sure to film those with your phone, send those to me.  Does the Defendant, no, I can't do that.  That would be illegal.  No, what are you talking about?  He says, yes, yes, for sure he'll keep an eye out.

The Defendant had the intent or reason to believe that the information was to be used to the injury of the United States or to the advantage of a foreign power.  He

V-52

knew it because was smart and he had common sense.  He knew it because he'd been trained on it.  This is more of that training, telling him about the potential harm from this.

And he also knew it because for the documents, almost all of those documents had warnings on the front of them that are similar to this.  That the information is technical data controlled by the United States Government, by the Arms Export Control Act.  That if you send that outside of the United States with approval, there's severe criminal penalties.  That you should destroy it rather than give it to somebody who shouldn't have it.

Last element of espionage, willful.  This is what the definition is.  And of course this was willful.  Of course he knew what he was doing was illegal.  That's why he destroyed evidence.  He deleted the Tieba, he deleted the military e-mails, he deleted the Telegram accounts.  That's why he used secret meetings to conduct his criminal activity, those disappearing websites, the multiple encrypted apps, new phone and the computer, multiple PayPal accounts.

And that's why he lied, lied to the USCIS officer when he went to his naturalization interview and his swearing in ceremony.  He lied to the United States Navy when he failed to report all this activity, even though he'd been trained and told, you have a duty to report this.  And

V-53

he lied to the FBI and the -- and NCIS when he was finally arrested and confronted.

And I just want to remind you of some of those clips, because you saw the body language, you heard the lies.  You saw that he minimized and only admitted after being confronted.  When he was asked who he talked to in China, he first said, just some friends.  You know, I don't really talk to anybody in China.

And then if you remember, the agent pushed him.  Agent Wetterer said, who else do you talk to in China?  And what happened next was very illuminating.  For 23 seconds, he sat there silent.  He just sat there, stared at the agents.  And we don't know what he was thinking, but you can use your common sense and conclude that maybe what he was thinking is, I'm caught but how caught am I?  What do they know?  So even then he says, nobody else after that 23-second pause.

And then she says, who's Andy?  And he says, he's just an on-line friend.  Didn't mention him before.  What do you guys talk about?  He just asked me about the Navy, you know, food, things like that.  Only later on after he's confronted does he say, yeah, Andy, that guy who paid me $12,000, the guy who I sent thousands of pages of technical manuals to, the guy who I used these secret disappearing websites, the guy who I talked to almost every day for the

V-54

last 18 months, that guy that I forgot to mention?

We also saw another pause, similarly, 23 second, when he first minimizes his conduct and says, Andy just asked me general things, and then the agents say, what else does Andy ask you?  Another pause.  Use your common sense.  Why was he pausing?

We also know from his Google history that he knew what he was doing was illegal.  He's smart.  He did his own research.  He googled another case where another U.S. Navy sailor unfortunately decided to commit espionage, was convicted, and he read the Department of Justice press release about that case.

Again, largely uncontested.  This is from the post-arrest interview.  Unprompted he said, I'm screwed.  It's near the end of the interview.  Agent asks him, why do you think that?  And he says, I'm sharing the unclassified documents, I mean with him, meaning the intelligence officer, I'm not supposed to do that.

Count three, export conspiracy, two elements.  First element, between February 2022 and August 2023, there was an agreement between two or more persons to export technical data related to defense articles to China without a license.  And that the Defendant became a member of that conspiracy knowing of its illegal object.

Largely the same evidence in terms of how you

V-55

prove when that conspiracy started, when that agreement was formed.  It was formed in February of 2022 when he took that step down that road to criminality.  And it continued through August 2023 when he was not being stopped, he was escalating his conduct, he was not hesitating, and the only thing that stopped was getting arrested.  You have similar communications about his knowledge of the illegal agreement and his participation in it.

You also for the export count, as I said, all those warnings.  Every time he sent one of those manuals it had one of those warnings on it about this specific law and the criminal penalties that were associated with it.  It looks like this.

Count four, five and six, so these are the specific exports of technical data that he sent to China, it that has three elements.  That he exported or caused to be exported from the United States technical data related to defense article for which a license or approval is required. That he failed to obtain that license or approval, and that he did it willfully.  Those are the elements of counts four, five and six.

This is when they happened.  This is the first one.  This is the boiler water, feed water test and treatment.  And this is how you know that he exported it. Other than the fact that Agent Wetterer told you when he

V-56

finally told a little bit of the truth in his post-arrest statement, he admitted to it, that's corroborated through the communications.

This first exhibit, 149, is a screenshot that was found from his iCloud that lists a number of documents that were passed in June, including this document, including this manual.  You also have the communications from June 5th and 6th where he talks with the intelligence officer about sending him using the secret website a large patch of documents.  And the intelligence officer says, I searched the 30 things you sent me.  Two-thirds of them are found on the internet.  It's okay, but at least I got one-third that I can learn from.  And then he got paid.  He got that $5,000 from -- from different accounts over PayPal, in five different $1,000 increments.  And then he wrote a receipt.

Count five, this is the propulsion operating guide, again, largely uncontested that he sent it to China.  But the evidence corroborates his statements.  It shows that on August 14th he sent batches of documents, took them, stole them from the Essex servers, and sent them to his personal e-mail accounts and then tried to cover his tracks, and one of the documents he sent was the propulsion operating guide.

And then he told the intelligence officer, I have something useful.  It's about the ship's power structure.

*Echo Reporting, Inc.*

V-57

And then he sent him that code for that website, and then the intelligence officer said, received.  And then the intelligence officer searched Google for that document, and the intelligence officer gave the Defendant what he wanted. He gave him that praise, very professional, and he gave him that money.

Last count for export charges, count six, was the weapons control system manual.  This was passed later, October 2022.  And we know it because of the metadata from the associated paper.  We know it because of the communications showing that use of that secret disappearing website.  We know it because of the money the Defendant got paid, and we know it because he admitted to it finally in that interview.

Now element 1(b), that these three documents contained technical data related to defense articles.  You heard Ms. Hamilton's testimony, the director of licensing of the State Department who handles this sort of thing, and she said, these three documents contain technical data.  These three documents relate to category six of the U.S. Munitions List.  And what is category six?  Category six is surface vessels of war, warships and other combatant vessels, including amphibious assault ships.  Guess what, the Essex is an amphibious assault ship.  So is the Wasp-class.

She is the definitive authority on what is

V-58

technical data, and her testimony that these three documents contain technical data subject to the International Traffic and Arms Regulations was uncontroverted. She also testified that a license was required, and that, unsurprisingly, because the Defendant knew is activity was criminal, because he was hiding his activity, that he did not have one.

Last element of these counts, was it willful? Did he know it was illegal? Again, this one's pretty obvious. He knew it was illegal. That's why he lied. That's why he tried to hide his conduct. He also told law enforcement eventually that he knew he wasn't supposed to do it.

And again, for these three documents that he sent to China, that the Chinese have, each one had this warning on the front about this specific law and the specific consequences of what happened if you violate that law.

The last count, naturalization fraud, has three elements. The Defendant knowingly made a false statement. The false statement was material, meaning it concerned facts that would have mattered to an immigration officer. Again, pretty obvious here. And that the true facts would have justified denying naturalization or would have predictively led to other facts that would have justified denying naturalization.

So, first element. He knowingly made a false statement. He knowingly made a false statement at that

V-59

naturalization interview, that all of the information contained in his original application -- application remained true.

It did not remain true because he had in fact by that point committed, assisted in committing or attempted to commit a crime or offense for which he had not been arrested. By that point, he had joined a conspiracy with someone associated with the Chinese government to commit espionage, and he had joined a conspiracy to send defense articles to China without U.S. Government approval.

And they add to that interview, he knew it could be problem. He told the -- he told the intelligence officer, I was asked if I'd been in contact with anyone in China. The thing is, I'm in the process of applying for my citizenship, and they are rigorous in their investigation. If this kind of work is discovered, it may be considered espionage activity.

Now pause for a minute. Did he say, therefore, thank you very much. I don't want to ever talk to you again. Did he say, I'm going to report you? No. He said, I'll take a look next month when I'm on the ship. And the evidence shows that's what he did.

He took a look next month once he was on the ship in March of 2022. He started sending videos and he started sending photographs and information. And once his

V-60

naturalization interview was completed, that's when he did that first big dump of documents and got paid $5,000. He waited because he knew he had to hide it.

You also heard the testimony from USCIS Officers Flores and former Officer Younis confirming that the certification that he made in that naturalization interview, he had been actually asked that question at the interview itself, and he had answered, no. And you heard that if he had said, well, I met someone associated with the Chinese government and I've started sharing information with them, including operational information about the U.S. Navy, that that would have justified denying his naturalization, or at a minimum, predictively led to other facts that would have denied -- justified denying his naturalization.

Now the sad truth is that the damage is already done. China already has all this. They already have everything that the Defendant gave them. The Defendant's choice to ignore Mr. Chang's advice, his choice to start committing crimes with somebody he knew to be associated with the Chinese government, that's why we're here.

And at the end of our arguments -- defense counsel will have an opportunity to talk to you, then I'll have an opportunity to say a few more words, we'll be asking you to deliver the only verdict that is consistent with the evidence, and that's guilty on all counts. Thank you.

V-61

THE COURT:  Thank you.

We'll take our morning recess at this time.  We'll be in recess for 15 minutes.  Please remember the admonition that I gave you to earlier.

(Jury exits courtroom.)

THE COURT:  We're outside the presence of the jury.  I've handed to you the numbered copies of the jury instructions.

MR. PARMLEY:  Thank you, your Honor.

THE COURT:  And then, also, I do have the first page of 53-4, which we'll put in the defense binder.

MR. JONES:  Thank you.

THE COURT:  So I'll ask the parties to approach and verify that the items in the defense binder are correct. Where are the other three-hole punch ones?

MR. JONES:  It's over here.

THE COURT:  I only have this one now.  Okay.  I only have this one.

THE CLERK:  That's the court's.

THE COURT:  I have no idea if they're correct or not.  The problem with substituting documents is that they disappear.  We have some that were already three-hole punched.  There's two pages for 54-4, correct?

MR. JONES:  53-4?

THE COURT:  "53-4."

V-62

MR. JONES:  I don't think there is a 54-4.  There is no --

THE COURT:  53-4.

MR. JONES:  Yes.

THE COURT:  One through six?

MR. JONES:  Yes.

(Sidebar discussion held.)

(Sidebar discussion ends.)

THE COURT:  And, Wanda, make an extra copy for me of those.

(Proceeding recessed briefly.)

THE CLERK:  The jury is entering.

(Jury enters courtroom.)

THE CLERK:  Jury entering.

THE COURT:  Welcome back.  The audience may be seated.

THE CLERK:  Jury entering.

THE COURT:  Welcome back.  Now it's the defense opportunity to give a closing argument.

You may proceed.

CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

MR. JONES:  If you're waiting for me to come before you and explain to you why my client Jinchao Wei did nothing wrong, I'm very sorry to disappoint you.  We know he did some things wrong.  We know he did some things very,

V-63

very wrong.  That is not why we are here.  That is not why I am here.

I am not here to defend every stupid action that Jinchao Wei took between February of 2022 and August of 2023.  I am not here to excuse every regrettable mistake he made.  That is not why I'm here.  I am here for one reason, and that is to hold the Government to its burden to prove every element of every count beyond a reasonable doubt.

Our justice system in America is controlled by the burden of proof, and there are different burdens of proof.  In civil court, for instance, a breach on contract, the plaintiff must prove by a preponderance of the evidence, more likely than not.  Some people say 51-percent.  That's not what we're doing here.

There's a higher burden, clear and convincing evidence, in cases such as parentage, when the Government might take parental rights away from a parent.  They must prove by clear and convincing evidence that it's in the child's best interest.  That is not what we're doing here.

In criminal court, where the Constitutional, fundamental right of liberty is at stake, the Government must prove its case by the highest burden of proof, and that's beyond a reasonable doubt, and that applies to every element of every charge.  They can't overwhelmingly prove some of the counts or some of the elements, and skate by on

V-64

some of the others.  They must prove every element beyond a reasonable doubt.

And that is why at the outset of this trial, I told you, intent is everything.  Because for each of the counts alleged against Jinchao, the Government must prove a specific state of mind.  They must prove his intent for espionage, that's counts one and two.

One is conspiracy to conspiracy to commit espionage, the other is espionage itself.  Conspiracy requires an intent to further the actual crime, which requires intent.  So if we're just looking at intent, I'd argue that counts one and two are effectively the same, and they both hinge on that element of intent.  And they have to prove Jinchao's subjective intent to harm the USA and empower China, or that he acted with the reasonable -- or with the belief that such harm was likely.

For the next counts, three through six, concerning arms export control violations, again, we have to look at Jinchao's subjective intent.  We have to look at whether he acted willfully, and that's with purpose to disobey or disregard the law.

And then with naturalization fraud, again, we have to look inside his mind and determine whether he knowingly made a false statement.

Now, the Government has proven many, many things

V-65

beyond a reasonable doubt.  I'm not going to touch those, or if I do, I'm going to conceded they did any excellent job. They put on credible witnesses.  They were extremely professional, and diligently went through a massive amount of evidence.  And they did their job effectively and they've proven many things beyond a reasonable doubt.

They may have proven some crimes that aren't being charged, and it's your job as the jury to respect the Court's instruction not to consider other potential crimes that aren't charged in the indictment.

Now I'll concede, sitting in these chairs, listening to that evidence, seeing the payments come through PayPal, seeing the encrypted messages go out, I understand it is a tall request to grant Mr. Wei an acquittal.  It's likely that what he did constitutes some kind of a crime.

As I mentioned, these specific crimes require the element of subjective intent.  For our other crimes that are strict liability, intent doesn't matter.  Running a red light, it doesn't matter if you thought it was going to stay yellow.  It doesn't matter if you were telling your kids to quiet down in the back seat and you coasted through.  It doesn't matter.  If the light's red, you enter, you get a ticket.  Case closed.

And there may be some things like that in this case, where Jinchao, he sent the materials and case closed.

V-66

That's all we need to know.  But as Judge instructed you, you are here only to determine whether the Defendant or not guilty of the charges in the indictment.

The Defendant is not on trial for any conduct or offense not charged in the indictment.  So for that reason we are looking at seven specific counts, each requiring proof beyond a reasonable doubt of Jinchao Wei's subjective intent or state of mind.

Let's go back to the beginning.  If we're going to understand who Jinchao Wei is, and try to understand what his intentions, his thoughts, his state of mind were, let's get to know him.  And I apologize if you were really hoping that he would take the stand.  That was my call that he remain in that seat, not face cross-examination.

He's been interviewed by agents already.  There's a massive amount of information.  That was my call.  He has no obligation to testify.  He has the absolute right to require the Government to prove their case, and not try to prove his own innocence.  And so we're not required to put him on the stand.  We don't need to put him on the stand. We have the information there.

Who is Jinchao Wei?  We know from his interview with NCIS and FBI, he's an only child raised by a single mother, no other family members.  Him and his mom alone growing up in Northern China until he's 16 years old, when

V-67

he and his mom together move to the United States to Wisconsin.  She marries an American citizen.  It's the two of them his whole life, him and his mom.  Come to America, new country, new everything.  New school, new friends, him and his mom.

After three years in America he joins the Navy. He goes to boot camp close by in Great Lakes.  At the age of 20, for the first time, he leaves home away from his mom, goes to San Diego and is for about a month in the transient personnel unit.  As you heard testimony, that's where the recruits go before they get their assignments.  People that he's there with are not necessarily the people he's going to be on ship with.  They're not going to be his longtime companions.  He's in the transient personnel unit.

So we know he's dreamed of deployment, wanting meaningful work.  He talked about hoping that he might even get to go to a combat zone, become a combat veteran.  He at one point put in for a transfer to the Boxer, because that ship was actually going places, not like the Essex, which is in dry dock.

We know that he comes from an anti-communist background.  If you read Exhibit 131, him and his mom are talking about communists.  His mom's saying, anyone with a brain would be anti-communist, making fun of communists.  I think it's obvious she makes a joke, that you could go work

V-68

for the communists with everything you know.

If you read that whole document in context, I think it's -- I think it's clear. You made your own decision. But I'd argue that it's clear that Jinchao and his mom come from an anti-communist background. His mom is telling him, it's so horrible in China. They don't even treat people like humans. And obviously, they left there. They moved to the United States.

Jinchao, his colleagues talked about he was highly driven and studious. So let's talk about how studious he was. We know that -- I hope you recall my questioning of special agent Wetterer, where we went through some of the like metadata that was found on his phone when the FBI got a hold of it. You could see traces of these old Facebook messages and iChat messages, groups with him and other machinist mates. And these go back to March of 2022. This is right after he gets put on the Essex.

So he gets put with his new shipmates on the Essex. They've got a group chat. These group chats continue, and what you see in them is that Jinchao has a ton of these tech manuals. And now you find later he got a bunch of them off Facebook. He got some of them off the shared drive from the Essex computer, but he's got all of these, and they're great for studying.

Many of the witnesses testified that tech manuals

V-69

are great study materials.  That's what the sailors are tested on when they're advancing.  So, Jinchao, he's new on the ship, just getting to know people.  He's got all the goods.  He's got all the study materials and he's sharing, his generous with them.  He's sending them to his -- to his friends on the Essex.

And you see that he's got this Facebook link to a Google drive, and then he's also sending -- you see in the bottom, right corner here this OPNAVINST, which, coincidentally, is Exhibit 235.

And it's around the same time when he's downloading all these tech manuals, he's studying to advance in his career, he's sharing all these study materials and it gives him some clout, some prestige within his friend group that he's the guy that's got all the stuff.  He's got all the answers to the test.  He's got the practice guides.

It's at this same time he meets Andy Li on Baidu/ Tieba, the Chinese version of Reddit essentially.  Who is Andy Li?  This is a critical question in this trial.  And I would argue that there is a substantial amount of reasonable doubt as to exactly who Andy Li is and, more importantly, who Jinchao Wei thought Andy Li is.

So here's who is Andy Li according to Andy. Initial introduction:

"Let me introduce myself.  First I

V-70

am with the China Shipbuilding Industry Corporation.  It has an institute in Shanghai and we specialize in doing research on heavy industrial shipbuilding.  And I myself am also a military fan.  So, anyway, things like China's equipment, U.S. equipment, anyway, I really like them all."

Then he goes on to say this is -- if you read through Exhibit 120, which is the -- I think it's the Telegram messages between Andy and Jinchao, you'll see him repeatedly say things like, this is one of the topics I'm studying.  Thanks for educating me.  Which website can I see this?  Let me learn something.  But I look forward to being schooled.

This is the nature of his communication with Jinchao.  It's got an education tone to it.  I'm -- I want to learn.  Help me learn.  And you'll see that Andy was also sending Jinchao tidbits about the Chinese fleets and stuff like that.

Now, throughout 2022/2023, Jinchao makes a number of statement to his mom, and then later to the -- to the special agents, about who he thinks Andy Li is.  Because his mom's asking, who's this guy that you're talking to, that you're giving these documents to, that you're making money

V-71

with?  Who is this guy?

And this is candid.  This is before Jinchao has any idea that he's being spied on.  That he's being listened in on.  This is totally candid.  And he's saying, he's probably -- he's probably a cadre or something like that, doing research work as a state-owned enterprise affiliated with the Navy.  He seems to be rather anti-communist.  I think -- I think he's a college professor because he says he teaches like classes like marine.  That's what he tells the investigators after he's been arrested.

Now, I want to go back to what Andy Li told Jinchao.  He said he's with the Shipbuilding Industry Corporation, which has an institute in Shanghai where they specialize in doing research.  Does that sound like anybody else that you heard from in this trial?

Remember Commander/Professor Caldwell, the Government's expert?  He works for a maritime research institute.  He's affiliated with the Navy.  He's also a professor and teaches classes.  Is it unreasonable to think that Jinchao perceived Andy Li in a similar capacity to Professor Caldwell?  Yeah.  Kind of works with the Navy.  Doesn't work for the Navy, he works with the Navy.  He teaches classes.  He's a professor at a research institute.

And so it's consistent throughout their communications that Jinchao is treating this man he doesn't

V-72

really know, like somebody who's in an education setting, and they're educating each other.

Now, pretty early on Andy Li asks Jinchao, hey, can you give me a favor?  I think this would be really cool. I think it would be very interesting, walk all 14 piers, track who's going where, what boats are going where, who's doing what, make a spreadsheet, send it me.  I think that would be really interesting.  And Jinchao says, I can't take this on.  He tells his friend Raf that he's been offered this -- this job.  He says, I can't take this on.  I'm no idiot.  This is quite obviously espionage.  Raf smartly tells Jinchao, delete this guy.  That's suspicious.  Delete him.

And Jinchao goes back to Andy and says, hello. I'm really sorry, bro, I can't take this job.  So he's consulted with Raf, talked about how it's suspicious, tells Andy, I can't take this job.  It may be considered espionage.  He's drawn a hard line saying, I won't do this. It may be considered espionage.  Andy says, can I call you? Jinchao says, sure.

What follows is a 16-minute phone call, and I wish I knew what was discussed on that phone call, but I'll argue that if you read through the messages, it's clear what happens, because two things happen.

One, Andy drops that job, the request of having

V-73

Jinchao walk the piers, collect the data, that's gone.  That job that Jinchao rejected is gone.  The nature of their relationship and information exchange pivots.  So that's the first thing.

The second thing is, it appears that Andy was regained Jinchao's trust and confidence and put his mind at ease about them continuing this correspondence.  Because as the Government has pointed out, and I completely agree, despite that initial reservation and despite saying this is suspicious, Jinchao does in fact -- after that phone call, he does in fact continue his relationship with Andy and accelerates it.

But we do know that the one job that Jinchao said, that's crossing the line, that sounds like espionage, never gets brought up again, and he never in fact does that.  Instead what he does a couple weeks later is send all those same tech manuals, all the same study materials he's been sending to his friends, sends those to Andy Li.  And again, to this point, their conversation has been largely focused on education and learning and schooling.

So now let's talk about what was shared with Andy.  I've -- I would say it breaks down into three essential categories.  there's the tech manuals, then there's a handful of essays about life onboard the Essex, and then there's some photos and videos of Jinchao at work.

V-74

And I appreciate you've all been paying attention, taking notes, obviously showing interest.  Your work's going to be cut out for you.  You've got a fair amount of reading ahead of you.  But I encourage you, you read all these things.  Read the tech manuals, read the essays, review the photos and videos.

So let's start with the tech manuals.  We know that none of these are classified or top secret.  We know that the Government is capable of keeping things secret and out of prying eyes when it wants to.  We know that classified materials can be kept from ever seeing the light of day.  These are not classified.  They're not top secret. Jinchao after a couple of months in the Navy on the ship was granted the credentials necessary to access all this.  Not top secret, not classified.

We know that these tech manuals were routinely downloaded and shared and the contents are readily available. Chief Petty Officer Ceja said, yeah, we download them.  I download them.  I've got them on my personal iPad. They come off the ship.  They're on our personal devices.

Chief Petty Office Palis talked about how things can be printed, shared, taken off -- nobody collects them.  Nobody returns those binders.  Nobody keeps a account of which binders left the shelf and come back on.

Special agent Wetterer agreed that many of them, a

V-75

lot of them can be found on-line just by doing a google search.  You may have -- recall, I made a point of asking everybody that question.  Would you be surprised to find all this stuff on Facebook?  Nobody said they'd be surprised.  There's no surprises there.  This stuff is on Facebook.  This stuff is on other websites.

There's stuff being sold on Course Hero and Quizlet.  The Government's not investing them for export control or espionage.  The stuff's out there.  And I'd argue that the reason nobody is really making that big of a fuss about it is because these things are several years or decades old.  If you read them you'll see, it's basically like the owner's manual to a 30-year-old car.  It's not that sexy.

Warning labels on them.  Small print, legalese, references a bunch of codes, and those same warnings are the same across the manuals.  If can read the refrigeration one or the propulsion one or the weapons control, it's the same -- you'll see it, they all fall in the same class with the same warnings.  Boilerplate, fine print, and we'll talk about fine print a little bit later.

They're largely related to obsolete technologies.  We know there was plenty of discussion about the Essex, how high-tech a vessel that is.  It's supposed to be sea worthy for 30 years.  It's 33 years old, uses an obsolete steam

V-76

propulsion mechanism which nobody's making anymore.

The Essex' brothers and sisters, the Barmorshard, the Boxer, they're all being taken out of service.  The ones that are breaking down, they're scrapping them.  They're not trying to repair them.  These are not elite vessels.  This is not the technology that anybody's trying to copy at this point.

And then just bringing it back, that the Government knew that Jinchao was saying, this stuff's on Facebook.  He even specifies, if you go to my Facebook, machinist mate active duty group, you'll find all this stuff.  Despite knowing exactly what it was, the Government never bothers to check Facebook, even though they know exactly where he got this stuff.

The exact group where they could look for it, the Government never made any effort to look on there, and obviously they're not making any effort to shut any of these platforms down because they're -- it's not valuable.  They don't -- they don't care, and they've shown they don't care.

All right.  This one sounds important.  This one sounds a little scary.  Weapons control system, Exhibit 201.  It sounds exciting, it's not.  It's not that exciting, but don't take my word for it, you can read it.  You'd think in there you're going to find stuff about like how to launch a rocket or how to intercept a missile.  It's really about how

V-77

to tighten screws in the part of the ship where the weapons controls are.

There's no tactical or strategic information in there.  It was published in 2007, and it's got the same level of distribution restriction as the refrigeration manuals.  Remember that fine print that says, don't -- don't distribute this code section, whatever?  It's no more significant than the other arcane, boring technical manuals for the other parts of the ship, which, again, are primarily used by the sailors to study for their tests.

Damage control, this one also sounds pretty exciting.  In this one the Government actually highlighted and put expert Caldwell on the stand and had him go through this.  Now I don't why they chose this one.  Ostensibly, they would want to highlight the most important, meaningful one, but I -- that's conjecture.

But if you recall, my questioning of -- of their expert, Commander Caldwell, basically damage control is if there's a fire on the -- on the ship you should put it out.  If a torpedo hits the boat, get to safety, try to put out the fire, plug the holes, use practical means.

This is not highly protected secrets.  This is not -- just use your common sense.  This is not something that we're concerned about getting into the hands of a foreign power, this 10-year-old instruction manual on essentially

V-78

how to use a fire extinguisher.  Did Jinchao Wei believe that dissemination of this would lead to the harm of the United States and the empowerment of China?  There's at least reasonable doubt as to that.

Let's talk about trade craft.  What you would expect of a spy.  Now, obviously, Jinchao is charged with espionage.  Espionage, spying.  Is he a spy?  Did he think he was a spy?  Did he believe he was acting as a spy?  Was he intending to serve as a spy?  His passcode to his phone was 0000.  Never used an alias.  We know that he's -- for as long as he's been in America, calling himself Patrick.  We've seen Patrick on other things.  Patrick Jinchao, that's not an alias.  Never uses any other alias, no code words.

Special agent Wetterer said, yeah, surprisingly.  You know, we do other espionage cases.  People try to be secretive about stuff.  They try to hide their identity.  They delete everything, they shred document.  We went into his apartment, he had paper copies of everything.

He never asked for money or negotiated payments.  He never said, hey, if you give me this money, I'll give you this stuff.  It was always, hey, here you go.  Here's something I think's useful.  Here's something I think's informational or interesting, and then Andy would unilaterally send money.  Assign a value to it, send money.  And every single time, if you read through Exhibits 120,

V-79

121, that's all the chats between Andy and Jinchao.

You'll see that Jinchao not only is not asking for money, every time he gets money, he's saying, you shouldn't have. You didn't have to. He's not -- it's bizarre. I'll concede it's bizarre, but he's not -- he's not a spy. He's not trying to sell secrets. He's giving stuff away and ends up becoming excited by the notion that he's getting money for basically giving away junk, and he tells his mom that. Yeah, I'm leaking secrets but I -- it's -- I don't have this secret kind of work. I don't have high-level clearance. It's all basic stuff.

And he's not deleting stuff. The only time he deletes anything is when Andy specifically says, hey, delete that. On his own initiative, he's not deleting anything. Even some of the stuff Andy's saying, delete that, you'll see it's still -- it's still in there are after Andy delete it. He's not -- he's not following the rules of the game of deleting everything.

And then, finally, this supposed spy, this asset of the Chinese government, when he's finally arrested, he brought in for questioning, blindly signs a waiver saying, I don't need an attorney. I'll talk. I know my constitutional rights. Blindly signs it, waives the right to remain silent, waives his right to an attorney, and he gets, you know, grilled for two hours.

V-80

Let's talk about the tech manuals on Facebook. During that interview after he waives his rights, talks to the NCIS and FBI, and he repeatedly says, you know, this stuff's on Facebook. And he says it's a Facebook group. It's called, "active duty machinist mate," and that's -- that's all in Exhibit 198, pages 85 and 86.

As I'm --

MR. PARMLEY: Objection, your Honor. 198 is not evidence.

THE COURT: Sustained. Stricken.

MR. JONES: Is this the audio? Okay. So, 190. Strike the page number. We'll listen to the audio. I'll show you a clip of it later. My apologies for that. But the exact same comments I'm talking about, it's -- just watch the video. Sorry.

Okay. So, you've been here for a few days, listened to the witnesses with the all the evidence, and now it's the part where we have to try to match that evidence to the law. And -- yeah. So I'm going to start at the bottom, start with count seven, and then we'll work our way up to -- to espionage.

Naturalization fraud. As I mentioned, each of these require that the Government prove beyond a reasonable doubt Jinchao Wei's state of mind. Naturalization fraud requires proof that Jinchao knowingly made a false statement

V-81

when he took his oath on May 18, 2022 or prior to that, right.  So he applied.  He submitted the questionnaire, and then re-affirmed everything.  But the latest part of this would have been May 18, 2022.

The first time he sent any of those tech manuals to Andy was a couple weeks later, June 5.  As of May 18, this conversation with Andy had been, what's the Navy like?  I'm on this ship.  How's it going, bro?  And then later, I'm not going to do that, that one job you requested.  But as of May 18, he hasn't sent anything of substance to Andy.

We also had USCIS agents testify.  And Mr. Bertola asked, so what constitutes an uncharged crime, can you explain that?  They didn't have a clear answer.  What constitutes an affiliation with a communist regime?  If I was just -- if I was born in China, is that enough?  I don't know, maybe.  Is there anybody there to explain or parse this language for anybody that doesn't know what it means?  No.

What do you do about people that English is their second language?  Maybe they don't know any specific words.  No, they just to start from the beginning, yeah.  We can't go through with anything if -- if they're not speaking English well enough.

So, is there proof beyond a reasonable doubt that when Jinchao Wei was taking that oath, that he was thinking

V-82

in his mind, I know that I am affiliated with a communist regime and I'm going to lie about it.  Or I know I've committed offenses which are criminal but have not been charged, and I'm going to lie about it.  Is there proof that that was his state of mind when he took the oath?  Argue that the Government cannot that beyond a reasonable doubt.

Now let's go to counts three through six, the export control violations.  These require that Jinchao acted willfully.  Now I want to keep in mind, this is a little bit different, acted willfully.  This only applies to counts three through six.  And it's important because it's -- it's distinct from what we're going to talk about with the espionage.  The espionage is not -- the willfully does not pertain to counts one and two, espionage.  It's a different state of mind.  It's different intent, so try to keep that separate.

We'll need to talk about willfully for the purpose of count three through six, and that's with a purpose to disobey or disregard the law.  Now, all concede that these tech manuals say on them in the fine print in English, don't distribute these.  That's on there.  Has the Government proven to you that Jinchao Wei read those warning labels, considered those warning labels and deliberately disobeyed them?  Did Jinchao Wei read the fine print?

And I'm going to play you a clip that I think

V-83

speaks to how much Jinchao Wei has -- how much attention he pays to the fine print.  And hopefully can hear it here.

(Playing video recording.)

(End video recording.)

MR. JONES:  How much time just went by between saying, read this and then sign saying you understand you rights, your right to an attorney, your right to remain silent.  If you understand that, sign this document.  Grabs a pen, signs it.  I think if you time it it's about an eighth of a second goes by for him to read the most important fine print of his life.  He's brought there in handcuffs by the FBI and the NCIS, told he's under arrest, and given this advisement, told to read the fine print and sign when he understands it.

Do you think he for a second, when he's downloading all the study materials off Facebook -- he goes on Facebook.  He sees all these tech manuals.  They've got some gobbledegook on the front page.  Get's them all.  He's getting stuff off the shared drive.  It all looks the same.  It's a bunch of boring tech manuals, stuff that he uses to study.  Stuff that everybody's passing around.

Do you think he really stopped and considered the fine print warning label saying, don't redistribute this subject to code whatever, code whatever?  Or like he did in this interrogation room, do you think he looked right over

V-84

that?  And keep in mind, he's been speaking English for just a couple of years.  This is in 2023.  He moved to the U.S. in 2016.

So now let's talk about the big one, espionage and conspiracy to commit espionage.  Did Jinchao Wei posses the intent to harm the United State or support a foreign power, or did he act with the belief that his actions would likely cause harm to the USA?

My counterpart, Mr. Barry, stood up here before you not too long ago and said, this is not a case about proving that Jinchao Wei hates -- hates America, but that he loves China.  He said that because they're conceding that there's zero evidence, zero evidence.  There is a -- there is a ton of evidence in this case.  This is a fraction of what's on these hard drives, and it's all been in the Government's possession for a couple of years now.  And they is no evidence.

And this is somebody that was wiretapped for months, continuous surveillance at his apartment.  They could listen to every phone call, every conversation he had in there.  They were watching him, keeping close tabs on him for eight months.  From December of 2022 to August of 2023, they were watching every move, listening to his phone calls, checking out his chats, downloading his hard drives, and they no evidence, none, that he intended to harm the United

V-85

States.  That he wanted to harm the United States.  That he was acting in a manner consistent with somebody trying to take down, harm or hinder the United States, or to support a foreign power.

Yes, he was giving stuff to his friend in China that he thought was affiliated with the Navy, but at no point has it been proven that Jinchao Wei knew that Andy worked for the government.  And, in fact, it still has not been proven beyond a reasonable doubt.  The Government's relying on a couple of fragments of information related to somebody named Rei Gi or Gi Li (phonetic), that they think is Andy Li, and they're basing it off of a profile, undated, that says that he works for the Chinese navy.  It think it remains reasonable doubt as to who Andy Li is, and that's -- that's information the Government has, that Jinchao never had.

So we should only be considering the information that Jinchao is working with when considering who he though Andy Li was and what impact giving Andy Li documents would have.  And there was a massive amount of reasonable doubt as to whether Jinchao had any belief that giving this stuff to this professor or somebody that works at a shipyard in China, would actually have real harm on you -- the United States, especially get something that's 30-year-old tech manuals, 15-year-old tech manual for a 30-year-old ship

V-86

that's been in dry dock and seeing any action.

And then I hope you recall, I specifically asked special agent Wetterer, I said, what do you think his motive was?  Because there's not evidence that he hated America.  There's not evidence that he had any ties to China.  Why?  Why do you think he did this?  The money.  Okay, that's bad, I don't love that, but it's not espionage.  Because financial motive is not the requisite intent for espionage.

When Attorney Barry came before you and said, Jinchao Wei was in an allegiance of one or an allegiance of Wei.  Okay.  Maybe.  That's not great, but it's not espionage.  Being self-serving is not harming the United States.  Being self-serving is not trying to empower a foreign nation.  Making money for giving away junk documents, however misguided it is, does not satisfy the requisite intent necessary for the Government to prove espionage beyond a reasonable doubt.

While I believe the Government has conceded that there's no intent to harm the United States or intent to support China, I think it's further established by the chats with mom where they're bashing communists.  They're talking about how horrible China is.  Anybody with a brain would be into communists.  In fact, Jinchao told his mom, I think Andy, he seems rather anti-communist.

One other reason for him to trust him, they're

V-87

both Chinese.  They're both anti-communist.  They're both nerds.  They both like main stuff and navy stuff.

So, if there's no intent to harm, there's no intent to support a foreign power, the Government then has to rely on proving that Jinchao Wei had the specific belief that his actions would in fact harm the United States or empower China.  He repeatedly says, I'm work's not the secret kind.  And I'm sharing secrets, but my work's not secret.  It's all very basic stuff.

If you read through 131 and the 130's, exchanges with this mom, they're repeatedly talking about, I don't -- you don't even have a high security clearance.  This isn't -- this is stuff about how to -- how many valves are on a -- some system that's -- he continually brings up the fact that he does not have access to state secrets, to anything that valuable.  It's basic stuff.  It's not secret kind.

And then let's look at the Government's reaction.  The Government finds out in December of 2022 or January of 2023, around that time the Government knows everything Jinchao's been doing.  They've got his hard drives.  They've got all of his stuff.  They've got his checks, they've got his Facebook, they've got his iCloud, they've got his Google.  They know everything he's doing.  Are they concerned?  Do they think this stuff's actually harming the United States?  No, because they could put a stop to it

V-88

right then, and they don't.

They wait eight months to try to build a case. Wiretap his phone, listening in everything he's saying for the next eight months.  Track his whereabouts, download his hard drive some more.  They're not concerned with protecting the United States against some harm.  They're not concerned with mitigating empowerment to a foreign nation.  That's the least of their concerns.  They're trying to build a case against this guy so they can try him in court and get him on the espionage.

I mean, witnesses admitted that the priority was not putting a stop to this.  It's the likelihood of harm. The Government's proven it themselves, there's no likelihood of harm.  And Commander Caldwell, he was -- he was, to his credit, extremely candid.  He admitted, the U.S. Navy is very transparent.  He knows that stuff's floating out there. He's recommended, hey, we should try to make some efforts to get some of this stuff off-line.  It probably shouldn't be out there.  It's got distribution labels that say, this shouldn't be put on-line.  This shouldn't be distributed, but it's out there.  It's out there and nobody's doing anything about it.  I said, hey, maybe we should get it down.  They know it's out there.

Again, I asked everybody.  When I was up here I asked everybody, would you be surprised to know this stuff's

V-89

all over Facebook?  Nobody's surprised.  They know it's out there.  There's no effort to reel it back in, because it's -- it's like an owner's manual to a Ford Taurus.  It's not a game changer.

It's like some kid that works for Ford, and some guy at Nissan says, hey, I'll pay you some money if you give me the owner's manuals.  Or what you do have?  I've got an owner's manual for a Taurus.  We don't build them anymore.  It's an absolute thing.  We're putting all our money in electric cars.  It's some old gas car.  We don't build them anymore.  But, hey, if you'll give me some money, here's the Ford Taurus owner manual.  Does that kid think that he's going to change the game for Nissan.  That it's going to completely disrupt the way they build, sell, manufacture cars?  No.

And for the record, I know Nissan is Japanese, not Chinese.  I don't know any Chinese car companies.

Intent is everything.  The Government has done an exceptional job of proving so many of the elements of their counts.  They have been professional, they have been diligent.  I haven't -- I have no qualms with anything they've done.  I don't think they've pulled the wool over your eyes, I don't think they've shaded anything.  They haven't mischaracterized the evidence.  They've done a fantastic job of proving most of their case.  But these

V-90

specific charges require a specific intent, a specific state of mind. And they can't prove and they haven't proven it.

And so I must ask you, I don't -- no matter what you think about Jinchao, what he did, how stupid this stuff was, how ignorant, how misguided, idiotic it was to believe Andy, to continue communicating with him even when he had his suspicions, even if you think that horrendous, stupid, inexcusable, you must only look at the offense he's actually in the indictment.

He might be guilty of a whole bunch of other shit, I don't know, but the offenses he's charged, these seven counts, require that you look into his mind, you know his specific state of mind, what he was trying to do, what knowledge he was operating with, what he was trying to accomplish, and the evidence is not there. It's not in any of this, and they have everything. Eighteen months of surveillance, and they can't prove it. It's not in here. Read everything. Read the manuals, read the chats, listen to the audio, examine the evidence, his specific intent is not there. You must find my client not guilty. Thank you.

THE COURT: Thank you. You want to pass the mike?

Now it's the Government's opportunity for a rebuttal.

MR. BARRY: You know, there's an old saying in law school that says something like, if the law is against you,

V-91

argue the facts.  If the facts are against you, argue the law.  If they're both against you, just try to muddy it up. And you just heard a lot about mud.

So I'm not going to respond to every little thing that Mr. Jones said.  I'm just going to respond to a few things that I think are important.  First is reasonable doubt.  You'll have the opportunity to read the instruction. Reasonable doubt is not beyond all doubt.  Reasonable doubt also cannot be doubt based on speculation.  And a lot of what Jones just said and what he asked you to do is speculation.  That is what they have been doing from the beginning of the case.

So whenever he said something, remember, your duty is to consider the evidence.  Don't consider the arguments, what I say, what he says, what our colleagues say, that's not evidence.  So, for example, when he told you in the beginning of the case that they came to the United States to flee China, there's no evidence to support that.  In fact, the evidence is to the contrary.  You heard the USCIS officer say that she had no evidence of any kind of asylum application and the basis for them coming was called the fiance visa.

He also talks about these Reddit groups, where all these manual were available on-line.  Where's the evidence of that?  That's an argument.  There is no evidence in this

V-92

case about Reddit groups.  There is no evidence in this case that the three manuals that constitute counts four, five and six were available on a Reddit group, in a Facebook chat, anywhere else on-line.

In fact, the evidence is contrary to that.  The evidence is that the FBI searched for those documents on-line and could not find them.  The evidence is that the state department searched for those documents on-line and they could find them.  That's the evidence.

He also said there's no evidence that the Defendant deleted anything that wasn't at the direction of the intelligence officer.  He's conceding the Defendant deleted Tieba where he met the intelligence officer.  He deleted his Telegram messages, which the Government said, we don't know a lot of what he did because he deleted messages. But he also deleted his Navy e-mail accounts, and there's no evidence that anybody told him to do that.  The evidence is that he did that on his own.

Now defense counsel is essentially arguing out of both sides of his mouth.  He's criticizing the FBI because the investigation took too long.  They didn't look down every little nook and cranny, go through every little alley. But then he also saying, I also don't like the way that the FBI did the investigation.  They have predetermined what they wanted to do.  They took too long because the --

V-93

otherwise the stuff, you know, is not sensitive, they took so long.

Now, if you have a problem with the way that the FBI and NCIS investigated this case, you are absolutely within your right to have that issue.  You should write to the leaders of the FBI and NCIS, you should write to your member of Congress, you should write to your senators, but you should not ignore the evidence in this case.  You should not ignore what the Defendant did.

Mr. Jones also talked about how these manuals that are in China, they're not worth anything.  They're old.  You can find them all on-line, but you heard evidence to the contrary.  You heard from the captain of the ship, Captain Taylor, 25 years of service in the United States Navy.  You heard from Commander Caldwell.  And they explained to you why this is a big deal.  Why these have the potential -- and that's the law, the potential to harm the United States, and they could be used to the benefit of China.

You know who else who found this valuable?  Andy Li.  If these weren't valuable, why would he have paid the Defendant $12,000 over 18 months?  If these weren't valuable, why would he have brought in the Defendant into his secret world of spying?  Boughten his a phone and computer, taught him about those disappearing websites, taught him how to delete, how to hide, how to conceal.

V-94

Now the Defendant, his counsel focused a lot on intent, but I want you to read the instructions when you get back there.  Motive is not an element of any of the offenses.  There are specific intent requirements, and you can determine what the intent is based on the words of the Defendant, based on the actions of the Defendant.  That's how you determine intent.

Defense counsel conceded in his closing argument that the Defendant knew that his stuff was going to China, and that he knew that the person he was sending it to was affiliated with the Chinese navy.  That's the game.  That's enough.  That constitutes espionage.

Now the other thing that defense counsel tried to do was muddy up the law on the export counts.  He tried to make you think that the Defendant needed to know the intricacies of this export regime and all the regulations, but look at the instruction, that's not what willfulness is.

Willfulness is, you knew what you were doing was illegal.  Do you need to know which specific law, which specific regulation, which specific citation of the Federal Register or the U.S. code it violated?  No, that's not what the law requires.

So what defense counsel is essentially doing is he's asking you to move the goal posts.  He's asking you to ignore the evidence, he's asking you to ignore the law.  But

V-95

you're not going to violate your duty because you've instructed on your job is to follow the evidence and follow the law.

He also disputes who Andy was. Again, that's not an element. We don't have to prove exactly who Andy was, who he is, we have to prove the Defendant's intent. And defense counsel tried to use this analogy with Commander Caldwell you know, saying, well, Commander Caldwell works at the Chinese Maritime Studies Institute, and maybe Andy's just like him. Well, if he was just like him, that would also constitute an offense. Because as Commander Caldwell told you, he works at the U.S. Naval War College. He advises the Secretary of the Defense of the United States military. He has a top secret security clearance. He's a career naval officer. If that's what Andy is, that's still constitutes an offense.

Also, how many college professors do you know who use secret, disappearing websites that only exist for 72 hours, where you have to send a passcode, and you sent it over two different encrypted applications? How many college professors do you know who after you have communications with them, they say, don't tell anybody about we're doing -- what we're doing. That would not be good for me and you, and you should also delete all your communications. How many college professors pay you $12,000 for thousands of

V-96

pages of documents?

Defense counsel's strategy is -- is essentially trying to get you to forget the forest for the trees. But I want you to remember that forest, okay. And what that forest showed you through the evidence put on in this case, is that beginning in February of 2022, the Defendant was contacted by somebody associated with the Chinese government. That the Defendant knew almost immediately that that's what was going on. That the Defendant's only hesitation, the only evidence in this case when he hesitated, is when he essentially told that member of the Chinese government, we got to pump the brakes a little. I'm not saying we stop, but I have this naturalization interview coming up, and so we got to pump the brakes. And what that resulted in is that phone call -- we don't know what happened on that phone call, but what we do know is the very day, the very next day after Mr. Chang said, that's no good, you should delete that contact, he opened a Telegram account, and that's the account where most of the operational activity happened. We also know that his activity escalated and escalated, ultimately resulting in the transfer of thousands of pages of technical data to China.

Technical data -- again, going back to arguments. That a commander of the United States Navy and a captain of

V-97

the United States Navy have explained to you how this would be potentially harmful and how it could be used for China. So use your common sense and remember the evidence.  This is obviously espionage.  And because of that, we ask you to find him guilty on all counts.  Thank you.

THE COURT:  Thank you.

When you begin your deliberations, select one member of the jury as your foreperson who will preside over the deliberations and speak for you here in court.  You will then discuss the case with your fellow jurors to reach agreement if you can do.

Your verdict, whether guilty or not guilty, must be unanimous.  Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.  Do not be afraid to change your opinion if the discussion persuades you that you should, but do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict, but of course only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.  Perform these duties fairly and impartially.

V-98

You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender or economic circumstances.

Also, do not allow yourself to be influenced by any personal likes or dislikes, sympathy, prejudice, fear, public opinion or biases, including unconscious biases. Unconscious biases are stereotypes, attitudes or preferences that people may conscientiously reject but may be expressed without conscious awareness, control or intention.

It is your duty as jurors to consult with one another and to deliberate with one another with the view towards reaching an agreement, if you can do so. During your deliberations, you should not hesitate to re-examine your own views and change your opinion if you become persuaded that it is wrong.

Because you must base your verdict only on the evidence received in this case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations, do not communicate with anyone in any way, and do not let anyone else communicate you -- with you in any way about the merits of the case or anything to do with it.

V-99

This restriction includes discussing the case in person, in writing, by phone, tablet, computer or any other means, via e-mail, text messaging or any internet chat room, blog, website or any other forms of social media.  This restriction applies to communicating with your family members, your employer, the media or press and the people involved in the trial.

If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter, and to report the contact to the court.  It's not the Court's practice to seize your phones, because you may need that for communication, but don't communicate with anyone, don't take any pictures of any of the evidence that goes back in the jury room, and not permit anyone else to communicate with you during your deliberations.

Do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it.  Do not research, such as consulting dictionaries, searching the internet or using other reference materials, and do not make any investigation or in any way -- other way try to learn about the case on your own.

The requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who

V-100

violates these restrictions jeopardizes the fairness of these proceedings and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the court immediately.

Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

The punishment provided by law for this crime is for the Court to decide.  You may not consider punishment in deciding whether the Government has proved its case against the Defendant beyond a reasonable doubt.

A verdict form has been prepared for you.  It will be in this binder.  After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the clerk that you are ready to return to the courtroom.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiffs signed by any one or more of you.  No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning

V-101

the case only in writing or here in open court.

If you send out a question, I will consult with the lawyers before answering it, which may take some time. Typically they go back to their offices and they're doing other things, so we have to assemble everybody -- and the Court may be doing other matters as well, so we have assemble everybody because -- before we can respond. You may continue your deliberation while waiting for the answer to any question.

Remember that you are not to tell anyone, including me, how the jury stands numerically or otherwise, on any questions submitted to you, including the question of the guilt of the Defendant, until after you have reached a unanimous verdict or have been discharged.

These are the original jury instructions. Don't write on those. If you want additional copies, we can make them for you.

Then we also have for you an exhibit list that consists of the Government's exhibits ad the defense exhibits. Many of the exhibits are in a binder of the Government's exhibits, and then there are physical exhibits and the manuals that will be going back to the jury room with you.

I don't know if we have the capacity for the thumb drives for you play. Some are very, very voluminous. If

V-102

there's a question about that you can send a note, and then we can respond accordingly.  Like seeing the whole hard drive, yes, it's in -- in evidence, but it's up to you to decide how to review the evidence.

And then we also have, most importantly, the verdict form.  It says:

"We the jury in the above-entitled cause find the Defendant, Jinchao Wei..."

Blank for guilty or not guilty:

"...of the offense of conspiracy to commit espionage as alleged in count one of the indictment..."

Blank for guilty or not guilty:

"...of the offense of espionage as alleged in count two of the indictment."'

Blank for guilty or not guilty:

"...of the offense of conspiracy to violate the Arms Export Control Act as alleged in count three of the indictment."

Blank for guilty or not guilty:

"...of the offense of violating the Arm Export Control Act as alleged in count

V-103

four of the indictment for the boiler

water feeder technical manual."

Blank for guilty or not guilty:

"...of the offense of violating the Arms

Export Control Act as alleged in count

five of the indictment related to the

propulsion operating guide."

Blank for guilty or not guilty:

"...of the offense of violating the Arms

Export Control Act as alleged in count

six of the indictment related to the

weapons control systems manual...

And blank for guilty or not guilty:

"...of the offense of naturalization

fraud as alleged in count seven of the

indictment."

So I'll ask our bailiffs to be sworn at this time.

THE CLERK:  Please raise your right hand.  Do you and each of you, do you solemnly swear that you will keep this jury in some private and convenient place that will not permit any person to speak to or communicate with them, nor do so yourself, except by order by the Court or to ask them if they have agreed upon a verdict.  And that you will return them into court when they have agreed so or when they are ordered by the Court, so help you God.

V-104

(Bailiffs sworn.)

THE COURT:  So typically you will go back to the jury room, and then we have lunch there so you will not be going out for lunch, and you can continue your deliberation during lunch.  Typically if you want a break at 3:00 o'clock or at whenever, you can send a note out to the bailiffs, and then we can give you break.

And then we'll go until 5:00 o'clock.  And then if you haven't returned a verdict, I'll remind of your admonition not to form or express any opinion and don't communicate with anybody else outside the -- the jury room.  Only the deliberations happen in the jury room.  And then return to court tomorrow at 9:00 o'clock for further deliberations.

And then I'll -- I'll speak to the alternates, the two can remain.  So you may go into the jury room.

(Jury exits courtroom.)

THE COURT:  And I'll ask the lawyers to verify the Government exhibits, the defense exhibits and the physical evidence that's to go back.

MR. PARMLEY:  Yes, your Honor.

THE COURT:  Why don't you -- have you verified the evidence, counsel?

MR. JONES:  We did our five.

MR. BARRY:  Yes.

V-105

THE COURT: Yes. Okay. So -- you can -- that can go back.

I do want to thank you for your time and attention that you've spent on this case. There may be a time, if somebody gets sick or unable to proceed, that we call you, and that then we substitute you in for the juror -- the jurors who can't proceed in this case. I want to keep you under your admonition not to talk about the case. My clerk will call you if the jury reaches a verdict and notify you of the result. But I do want to thank you, and so do the parties in this case. You may go back to the jury room if you've given her a phone number where we can reach you.

THE CLERK: The jury room downstairs.

THE COURT: Downstairs to check out. You may or may not need to check out. And then leave your notebooks with my courtroom deputy. She'll take of them.

We won't reassemble at the end of the day. We'll just dismiss the jury.

MR. PARMLEY: Understood, your Honor.

THE COURT: And I'd ask that the parties be available by phone in case there's any question. You're not too far away?

MR. JONES: No.

MR. PARMLEY: No.

(Alternate jurors exit courtroom.)

V-106

THE COURT:  So, before we go, now I want to discuss how to handle the exhibits at the -- after a verdict has been reached.  What do you suggest?

Typically we ask -- our standard practice is to ask the parties to retain copies of the exhibits.  This is between counsel.  And so, what do you want to do?

MR. PARMLEY:  So if they're not put on the record -- if they're put on the docket anywhere, I think that's appropriate.  I think we can -- we can store them ourselves.

MR. BARRY:  Yeah.  I think the concern is just there are certain documents that should not be part of the public record at any point, in the sense of accessible through FOIA or other things like that.

THE COURT:  Correct.

MR. BARRY:  So that's the concern, but --

THE COURT:  So, we're not -- we're not subject to FOIA -- me, but -- you mean if you have them that they could do FOIA on that?  No --

MR. BARRY:  No, not if we have them.  Just if the Court was in possession of them in any way.  I just don't know logistically how that works, like after -- I know we obviously preserve them for appellate reasons, but I don't know if -- for the dockets at issue in this case, in particular, the manuals, that they would some day become publically accessible through a process that the executive

V-107

branch is not involved in.

THE COURT:  I don't --

MR. BARRY:  So that's the concern.

MR. PARMLEY:  I don't think so.

THE COURT:  I don't think --

MR. PARMLEY:  If they're not lodged on the dockets --

THE COURT:  -- I don't think so.  They're not lodged, and they're not -- but I'll ask you to -- when -- to retain them in tact.

MR. BARRY:  Yes.

MR. PARMLEY:  All right.  Thank you, your Honor.

THE COURT:  And then what about the few defense exhibits?  Did you want to retain them as well?

MR. PARMLEY:  We're happy to.

THE COURT:  Any objection to that?

MR. JONES:  Yeah.  No, that's appreciated.

THE COURT:  Okay.  And then if -- I haven't done this in other cases, but it would be helpful, if you're willing to do so, to share your PowerPoints with the Court, and I'll place them under seal, for final argument?

MR. PARMLEY:  Sure.

MR. BARRY:  Sure.

MR. PARMLEY:  We could --

THE COURT:  They discuss a lot of the exhibit

V-108

numbers in case anything comes up on post-verdict.

MR. PARMLEY:  Would you like us to e-mail it to you, your Honor?

THE COURT:  Yes.  And then I'll file them under seal.

MR. PARMLEY:  Great.  Thank you.

MR. JONES:  Do you want me to correct the erroneous 190(a) reference?

THE COURT:  No, I don't --

MR. JONES:  I apologize.  I swear I wasn't trying to pull a fast one.

THE COURT:  No.  I thought it was innocent.  Also, you said that there wasn't willfulness on the other, but as to count two there is willfulness.

MR. JONES:  Yeah.

THE COURT:  Okay.  Anything else?  I thought that both sides handled the case very professionally.  I know it takes a lot of time and effort to pull all of this information together.  And so the Court appreciates the -- the professionalism that you've demonstrated during this case.

MR. JONES:  Thank you, your Honor.

MR. PARMLEY:  Thank you, your Honor.  Appreciate it.

THE COURT:  And then the marshals have asked how

V-109

long to keep the Defendant, and I've said we'll keep him until 5:00 o'clock when we recess, if they don't have a verdict earlier.  And then the lunches are supposed to come around noon.

            Anything further?

            MR. JONES:  Cell number --

            MR. BARRY:  Not from the Government.

      (Pause.)

            MR. PARMLEY:  Thank you.

            MR. BARRY:  Thank you.

            (Proceedings recessed to reconvene.)

V-110

AFTERNOON SESSION

--oOo--

MR. BARRY:  Good afternoon.

MR. PARMLEY:  Good afternoon.

THE COURT:  We're outside the presence of the jury.  The jury has sent in a note:

"Which exhibits pertain to the
transmission of the boiler water, feed
water and weapons control systems
manual?"

What do you suggest our response is?  I got your argument.

MR. BARRY:  You know, your Honor, I think it's a different question if they're -- if they're asking which exhibits are the weapons control system manual and which exhibit is the boiler water, you could just point them to the exhibit list.

If it pertains to -- that's asking a much broader question I think.  And I don't think the Court could answer it.  I think because the reality is, for both of those documents, it is testimony of the witnesses, it's, you know, Gmail account, it's the PayPal account, it's the Telegram conversations, it's the WeChat conversations, it's kind of everything.

So, I think that probably the most appropriate

V-111

answer, which they're not going to like, is something along the lines of --

THE COURT:  You have all the evidence?

MR. BARRY:  -- you have all the evidence and you've heard all the testimony in this case.

THE COURT:  Now the Government in its final argument referred to the post-arrest interview, Exhibit 190. The 140 -- I don't have my glasses right now, but I think it's 140 that shows the boiler water and feed water chemistry.  120, where he sent all of the manuals.  And then one other one, which I could hardly read.  One -- and one other one that's small print on the count four.  But you don't think I should show them that?

MR. BARRY:  I think it's --

THE COURT:  I think that's what they're asking for.

MR. BARRY:  I think that is what they're asking, but I think it's -- I think on an appellate review, there may be an accusation that we're steering them in a certain direction.  And so that's my concern.

THE COURT:  Can I say --

MR. BARRY:  That's a broad question, but I'm open to hearing any proposals.

THE COURT:  And the defense?

MR. BERTOLA:  Yes, your Honor.  We -- we would

V-112

object if -- or would argue if the Government wanted to like point them towards certain exhibits that aren't necessarily the documents themselves.

And I talked with Sean, and he basically said that.  So if the Government's not trying to do that, we're fine with -- with kind of the direction they're giving right now.

THE COURT:  Just say, you have all the information.  It consists of all of the testimony of the witnesses, the --

MR. PARMLEY:  Exhibits.

THE COURT:  -- exhibits.

MR. PARMLEY:  I don't -- they're not going to like that answer, but I think that's the only appropriate answer.

THE COURT:  And the Court declines to direct you to certain exhibits.  That's up to you to determine.

MR. PARMLEY:  Right.

THE COURT:  Is that right?

MR. PARMLEY:  Yes.

THE COURT:  Do you have those exhibits, Mr. Barry?

MR. BARRY:  I have the citations from the presentation.

THE COURT:  Okay.

MR. BARRY:  I don't -- do you want me to give those to you?

V-113

THE COURT:  Yes, because I'm having difficulty reading them.

MR. BARRY:  Yeah.  No, I hear you on that.

MR. PARMLEY:  We can put them up on the screen.

MR. BARRY:  Well, I could use the Elmo.  We haven't had the opportunity to use that yet.

So for count four, what was referenced in the presentation of closing argument was Exhibit 149, Exhibit 120, Exhibit 190, and Exhibit 31-C.  And that's basically the post-arrest, a screenshot of the exhibits from his computer, the communication -- one of the chat communications, including a copy of the receipt and the summary chart of the financial transactions.

THE COURT:  But you agree that most likely, the Court should not direct them to those?

MR. BARRY:  I -- yeah.  Mr. Parmley and I agree on that point.  I think at this point, it's just they have what the evidence is.  If they come back with a more specific question, we may be able to provide further guidance.  But based on the kind of ambiguity of the current question, I --

THE COURT:  And --

MR. BARRY:  -- don't think we want to go there.

THE COURT:  -- and the jury foreman is (redacted).

MR. BARRY:  Okay.

THE COURT:  All right.  We'll bring them out.

V-114

MR. PARMLEY:  And after we bring them out, your Honor, I just -- one other thing I need to put on the record, but we can wait until we're done with that.

THE COURT:  What would that be?

MR. PARMLEY:  In closing argument, defense counsel suggested that he chose for his client not to testify.

THE COURT:  I was worried about that.

MR. PARMLEY:  Now I -- I agree -- I understand why he did.  There's a tactical reason to kind of take it away from his client, and that we didn't object.  But in speaking with counsel here, he's willing to put on the record, and I think that'd be appropriate, that he did advise his client of his right to testify, and his client chose affirmatively not to testify.  And if that's on the record, I think that closes that issue.

MR. BERTOLA:  Yes, your Honor.

THE COURT:  That you make the representation that you did --

MR. BERTOLA:  Yes.

THE COURT:  -- advise your client, and then, ultimately, it's the client's decision --

MR. BERTOLA:  Yes, your Honor.

THE COURT:  -- whether to testify or not?

MR. BERTOLA:  Yes.

THE COURT:  Is that -- is that true, Mr. Wei?

V-115

MR. WEI:  Well, it's kind of complicated, but, yeah.  It's because I -- I never had a chance to go through discovery with my counsel, so I just kind of follow his advice.

THE COURT:  But you made the decision?

MR. WEI:  Yes, your Honor.

THE COURT:  All right.  Thank you.

MR. PARMLEY:  That's helpful.  Thank you, your Honor.

THE COURT:  All right.

We'll bring out the jury.

(Jury enters courtroom.)

THE COURT:  Welcome back.  Thank you for your question.  I've conferred with the parties, and we all are in agreement that it would be inappropriate at this stage for the Court to direct you to certain exhibits.  It includes all the testimony, all of the exhibits, even though they're voluminous, that you have received, and all of the testimony of all of the witnesses.

And this pertains not only to this case, I'm not allowed to do it any case, to direct you to certain evidence.

So, you may continue with your deliberations.

(Jurors exit courtroom.)

THE COURT:  And we'll mark the jury note as Court

V-116

Exhibit 1.

Anything further?

MR. BARRY:  No, thank you.

MR. BERTOLA:  No, your Honor.

THE COURT:  Thank you.

MR. BERTOLA:  Your Honor, did you want me to address them about the -- what Sean said during his closing?  Did you want --

MR. BARRY:  No.  We don't need you to address the jury.

MR. BERTOLA:  Okay.  I see, I see.

MR. BARRY:  Just as long as it's on the record.

THE COURT:  No.  No.  Just that it was not just --

MR. BERTOLA:  Understood.

THE COURT:  -- solely his decision.

MR. BERTOLA:  Yeah.

THE COURT:  -- it was the client's decision.

MR. BERTOLA:  Understood.

THE COURT:  Thank you.

MR. PARMLEY:  Thank you, your Honor.

MR. BARRY:  Thank you.

(Proceedings recessed.)

V-117

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Jessica Reuter                    3/2/26
Transcriber                          Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.