UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,      )   Case No. 23CR1471-H
                               )
            Plaintiff,         )   San Diego, California
                               )
vs.                            )   Monday,
                               )   June 2, 2025
JINCHAO WEI,                   )   1:30 p.m.
                               )
            Defendant.         )
_____)

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARILYN L. HUFF
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          ADAM P. BARRY, ESQ.
                            United States Attorney's Office
                            601 D Street, Northwest
                            Washington, DC 20579

                            JOHN N. PARMLEY, ESQ.
                            United States Attorney's Office
                            880 Front Street
                            Suite 6293
                            (619) 557-5610

For Defendant:              PAYAM FAKHARARA, ESQ.
                            RICHARD D. FALLS, ESQ.
                            Federal Defenders of San Diego,
                              Inc.
                            225 Broadway
                            Suite 900
                            San Diego, California 92101
                            (858) 234-8467

Transcript Ordered by:      TODD W. BURNS, ESQ.


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

*Echo Reporting, Inc.*

ii

Court Recorder:                     Lynnette Lawrence
                                    United States District Court
                                    333 West Broadway
                                    San Diego, California 92101

Transcriber:                        Chinago Okonta
                                    Echo Reporting, Inc.
                                    9711 Cactus Street, Suite B
                                    Lakeside, California 92101
                                    (858) 453-7590

1

SAN DIEGO, CALIFORNIA  MONDAY, JUNE 2, 2025 1:30 P.M.

--oOo--

THE CLERK:  Calling matter number 11, 23CR1471, United States of America versus Jinchao Wei, for a motion hearing.

MR. FAKHARARA:  Good afternoon, your Honor.  Payam Fakharara on behalf of Mr. Wei, along with my colleague, Mr. Falls.

THE COURT:  Good afternoon.

MR. BARRY:  Good afternoon, your Honor.  Adam Barry and John Parmley on behalf of the United States.

THE COURT:  Good afternoon.

MR. PARMLEY:  Good afternoon.

MR. FAKHARARA:  And, your Honor, before we proceed, we got information from Mr. Wei on Friday with a request for new counsel.  Is it okay if when he arrives we clear out the courtroom, so that we have a second with him to discuss that request?

THE COURT:  Yes.

MR. FAKHARARA:  Thank you, your Honor.

THE COURT:  So we'll all leave.

Additionally, his mother wanted to hand something to my courtroom deputy, and we typically don't do that.  But can you find out what's going on there?

MR. FAKHARARA:  Yeah, I'll get that first, and then

2

speak to Mr. Wei.

THE COURT:  Okay.  So before you give it to me, if it is a letter, there is a chance that I would give this over to the Government.  Do you understand that?

DEFENDANT'S MOTHER:  Just for you.

THE COURT:  That may or may -- I can't give you any guarantees if that affects your decision.

MR. FAKHARARA:  And we'll speak to her after this, your Honor.

DEFENDANT'S MOTHER:  Your Honor, I understand.

THE COURT:  Thank you.

MR. FAKHARARA:  Thank you, your Honor.

THE COURT:  Okay.  We'll be in recess.

(Proceedings recessed briefly.)

THE CLERK:  We're back on the record.

MR. FAKHARARA:  Thank you, your Honor.  And, your Honor, after speaking to Mr. Wei, we're prepared to proceed as Counsel and also prepared to proceed on the motion.

THE COURT:  Thank you.  And what about the mom -- the mother?

MR. FAKHARARA:  I went outside to find her, your Honor.  I didn't see her.  I think maybe she's in the restroom.

THE COURT:  Okay.  All right.  We'll begin, and then she'll be able to come and join us.

3

MR. FAKHARARA:  Thank you, your Honor.

THE COURT:  So, first, I would like you to address the Miranda issue, and then the presentment issue.

MR. FAKHARARA:  Absolutely, your Honor.  Thank you.

So when it comes to the Miranda issue, Mr. Wei has a Sixth Amendment right to counsel.  And when we look to Ninth Circuit law, specifically with a case -- an opinion cited to in our brief for Rodriguez-Arvizu, it's imperative that for there to be a valid waiver of a right to counsel, that there must be an apprisal of Mr. -- of the Defendant's rights, the criminal liability he's potentially facing, and the gravity of the situation.

So in this case, Mr. Wei was arrested, as your Honor knows, early in the morning on a Wednesday.  He was arrested around 5:23 a.m.  He was taken to NCIS, which was about two miles away from the courthouse.  And then he was held in an interrogation room for about 11 hours.

During that time, not once was Mr. Wei told the criminal liability he potentially faced or the gravity of his situation.  And it's important to note that Mr. Wei was indicted about two weeks prior to his arrest.  So for two weeks in a sealed indictment, the United States had established probable cause with a grand jury to find that there was charges against Mr. Wei that can proceed.  So the Sixth Amendment had attached.  And for Mr. Wei, although he

4

was advised of his Miranda rights, he was not apprised of his criminal liability he potentially faced or the gravity of his situation.  And the Government points to things that he was saying during the interview, right?  For instance, things like, "I'm going to jail, I'm screwed," or, excuse my language, "I'm fucked."  He says these things during the interview, but not once during the interview is he told the reason why he is there, the indictment that's, you know, before the Court or the gravity of the situation or the criminal liability.  He was essentially left to guess for hours to figure out what is going on.  And, your Honor, this is a 22-year-old man who has no legal experience, no prior arrests before interrogating agents in a private room where he had been sitting there for a few hours at that time -- and not once was he apprised of the criminal liability he potentially faced and the gravity of his situation.  And I use that word "apprised" specifically because that's the word that the Ninth Circuit uses in their ruling in Rodriguez-Arvizu -- this is 130 F.4th 1125.  They use the word "apprised."  It's not about what the Defendant understood.  It's not about what the Defendant could guess at.  It is about whether, prior to giving a valid waiver, he was apprised, he was told the criminal liability he potentially faced and the gravity of his situation.  And the simple answer here is that he wasn't.  He wasn't apprised of the gravity of the situation or the

5

criminal liability he potentially faced.  And this is different than just a mere Miranda issue, right?  This is Miranda plus the right to counsel that he has to validly waive for his statements to be presented at trial.

Your Honor, I can go on with that issue, but under Ninth Circuit law, Mr. Wei was not apprised of his criminal liability he potentially faced or the gravity of his situation.  And for those reasons, at least under the Sixth Amendment right to counsel, we're asking for his statements to be suppressed.

THE COURT:  In Rodriguez-Arvizu, the Ninth Circuit recently addressed the issue of whether an accused must be told that he had been indicted before a post-indictment Sixth Amendment waiver will be valid.  In that case, the Ninth Circuit expressly rejected the argument that there is a categorical rule that a defendant must be notified of the charges in an indictment before he can validly waive his Sixth Amendment rights.  They also said that it's contextual, and so the Government will address the context, as they have in their papers, of this interview.

MR. FAKHARARA:  Certainly, your Honor.  And if it's okay, before you move on to the Government's position, I agree that it is contextual and it is -- that is exactly what Rodriguez-Arvizu said.  I'm not saying that the Government had to tell him what the indictment was.  But Arvizu is very clear

6

that -- in its holding, it is saying that the defendant will -- has to be apprised of his rights, his criminal liability that he's potentially facing, and the gravity of the situation.  It doesn't have to be the indictments, right?  It could be, "Oh, you're facing a pretty serious felony here."

THE COURT:  Well, they said they're from the FBI and the NCIS, that the Defendant's arrest was a big deal, and that "we're not concerned with minor transgressions like a car accident or stealing a power tool."

MR. FAKHARARA:  But that doesn't add up, your Honor, respectfully.  That doesn't add up to Mr. Wei understanding how much trouble he's facing, how important it is to have an attorney present, right?  For the majority of the cases before the courts and before this district, we all have felony cases coming before your Honor, and in all those cases, it's pretty significant to have an attorney present.  But it was especially so in this case.  This wasn't just an illegal reentry.  This wasn't just a border bust.  This wasn't just, you know, a fraud case.  In a context like this where Mr. Wei is facing significant time in prison, not once was he told the gravity of the situation or the criminal liability he potentially faced.

THE COURT:  But as part of Miranda, you have the right to have a lawyer present, and he waived that.  He's not a person just on a border bust who doesn't speak English.

7

He's highly intelligent.  He's in the military.  He has a security clearance.  He's brought by not only FBI and NCIS into this situation.

MR. FAKHARARA:  I appreciate that, your Honor.  And I think the difference here is that Mr. Wei had already been indicted.  There was criminal proceedings pending before him.

THE COURT:  I don't think that's -- I don't think that that matters one way or the other.

MR. FAKHARARA:  It does matter when it comes to whether the right to counsel had attached.  Sure, when someone is arrested and interrogation is about to start, they need to be told their Miranda rights, which he was.  But that's just the first thing that the Ninth Circuit is saying is a point to be apprised.

THE COURT:  You can have a sealed indictment that can last for months.  That does not mean because there's a sealed indictment, the Government has to go tell the person who is the subject of the indictment that there's an indictment.  And the indictment may allege any number of things, including mandatory minimums or other serious crimes, but there's no obligation under the law for the government or the questioning agents to inform the defendant that there is an indictment that's been filed.

MR. FAKHARARA:  I agree with your Honor.  There does not have to be an apprisal of the indictment.  The Ninth

8

Circuit, however, is clear that it's not just a Miranda warning but is also an apprisal of the criminal liability the defendant is potentially facing and the gravity of the situation.  And we are arguing that those two prongs of what the Ninth Circuit requires was not met here.

THE COURT:  All right.  Thank you.  Let's have the Government respond to this, and then you can go on to the presentment issue.

MR. FAKHARARA:  Thank you, your Honor.

THE COURT:  What do you say in response?

MR. BARRY:  We have a couple of responses.  The first is that it seems like when a counsel on the opposite side is speaking out of both sides of his mouth.  On the one hand, he's saying the standard for what apprisal means does not mean you have to inform the Defendant that they've been indicted and what they've been indicted for, which is what the Ninth Circuit says.  But then, on the other hand, when your Honor is pushing him to say, "Well, what does apprisal mean?" because in this context you have a Defendant who's arrested on his way to work, he is told at the beginning of the interview his rights, including his right to counsel, he's told that orally and in writing.  He's informed as he begins to kind of deflect the questions that the FBI and the NCIS are interviewing him.  They care about serious things.  They don't care about these minor transgressions.  And then 20 minutes

9

into the interview, so not deep into the interview, very early on is when they start talking about the intelligence officer. And from that point forward, that's what they're talking about.  The rest of the interview, if you watch the whole thing, it is about Andy.  And that discussion of him, that broach of his name, which the Defendant, prior to the agents bringing it up, had denied, had said repeatedly, "There's nobody else who I'm talking to in China" -- there's a telling moment in the interview where they say, "Are you sure there's anybody else?"  And he pauses for 16 seconds, looking down, and says, "No."  And then they say, "What about Andy?"  "Oh, I talked to him yesterday," and then starts talking about the discussion.

So if you look at the context of the interview leading up to it, the advisal of rights, the fact that he's been arrested, the fact that he's been brought to NCIS, he has been apprised not only of his rights, but he was apprised of the gravity of the situation.  And his own statements -- the reason why we point out these sort of statements of -- I don't know if you want to categorize them as just sort of him recognizing the severity of his situation, this kind of like self-talk of, "I'm screwed, I'm in trouble, I think I'm going to jail."  We don't know exactly what was going on in his mind.  But to the extent that there's some objective analysis, those statements are pretty helpful, because he's telling law

10

enforcement in a post-Miranda, post-waiver situation, that his own belief, assuming he's being honest, is that he's in trouble.  And what type of trouble?  The type of trouble that's going to lead him to jail.

So under Ninth Circuit precedent, he was fully apprised of his rights.  That means his waiver of his Sixth Amendment as well -- and we'll get to this prompt presentment. We think -- the Government's position is that his waiver included a waiver of his prompt presentment rights because of the context.  But at least as it pertains to the Sixth Amendment argument, it was a knowing and intelligent waiver. The Supreme Court -- and I'm not going to sort of go into depth about this because we cite the cases in our brief, but the Supreme Court has,

"Never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights."

That's what they're asking you to do.  They're asking the Court to stretch Rodriguez-Arvizu to hold what the Ninth Circuit said, "We are not going to hold this."  The Ninth Circuit expressly said in that opinion from earlier this year,

"While the Supreme Court has left open

11

the question of whether or not an accused must be told that he has been indicted before a post-indictment Sixth Amendment waiver will be valid, like other circuits, we have thus far answered that question in the negative."

So while Opposing Counsel is saying, "We're not saying you needed to tell him that he had been indicted or even specify the crimes," they haven't specified what above and beyond the agents already did would actually satisfy that apprisal standard.

Unless the Court has any other questions, we're happy to step down and then deal with the prompt presentment issue.

THE COURT:  Thank you.

You may continue with the presentment issue.

MR. FAKHARARA:  Yes, your Honor.

When it comes to the presentment issue, Mr. Wei was -- as I mentioned earlier, was arrested at 5:23 a.m. on a Wednesday morning, and then was brought to court the next day. For about 11 hours, he was sitting in an interrogation room at NCIS with the video on, and for about seven of those hours, he was being interrogated.  During that time, as the Government's briefing notes, MCC had two booking windows, the booking window at 8:00 a.m. and then a booking window at 3:00 p.m.

12

These are booking windows that are pretty standard at the jails in San Diego.  The NCIS building, as I noted earlier, was just two miles away from the courthouse and the local jails here.  But instead of bringing Mr. Wei to be presented to a magistrate, on that day, the agents continued to interrogate him, continued beyond two booking windows, did not try at all to bring him to the magistrate to be arraigned that day.  And I think it was in the hopes of putting, you know, the bow on their case, to be able to continue getting some -- you know, some affirmative responses from Mr. Wei that he was, in fact, the person that committed these crimes.

THE COURT:  You agree that questioning during the six-hour safe harbor period is perfectly permissible?

MR. FAKHARARA:  So, your Honor, questioning -- voluntary questioning during the six-hour harbor period is permissible.  But the question doesn't stop with just the questioning itself.  It's about whether the presentment was reasonably delayed or necessarily delayed.

THE COURT:  I don't see it that way.  Because he agreed to waive his rights, it's reasonable for the Government to then begin the questioning.  He never says, "Stop, I'm invoking, I don't want to say anything more."  So it's reasonable.  At least during the six-hour, you've got the safe harbor period.  Then thereafter, then the question is contextual about what did he say?  Did they deny him food?

13

Did they use abusive tactics?  There's nothing to indicate that.  It's on a video.

And then for the MCC where you say it's reasonable for their booking windows, he was not going to -- he was not going to make the 8:00 o'clock window and unlikely to make the later window when he's still talking.

So I think that your argument about the presentment, it's not the case when someone is arrested that they automatically have to be brought before a magistrate judge.  And our court has a very reasonable system where they're checked into the MCC medically, so that they're medically cleared to come to court for the safety of themselves, the people around them, the staff, the visitors. And I think that continues to be reasonable.  And so I just don't see your argument that suppression would be the correct remedy, even if the questioning went beyond the six-hour safe harbor window.  And we do have a video of what actually was said during that time period, and we can look and see how he was doing as well.  None of that indicates to the Court that they were trying to improperly interrogate him in order to secure some confession.  I think there was a nice question-and-answer flow.

MR. FAKHARARA:  Thank you, your Honor.  That was a lot of points, and I'm going to try to get to each one of them, if that's okay.

14

THE COURT:  Okay.

MR. FAKHARARA:  So here's the thing -- again, Mr. Wei was already indicted in a criminal proceeding.  There was probable cause to arrest him.  They had an arrest warrant and a search warrant.  They had enough to begin the criminal process.  And the interrogation was -- I'm not sure how else to describe it, but nothing more than the Government's hope to affirm some of the things they already knew about Mr. Wei. The only thing that the Government cites to in their briefing that they learned that was new was actually from their search of his cell phone.  Again, they already had a search warrant. They were going to search his cell phone anyways.  And they found out that Mr. Wei had discussions with the supposed -- the alleged handler and the day prior to arrest.  That was new information, certainly.  But that wasn't new information that was given to them only from this interrogation.  The Government had already begun prosecution.  They had an indictment.  And even if they -- even if they walked -- even if they walked from the place of arrest or walked from the NCIS building, they would have made it by the 8:00 a.m. booking window.

THE COURT:  Well, I totally disagree.  I totally disagree.  You have to be checked into MCC.  You have to have a medical X-ray.  You have to have doctors read the medical X-ray and be cleared for the medical X-ray.  So just because

15

he comes in at 8:00 a.m., if he did, others could come in at 8:00 a.m. as well.  And so there is no guarantee that he would be brought to court at 8:00 a.m., nor do I think that it is legally required within -- why would they have a six-hour safe harbor rule if they're legally required to bring him within the first five minutes?

MR. FAKHARARA:  I guess this brings up, I think, a difficult situation that the Government can take advantage of going forward if the Court were to rule and say that this type of behavior is okay.  And here's what I'm thinking, your Honor, the Government can then continue to make arrests in the early hours of the morning or in the -- late at night, begin interrogation sometime within the six-hour mark, take several breaks.  Things are going well in that interrogation.  They're getting what they need.  There's no evidence that someone is being coerced to make a statement.  Continue that interview until way past the two booking windows, present that person the next day, and do this indefinitely, right?  It wouldn't just be Mr. Wei, who is not lawyer who even understands that he's got a right to presentment that day or a right to presentment within six hours unless there's reasonable or necessary delay, but we would have that situation over and over again.  We don't.  There are routine arrests at the border at 2:00 a.m., 3:00 a.m., and those folks are coming to court that day.  They're being brought from the port of entry.

16

THE COURT:  Sometimes, sometimes not.

MR. FAKHARARA:  Sometimes -- and -- and, your Honor, we --

THE COURT:  There are many different scenarios.  So we're really focusing not on the other individuals but on Mr. Wei's.  There's no indication of coercion or duress.

MR. FAKHARARA:  And I'm not saying that there has to be any sort of coercion or duress, but I think the law is clear that when it comes to reasonable or necessary delay, there are specific items that are delineated as reasonable or necessary.  And none of those markers are present here.  There was availability of a magistrate.  There was availability of law enforcement to bring Mr. Wei down to the courthouse, which was just a couple of miles away.  There was a courthouse available.  There wasn't a humanitarian emergency going on at the time that Mr. Wei couldn't make it to the court.  But instead, the Government just continued their interrogation for about seven hours, waited, and I think one of the -- the Assistant US Attorney shows up to continue questioning, to make sure all the questioning is complete.  And then after the interrogation, again they don't take him to MCC that day.  He's booked -- I'm sorry, I think he's booked that evening, and then he's brought to court the next day.

THE COURT:  So even if he had been brought to court, the magistrate judge would appoint -- and in this case,

17

it was Mr. Conforti.  There's no showing that Mr. Conforti would see him that day.

MR. FAKHARARA:  So the question isn't whether Mr. Conforti would have seen him that day.  At that point, at least Mr. Wei would have known that there is an attorney, you know, by his side, and he should maybe wait for his attorney to come and meet with him before he discusses his case with Government counsel.

THE COURT:  But that's kind of putting the cart before the horse because he already waived his Miranda rights, and so he already began questioning.  So let's say he only questioned him -- that he only spoke to the agents for an hour, and then was brought.  Nothing else would have been different.  He already made his statement.

MR. FAKHARARA:  So, your Honor, I think this is maybe one of the arguments that the Government is making, that if someone is giving up their Miranda rights, they're also giving up at least some of their presentment rights.  Is that what you're --

THE COURT:  No.  No.

MR. FAKHARARA:  Okay.

THE COURT:  I don't agree on that.

MR. FAKHARARA:  Okay.

THE COURT:  I don't agree on that.

MR. FAKHARARA:  So --

18

THE COURT:  But I do agree that it's contextual as to whether suppression is the right remedy for any presentment issues.  And I think in this case, you don't have a very good presentment argument.

MR. FAKHARARA:  So, your Honor, I appreciate that you're not taking in together the Miranda issue and the presentment issue.  I think when we're looking at the context, this isn't just like a de minimis, you know, violation of the six-hour rule.  There are some cases, for example, where the courts have found that if there is a few minutes beyond the six hours and the interrogation continues on, that there's a de minimis violation, and they don't suppress those statements.  In fact, another judge in this exact courtroom, Judge Curiel, had a case like that where there was just a 13-minute, you know, interrogation that lasted beyond the six-hour mark, and he found that that was de minimis and not warranting of a suppression.  Here we have way more than just 13 minutes.  The Government estimates a total of 90 minutes of interrogation, but it lasted up until the afternoon until about 3:00 o'clock that day when Mr. Wei was arrested at 5:23 a.m.

And for those reasons, your Honor, we are asking for suppression here.  We do think that there is a presentment issue, and there was a violation of Mr. Wei's presentment rights and his due process rights.

19

THE COURT:  Thank you.

Let me hear from the Government.  Do you have any case that says that a waiver of Miranda or Sixth Amendment also waives a Rule 5 violation?

MR. BARRY:  Yes, your Honor.  There are a number of out-of-circuit and other district court cases, starting on page 13 of our brief, that cite to that authority.  We also recognize in our citations your colleague's ruling going the other way on a case.

But at the top, I do want to emphasize just something for the record, which is that it sounds like, and I would want to make sure that this is confirmed with the Defense, that there is no factual dispute at this point in terms of the sequence of events.  I know there was a little bit of ambiguity in the beginning, but I want to make sure that's clear, and then it's really an application question.

MR. FAKHARARA:  So I think that if the question is about the -- a timestamp, the video timestamp show that it was Pacific Time, but there was clarity in the Government's briefing that maybe it wasn't Pacific Time, but it was instead Universal Time.  We have no dispute there.

THE COURT:  All right.  So there's no need for witnesses.  Is that right?

MR. FAKHARARA:  Unless the Court finds that there is factual disputes.  Right now, we don't anticipate a need

20

for witnesses.

THE COURT:  All right.  Thank you.

MR. BARRY:  Okay.  So the facts are the arrest happens around 5:23 a.m.  The interview begins around 8:01 a.m.  The advisal of rights is given and waived at that point. And then the interview ends around 2:59 or 3:00 p.m.  And there are a number of gaps in that interview that are reflected in the tape.  I'm not going to focus on, I think, what I would call the safe harbor -- the six-hour 3511 (sic), which for this case would be the -- any statements made or any confession made between 5:23 a.m. and 11:23 a.m. because I think the Supreme Court is quite clear in <u>Corley</u> that 3501, Congress expressly, in responding to the Miranda decision, says that there is this six-hour safe harbor and the <u>McNabb-Mallory</u> rule, which is really what we're talking about, the sort of reasonable and necessary, kicks in after that six-hour mark.  So unless the Court wants to kind of debate that pre-six-hour, I think we're really talking about --

THE COURT:  I agree with you.

MR. BARRY:  Okay.

THE COURT:  And that's why I think it's contextual about what happens thereafter.

MR. BARRY:  The Government would agree that it is contextual and there are limits as laid out by the Supreme Court and the circuit on what you consider and what things are

21

appropriate to consider and what things are not appropriate to consider. So, in this case, the most important part of our analysis is that the primary delay in the presentment had to do with the unavailability of a magistrate and the limited booking windows at MCC. And this is -- it's kind of this collapsed argument that there's a de minimis aspect to it, right? This sort of, "Will it really have mattered or affected things if the interview had been cut short earlier?" But the circuit precedent says that what you look to is why did the presentment itself occur the next day? And in this case, as we lay out in our brief, unless he had made that 8:00 a.m. window, which was before the interview actually began, he was not going to be presented until the next day. You know, and it's unfortunate, but it's just one of the sort of logistical challenges that courts have to deal with when they're balance -- and the jail and everybody else, in terms of balancing all the things that they need to balance to get people properly booked and an attorney and presented before the court. So that's the first thing is -- that's the reason why there's this delay in presentment, right?

The second key thing to keep in mind here is that if you look at Corley and you actually take a step back and say, "Why do we have Rule 5 and why do we have the prompt presentment requirements in the first place?" It has to do with trying to prevent secret detention or delayed

22

interrogations that are intended to exhaust people, to increase the risk that people are going to falsely confess. There's nothing in the record here that suggests that that was part of the intent of the agents in any way or that that was the tactics. I mean, if you watch the video, it's the opposite of that. The agents are incredibly professional, respectful. They check in on him repeatedly. They bring him food. They take him to the restroom, you know, there's no raised voices, no slamming of tables. And, most importantly, the advisal of rights -- which, again, the point of presentment is to prevent secret detention and to allow people who are deciding what to do to know what their rights are, right? That's part of the function of a presentment is you -- somebody appears before a magistrate, and they're told, "These are your rights, and you have right to counsel," et cetera. Those were given to him at the beginning of the interview, that advisal of rights. He was told that he has the right to counsel. He was told that if he doesn't -- if he can't afford counsel, one would be appointed for him. He was told that anything he said could be used against him. He was told that if at any point he wants to stop the interview, that's entirely within his rights. And understanding that, he chose to waive his rights and he chose to proceed and talk to law enforcement. So, you know, that sort of contextually, when you look at that case law on page 13 about whether a waiver to

23

an FBI advisal of rights, what we usually call a Miranda waiver, would capture at least some sort of temporary or time-limited waiver of prompt presentment rights, I think that's the reasoning there.  And the reason why we say it's kind of a contingent right is because the Government's position is not that if you waive your Miranda rights, you can be held indefinitely.  But at least in the context here, we think that his waiver of his Miranda rights, as well as his Sixth Amendment right, also included that prompt presentment rights because of the reasons for why Corley says the rule exists in the first place.

The last thing I want to focus on is, there's a case we cite to called United States vs. Redlightning.  This is a Ninth Circuit case.  The Federal Register or the Federal Reporter is 624 F.3d 1090.  And I think there's some facts in there that are particularly illuminating.  So it's a case from about 20 years ago.  It's a 1987 cold case, murder, sexual assault case that occurred on an Indian reservation up in the Pacific Northwest.  And the defendant is interviewed 20 years after the murder.  And he's first arrested at 12:22.  And this is all within the circuit court rec, you don't have to kind of go beneath it.  But he's arrested around noon.  And that's when he's first implicated in the murder, because he's actually arrested for some -- the beginning of the questioning is about something else.  The first interrogation ends about

24

90 minutes later. And where he's arrested is in Bellingham, Washington, near the border of Canada, and in order to book him, they needed to drive him to Seattle. So there's a 90-minute window if they're driving, like, at the maximum speed limit to get there. And the booking window in that case is 2:30 p.m., so it's 45 minutes after his first, sort of, interrogation ends. And the court says that it was reasonable for the officers in that case to not prematurely end the interview and try to rush to make this booking window. So they continue the interrogation later on because he starts talking more about the murder from 20 years ago. And then he ends up staying in a local jail at night, similar to Mr. Wei in this case. And he's presented the next day. And, actually, what's interesting in that case is, as the officers are driving him from Bellingham to Seattle on the morning of the next day, so you're talking, you know, about 18 hours after he was first arrested, or more than 18 hours, the AUSA in that case calls the agents and says, "Hey, you need to, like, finish the interview up with him." And so they take him to another FBI field office on the way there. They interview him for 50 more minutes. And then he ends up being arraigned at 2:30 the next day. So that's about 26 hours after he was first arrested. And what the court -- what the circuit concludes in that case is that the overnight delay was caused because there was no magistrate available. And even though

25

the interview itself went beyond the six-hour mark because it goes into the evening of the first day, and then they re-interview him again the morning of the next day, the practical consequence because of the booking window and the travel time required is that even if they had tried to drive him down the night before or prematurely ended the interview, it would have had no effect.  And the court in that case -- the circuit says there's no prompt presentment issue, and the -- suppression is -- you know, even if there were some sort of violation, suppression is not the appropriate remedy.  The Government's position is that that case is sort of indicative of what should happen here.

The last thing I'll note is that -- and this is just a footnote in the brief -- is that since we're here, you know, the Government would also request that to the extent that the Court concludes the post-arrest statement and confession did not violate the Defendant's rights and the fruits of that -- although the statements themself should not be suppressed, that the Court also find under 18 U.S.C. 3501(a) that the confession is voluntary and is therefore admissible on trial, subject to whatever other evidentiary objections remain.

THE COURT:  Thank you.

MR. BARRY:  Thank you.

THE COURT:  On the voluntary issue -- voluntariness

26

issue, do you say that yours go hand in hand?  I don't think there's any showing that it was an involuntary confession.

MR. FAKHARARA:  Your Honor, we're not making that argument here.

THE COURT:  All right.  Thank you.

Anything further on those two issues?

MR. FAKHARARA:  I think the only thing that I'll add, your Honor, if I may, very briefly, is that there's been a lot of talk about the booking window as -- you know, as the tool here to think about the delay.  There hasn't been a showing that Mr. Wei couldn't have just shown up to court to be arraigned, right?  And here's the thing, when it comes to the Ninth Circuit, there's this discussion about whether a magistrate is available or whether personnel are available to bring him to court.

THE COURT:  Actually, I'll cut you short on that. That's why I said in our district, we have strict protocols where we do not have agents bring people to court for the safety and the health reasons of the public, the people.  And so the fact that he's arrested, under our system, he's going to the MCC to be booked in.  That's a much better system system-wide rather than just everybody showing up at court, and then what would we do with everybody showing up at court. So I don't think that that argument is very persuasive to me.

MR. FAKHARARA:  And I guess the only distinction

27

I'll make, your Honor, is that he didn't have to go to MCC. He could have been booked by the marshals downstairs, right, where they do a lot of the same sort of procedures that the MCC would do when they book him.

THE COURT:  No.  No.  Because, under our system, we do not want them to come down to the marshals to be booked in. We want them to be taken to the MCC for a medical protocol, to be screened in, so that we know everybody that's coming to court that day.  Otherwise, it could be chaos that agents could bring everybody in to the marshals, and then what are the marshals going to do?  They're going to have to take them to the MCC for a booking --

MR. FAKHARARA:  I appreciate --

THE COURT:  -- before coming to court, especially because they have to be medically screened before they come to court.  Unlike many places, we are a border court, and so we do have serious issues concerning tuberculosis that many other courts may not have, and so it's better for everybody to make sure that the people coming to court are medically screened.

MR. FAKHARARA:  I appreciate that I'm being unpersuasive in this particular point, your Honor. Ultimately, I just conclude that under Corley, a delay specifically for interrogation, as Corley says, is the epitome of unnecessary delay.  We are asking for his statement to be suppressed under both the Sixth Amendment issue that we talked

28

about earlier and then also under the Rule 5 due process issue as well.

THE COURT:  Thank you.  I do appreciate Federal Defenders bringing these two motions to the Court.  I think it's helpful to have the record as thorough as it possibly can be, and I think that those issues have been identified for the benefit of Mr. Wei.

The Court concludes that there was no violation of Miranda and that the statement was voluntary.  The Court also concludes that on the presentment issue, the proper remedy is not suppression, and -- that under the context of the entire circumstances, the Court declines to find that the questioning after the waiver for completion of it was for the purpose of coercion or unnecessarily continuing the questioning.  I think it was reasonable under the circumstances, and the Court declines to suppress the statements.  You have your appellate record.

MR. FAKHARARA:  Thank you, your Honor.

MR. BARRY:  I may have misheard your Honor, but I thought you said -- I just want to clarify, you said in the beginning that the Court is finding there's no violation of Miranda.  I wanted to clarify, did you mean the -- no Sixth Amendment violation?

THE COURT:  And no Sixth Amendment violation, both.

MR. BARRY:  Thank you.

29

THE COURT:  Thank you.  The Sixth Amendment right to counsel.

Then turning to the additional motions.  On discovery, where are we?

MR. BARRY:  The Government has produced all discoverable information that it currently is aware of.

MR. FAKHARARA:  I don't think there's any discovery disputes at this time, your Honor.  We're happy to speak with the Government and see if there's anything else, but I think we have a full picture of the case, and we're moving as fast as we can to review everything.

THE COURT:  We had previously requested -- correct me if I'm wrong -- 55 jurors to come to court, and we actually got 60.  Knowing now the length of the potential trial and that it's summer and the issues that are presented in this, how many -- we have to order the jurors about six weeks in advance.  How many jurors do you think we will need?

MR. FAKHARARA:  Can we have a moment, your Honor --

THE COURT:  Sure.

MR. FAKHARARA:  Thank you, your Honor.  I think we're in agreement for 75 jurors.

MR. BARRY:  Just because it's the summer, your Honor.  I think -- we think we can do the trial in a week.

THE COURT:  We can time-screen.

MR. BARRY:  Or time-screen.

30

THE COURT:  So we time-screened last time for three week -- for a three-week trial, so that -- and we had plenty. So that way we could then bring people that are available for that time.

MR. BARRY:  We certainly have no objection to screening for a three-week trial.  We think the case is likely to be finished in just a little bit more than a week.  I think we could probably do the evidence in a week and maybe deliberation and the Defense case --

THE COURT:  And then we always add a little --

MR. BARRY:  Right.  Exactly.  So three weeks --

THE COURT: -- bit more in case of issues.

MR. BARRY:  I think three weeks is -- and I guess the -- by the Court's reaction, 75 seemed too high.

THE COURT:  Well, if we could -- I think time-screening would help because a lot of people would come and say, "I'm on vacation."

MR. BARRY:  Yeah.  Yeah.

THE COURT:  And I don't think we're unnecessarily trying to exclude.  We're just trying to get people that are available to serve.

MR. BARRY:  So maybe 60 then or 50?

MR. FAKHARARA:  Sure, that sounds great.  Sixty --

THE COURT:  Okay.  All right.  Thank you.

And then we have a motion in limine schedule.

MR. FAKHARARA: That's right.

THE COURT: Have the parties then contacted their witnesses and cleared them for those dates for trial?

MR. BARRY: We are in the process.

THE COURT: Or will you do that, please? So that we don't have a surprise.

MR. BARRY: Yeah. We're -- we've kept them abreast of things, and we're in the process of reissuing trial subpoenas.

THE COURT: Okay. And the stipulations that were previously entered into prior counsel will continue?

MR. FAKHARARA: Yes, your Honor, as far as we know.

THE COURT: All right. And then what about the mother's note? Did you have a chance to talk to her about that?

MR. FAKHARARA: Your Honor, I don't think it's relevant anymore. We had a discussion about Counsel with Mr. Wei, and he's prepared to proceed with us as counsel.

THE COURT: Are you?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. Thank you.

Let's see. There were -- the reason I brought up the stipulations, it resolved a lot of the business records and other things and avoided custodians coming into court, and so --

32

MR. FAKHARARA:  I think -- if it's okay with your Honor, what we can do is, we can look back at the stipulations.  If there's anything that comes up, we're happy to make sure we bring it up in the in lims that we file in July.

MR. BARRY:  The sooner the better --

THE COURT:  The sooner the better because --

MR. BARRY:  -- because we would have to subpoena those witnesses.

THE COURT:  -- these are a lot of witnesses --

MR. FAKHARARA:  Of course.

THE COURT:  -- that --

MR. BARRY:  Right.

THE COURT:  -- might have to come.

MR. FAKHARARA:  We'll make it a priority.

MR. BARRY:  Okay.  Thank you.

THE COURT:  Anything else today?

MR. FAKHARARA:  Nothing else, your Honor.

THE COURT:  The Court finds valid excludable time under the Speedy Trial Act.

MR. FAKHARARA:  Thank you, your Honor.

THE COURT:  Thank you.

MR. BARRY:  Thank you, your Honor.

MR. PARMLEY:  Thank you, your Honor.

THE CLERK:  That concludes all matters, and we're

33

off the record.

(Proceedings concluded.)

34

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Chinago Okonta                    3/2/2026
Transcriber                          Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.

*Echo Reporting, Inc.*