UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

--oOo--

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 23CR1471-H |
| | ) | |
| Plaintiff, | ) | San Diego, California |
| | ) | |
| vs. | ) | Thursday, |
| | ) | August 14, 2025 |
| JINCHAO WEI, | ) | 9:00 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | VOLUME III |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARILYN L. HUFF
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

For the Plaintiff:          JOHN N. PARMLEY, ESQ.
                            United States Attorney's
                              Office
                            880 Front Street
                            Suite 6293
                            San Diego, California 92101
                            (619) 557-5610

                            ADAM P. BARRY, ESQ.
                            United States Attorney's
                              Office
                            601 D Street, Northwest
                            Washington, DC 20579
                            (202) 233-0788

For the Defendant:          MICHAEL J. BERTOLA II, ESQ.
                            Rudolph Baker & Associates
                            419 19th Street
                            San Diego, California 92102
                            (909) 499-3465

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

III-ii

APPEARANCES:  (Cont'd.)

For the Defendant:              SEAN MICHAEL JONES, ESQ.
                               Jones Trial Attorneys
                               401 B Street
                               Suite 2010
                               San Diego, California 92101
                               (619) 732-6377

Transcript Ordered by:          TODD W. BURNS, ESQ.

Court Recorder:                 Lynnette Lawrence
                               United States District Court
                               333 Broadway
                               San Diego, California 92101

Transcriber:                    Lorraine Caldwell
                               Echo Reporting, Inc.
                               9711 Cactus Street, Suite B
                               Lakeside, California 92040
                               (858) 453-7590

III-iii

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Laura Wetterer (recalled) | III- 6 | III- 19 | III-119 | -- |
| Jonathan Palis | III-135 | III-155 | III-169 | -- |
| Francisco Ceja | III-171 | III-203 | III-211 | III-214 |
| Natasha Flores | III-215 | III-254 | -- | -- |
| Reem Younis | III-257 | III-265 | III-266 | -- |

| EXHIBITS: | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| Plaintiff's: | | | |
| 32C | Certification statement from Navy Federal Credit Union | III- 67 | -- |
| 39 | Wei e-mails/attachments | III-152 | III-153 |
| 41 | Document location chart of manuals | III-148 | III-148 |
| 160 | Request for certification of military or naval service, Wei application for naturalization | III-221 | III-222 |
| 161 | Wei LPR identification card | III-221 | III-222 |
| 162 | N-400 form | III-221 | III-222 |
| 163 | Notice of interview re: Wei | III-221 | III-222 |
| 164 | Review of changes and signature at interview | III-221 | III-222 |

III-iv

| EXHIBITS: (Cont'd.) | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| Plaintiff's: | | | |
| 165 | DHS naturalization interview results re: Wei | III-221 | III-222 |
| 166 | Wei oath of allegiance | III-221 | III-222 |
| 167 | Electronic immigration system questionnaire | III-221 | III-222 |
| 168 | Notice of naturalization oath ceremony | III-221 | III-222 |
| 169 | Form N-445, confirmation of accuracy | III-221 | III-222 |
| 170 | Photo of ship log room entrance | III-170 | III-179 |
| 171 | Photo of ship log room door | III-178 | III-179 |
| 172 | Photo of ship log room | III-157 | III-158 |
| 173 | Photo of ship log room computer | III-159 | III-159 |
| 174 thru 177 | Photos from engine room | III-159 | III-159 |
| 238 | Document | (prev.) | (withdrawn) |
| 242 | Document | (prev.) | (withdrawn) |
| | | | |
| Defendant's: | | | |
| A | List of manuals provided to Li | III- 81 | -- |
| 34-4 | iCloud records | III- 88 | -- |
| 53-4 | Image from phone | III- 89 | -- |

III-v

| EXHIBITS: (Cont'd.) | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| Defendant's: | | | |
| 53-6 | Image from phone | III- 89 | -- |
| 53-10 | Image from phone | III- 89 | -- |
| 53-12 | Image from phone | III- 89 | -- |

III-1

SAN DIEGO, CALIFORNIA  THURSDAY, AUGUST 14, 2025  9:00 A.M.

                         --oOo--

     (Call to order of the Court.)

          THE COURT:  We're on the record outside the presence of the jury.

          You were going to correct certain exhibits?

          MR. PARMLEY:  Yes, your Honor.  One moment, please.  Yes.  Good morning.  Yesterday we admitted Government's Exhibits 201 through 265, kind of en masse in that shopping cart.  I neglected to realize that two of those exhibits have been pulled as duplicates, so there is no such thing as Government's Exhibits 238 and 242.  They don't exist.

          THE COURT:  So you're deleting 238 and 242?

          MR. PARMLEY:  Correct.

          THE COURT:  Do we need to say anything to the jury?

          MR. PARMLEY:  I don't think so, unless defense counsel would like us to.

          MR. JONES:  I'd make a quick note, just in case somebody did the math, and they're expecting us --

          THE COURT:  Should I just say they were duplicate?

          MR. PARMLEY:  Yes, and there -- so there is no -- and just let them know there is no such thing as Government's Exhibits 238 and 242.

III-2

THE COURT:  All right.  Thank you.

The instruction about the stipulation to say:

"The parties have agreed to certain facts and witness testimony that has been stated to you in a stipulation. Those facts are now conclusively established."

Any objection?

MR. PARMLEY:  I don't have any objection to that.

MR. JONES:  None.

THE COURT:  I think it's better than doing one for facts and one for witnesses, without specifying what it is.

UNIDENTIFIED SPEAKER:  Your Honor, we're just going to test the equipment really quick.

THE COURT:  Sure.  We'll go off the record.

(Proceedings recessed briefly.)

THE CLERK:  Jury entering.

(Jurors enter courtroom.)

THE COURT:  Good morning.  Good morning to everybody.  You may be seated.

A couple of preliminary matters.  I'm going to give you a couple of instructions that apply, and then I'll give you more detailed instructions at the end of the case. I've told the lawyers that I don't like to instruct in -- at the very beginning, when you don't really have context.  Now

III-3

that you have context, these instructions apply to all of the case.

In deciding the facts in the case, you must -- may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account: first, the witness' opportunity and ability to see or hear or know the things testified to; second, the witness' memory; third, the witness' manner while testifying; fourth, the witness' interest in the outcome of the case, if any; fifth, the witness' bias or prejudice, if any; sixth, whether other evidence contradicted the witness' testimony; seventh, the reasonableness of the witness' testimony in light of all the evidence; and, eighth, any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part that you think is true and ignore the rest.

You must avoid bias, conscious or unconscious, based on a witness' race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances in your determination of credibility.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.  What is important is how believable the witnesses are, and how much weight you think their testimony deserves.

Every night, we review the exhibits that have been received into evidence, because they're so voluminous, to make sure that we have everything correctly.  In reviewing the exhibits last night, we determined that two were duplicates, and so we've withdrawn those.  That's 238 and 242.  Those were some of the technical manuals, but they were actually duplicates.  So there will be no 238 or 232.

And then, finally, there are rules of evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit in evidence, and

III-5

a lawyer on the other side thinks it is not permitted by the rules of evidence, that lawyer may object. If I overrule the objection, the question may be answered or the exhibit received. If I sustain the objection, the question cannot be answered or the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question, and must not guess what the answer would have been.

Sometimes I may order that evidence be stricken from the record -- I don't think that thus far I've done that, other than these two exhibits that we talked about -- and that you disregard or ignore the evidence. That means that when you are deciding the case, you must not consider the evidence that I have told you to disregard.

All right. We're ready to continue. We'll have our witness back.

MR. PARMLEY: Thank you. And, your Honor, one brief matter. Ms. Lake (phonetic) was our paralegal for the first few days of the trial. Ms. Mullins (phonetic) is joining us for the rest of the trial --

THE COURT: All right. Thank you.

MR. PARMLEY: -- after taking her son to college. So she's back.

THE COURT: Thank you.

I remind you, you're still under oath.

III-6

You may continue.

LAURA WETTERER - PLAINTIFF'S WITNESS - PREVIOUSLY SWORN

DIRECT EXAMINATION  (RESUMED)

BY MR. PARMLEY:

Q    Good morning.

A    Good morning.

Q    When we last left off, we were going through some of the Defendant's post-arrest statement.  I'd like to continue with that, and at some point, did you ask him about some of the payments he had received?

A    I did, yes.

Q    Did you ask him about a payment for $5,000?

A    I did.

Q    Why did you specifically ask him about that one in particular?

A    I asked about that one in particular because it was the largest single payment that the Defendant had received, and I wanted to know -- I wanted to know from him what he had provided to the intelligence officer to receive a payment of that size.

MR. PARMLEY:  All right.  If we could, Ms. Mullins, could you play clip 22, please.

(Video plays.)

BY MR. PARMLEY:

Q    So, when you originally asked him what he received that

III-7

$5,000 for, he said, "Learning for me"?

A    Yes.

Q    And then, a little after, you asked him what he had sent.  Did he admit to sending tech manuals?

A    That's right.

Q    And he said 15 to 20.  Was that corroborated by your investigation?

A    Yes.  I think our investigation showed that he sent more than 20 manuals in June.  I think he sent around 30.

Q    And he admitted to sending it through some kind of link.  Is that correct?

A    That's right.

Q    And did you ask him about that?

A    I did.

Q    Okay.  Let's play the next clip, please, clip 23.

    (Video plays.)

        MR. PARMLEY:  I think that's the last clip.

        MS. MULLINS:  I'm sorry.

    (Video plays.)

        MR. PARMLEY:  One moment, please.

        MS. MULLINS:  Twenty-two or 23?

        MR. PARMLEY:  Twenty-three, please.

        MS. MULLINS:  Thank you.

        MR. PARMLEY:  I need to speak louder.

    (Video plays.)

III-8

BY MR. PARMLEY:

Q    So, if I understood that, it's a fake website that's in English.  Is that correct?

A    Yes, that's what the Defendant said.

Q    So not e-mailing documents to somebody?

A    No.

Q    Not e-mailing them to somebody at, say, a research institution or university?

A    No.

Q    And it required the Defendant himself to set the passcode to get access to it?

A    That's right.

Q    Did he ever tell you that Andy wanted to meet him in person?

A    He did.

        MR. PARMLEY:  Can we play clip 25, please.

    (Video plays.)

BY MR. PARMLEY:

Q    And you testified yesterday about why an intelligence officer would want to meet somebody in person.  Is that correct?

A    That's right.

Q    Okay.  Did you ask him about receipts?

A    I did.

Q    And did you show him some receipts?

III-9

A    Yes, I did.

        MR. PARMLEY:  Can you play clip 26, please.

        (Video plays.)

BY MR. PARMLEY:

Q    So he admitted to writing receipts?

A    Yes.

Q    Did you ask him -- did you start to show him some of the papers that were involved in this case?

A    Yes, I did.

Q    Which documents did you show him, if you recall?

A    I showed him the paper that was written in Chinese that included the diagrams from the Weapons Control System Manual.

Q    Would that be what's been previously admitted as Government's Exhibit 139 and 139A?

A    Yes.

        MR. PARMLEY:  Okay.  Let's show that clip, please. this is 27.  This is about a five-minute clip.

        (Video plays.)

BY MR. PARMLEY:

Q    Okay.  Let me ask you a few questions about that clip. First of all, you're showing him some things.  Can we talk about what you were first showing him?

A    Yes.  So first I showed him the paper that we had found in this Google account, the Chinese paper -- we had gone

III-10

over it yesterday -- with diagrams in it from the Weapons Control System Manual, a photo of a -- kind of like a picture on the inside the Essex that shows sailors where to go, and then pictures that listed room locations, phone numbers, and the physical room location.

Q    All right.  Starting first with those diagrams, those came -- did those come from the Weapons Control System Manual?

A    They did, and that's also what I showed him during this clip, is the actual cover page of the Weapons Control System Manual.

Q    And did he explain how he got those diagrams from that manual into his original paper?

A    Yes.  He said he took the diagrams from that manual and put them in the paper.

Q    Did he say he took a screenshot?  Is that what he said?

A    Yes.

Q    Okay.  And then how about the photos?  He said he took those himself?

A    Yes.

Q    Now, I recall him saying about berthing area, and he's also talking about the phone directory?

A    Yes.

Q    Is that the document we saw yesterday, as well?

A    Yes.

III-11

Q    That includes the location on the ship of where those people are sleeping, for example?

A    Yes, that's right.

Q    He also mentioned ChatGPT at one point.  At one point, did he say that ChatGPT wrote the paper?

A    He did.

        MR. PARMLEY:  Can you play the next clip.

BY MR. PARMLEY:

Q    Did you ask him about the Damage Control Manual, another document, the Damage Control Manual?

A    Yes, I believe so.

        MR. PARMLEY:  Okay.  Could we play the next one, clip 28, please.

    (Video plays.)

BY MR. PARMLEY:

Q    He mentioned a CAC card, also known as a "common access card."  Do you know what that is?

A    I do.

Q    What is that?

A    It's a card that's assigned to people who join the military or people who work and need access to a military base, and I think you can add specific accesses to it to scan on to the base, to get access to certain computer systems that you're assigned to.  It's your ID card.

Q    That's something that Captain Taylor had briefly

III-12

touched on.  Is that correct?

A    That's right.

Q    Going back to the prior clip, he was -- you were talking about the Weapons Control System Manual, correct?

A    Yes.

Q    Did he ever, at any point -- well, let me withdraw that.  Let me try this again.

The Propulsion Guide you asked about, correct?

A    Yes.

Q    And what did he say that that came from?

A    The shared drive.

Q    That requires you to use your CAC card on the ship to get access to?

A    That's right.

Q    And the Weapons Control System Manual, he said that that came from where?

A    He said that came from the SHIB (phonetic), the Ship's Index Book.

Q    Did he ever mention that that was not part of the engineering materials on the ship, and it was in a different folder, the Surface Warfare Officer Folder?

A    No, he didn't mention that.

Q    At some point, did you decide to ask him what he thought his conduct amounted to?

A    Yes.

III-13

Q    In fact, you asked him, "What would you call that you were doing?," correct?

A    Yes.

MR. PARMLEY:  Let's play that clip, please.  Clip 29, please.

(Video plays.)

MR. JONES:  Your Honor, I'm going to object, 403, legal opinion.

THE COURT:  Overruled.

MR. PARMLEY:  Can we start the clip again, please.

MR. JONES:  Sorry.

MR. PARMLEY:  It's okay.

THE COURT:  You can have a standing objection.

MR. JONES:  Okay.

(Video plays.)

BY MR. PARMLEY:

Q    He described his own conduct as "espionage," correct?

A    Yes.

Q    Prior to that, had you ever used that word or volunteered that word in the course of your interrogation?

A    No, I don't believe so.

Q    And then he said he was fooled?

A    Yes.

Q    Did you take a break at that point?

A    We did.

III-14

Q    For about how long, and what was the purpose of the break?

A    I want to say it was about an hour, and, honestly, I don't recall why we took a break at that point.  I think maybe it was just the natural time for us to take a minute and regroup.

Q    Okay.  And then did you go in and ask him some more questions?

A    We did.

Q    Why?

A    We had more things we wanted to ask him, and especially one of the things that we wanted to do was, we were able to get a copy of his laptop that we had seized from his apartment, where we were able to find a lot of the technical manuals that we had talked about, and we wanted to specifically go over those with the Defendant and ask him what he had provided to the intelligence officer.

Q    So, the search of that day, you were able to access laptop and show him some things from the laptop?

A    That's right.

Q    Did you ask him about his military e-mails, and whether or not he'd deleted any?

A    I did.

        MR. PARMLEY:  Can you play that clip, clip 40, please.

III-15

(Video plays.)

BY MR. PARMLEY:

Q    And then did you ask him specifically what Andy was interested in?

A    We did, yes.

MR. PARMLEY:  Okay.  Could you play clip 41, please.

(Video plays.)

BY MR. PARMLEY:

Q    When you asked him about Andy being interested in nonpublic information, he volunteered, "Like those tech manuals"?

A    He did, yes.

Q    And we heard testimony earlier as to why an intelligence officer would only want nonpublic information. Is that right?

A    That's right.

MR. PARMLEY:  Okay.  We don't need to go over that again.  I want to look at a couple of papers now.

Could we pull up 141, please, and if we could publish this to the witness and the jury only, please.

BY MR. PARMLEY:

Q    Okay.  Is this one of the papers that you found on the Defendant's hard drive?

A    It's the English translation of one of the papers that

III-16

we found on the Defendant's hard drive.

Q    141A would be the Chinese version?

A    That's right.

Q    Okay.  One of the things that -- would you -- let me -- would you characterize this paper as fairly innocuous or fairly sensitive?

A    I mean, I would say innocuous.

Q    Okay.  One of the things that Mr. Liu (phonetic) asked for was blueprints or diagrams of the ship.  Is that correct?

A    That's right.

Q    And can you look at that photo in the left.  Do you know where that comes from?

A    I do.

Q    Where does that come from?

A    It comes from the engineering department aboard the U.S.S. Essex.  There's a room where they have big blueprints of the ship that they use in their work.  They're kind of like big screens that they can flip through, and I think that's a picture of one of those screens.

Q    Because you saw it in the engineering department?

A    Yes, that's right.

        MR. PARMLEY:  Okay.  Can we pull up 142.

BY MR. PARMLEY:

Q    This is again the engagement version of a paper that

III-17

you found.  Is that correct?

A    That's right.

Q    Would you mind reading the first paragraph of that paper?

A    Sure.  It's titled "Structure of Essex Bottom Levels," and it says:

> "This week I was focusing on the
> qualification of the investigator.  For
> the first time, I discovered some
> diagrams of the ship's structure.
> However, due to time constraints, I
> mainly looked at the bottom levels this
> time."

Q    And above that -- if you could clear that, Ms. Mullins -- above that is another photograph.  Is that right?

A    That's right.

Q    And do you know what that photograph is of?

A    Yes.  As you can see, it's another one of those big screens of diagrams that you can kind of flip through.

Q    I mean, is it -- just to give us a size, is it as big as that poster at 26A?

A    Yes.

MR. PARMLEY:  Could we go to the next page of 142, please.

//

III-18

BY MR. PARMLEY:

Q    Is that another example of a photo that was found in the Defendant's paper?

A    That's right.

Q    Was one of those photographs -- could you see the words -- or, excuse me, the letters "F-O-U-O" on them?

A    I'm sorry.  Which picture?

Q    At one of the pictures.

        MR. PARMLEY:  Could we go back -- I think it's at 141.  Could we go to 141.  Sorry, Ms. Mullins, making you do things.  Exhibit 141, and go to the next page.  Okay.  Could you just zoom on the bottom right of that picture.

BY MR. PARMLEY:

Q    Do you see there are markings in red?

A    I do.

Q    Could you just read that.

A    It's "Unclassified/FOUO."

Q    Do you know what "FOUO" stands for?

A    I do.

Q    What does that stand for?

A    "For official use only."

        MR. PARMLEY:  If you could clear that, please.

BY MR. PARMLEY:

Q    Last couple of questions.  During the post-arrest interview, did he admit to sending the three manuals to Andy

III-19

Li that were charged in the indictment?

A    Yes, he did.

Q    Did you search the Internet for those manuals charged in the indictment?

A    I did.

Q    Specifically, the boiler water, feed water, technical manuals for LHD amphibious assault ship?

A    Yes.

Q    The Propulsion Operation Guide for Amphibious Assault Ships?

A    Yes.

Q    The Weapons Control System Manual for LHD Amphibious Assault Ships?

A    Yes.

Q    Did you find those anywhere on the Internet?

A    I did not, no.

        MR. PARMLEY:  I don't have any other questions. Thank you.

        THE COURT:  Thank you.

        Cross?

        MR. JONES:  Yes.

                CROSS EXAMINATION

BY MR. JONES:

Q    Good morning, Agent Wetterer.

A    Good morning.

III-20

Q    I appreciate your stamina.

A    Thank you.

Q    I'll try to not drag this out any other than necessary. I may have run into some technical issues bringing some stuff off. We'll cross that bridge when we get to it. I apologize in advance.

THE COURT: If you need a hard copy, we also have an Elmo that we can use.

MR. JONES: Okay.

THE COURT: We can use it that way if --

MR. JONES: Yes. We'll see.

THE COURT: We'll see.

MR. JONES: if it becomes an issue, I think I'll probably go until the break, and then I can clean up tech issues and finish on that. All right.

BY MR. JONES:

Q    When, to your knowledge, was it first discovered that Jinchao Wei was sharing documents with Andy Li?

A    I would say I believe we opened this investigation where we received information that indicated that in the summer of 2022.

Q    That was around the time that you started issuing subpoenas?

A    Yes. I don't -- you know, I don't recall exactly when we issued our first subpoena.

III-21

Q    By my calculation, I think the team -- there was a team over one from early or mid-December of 2022.  Does that sound about right?  You know --

A    Yes.  That sounds right, yes.

Q    And then the TSA airport sting, that was either December 2022 or January 2023?

A    Yes.  I believe that was December 2022.

Q    And at that point, you got his cell phone PIN, and then were able to get into his devices?

A    Yes.

Q    And it was around the same time that you also started getting information on Andy Li, right?

A    Yes, I think that was around that same time.

Q    All right.  And so that's approximately eight months before the arrest of Jinchao Wei, right?

A    Yes.

Q    I want to know, if the information that was being leaked to Andy Li was so critical, and putting the lives of sailors in jeopardy, why not arrest him and put a stop to it right then, versus vetting a case for eight more months?

A    So I should say that, when we opened the investigation, we received information that led us to believe that we should investigate Mr. Wei for communicating with and potentially providing information to an intelligence officer, but I didn't know that for sure at that time.  That

III-22

eight months of investigation was being used to build the evidence to confirm what we thought may have been happening. So we needed time to gather information, and to do the best we could to sort of ascertain the Defendant was transmitting.

Q   The subpoenas of Andy Li's iCloud and Google accounts were effectuated in that same December 2022, January 2023 time frame, right?

A   Yes.

Q   So, as of the winter of -- I don't know a better way to put it -- that time frame, December 2022, January 2023 -- at that time, you knew that Jinchao Wei was in communication with Andy Li, right?

A   Yes.  I would say around that time, yes.

Q   And as of January of 2023, you had copies of the iCloud and Google accounts to some extent, right?

A   Yes, we had copies.  I mean, kind of, as I said before, it was all in Mandarin, so it took a little time to actually be able to digest that information, but yes.

Q   And so, once you had access to those accounts, that revealed -- maybe not immediately, but that's the information that contained evidence of the release of the tech manuals, right?

A   Yes.  That's where we were able to start, yes, putting together those pieces and ascertaining which tech manuals we

III-23

thought had been sent over.

Q    So, as of January 2023, the Government was in possession of evidence that Jinchao Wei had sent tech manuals to Andy Li, correct?

A    Yes, I think that's right.

Q    And yet no effort was made to stop Jinchao Wei from releasing more of that kind of information until August of 2023, right?

A    Yes, I would say that's right.

Q    And you were here when Captain Taylor testified that he was concerned that Mr. Wei's actions were putting sailor and marine lives at risk, right?

A    Yes.

Q    And so was it the Government's position that it was worth it to risk the lives of those sailors in order to build a case against Mr. Wei?

A    No, I don't think that's right.

Q    You mentioned yesterday that, after Jinchao Wei told you that a lot of this information came from public sources, that you made an effort to find those sources, right?

A    Yes.

Q    And by your estimation, there was a total of about 50 to 60 documents -- strike that -- 50 to 60 manuals?

A    Yes, I think that's about right.  Yes.

Q    And of those, you were able to find about 20 un-public

III-24

sources?

A    Approximately.  I can't recall the exact number.  Yes.

Q    Did you make a list, by chance?  And I don't blame you if you didn't, but did you make any kind of list of which ones were publicly available and which ones weren't?

A    Yes, we did.  We did, yes.

Q    Do you -- is that -- you might not be the person to ask, but do you know if it's -- if that list would be in any of this mountain of paperwork?

        UNIDENTIFIED SPEAKER:  We can give it to you.  We can give it to you.

BY MR. JONES:

Q    I'll circle back on that.

A    Okay.

        MR. JONES:  Can we flip to Exhibit 251?  I don't even know who's doing this.  Should I be doing this?

        THE COURT:  Here we go.  Magic.

        MS. MULLINS:   Or I can --

        THE WITNESS:  Great.  There we go.

        MR. JONES:  I always love it when my adversaries have to do clerical work for me.

BY MR. JONES:

Q    Do you by chance recognize this, Exhibit 251?  Looks like a refrigeration systems manual.  Do you recognize this as one of the documents that was publicly available?

III-25

A    You know, I can't say for sure without looking at my work which ones were publicly available, but -- thank you.

Q    That was fast.  All right.  Attorney Parmley has been kind enough to hand me a color-coded document.  I'm far away, but any chance you recognize this?

A    Would you mind bringing it closer?  I'm sorry.

Q    Yes.  No problem.

THE COURT:  Does it need to be marked?

MR. PARMLEY:  Might be.

Sean, you might want to confirm that's the right thing, too.

THE WITNESS:  So this is not --

MR. PARMLEY:  That's not it?

THE WITNESS:  No.

MR. PARMLEY:  Okay.  Apologies.

MR. JONES:  Probably don't need to mark it.  No. It's not urgent.  We can follow up on that, again, after the break.

BY MR. JONES:

Q    Jinchao -- during the investigation -- or, sorry, not the investigation.  During the interview on August 2nd, 2023, when he had had been arrested, you were there.  Who else was in that room with you and Mr. Wei?

A    Agent Christian from NCIS, and John Parmley, USA.

Q    I know that went on for a couple hours, but do you

III-26

recall him mentioning Facebook groups a couple of times?

A    I do.

Q    When you set out to find publicly available manuals, did you look on Facebook groups?

A    I didn't specifically search within Facebook.  I mostly did a -- sort of like a Google, and went through the pages. I do think, like, some Facebook links would pop up, but I didn't specifically go into Facebook and look.

Q    Would it surprise you to know that this document, 251, is on a machinist mate Facebook group?  Would that surprise you?

A    No.

Q    All right.  And I want you to look at the warning on this document.

        MS. MULLINS:  More?

        MR. JONES:  Yes, if we can zoom in.  Thank you so much.

        MS. MULLINS:  You're very welcome.

BY MR. JONES:

Q    And now the central warning:

        "This document contains technical data

        whose export is restricted by the Arms

        Export Control Act, Title 2022, U.S.C.

        Section 2751, et cetera."

    You see that?

III-27

A     I do.

Q     Now I'd like to flip over to Exhibit 201, which is the Weapons Control Manual, I hope, and if we could zoom in on that, the warnings there.  Does that appear to be the same warning that we saw on the cover page of 251?

A     Yes, it does.

Q     When Jinchao mentioned that he found stuff on Facebook, did you go onto his Facebook profile?

A     No, I did not.

Q     So you didn't look to see which Facebook groups he belonged to?

A     No, not at that time.  I did not.

Q     And you didn't, of course, then, see what files were posted in those Facebook groups, right?

A     No, I didn't.

Q     All right.  Do you have an understanding of how Facebook groups and communities operate?

A     I would say generally, yes.

Q     Would you agree with me that, for instance, I could go on Facebook, log in with my credentials, create a group, and make it either public or private, and that if I make it private, I'm the person that gets to decide who can join that group?

A     Yes, I think that's right.

Q     And so, if I wanted to create a group for, say,

III-28

machinist mates, other people could search on there, join that group, and it would be up to me who could join that group, right?

A    Yes, I think that's how it works.

Q    And this is -- I understand you're not a Facebook guru or expert.  I'm not holding you to that.  And so, even though a Facebook group might be labeled, you know, "Navy Sailors" or "Navy Machinist Mates," it doesn't necessarily mean that it's run or overseen by the Government, right?

A    No, it doesn't mean that.

Q    And so, if I'm operating one of those groups, again by way of example, I can, at my own discretion, choose how stringent my screening process is of who gets to join my group, right?

A    Sure.

Q    And I don't need to call the Joint Chiefs of Staff -- forgive my miliary ignorance -- to gain approval to admit John Doe to join my group, right?

A    No.

Q    And when you say, "No," you're --

A    I agree with you, yes.  You do not have to call the Joint Chiefs of Staff.

Q    Okay.  Fatal flaw of my examination abilities is asking questions in the inverse.  Apologies.  Going back to Exhibit 211, 251, again, that's the -- we don't need to pull those

III-29

up, but that's the Weapons Control Manual.  It's the Refrigeration System Manual that we just looked at that had the same distribution warning.  Those are both considered unclassified, right?

A    Yes.

Q    And can you -- if you know, can you square for me the difference between, say, classified, unclassified, sensitive, technical, restricted?  Are there clean categories for those things, or am I jumbling stuff together there?

A    So I guess I'm not -- are you asking for definitions?  I guess I'm not sure what you're asking.

Q    Yes.  So, just in my truck work (sic), looking through a million of these manuals, some of them will say -- I didn't see anything that said, "Classified."  I'll put that out there.  But a lot of them will say, "Unclassified."  Some of them will say at the top -- they'll say, "Sensitive," and then most of them that we're dealing with will say, "Warning:  Contains technical data."

Are those, like, static definitions that fall into different buckets, or -- I guess I'm just ignorant about how and when to apply those terms, and I'm wondering if you know.

A    You know what?  No.  So I don't know -- so I don't make determinations for, right, like those handling caveats, what

III-30

is sensitive, what is technical data.  That's not something I would do.  I would just look at the markings on the documents, and those handling caveats for how they should be controlled.

Q    For instance, when you see something that says, "Sensitive" at the top, do you know if that changes the type of security clearance that's needed to view or access that?

A    I don't.

Q    And would you agree with me that there's a huge leap in sensitivity between -- no, that's a poor choice of words -- a huge leap in secrecy of documents between something that's sensitive or has technical information and then something that's classified?  Is that fair?

A    Yes.  I guess I would say there is a difference.  So that's -- to classify something, my understanding of the way that that works is it would be -- you know, there are -- whoever makes that determination makes that determination based on, yes, like, the sensitivity of that data, but, again, I don't do that.

Q    You all could play that (sic) on Google or Facebook, and we could find some stuff that's sensitive, right?

A    Yes.

Q    We could find some stuff that says, "For authorized use only.  Do not distribute," right?

A    Yes.

III-31

Q    And we could see stuff like 251 that says, "Warning: Distribution subject to severe criminal penalties," right?

A    Yes.

Q    It would be much more difficult for you or I to be playing around on the Internet and find something that was classified, right?

A    I hope so, yes.

Q    This might be a bad example, but there's a lot of talk right now about, like, the Epstein files and unclassifying or declassifying them, and there's a lot of people that really, really want to see what's in those files, right? And despite all of that passion for pursuing this, we're not seeing anybody leaking that type of stuff, or it becoming available on Facebook.  Is that too much to ask you to answer?

A    Yes.  I'm not sure what the classification level of those files are, and whether they're available online.

Q    Right, but there's the ability, it seems -- and correct me if I'm wrong.  It seems like there's the ability for the Government to really lock up super-important data to the point that it's not getting found or released to the public online, right?

A    Yes.  The Government can take measures to protect, and does take measures to protect, sensitive and classified information.

III-32

Q    And nothing that we're dealing with in this case is considered classified, correct?

A    That's right.

Q    During your interview of Mr. Wei on August 2nd, he told you that he initially downloaded all of these manuals for his own professional use, right?

A    Yes.

Q    I think he said that it made him better at his job and helped him study.  When you went through -- strike that.

Do you recall when you personally got your hands on all of the data from his phone and iCloud and Google accounts?

A    I don't recall an exact date, no.

Q    Would it have been January or February of 2023?

A    Yes.  That's when we conducted those searches that we talked about, yes.

Q    Was there a period of time -- because I got them, and I admittedly did not -- there's like tens of thousands of files, right?

A    Yes.

Q    Sorry.  I'm trying to think how to word this, but do you recall how long you spent parsing all of the materials that you gained from the searches?

A    That's a very good question.  So, when we execute search warrants, we are only allowed to retain items that are responsive to that search warrant.  So the judge gives

III-33

you a search warrant, and then gives you a list of the things you're allowed to keep, and so we have to review for those things.  So we do review all of the -- you know, the FBI and NCIS reviewed all of these things, but, I mean, it took a significant amount of time, yes.  They were large files.

Q    Like weeks, months?

A    Probably months, because a lot of it was in Mandarin, so it had to be translated and then reviewed by investigators.

Q    Did you have, for the translations, have to go through formal searches, throughout the formal translator, for everything, or did you sometimes run stuff through, like, Google Translate, to get a feel for whether this is worth looking into or not?

A    We would definitely put stuff into Google Translate, but I don't find it to be super helpful, particularly when you're translating from Mandarin, or from languages with characters, and so we would use our linguists for that.

Q    And to be clear, I'm not asking if any of the stuff that we're talking about here has been translated informally.  I'll acknowledge that everything that the jury is seeing went through a certified translator.  I'm just asking if, like --

A    Sure.

III-34

Q    And I'll say -- because, as I was going through, I was running into a bunch of stuff, and I would throw it into ChatGPT or Google Translate to see, "Does this matter?  Is this, you know, some 2011 text to Mom, or is this a text to Andy Li or something?"  So I was just -- I was curious if the process was delayed at all by going through certified translators, or if there was, like, cursory translation done, parse the information.

A    Yes.  For sure we would kind of toss stuff in to kind of see what we were looking at, but there was, for sure -- it took longer because we had to go through that translation process with our linguists, which is just sort of standard procedure.

Q    Do you recall if you went through -- once you got Jinchao's iPhone, and you got that cloned or downloaded, did you go through his Facebook Messenger chats?

A    I don't recall personally doing that, but yes, they would have been reviewed at some point.

Q    Do you recall -- and maybe you're not the one that specifically dealt with this.  I know you're the team (sic).  But do you recall seeing chats between him and others, machinist mates, about studying for exams?

A    I don't specifically recall that, but I did know he was in some of those, yes, groups.

Q    Do you recall seeing any chats where he and machinist

III-35

mates were sharing technical manuals?

A    I don't recall seeing that, no.

Q    Okay.  By my count, Jinchao's Google account that was subpoenaed contained 242 e-mails.  Do you have any knowledge if that's accurate, or does that sound right, or do you have no --

A    I mean, that would probably be responsive e-mails.  So I'm sure there were more e-mails in his account.  Maybe that's what -- I'm not sure.

Q    No, that's a good point.  I believe there were, and I'm not (indiscernible), but I believe those I saw in a folder called "Responsive."  So what does that mean?

A    So that would mean that we obtained someone's entire Google account, all of their e-mails.  We go through it and segregate out e-mails that we are allowed to retain and seize based on the parameters of the court order, so that would be those e-mails.

Q    So the word "responsive," is that responsive to the warrant?

A    Yes.

Q    Okay.  And going through those e-mails, did you find any communications that suggested, like, an anti-American sentiment?

A    No.

Q    Any that suggested a pro-Chinese sentiment?

III-36

A      No.

Q      There were also something like, I don't know, 7,000-plus chat messages in different folders from that iPhone download.  Does that sound about right?

A      I'm not sure.

Q      Okay.  Do you remember going through all those chats?

A      So, like I said, I'm not sure which ones I personally reviewed, versus our linguists and investigative team, but we did review the chats, yes.

Q      And in your review of those -- would you agree there's thousands of chats?

A      Yes.

Q      In those thousands of chats, there's nothing saying, like, "I want to take America down."  That's not -- nothing that specific, anything that echoed a similar sentiment of wanting to take America down or cripple America?

A      Not that I can recall.

Q      Is there anything about wanting to empower China?

A      No, not that I can recall.

Q      Given your review of communications -- and I don't want to misquote you or -- I can't remember your exact response about his chats with other machinist mates -- would you agree with me that these messages demonstrated he kind of became the guy that could furnish study materials and tech manuals to the other machinist mates?

III-37

A    I don't know.

Q    I want to go back to kind of where you started on direct examination, 24 hours ago.  You had previously referred to Andy Li as a Chinese intelligence officer, right?

A    That's right.

Q    And you have a pretty firm belief that that's an accurate title for him?

A    I do.

Q    And that's based off of you getting his Google and iCloud -- is it -- the opinion is largely due to the stuff that you found on his iCloud and Google subpoenaed documents, right?

A    Yes, that's part of it.

Q    It looks like he had some scripts of how he might reach out to potential cooperators?

A    That's right.

Q    But you don't have any actual -- any evidence of Andy Li's actual title, role, or rank in the Chinese government, right?

A    Well, when we reviewed his iCloud, we did find the sheet where he listed himself as active-duty military for the People's Liberation Army.

Q    Correct.  Yes.  It said -- I think it said, "Occupation" --

III-38

A    Right.

Q    -- "active duty Navy," or something like that?

A    Something like that, yes.

Q    But you don't know if he was higher up or lower?

A    No.

Q    Do you have an understanding of what the, like, rankings of Chinese Navy officers are?

A    You know, not at a specific level, no.

Q    And there's a distinction, at least in America, between, like, an officer and like a corpsman or a sailor? Maybe hold off on that.  Do you have an understanding of -- there's been some hierarchy of power and status between different ranks of the U.S. Navy, right?

A    Yes.  There are ranks in the U.S. Navy.

Q    But you don't know -- assuming that China has a similar hierarchy, you don't know where Andy Li would fall in that hierarchy, right?

A    No, I don't.

Q    You don't know who he was reporting to?

A    Not specifically, no.

Q    And you don't know who, if anyone, was under him in the Chinese Navy, right?

A    No.

Q    Do you think it's at all possible that, despite working for the Chinese Navy, he could have been working on some

III-39

kind of separate or individual capacity to potentially even undermine the Chinese Navy, or serve some other private interest?  Does that seem like a possibility at all to you?

A    No.  I saw no evidence of that.

Q    You also saw no evidence of him taking what he got from Jinchao and passing it on to other people in his command, right?

A    You know, I have to be careful about what I can say in an open forum.

Q    That's fair.  What he did say to Jinchao -- and at any time, if something is --

A    Yes.  Thank you.

Q    -- crossing the line, just tell me to shut up, but what he did relay to Jinchao was occasionally "The people at my company might want this information," or "My company has set aside funds for me to spend."  He'd talk about his company, right?

A    Maybe a little.  I don't specifically recall.

Q    But he never said, you know, "Chief Officer Whatever is going to want this," or "My commanding officer says, 'Get that.'"  There's nothing like that in all these documents, right?

A    That's right.  No, there's not.

Q    In one of the documents that we reviewed, and, hopefully, I don't have to go searching for it, but Andy

III-40

expressed to Jinchao that he didn't want China to go to war with Taiwan.  Is that --

A    Yes.  I think I vaguely recall that.  I would have to review the specific communications.

Q    And that's because he had some financial or business interests in Taiwan, right?

A    I would have to review the specific communications.  I don't recall.

Q    Yes.  Me, too.  Did it ever cross your mind that Andy might be working in some capacity for the benefit of Taiwan in getting Chinese and U.S. Navy information?  Did that seem like a possibility at all?

A    Not based on the evidence I reviewed.

Q    Early on in their communications, Andy sent a message to Jinchao that said he worked for Shipbuilding Industrial -- I'm sorry -- he worked for Chinese Shipbuilding Industrial Corporation, right?

A    Yes, the China Shipbuilding Industry Corporation.

Q    Apologies if I got it wrong, but did you say that you tried to find that company and it didn't exist?

A    No.  So I looked that company up.  I think its name has changed since that time, but it's a state-owned company in China.

Q    And it's not uncommon in China for a large part of the, I guess, like, quote/unquote, "private sector" to be state

III-41

owned.  Would you agree with that?

A    Yes.  Yes.  A lot of the industry in China is state owned.

Q    Is it possible that, rather than referring to a specific company, he was just saying that he works for a Chinese shipbuilding corporation?

A    I don't think that's what the message said.

Q    Okay.  Would you be -- in Chinese-to-English translations, we'll say things like "I'm going to the store," or "I work for a law firm," whereas, in Chinese, it would be said more like "I'm going to store," or "He is friend," or "I work for law firm," without the article "the" or "a."  Is that --

A    I'm not sure

Q    Yes.  That was a stupid question.  I guess my point in that is, when he says, "I work for Shipbuilding Corporation," would you agree he's possibly saying, like, "I work for" -- just "I work for a shipbuilding corporation, a Chinese shipbuilding industrial corporation"?

A    I don't think so, just because the translation said, "I work for the China Shipbuilding Industry Corporation," and when you search that specific title, it is an actual company that is called that.

Q    And you said that, when you looked it up, the name had changed?

III-42

A    I mean, I think like the company got -- yes, I think the name may have changed.  I would have to go back, but, like, it just changed the title of the company.  It's not -- the company still exists.

Q    Would you agree that, say -- I'm going to ask you a whole bunch of questions.  I know you might just say, "I don't know."

A    No worries.

Q    But would you agree that there's a difference between saying that you work for a state-owned Chinese company and saying that you work for the Chinese government?  Would you agree there's a distinction there?

A    Yes.

Q    That's what I should have asked from the beginning. During your interview with Jinchao, August 2nd, 2023, there was a salient question that kept coming up of "Who did you think Andy Li was?"  Right?

A    Yes.

Q    "And did think he worked for the government?"

A    Yes.

Q    And Jinchao initially says, "I thought he might be a college professor, because he said he teaches maritime classes," right?

A    Yes.

Q    And he said, "I thought he worked for a shipping

III-43

company or a shipbuilding company"?

A    Yes.

Q    And he said, "I" -- reading from Exhibit 190, page 130 -- "I think they're on a ship, but I never ask."  He said that about Andy Li?

A    That's right.

Q    And he says, "He never tells me what he does"?

A    Yes.

Q    Would you agree that that's consistent with what he was telling other people in his orbit during his 2022, 2023 -- when talking about Andy Li?

A    No, I don't think that's consistent with what he was telling others.

Q    How about when he was talking to him mom?  Because we've got two conversations with his mom, one from, I think, February of 2022 and one from July of --

A    Yes, July of 2023.

Q    Yes.  And during those conversations, his mom is asking him, "Who is this guy?"  And Jinchao is saying, "I don't know, really, what he does.  I think he works for some important company, or he's high-status," right, something like that?

A    I think he says, "He works for" -- "He was someone who works for the Chinese Navy."

Q    And then he also says, "In a shipyard or shipbuilding

III-44

company"?

A    Yes.  Yes.  I think he talks a little more specifically.

Q    And, again, I want to be clear.  I'm not trying to rewrite Exhibits 130 or 131.  We can read those with the actual text if we need to.  I'm just speaking from memory.  But he clearly expresses uncertainty about Andy Li's exact role, right?

A    I guess I would have to look.  Can we -- I would have to look at the exact --

Q    Yes.  Can we --

        UNIDENTIFIED SPEAKER:  She's got those translations in front of her.  She should.

        MR. JONES:  Okay.  Perfect.

BY MR. JONES:

Q    So that's -- 130 is the July phone conversation, I believe, and 131 is the text.

A    Got it.  So, sorry.  Which one did you want to look at?

Q    Looking at Exhibit 130, that's the -- I'm sorry.  Was it July of 2023?

A    Yes, July 15th, 2023.

Q    And it -- I apologize.  I don't have a pinpoint cite.  But the quote I had written down is "Working at state-owned enterprise affiliated with the Navy."  No, that's a mis-attribution.  Strike that.

III-45

THE COURT:  It's stricken.

MR. JONES:  Thank you.

THE COURT:  You're instructed to disregard.

MR. JONES:  I was on such a roll, and then here we are.

BY MR. JONES:

Q    All right.  So let's just look at 130 for a minute, here, while we've got it pulled up.  On page one, which is actually the second page of the document, so after the cover page, his mom asked, "Do you still have" -- "Did you still have contact with that person, that person in China?"

A    Yes.

Q    And so that was at this point -- well, let's just clarify.  In this document, as of July 2023, does he ever say that he thinks that Andy Li works for the Chinese government?

A    I don't believe he specifically says that on this phone call.

Q    And keep that up.  I'll get back to it in a second, but I was going to follow up.  Going back to the interview on August 2nd, Jinchao never puts it out there voluntarily that he thinks Andy Li works for the Chinese government, right?

A    No, he doesn't volunteer that information.

Q    He says, "He didn't tell me what he does.  I don't know.  I think maybe he might work for a state-owned

III-46

company, something like that," and then the Government is the -- I don't know if it's you or Mr. Christian -- "Well, do you" -- puts that, "You think he works for the government, right?"  That's the first time it's put in those words, and he says --

A    Yes.  I might have to go back to the transcript, actually.

Q    Okay.  I apologize for jumping around a little bit, but we'll go through that.  I've got the lines written down.

A    Okay.

Q    But he does say -- do you recall him saying -- when questioned, he says, "So now I'm kind of realizing he works for the" -- he trails off, but it's in response to "You think he works or the government, right?"  And during that conversation, he's demonstrating that he's just now becoming aware that there's a strong likelihood that Andy Li works for the government, right?

A    I would have to review the transcript.

Q    Okay.

A    I don't think he realized that during the interview, no.

Q    All right.  We'll come back to that.  Exhibit 130, page three -- it's the fourth page, but it's got the three at the bottom -- he's talking to his mom about the money he's getting from Andy Li, right?

III-47

A    Yes.

Q    And he's saying it must come from some kind of a public fund, "Because I'm having to write receipts," right?

A    Yes.

Q    And you also talked about how the work he's doing writing the articles and stuff is also good training for Jinchao, right?

A    Yes.

Q    This isn't stuff -- it's helping be better at his job, or learn his job better?

A    Sorry.  Which part are you -- which page are you looking at?

Q    I'm so sorry.

A    Something got jumbled.

A    No worries.

Q    So I was looking in the middle of page four, but it's his mom saying, "All of it is good training for you," right? And that's kind of --

A    Yes.  She says, "All of it is good training for you."

Q    Yes.  And I'm so sorry.  May I scroll back up?  But -- so now the page labeled "Page two," still talking about, you know, what happens if he gets caught, and his mom says, "It's not as though these are some great secrets, anyway, these things that you" -- and Wei Jinchao says, "All very basic stuff."  Right?

III-48

A     Yes.

Q     And I think it's in the same document where he says that he's making some extra money leaking secrets, but his work is not the secret kind.  Right?

A     That's either -- it's either in the call or in the text message.

Q     You're right.

A     I --

Q     So let's switch over to 131, since I'm clearly confusing the two documents.

A     Yes.  I think that's in a text message with his mother.

Q     And so these text messages -- this is February of 2023, right?

A     Yes.

Q     And he's texting his mom?

A     Yes.

Q     And it starts by his mom trying to send him a thousand dollars, right --

A     That's right.

Q     -- to help him with groceries or something?  And he says, "You can have it, Mom.  I've got my own money," basically?

A     Yes.

Q     And she's asking where he's getting his money, and they start talking about this work he's doing on the side, right?

III-49

A    That's right.

Q    And he characterizes it as, like, a side job for making money on the side, right?

A    Yes, I think that's fair.

Q    And they're talking about how other people struggle to pay the bills, they might have to drive a cab on the side to make enough money to get by, but he's able to do it just leaking secrets, but his work is not the secret kind, right?

A    Yes.

Q    To which his mom says, "Oh, not a big deal," right?

A    That's right.

Q    I assume you would disagree with that?

A    I do.

Q    And then they talk about the money, how it -- his mom says, "That's okay.  Your ship is so outdated, no big impact."  And then Jinchao replies, "The quality of life of different professions varies so much," but it's the company's money that he embezzles.  It's not his own money, right?

A    Yes.

Q    So he's not saying that he's getting money from the Chinese government.  He's talking about, Andy Li, taking money from his company to pay Jinchao, right?

A    Yes.  He refers to it as "the company's money."

Q    There was also some talk about how Andy Li is from

III-50

Shanghai, and that means he's, like, a fancy person, right?

A    I don't know what, specifically, you're referring to.

Q    At the top of the second page, Jinchao --

A    Here, yes.

Q    Yes.  His mom says, "Shanghai people respect foreigners only."  Do you see that?

A    (No response.)

Q    And I understand that's a totally different one than I asked you a second ago.

A    Yes, I see.  Yes.  The Defendant says his parents served in the Chinese Navy.  His mother says, "Shanghai people respect foreigners only."

Q    Yes.  And there's a little bit of other discussion about Chinese culture and, like, class differences in this message thread, right?

A    Yes.

Q    Do you have any understanding of the class differences in China, or why people from different regions would respect other people differently?  Do you know anything about that?

A    Just very generally, not specifically.

Q    Did it seem to you, in reading these messages between Jinchao and his mom, that there was some allure of Jinchao being able to work with someone that's highly educated, high-class, from Shanghai?  Is that -- did that strike you at all?

III-51

A    Yes.  I mean, I think that's true.  She talks about Andy being from the upper class.

Q    In this message -- well, let's put this aside.  Let me come right back to it.

     If we can go to Exhibit 137, this is Andy Li's profile that was obtained from his, I think, iCloud or Google, right?

A    iCloud, yes.

Q    And this -- on the political affiliation, it lists him as -- what is his political affiliation?

A    The Communist Party of China.

Q    And that's the only -- in America, you know, we've got some other ones, but Democrat and Republican are really the main ones, right?  It's called a "two-party system," right?

A    Yes.

Q    In China, it's a one-party system, right?

A    Yes.

Q    And so the founding and controlling political party of China is the Communist Party, right?

A    Yes.

Q    And it shows on here that Andy is a member of the Communist Party, right?

A    That's right.

Q    Going back to Exhibit 131, kind of like the top -- kind of right in the middle, Jinchao says to his mom about Andy,

III-52

on February 5, 2023, "And he seems to be rather anti-Communist," right?

A    Yes, I know he says that.  I'm just trying to find it.  Yes.  I see it.

Q    And then his mom responds:

        "They're definitely anti-Communist.
        China is so horrible nowadays.  Anyone
        with knowledge and a brain would be
        anti-Communist."

    Right?

A    Yes.

Q    All right.  Going to -- it's like fifth message from the bottom on page one of 131 -- well, actually, the -- well, let's go up to the sixth line from the bottom.  Mingli, Jinchao's mom, says, "The money would be coming from a research fund, legit," right?

A    She says, yes, "Then it would be a research fund, legit."  Yes.

Q    And then Jinchao says:

        "He's probably a cadre or something like
        that, doing research work at a
        state-owned enterprise affiliated with
        the Navy."

    I found it.  So that's what I was quoting earlier.  So he says:

III-53

"He's probably a cadre or something like that, doing research work at a state-owned enterprise affiliated with the Navy."

Right?

A    Yes, he says that.

Q    Would you agree that "cadre" -- I don't know what the Mandarin word that was translated, but "cadre" is kind of a (indiscernible) word, right, that -- would you agree that kind of implies, like, activism or something like that, or would you disagree with that?

A    You know, honestly, I'm not sure.  I'm not super, yes, familiar, no.

Q    That's fine.  But does it strike you as odd that they're talking about he probably works in some affinity with the Navy, but he's definitely anti-Communist?  Did that arouse any, like, interest?

A    Yes.  I mean, I think it's interesting.  I think that there's many, you know, potential reasons for that.  I can, you know, only go off of what they're talking about here, but yes.

Q    Of course.  Did it cross your mind that it could be that, if he's anti-Communist, but he's working with the Navy, that Andy could actually be working in subversion of the Chinese government?

III-54

A     No.   That didn't come up in any of my evidence.

Q     And we only have limited information from Andy Li, right, stuff that crossed into U.S. jurisdiction?

A     Yes.   We have limited insight into Andy Li.

Q     So, aside from his messages with Jinchao, we don't really have Andy Li's other communications, right?  There were some e-mails, right?

A     Yes.   I can't say too much more in an open forum.

Q     Can you tell me whether -- I don't want to get you in trouble, here.

A     I won't answer.  Don't worry.  You can ask.

Q     Maybe you're just so eager to go on with my theories, here (sic).  But in reviewing any of the communications involving Andy Li that may or may not have existed, did you find anything that conclusively dispelled Jinchao's belief that he was anti-Communist?

A     I don't recall reviewing things from Andy Li that discussed his views on Communism.

Q     If Jinchao was right, and Andy Li truly was anti-Communist, that would mean that Andy Li is not working to assist the Chinese government, right?

A     No, I don't think so.

Q     You think he could be an anti-Communist, but could be gathering information to benefit a Communist regime?

A     I think China is an authoritarian state, and if you

III-55

work for the government, you have to be a member of the Chinese Communist Party, and I think that people in China have differing views on the Chinese Communist Party, but that doesn't necessarily mean they don't support the government.

Q    Fair enough.

THE COURT:  Is this a good place to break?

MR. JONES:  Yes.

THE COURT:  Okay.  We'll be in recess until quarter to.  Please remember the admonition I gave to you earlier.

(Jurors exit courtroom.)

THE COURT:  You may step down.

We're outside the presence of the jury.  I've reviewed the jury instructions, and have prepared a set of jury instructions.  A couple of them have alternates in them, version one, version two, and so read these over carefully.  It covers the elements of the offense, and makes some modifications to the model instructions as warranted by the facts in this case.  I'll have my clerk give them to you.

And then the one juror said that her screen is not working, so we'll try to work on that, and Juror Number 11 and Alternate Number Two cannot adjust their seat height, and GSA may come in trying to fix it.

III-56

Also, for your commentary -- mostly you practice in state court, not federal court.  It's really -- the Government has not objected, but you put in a lot of your own commentary in speaking, testifying.  It's not really proper.

MR. JONES:  Sure.

THE COURT:  So make sure you be careful to not comment.  You're trying to gain the friendliness of the jury.  I understand that, but some of it really goes across the line.

MR. JONES:  Understood.

THE COURT:  Thank you.

MR. PARMLEY:  Your Honor, just if we can have an opportunity to review this, (indiscernible), before we discuss it, I'd appreciate it.

THE COURT:  What is "this"?

MR. PARMLEY:  The jury instructions.

THE COURT:  Yes, yes.  So I'm giving it to you today --

MR. PARMLEY:  Yes.  Thank you.

THE COURT:  -- and depending on how many witnesses we have, it seems like we're going to finish probably tomorrow, and do we have the witness coming from D.C.?

MR. PARMLEY:  Yes.

THE COURT:  And is Jayne Liu one of your experts?

III-57

MR. PARMLEY:  She was the linguist.  We listed her as an expert in an abundance of caution.  I don't know if you would characterize it as expert testimony.  I think I would.

THE COURT:  All right.

UNIDENTIFIED SPEAKER:  Yes.

THE COURT:  Okay.  Anything further right now?

MR. PARMLEY:  No, your Honor.

THE COURT:  No.  Okay.  Thank you.

I did want to flag, if we're back on the record, one of -- I had asked you, from the Chang May (phonetic) case that says that I instruct you, that these things are subject to -- and I've given two versions, one to say, "You're to decide whether it's public domain or not, and you're to decide whether it's subject," and then the other instruction, too.  So we haven't heard her testimony, but take a look at that, because the case reviewed for plain error, and so we can modify the one that I proposed, as well.

MR. BARRY:  Understood, your Honor.  We'll be ready to talk about it.  I think we'll probably propose some modifications, at least to the one we initially submitted, to make sure we're clear that we're not --

THE COURT:  And I added --

MR. BARRY:  -- injecting an issue.

III-58

THE COURT:  -- "The Government bears the burden," which is what comes from the case itself, but then I think we're probably better off having the jury decide, based on the evidence we hear.  I don't think -- on exporting, you can be on a Facebook page, but that means you still can't export it to another country without a license.

MR. BARRY:  Right.  I think -- when we get into this, I think it's going to be the -- there's this particular section in the regs, and they're sort of like "This is the way that it (indiscernible)."  There's two sub-elements.  One is the public domain piece, you know, that the jury has to find, and it's not in the -- that all of it is not in the public domain.  And then the first is the finding that the technical data is for the design, minimum, blah, blah, blah, blah, blah, of the defense article.  So we may be able to break it out, to just make it clear.

THE COURT:  Okay.  Thank you.

(Proceedings recessed briefly.)

THE COURT:  Still under oath.

BY MR. JONES:

Q    All right.  So, when we broke, we were talking about what we know about Andy Li, right?

A    Yes.

Q    On direct exam, there was a, I believe, mention of a

III-59

firewall.  Do you remember that?

A    I do.

Q    And that was in Exhibit 121, page -- looks like page six, and he says:

> "I just added you.  Take a look.  It's a Hong Kong number, makes it easy to bypass the firewall.  The VPN is not stable."

Do you remember testifying about that?

A    I do.

Q    And can you remind us what that firewall is?

A    Yes.  So the government of the People's Republic of China very strictly controls their citizens' access to the Internet.  It's sometimes referred to as a "firewall," and it prevents citizens there from accessing, generally, like the open Internet or the Internet here, kind of like how we would consider the Internet, I guess.

Q    Okay.  If Andy was an intelligence officer with the Chinese government, wouldn't he be able to circumvent that firewall?

A    What do you mean?

Q    Like, wouldn't the firewall not pose an issue to him if he was in a position of power with the Chinese government?

A    I guess I don't know.  I mean, he did -- he was able to get around the firewall.  That's what he was talking about.

III-60

Q    But he had to instruct Jinchao to switch to something else to get around the firewall, right?

A    Yes.

Q    So it suggests that there was an impediment, even to Andy Li, posed by this firewall, right?

A    Yes.

Q    Talking about the Telegram messages, which I think are all in Exhibit 120, I believe you testified on direct exam that when Andy would have Jinchao create these receipts and provide them, that gave Andy some kind of a leverage over Jinchao, right?

A    Yes.

Q    To your knowledge, Jinchao didn't delete any of the Telegram messages containing the receipts, right?

A    No, he did delete Telegram messages containing receipts.

Q    If we were to compare -- strike that.

    When officers or agents went into Jinchao's apartment, they found a notepad, right?

A    Yes.

Q    And that notepad had all of the paper copies of the receipts, right?

A    Some of the receipts, not all of them, but yes, there were copies.

Q    How do you know that not all of them were in paper

III-61

format?

A    Well, when we looked through the notebook, we only found some of the receipts, and then, when you look at the Telegram communications, we see the Defendant sending screenshots of other handwritten receipts that we didn't find the originals of.

Q    And you were able to -- well, let me ask this.  Are you saying, then, that there's receipts that we -- that you know exist, based on the PayPal history -- that we don't have a copy of, either digital or paper?

A    No.  So there are copies, digital copies, of those receipts in the Telegram chats.  We didn't find physical hard copies of all of the receipts.

Q    So, for every PayPal transaction, there is a non-deleted Telegram copy of the corresponding receipt, right?

A    I believe so.  The vast majority.  I want to be careful to say "all," but I believe we have all of them, yes.

Q    So wouldn't that then suggest that Jinchao did not delete the Telegram messages containing those receipts?

A    No, he did delete them.  So we see those receipts in the Telegram communications from the first time we imaged his device, and that was covertly.  We didn't know that -- he didn't know that we did that.  When we reviewed the Telegram messages at the time of arrest, when we imaged his

III-62

phone a second time, all of those messages had been deleted except for just a little bit right before the arrest.

Q    So, from the period -- well, Jinchao first met Andy in February of 2022?

A    That's right.

Q    And then you got his phone in, let's say, January of 2023?

A    Yes.

Q    And at that time, all of the Telegram messages were intact, right?

A    Yes.  It appeared that yes, the Telegram messages were there.

Q    And then, later, Andy instructed Jinchao to start deleting stuff, right?

A    That's right.

Q    And it was after that directive from Andy to delete stuff that you noticed things were missing, the second time you got his device?

A    Yes, that's what it appears.  That's what appears to have happened.  When we imaged his device the second time, we see Andy instructing him to delete his Telegram chat history, and there is no Telegram chat history.  So those chats we initially found are gone.

Q    Is it fair to say that, as of the time the FBI got hold of Jinchao's phone, in January 2023, that Jinchao hadn't

III-63

been -- it didn't appear that he had been deleting messages with Andy?

A    Outside of that posting on Baidu (phonetic), I don't think they discussed deleting anything else, and it did seem like that chat history was there, yes.

Q    And regarding the Baidu posting, Andy told Jinchao to delete that, right?

A    That's right.

Q    Did it surprise you to find the paper copies of those receipts in Jinchao's apartment?

A    Yes.

Q    Do you handle a lot of spy-type cases?  Could you estimate -- trying to figure out where this -- can you estimate the number of espionage-related investigations you've worked on?

A    I would say dozens.  I'm on a squad that specifically focuses on espionage investigations.

Q    And is that something that you usually see, is somebody keeping handwritten records of their communications with a foreign agent?

A    There's a wide variety.  It just depends on the case.

Q    Did some of these things surprise you, like Jinchao having all zeroes for his password?

A    Yes, that was a surprise.  I didn't -- yes, it was.

Q    There were discussions about Andy and Jinchao

III-64

potentially meeting up in the future, right?

A    Yes.

Q    And Andy was essentially saying, "I'll pay for everything if you ever want to come out to China.  I'll get you a hotel and pay for the airfare," stuff like that?

A    Yes.

Q    Jinchao never -- aside from sort of like "Okay," he never expressed any desire to take him up on those offers, right?

A    No, he didn't affirmative ask to travel to China.

Q    And in one of those messages, Jinchao even says, "That would be like a long way off," or something like that?

A    Yes.  I think he talks about the paperwork that he would have to do to do that.

Q    I want to talk to you about the payment history. Jinchao never made any requests for payment, correct?

A    No, not in the communications I reviewed.

Q    It was always Andy offering money, right?

A    Yes.  Yes.  Andy would pay him, and talk about paying him.

Q    Either saying, "I want to pay you," "I'm going to pay you," or just paying him, right?

A    Yes.

Q    So sometimes he would just send -- I think initially he -- strike that.

III-65

He asked for PayPal information, right, and then he sent the money to Jinchao?

A    He did.

Q    And that first 5,000, there was no negotiation over that dollar amount, right?

A    No.

Q    Jinchao never said, "Hey.  I'll give you this, but I want $5,000 in exchange," right?

A    No.  I mean, he did say at one point that he didn't want to do, you know, work for nothing, I think, but, other than that, I can't think of him bringing up the payment.

Q    He said that to his mom, though, right?

A    I would have to go back and review the chat, which chat that came from.

Q    Occasionally, when Andy would pay Jinchao, Jinchao would respond with things like "You shouldn't have, bro," right?

A    Yes, I think he did respond that way.

Q    Or say, "You're too kind"?

A    Yes.

Q    At one point, Andy says, "I'm going to start" -- "Instead of paying you 300, I'm going to start paying you 339, to cover, like, your Red Bull budget," right?

A    Yes, I remember that.

Q    And Jinchao basically says, "I don't drink Red Bull.

III-66

You don't have to pay me that extra money for Red Bull"?

A    Yes, he says that.

Q    And I mentioned this on the 5,000, but it would apply to all these payments, right?  There was no negotiation over the amount of money being paid, right?

A    I didn't see that in the communications that I had access to.  I didn't have access to their phone calls, but I didn't see that in what I reviewed.

Q    Okay.  Now, but -- and the -- what you did have was the text messages, and on those, it was always Andy setting a price, right?

A    That's what it seemed like, yes.

Q    When was it that you got the subpoenaed records for Jinchao's bank records?

A    I would have to review the records to look at the exact date.

Q    Do you recall if it was around the same time for the subpoenas to T-Mobile and Apple and Google?

A    I assume so, but I would have to review the records.

Q    Okay.  One second.  Unless you know, Exhibit, looks like, 32D --

          UNIDENTIFIED SPEAKER:  32.

          MR. JONES:  32.

          THE WITNESS:  Yes.  These are his Navy Federal records.

III-67

BY MR. JONES:

Q    Okay.  And is there anything on here that shows when they were obtained by the Government?

A    I don't see anything.  It probably would have been in sort of like the business record certification.  I'm not sure.

          THE COURT:  Stipulation?

          THE WITNESS:  Yes, I think maybe in the stipulation.

          THE COURT:  Do we have --

          MR. PARMLEY:  We'll certainly stipulate to whatever date they came in.  I just -- let me find it.

          THE WITNESS:  These returns, at the bottom, they're dated July 28th, 2023.

BY MR. JONES:

Q    That would have been just a few days before the arrest, right?

A    Yes.

Q    To your recollection, did the bank records come in later than all the other stuff?

A    I don't recall.  I will say it's possible that we did multiple subpoenas to the bank, and this is a copy of the most complete volume of records that we have.

          MR. JONES:  This is 32C (indicating)?

          UNIDENTIFIED SPEAKER:  Yes.

III-68

MR. JONES:  All right.  Can we -- you want me to do it for the witness or just --

THE WITNESS:  You said 32C?

UNIDENTIFIED SPEAKER:  She's got it in the book.

BY MR. JONES:

Q    Yes.  Let's flip to 32C.

A    I have it right here.  Okay.  Yes.

Q    And what is 32C?

A    This is a certification statement from Navy Federal Credit Union.

Q    All right.  And what's the date on that?

A    This was executed on October 14th, 2022.

Q    All right.  And does that sound about right, about when you and your colleagues got your hands on Jinchao's bank records?

A    Yes, sure.  That seems right.

Q    Would you agree that there's not a lot of movement of money in his bank records?

A    Yes, I think that's right.

Q    So you can obviously see money coming from Andy, from a couple different sources, right?

A    From PayPal, yes.

Q    But no money going to, like, Chinese political endeavors or anything like that, right?

A    No, I don't think so.

III-69

Q    Were there any other financial transactions that seemed suspicious to you?

A    No.

Q    I know that there was the purchase of the car, which we understand came -- the money went from Andy to Jinchao, and he used it to buy a car, right?

A    Yes.

Q    And that was of interest to the FBI?

A    Yes.

Q    But, beyond that, there was nothing salacious about his financial activities, right?

A    No, there wasn't.

Q    Looking at Exhibit 120, page 10, this is the Telegram messages, and I'll read from the last line.

A    Sorry.  Would you mind saying the date on those?

Q    April 17, 2022.  So this would have been before Jinchao's financial records were subpoenaed, right?

A    Yes.

Q    And this would have been -- these messages were discovered in the December 2022, January 2023, time frame, right?

A    The messages in here, yes, came from the image of his phone in January 2023.

Q    And this specific message I'm looking at is dated from April of 2022, right?

III-70

A    That's right.

Q    And his says -- Andy is saying, "Okay.  I have funds in Los Angeles.  It's easy to transfer money.  Take care." Right?

A    Yes.

Q    You testified on direct exam that you were able to get some of Andy's iCloud and Google stuff when it was coming from a server operating within U.S. jurisdiction, right?

A    Yes.

Q    Did your office make any effort to subpoena Andy's financial records that would have been related to his money in Los Angeles?

A    I didn't send any subpoenas targeting financial accounts of Andy's.  I'm not sure we had any information that he had U.S. bank accounts.

Q    When he says that he has funds in Los Angeles, "It's easy to transfer money," that would suggest that he has some kind of an electronic account in the United States, right?

A    I think it could mean an electronic account or a -- I think it could mean that he has the ability to get money in Los Angeles.

Q    So, when he's saying that "I have funds in Los Angeles. It's easy to transfer money," you don't agree with me that that strongly suggests that he has money in an account in California?

III-71

A    Based on my knowledge of the investigation, no, I don't.  I don't think that.

Q    Was there any subpoena to PayPal for Andy Li's financial records, or just Jinchao's?

A    We subpoenaed Jinchao's PayPal records, and we subpoenaed PayPal records related to the accounts that paid the Defendant on behalf of Andy.  I am not aware of Andy having a PayPal account in his true name.

Q    At any point in this investigation, did you obtain financial records for Andy Li?

A    I did not obtain financial records for Andy Li.

Q    Would you agree that that would be helpful in determining who Andy Li is and what his motives are, to be able to see his financial transactions?

A    Yes.  Yes.  I would love to see the financial records for a Chinese intelligence officer.

Q    Alleged.

A    Yes.  I'm sorry.  Alleged.

Q    How much work-up did you and the team do about Jinchao's connections to the country of China?

A    We looked into the foreign contacts that he had disclosed.  We, you know -- you know, we looked into it.  You know, we didn't find a lot of evidence of him having other contacts in China.

Q    And when you say, "The contacts he disclosed," that's

III-72

talking about the names he provided after he was arrested, right?

A    Yes, and I believe he also provided some names in his SF-86 when he applied for the Navy and security clearance.

Q    Like professional references or --

A    No.  So, when you go through your SF-86, you have to provide the names and contact information of all of your close and continuing foreign contacts.

Q    Got it.  And so, during the course of the investigation, you looked into those individuals listed on the SF-86?

A    Yes.

Q    And there was nothing concerning there?

A    No.

Q    Do you recall, in Jinchao's communications with Andy -- let's flip to WeChat.  Is that right?  One second.  Sorry. Yes.  Exhibit 121, and let's go to page 19.

A    Would you mind telling me the date?  This copy doesn't have page numbers.

Q    Yes.  No problem.  It's going to be the whole page, but September 4, 2022.  Sorry.  And there's 22 pages, total, so --

A    Got it.

Q    -- if that helps.

A    Yes.

III-73

Q    I'm just going to read this.  Andy says:

"Another thing.  The Mid-Autumn Festival
is almost here.  If there is anybody
here in China that you would like to
send a Howata (phonetic) gift, give me
the person's address and contact method,
and I can courier it from Shanghai.
During the pandemic this year, much of
my annual budget remains unused during
the first half of the year.  I will need
to get a move on and spend some money.
There is no need to thank me."

You can see that, right?

A    I do.

Q    And so Andy basically said, "If you know anybody over here in China that I can give gifts to, let me know.  I'm trying to spend money to help you out," right?

A    Yes.

Q    And Jinchao responds, "I don't really stay in touch with my relatives in China.  You're being too kind," "rolling on the floor laughing" emoji.  Andy presses on, "Then what about friends from school, especially the girls? Hah-hah."  Jinchao:  "I was too young when I left China," "rolling on the floor laughing" emoji:

"I didn't have any female classmates.

III-74

If you hadn't mentioned it, I'd forgotten that it's the Mid-Autumn Festival."

Messages like this, this suggests that Jinchao hasn't really retained any connection with China, right?

A    It certainly doesn't seem like he stayed in touch with friends or relatives in China.

Q    No friends, no relatives, and he's forgotten that there's a festival going on, right?

A    Yes, that's what he says.

Q    And this is consistent with -- all of the other messages contained in his devices that have been subpoenaed show that Jinchao didn't have any, like, ongoing allegiance or loyalty to China, right?

A    I mean, he -- I think that, in the review of the messages, you know, he doesn't talk a lot about China, but I don't know that I can make an assessment about his allegiance to the country based on that.

Q    That's fair.  There's nothing in these messages, like, glorifying China, right?

A    I think that's right.

Q    He never says that he misses China, right?

A    No.

Q    He never says, you know, "This is something in America that I don't like.  It's so much better in China," or

III-75

anything like that, right?

A    Not that I recall.

Q    We talked earlier about the reasons why you are convinced that Andy Li is Chinese intelligence, and a big part of that is the documents you obtained from his iCloud and Google subpoenaed records, right?

A    Yes.

Q    And, again, that's the, like, scripts, and the profile showing that he's active duty?

A    Yes.

Q    To your knowledge, Jinchao never had access to those documents, right?

A    That's right.

Q    And, again, Jinchao, in all of the documents we've discussed, never expresses any certainty about who Andy -- who he works for, right?

A    What do you mean by that?

Q    His speculations to his mom, to Rafael Chang (phonetic) -- I don't know if there's anybody else -- are unclear when he talks about Andy Li is, right?

A    I think I would disagree with that characterization.

Q    What --

A    I think he tells Rafael Chang that he's on the radar of a China intelligence organization, and that seems pretty clear to me.

III-76

Q    Yes.  Right.  So that's the very beginning.  He says, "I think I'm on the radar of Chinese intelligence.  Hah, hah, hah," right?

A    Uh-huh.

Q    There's a bunch of laughter throughout that discussion, right?

A    Yes.

Q    And then let's talk about that for a second, and that's the message where he says -- that's -- I don't know if I have the exact quote, but that's where he says, "It's clearly fucking espionage," or "obviously fucking espionage," right?

A    That's right.

Q    And the preceding line to that -- we can look at Exhibit 123, but immediately before saying, "It's clearly espionage," he says, "I can't take this one.  It's clearly fucking espionage," right?

A    He says that, yes.

Q    And then he says something similar to Andy Li a couple days later.  He says, "Sorry, bro.  I can't do that job." Right?

A    That's right.

Q    And to your knowledge, he never did that specific job that Andy was requesting, right?

A    What job are you referring to?

III-77

Q    The one he was talking to Rafael Chang about, about walking the pier every day and creating an Excel spreadsheet of the --

A    I don't know if he did that or not.

Q    We have a lot of records here.  That's fair to say?

A    Uh-huh.

Q    And there's no evidence in any of these records that he did that specific job, right?

A    I mean, I would have to go through -- let me -- sorry. I'm just going to look back at the chats.  I thought that they might have discussed it, but I never found that Excel file, if that's what you're asking.

Q    Sure.

A    Okay.  Yes, I guess you're right.  He says on the 22nd, "I can't take this job," if you're referring to that, walking the piers.

Q    And at least at one other time in his communications with Andy, he says, "I can't do that.  That could be viewed as espionage," right?

A    Yes.

Q    And you're a lawyer, or you were a lawyer, right?

A    I am a lawyer, yes.

Q    You went to law school.  You got legal training. Jinchao is not a lawyer, right?

A    No.

III-78

Q    And you'd agree with me that "espionage" is a legal term?

A    I don't know that I would agree with that.

Q    Would you agree that it is both a legal term and has a lay definition?

A    Yes.  I think there's a pretty standard definition of "espionage," but, if you're referring to, like, the Espionage Act and the elements of the crime that we're talking about here, then yes, there's a -- there are -- you know, there is an Espionage Act.

Q    Right.  So a layperson could be talking about espionage, and they aren't necessarily saying that whatever they're describing checks all the boxes of the legal definition, right?

A    Sure.

Q    And so, during the interview with Jinchao Wei -- I'll rephrase.  You or Chris --

A    I think it was Chris.

Q    -- asked, "What does this look like?"  And he says, "Espionage," right?

A    Yes.

Q    And to you, that's not him forming a legal opinion based on the Espionage Act, right?

A    Yes.  I guess I couldn't say, but no, I assume he is using his knowledge of what espionage is.

III-79

Q    And a more, like, colloquial light?

A    Sure.

Q    I believe, on direct -- so let's go to the tech manuals and stuff.  When you said that he definitely sent Exhibit 201, the Weapons Systems Manual, to Andy Li --

A    The Weapons -- sorry.  Yes.  The Weapons System Manual?

Q    Yes.  Is that -- your understanding is that Jinchao sent Exhibit 201 to Andy Li?

A    Yes.  That's what he said when we interviewed him after his arrest.

Q    And he also was saying, "I think I sent like 15 manuals," right?

A    Uh-huh.

Q    And there was asking, "Were those tech manuals?  Were they Weapons System Manuals?"  Right?  There was questions by the Government?

A    Yes.  We were asking about what he did to receive that $5,000 payment in June of 2022.

Q    Do you have physical confirmation of some type showing exactly which manuals he definitely sent to Andy Li?

A    So I guess, like, when we were reviewing manuals that we found on his computer during his post-arrest statement, yes, we made a sheet of the ones that he said he passed.  If you're referring to, like, in the evidence of this case, the manner in which he transmitted documents was through those

III-80

temporary websites, so no.

Q    And so, when you made a list of the ones that you believed that he sent to Andy Li, did he provide -- did Jinchao provide you the specific name of those manuals?

A    So I will say, in our post-arrest statement, we had a copy of the technical manuals that he had on his personal MacBook.  So we went through the manuals on that specific device, and took the titles of the manuals as they were on that device, and made a list of the ones that he said he passed.  I don't think that's necessarily a complete list of the manuals he passed.  It's just the ones that were on his computer at the time of his arrest.

Q    And when you say, "The ones he said he passed," how specific was Jinchao in describing the ones he passed?

A    I would have to look back on the sheet.  I think some of them he said yes, and some of them he said, "I think I may have" or "I passed an older version of this manual."

Q    When you said -- when you referred to a list, is that -- any chance it's this one (indicating)?

A    That is not the list that we made in the post-arrest statement, but that is a list of the manuals I believe he provided.

Q    Okay.  I don't want to confuse the lists.  Let me just show this one to you, though.

A    Sure.

III-81

THE COURT:  Do you want to mark it?  I think you need to mark it.

MR. JONES:  Sure.

THE COURT:  You don't need to offer it, but you need to mark it.  Defense 1?

MR. JONES:  Do you want 1 or A?

THE COURT:  A is fine.  Either.

MR. JONES:  A.

BY MR. JONES:

Q    Showing you what I just marked Defense A for identification purposes.  Do you recognize that?

A    I do.

Q    And what is it?

A    This is list that I made -- or that I -- I don't know if I specifically made this list -- of the manuals that we believed he had provided to Andy Li.  This was created prior to his arrest.

Q    And what was the basis for your belief that these manuals were passed?

A    So, as we discussed in my testimony before, we thought that he had passed 30 manuals in June of 2022.  We had found a screenshot of about 30 manuals, and so, based on the evidence from around that time, and based on the fact that Andy said, "You sent me 30 things, about one-third of which is useful," we thought those were the 30 that he had passed

III-82

on June, so these are on that list.

The others on the list are the technical manuals that he sent from his military e-mail address to his personal Google account in August of 2022, and then the Weapons Control System Manual, which we found -- the Weapons Control System Manual, which we found in his iCloud, and then I believe these are just other manuals that we found when we were reviewing the Defendant's iCloud, that we found saved there.

Q    You mentioned that Andy had referred to 30 things that Jinchao sent?

A    That's right.

Q    Is that -- I'm looking at Exhibit 120, page 23.  It's a June 6, 2022, message.

A    June 6th of 2022?

Q    Yes.

A    Yes.

Q    And so are you referring to the message where Andy says:

"Until this evening, I searched up to 30 things you sent me.  Two-thirds of them can be found on the Internet.  It's okay.  At least I got one-third of it that I can learn from"?

A    Yes, that's right.

III-83

Q    So he says, "Thirty things," right?

A    Yes.

Q    He wasn't saying, "Thirty manuals"?

A    Right.

Q    And it's your belief that there was a screenshot of like 30 tech manuals that was obtained at some point, and that you believe there's a correlation or a connection between that screenshot and the number 30 here?

A    I do.

Q    Jinchao was also sending things like photographs, right?

A    Yes.

Q    And some of them were just, like, pictures of the water when he was at sea, right?

A    Yes.

Q    Or things like Fleet Week, which -- where it was a public event, right?

A    Yes.

Q    Is there any confirmation that the 30 things that Andy had received that he's referring to in this message are, in fact, tech manuals?

A    Well, in his post-arrest interview, the Defendant told us that he sent these manuals to Andy.

Q    Right.  And then he tried to identify specific manuals, right?

III-84

A    Yes, these 30.

Q    And this -- so this had all happened on or before June 6, 2022, right?

A    That's right.

Q    And he's arrested on August 2nd, 2023, 14 months later, right?

A    Yes.

Q    And so, 14 months later, he is trying to recall from memory the specific manuals that he passed, right?

A    That's right.

Q    And that's what the Government used to make this list of what the Government believes Jinchao provided to Andy Li, right?

A    That's not how I made this list, specifically --

Q    Understood.

A    -- but yes, I take your point.

Q    But there's no -- we don't have conclusive records of specific manuals going from Jinchao to Andy Li, right?

A    Yes.  Because of the way that they transmitted documents through those temporary websites, I don't have those records.

Q    Right.  So our best assessment -- I don't want to say "guess" -- our best assessment of the specific materials that were transmitted from Jinchao to Andy Li comes from Jinchao's recollection on the day of his arrest.  Is that

III-85

fair?

A    I would say that's partially correct.  I think one other additional piece of evidence would be that Andy Li did a Google search for the citation of one of the manuals, which, to me, confirms that he did receive that manual, or is good evidence that he received that manual.

Q    Do you recall which manual that was?

A    The Propulsion Operating Guide.

Q    Do you by chance know which exhibit that would be?

A    I don't have a list in front of me.

Q    It's okay.  We don't need to worry about it.

A    (Indiscernible) somewhere.

Q    In or around January of 2023, when you got your hands on Jinchao's iCloud, Google, and Facebook stuff, did you do a count of the total amount of military manuals that he had?

A    We certainly -- I believe we made a list of them.  I don't know that -- like, what the count is, off the top of my head.

Q    Would you say it's in the hundreds?

A    No, I don't think so, not from his iCloud and his phone.

Q    And did you make note of all the people that he had been sending tech manuals to?

A    No.  Well, and I guess I would have to go back.  I'm not sure who else he was sending tech manuals to.

III-86

Q    Are you familiar with the name Dominic Bell (phonetic)?

A    No.

Q    How about Diego Molina (phonetic)?

A    No.

Q    Wes Eschrich (phonetic)?

A    No.

Q    And then the three -- Machinist Mate Third Class Nuna (phonetic)?

A    No.

Q    Did you review any of the transfers or messages containing tech manual transfers between Jinchao and any of those individuals?

A    No, I'm not -- no, I didn't review that.

Q    Do you review any messages containing evidence of transfer of tech manuals between any of -- Jinchao and any of his colleagues?

A    I just -- I don't recall.  I mean, I know we reviewed his devices, and there were chats, but I personally wasn't -- I don't remember reviewing that.

Q    Did you become aware of any other transmissions from Jinchao to other individuals of tech manuals and weapons manuals or anything like that between May of 2022 and June of 2023?  Did you review anything that showed that?

A    I don't recall.  I don't -- I mean, I don't recall any, no.

III-87

Q    When you --

A    From -- sorry.  From where?

Q    From his iPhone or his -- let's see.  Do we have Exhibit 53?  Just pause.

A    Is that going to be like the actual --

MR. JONES:  53 is not in evidence, is it?

MR. BARRY:  It is, but it's a forensic image of the phone.  So it's just a --

MR. PARMLEY:  Whole bunch of data.

MR. BARRY:  Yes.

MR. JONES:  Yes.

MR. PARMLEY:  Physical device.

MR. JONES:  One second.  Mind if I confer with counsel?

(Pause.)

THE COURT:  Do you show 53 in?

BY MR. JONES:

Q    In your binder, does it say what Exhibit 53 is?

A    I think that's the actual image of the phone, right?

Q    Yes.

A    Like a thumb drive.

MR. JONES:  All right.  Permission to approach?

THE COURT:  You may.

MR. JONES:  Let me put a tag on these.

THE COURT:  Why don't you call it 53A.

III-88

MR. JONES:  So, if it's all right the Court --

MR. PARMLEY:  Quick sidebar?  I don't want to --

THE COURT:  You want to do Defense B?

MR. JONES:  I was going to do B, dash -- there's numbers on the filings, but then there's more than what I have here.  So, in case the Government wants to bring in the other ones, I'd rather do B4, B6.

THE COURT:  All right.  That's fine.  Can we call it Defense 53B, 4, 5, 6, or whatever?  Or you just want --

MR. JONES:  Yes, that makes sense.  I would request just 53 dash four, or point four.

THE COURT:  Okay.  All right.  And put it "Defense 53-4."

Any objection?

MR. PARMLEY:  No.

MR. JONES:  And then, while I'm at it, I'm going to mark what I have as 34-4.

THE COURT:  All right.  You want to call it "Defense 34-4"?

MR. JONES:  I'm sorry?

THE COURT:  Do you want to call it "Defense 34-4"?

MR. JONES:  Yes.  These all have defense stickers.

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  (Indiscernible.)

THE COURT:  No, you're fine.

III-89

(Witness proffered document.)

THE WITNESS:  Thank you.

MR. JONES:  And then this (indicating) is 34-4, which is from the separate things.

And you have everything?

MR. PARMLEY:  I think so.

BY MR. JONES:

Q    If you could just look quickly over the -- I think I gave you 53-4, 53-6, dash 10, and dash 12.  See those?  If you could look over those quickly.  Do you recognize those?

A    Not specifically, no.

Q    Does that look -- those look like anything that you reviewed during your investigation, after you had Mr. Wei's phone imaged?

A    No, I don't recall.

Q    Would you agree that these appear to be messages between him and his colleagues?

A    Yes.

Q    And would you agree that -- let's look at 53-6.

MR. PARMLEY:  I'm sorry.  Did you say, "53-6"?

MR. JONES:  Six, yes.

BY MR. JONES:

Q    Would you agree that that's a message between Jinchao Wei and Dominic Bell, where Jinchao is sending Dominic safety manuals?

III-90

A     Yes.

Q     And then, looking at 53-12 -- well, let's stick with the single-page ones, here.  53-12, would you agree that that's Jinchao sending Machinist Mate Third Class Nuna all the tech manuals?

A     You know, so I actually do recall this.  This is a link to a Google Drive account, and I do think we sent a subpoena to Google for the owners of this Drive account, because yes, that "MM" kind of corresponds with that MM BIB (phonetic) folder, but we weren't able to see what was in it.

Q     Understood.  Do you know why that was?

A     No.  I just think we didn't get back the actual content of the drive.

Q     Did you, through any other means, determine what was contained in that drive?

A     No.

Q     Looking at 53-4, this one is a little bit longer.  I'm going to take a minute to just kind of flip through it. important refer more to the -- I think it's like 30 pages, but the second half of it.  Would you agree that this message contains -- it shows Jinchao sending someone named Wes Eschrich tech manuals, and suggesting that Wes should be -- should study them for his exams?  And I can probably give you -- I know they're not numbered by page, but --

A     Yes.  Just give me just one minute.

III-91

Q    I'll just tell you right now I'm looking at page 19 of 33, and I apologize.  They are -- the pages are not numbered.

A    Yes.  Yes.  All right.  Hold on.  You said 19?

Q    Nineteen.  The top line is the word "Body," colon, and then a crying and laughing emoji.

A    Like the "That's pretty much like hey (sic)," that line?

        THE COURT:  Do you want to come find it?

        MR. JONES:  Yes.

        THE WITNESS:  Sorry.

        MR. JONES:  I'm so sorry.

        THE WITNESS:  No, you're fine.

        MR. JONES:  (Indiscernible.)

        UNIDENTIFIED SPEAKER:  (Indiscernible.)

        MR. JONES:  Well, there's a lot of those.

BY MR. JONES:

Q    Okay.  No, just -- you're reading from here (indicating).

A    Yes.

        MR. JONES:  And (indiscernible) what I was talking about?

        MR. PARMLEY:  No, but go ahead.

        MR. JONES:  Okay.

        MR. PARMLEY:  Don't wait for me.

III-92

BY MR. JONES:

Q    So, on the lower third of that page, do you see there's side-by-side "crying" and "sweater" smiling emojis?  I'm looking immediately below that.

A    Yes.

Q    And this is from February 25, 2023?

A    Yes.

Q    And it's from Wes Eschrich, and it says:

        "Wei, remember the pick you airdropped

        me?  How did you get the documents for

        it?"

A    Yes.

Q    And then, going down to the top of the next page, there's a message from My MacBook, and it --

        MR. PARMLEY:  Objection, this is not in evidence, your Honor.

        THE COURT:  53 is in.

        MR. PARMLEY:  That's true.  Okay.

BY MR. JONES:

Q    Looking at it, it says, "Shared drive," and that would be Jinchao responding, "Shared drive," right?

A    Yes.

Q    And then they go on to talk about all the tech manuals should be under the SGPI folder.  Do you see that?

A    I do.

III-93

Q    Do you know what the SGPI folder is?

A    No.

Q    Go down to the next page, please.  I'm looking at --

MR. PARMLEY:  Excuse me, Counsel.  Could you give me the date and time?  That would be helpful.

MR. JONES:  Yes.  So now I'm -- well, the last one I mentioned with SGPI was February 25, 2023, at 11:56, and that's on page 20.

MR. PARMLEY:  Thank you.  That's helpful.

BY MR. JONES:

Q    And then, going down to the next page, February 25, 2023, at 11:59, Jinchao says to Wes Eschrich:

"I would suggest read those every day, because I know damn well they are not going to train us."

Do you see that?

A    I do.

Q    And were you generally familiar that the sailors would use these tech manuals for training and education?

A    Yes.

Q    And Jinchao, I think, correct me if I'm wrong, but, during the post-arrest interview, mentioned that he would use these materials to study, right?

A    Yes.

Q    And so these Facebook messages confirm that there was

III-94

an element, at least, of using these tech manuals for studying purposes, right?

A    Yes.

Q    Did you see in the iPhone image that there were other -- in addition to the tech manuals, there were other, like, study guides and things like that in his files?

A    Yes.

Q    And those were all kind of intermixed?

A    They were stored on his -- yes, his iCloud drive, but yes, they were manuals and study guides, and like practice test kind of stuff.

Q    Exactly.  And then there were even some that had, like, the answers, like answer cheats, right?

A    Yes.

Q    All right.  Now I'd like to turn your attention to 34 -- what did I call it, 34-4?  I think it's the spreadsheet that I put at the top of your desk.

A    Okay.

        MR. JONES:  And then does the Government --

        MR. PARMLEY:  I have that.  Thank you.

BY MR. JONES:

Q    Do you recognize this document, by chance?

A    I mean, not off the top of my head, but I can see it's a text message between the Defendant and another person.

Q    And I'll note -- hang on.  Would you agree that this is

III-95

a -- appears to be a message between someone named James Parlow (phonetic) and Patrick Wei?

A    Yes.

MR. JONES:  And is 34 in evidence?

THE COURT:  That's what I was checking.  Yes.

MR. PARMLEY:  Yes.  We'll stipulate this came from his -- the iCloud records.

THE COURT:  All right.

BY MR. JONES:

Q    So it says:

"I'll try my best MM (phonetic), too,
LOL.  I hope they send me to Boxer to
get my underway crawls," emoticon,
"rolling on the floor laughing," "and
with the "Parlow's Way to Success
binder, and all the tech manuals I've
saved from the shared drive, it
shouldn't be too bad," emoticon,
"rolling on the floor laughing," "but
right now I'll probably focus on my
in-rate knowledge, so I can do well on
the next March E-5 exam."

Does that indicate a discussion about studying for some test?

A    Yes, and that the Defendant saved tech manuals from the

III-96

shared drive.

Q    Correct.  So he had saved tech manuals from the shared drive, and then he said he also had received "Parlow's Way to Success" binder, right?

A    Yes.

Q    And he felt confident that, if he studied everything in "Parlow's Way to Success" binder, and all the tech manuals, that he would do well on his exam, right?

A    Yes.

Q    Do you have any idea what "Parlow's Way to Success" binder is?

A    Not off the top of my head, but I'm going to be honest.  That sounds familiar.  But no, I can't recall.  I'm sorry.

Q    All right.  If you recall, interrupt me, and we can talk about it.

A    Yes.  No, I don't.

Q    Based on the fact that this says, "I'll try my best MM, too, LOL," would that suggest that James Parlow was a machinist mate second class?

A    Yes.

Q    This also mentions that -- Jinchao said that he hopes they send him to the Boxer.  That's another LHD, right?

A    It is.

Q    And he was saying that he wanted to get his "underway crawls."  Do you know what that means?

III-97

A     I don't.

Q     All right.  Having now gone over some of these exhibits, these documents from Exhibit 53, would you agree with me that Jinchao was kind of the guy that could supply tech manuals to his friends for studying?

A     I don't know if I would characterize it, just by my review of these messages, but yes, he was sending these tech -- a few of these tech manuals, yes, to his friends, it seems like.

Q     All right.  And then just quickly flipping back to 53-6, the date on this one is May 6, 2022, is the first message on this exhibit, right?

A     Yes.

Q     And this is where Jinchao appears to be sending Dominic Bell some kind of a safety manual, right?

A     Yes.

Q     So, as early as May of 2022, would you agree that Jinchao is distributing military manuals, at least to friends?

A     Yes.  This is -- yes.

Q     I'm sure --

A     This is from the -- so that -- sorry -- that picture from the iCloud of the MM BIB folder, this is one of those manuals.  Yes.

Q     Got it.  In this same -- well, do you remember seeing

III-98

any other chats in this same group of documents?

A    I'm sorry.  What?

Q    I can't remember, sorry, if you testified that you do remember seeing some of these during your investigation.

A    No.  I recall the Google Drive, and some of the communications about that, but I don't specifically recall seeing these messages.

Q    Got it.  Yes.  That's what it was.  Okay.  Moving on, I want to talk about -- you're a special agent with the FBI, working in counterintelligence, right?

A    Yes.

Q    You'd agree that espionage, anything even related to espionage, is pretty -- that's high stakes, right?

A    Yes.

Q    I almost overstepped my balance there.  Sorry.  Did you ever form a clear understanding of what Jinchao's motives were for working with Andy?

A    I have an assessment of what his motives are, but he didn't tell me what his motives was, no.

Q    He didn't tell you.  Did he tell Andy?

A    Not in the communications that I reviewed.  I don't think they talked about why he was doing it.

Q    How about when he talked to his mom?

A    I mean, I think he wanted to make money.

Q    Right.

III-99

A    I think that's what he told her.

Q    Did it seem, based on all the documentation here, that the primary incentive was to make some money?

A    Yes.  I think one of the main incentives was to make money.

Q    He also told his mom he wants to make his own way, right?

A    Yes.

Q    With regards to motive, is there any evidence in any of these binders or carts showing that one of his motivations was to bring down the U.S.?

A    No.  They didn't talk about wanting to bring down the U.S.  I do think the Defendant expressed some strong dislike of the U.S. Navy.

Q    There were two messages I saw which I didn't love, where he said -- I think one he said, "Fuck the Navy.  They make me work too hard," and another one where he said something similar, like "I hate my job right now."  Is that --

A    And "They won't bother looking for me because they're incompetent," basically.

Q    Aside from those -- so I think, together, it sounds like all these three messages, but, aside from those, was there anything where he just expressed disdain for the United States, or the United States Government?

III-100

A    I guess not outside of those messages about the Navy.

Q    And was there anything in either the e-mails, the texts, the chats, the wire-tapped conversations -- anywhere where he said he was trying to hurt the Navy, the U.S. Navy?

A    I mean, I guess not, outside of, you know, saying, "Fuck the Navy."

Q    Right.  There's nothing like him saying that he could sabotage the boat, or expressing an interest in doing that, right?

A    No, he doesn't discuss sabotage.

Q    And at multiple times, he downplays the significance of his role in the Navy, right?

A    Sorry.  What do you --

Q    At various times, he says things like "I don't" -- "The stuff I do isn't that important," or "I don't do the secret type of work," stuff like that?

A    Yes.  Yes, he does.

Q    And the only ship that he was assigned to during his active service was the U.S.S. Essex, right?

A    Yes.

Q    So, despite wanting to go out on the Boxer, to your knowledge, he never got moved to the Boxer, right?

A    No, he did not.

Q    And the Essex, as we know, as of September of 2022, was taken out of service, right?

III-101

A    Yes.  It was in dry dock.  It was being repaired and upgraded.

Q    And in some of those messages, he says that most of his work now is sanding and repainting?

A    Yes, that's right.

MR. JONES:  I probably have 10, 15 more minutes.

THE COURT:  Do you want to break now, or do you want to go 10, 15 more minutes and finish?

MR. JONES:  I don't -- let's go ahead and break now, if that's okay.

THE COURT:  Okay.  All right.  We'll take our lunch recess.  We'll be in recess until 1:00 o'clock. Please remember the admonition I gave to you earlier.

And for Alternate Juror Number Two, does your chair work?

ALTERNATE JUROR NUMBER TWO:  Yes.

THE COURT:  Yes.  Okay.  Great.  Thank you.

You may step down.

THE WITNESS:  Thank you.

(Jurors exit courtroom.)

THE COURT:  We're outside the presence of the jury.  Who will be your next witness?

MR. BARRY:  Jonathan Palis.

THE COURT:  Okay.

MR. BARRY:  U.S. Navy Chief Jonathan Palis.

III-102

THE COURT:  Thank you.  All right.

Anything right now?

MR. JONES:  Is there anything I need to clean up with those exhibits?  I apologize.  I kind of made a mess of that.

MR. PARMLEY:  I don't think so, but I'll take a look at them.

THE COURT:  All right.  Thank you.

MR. PARMLEY:  Are they up on the stand right now?

MR. JONES:  They are, and I've got another copy if --

MR. PARMLEY:  I just probably need to staple.  That's about it.

THE COURT:  And maybe, then, are you going to admit portions of them?

MR. JONES:  My understanding is they were already in evidence.  So I don't know how to --

MR. PARMLEY:  I would object to -- I mean, there's a lot of hearsay in there, a lot of irrelevant information in those particular messages.  I think that testimony was elicited about what messages he wanted to --

THE COURT:  So that's enough?

MR. PARMLEY:  In our view, that's enough, and we certainly didn't object to it.  It seemed, although there was some hearsay, potentially relevant.  But as far as

III-103

admitting that particular document, we would object to it.

THE COURT:  All right.  We can take that up later.

MR. PARMLEY:  Sure.

THE COURT:  All right.  Thank you.  We're in recess.

(Proceedings recessed to reconvene.)

III-104

AFTERNOON SESSION

--oOo--

THE COURT:  We're on the record outside the presence of the jury.  I have two proposed verdict forms on your desks, one that lists for the counts, I think, four through six, the specifics from the indictment, and one that just has it blank, and I didn't receive one from the defense.  So you can take a look at those and see if any modifications need to be made.

UNIDENTIFIED SPEAKER:  Understood, your Honor.

THE COURT:  Thank you.

You may bring them in.

THE CLERK:  Jury entering.

(Jurors enter courtroom.)

THE COURT:  Welcome back.  We're ready to proceed. I remind you you're still under oath.

LAURA WETTERER - PLAINTIFF'S WITNESS - PREVIOUSLY SWORN

THE WITNESS:  Yes.

THE COURT:  You may question.

CROSS EXAMINATION   (RESUMED)

BY MR. JONES:

Q    I think, when we left off, we were talking about the status of the U.S.S. Essex.

A    Yes.

Q    All right.  So, as of September of 2022, it was in dry

III-105

dock?

A     That's right.

Q     And it was expected to be out of service for at least a couple of years?

A     Yes, that's right.

Q     Do you recall messages involving Jinchao where he says things like "The Essex is a broken ship"?

A     Yes.  He does talk about the status of the Essex.

Q     And he also had made mention of wanting to be like a war veteran, right?

A     He does, yes.

Q     And he expressed interest in going out to sea?

A     Yes.

Q     So does it stand to reason that he was disappointed or maybe disillusioned in his job, being stuck on a vessel that was taken out of commission?

A     Yes, I think that's fair.

Q     And this time, September 2022, after fleet week, he comes back.  It's in dry dock.  This is prior to when the Government began its heavy surveillance operations of Jinchao, right?

A     Yes.  That was prior to us installing the microphone in his apartment and searching his physical phone.

Q     Which all happened between, like December 2022 and early 2023?

III-106

A    Yes, around then.

Q    And we've got a handle of phone calls.  It's Exhibit 125 through 129.  These are phone calls made by Jinchao when he was in his apartment, and they were recorded, and we have translations of those, right?

A    Yes.  Those are the translations of recording from the Defendant's apartment.

Q    And those took place between January 9, 2023, and March 19, 2023?

A    Yes.

Q    Does that sound right?

A    Yes.

Q    And so this would have been during the time of his service when he was still stationed on the Essex, but in dry dock, right?

A    Yes.

Q    And so his day-to-day work was working on a ship that wasn't in active operations, right?

A    Yes, that's right.

Q    And this is the time -- this is about the time when he's writing the articles to Andy -- well, hold on.  Do you know if there are dates attached -- or do you know the dates that he sent the various articles about, like, the training system and the crew living quarters?

A    I don't.

III-107

Q    Do you have any basis for when those would have been sent?

A    We found those papers written in Chinese when we searched the Defendant's hard drive at the time of his arrest.  We didn't -- because of the gap in communication, we weren't able to determine when he sent those papers, outside of the paper on the Weapons Control System.

Q    So those articles that he had written did not appear in the first imaging of his iPhone and iCloud in December 2022, right?

A    That's right.  Besides, I think they discussed the firefighting training and the firefighting paper, but I didn't those -- any reference to the other papers, I don't believe.

Q    And those -- but those did appear when you searched his phone in August of 2023?

A    No.  When we searched his hard drive, we found those papers.

Q    When was that search done?

A    That was on the day of his arrest.  Yes.

Q    Got it.  Okay.  So that would suggest, maybe not conclusively, that but that would suggest that those articles or some of those articles were written between January 2023 and August 2023.  Is that --

A    I think that's a fair assumption.

III-108

Q    And, again, that's the time when he's stationed on the Essex while it's in dry dock, right?

A    Yes.

Q    And during his post-arrest interview, he said that ChatGPT wrote those articles?

A    Yes.

Q    Did you make any effort to duplicate those, or try seeing how ChatGPT would write an article like that?

A    No, I didn't.

Q    You didn't go on ChatGPT and put something like "Write me a three-page article about the U.S.S. Essex and its weapons systems and amphibious landing abilities"?

A    No, I didn't.

Q    Okay.  How familiar are you with the capabilities of ChatGPT?

A    I would say generally familiar.  I'm not super familiar.

Q    Have you ever put prompts, obviously not exactly like that, but to test its capabilities and see what it could write with those --

A    I actually don't think I've used ChatGPT at all.  I've tried out some of the other AI tools, but not ChatGPT.

Q    How about like Claude or Gemini?

A    Yes.  Yes, Gemini.

Q    And are you more familiar with how that platform

III-109

functions?

A    I mean, generally, yes.  Again, I'm not -- I don't use it frequently.

Q    Have you ever experimented with it to see if it could write an article similar to what Jinchao generated?

A    No, I haven't.

Q    All right.  The term "spycraft" has come up a couple of times.  I think you've used it.  Is that right?  Have you used the word "spycraft"?

A    "Tradecraft"?

Q    "Tradecraft."  Can you describe kind of what that means?

A    Sure.  In my experience, tradecraft is essentially the techniques and tools that individuals use to conduct clandestine relationships, to facilitate this kind of spying activity, and to ensure that it's not detected.

Q    Would something that falls under tradecraft be using an alias?

A    Yes.

Q    Aside from Patrick, which I think is established was a very commonly used name for Mr. Wei, are you aware of any other aliases that Jinchao used?

A    No, at least not that he used regularly.

Q    In all of his communications with Andy Li, did he use any other names besides Jinchao Wei or Patrick Wei?

III-110

A    No.

Q    Did you identify any code words that he would use in his communications?

A    No, not specifically.

Q    Would you agree that that's somewhat common tradecraft?

A    I mean, code words would be an example of tradecraft. I'm not exactly sure what -- you know, in this context, what a code word would be used for, but, sure. You mean like code words for someone's -- what do you mean?

Q    An example I would use is, like, buying drugs. A drug dealer might say, "Hey. Do you want to buy some more shoes?" That's a made-up example, but would that fall under the, like, tradecraft umbrella?

A    Yes, absolutely.

Q    Did you see any evidence of Jinchao using identifiable code words for anything?

A    No.

Q    There was some discussion -- I think it was on your direct. I apologize. It might have been a previous witness. But you've been here for the whole trial, right?

A    Yes.

Q    You recall there was some discussion about Jinchao telling Andy that two of the other LHDs were damaged or out of operation?

A    I do.

III-111

Q    Was that on your direct?

A    Yes.

Q    Okay.  And that was the Bonhomme Richard and the Boxer, right?

A    I believe so, yes.  I think maybe the Tripoli.  I don't specifically recall.  I'd have to look at the chat.

Q    And you explained that there was like a fire on one, and a pipe issue on the other?

A    Yes.

Q    Would you agree that information about those incidents is readily accessible online?

A    Certainly the fire on the Bonhomme Richard is online. I would have to -- I don't think I have specifically looked up the issue with the Boxer.

Q    Are you aware that all these boats have Wikipedia pages?

A    Yes.

Q    Ships.  But they have Wikipedia pages, right?

A    Sure.  There's publicly available information on these ships.

Q    And Wikipedia and other websites, would you agree, detail what their, like, weapons arrays are?

A    I don't know.  I haven't specifically reviewed their Wikipedia pages for weapons locations.

Q    You're aware of publications like Seapower Magazine?

III-112

Are you familiar with them?

A    I haven't read that magazine.

Q    Would you agree that there's enthusiasts out there that have a particular, not necessarily nefarious, but an interest in naval vessels and their capabilities?

A    Yes, absolutely.

Q    There's people that have blogged about the differences in these boats?

A    Sure.

Q    Would you agree that a lot of the information, if not all, reflected in what Jinchao was sharing would be visible in some of these blogs and trade publications?

A    I don't think I would agree with that.

Q    Okay.  Are there specific things that you felt that Jinchao shared that would not be found on Wikipedia, trade publications, or Navy enthusiast blogs?

A    Yes.

Q    Can you expand on that?

A    Yes.  So I think, in particular, the, you know, full text of the Weapons Control System Manual for the U.S.S. Essex, the Propulsion Operating Guide for the U.S.S. Essex, Those, to my knowledge, are not publicly available.

Q    Are there certain elements of those publications that you felt were particularly sensitive, or just the documents in general?

III-113

A    So I guess I would say that, you know, kind of like what I feel is sensitive is not really something that is sort of useful in this case.  I mean, like, I'm not an expert on what is ITAR controlled and what is Arms Export Act controlled.  I found those manuals.  I believe that he passed them to an intelligence officer, and I wasn't able to find them online.

Q    Understood.  When Jinchao was arrested on August 2nd, 2023, he was cooperative, right?

A    Yes.

Q    He agreed to speak to you and NCIS without a lawyer?

A    Yes.

Q    He was advised that he had the right to remain silent?

A    Yes.

Q    But he agree to talk, anyway?

A    That's right.

Q    He even signed a waiver waiving his Fifth Amendment and Sixth Amendment -- his right to remain silent and his right to an attorney?  He waived those in writing?

A    Sure.

Q    Do you recall if he spent any significant time reviewing the language of that waiver before he signed it?

A    I don't recall.  I mean, I think it was on the recording.

Q    During the arrest interview, he unlocked his phone for

III-114

you and Mr. -- Agent Christian?

A    Yes.  Yes.

Q    And, again, he mentioned the availability of a lot of those materials on Facebook?

A    He did.

Q    But you did not go onto his Facebook to confirm that, right?

A    Right.

Q    And while you did look for a lot of materials, you did not use Facebook as one of the sources for them, right?

A    When I searched for the publicly available documents, right.  I primarily just searched on Google.

Q    Even though Jinchao had told you specifically that he got them from Facebook?

A    He told us that he got some of the manuals from Facebook, and he said that he got some from the shared drive of his ship.  We were aware that some of the documents that he provided were publicly available, and we were concerned with the ones that were not.

Q    Got it.  I think it's still up there, Exhibit -- I'm sorry -- Exhibit A, the list that you made?

A    Yes.

Q    Some of the sources that you checked to find some of those tech manuals and related materials -- one of them was Brainscape.  Is that right?

III-115

A    Do you know what page you're looking at?

Q    I'm so sorry.  I don't.

A    That's okay.  Sorry.  These are also my notes.  Yes. So, yes, I see the -- yes, Brainscape.com was, it looks like, one of the websites where at least this manual could be found publicly.

Q    And then there's also GovTribe, Navy Tribe, Coursera. Do you recognize those?

A    Yes.

Q    These aren't government-sanctioned or government-managed websites, right?

A    Not that I'm aware of.

Q    And there's Quizlet, was one of them?

A    Yes.

Q    Do you understand -- or have an opinion on what Quizlet is?

A    I mean, not specifically, no.

Q    And then I think the rest of them on there are universities, like University of Connecticut and BYU.  Did I miss any?

A    Sorry.  I'm just looking for University of Connecticut. I don't see that one.  Yes.  Well, yes.  I'm not quite sure what that means, but yes, said, "Maybe you can find it there."

Q    And so, when you were searching on these various

III-116

websites, you were able to obtain access to some of these materials which had restricted distribution rights, correct?

A    Yes, that's right.

Q    And you didn't have to show any kind of a security clearance to see them, right?

A    No.

Q    You didn't have -- you didn't need a CAC card?

A    No.

Q    Am I saying that right?

A    Yes.

Q    Did you use -- did you look at any other websites, such as -- just wanted to know if you recognize this -- GlobalSecurity.org?

A    That name doesn't ring a bell.

Q    How about IRP.FAS.org, which stands for "Intelligence Resource Program"?

A    That doesn't sound familiar.

Q    And how about LiberatedManuals.com?

A    That doesn't sound familiar.

Q    Would it surprise you, if you were to continue searching, to find additional websites beyond those that you listed on -- that host restricted distribution military manuals?

A    No, that wouldn't surprise me.

Q    Is the FBI or the NCIS, to your knowledge, making any

III-117

kind of an active effort to shut down these websites?

A    From the FBI perspective -- I can't speak for NCIS, but I personally am not.  I'm not sure if there's some kind of larger FBI effort.  I'm not aware of it.

Q    You're an FBI counterintelligence special agent, right?

A    Yes.

Q    And you're not, nor have you been at any point in your career, involved in an effort to investigate or shut down any of these websites that we've discussed, right?

A    That's correct.

Q    Do you have an estimation of the amount of, let's say, hours of phone calls of Jinchao's that the Government recorded or had access to?

A    I don't have -- I don't know that total.

Q    Do you know if -- I know we talked about Exhibits 125, 26, 27, 127, 128, and 129, and then the phone call with his mom on 130.  Beyond those, do you know if there are other phone calls that were recorded or listened to?

A    So the recordings from the 120s, those are recordings from his apartment, from the microphone.  That wasn't a recording of a phone call on his phone, if that makes sense. But the phone call from his mom, yes, was a phone call that was recorded from court-authorized surveillance of his phone, and yes, there were other, you know, calls captured during that surveillance.

III-118

Q    And you raised a good point.  So it wasn't just the phone calls.  It was any noise he was making his apartment over a what, two-plus-month period?

A    Yes, approximately.  Yes.

Q    Were you the one tasked with listening to --

A    I listened to some of it.  A lot of it was in Mandarin, and so that was not something that I listened to.

Q    Okay.  Is it safe to say that only the translations that we have here in court and that we've talked about are of significant value to the Government?  Like, is it fair to say that there's not a bunch of other conversations that are equally interesting, that were left out?  Is that fair?

A    I think that's fair.

Q    And so there was continuous recording of his apartment for about two months, and that's in addition to -- do you have an estimate of gigabytes, terabytes of data recovered from his iPhone, iCloud, Google?

A    No, I don't have an estimate, but it was a lot of data.

Q    Thousands and thousands of documents, right?

A    Yes.  There was a large volume of material.  I don't know if I would say thousands of documents, but yes, items, pictures, all kinds of stuff.

Q    And in addition to all of that, you have, to your knowledge, all of his bank records, right?

A    Yes, I believe so.

III-119

Q    And in all of that, as you mentioned, there's no expressions from Jinchao of wanting to harm the U.S. Government, right?

A    I don't think I would -- I think, outside of the comments that we discussed about his feelings towards the U.S. Navy -- I think, to me, that seems like in that family, but no, he did not say, "I want to harm the U.S. Government."

Q    And there's no expressions of love or allegiance towards the Chinese government in any of that, right?

A    No, not explicitly.

        MR. JONES:  All right.  Thank you.  I think that is all I have.  Thank you so much for your patience.

        THE WITNESS:  Thank you.  I appreciate it.

        THE COURT:  Thank you.

        Redirect?

        MR. PARMLEY:  Yes.  Thank you.

                    REDIRECT EXAMINATION

BY MR. PARMLEY:

Q    Good afternoon.  One of the first questions counsel asked you was "Why did this take so long?  If this was so serious, why did this take so long?"  Do you have an opinion on that?

A    I do.

Q    What's that?

III-120

A    And I think we discussed this a little bit yesterday, but there are many reasons why investigations just take as long as they do.  The first is practical.  It takes a lot of time to sequentially gather the amount of evidence you need to get the legal process required to take certain actions, like search someone's phone, like search someone's apartment.

In this case, particularly, much of the evidence that we gathered was in a foreign language, and so we had to have that translated before we reviewed it, and then the materials that we did find required additional review by other government entities, like the Department of Defense, and all of that just takes time, and when we get court authorization to do things, it's for explicit, discrete actions, and then, if we want to do something else, we have to go back and get permission again, and so it's just a lengthy process.

In national security cases, in particular, as I've also discussed, we understand that our co-conspirator in this case is a foreign government, a foreign intelligence service that we think and we assume is a sophisticated actor, so we are especially careful to take measured steps that will allow us to gain the evidence we need without going overt or alerting them that we are investigating them, because that leads to them deleting evidence and concealing that

III-121

relationship further, you know, and we -- in addition to gaining evidence in terms of -- you know, of the Defendant's actions, you know, we want to figure out what he's doing, because it does affect other government agencies.  It affects kind of a larger -- you know, there's a larger issue.  We need to know what he passed, so that the Department of Defense knows what the Chinese government is in possession of.

And I think, finally, we understand that espionage allegations are serious.  It involves a service member, and we want to make sure that we get it right, and, again, because it involves a foreign government, these investigations happen in the context of a lot of other things that the U.S. Government is doing.  There are different equities that we have to consider when we disrupt this type of activity.

And so I think all of those factors came into play in this investigation, and just, you know, that is why the investigation took the amount of time that it took to get right.

Q    It would be fair to say that the local San Diego FBI can't make the decision, for example, to arrest somebody by themselves?

A    That's true.

Q    You have to consult with other government agencies,

III-122

including the Department of Justice and others?

A    Yes, that's right.  We work closely with our prosecutors to decide when we have enough evidence to actually charge someone with a crime.

Q    And as to the specifics of an investigation, there was (indiscernible) a minute ago about dropping a microphone, placing a microphone in the Defendant's home so you could listen in.  I assume that took court process and some effort to get that done.  Is that fair to say?

A    Yes.  That required court authorization, and, as you can imagine, because it is a -- it's a, you know, fairly invasive tool, it requires very stringent court orders and legal process before you're allowed to do something like that.

Q    But it only lasted two months.  Why?

A    The Defendant moved.

Q    Okay.  You have conceded that some of the manuals involved in this case were likely shared by other sailors, and possibly on Facebook groups.  Is that correct?

A    Yes, absolutely.

Q    Well, do you have any evidence through the course of your investigation that the Defendant shared these manuals with other sailors through the use of a disappearing website?

No.

III-123

Q    That he shared them in exchange for money?

A    No.

Q    Or that he thought that these people were members of the Chinese Navy or the Chinese military?

A    No.

Q    I'm going to show you -- it's from the defense Exhibit 53.4, and we go to -- it's about (indiscernible) number of the pages.  I'm going to show you my copy.  It's from February 25th, at 12:05 p.m.  It's about 22 pages in.

MR. JONES:  If anybody wants to number the pages, I have no objection to that.

BY MR. PARMLEY:

Q    Yes, I put an asterisk next to it.  Is it your understanding that's a message from the Defendant to the group?

A    Yes.

Q    Could you read that for me, please?

A    Yes.  The Defendant says:

"It takes a long time to upload, and
we're not supposed to extract things out
of Government computers.  So do it late
at night, and don't let anyone catch
you."

Q    And you said earlier, also, that -- counsel was asking about your opinion of whether or not Andy Li was an

III-124

intelligence officer.  Do you recall that?

A    I do.

Q    And he asked about Google and iCloud, the documents that we saw, for example, the personal information we found from Andy Li or Giu Li (phonetic)?

A    Yes.

Q    And you said that that was just part of it?

A    Yes.

Q    Would another part of it include -- well, tell me what the other part of it was, to the extent you can.

A    Well, I think, outside of the communications that the Defendant had with other people, where he said that Andy Li was part of a Chinese intelligence organization, I think the FBI has other information about other individuals who have interacted with Andy Li who came to that same conclusion.

Q    What about the fact -- the methods with which he's communicating?  Would that indicate --

A    Yes.

Q    How about the method by which he's being asked -- the Defendant is being asked to send materials?

A    Yes.

Q    What about the fact that he's being paid through PayPal accounts, through PayPal accounts that are not in the name of Andy Li?

A    That's right.

III-125

Q    Does that indicate to you that this is a Chinese intelligence officer?

A    Yes.  I think those all are examples of tradecraft that are consistent with a Chinese intelligence organization.

Q    Defense counsel asked you about things that -- how the Defendant characterized Andy Li?

A    Yes.

Q    For example, I think maybe, at one point, he was a researcher, for example.  Is it fair to say that the Defendant, over the course of this investigation, has referred to Andy Li as many different things in many different ways?

A    Yes.

Q    How did he refer to the -- to Andy Li when he was speaking with his mother?

        MR. PARMLEY:  Can you pull the Exhibit 31 up, please?

BY MR. PARMLEY:

Q    Do you have that in front of you?

A    I'm sorry.  I thought you had it on the screen.

        MR. PARMLEY:  Could you pull up 31?  Actually, could we put up 31?

        MS. MULLINS:  131?

        MR. PARMLEY:  Sorry, 131.

        MS. MULLINS:  (Indiscernible.)

III-126

MR. PARMLEY: Yes, please. If you could go to the middle of the page. If you could zoom in on that, Ms. Mullins. It's not showing up. Hold on one moment.

BY MR. PARMLEY:

Q   You see that sentence that starts with "Do you remember"?

A   I do.

Q   And is this a conversation that he was having with his mother?

A   Yes.

Q   A text message conversation?

A   Yes.

Q   And what did he say to his mother?

A   He says, "Do you remember I once mentioned that I was in contact with a person who worked for the Chinese Navy?"

Q   And that wasn't during an interrogation with trained agents, was it?

A   No.

Q   Defense counsel -- thank you. You can put that down. Defense counsel also suggested that this was a side job, like driving a cab. Did the Defendant get a paycheck as a member of the Navy?

A   He did.

Q   Did he have his housing paid for as a member of the Navy?

III-127

A    He did.

Q    Did he receive a meal allowance as a member of the Navy?

A    Yes.

Q    In fact, this side job, he was able to purchase a car with it, wasn't he?

A    He was.

Q    Approximately how much money did he get from this, quote/unquote, "side job"?

A    About $12,000.

Q    There were also some questions about deleting items, and I think you cleared up that we were talking about receipts.  Do you recall that testimony?

A    I do.

Q    And it's your testimony that the question was whether or not the Defendant ever deleted his receipts.  Do you recall that?

A    Yes.

Q    And what was your explanation of that?

A    Yes, the Defendant did delete receipts, because he deleted the Telegram chats with the photos of those receipts that he had sent to Andy.

Q    So, the first time you searched the iPhone, in December of 2022 or January of 2023, the full Telegram chats were there, including receipts, correct?

III-128

A    Yes.

Q    And when you searched it later, they had all been deleted?

A    Yes.

Q    Okay.  Telegram chats are not available, anyway, on the open Internet, are they?

A    Sorry.  What do you mean?

Q    If I was going to search for a -- if we had a Telegram conversation between the two of us on our phones, if I searched on the Internet, I shouldn't be able to find that anywhere, correct?

A    No.  That's correct.

Q    That's an encrypted app-to-app, person-to-person application that should never get broadcast anywhere, right?

A    Right.

Q    What about Baidu Tieba?  Is that broadcast wide to the Internet, that website?

A    That is a public forum, yes.

Q    Did the defendant, according to the evidence you collected in this case, delete his first contact with Andy Li from Baidu Tieba?

A    Yes, he did.

Q    You testified a moment ago, a little earlier, later in the morning, that Andy -- excuse me -- the Defendant never requested payment.  Is that accurate?

III-129

A    I did, yes.

Q    He provided his PayPal account, though, didn't he?

A    He did.

Q    Did he ever send any money back to Andy Li?

A    No, he did not.

Q    He spent it, didn't he?

A    Yes.

Q    Also, there's this conversation about whether or not he was talking to people in China, and, generally speaking, was he speaking to people in China?

A    Generally speaking, no.

Q    How about with one particular person?

A    He was regularly speaking with one person.

Q    Is there any way to characterize how often or how much he was speaking with Andy Li?

A    I mean, it was almost daily.

Q    There was also a conversation where defense counsel asked you a question, was about his chat with Rafael Chang, when he says that "This is quite obviously espionage."  Do you recall that?

A    I do.

Q    And he intimated that, at that point, he needed to get out of the situation.  What, specifically, do you recall, did he tell Andy Li about that?

A    Did he tell Andy Li?

III-130

Q    Yes.  Let me rephrase.  He talked about -- he spoke to Rafael Chang, correct?

A    Yes.

Q    And he said, "This is quite obviously fucking espionage," correct?

A    Yes.

Q    And then he said to Andy Li, "I need to slow down," didn't he?

A    He did, yes.

Q    Did he tell him the reason why he needed to slow down?

A    Yes.

Q    What was the reason?

A    It was because he was applying for his U.S. citizenship, and they were investigating, you know, his background, and this could be considered espionage activity.

Q    In fact, that's -- when you say, "Specifically," this could be considered espionage?

A    Yes.

Q    Did he, in fact, slow down?

A    No.

Q    Did he continue to talk to Andy Li?

A    He did.

Q    Within a few months, did he receive a payment of $5,000 from him?

A    Yes, he did.

III-131

Q    There's also questions about manuals being passed and that you -- whether or not they come from certain websites or things like that.  Do you recall that?

A    I do.

Q    Let's talk about the Propulsion Guide, specifically. Were you ever able to find the Propulsion Guide of the U.S.S. Essex on the open Internet?

A    No, I was not.

Q    And where did the Defendant say he got that from?

A    The shared drive on the U.S.S. Essex.

Q    And do you have any evidence, specific evidence, that that manual actually made it to Andy Li?

A    I do.

Q    And what's that?

A    Andy Li googled the citation and title of that manual, of the Propulsion Operating Guide, and then the Defendant was paid in that same time period, and wrote a receipt for a project in that time period.

Q    So, based on that, you would conclude that he sent it to him?

A    I did, yes.

Q    You were also asked whether or not you tracked all the people who he sent manuals to.  Is that right?

A    That's right.

Q    Are you aware of any other tech manuals sent to any

III-132

other person, via a temporary website or passcode, for which he was paid?

A    No, I'm not.

Q    You also said ChatGPT wrote the papers.  Do you recall that?

A    I do.

Q    Do you know whether the diagrams came from for those papers that were in -- that were presumably, potentially, or possibly written by ChatGPT?

A    Yes, I do.

Q    Where were those diagrams from?

A    Those diagrams came from the Weapons Control System Manual for the U.S.S. Essex.

Q    And how do you know that?

A    I know that because I reviewed the manual, and I found those diagrams in the manual.

Q    And the Defendant admitted it, too, didn't he?

A    Yes, the Defendant admitted that.

Q    What about the photos on the Essex, specifically the photos of the locations of cabins and the phone numbers?  Do you recall that photo?

A    I do.

Q    And where did that come from?

A    That came from the U.S.S. Essex.

Q    And how do you know that?

III-133

A    Because the Defendant told me that.

Q    You talked about some information being on Wikipedia about the weapon systems of the Essex.  Do you recall that testimony?

A    I do.

Q    Does Wikipedia ever -- to your knowledge, is there any public information that -- specifically, that one rocket launcher was out of commission?

A    No, not to my knowledge.

Q    Was that some information that the Defendant passed on to Andy Li via chat?

A    Yes.

Q    Finally, speaking of the Weapons Control System Manual, is there any evidence, based on your investigation, that that was available to the public?

A    No.

Q    What is your evidence that the Defendant -- where did the Defendant obtain it, and how do you know?

A    The Defendant obtained that from the shared drive of the U.S.S. Essex, particularly a folder for surface warfare officers, and I know that based on my conversations with people on the Essex who were able to locate that manual.

Q    And did the Defendant admit that that's where he took the Weapons Control System Manual from?

A    No, I don't think so.

III-134

MR. PARMLEY:  I don't have any other questions.  Thank you.

THE COURT:  Any redirect?

MR. JONES:  One moment.  I'm sorry.

THE COURT:  Recross?

MR. JONES:  No recross.

THE COURT:  All right.  Thank you.  Is she excused?

MR. JONES:  Yes.

THE COURT:  All right.

MR. JONES:  Thank you.

MR. PARMLEY:  Yes, your Honor.  Thank you.

(The witness was excused.)

THE COURT:  You may call your next witness.

MR. BARRY:  United States calls U.S. Navy Chief Jonathan Palis as our next witness.

THE CLERK:  Please raise your right hand.

JONATHAN PALIS - PLAINTIFF'S WITNESS - SWORN

THE CLERK:  Thank you.  Please state your first and last name for the record, and spell each.

THE WITNESS:  Jonathan Palis, J-O-N-A-T-H-A-N, Palis, P-A-L-I-S.

THE CLERK:  Thank you.

//

//

III-135

DIRECT EXAMINATION

BY MR. BARRY:

Q    Good afternoon, Chief Palis.

A    Good afternoon.

Q    Where do you work?

A    Where do I work currently?

Q    Yes, sir.

A    Navy Blue Team, United States Navy.

Q    How long have you been a member of the United States Navy?

A    Nineteen years now.

Q    What's your rank?

A    I'm a chief petty officer, E-7.

Q    And what do you do in the Navy?

A    I'm an information systems technician.

Q    What does that mean?

A    So, as IT, you can do multiple stuff with computers, you know, network, servers, as well as radio communications, cybersecurity.

Q    Have you done that your entire career in the Navy?

A    Yes, I have.

Q    Are you familiar with something called an MOS, or military occupational specialty?

A    I'm familiar with it, but it's different in the Navy. It's more of an NEC, the Navy enlisted classification.

III-136

Q    And do you have a special Navy enlisted classification related to your job?

A    It depends on the command.  I have multiple NECs.

Q    What are some of the NECs that you have?

A    So I have a 742 Alpha, which is a network security vulnerability technician, as well as 735 Alpha, which is a CANES administrator.

Q    Is CANES an acronym for something?

A    Yes.  It's Consolidated Afloat Network Enterprise Services.

Q    Okay.  Does part of your job involve protecting information on electronic computer systems?

A    Yes, it is.

Q    What type of training did you receive to get that job title?

A    So it's -- we have to go through school.  They were put in for us, and then just, I believe, a six-week course for just network security, and just the ins and outs about how to deal with your vulnerabilities, and anything network security-related.

Q    And this is computer networks we're talking about, right?

A    Computer networks, yes.

Q    Was there a point in your career when you were assigned to the U.S.S. Essex?

III-137

A     Yes.

Q     When was that?

A     2021 to 2024.

Q     You're currently not on the Essex anymore?

A     I am not.

Q     Were you on the Essex when it deployed overseas?

A     Yes.

Q     Where did you go?

A     Where we went?  Mostly Bahrain.

Q     So Middle East?

A     Yes, Middle East.

Q     What did you do when you were on the Essex?  What were your responsibilities?

A     So I was -- at the time, I was a first class petty officer, an E-6, so I was the information assurance leading petty officer, basically cybersecurity-related, trying to -- on our networks as well as our servers, information assurance, dealing with people's accounts, as well.

Q     So you said you were an E-6.  That's a rank in the Navy?

A     Yes.

Q     And that's an enlisted rank, right?

A     Yes, it is.

Q     So were you one of the more senior enlisted personnel on the Essex responsible for the computer networks at the

III-138

time you were deployed?

A    Yes, I was.

Q    And you had that regarding through July of 2024, right?

A    Yes.

Q    Let's talk a little bit about the computer network on the Essex.  Does the Essex have computers on board?

A    Yes, they do.

Q    Does it have its own internal shared drive?

A    Yes.

Q    Is that -- are those computers connected to each other on the ship in some way?

A    Yes.

Q    Are those computers connected to computers off of the ship?

A    Computers off of the ship?

Q    Yes, sir.

A    No.

Q    So, for example, if I wanted to log into the Essex servers from my laptop right here, could I do that?

A    No.

Q    So does the ship have what's called its own "intra network"?

A    Yes.

Q    And that's different than an "inter network," where different computer networks would be talking to each other,

III-139

right?

A    Yes.

Q    And that's by design?

A    Yes.

Q    Are the servers for the Essex physically located on the ship?

A    Yes, it is.

Q    And on those servers, is there a shared drive that sailors who are physically on the ship can access?

A    Yes.

Q    So let's talk about how a sailor or marine would get access to those shared drives.  Can you tell us a little bit about that process?

A    Yes.  So we usually give them a form called the System Authorization Access Request form, and they would have to fill out the information.  After they fill out the information, they would have to bring it to a supervisor for them to sign, and then, from their supervisor, they would have to -- they would hand it to our division, the Information Assurance Division, and just go through the information, and after we verify the information, we would have to send it to the special security officer, the SSO, so they could verify security claims, and after it's verified, it would to me, as the information assurance security officer, to sign off on that.  So then, after that, my team

III-140

can create their account.

Q    Can any member of the public submit one of these system authorization request forms to you and the members of the security team on the Essex?

A    Say again?

Q    Sure.  That was a little fast.  Can any member of the public submit a request form to you or your team on the Essex to get access to its computer networks?

A    Yes.

Q    What would happen if a member of the public somehow got your e-mail address and submitted one of these request forms to you?

A    If someone from the public -- if they don't have a proper justification to get into our network, we would deny it.

Q    Okay.  And you talked a little bit -- you testified a little bit about the steps you take.  I think the first step you said was that the supervisor of whoever is submitted that request has to sign off on it?

A    Yes.

Q    So a sailor can't just submit the request on their own?  There has to be somebody in their command who says, "This person has a need to know or justification for access"?

A    Yes.  It's not just their command, but their actual chain of command.

III-141

Q    Okay.  And then you also said that the security officer on the ship would verify that that person who was requesting access to that computer network had the appropriate security clearance?

A    Yes.

Q    Would they also verify that they had a common access card, or a CAC card?

A    For the SSO, no.

Q    Okay.  What happens after somebody gets access to the shared drive on the ship?  Do they just have access to the entire shared drive?

A    No, they do not.

Q    So talk to me a little bit about that.  When somebody submits a request, do they submit a request that says, "I want access to everything that's on the ship," or do they have to specify which portions of the shared drive they want access to?

A    There's a block in the SAAR-N list that basically tells you which group you want to be a part of, and we'll verify that, depending on which department they're in, so just depending on what access the supervisor gives them.

Q    When you say "department," do you mean like the different departments on the ship?  Like, engineering would be an example.

A    Engineering, combat system, deck department, supply.

III-142

Q    Okay.  So is the shared drive on the ship kind of siloed or compartmentalized?

A    Yes, it is.

Q    And when somebody submits a request, they submit a request just for a specific compartment?

A    Yes.

Q    And then, when your team or the other folks who are reviewing the request have to go to someone in the chain of command, they're asking whether or not that sailor has a justification to get access to that particular compartment?

A    Yes.

Q    So, if somebody doesn't have access to another compartment, can they access that other compartment?

A    No.

Q    Once someone gets -- let's assume someone submits a request.  It gets reviewed.  They have the appropriate clearance.  They have the appropriate authorization from their chain.  How do they physically get access to that computer system?

A    They would have to use their common access card, also known as "CAC," to log into our system, using their PIN from their CAC.

Q    Would they have to be on the ship in order to log into that system?

A    Yes.

III-143

Q     And you mentioned a PIN.  Can you explain what that means?

A     No, it's just a number to put input, to be able to access the computer.

Q     So let's say, for example, I happen to be on the ship, and I found somebody else's card, and I went to a computer station on the ship, and I put their card in the CAC reader. Would I be able to -- should I be able to access that computer network if I don't have their PIN?

A     No.

Q     Is that use of a physical card and an associated PIN sometimes called a "two-factor authentication"?

A     "Authentication," yes.

Q     Okay.  When somebody applies or submits one of these system authorization requests, do they also have to agree to abide by certain rules having to do with what's permitted and not permitted on that computer system?

A     Yes.  There's rules and regulations on that form, as well.  It's usually on the second or third page.

Q     You've been in the Navy for, what did you say, 19 years in the beginning?

A     Yes.

Q     Based on your experience working in information technology and cybersecurity, why do you think the Navy compartmentalizes access to an unclassified computer network

III-144

on the Essex?

A    Certain people don't have the need to know.  For example, people from deck department doesn't need to know what people from engineering needs to do, or combat systems, or supply.  So it's certain access.

Q    Why not just allow everybody on the ship to have access to everything on the ship, and it can just be a learning environment, where people can learn anything they want about the ship at any point in time?

A    It's a security reason, basically, like, just going back, just the need to know, and they don't need to know what's in the other departments' folder.

Q    You've said the phrase "need to know" a couple times. Based on your career in the Navy, is that kind of a motto that's been drilled into you from a security perspective?

A    Yes.

Q    And is the conclusion of the "need to know" phrase something along the lines of "If you don't need to know, you shouldn't have access"?

A    Yes.

Q    You testified earlier that there's no remote access to the servers on the Essex, correct?

A    The only remote access is either through Blackberry, Blackberry Enterprise Service, just basically getting into e-mail using a phone.

III-145

Q    So that's just access to the e-mail servers on the ship?

A    Yes, but only certain people have access to that server -- or to that service.

Q    So, just to distinguish this, when we talk about the shared drive servers, is that the same as e-mail servers?

A    It is not.

Q    So can you explain, just at a very high level, what's the difference between, like, a shared drive and the server infrastructure for that, versus an e-mail system?

A    So an e-mail system is basically just getting access to your e-mail, just e-mail, just anything that's in your inbox, anything that was sent to you.  For your shared drive, it's basically data storage, so documents, PDFs, Excel spreadsheets.  So it's just data storage for a shared drive.

Q    You also testified that, even within the remote e-mail access, only certain members of the ship have access?

A    Yes.

Q    Who are those members?

A    Usually it's just officers, so higher-ranking, above enlisted.  So it's usually the triad, which is the commanding officer, executive officer, command master chief, department heads, such as the supply officer, combat system officer, chief engineer.

III-146

Q    Is it a relatively small group?

A    Yes, it is.

Q    During your time on the Essex -- and I'm going back to the sort of shared drive -- approximately how many people had access to the shared drive on the Essex?

A    I would say two to 3,000 personnel.

Q    And that's within the entire military?

A    Just people stationed on board the Essex.

Q    So, if you weren't stationed on board the Essex, you shouldn't have access to the shared drives, correct?

A    Yes.

Q    After somebody is granted access to the shared drives on the Essex, is there anything done to ensure that they have a continuing reason to have access?

A    (No response.)

Q    Let me rephrase that.

A    Yes.

Q    What happens with somebody's access to the Essex after they get assigned to a different ship?

A    So it's called 30/90.  So, after 30 days of not being used, we just disable it, and after 90 days, we delete that account.

Q    Is that another security measure?

A    Yes, it is.

Q    And is that another measure intended to ensure that the

III-147

people who had access to that server were only people who had a need to know?

A    Yes.

Q    At some point during your time on the Essex, were you asked to assist in the investigation of the Defendant, Mr. Wei?

A    Yes.

Q    Were you asked to search the shared drive on the Essex to locate certain files?

A    Yes.

Q    And were those files certain operating or technical manuals related to the Essex and other Wasp-class LHDs?

A    Yes.

Q    Did you locate where some of those files were located on the shared drive when you searched for them?

A    Yes.

Q    And in engaging in that activity, did you create a chart that listed the locations or file paths on the shared drive where you were able to locate some of those manuals?

A    Yes.

Q    Did you create that chart close in time to when you conducted those searches?

A    Yes.

Q    Without referencing that chart here today, would you be able to testify as to the specific file location on the

III-148

shared drive of each of the manuals you searched for?

A    Some, yes.

Q    But not all of them?

A    No.

Q    Okay.  I'd like you to -- there are some exhibit binders in front of you, and I'd like you to turn to what's been marked as -- there's a tab that says "41."  If you could please turn to that, and just tell me when you're there.  Okay?

A    Okay.  I'm there.

Q    All right.  Do you recognize what is marked as Exhibit 41?

A    Yes.

Q    What is that?

A    It's the document that I created, with all the tech manuals as well as their file path.  I found those manuals.

        MR. BARRY:  Move to admit Government's Exhibit 41 into evidence.

        THE COURT:  Any objection?

        MR. JONES:  No, your Honor.

        THE COURT:  It's received.

        MR. BARRY:  All right.  Can we please publish that for the jury.  Okay.

BY MR. BARRY:

Q    So what are we looking at here?

III-149

A    So everything on the left are the file names that were given to me to search up in our shared drive, and anything on the right were the file path on the shared drive where I was able to find them.  Again, the MAs (phonetic), I was unable to find those.

Q    So some of these you were just unable to find based on your searches?

A    Yes.

Q    Does that mean that they weren't on the shared drive, or just simply that you weren't able to find them based on the search techniques you used?

A    That's correct.  I was unable to find those.

Q    Okay.  So I want to look at the file path, actually, at the top.

A    Okay.

Q    "S" stands for what?

A    "Shared drive."

Q    Okay.  And then it says, "Departments," and then "ENG." What does "ENG" stand for?

A    "Engineering."

Q    So does that mean that you located this top document in the engineering department folder on the shared drive?

A    Yes.

Q    Okay.  Let's zoom out, please.  And it looks like a couple others below this also related to -- have that "ENG"

III-150

in front of them?

A    Yes.

Q    What is -- there's a couple others that say, "Deck."
What does that mean?

A    So I found those specific files in the deck department
folder.

Q    Okay.  And then let's go, actually, to the bottom two,
please, where the Propulsion Guide is.  You see there
there's a photo that says -- or there's a file path that's
next to the Propulsion Guide that says, "S," which you
said -- you testified stands for "Shared folder," right?

A    "Shared drive," yes.

Q    And then it says, "Cross-departmental share"?

A    Yes.

Q    What is that?

A    So a cross-departmental share is basically everyone has
access to that folder.

Q    Okay.  And it says, "SWO" after it.  Do you know what
that stands for?

A    Surface warfare officer.

Q    Are you a surface warfare officer?

A    I am not.

Q    What is a surface warfare officer?

A    It's usually the officers who were -- they were
training to become a surface warfare officer, and after the

III-151

training, after getting qualified, they basically become a surface warfare officer.

Q    So a surface warfare officer, or SWO, is a special title or role that is earned, and you get -- do you get some sort of special pin or something that you get to wear as a result?

A    Yes.  It's usually a gold pin.

Q    So not everybody on the Essex is a SWO?

A    No.

Q    So those file path mean that that folder was for surface warfare officers?

A    Yes.

Q    You testified earlier that the Essex has its own e-mail system, correct?

A    Yes.

Q    During the investigation of the Defendant, were you asked to pull some of the e-mails from the Defendant's military account?

A    Yes.

Q    And before doing that, did you receive authorization from your chain of command and other Navy personnel in order to pull the Defendant's military e-mails?

A    Yes.

Q    Were those e-mails stored on the Navy Essex servers at or near the time that you pulled them?

III-152

A     Yes.

Q     And were those e-mails stored in the regular course of how the Navy operated its e-mail systems?

A     Say again?  Sorry.

Q     The e-mails that you pulled from the Essex e-mail servers, are those e-mails regularly stored on that server?

A     Yes.

Q     So it's not as if you did anything special to save the Defendant's military e-mails onto that e-mail servers?

A     No.

Q     After pulling those e-mails, did you then provide those e-mails to NCIS and the FBI?

A     Yes.

Q     Okay.  Before testifying today, did you happen to review a thumb drive?

A     Yes.

Q     And do you remember what was on that thumb drive?

A     It was all the e-mails that we gave -- I gave the NCIS, all the e-mails, as well as a website CD, one and two.

MR. BARRY:  Okay.  Your Honor, may I approach?

THE COURT:  You may.

BY MR. BARRY:

Q     I'd like you to take a look at what's been premarked as Government's Exhibit 39, Mr. Palis.  Do you recognize that?

A     I do.

III-153

Q    And are those your initials on the envelope?

A    Yes.

Q    So is that a true and accurate copy of the Defendant's military e-mails that you pulled pursuant to the request from law enforcement?

A    Yes.

MR. BARRY:  Seek to admit Government's Exhibit 39.

THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  It's received.

BY MR. BARRY:

Q    When you pulled the Defendant's e-mails, did you happen to review any of the e-mails?

A    Some.

Q    And in the course of your review, did you see the Defendant sending documents from his military e-mail account to a personal Gmail account?

A    Yes.

Q    Based on your almost two decades of experience working in information technology, and your understanding of the "need to know" philosophy, do you have an opinion as to whether or not a Navy sailor on the Essex should be permitted to share manuals he's taken from that shared drive outside of those Navy systems?

A    No.

III-154

Q    No, you don't have an opinion, or no, you don't think that's something that should be permitted?

A    It shouldn't be permitted.

Q    And it's not permitted.  Is that true?

A    Yes.

Q    So I want to go back.  Last question or two, these are questions -- I wanted to go back to something you testified in the beginning, in terms of how somebody gets access to that Essex server where those manuals are in the first place.  You testified that first that person needs to have a CAC, or common access card, right?

A    Yes.

Q    And then they need to submit a request to get access to a particular part of that shared drive?

A    Yes.

Q    And then someone in their command needs to approve that request and say, "Yes, this sailor or marine has a legitimate reason to have access to this part of the computer network"?

A    Yes.

Q    And then there's a team that verifies that the information on the form, including the security clearance of the sailor or marine, is appropriate, correct?

A    Yes.

Q    And then, once that person gets access to that computer

III-155

network, they need to be physically on the ship to access that shared drive, correct?

A    Yes.

Q    And then, when they access the shared drive, they need to have their common access card?

A    Yes.

Q    And they also need to have a PIN associated with that access card, correct?

A    Yes.

MR. BARRY:  No further questions, your Honor.

THE COURT:  Thank you.

Cross?

CROSS EXAMINATION

BY MR. JONES:

Q    Good afternoon, Officer --

A    Chief Petty Officer Palis.

Q    What is it?

A    Chief Petty Officer.

Q    Chief Petty Officer Palis.  Thank you.  I understand that you have a great deal of expertise in computer networks in the Navy, which you obviously spoke to.  How involved have you been in this case, would you say, involving Jinchao Wei?

A    How involved?  Just basically anything they needed from me, whether it's e-mails or what websites he's been to.

III-156

Q     Are we talking about, like, weeks or months?  How long have you been working with U.S. Attorneys, FBI, NCIS?

A     Probably since 2022, so years, on and off.

Q     Got it.  I'm still going to ask you a bunch of questions about the case, but -- so it sounds like you're pretty well involved in this case.  Is that fair to say?

A     Yes.

Q     Do you know what specific dates Jinchao Wei accessed the computer room?

A     The specific computer?

Q     I guess let's clarify, the shared drive.  Are you able to see the number of times he accessed it, and what the times and dates would be?

A     Times and dates was -- we would have to be -- dig more into it, just like going through event logs, but that wasn't something I looked through.

Q     Is that something that you can do, to see when specific sailors are accessing specific documents?

A     Yes.  It's (indiscernible) event log, but after a certain amount of days, it will clear up.

Q     Does the event log track use of the CAC card, or log-on to a computer, or, like, what is it tracking?

A     It just shows their user name, like which person was logged into the work station.

Q     So they go and do -- well, let me pull up --

III-157

MR. JONES:  May I get some assistance pulling up some pictures?  Let me just ask, are the photos of the computer room in evidence.  No.  Bear with me for just a second here.  Sorry.  Can I have 172 published only to the witness?

MS. MULLINS:  Only to the witness?

MR. JONES:  Yes, if it's not in evidence.

THE COURT:  Just the witness, not the jury, not --

MR. JONES:  Counsel can see it, but not the jury.

MR. BARRY:  Can you all see anything on your screens?

BY MR. JONES:

Q    Do you recognize this photo?

A    I know this location is (sic).

Q    Can you tell me what it is?

A    This is the engineering room, so it was basically the high-rank engineers who's leasing that space.

Q    Is this on the Essex?

A    It is.

Q    And this is somewhere that you've been many, many times?

A    Yes.

Q    Does this picture appear to be a fair and accurate depiction of the engineering room on the U.S.S. Essex?

A    At the time, yes.

III-158

Q    At the time.  So it may be today it's organized differently, but as of what, 2023?

A    Yes.

MR. JONES:  All right.  I'd offer 172.

THE COURT:  Any objection?

MR. BARRY:  No objection, your Honor.

THE COURT:  It's received.  You can show the jury.

BY MR. JONES:

Q    So can you just briefly explain what all we're seeing in this photo?

A    So it's the engineering room on board the U.S.S. Essex that has multiple computers that officers as well as chief petty officer would use, and sometimes low enlisted sailors, for maintenance, would use.

Q    Are there other computer rooms similar to this on the Essex?

A    Yes.

Q    Is this the one that machinist mates would use, do you know?

A    I've seen some machinist mates worked out of there. So, yes.

Q    Do you know if machinist mates can use the other ones, or are certain ranks limited to certain computer rooms?

A    There's other computer rooms that they could use, depending on their engineering spaces.

III-159

Q    Are the materials accessible in this room different from those accessible in other computer rooms?

A    No.   They should be able to access in the computer here, as well as the other engineering spaces.

Q    When we talk about the shared drive, that's a specific enough term we can use, right, the shared drive?

A    Yes.

Q    If somebody were to go into this room and log onto the shared drive, would it be functionally equivalent to going into one of the computer rooms and logging onto the shared drive?

A    Yes.

          MR. JONES:   Can we put 173 up, just for the witness?

          MR. BARRY:   You can -- if you want -- we were going to admit them through the next witness, but, if you want to move to admit 172 through 177, we'd have no objection.

          MR. JONES:   Perfect.

          THE COURT:   Okay.

          MR. BARRY:   Stipulated.

          THE COURT:   We'll receive 173 through 177.

          MR. JONES:   Appreciate that.

          So, if we can put 174 up for the witness and jury.

//

III-160

BY MR. JONES:

Q    I noticed in the last picture there were three or four desktops, and then, in this picture (indicating), we see a laptop.  Is there any significantly different between this laptop and the desktops?

A    It's a small work station.

Q    Can that laptop be taken out of the room?

A    Yes, it can.

Q    So, if somebody needed to reference a manual while they were working on a boiler, would they have authorization to remove this laptop and go down below into the ship?

A    Yes.

Q    Do you know what operating system this laptop is running here?

A    Was it Windows 7 at the time, I think?

Q    I'm asking you, and if you don't know know, I don't want you to guess.

A    Yes.  So it was Windows 7.  Then we upgraded to Windows 10.  So I think, during this time, there was Windows 7.

Q    Do you have an opinion on how fast that computer would load things, versus something that somebody might have bought outside of the Navy around the same time?  Are you able to make an assessment on that?

A    I know that our work stations are slower than computers today.

III-161

Q    Were there ever times when there would be more people needing to use computers than there were computers?  Is that been an issue?

A    Yes.

Q    Do you know if sailors would bring their own computers on board sometimes?

A    Their personal computers, yes, like if we're on -- like, on deployment, yes.

Q    And there's cell phones, of course?

A    Yes.

Q    Would you have sailors using their phones and computers to look up manuals and stuff while they were working on components on the ship?

A    It depends on which space, because, if you use -- try to use your cell phone, you won't have Internet connectivity down there.

Q    Right.  But they would be able to -- if they had materials downloaded or saved onto their personal device -- were you aware of sailors occasionally using their own devices to reference work products or documents?

A    Usually no.

Q    You said, "Usually no"?

A    Yes.  Usually they would just either print it out from the work station here, and they would just use that document, from what I've seen.

III-162

Q    So they'd have to go into this room, log onto the shared drive, print the manual, and then take the papers down while they're -- I don't know a lot about this, but, like, if you were repairing a pipe, you might be looking at the diagram of how to repair the pipes --

A    Yes.

Q    -- something like that?

A    Yes.  So, maintenance -- when they usually do maintenance, they would print it out from the computer, from a specific software that we use, and they would just use that to go line item by line item there, complete their maintenance.

Q    What would happen to those printed copies after they were done with them?

A    Usually -- it depends.  They would just shred it, if it's not needed, but, for other engineering spaces, I don't know what they do.

Q    Was there a policy that required them to shred it before exiting certain areas of the boat?

A    No.  Out of the boat?

Q    Areas of the boat.

A    No.

Q    So, if somebody were to print out a whole Propulsion Manual and take it down to work on the propulsion system -- and I apologize if my ignorance is (indiscernible).  If they

III-163

were to do that, print out the whole manual, take it down to area, fix the stuff, would anybody be standing by to intercept them and take that away, and make sure that they didn't go back to their personal quarters or something with that manual?

A    No.

MR. JONES:  Do we have 174 still put up?

MS. MULLINS:  Yes.

MR. JONES:  Can we -- yes.  This is no good. Let's go to 175, and then please zoom in on that green bar at the top of the screen.

MS. MULLINS:  That (indicating)?

MR. JONES:  Yes.

BY MR. JONES:

Q    Can you read that?

A    The green bar?  "Unclassified."

Q    "Unclassified."  What does that mean?

A    So it's a lower classification from top secret, secret, as well as confidential, but, with it being classified, you still need authorizations to publicly release it.

Q    When you said there was -- you listed a few things, classified, unclassified, top secret, secret, and confidential?

A    Yes.

Q    Is that like a hierarchy, or are those kind of distinct

III-164

categories?

A    I would say a little bit of both.  At least there's their own category, as well as this could be a hierarchy, with top secret being the -- like, could do the most damage to U.S. security, national security.

Q    What's more secretive, classified or top secret, or is that -- are you able to say that?

            MR. PARMLEY:  Object -- well, go ahead.

            THE WITNESS:  Top secret is classified, so confidential, secret, as well as top secret, are considered classified.

BY MR. JONES:

Q    How about secret?  If somebody has secret clearance, can they see classified documents?

A    If they have the need to know, if they have, like, the specific access to the secret network.

Q    And who would grant that access?

A    Usually it depends on your job title, as well as your rank.  One needs special access to a secret network.

Q    Can somebody with -- can top secret access be granted by somebody who themselves does not hold top secret clearance?

A    So you're talking about --

Q    In order for a sailor to obtain top secret materials, would they need to apply for that with somebody who has top

III-165

secret clearance?

A    Yes.

Q    Do you know what Jinchao Wei's security clearance was?

A    Top of my head, no.  I don't remember.  Usually, if you get access, you would have to have secret clearance or above.

Q    To your knowledge, are there classified documents on the Essex?

A    Yes.

Q    And to obtain access to those, you would need a top secret clearance?

A    Or either a secret clearance or higher.

Q    So you're saying, with a secret clearance, you could potentially see classified documents?

A    Those classified documents are in specific spaces that you would need physical access to.

Q    And you would need to get that from somebody who has top secret access?  You'd need to demonstrate need to know to somebody has stop secret clearance, and they would be able to provide what, temporary access to the classified materials?

A    Not to the actual materials but, like, to the space directly.

Q    And so that's a totally different part of the ship that houses the classified materials?

III-166

A    Yes.

Q    I don't want to ask you to breach any kind of protocols, but I'm just -- I'm trying to picture where the classified top secret stuff is.  Is that like a totally separate part of the ship, or is that just a different room?

A    Yes, they are a different part of the ship.  It's like, it's a room, but it's on the ship, just a different space.

Q    Is it similar to what we saw in 172?

A    172?  No, that's --

Q    That was with the table and the chairs and the printers?

A    Those classified spaces are more secure.  That's easily accessed to everybody.  You would need a PIN to be able to access that.  If you do not, you would just need to sign in as a visitor log -- or in the visitor lot -- to be able to gt in.  And they would have to sanitize the space, or, like, clear any secret or top secret material from view.

Q    Can you bring cameras or a cell phone into those rooms?

A    No.

Q    Are there any safeguards in place to prevent sailors or marines from e-mailing -- from logging into the shared drive and e-mailing documents out?  Is there -- are there any internal mechanisms that prevent that?

A    No.

Q    Do you know how long ago the -- yes.  Strike that.

III-167

Do you have the ability, if given the time, to go consult the event logs and everything?  Is it possible to see the number of files that Jinchao Wei viewed or downloaded on the shared drive?

A    Not that I'm tracking, no.

Q    What all can you tell from the event logs that you mentioned earlier?

A    So, from what I view them is basically, when they logged in, which computer they logged in, as well as how many times per day, if you just go through each one of them.  Yes.  That's pretty much what I usually look for.

Q    You can't see which specific files a particular person viewed?

A    No.

Q    How about printed?  Can you see what -- if they printed something?

A    No.  You could probably look in the print server, but I haven't really gone into that specific server to gain more knowledge about what it does.

Q    And then I apologize if I got this wrong.  I think I heard you say that there was a system authorization access request?

A    Yes.

Q    And that doesn't require a CAC card?

A    No.  That's a form that they have to fill out.

III-168

Q    It's a form that you fill out, and who all can fill out the system authorization access request?

A    Anybody who needs access to it.

Q    Civilian, too?

A    Contractors, civilians, yes.

Q    They fill that out, and who does it go to?

A    I mean, it usually goes to the supervisor, or, if it's like a contractor, whoever is in charge of those contractors, and then, from there, it would go to -- I already said supervisor.  It would go to myself, so I could bring it up the special security officer to check their security clearance, and then back to myself as the information systems security office, and the, from there, my team, to create the account.

Q    And what goes into the request?  Does it have to specify the exact manual, or do they specify a type of material that they're looking for, or questions they need answers to, and then you guide them in finding the right materials?

A    No, it's just a group.  So, basically, the departments, so engineering department, supply department, combat systems, security department, so just depending on the group that they're in.

Q    So, if somebody is asking for access to something that falls under the engineering umbrella, and it's granted, do

III-169

they then have access to view all the engineering files?

A    Not all the files.  Some folders can be locked down, especially if it -- it's usually -- we call them "CACHI (phonetic)," so E-7 or above, the rank, have access to specific folders that other junior sailors don't have access to.

Q    Do you -- are you able to give an estimate as to the percentage of files that are subject to that higher degree of security?

MR. BARRY:  Objection, we're getting way beyond scope, I mean, especially on the basis of --

THE COURT:  403?  403?

MR. BARRY:  403 could be an additional basis.

THE COURT:  Sustained.

MR. JONES:  I think that's all I've got.  Thank you so much.

THE WITNESS:  Thank you.

THE COURT:  Okay.

                    REDIRECT EXAMINATION

BY MR. BARRY:

Q    A few additional questions.  Chief Palis, in your experience in the Navy, is it fair to say that if somebody promotes, they may get greater access to Navy systems and materials?

A    Yes.

III-170

Q    Do you recall Mr. Jones asking you about what types of -- I think he used the phrase "internal mechanisms" -- the Navy has in place to prevent sailors from sending materials from their military e-mail account to their personal e-mail accounts?

A    Yes.

Q    Is Integrity one of those internal mechanisms?

A    Yes, it is.  Yes.

Q    Are members of the Navy expected to be trustworthy?

A    Yes, definitely.

Q    And then the last question.  Do you recall Mr. Jones was asking you about the system axis request process, and whether a member of the public could apply?

A    Yes.

Q    You were involved in reviewing those types of requests while you were on the Essex?

A    Yes.

Q    Would you have ever approved a request submitted for access to the Essex servers by a Chinese intelligence officer?

A    No.

          MR. BARRY:  No further questions.

          THE COURT:  Thank you.

          Anything else?

          MR. JONES:  No.

III-171

THE COURT:  Is he excused?

MR. JONES:  Of course, yes.

THE COURT:  Okay.

MR. BARRY:  Yes, your Honor.  Thank you.

THE COURT:  Okay.  Thank you.  You may step down.

You may call your next witness.

(The witness was excused.)

MR. BARRY:  The Government calls as its next witness U.S. Navy Chief Francisco Ceja.

THE CLERK:  Raise your right hand.

FRANCISCO CEJA - PLAINTIFF'S WITNESS - SWORN

THE CLERK:  Please state your name, first and last, and spell each for the record.

THE WITNESS:  Francisco Ceja, F-R-A-N-C-I-S-C-O, C-E-J-A.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. BARRY:

Q    Good afternoon.

A    Good afternoon.

Q    If you wouldn't mind, would you please pull the mic a little bit closer to yourself?  You can move -- I'm going to ask you in a little bit to look through those binders, but you can move them out of your way if that's more convenient for you.

III-172

A     All right.  Yes.

Q     Where do you work, Chief Ceja?

A     I work in the Naval Region Southwest Maintenance Center.  I'm the port inspector.

Q     How long have you been a member of the United States Navy?

A     I've served for the past 19 years, active duty.

Q     And what do you do in the Navy?

A     I'm a missions chief.  We're in charge of steam propulsion plants.

Q     Can you talk a little bit about what a machinist mate who's in charge of steam propulsion plants -- what that job entails?

A     So we take care of all the preventive maintenance on the equipment, train sailors, and along the way, we stand watch on the plants.

Q     You used the phrase "steam propulsion."  How does that differ from other forms of propulsion when you're talking about Navy ships?

A     Steam propulsion specifically is only applicable to the seven ships in the Navy.  They use the boiler as a primary method for generating steam, which propels the ships through the water.  We also generate steam for the electrical tailing generators and for the evaporators.

Q     So is it fair to say that the steam propulsion plant

III-173

is kind of like the heart of the ship?

A    That's correct.

Q    And other methods of propulsion or power generation are nuclear or diesel, typically?

A    Yes, typically are gas turbine, diesel, or nuclear.

Q    During your career in the Navy as a machinist mate, have you worked on numerous warships?

A    I've only served on amphibious-class ships, such as the Essex.

Q    And is that because of your specialization in steam propulsion technology?

A    That's correct.  I have an NC (phonetic) that links me to that ship.

Q    Is the U.S.S. Essex a steam propulsion ship?

A    Yes.

Q    And you said you're currently a chief petty officer?

A    That's correct.

Q    I think you mentioned in the beginning that you're also an inspector?

A    That's correct.  I'm a port inspector.

Q    So what does that mean?

A    So we inspect pressure vessels, automatic controls for the ships, and we also do training with vlogs for all steam propulsion ships and carriers.

Q    So is it fair to say that you, at this point in your

III-174

career, are inspecting propulsion plants on other ships?

A    That's correct.

Q    And are you doing that in part to ensure that those plants are up to date, and they're not going to run into any issues?

A    Yes.  We take care of all the valve maintenance to ensure that they have no catastrophic casualties while they're out to sea.

Q    I'd imagine, as an inspector, you've got to know what you're looking for?

A    Yes.

Q    And so is your current role, an inspector, in part a result of your decades of experience working on steam propulsion technology?

A    Yes.  It's a (indiscernible) that we have to go through to certify.

Q    You testified earlier that steam generation provides the propulsion or the force that moves the ship through the water, right?

A    Yes.

Q    You also said that it provides the electricity for the ship?

A    That's correct.

Q    And is that the electricity that powers all of the other systems that require energy on the ship?

III-175

A    That's correct.  We use the boiler as a prime means for electrical generation.  We have backup diesels, but the primary is always going to be steam.

Q    What else do you use the power generated by steam propulsion for on the Essex?

A    We use it to distill fresh water and feed water for the boilers.

Q    Let's start with that first, with fresh water.  Why would someone on a warship need to distill its own water?

A    So we have saltwater disseminators that we use.  So the primary purpose would be to remove all impurities, to make it safe for human consumption, but the majority of the water that we generate on board a ship is used for steam propulsion, to have the purest water available.

Q    If that system went down, would drinkable water on the ship eventually run out?

A    That's correct.

Q    So steam propulsion is basically the power plant on a ship?

A    Yes.

Q    Before becoming a chief petty officer, were you assigned to the U.S.S. Essex?

A    Yes.  I was a first class petty officer in charge on board the Essex.

Q    And when were you on the Essex?

III-176

A    I arrived the Essex (sic) February 2021, and I departed February 2025.

Q    And you said that you were responsible for the main machinery room?

A    Yes.  I was in charge of the main machinery room and the one on board Essex.

Q    What's main machinery room number one on the Essex?

A    Main machinery room number one encompasses the boiler, main reduction gear, two electrical generators, and all associated auxiliary equipment required to run the plant.

Q    What's a reduction gear?

A    So a reduction gear, it's -- well, just the boiler generates steam, and it gets into turbines.  The turbines, they spin at high speeds, low torque, high speed, high torque, and reduction gears just convert it to low torque, usable power for the ship, so essentially like a transmission on a vehicle.

Q    Okay.  Kind of like a differential or something that allows different types of power generation to move at different speeds?

A    Yes.

Q    When you were on the Essex, did you supervise other sailors?

A    I did.  I was in charge of 34 sailors when I first got there.

III-177

Q    What department was your team a part of?

A    We were on -- I was in charge of main propulsion, and my one encompassed 34 sailors, and the other MMR had another 30 or 35 sailors.

Q    Was your main machinery room -- well, actually, let me -- when you say, "MMR1," does that mean "main machinery room one"?

A    Yes.

Q    And was your team of 30 to 40 sailors in main machinery room one part of the engineering department?

A    Yes.

Q    When you were serving on the Essex, approximately how many sailors were part of the entire engineering department?

A    The engineering department, any given time, had between 200 and 220 sailors assigned.

Q    You testified that your responsibility involved the main propulsion and then auxiliary equipment?

A    That's correct.

Q    Were there other parts of the engineering department that had other responsibilities?

A    Yes.  We would have our electrical division.  They're in charge of electrical distribution, maintenance, repairs. We also have a repair division.  They train for fire-fighting efforts.  And we have main propulsion.

Q    Was your team's main responsibility to ensure that the

III-178

propulsion system or plant on the ship operated?

A    That's correct.

Q    Is main machinery room number one an actual room?

A    Yes.  It's a P-level room below -- it goes down to 34 below the water line on the ship.

Q    Did you spend a lot of your time on the Essex in that room?

A    Yes, I did.

Q    Are you also familiar with something called the "ships's log room"?

A    Yes.

Q    What's that?

A    So the ship's log room is where the senior engineering leadership, the chiefs and the officers, they go for the daily morning meeting, our end-of-day meetings.  Any planning or any organizational things that we're doing get planned right there in the log room.

Q    I'd like you to turn to -- actually, we can publish it. It's already been admitted.

        MR. BARRY:  Can we please publish Government's Exhibit 171.

        THE COURT:  It hasn't been admitted.

        MR. JONES:  Yes.  I started out with 72.  I'll stipulate to --

        MR. BARRY:  Okay.  You can take it down, please.

III-179

I apologize.

THE COURT:  So you agree that it --

MR. JONES:  I agree, yes.

THE COURT:  So 171 is received.

MR. BARRY:  Okay.  Thank you.

MR. JONES:  I think 170, as well, I'll stipulate to.

MR. BARRY:  Okay.  Let's actually do that right now.

BY MR. BARRY:

Q    Would you please turn to page 170 in your binder.  It might be in the other binder, if you're not seeing the tabs.

THE COURT:  We're on volume two.

BY MR. BARRY:

Q    All right.  Are you at 170, Chief Ceja?

A    Yes.

Q    And do you recognize this photograph?

A    Yes.  It's outside the engineering log room.

THE COURT:  And you agree, so we can publish?

MR. BARRY:  Okay.

MR. JONES:  Yes.

MR. BARRY:  So I'll move to admit 170.

THE COURT:  170 and 171 are received.

MR. BARRY:  All right.  So let's actually -- can we please publish 171 first.  Okay.

III-180

BY MR. BARRY:

Q    So, Chief Ceja, you should -- you can look at it in the binder, 171, or you should be able to see it on your screen, as well.

A    Okay.

Q    All right.  So Government's Exhibit 171, what are we looking at right now?

A    That's the door to the entrance in the engineering log room.

Q    And you testified that the engineering log room is where more senior members of the engineering department meet for meetings?

A    That's correct.

Q    Does the log room also have computers?

A    Yes.  There's multiple computers, and I believe a secret asset.

Q    When you say "secret asset," do you mean secret in the kind of like colloquial sense, or secret in the Government classification sense?

A    In the Government classification.

Q    Okay.  So the computer ship log room has a secret asset in it?

A    That's correct.

Q    Because of that, is access to that room limited?

A    Yes.  It's locked with a cypher lock.

III-181

Q    And is that -- which of those locks on that door is a cypher lock?

A    The cypher lock would be the one at the bottom.

Q    Okay.  In order to access that room, because of that asset in there, do sailors or marines have to have a certain level of security clearance?

A    Yes.  To enter the room, you have to have a security clearance.

Q    And you see that sort of dial at the top of the door in the photograph?

A    Yes.

Q    What is that?

A    I'm not sure.  I've never used it.  I only used the one at the bottom.

Q    Okay.  Does that bottom lock have a code associated with it?

A    Yes, it has a code.

Q    And is that code used to limit access to that room?

A    That's correct.

Q    Does the Navy keep track of who enters or exits that room?

A    There's a log that you have to sign in if you're not a part of the department, or, if you don't have a clearance, you have to sign the log.

Q    So, if you're not part of the engineering department,

III-182

or you don't have a clearance, and for some reason you go into that room, you've got to sign a log?

A    Yes.

Q    Now let's go to Exhibit 170, please.  Are you with me, Chief Ceja?

A    Yes.

Q    Okay.  What is 170 showing?

A    So those are the lockers that you use to store your personal electronic devices prior to entering the log room.

Q    And from the perspective of this camera, if I'm standing here (indicating), and I'm pointing towards you, and that's the scene that you're seeing, where is that door to the log room located vis-a-vis me?

A    So, if you're facing the lockers, it would be on your lefthand side, the entrance to the door.

Q    Okay.  What are these cubbies used for?

A    They're used to store personal electronic devices prior to entering the log room.

Q    So, if people enter that log room, are they supposed to leave their personal device outside?

A    That's correct.

Q    Why is that required?

A    Because of the secret asset in the room.

Q    So that's a security measure?

A    That's correct.

III-183

Q     Let's go to 172, please.  What's this depicting?

A     That's the inside of the log room.

Q     And those are the computer stations that you testified to that are available?

A     Yes.

Q     Are these computer stations assigned to individual sailors?

A     So each cubicle is designated for a separate division, so electrical, auxiliaries, main propulsion.  Each one of them has its own stand-alone computer.

Q     And is each division within the engineering department supposed to use their computer as assigned to them?

A     They can use any of the computers available. (Indiscernible) they would store all their applicable documentation above their computer.  So (indiscernible) would sit in the one station.

Q     Let's go to 173, please.  Is this a close-up of one of those computers in that log room?

A     Yes.

Q     In order to access this computer, does a user need to do anything special once they're in that room?

A     In order to access, you have to have access granted by the ship's IT department, and you have to have a common access card in order to log in, once you get the access.

Q     So, if someone were to go up to that computer screen

III-184

and shake the mouse, and try to log in without a common access card, would they be able to do that?

A     No.

Q     Once someone plugs their common access card in, what do they have to do next?

A     They have to type their PIN specific to their card in order to access the computer.

Q     So, for example, if you tried to use somebody else's card, and you put it into that computer station, but you didn't know their PIN, would you be able to access that computer?

A     No.

Q     Once somebody is logged into that computer, is there a shared drive that's accessible?

A     Yes, there is.

Q     And is that shared drive compartmentalized or segmented in any way?

A     There's departmental access folders that (indiscernible)  you have access to your specific department.

Q     If I were to get somebody else's CAC card or common access card, I'll get into that machine, try a couple different PINs.  At some point, would I get locked out?

A     After three attempts, your card gets blocked, and you have to unlock it.

III-185

Q    Let's go to 174, please.  Okay.  What's this?

A    That's the forming machine, then closed operating station.

Q    So this is a different room than the log room that we were just talking about?

A    Yes.

Q    And who works in this space?

A    Sailors assigned to MMR1.  That's the control booth that we work out of.

Q    And MMR1, that's the team that you led when you were on the Essex?

A    Yes.

Q    What's in this room, generally speaking?

A    So, in this room, it's not shown in this picture, but we have all the controls for the plant, all the electronic automatic controls.  We have generator controls.  We have the throttles for the shaft, and off to the side, that is a fan coil unit used for cooling all the electronics in the room, and shown in the picture we have our applicable tech manuals for the equipment in the space, and the work station.

Q    Is anybody on the ship allowed to go in this room?

A    Only sailors that work down there, or when we're on the way, that becomes our main control, and it's a central point of contact for everything engineer-related.

III-186

Q    What do you mean when you say "main control"?  Can you describe a little bit?  I guess there's two things I'd like you to describe.  You said, when the ship is away, this room becomes the main control room.  Explain what that means.

A    So there's 11 watchstanders.  When the plant is in operation, there's 11 watchstandes.  The main watchstander is the engineering officer, or the watch, and that's his station where he stands watch.  All functions within the department that have to do with engineering, they come to him, and he gives out orders and directs the plant from down there.

Q    When you say the ship is "away," what does that mean?

A    When the steam plan is in operation.

Q    So does that mean that, essentially, when the steam plant is not in operation, the room is treated in one way, and when the steam plant is in operation, the room is treated in a different way?

A    Yes.

Q    Let's go to 175, please.  What's this?

A    That would be the computer in Forward MMR (phonetic).

Q    And that's -- is that a computer that is accessible to the shared drive?

A    Yes.

Q    Would access to the shared drive be similarly limited in the same way that the computers in the ship's log room

III-187

were limited?

A    That's correct.

Q    Let's go to 176, please.  Is that little card that you see in the bottom right -- is that an example of the common access card that you testified about earlier?

A    That's correct.

Q    And so that's the little sleeve or slot that that card needs to be inserted for that particular computer to read?

A    Yes.

Q    Let's go to 177, please.  What are we looking at here?

A    Those are technical publications for equipment within the space.

Q    Who uses these physical copies of manuals?

A    Physical copies are used by sailors when they're conducting maintenance or corrective repairs on the equipment.

Q    How are the manuals used?

A    So it's sectioned off by portions, and for most of the manuals, chapter five would be corrective, and equipment, specific details on how to repair it or troubleshoot it, and it's also used for starting and for advancement purposes for the sailors.

Q    So, if a member of your team encountered an issue with the propulsion plant, and they didn't know what was causing it, and they were trying to troubleshoot it, would these

III-188

manuals be one of the resources available to them to figure that out?

A    Yes.  It would be their primary resource.

Q    Are some of these manuals also available in electronic format?

A    Yes.

Q    So, if they're available in electronic format, why have a bunch of physical copies, too?

A    So the copies are maintained in physical format in case the line goes down while we're out to sea.  We keep mostly printed manuals on the principal equipment like the boiler, the ship's service turbine generators, evaporator.

Q    So you keep physical copies kind of as a backup?

A    That's correct.

Q    And is part of that because, if you're at sea, in the middle of the ocean, and you have an issue with the propulsion plant, you and members of your team want to readily have access to these materials to figure out what's going on?

A    Yes.

Q    Is that important to your job and your team's job in terms of maintaining and repairing that propulsion plant?

A    Yes.  We have multiple levels throughout the plant, and sometimes having a computer up there is not feasible, so we (indiscernible) carry the physical copy to do maintenance on

III-189

maintenance on station.

Q    Are these physical copies widely available throughout the ship?

A    Yes.

Q    How are they widely available?

A    So we have some in the log room, throughout the department.  Auxiliaries repaired within their shops, they have manuals printed, as well.

Q    Are they available to members outside of the engineering department?

A    They will be if they access to the shop.

Q    Okay.  And you testified earlier that, especially when the ship is away, access is limited to that space?

A    Yes.  There's 11 watchstanders down there at all times.

Q    So, if somebody were to show up who's not a member of the engineering department, would they be questioned as to why they were there?

A    Yes.  They would be questioned and directed to the supervisor or the engineering officer, the watch.

Q    Is the distribution outside of the engineering department of these manuals a security measure?

A    It's most on a need-to-know basis.  Nobody would normally ask for these type of manuals.

Q    Okay.  So let's take a step back.  I know we talked a little bit about some of the scenarios in which the ship is

III-190

at sea.  I want you to imagine the ship's anchored.  We're at a pier, okay, at base, Navy base, Naval Base San Diego.  In order to get access to this room where these manuals are, would someone first need to get access to the base?

A    That's correct.

Q    Would they then need to get access to the pier where the Essex is anchored?

A    Yes.

Q    Would they then need to get access onto the Essex?

A    Yes, to the quarterdeck.

Q    And then would they need to then get access or authorization to go into this room?

A    Yes.

Q    You talked, also, about how this room is even more protected when the ship is at sea.  When it's in operation, are there other kind of protective or security measures that are put in place that the people in that room have to follow?

A    Mostly it's just the watchstanders.  They're roaming around, monitoring the equipment.

Q    Do people also have to wear additional gear while the plant is operating?

A    Yes.  When the plant is in operation, they have to wear fire-retardant coveralls, steel-toed boots, hearing protection.

III-191

Q    From a security perspective, when the plant is operating, meaning it's on, why is access restricted?

A    Access is restricted due to the fact that we have sensitive equipment down there, electrical generators.  If they bump into a valve or control system or anything like that, they could disrupt our plant operation, causing us to lose our power throughout the ship.

Q    So, even if someone unintentionally did something in that room, they could disable the power to the entire ship?

A    Yes.

Q    And if somebody intentionally wanted to do something and had access to that space, they could intentionally disable the ship?

A    That's correct.

Q    I want to show you just the first page of what's been marked as -- or introduced as Government's Exhibit 201.  Can you see that on the screen?

A    Yes.

Q    At some point during the investigation, did one of the law enforcement agents ask you if you could locate this document on the shared drive?

A    Yes.

Q    Were you able to locate it?

A    I was.

Q    Where?

III-192

A    I went into the shared drive in the cross-departmental folder.  I typed in "Weapons," and we were able to locate that manual.

Q    And was it in a specific subfolder of the cross-departmental folder?

A    Yes.  It was in the SWO folder.

Q    What's that mean?

A    "SWO" is "surface warfare officer."

Q    And do you know what that cross-departmental SWO folder is intended for?

A    It's used for training on the surface warfare officers when they're trying to obtain their qualifications.

Q    So, if you weren't studying to become a surface warfare officer, then you shouldn't have been accessing that folder.  Is that accurate?

A    Yes.

Q    I'd like you to see -- I want to go to what's been already admitted as Government's Exhibit 139, please, and if we could go to page eight of the PDF, and could we -- okay.  What is this?

A    That would be the ship's directory for dialing within the ship's circuits.

Q    Does this show the sleeping quarters of senior members on the ship?

A    Yes.

III-193

Q    Does it list the sleeping quarters of the chief engineer of the engineering department?

A    Yes, it does.

Q    And it also lists the location of the commanding officer's cabin?

A    Yes, it does.

Q    If you look a little below, does it also list the cabin of the commander of the amphibious group?

A    Yes.

Q    Do you know what that is, what the commander of the amphibious is, generally?

A    Yes.  He's in charge of the landing force that we have on board the ship.

Q    So he or she is generally going to be a marine?

A    Yes.

Q    And then that "Tack" column, can you kind of explain to us what those alphanumeric codes mean?

A    So the alphanumeric code is the location of the compartment within the ship.  Our first number would be the level.  Our "02," for example, would be the level, with the main deck being "01."  The second number would be the frame, and the third number would be the location, whether it's port or starboard, and the latter will be a designation whether it's a living space or engineering space, or storage.

III-194

Q    So does that tack number provide kind of like a three-dimensional location within the ship of where that specific room or cabin is?

A    Yes.  It pinpoints the location of the compartment.

Q    And I want to show you page nine, so just the next page, please.  If we could highlight that, please.  Do you see the section about "Engineering department"?

A    Yes.

Q    That was the department you were in, right?

A    That's correct.

Q    And does this list the locations of certain members and range related to the engineering department?

A    Yes.

Q    And it uses that tack number which pinpoints those locations on the ship, correct?

A    That's correct.

Q    All right.  We can take that down, please.  I want to show you what's been admitted as Government's Exhibit 142.  Okay.  And I just want to show you that first photograph, please.  Do you recognize what this is?

A    Yes.

Q    What is it?

A    Those are our damage control plates, located in damage control central.

Q    So what is -- let's describe those two things.  Number

III-195

one, what is damage control central?

A    So damage control central is a place on the sixth deck on the ship that's used for battling casualties, flooding, fire, smoke, and it has plates.  These plates are used to set boundaries to prevent the casualty from spreading out further than the effective location.

Q    When you talk about or use the phrase "damage control" in the context of a ship, what does that mean?

A    So any catastrophic casualty, as in a fire, flooding, smoke, toxic gas.

Q    So these plates, I think you called them "damage control plates"?

A    Yes.

Q    These are detailed schematics about the Essex and how the Essex would respond to certain types of damage control scenarios?

A    Yes.  It lists specific piping and systems running through compartments.

Q    Does this room also have a secret asset in it?

A    The plates have a classification.

Q    And are there plates in this room that are of different levels of classification?

A    Yes.

Q    Similar to what you testified about earlier, is access to that room limited?

III-196

A    Yes.

Q    If a foreign adversary had access to these plates, would they know how the ship's crew is trained to fight fires or other damage that could happen to the ship?

A    I believe that it would give them a greater picture of the extent of the damage.

Q    At some point during your time on the Essex, did you encounter a Navy officer named Jinchao Wei?

A    Yes, I did.

Q    And were you his supervisor while on the Essex?

A    I was his supervisor, yes.

Q    When were you his supervisor?

A    From the time he checked on board until he got detained.

Q    So is that from about 2021 to about 2023?

A    He came in when we got back from deployment, so it was around February or March of 2021.

Q    Okay.  Or, actually, I misspoke.  You were on the Essex from 2021 to 2023, correct?

A    That's correct.

Q    And did Mr. -- if you want, you can reference that exhibit -- there's a little -- to your right -- describing the ship's movements, if that helps you.  But Mr. Wei joined the Essex in 2022.  Is that right?

A    That's correct.  He showed up to the ship when we came

III-197

back from deployment.  It was March of 2022 when we returned.

Q    Is Mr. Wei in the courtroom today?

A    Yes.

Q    Would you please point to him and describe what he's wearing?

A    He's over there (indicating).  He's wearing a black suit with a white shirt.

        MR. BARRY:  Let the record reflect that Chief Ceja is pointing at the Defendant.

        THE COURT:  Yes.

BY MR. BARRY:

Q    As the Defendant's supervisor, how would you evaluate him as a sailor?

A    He was our -- from the time he showed up on board, he was probably one of the most motivated sailors I've ever had work with me.

Q    Why do you say that?

A    Normally you don't see sailors with that type of motivation or tenacity to obtain qualifications at that pace.

Q    Was he a quick learner?

A    Yes, he was.

Q    Was he highly motivated?

A    Yes.

III-198

Q    You've supervised sailors for about how long?

A    Nineteen years.  I've been in 19 years, but I've supervised around 10 to 12 years.

Q    During your 10 or 12 years of supervising sailors, how would you rank the Defendant relative to other sailors who were at his level?

A    He was definitely in the top tier as far as work ethic and willingness to learn, going above and beyond what is asked of him to do.

Q    During your time supervising him, did he actively seek out new information?

A    Yes.  He was never content with the level of responsibility, given he always wanted more.

Q    Can you give an example of that?

A    So normally a brand-new accession sailor, it will take them anywhere between two to three months to obtain their first qualification, which would be our engine room messenger.  He got it out relatively faster than anybody else, and he started working immediately on the next qualification.

Q    Can you think of any other examples of the Defendant being very eager to learn, and kind of learning at a quicker pace than others?

A    So, normally, first-time sailors, they come, and they're limited to basic maintenance, cleaning, painting,

III-199

that kind of nature.  He was more interested in learning the technical side of the rating, like getting involved in repairs, maintenance.

Q    Did he ever qualify to serve as a watch officer?

A    He did not.  He got up to (indiscernible), which would be the second qualification from messenger.

Q    Did he qualify to be able to serve in multiple watch stations?

A    Yes.

Q    And was that something that gave him greater access to different parts of the ship?

A    It gave him more access, due to the fact that he was working on the equipment and operating it while we're out to sea.

Q    At some point when you were supervising him, did he volunteer to transfer to another ship?

A    When the ship went dry dock, they asked for volunteers for the U.S.S. Boxer, and he volunteered for that.

Q    Did he ever end up going to the Boxer?

A    He did not.

Q    Do you know why?

A    Our chief engineer said no.

Q    Do you know if it was related to this investigation?

A    I'm pretty sure it was.

Q    All right.  I want to go to Exhibit 1, actually, and if

III-200

we can go to page 11, please.  What his this?

A    That's a periodic eval that sailors receive bi-yearly.

Q    And if we can go to the next page, please.  Is that your signature in the middle of the page?

A    Yes.

Q    And is this the evaluation for the Defendant?

A    Yes.

Q    And then if we could zoom out a little bit, and you might need to go to the prior page, as well, but, for this evaluation, how did he rank relative to his peers?

A    If you'd go to the back page.

        MR. BARRY:  Go the next page, please.  Could we go to page 12, please.  Is that the page?

        MS. MULLINS:  That should be.

        THE WITNESS:  Yes.  So he received a "Must promote" for this evaluation cycle.

BY MR. BARRY:

Q    And was he given an individual trait average -- look at the middle of the page -- of 3.67?

A    Yes.

Q    And what time period was this evaluation for?

A    If we can go back to the first page.  That one was from February 2nd, 2022, to July 15, 2022.

Q    Now let's go to page 13 of the PDF, please.  Is this another evaluation that you completed for the Defendant?

III-201

A    Yes.

Q    And what time period is this one for?

A    That's from February 28th -- or, sorry, from July 16, 2022, to February 20th, 2023.

Q    And how did he rank in this evaluation?

A    Can we go to the back page?

        MR. BARRY:  So 14, please.

        MS. MULLINS:  What?

        MR. BARRY:  Page 14 of the PDF, please.

        THE WITNESS:  So, on this evaluation, he got a "Must promote."  This evaluation was submitted for him to take the advancement exam to second class petty officer.

BY MR. BARRY:

Q    And during this period, it looks like his individual trait averages actually improved than the prior period?

A    That's correct.

Q    In retrospect, did you view the Defendant as a -- or, actually, not in retrospect.  At the time, did you view the Defendant as a rising star within the engineering department?

A    Yes.

Q    Before he was arrested, did you know that he had been sending tech manuals of the Essex to someone outside of the United States?

A    No, I didn't.

III-202

Q    Did you know that he had been sending photographs and videos of various spaces on the Essex to somebody outside of the United States?

A    No.

MR. BARRY:  No further questions.

THE COURT:  Thank you.

We'll take our afternoon recess.  We'll be in recess until 3:15.  Please remember the admonition I gave to you earlier.

(Jurors exit courtroom.)

THE COURT:  Thank you.  Who will be our next witness?

MR. PARMLEY:  Two USCIS individuals, Natasha Flores and Reem Younis.

THE COURT:  And then for tomorrow?

You may sit down.

MR. PARMLEY:  The two for tomorrow, Cat Hamilton and Daniel Caldwell.

THE COURT:  Okay.

MR. PARMLEY:  Those will be the last witnesses.

THE COURT:  All right.  Thank you.  We're in recess.

(Proceedings recessed briefly.)

THE CLERK:  Jury entering.

(Jurors enter courtroom.)

III-203

THE COURT:  Welcome back.

All jurors are present.  I remind you, you're still under oath.

You may proceed.

CROSS EXAMINATION

BY MR. BERTOLA:

Q    Good afternoon, Chief Ceja.

A    Good afternoon.

Q    So, in the beginning of your direct examination, you mentioned only seven ships in the entire Navy use stem propulsion still?

A    That's correct.

Q    So is it safe to say, given the entirety of the ships in the Navy, steam propulsion is relatively uncommon?

A    Yes.

Q    Would you say it's due to its -- no new ships are being made utilizing steam propulsion, correct?

A    Yes.  Their obsolescence is running due to parts.

Q    Is it also due because newer technologies are more efficient and better at giving propulsion to ships?

A    Yes.

Q    And you were Mr. Wei's supervisor on the U.S.S. Essex, correct?

A    Yes.

Q    And you were the supervisor of -- or the -- you were in

III-204

charge of main machinery room one, correct?

A    Yes.

Q    While Mr. Wei was serving on the Essex?

A    That's correct.

Q    And main machinery room one is a large department, kind of in the bottom of the ship, correct?

A    Yes.  It's a division within the department.

Q    And within main -- within that division, the computer ship log room, the one secured with the cypher lock, is located within machinery room one, correct?

A    The log room is located in the second level, so the main machine room is all the way at the bottom of the ship. The log room is two decks above the main deck.

Q    So it is within the division, though, correct?  Or is it a separate room outside of the division?

A    Yes, it's a separate room.

Q    So you -- the computer ship log room was not under -- you didn't control that room at all?

A    No, I didn't.

Q    Understood.  So do you have any knowledge of who would access or not access the room with the cypher lock, the computer log room?

A    We would go up there for the morning meetings, and a lot of the senior leadership would be there, planning committees, and during the dry dock, everybody used those

III-205

computers, due to the availability of computers throughout the ship.

Q    But, under your duties, were you responsible for kind of determining who was allowed in and out of that room at all?

A    Yes, to a certain extent.  When I needed something done, we would send them out to a log room, when there was no computer available downstairs.

Q    Do you have any knowledge of Mr. Wei's access to that room?

A    Yes.  He was the assistant works (indiscernible) that room closing out weeks, planning maintenance.

Q    So you have personal knowledge of him entering the room?

A    Yes.

Q    Do you know how many times he entered that room, or is it too large of a number to --

A    It's too large.

Q    Okay.  So, once you had the code for the cypher lock, could you freely enter the room, or would you have to check in before you could enter it, even if you had the access?

A    If you had the code, you could freely enter the room.

Q    And there was nobody checking who went in and out?

A    During normal working hours, we used to have a yeoman that would vet people coming in and out, but, after working

III-206

hours, if you had the code, you could enter the room.

Q    So, during working hours, there's a person at the door that's checking every single person that tries to gain access to the room?

A    Yes.

Q    Did they log who goes in and out of the room?

A    If they're not part of the department, they do their log in the record book.

Q    So, if they're part of the department, no log is made?

A    No.

Q    And you also talked about the physical manuals that are present on the ship that are used for repairs and et cetera?

A    Yes.

Q    Where are those physical manuals located?  Are they within your room or the log room?

A    The physical manuals were located in the main machinery room where we worked at.

Q    And I believe you mentioned there was also security protocol to enter the main machinery room, correct?

A    Yes.  There was a roving watch who was constantly monitoring everybody in the space, as well as the equipment.

Q    So is that an individual that's monitoring who's in?

A    Yes.

Q    And if they see somebody out of place, they would report it or ask them to leave?

III-207

A    They would ask them to leave, and then report it to a senior DE (phonetic) officer out there.

Q    And the manuals themselves, are there any security measures regarding the manuals?

A    So the manuals are contained inside the control booth, which has two doors on each side, and, normally, when the watchstander finishes taking his ratings or doing his rounds around the space, that's where he's normally stationed at.

Q    Are those doors locked at all?

A    They'll have a hatch on them.  They're not locked, though.

Q    They have a hatch.  So you just need to turn the hatch?

A    Yes.

Q    There's no key card you need to put in, or a code?

A    No.

Q    And the person observing, do they stop people from entering?

A    If they're not part of our department, then they have no business being down there.  They'll confront them, ask them what their business is, and I'll report it to a senior officer on duty that day.

Q    And that is their actual orders to perform that way, to stop people from entering who are out of place and deny the Next?

A    Yes.  It's part of their training, the qualification

III-208

process.

Q    And that person on watch is only on watch during normal operating hours?

A    That's a 24-hour watch.  So somebody around the clock is down there at all times.

Q    So, if you're part of the department, are you free to take the manuals at your pleasure, in and out of the room?

A    Of the department, no, but, if you're part of the division, if you worked any machinery, you can read the manuals any time you want, or take them for maintenance, or whatever you need them for.

Q    So you can take them out of the room freely?

A    They could take them to their compartment and study, but we always require the manuals come back.

Q    Is there a log of the manuals that are printed?

A    No.

Q    So is there somebody responsible for making sure the logs that are printed are maintained there, and aren't out of place?

A    For the operating logs or for the technical manuals?

Q    Let's start with the technical manuals.  Is there somebody that makes sure all the printed ones are placed back there, or kept track of, in general?

A    For the tech manuals, they're not documented anywhere.

Q    So is it safe to say, if one went missing -- strike

III-209

that.

What about the other printed material that you mentioned?  Is that recorded at all?

A    So the printed material, out of the logs, those are collected daily and reviewed by all the supervisors, to include our chief engineer.  He signs them, and they're filed on board for six months.

Q    And, again, the technical manuals are not inspected in any way after they're printed.  They're just left in that room and available to access by members of the division?

A    Yes.

Q    And yes, you mentioned you were Mr. Wei's direct supervisor, correct?

A    Yes.

Q    From the entire time he was on board the ship?

A    Yes.

Q    And you mentioned he was one of the most motivated sailors you'd ever seen?

A    That's correct.

Q    Do you believe he had a genuine interest in the subject matter he was learning?

A    Yes, I did.

Q    Did you develop the opinion that Mr. Wei wanted to be challenged by his work?

A    I believed he wanted to succeed and accept more

III-210

responsibility.

Q    You mentioned he was interested in the technical side of his job, correct?

A    Yes.

Q    But the actual -- the majority of the work he performed was more on the manual labor side.  Is that correct?

A    For the time he first got there, yes.  He performed a lot of physical stuff that we have the new personnel accomplish, but towards the latter part of his time there, he was the assistant works supervisor, so he was in charge of coordinating weekly maintenance, repairs, and stuff (indiscernible).

Q    And about how much time would that have been, when his duties got more technical?

A    I would say the last year he was (indiscernible).

Q    And you said he got dual access, correct?

A    In regards to what?

Q    You mentioned him gaining dual access because he had dual rules, so he had more access to different departments on the ship?

A    So, as far as his qualification, he had more access to equipment that he operated.

Q    And you said he had greater access, and that -- greater compared to what?

A    So our new personnel will check in.  They essentially

III-211

rove the spaces and collect samples and stuff (indiscernible).  He was in charge when he qualified as second watch, in charge of the boiler room, the lower level. So he had access to all the equipment on the lower level, and he was responsible any time we changed speed to make sure that the equipment was corresponding to the speed and we had enough pressure, temperatures, up to par for the speed being requested.

Q    Was that uncommon for a sailor of Mr. Wei's position?

A    For a sailor of his time on board, yes, it wasa.

Q    And you viewed Mr. Wei as a rising star, correct?

A    Yes.

Q    And you didn't know he was sending info during the time he was working under you, correct?

A    No, I didn't.

Q    Did any of his actions give you reason for concern while he was working under you?

A    No.

          MR. BERTOLA:  No further questions, your Honor.

          THE COURT:  Thank you.

          MR. BARRY:  Just a few on redirect, please.

          THE COURT:  You may.

                    REDIRECT EXAMINATION

BY MR. BARRY:

Q    Chief Ceja, did you expect the Defendant to follow the

III-212

result regarding how to handle tech manuals?

A    Yes.

Q    Did you at some point tell the investigators that you thought, in retrospect, the Defendant was too good to be true?

A    Yes, I did.

Q    You testified earlier that the manuals, or at least the physical copies, are in main machinery room one, so that, if the ship is at sea, and the computer network is not available, and something happens, whoever is manning that station can reference those manuals quickly to figure out what the issue is, right?

A    Yes.

Q    So I want to -- if we could just pull up Exhibit 26, please.  Are there more secure spaces on the ship?

A    Yes.

Q    Is there a space for secret material?

A    That's correct.

Q    Is there a space for top secret material?

A    Yes.

Q    And does that space that has top secret material have greater security procedures in place than main machinery room one?

A    Yes.

Q    So I want you to -- and when you're talking about on

III-213

the deck, on the ship, approximately, is the -- how long does it take to get between decks?

A    So, from the main deck to the main machinery room, if you're walking from the (indiscernible), between three to five minutes, depending how fast you're moving.

Q    Okay.  And what if you're, like, moving from one -- you know, from the bow to the stern or something like that?  How long does that take, if you're in the -- if the ship is moving, it's at sea, how long would it take to walk that space?

A    If we're at sea, there's more personnel walking around, so I'd probably say 10 minutes from bow to stern.

Q    Okay.  So let's just imagine the ship is somewhere here in the Pacific, right, a couple thousand miles from land, and something happens with the propulsion plant.  Power on the ship is about to go out.  Okay?  What would happen if whoever is manning that main machinery room number one needed to go to the space, the most secure space on the ship, to go look in that manual to figure out what to do?

A    It would be too late.  It would probably lose all propulsion and be dead in the water.

MR. BARRY:  No further questions.

THE COURT:  Anything further?

MR. BERTOLA:  Yes, your Honor.

//

III-214

RECROSS EXAMINATION

BY MR. BERTOLA:

Q    So you mentioned the rules regarding tech manuals, correct?

A    Yes.

Q    Is there a rule against putting a tech manual on a personal device?

A    The manuals are -- they're, like, on a need-to-know basis, so sailors, they would see what's called the "BIBS (phonetic)," a study guide for advancement, and a lot of the sailors have physical copies of digital copies of those manuals they need to advance.

Q    So you can put a technical manual on a personal device?

A    Yes, but it has to be for use within your rating, your job.

Q    Understood.  Have you ever put a technical manual on your personal devices?

A    Yes.

        MR. BERTOLA:  No further questions, your Honor.

        THE COURT:  Anything else?

        MR. BARRY:  No further redirect.

        THE COURT:  May he be excused?

        MR. JONES:  Yes, your Honor.

        THE COURT:  All right.  You may call your next witness.

III-215

(The witness was excused.)

MR. PARMLEY:  Thank you.  Plaintiffs call Senior Immigration Services Officer Natasha Flores.

THE CLERK:  Please raise your right hand.

NATASHA FLORES - PLAINTIFF'S WITNESS - SWORN

THE CLERK:  Please take the stand.  Please state your name, your first and last, and spell each for the record.

THE WITNESS:  Natasha Flores, N-A-T-A-S-H-A, F-L-O-R-E-S.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. PARMLEY:

Q    Good afternoon.

A    Good afternoon.

Q    Officer Flores, where are you employed?

A    With USCIS.  That's United States Citizenship and Immigration Services.

Q    And where are you employed with USCIS?

A    At the San Diego field office.

Q    What, exactly, does USCIS generally do?

A    We're known as the "benefit people," so we adjudicate immigration benefits.  So people apply for different types of immigration benefits, green cards, citizenship, and we adjudicate those benefits.

III-216

Q    So someone would apply for some immigration benefit, and you would be the agency that makes that decision and helps them through the process?

A    Correct.

Q    Okay.  And how long have you worked there?

A    I have been there for about nine years.

Q    What's your title there?

A    I am a senior immigration services officer.  I've been in that position for about three years, and prior to that, I was just one level down.  It's called an immigration services officer, level two, and then now the senior position, level three.

Q    What are the duties of both a senior immigration services officer and I guess what you called a "regular immigration services officer"?

A    So they have a lot of similarities.  So a regular immigration services officer, you are interviewing those people that applied for the benefits, so you're conducting green card interviews, you're conducting citizenship interviews, and then you're also adjudicating benefits that maybe don't require interviews.  You're making decisions.  You're doing writing, making any sufficient decisions.

     As a senior, it's a little bit -- usually working on cases that might be a little bit more complex, might have some sort of visibility to them, or, also, I conduct

*Echo Reporting, Inc.*

III-217

training.  I'm in charge of training, like, the new officers that we intake, and developing training.  It's a little bit different.

Q    So a little beyond the supervisory role.  Is that right?

A    Well, from time to time, I am asked to step in.  When the supervisors have meetings and things, I have to kind of cover the supervisory role in that way, like reviewing people's work if they're on supervisory review, but that's not my main role.  It's mostly just those more complex cases, training, a lot of security checks that we do.  Like, say, before somebody naturalizes, we do something called a "just in time check."  I have to run all those every week.

Q    Okay.  And you've been -- you said for about nine years you said you've been --

A    So nine years with USCIS and three years as a senior.

Q    And prior to that, did you have any government employment?

A    Right.  So I've been the Department of Homeland Security for 18 years total.  Prior to USCIS, I was at -- I was a CBP officer, so U.S. Customs, Border Protection Officer at the San Ysidro port of entry, and a little bit at the Otay port of entry, as well, and I did that for eight and a half years.

Q    So one of those people would be working at the booth at

III-218

the border to assess people's entry into the United States. Is that right?

A    Right.  So there's different position you can have.  I did that, where -- you know, what we all see when you cross the border.  Someone is just kind of at the booth, checking your dos, talking to you, "What did you bring?  Why did you go to Mexico?"

I did that for about five years.  When you're doing that work, you also get assigned a lot to do seizures, so, say, money, drugs, seizures.  So you're processing those, weighing them, boxing them, making sure every -- like, it's done properly, so that for about five years.

Then, from there, I went to an immigration unit, where we -- people would come, say, to the border with, like, some sort of fake document, trying to come into the United States, so we would process those individuals, and I did that for probably the last three, four years of my time at the border.

Q    But that was a totally separate agency or group than the one you're working for now.  Is that right?

A    That's right, still under Department of Homeland Security, but totally different work.

Q    Okay.  Are you familiar with something that's called an "alien file" or an "A file"?

A    Yes.

III-219

Q    What are those?

A    An A file is a file that we create when somebody has their first encounter with the immigration system, so that can be -- their first encounter might be with my agency, like, if they've never had any adverse actions, never been deported or remove, and their first time having contact with USCIS, we would issue them an alien registration number and a physical file.

It can also be issued at the border if they have some sort of -- like the person I said with, let's say, a fake document, and we're going to issue them some sort of removal.  We would give them an alien registration number and a file at that time.

Q    So, if I understand you correctly, it also includes an actual physical file?

A    Yes.

Q    And it's a specific number that's assigned to it?

A    Yes.

Q    And is that number unique for each person that has an A file created for them?

A    Yes.

Q    And what kind of documents would be kept in something like an A file?

A    So the basic information about that person would be the start of there, so, like, their birth certificate, marriage

III-220

certificates, divorce certificates, then whatever paperwork that the Government has issued to them.  So, if they have been removed before, then those documents would be in there. If it's their first encounter with us, then it would be their application for their green card, lawful permanent resident card, just all -- their entire immigration history is going to be housed in that file.

Q    And how long does that A number stay with a particular person?

A    Their entire immigration, until -- all the way through.

Q    Okay.  So, in that way, it's sort of like a Social Security number?  It's unique to a person?

A    Yes.

Q    Okay.  Is USCIS responsible for maintaining A files?

A    Yes.

Q    And have you had training and experience working with A files?

A    Yes.

Q    About how many A files would you say you've reviewed over the course of your career?

A    Thousands.

Q    Do you also have access to databases associated with A files?

A    Yes.

Q    And your training and experience covers those

III-221

databases?

A     Yes.

Q     And how often to do you use those?

A     Every day.

Q     Okay.  Are you familiar with a particular A file -- I'm just going to read it out loud -- A214468756?

A     Yes.

Q     How are you familiar with that?

A     I reviewed it.  It's Mr. Wei's A file.  I reviewed it a few times, extensively.

Q     Okay.  And does he have any other A numbers assigned to him?

A     No.

Q     Are you generally familiar with the contents in it?

A     Yes.

Q     Is that file maintained by your agency?

A     Yes.

Q     Could you look at Government's Exhibits 160 through 169 in the binder in front of you?  It might be in a different binder.  Just let me know when you've had a chance to flip through 160 through 169.

A     I'm on 160.

Q     Just go ahead and take your time, and let me know after you've reviewed all of those, and let me know if you recognize them.

III-222

A    Yes, I recognize everything.

Q    And are those documents from the Defendant's A file, Mr. Wei's A file?

A    Yes.

        MR. PARMLEY:  And pursuant to the stipulation, your Honor, we move to admit Government's Exhibits 160 through 169.

        THE COURT:  Any objection?

        MR. JONES:  No.

        THE COURT:  They're received.

BY MR. PARMLEY:

Q    Okay.  We're going to talk about those specifically in a moment, but I want to talk to you about the citizenship process, the process for which somebody applies to become a U.S. citizen.  I'm not talking about somebody who was born here, but somebody who was born elsewhere and wants to become a U.S. citizen.  Are you familiar with that process?

A    Yes.

Q    How are you familiar with that process?

A    I have adjudicated many applications, and taught training regarding that topic.

Q    Could you estimate for me approximately how many naturalization applications you've been involved in?

A    Well, for the first three years of my career, that was all I did, eight hours a day, so that would be eight to 12

III-223

day for five days a week, for three years, so a lot, and then --

Q     I'm not going to require you to do math.  So could you just walk me through the process?  And I'm somebody who's applying to become a U.S. citizen, what does the process look like?

A     So the path to citizenship definitely has to start with -- typically, it's going to start with having a lawful permanent resident card.  You're going to have to meet certain requirements.  So a general requirement that a lot of people put into their mind when they get that lawful permanent resident card is "How long do I have to wait?"

So, generally, you need to wait five years with your green card in order to apply for citizenship.  That's just a basic requirement.  You also have to establish that you have good moral character for five years.  You have to have attachment to the U.S. Constitution.  You need to pass the testing requirements.  So that would be a general requirement.  So then that's INA Section 316.

Then there's INA Section 319.  That's going to be that you're married to a U.S. citizen.  So you're given a little bit of preference because of that.  You only have to wait three years to apply for U.S. citizenship.  You only have to demonstrate three years of good moral character, from the three years prior to the filing of the application up until

III-224

you take the oath, up until naturalization.

Then there's the section of law -- so there's several, but I'm just covering those three. The third one would be INA 329, which applies to Mr. Wei's case, in which you are applying for citizenship due to your honorable service in the U.S. military during a time of hostility. So you might be thinking, like, "How is it a time of hostility?" But, since September 11th, 2001, we're considered to still, unto this day, be under the War on Terrorism.

So, under that, there's different, even quicker, paths to citizenship, because of your military service. So you only have to establish one year of good moral character, pass the testing requirements, show attachment to the U.S. Constitution, and demonstrate that you have good will towards the United States, and then some of the other requirements are waived for military members. So joining the military, I would probably go as far to say that is the fastest path to U.S. citizenship. Yes.

Q    Okay. I appreciate that explanation. I want to back up for a couple of those. You mentioned -- a couple of the things you said. You mentioned something called the INA. Is that particular law related to immigration?

A    Right. So the INA is what governs my agency, the Immigration and Nationality Act.

Q    Okay.

III-225

A    So that is the laws that we follow.

Q    You also said there's some exams or tests associated with it?

A    Right.

Q    What are you referring to?

A    So, for citizenship, in all three of those categories that I mentioned, you need to pass a history test on basic U.S. history, reading, writing, and speaking and understanding English.

Q    And it's very -- I assume there are forms associated with this that you have to fill out?

A    Yes.

Q    And are those some of the documents that have been admitted already?

A    Yes.

Q    Okay.  Is there an interview process?

A    Yes.  So it is required that there is an interview for naturalization.  So that is not a process in which an interview can be waived, ever.

Q    Can you tell me about the interviews for citizenship? What happens?

A    So the applicant will get a notice in the mail to come to a field office in their area.  So, for us, it's quite close to here, the San Diego field office.  They'll come in, check in.  They'll do a fingerprint and photo to verify that

III-226

they are the same person who showed up at the appointment. It's called the "biometrics appointment," that you have to do when you file the application. We just want to make sure that it's the same individual coming for the interview.

They wait until the time. The officer calls them in. The person who's assigned to do their case calls them into the office. They confirm their identity, place them under oath. Then the first thing we do is administer the test. Once they've passed all the testing requirements, then we go ahead and conduct the interview, which consists of reviewing their entire form with them in person, verifying their biographical information, confirming, I would say most importantly, their responses to the eligibility questions on the application, if they responded, "Yes" to any questions, clarifying what occurred, making sure that, if they responded, "No," it's still "No," and then any changes that are made, they would sign for that.

You present to them the oath of allegiance, which is the oath you have to take to become a U.S. citizen. You ask them, are they still willing and able to take the complete oath? They agree. They sign that, and that pretty much would conclude the interview process.

Q    You mentioned they take an oath. Is that at the beginning of the immigration interview?

A    They're placed --

III-227

Q    I'm sorry.  Yes.  They're placed under oath.

A    They're placed under oath, the same thing I did today when I came in.

Q    You have them -- they raise their right hand, swear to tell the truth?

A    Yes.  Yes.

Q    And you said that all of the questions related to eligibility are asked during these interviews?

A    Yes.

Q    Are they recorded?

A    Sometimes, but -- sometimes.

Q    Is that -- would that be atypical, to record an interview?

A    Yes.  It's not -- it would have to be for -- because we have -- there's pretty much only two scenarios in which we record an interview.  There's national security concerns that we are aware of, and/or there are fraud concerns that we are aware of.

Q    So, if you had no concerns about a person going into an interview, you had no information indicating that they were involved in -- they were a national security risk or committing a fraud, then the interview would not be recorded?

A    No, it would not.

Q    So, I mean, could you ball park an estimate of what

III-228

percentage are recorded and what percentage are not recorded, if you can?

A    Maybe recorded, two percent, and those interviews are typically going to be done by a senior officer.

Q    And you mentioned different waiting periods for different people under different circumstances.  Is that right?

A    Yes.

Q    So, after they apply for a green card -- and is that also known as a "legal permanent residence card"?

A    Yes.

Q    Okay.  So a single person would have to wait five years before they could even apply?

A    Yes.

Q    And a person who's married would have to wait three years before they could even apply?

A    Married to a U.S. citizen.

Q    Married to a U.S. citizen.  And a person in the military has to wait how long?

A    No time.

Q    So --

A    They don't have to wait a specific time.  They just need to have served honorably for any period.  So, whatever time it takes to get the paperwork together and mailed in, they can apply.

III-229

Q    So, literally the day somebody enlists, they can apply to become a U.S. citizen.  Is that right?

A    Yes.

Q    Okay.  Let's look at some of the documents now, if you don't mind.  Let's pull up Government's Exhibit 160, one, six, zero, please.

A    Okay.

Q    Do you recognize that?

A    Yes.  This is the request for certification of military or naval service, Form N426.

Q    What is the purpose of this form?  And I'm going to zoom in on it in a moment.  What is the purpose of this form?

A    Since it's going to be a required form for someone who is applying as active duty under INA 329, so they're saying, "I am an active-duty military member."  So we are like, "Please show us that."  This is the form in which they can do that.

Q    So you don't just take their word for it?

A    No.

MR. PARMLEY:  And if you could just zoom in on the bottom portion of that, Ms. Mullins.  Maybe it's, sorry, a little bit -- actually, could you just do all of part one, please.

MS. MULLINS:  Of part --

III-230

MR. PARMLEY:  All of part one that you can see on that page.

BY MR. PARMLEY:

Q    And whose is this?  Whose form is this?

A    Mr. Wei.

Q    If we could go to -- I think you said that they're -- "We don't just take somebody's word for it," correct, that they're in the military?  They have to get somebody to actually confirm that.  Is that right?

A    Yes, but it has to be confirmed, depending on what branch of the military, by specific ranks.  I don't recall them off the top.  I would look them up when I get the case, make sure the correct rank signed on the form.

MR. PARMLEY:  If we could go to the fourth page of the document, please.  Could you zoom in on the portion that's been filled out?

BY MR. PARMLEY:

Q    And is that the certification process you're talking about?

A    Yes.

Q    So who certified the Defendant's military service in this paragraph case?

A    So it says, "Andrew Roy (phonetic)," and this is a captain of the Surface Warfare Engineering School in Great Lakes.

III-231

Q    And he signed it.  Is that correct?

A    Yes, on December 1st, 2021.

Q    So, once that's been signed, filled out by the Defendant and signed, the Defendant is able to apply for citizenship?

A    Yes.

MR. PARMLEY:  Can we go to Government's Exhibit 161, please.  Could you zoom in on the document, please.

BY MR. PARMLEY:

Q    What's that?

A    That is a lawful permanent resident card, or what people commonly refer to as a "green card," shows the applicant's name on there, Mr. Wei's name, the country of birth.  It's the same for everyone, the green -- what's on the permanent resident card, the category in which they were able to become a permanent resident, country that they are born in, when the card was issued, when it expires, date of birth.

Q    So what does this tell you about the Defendant, his place of birth?

A    Well, it tells me -- I mean, when I look at him, looking at it as an immigration officer, I'm seeing, "Okay." First thing I see is that the person is from China, and that they entered as the child, F-I, F-1, so the -- his mother was a fiancee to a U.S. citizen.

III-232

Q    Is that what that -- the category section, is that what that means?

A    Yes.

Q    Can you explain that, briefly?

A    So there's different categories based on how someone does lots of things in immigration, so how you get a visitor's visa or -- not a visitor's, I'm sorry -- non-immigrant visa, so a visa that doesn't allow you to remain here permanently, but just come and go for different reasons.

So let's say you're a student.  Then you're an F-1.  Let's say you're a visitor.  You're a B-1/B-2.  Let's say you're a crewman.  You're a C-1/D-1.  There's just -- it goes on and on forever.

And then there's -- the same thing applies to permanent resident cards.  So you can just glance at the card as an officer and be able to tell, "IR-1.  Okay.  You're the spouse of a U.S. citizen," "IR-O, you're the parent of a U.S. citizen," "IF-2, you're the" -- this was the child of a fiancee visa.

Q    So somebody -- so he's the child of somebody who obtained a fiancee visa to get to the United States?

A    Yes.

Q    Okay.  Can we go to 162, please, and what is this document?

III-233

A     This is the application for naturalization form, N-400.

Q     This is the actual form someone would sign and fill out to become a U.S. citizen?

A     Yes.

Q     What type of information is collected?

A     A lot of things.  So, on this first page here, we're looking at "What category are you filing in?"  Box D is checked, so is applying on the basis of qualifying military service.  Then we're going to have name, date of birth.  There's going to be current address, and we ask for them to provide their addresses for the last five years, employment history for the last five years, marital status, whether or not you have children, your immigration status, when you obtained your permanent residency, and if you have any disabilities that might prevent you from taking the test or completing the testing requirements, and then all the eligibility questions.  That's the bulk of the form.

Q     It's a relatively lengthy form?

A     Yes.

Q     Twenty pages, at least?

A     Yes.  Yes.

Q     Okay.  Information where somebody has lived in the past, who their close relatives are, things of all that nature.  Is that right?

A     Yes.

III-234

Q    Okay.  I want you to turn to page -- part 12, which begins on page 12.

A    Yes.

Q    Do you have that in front of you?

A    I have it on the screen here.

Q    I'm following along on paper.

A    I have it on paper.

Q    Okay.  Are there a number of questions asked of an applicant at that point, on the form?

A    Yes.

Q    Are these just basically yes-or-no questions?

A    They're all yes-or-no questions, and then, if you answer yes to one of them, we ask for an explanation.  The form itself is 20 pages.  I don't know off the top of my head, but I'm sure the instructions are probably not far behind that.

Q    So, for example, question 10 asks some pretty significant questions.  What does question 10 ask, for example?

A         "Have you ever been a member of or in any way associated, either directly or indirectly, with the Communist Party, any other totalitarian party, or a terrorist organization?"

Q    And there's other questions about polygamy, other

III-235

questions about prior criminal records, things of that nature.  Is that correct?

A    Yes.

Q    Let's go to Section 14, which is on page 22 through 28, I believe.  It's lengthy.  Page 14, please.

A    Page 14.  Okay.

Q    So these are additional questions you might ask about potential criminal offenses or acts that would be considered crimes.  Is that correct?

A    Yes.

Q    So, for example, question 24.  What does question 24 say?

A    "Have you ever been charged with committing, attempting to commit, or assisting in committing a crime or offense?"

Q    Hold on a second.  Let's get 24 and 25 up.  Yes, perfect.  And how about 25?

A    "Have you ever been convicted of a crime or offense?"

Q    And how about 26?

A    Twenty-six:

          "Have you ever been placed in an
          alternative sentencing or rehabilitation
          program, for example, diversion,
          deferred prosecution, withholding
          adjudication, deferred adjudication?"

Q    And the Defendant checked no on all of these.  Is that

III-236

correct?

A    Correct.

MR. PARMLEY:  Let's go up to question 22, please, if you could zoom in on question 22.

BY MR. PARMLEY:

Q    Could you read that for me, please.

A        "Have you ever committed, assisted in
        committing, or attempted to commit a
        crime or offense for which you have not
        been arrested" -- "for which you were
        not arrested?"

Q    Is this question asking people to admit to things that they haven't been arrested for?

A    Yes.

Q    Do people actually answer yes to this question?

A    Yes.

Q    Can you give me some examples of that, in your past experience?

A    Maybe bringing, like -- what sticks out in my mind was a case where someone brought in drugs into the United States, but they weren't caught.

Q    People sometimes talk about, maybe, shoplifting or running a red and speeding tickets, things like that?

A    Yes.

Q    So the question is asking, "Have you ever committed a

III-237

crime and not been caught?"

A    Yes, or even assisted, or attempted to.

Q    And what was the Defendant's response?

A    No.

MR. PARMLEY:  Can you go to page 17, please.  Can you zoom in on the applicant's certification and signature, please, the top half of the document.

BY MR. PARMLEY:

Q    Can you read starting with -- there's three paragraphs, and there's one starting with "I understand that USCIS."  Do you see that?

A    Yes.

Q    Would you mind reading that, and then reading the three bullet points after that?

A    "I understand that USCIS will require me
to appear for an appointment to take my
biometrics, fingerprints, photos, and/or
signature, and at that time, I will be
required to sign an oath affirming that
I reviewed and provided or authorized
all the information in my application, I
understood all the information contained
in and submitted with my application,
and all this information was complete,
true, and correct at the time of

III-238

filing."

Q    And just read that last paragraph, please, to us.  Yes.
Just continue.  Thank you.

A         "I certify under penalty of perjury that

          I provided or authorized all the

          information in my application, I

          understand all the information contained

          in and submitted with my application,

          and that all the information is

          complete, true, and correct."

Q    And the Defendant signed that?

A    Yes, on October 15, 2021.

Q    And so this is saying, "This is all true, and then I'm
going to have to take another oath again at the time of the
interview to certify that this is true"?

A    Correct.

Q    Okay.  Let's go to what happens next.  There's an
interview next.  Is that right?

A    Yes.

          MR. PARMLEY:  Let's go to Document 163, please.
Can you just zoom in on the top half of that, please.

BY MR. PARMLEY:

Q    What's this?  What is this document?

A    This is the notice asking Mr. Wei to appear for an
interview at the San Diego field office, 1325 Front Street,

III-239

on Wednesday, April 27th of 2022, at 8:00 a.m.

Q    I see a "Received" date in the top left.  Do you see that?

A    Yes.

Q    1/10, 2022.  What does that mean?

A    The date that USCIS received the application.

Q    So the Defendant signed it in October of 2021, and the "Received" date was January of 2022?

A    Yes.

Q    And then his interview is scheduled for across the street here on April 27th, 2022?

A    That is correct.

Q    Okay.  And what happens during the interview?  You're placed under oath, and is this -- what does it even look like, where someone is giving an interview?  Is there a room for just two people?  What does it look like?

A    No.  Our office is really nice, actually.  The room is -- it's fairly large.  We can fit comfortably the applicant.  A lot of times, people have an interpreter, their attorney.  So we could fit maybe four or five people in there.  It's a really nice building, really clean, nice views.

Q    So let's look at Government's Exhibit 164.  Do you know what this is?

A    Yes.  So this is the -- when I stated earlier that, at

III-240

the end of the interview, they're going to sign two documents, this is the first one, which is going to be presented, typically, on a tablet in front of them, and they can review any changes or updates made during their interview.

Q    So, if I understand that, so the interviewer goes through the whole N-400.  Is that right?

A    Yes.

Q    Asks virtually every question.  Is that right?

A    Yes, yes.

Q    And then, if there are changes, it's noted what, on a tablet, you said?

A    Well, if there's changes, then the applicant needs to let the officer know who's conducting the interview, and that we make those changes, ask the appropriate questions to clarify, depending on what the changes are, and then we annotate those on our end.  At the end of the interview, we have a -- we can send it to the tablet so the applicant can see what changes were made, because they're signing that there's been updates to their application.

Q    So, if there are any changes made, they need to sign off on it?

A    Yes.

Q    And what changes were made to Mr. Wei's application, just on page one?

III-241

A    Right.  It looks like the -- and this might have more of, like, a clerical error in the early processing.  It looks like the section of law which they were applying under was missing, undefined.  It wasn't -- the box wasn't checked.  So that was -- the officer doing the interview updated that.  It looks like an address -- and this, I suspect, might be also a clerical thing, because the address is a military ship.  It tends -- putting this address into the system can be a little tricky, because it's not getting read as like a regular postal, U.S. postal, address.  So those are the two changes or updates I see here.

Q    Okay.  And let's go to the next page.

A    Oh, new response.  Okay.

Q    So, yes.  I guess we missed that.  So the new response is the "King Street (phonetic)" --

A    Yes.

Q    -- and the first response was "Essex."  Is that right?

A    That's what it looks like, yes.

Q    And on 38A, it looks like the original response was "Nothing"?

A    Right.

Q    And that was changed to "Are you currently a member of the Armed Forces?"

A    "Are you currently a member of the Armed Forces?"  It was blank, and then changed to "No," which should be "Yes."

III-242

Q    Well, it says, "If you answered yes, you are currently stationed overseas."  Is that the --

A    Okay.

Q    Is that what's been changed?

A    Okay.  They're answering to eight, 38C.  Correct.

MR. PARMLEY:  Okay.  Can you go to the next page, please, and zoom in on the top half.

BY MR. PARMLEY:

Q    So is this what you're talking about at the end of -- the interview is done?

A    Yes.

Q    And what is the Defendant -- excuse me.  What is the applicant doing at the end of the interview?

A    Signing that what they provided is true and correct.

Q    And are they just signing off on the changes or they're signing off on the entire contents of the Form N-400?

A    They're signing off on the entire contents.

Q    Is that what it actually says?

A    It's there under the signature.

Q    Yes.  Can you read that paragraph for me, so what they're actually swearing to?

A         "I swear, affirm, and clarify under
          penalty of perjury, under the laws of
          the United States of America, that I
          know that the contents of this Form

III-243

N-400, Application for Naturalization, subscribed by me, including the corrections displayed above, are correct" -- I mean, sorry -- "are complete, true, and correct.  The evidence submitted by me on numbered pages one through zero are completely true and correct."

Q    And the Defendant signed it?

A    Yes.

Q    On April 27th, 2022?

A    Yes, on the day of the interview.

Q    And so this affirmation was done under oath?

A    Yes.

Q    And that would include question 22 on the N-400?

A    Yes.

Q    Question 22, which asks "Whether or not you've committed any crime for which you have not been arrested."

A    Yes.

Q    Let's go to the next document, please, Government's 165.  What is this document?

A    This is the interview results.  This is -- I view it -- it's a courtesy that we provide after the interview to the applicant, so they kind of have an idea of what's going to happen next with their case.

III-244

Q    And it congratulates them?

A    If that -- yes.  On this one, it does.

Q    Okay.  And it says, "Recommended for approval."  Is that right?

A    Yes.

Q    What does that mean?

A    That is related to what I touched on earlier, that "just in time" check, because we are not going to say, "You are approved," and then your oath-taking ceremony is down the road, let's say, even five days later.  What if something happens between now and five days?

     And so we run another check 24 before the oath, security checks, and then also ask -- when they get their notice telling them to come to the oath ceremony, it asks them to answer a series of questions that are similar to some of the questions on the N-400, to see if anything has changed since they were interviewed.  So we are really making sure, in every way possible, that someone does not become a U.S. citizen who is not eligible.

Q    So they sign the N-400 under oath, right?

A    Yes.

Q    With all those questions?

A    Yes.

Q    And then, if there are any corrections made at their interview, they sign that under oath, asserting that

III-245

everything is true in it?

A    Yes.

Q    And then, if they don't naturalize that day, in between the time they finish their interview and in between the time they naturalize, you run them again, and then they have to swear again that nothing has changed.  Is that right?

A    Yes.

Q    Okay.  Now let's go to 166, please, and what is that?

A    This is the oath of allegiance.  This was -- this is the oath of allegiance.  So we present the changes at the interview, signed on the tablet, or on paper, and then we also -- once they've signed that, this is the second signature that is captured at the N-400 interview, which is then signing that they agree to the oath of allegiance.

Q    This is an oath of allegiance to the United States?

A    Yes.

Q    And they're required to take that to become a citizen. Is that right?

A    That's correct.

Q    And part of that oath is that they will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic.  Is that right?

A    That is correct.

Q    Let me show you what's been marked as Government's

III-246

Exhibit 167.  Do you recognize what this is?

A    This is the eligibility questions.

Q    Where did this document originate from?

A    Well, I think what -- so the N-400 hard copy has these questions on there, and then, because we're conducting the interview through an electronic system that we use, the questions are also placed in the electronic system, and that's what the officer works off of during the interview. They don't typically have the actual physical N-400 piece of paper in front of them.  They're on a computer, in the specific system that we use, and this is the view from that system.

Q    So this is a printout of the notes of the interview?

A    Yes.

Q    And this was cleared contemporaneously when the interview happened?

A    Yes.

Q    And this shows which questions were asked in the interview and what the answers were?

A    Yes.

Q    And if there are any changes?

A    Yes.

Q    Let's go to question 2022 -- or, excuse me, question 22.  It's going to go from one page to the next.  I think it's going to go from -- it starts on that page.  Do you see

III-247

it in front of you on the screen?

A    I do.

Q    And what's that question, again, if you can read it?

A        "Have you ever committed, assisted in committing, or attempted to commit a crime or offense for which you were not arrested?"

Q    And then it says, "A declined response"?

A    On January 11, 2022, is "No."

Q    What does that mean?

A    That the applicant said no to the question on that time.

Q    So that's a note that the interviewing officer would take at the time that the person answered no?

A    I think that that's declaring --

Q    We can go to the next page.  I think it cuts off the page.

A    Okay.

Q    We can go to the next page.  Does it indicate at the very top of that question -- was he asked during the interview?

A    Yes, "Question asked during the interview."  Yes.  So it looks different here.  The way we would see it in the interview is it gives you like a red check mark that you asked that question, and this is more of the transcript form

III-248

of that.

Q    Got it.  But what does this document indicate to you?  Does it indicate to you, yes or no, that the Defendant was asked that question, and that he said no?

A    Yes.

Q    Okay.  Let's go to 168, please -- no, I'm sorry.  Going back to 167 -- I'm sorry.  So this was all -- the date of this was indicated at the top, is that right, the very first page?

A    Of the entire transcript?

Q    Yes, of the entire transcript.

          MR. PARMLEY:  Well, for example, can you go back one page, Ms. Mullins?  Apologize for the clunkiness.

BY MR. PARMLEY:

Q    Does it say the date that this happened, on question 22, for example, or is that not the date that this happened?

A    I believe that's the date that -- that wasn't the interview date.

Q    That's not the interview date?

A    I believe the interview was May.

Q    Right.  So that was the original N-400 as filled out.

A    "When the N-400 was submitted, you answered no, and at the interview, I asked you this question, and it's still no."

Q    Yes.  I apologize.  I confused myself.  Thank you.  And

III-249

this is all under oath, correct?

A    Correct.

Q    Okay.  Let's go to -- thank you -- 168, please.  What is this?

A    This is the notice of naturalization oath ceremony.  So this is Form N-445.  I like to look at it as their invitation to come to their oath ceremony.

Q    And what's the purpose of this here?

A    Well, it provides the information on the date, time, and location for them to take the oath, and then, also, it has some questions that need to be completed directly prior to them taking the oath of allegiance.

Q    Let's go to the last page of the document.  Is that the questions you're referring to?

A    Page four, yes.

        MR. PARMLEY:  Okay.  And so question three, on that, could you zoom in on question three?

BY MR. PARMLEY:

Q    Is that the same question that's asked in question 22 of the N-400?

A    Same question.

Q    So one is the applicant asked this right -- prior before they take the oath of allegiance.  Is that right?

A    Yes.

Q    On the day of their ceremony?

III-250

A    Yes, typically at their -- I mean, we have them fill it out at the ceremony.

Q    Okay.  Let's go to 169.  Is this the actual filled-out from the Defendant on the date of his naturalization?

A    Yes.

MR. PARMLEY:  Can you zoom in on the top half, please.

BY MR. PARMLEY:

Q    And what was his response to the question of whether or not he has been -- question three?

A    Right.  So we're asking again, but this time we're phrasing it as "Since your interview, have you committed any crime or offense for which you have not been arrested?" "No."

Q    And is that done under penalty of perjury and under oath?

A    Yes.

Q    And what was the date of that?

A    That is at the ceremony on May 18th, 2022, in San Diego.

Q    And what's important about that date?

A    That's the day that he, Mr. Wei, took the oath of allegiance.

Q    Can I show you Government's Exhibit 106, please?  Do you recognize what this is?

III-251

A    That's a certificate of naturalization.

Q    And whose certificate is that?

A    Mr. Wei.

Q    And when was he naturalized?

A    On that day, May 18th, 2022.

Q    One of the elements of the crimes charged in this case is materiality, in other words, that if somebody lied under oath during the naturalization process, that it mattered, in other words, not that they lied about their favorite color, but about something else.  In your experience as a USCIS officer, do you need to evaluate people's testimony, ensure that they provide truthful information?

A    Yes.

Q    And if they provide untruthful information, could it affect their application?

A    Definitely.

Q    In other words, if on question 22 Mr. Wei had answered, "Yes, in fact, I have been engaged in crime, including committing espionage for and behalf of the People's Republic of China," would that have affected his application?

A    Huge.  Yes, very much.

Q    In what way?  What would you have done?

A    You want me to go through -- okay.  Yes.

Q    If somebody -- if Mr. Wei had said, "Yes, I have committed a crime since I have been interviewed," or during

III-252

his interview, and for which he had not been arrested, what would happen?

A    If it was in the interview, at that point I would have turned the interview into a different path, which would be called a "sworn statement."  So, at that time, I would re-place him under oath, just making sure that he understood that he was under oath, and I would create a document.  A sworn statement is a document in which the officer asks specific questions and writes down exactly how the person response.

So I would ask a series of questions regarding the "Yes" response, and once I gathered all the information, and if it was -- I'm sorry.  Let me back up for a second.  If it was something like what you're saying, "I committed espionage," I would have first probably paused, talked to my supervisor, and started recording the interview at that point, and conducting a written sworn statement.

Once that was complete, I would probably as far to say -- we're not law enforcement, so we don't detain people, but I think I would reach out to our national security -- fraud detection and national security unit, while Mr. Wei was still in my office, so they can contact -- they would have contacted the FBI.

Q    So is it fair to say that it would have prompted an investigation?

III-253

A    Yes.

Q    Is it also fair to say that if the investigation had discovered that he had, in fact, committed a crime like espionage or export control offenses, would that have predictably disqualified him from becoming a U.S. citizen?

A    Yes.

Q    And was his statement recorded, to your knowledge, this interview?

A    Was it recorded?

Q    Yes.   Was this interview recorded, to your knowledge?

A    No.

Q    Just a couple more questions.  There was some intimation earlier in this trial that the Defendant and his mother came to the United States before of persecution.  Did you review the Defendant's A file and his mother's A file?

A    Yes.

Q    Did you find any evidence that they had applied for asylum because of prosecution?

A    Because of prosecution?

Q    Persecution.  Thank you.

A    No.  I checked every system that we have access to.  I also reviewed both files.  I did not find any evidence of -- there's no asylum claim filed, the actual form, and then I didn't even find any evidence of a reference to any claim of persecution in China.

III-254

In fact, I did see that his mother had actually reached out to the Chinese government, asking for them to favorably allow her fiancé and her fiancé's son to come to China on a visa, but I didn't see any other interactions with the Government or any persecution referenced in the file, and there was definitely nothing ever filed with any U.S. Government agency for asylum.

Q    And your earlier testimony was that she came to the United States as the fiancee of a U.S. citizen.  Is that right?

A    That is correct.

MR. PARMLEY:  I don't have any other questions. Thank you.

THE COURT:  Thank you.

Cross?

CROSS EXAMINATION

BY MR. BERTOLA:

Q    Good afternoon, Officer Flores.

A    Hi.  How are you?

Q    Can you flip to Exhibit 162.19?

A    I'm on 162.  What section?

Q    Point 19, so page 19.

A    Page 19.  I'm here.

Q    So question 10, "Have you ever been a member of or in any way associated with, A, Communist Party?"

III-255

A    I must be on the wrong page.  I'm sorry.

THE COURT:  Mine, too.

THE WITNESS:  Okay.

THE COURT:  The bottom --

MR. BERTOLA:  Did you find it?

THE COURT:  No.  The bottom page number 19 isn't that.

UNIDENTIFIED SPEAKER:  We can put it up on the screen if you want.

MS. MULLINS:  We're done with 62?

MR. BERTOLA:  Yes, 162.  I had --

MS. MULLINS:  163?

MR. JONES:  -- one, nine.  No, 162.

MS. MULLINS:  And what page?

MR. BERTOLA:  Point 19, page 19.

THE WITNESS:  So I have -- if you go to 162, page 12, question 10.

BY MR. BERTOLA:

Q    Yes, that's it.  Yes.

A    Page 12.

Q    Page 12.  Sorry.

THE COURT:  Can we put that up?

THE WITNESS:  Thank you.

BY MR. BERTOLA:

Q    Do you find it?

III-256

A    I did.

Q    So what do you consider "associated," anyway?

A    Any involvement, directly or indirectly.  I don't know that I'm understanding, exactly.

Q    Well, does being born in China itself associate you with the Communist Party?

A    No.

Q    Okay.  So more of an official association, correct?

A    Yes, or, indirectly, maybe family associations.

Q    So, if somebody's family was a member of the Communist Party, that would be an association?

A    Yes, an indirect association.

        MR. BERTOLA:  Okay.  Thank you.  No further questions, your Honor.

        MR. PARMLEY:  No further questions.  Thank you.

        THE COURT:  Thank you.  Is she excused?

        MR. PARMLEY:  She is excused.

        THE COURT:  You're excused.  Thank you.

        THE WITNESS:  Thank you.

     (The witness was excused.)

        MR. PARMLEY:  United States calls Reem Younis.

        THE CLERK:  Please raise your right hand.

        REEM YOUNIS - PLAINTIFF'S WITNESS - SWORN

        THE CLERK:  Please state your name, first and last, and spell each for the record.

III-257

THE WITNESS:  Reem Younis, R-E-E-M, last name Y-O-U-N-I-S.

DIRECT EXAMINATION

BY MR. PARMLEY:

Q    Good afternoon, Ms. Younis.

A    Hi.

Q    Where are you currently employed?

A    At Grossmont-Cuyamaca Community College District.

Q    Doing what?

A    I work as an HR technician.

Q    Did you previously work for USCIS?

A    I did.

Q    This may be a little awkward to discuss, but, at some point, did USCIS try to fire you from that job?

A    Correct.

Q    Can you talk to me about that?

A    Yes.  So I was accused of showing preferential treatment to my brother as an applicant -- he was a petitioner -- and to my sister-in-law as a beneficiary. They were applying for a green card.

Q    And did they conduct an investigation?

A    They did.

Q    And did they attempt to fire you at that point?

A    They did.

Q    And did you appeal it?

III-258

A    I did.

Q    And what happened?

A    I won the case.  I was just -- it was reduced from a removal to just suspension of 60 days, and then I was reinstated, given back pay, and then I was reinstated into my position.  Yes.

Q    Okay.  But you're no longer there?

A    No.  I resigned in July 2025.

Q    Okay.  And you were -- what as was your title while you worked for USCIS?

A    Initially it was a student intern, back in June 2017.  Then that was extended for about a year and a half.  Then I left.  Then I was hired again as an immigration services assistant, from March 2020 until September 2021, and I was promoted to Immigration Services Officer I, and then later promoted to Immigration Services Officer II.

Q    So we've heard some testimony about what a U.S. Citizenship and Immigration Services officer does.  Can you briefly describe what you did as it relates to the naturalization process?

A    Yes.  So our job was to conduct interviews, review files, and adjudicate benefits by approving or denying them.

Q    Were you working at USCIS in April of 2022?

A    I was.

Q    Did you conduct an interview with somebody named

III-259

Jinchao Wei?

A    I did.

Q    Would you recognize him if you saw him again?

A    I will.

Q    Would you mind pointing him out and describing an article of clothing that he's wearing?

A    Yes.  He's wearing a black suit with a white shirt.

Q    Thank you.

MR. PARMLEY:  May the record reflect the witness has identified the Defendant in this case?

THE COURT:  Yes.

BY MR. PARMLEY:

Q    Tell me about the interview.  How did it happen?  What happened at the interview?

A    Yes.  So usually I would go to the front, pick up the file, and then I would review the file, review the electronic documents, the application, whatever the applicant submitted.  Then I would go to the reception, call the person by the name, and then I would walk them back to my office.

Before we sit down, I would administer the oath, and then, you know, the oath would be "Do you swear to tell the truth, the whole truth, and nothing but the truth?"  And they would reply by saying yes or no.  If they say no, then I would not be completing the interview, and if they say

III-260

yes, then, obviously, I would continue with the interview.

And we sat down. I reviewed the whole N-400 form, which is for citizenship, and all his answers that he had on the application. We reviewed every section, and then, later, I asked him questions about, you know, like, all the questions that are in the application, and then, based on his answers, I would make my determination whether, by denying, continuing the case, if further investigation is needed, or by approving, if there is no red flags.

Q    Okay. So you put the Defendant under oath in this case?

A    I did.

Q    And when was that? Do you recall?

A    That was in the beginning of the interview, like before

Q    Let's put on -- if we could put up Government's Exhibit 162. Do you recognize that form?

A    I do.

Q    Is that the -- what is that?

A    That is the Defendant's N-400 application for citizenship.

MR. PARMLEY: Okay. Could you go to question 22? I think it's on page 14.

THE WITNESS: I do?

MR. PARMLEY: Let me try to put it up on the screen for you. I think it's page 14. Is that right? No.

III-261

          MS. MULLINS:  All right.

          MR. PARMLEY:  There we go.  Can you zoom in on question 22.

BY MR. PARMLEY:

Q    Do you see that question?

A    Yes.

Q    Did you ask him that question?

A    I did.

Q    And what was his response?

A    It was "No."

Q    Let's look at Government's Exhibit 164.  Do you recognize what this is?

A    I do.

          THE COURT:  Can we get the date of the interview?

          MR. PARMLEY:  Yes, I'd be happy to.

BY MR. PARMLEY:

Q    Can we go back to -- what was the date of the interview?  Would that be listed on this form, or where would that be listed?  Actually, I can pull it up for you.

A    It's not on here.  I believe somewhere -- sometime in April of 2022.

          MR. PARMLEY:  One moment.  Could you pull up Government's Exhibit 168, please.  Could you just zoom in on that box.

//

III-262

BY MR. PARMLEY:

Q    That's the date he was invited to the interview.  Is that correct?

A    That's the oath ceremony.

Q    I'm sorry.

A    Yes.

Q    That's the oath --

A    Yes.

Q    There was an interview that was before that?

A    Yes.

Q    And do you recall when that was?

A    Not the specific day, but I know it's in April 2022.  I think it was like just a month before.  It's April -- well, I think it's April 28th, because I would give him the appointment the same time.

Q    If you don't know, I wouldn't ask you to speculate.

A    Okay.

Q    But it was sometime in April of 2022.  Is that right?

A    Correct.  Yes.

        MR. PARMLEY:  It's always nice to have help.  Can you pull up 165, please.

        THE WITNESS:  Yes.

        MR. PARMLEY:  We're zooming in on the top half of that.

//

III-263

BY MR. PARMLEY:

Q    Is that the day he was interviewed?

A    Yes.

Q    April 27th of 2022?

A    Yes.  And I would know that by giving him that paper at the end of his interview.

Q    What is that?  What is the purpose of that paper?

A    This is just to tell him the results of his interview.

MR. PARMLEY:  Let's go back to 167, please, and can you go to the last page of that transcript.

BY MR. PARMLEY:

Q    Did he indicate to you -- well, if any corrections were made, he signed off on them and he swore to them under oath. Is that correct?

A    Correct.

Q    And did he ever change his answer to Government's Exhibit -- excuse me -- question 22?

A    No.

Q    And did he sign that under penalty of perjury?

A    He did.

MR. PARMLEY:  Can we go to the last page of 164, please.

MS. MULLINS:  The last page of --

MR. PARMLEY:  164, please.

//

III-264

BY MR. PARMLEY:

Q    Is that when he -- did he sign that in front of you?

A    Yes.  Every applicant, at the end of the interview, signed this on a tablet, after reviewing all the changes that were made during the application.

Q    So that was done during the interview?

A    Yes.

Q    And the interview was April 27th of 2022?

A    Correct.

Q    In your experience as a USCIS officer, did you need to evaluate people's testimony and decide if they had provided truthful or untruthful information, and that it could affect their application?

A    Of course, yes.

Q    In other words, if Defendant had said, "Yes, I have committed a crime for which I have not been arrested," saying either "Espionage" or "Violating the Arms Export Control Act," would that -- could that have affected his application?

A    Yes.

Q    Would that have caused you to undertake an investigation?

A    Correct.

Q    And depending on the results of that investigation, could that have prevented him from getting U.S. citizenship?

III-265

A    Yes.

MR. PARMLEY:  I don't have any other questions. Thank you.

THE COURT:  Cross?

MR. BERTOLA:  Yes, your Honor.

CROSS EXAMINATION

BY MR. BERTOLA:

Q    Good afternoon, Ms. Younis.

A    Hello.  Good afternoon.

Q    When you interview applicants, are interviews offered in languages other than English?

A    Not the interviews.  We would get a translator.

Q    Okay.

A    So I would still speak English, but then, if they qualify -- because, first, if you're talking for citizenship or just in general?

Q    Citizenship.

A    Citizenship, if there's, like, eligibility, if they're over the age of 55 or 60, then they can -- and if they have been here, I think, a resident for over 20 or 25 years, the they would be eligible.  If they meet all the requirements, then I would just get a translator on the phone, or sometimes they bring a relative.

Q    If they don't -- if they're not over 55, if they don't meet those requirements, then they don't get a translator?

III-266

They have to do the interview in English?

A    Exactly, yes.

Q    Understood.  So they have to be proficient in English if they don't meet the qualifications, to get interviewed?

A    Just enough to pass, you know, the exam, and to be able to speak, like, you know, English, standard English.

Q    So there's no protocol if you notice an applicant -- if they pass the English test, but you notice they have an accent, they might have some trouble understanding words, there's no protocol to request a translator for them?

A    No, we can't.  They would have to actually fail if they don't understand what I'm saying --

Q    Understood.

A    -- because one of the requirements to pass is to be able to comprehend and to answer, and ask questions or have a conversation in English.

Q    And if you feel that they don't understand something, would you end the interview there?

A    Correct.

Q    Understood.

        MR. BERTOLA:  No further questions, your Honor.

        THE COURT:  Thank you.

                REDIRECT EXAMINATION

BY MR. PARMLEY:

Q    To your recollection, did you have any difficulty in

III-267

communicating with the Defendant during your interview?

A     No, I did not.

MR. PARMLEY:  Okay.  I don't have any other questions.

THE COURT:  Thank you.

Anything else?

MR. BERTOLA:  No, your Honor.

THE COURT:  Is this witness excused?

MR. PARMLEY:  Yes, please.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Okay.

(The witness was excused.)

THE COURT:  Are we going to --

MR. BARRY:  This would be a great time for a break.  We'd appreciate it.

THE COURT:  Okay.  So we'll resume tomorrow at 9:00 o'clock.  Please remember the admonition that I gave to you earlier.

(Jurors exit courtroom.)

THE COURT:  We're outside the presence of the jury.  So, for tomorrow, we have the two experts.  Is that right?

UNIDENTIFIED SPEAKER:  Yes, your Honor.

THE COURT:  And will the one be here?

MR. PARMLEY:  They should both be here.

III-268

THE COURT:  Both be here.  Yes.

And then we have -- and then will the Government rest?

MR. PARMLEY:  Yes.

THE COURT:  And then we'll have the defense case?

MR. BERTOLA:  Correct.

THE COURT:  And then any rebuttal?

MR. PARMLEY:  If any, yes.

THE COURT:  Okay.

MR. PARMLEY:  We don't have anything planned, but I don't know what their case is, right.  Yes.

THE COURT:  Okay.  All right.  So there is a potential that we argue tomorrow?

MR. PARMLEY:  I think so.  I think it would be -- obviously, we haven't had an opportunity to review the instructions the Court put out.  I think we would need an opportunity to review those, and see if we agree or if we disagree, and have a conversation about that.  I don't know when that would happen.

THE COURT:  So, since there is a potential that we go into final argument tomorrow, I want to make it clear that you need to review the jury instructions.  If there are any changes, it's welcome for you to submit them in writing, even if you handwrite and copy and send them in to the Court, and then we can discuss them tomorrow.

III-269

There are -- as I mentioned before, there are couple of ones that there are alternative ones.  There's a couple I said -- I don't think any of the jurors said that they knew Mandarin.  So I deleted the phrase that says, "Although some of you may know the Mandarin language," because I don't think any of them did.

MR. PARMLEY:  Nobody who's on the jury indicated that they did.

THE COURT:  Yes.  So I deleted that, and then made a couple of other annotations or changes to the model instructions.  So take a careful look and then be prepared.  It may be that we fill up enough of the day tomorrow with the defense case that we then argue on Tuesday, instead of tomorrow.

MR. PARMLEY:  I do know that it's very helpful for the purposes of closing argument to have the -- at least enough time so we can maybe put an instruction or two into the closing arguments.  If the --

THE COURT:  I see what you're saying.

MR. PARMLEY:  Right.  And we're not going to know until we know.

THE COURT:  But you at least have --

MR. PARMLEY:  We have a good sense, yes.

THE COURT:  You have a good set, and you could substitute in a few.  So I'm cognizant of that, if both

III-270

sides said, you know, "It's been a long trial.  It's an important trial.  We want the weekend.  We want to think through our thoughts and then be prepared."  It's good.  On the other hand, since it's a Friday, if there is a chance to then argue, then everybody is fresh, because we're dark on Monday.  So we'll see how it goes, and I'll be --

MR. PARMLEY:  Talk to counsel about that.

THE COURT:  Yes.  And I'll be happy to accommodate counsel either way.

MR. PARMLEY:  And as far as the Court's practice, is it pre-instructing before closing argument?

THE COURT:  I'm welcome to listen to your suggestions.

MR. PARMLEY:  Yes.  That would be our preference, I think.

MR. BERTOLA:  Same.

THE COURT:  Pre-instruct?

MR. BERTOLA:  Pre-instruct.  Correct.

THE COURT:  I think so, except for the concluding instructions.  I'll reserve those.

All right.  We'll see you tomorrow.  Anything else from --

MR. JONES:  Yes.  I did want to bring one thing up.

THE COURT:  And you've got to -- and you have to

III-271

check with the -- on the exhibits.  That brings me one other matter.  If we do -- I think, since most of the exhibits were admitted, it would be my suggestion that, depending on what happens tomorrow, we simply pull out the ones from the binders that were not admitted.  So we will give them the binders, and then, as to the defense exhibits, we'll just give them the physical defense exhibits, and then there's a few, the phone and the few physical exhibits that go with them.

MR. PARMLEY:  And with regard to exhibits, your Honor, with the ongoing drama in trying to get the exhibit list correct, where those manuals are, there's a couple that were reserved, and we never introduced anything.  So, in addition to the ones that were blank that we talked about this morning, there was a couple that were reserved, and we did not end up using them.  So I guess they were technically admitted.  I'll look at the numbers, and we can clear that up tomorrow.

THE COURT:  So we'll clear that up, as well.

MR. PARMLEY:  Yes.  Yes, we'll --

THE COURT:  And then sometimes the parties send in the exhibit list for their help, and sometimes they don't, so you can give that some thought, like, "Here are not the ones that were not admitted, but here are the ones that are admitted," and the names of them, like photos or whatever it

III-272

is.  So think about that.

MR. JONES:  Understood.

THE COURT:  So be prepared either way, or if the two of you meet and confer and say, you know, "We're just going to argue on Tuesday and be more prepared," that's fine, too.

MR. PARMLEY:  I appreciate it, your Honor.  Thank you.

THE COURT:  Then you wanted something else?

MR. JONES:  There is, and I don't really know how to frame this, but the defense is still undecided whether Mr. Wei will testify.  That will be a decision at the close of the prosecution's evidence.  But, in the event that he does take the stand, I did want to propose that he be able to demonstrate --

THE COURT:  No, we don't do that.  You mean get down from the stand?

MR. JONES:  Not get down from the stand, but if there was a way to sync the computers for him to show, one, how he accessed documents, or, two, how he generated articles using ChatGPT, since there's been discussion about it, and uncertainty about the --

THE COURT:  No, I don't think that that -- you'll have to cite me a case where it says that he can show that, because he cannot replicate it in any way, and on ChatGPT, I

III-273

have a concern that not only it appears that he's uploading a diagram of a ship, but then is remembered by ChatGPT, and not deleted by ChatGPT.

MR. JONES:  I understand that concern.  I don't --

THE COURT:  The Government hasn't been arguing that, but that's a separate concern.

MR. PARMLEY:  We would object to that, and I think he could testify specifically as to what he did.

MR. BARRY:  Without any sort of demonstration.

MR. PARMLEY:  Without any --

THE COURT:  But not to show, "This is how I did it," because I don't think he can replicate how he did it.

MR. BARRY:  But, also -- and we'll talk to your staff about this, but we will have to figure out, for that cart of exhibits, after the case concludes, in terms of how we're going to handle them for public record purposes.  So we'll talk, to figure out what the idea --

THE COURT:  And then I have a question as to the boiler one.  Is there any testimony one way or the other as to whether that's publicly available information?

MR. BARRY:  There's the boiler feed water (sic), count four.

THE COURT:  Yes.

MR. PARMLEY:  I did ask that question, your Honor, and the answer was "We could not find it on the Internet."

III-274

THE COURT:  What about his argument that it's available through his mates on Facebook?

MR. PARMLEY:  We couldn't find it on the Internet. So that was the testimony from Agent Wetterer, that she searched for it and couldn't find it.

THE COURT:  Okay.  So be more specific on what you intend to have him do.

MR. JONES:  So the offer of proof, or I don't know that we'd call it, would be that Mr. Wei could take any laptop, log onto the Internet, log into his Facebook, go to one of the groups, download one of these documents, and show for the Court that he was able to obtain it through public sources.

MR. BARRY:  We would strongly object.  I mean, we --

MR. PARMLEY:  Public sources being his private Facebook group?

THE COURT:  Well, and it could be created when? And there's not been any reciprocal discovery to the Government for that.  So I'm disinclined to do that, because I don't think it's current as of -- the Facebook page today, which is 2025, is not the same as the Facebook page that existed when he allegedly did this.

MR. JONES:  I don't know if this will change anything, but I'll offer that every posting on Facebook is

III-275

time stamped. So, when somebody creates a group, it will say, "The group was created on 'date.'" When somebody posts a file, it will say, "Posted on," and any comment on that will also have a date. So it's -- I'm not an expert on this.

THE COURT: You're not and he's not, and so, if you want to bring in somebody that says, "Okay. I've reviewed the file from 2022, and here are" -- if you subpoenaed Facebook and got that information, which you would have known a long time ago, "Here's all of the things that were available."

MR. PARMLEY: I would certainly -- and I didn't mean to cut you off, your Honor. I would certainly add that we've asked for reciprocal discovery. We were told there was none, and this appears to be a big something, right? This is dropped on us. We don't have no idea (sic) to assess the foundation. We have no idea to assess the credibility of it. He can testify under oath to whatever he wants, but having him do a live demonstration on a laptop, it would be -- I think it also would be impossible to capture for the purposes of the record. We are opposed to it.

MR. JONES: And I fully --

THE COURT: And I also think, physically, it might not be able to be done in our courtroom setting. So,

III-276

without prejudice, the Court denies that.  It doesn't meet reciprocal discovery.  It's not going to be what had happened back at that time, and it may also contain some hearsay information, and I don't think that he got the Weapons Control Manual from Facebook.

MR. BARRY:  It also would just confuse the jury, I mean, for 403.

THE COURT:  But, nevertheless, you can look at -- talk to your appellate folk, and then you can think through more clearly how this would happen, but I don't generally do demonstrations.

MR. JONES:  That's why I wanted to just put it out in open forum, because, obviously, I wasn't here on the case at the time discovery was being exchanged, and whether --

THE COURT:  No, but you have been on the case, and know what they did, and that he did have Federal Defenders, and he did have Mr. Conforti (phonetic), that could have had subpoenaed Facebook and get that.  Plus, if he can get it here from Facebook by tomorrow, good.  I mean, good luck.

But it should have been turned over to the Government, if that was the plan, and he can still testify he accessed Facebook, and he was sharing it with his mates, and you can have some of the mates come in and say, "Yes, I gave it to -- I got one from him," or whatever.  That's your option.  But to have a live demonstration for which we have

III-277

really no control, and no way of capturing it for the record, and not turned in to the Government on time, I'm disinclined to do that.

MR. JONES:  Understood.

THE COURT:  All right.  Thank you.

MR. PARMLEY:  Thank you, your Honor.

MR. BERTOLA:  Thank you, your Honor.

MR. BARRY:  See you tomorrow.

MR. PARMLEY:  See you tomorrow.

(Proceedings recessed briefly.)

THE COURT:  Okay.  We're back on the record, and an additional thought I had is, even if his mates have it on Facebook, that doesn't mean that it's not exported.  It's in the United States.  It's not exported, even if friends or other people have it.

MR. JONES:  Right.

THE COURT:  So that's an additional issue.  It may help you on the espionage count.  I don't know.

MR. JONES:  Sure.

THE COURT:  All right.  Thank you.

MR. PARMLEY:  Thank you.

MR. BARRY:  Thank you, your Honor.

(Proceedings recessed.)

III-278

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Lorraine Caldwell               3/2/26
Transcriber                        Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.