UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,    )  Case No. 23CR1471-H
                             )
          Plaintiff,         )  San Diego, California
                             )
vs.                          )  Wednesday,
                             )  August 13, 2025
JINCHAO WEI,                 )  9:00 a.m.
                             )
          Defendant.         )
_____)  VOLUME II

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE MARILYN L. HUFF
UNITED STATES DISTRICT JUDGE, and a jury

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | JOHN N. PARMLEY, ESQ.<br>ADAM P. BARRY, ESQ.<br>United States Attorney's<br>  Office<br>880 Front Street, Suite 6293<br>San Diego, California 92101<br>(619) 546-6750 |
| For the Defendant: | SEAN M. JONES, ESQ.<br>Jones Trial Attorneys<br>401 B Street, Suite 2010<br>San Diego, California 92101<br>(619) 732-6332 |
| | MICHAEL J. BERTOLA II, ESQ.<br>Rudolph Baker & Associates<br>419 19th Street<br>San Diego, California 92102<br>(909) 499-3465 |
| Transcript Ordered by: | TODD W. BURNS, ESQ. |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

II-ii

Court Recorder:                    Lynnette Lawrence
                                   United States District Court
                                   333 Broadway
                                   San Diego, California 92101

Transcriber:                       Jordan Keilty
                                   Echo Reporting, Inc.
                                   9711 Cactus Street, Suite B
                                   Lakeside, California 92040
                                   (858) 453-7590

II-iii

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Nicholas Reed | II-5 | -- | -- | -- |
| Jayne Liu | II-19 | II-48 | II-57 | -- |
| Laura Wetterer | II-59 | -- | -- | -- |

| EXHIBITS: | | IDENTIFIED | IN EVIDENCE |
|---|---|---|---|
| Plaintiff's | | | |
| 23 | Photograph | II-152 | II-152 |
| 30 | Response from T-Mobile | II-66 | II-67 |
| 31 | Response from PayPal | II-68 | II-69 |
| 31A | Response from PayPal | II-68 | II-69 |
| 31C | Summary Exhibit PayPal | II-70 | II-71 |
| 32 | Response from NFCU | II-71 | II-72 |
| 32D | $5,0000 Transfer to NFCU | II-72 | II-72 |
| 33-34 | iCloud records | II-41 | II-41 |
| 35 | Wei Google records | II-76 | II-76 |
| 36 | Google records | II-78 | II-78 |
| 37 | Andy Li iCloud records | II-80 | II-80 |
| 38 | Google Ayelee91@gmail | II-81 | II-82 |
| 40 | Celebrite Report | II-18 | II-18 |
| 52 | iPhone Search 1 | II-35 | II-35 |
| 53 | iPhone Search 2 | Ii-35 | II-35 |
| 60-64 | Room audio | II-31 | II-31 |
| 70 | Audio 7/15/23 | II-33 | II-34 |
| 71-75 | Photographs | II-10 | II-11 |

II-iv

| EXHIBITS: | | IDENTIFIED | IN EVIDENCE |
|---|---|---|---|
| Plaintiff's | | | |
| 101 | Asus Laptop | II-13 | II-14 |
| 102 | Apple Laptop | II-13 | II-16 |
| 103 | Samsung External Had Drive | II-13 | II-16 |
| 104 | Steno notebook | II-13 | II-16 |
| 104A-H | Excerpt from notebook | II-17 | II-17 |
| 105 | Best Buy receipt | II-13 | II-18 |
| 106 | Photo of Certificate of Naturalization | II-85 | II-86 |
| 120 | Summary -Telegram spreadsheet | II-40 | II-40 |
| 121 | Summary WeChat translations | II-36 | II-37 |
| 122 | 11 Audios from WeChat spreadsheet | II-36 | -- |
| 123 | Verbatim translation WeChat | II-39 | II-40 |
| 124A | Clip from Exhibit 123 | II-89 | II-90 |
| 124C | Clip from Exhibit 123 | II-89 | II-90 |
| 125-129 | Translations of Audios | II-32 | II-33 |
| 130 | Translation phone call | II-34 | II-35 |
| 131 | iMessage translation | II-41 | II-42 |
| 132-138 | Translation Andy Li notes | II-44 | II-45 |
| 137 | Translation of Andy Biographical | II-44 | II-44 |

II-v

| EXHIBITS: | | IDENTIFIED | IN EVIDENCE |
|---|---|---|---|
| **Plaintiff's** | | | |
| 139 | Translation of partial graphic analysis | II-41 | II-42 |
| 139A | Translation of partial graphic analysis | II-43 | II-43 |
| 145 | Tieba Baidu URL screenshots/translations | II-47 | II-47 |
| 145A | Screenshot of Tieba | II-46 | II-48 |
| 146 | Summary Google searches | II-107 | II-108 |
| 147 | Summary Google searches | II-107 | II-108 |
| 148 | YouTube video | II-109 | II-109 |
| 149 | Screenshot of Manual on Laptop | II-109 | II-110 |
| 190 | Wei interview | II-294 | II-294 |
| 200 | Email NFCU | II-200 | II-201 |
| 201 | Weapon Control System | II-110 | II-110 |
| 202-265 | Documents and Manuals | II-111 | II-112 |

II-1

SAN DIEGO, CALIFORNIA  WEDNESDAY, AUGUST 13, 2025 9:00 A.M.

--oOo--

THE CLERK:  Okay.  We're on the record outside the presence of the jury.

The parties did meet and confer with the courtroom deputy and agreed as to the exhibits, is that correct?

MR. PARMLEY:  We did.

THE COURT:  From the Defense?  The parties met and conferred on the exhibits and agreed with the exhibits, is that correct?

MR. JONES:  Yes, your Honor.

THE COURT:  Thank you.

All right.  We're ready for the jury.

MR. PARMLEY:  One other thing, your Honor.  You asked for those jury instructions.  Due to a formatting issue, I think we'll get it to you by noon.

THE COURT:  All right.  Thank you.

MR. PARMLEY:  I appreciate it.  Thank you.

THE COURT:  And then the Defense had also submitted some preliminary instructions, and from time to time, I'll give one that's warranted.

MR. PARMLEY:  Okay.

MR. JONES:  And then briefly, your Honor, I was just notified by Department 65 in State Court I had a client that set an ex parte.  They want me to call and just check in

II-2

on that.  I'm -- I'm -- we already know who's coming on, and fine with Mr. Bertola handling things for the next 15 or so minutes.  But I wanted to check with the Court.

THE COURT:  That's fine.

MR. JONES:  Okay.

THE COURT:  All right.

MR. JONES:  Sorry for that inconvenience.

THE COURT:  Oh, no problem.  Can it be maybe -- could they do it faster or did they start at 9?

MR. JONES:  They -- they started.  They took another case.

THE COURT:  Oh.

MR. JONES:  I told them I had to go through security, and we were waiting on another attorney.  And, so, I told them I -- I'd check in with you.

THE COURT:  Do you want to do it at 10:30?

MR. JONES:  I'll see if that's okay.

THE COURT:  Okay.  You could do it now or if you want to be here, then you could do it at 10:30, and we'll take a recess.

MR. JONES:  Okay.

THE COURT:  Thank you.  Do you want me to say anything, that you're handling another matter in State Court?

MR. JONES:  That would be perfect.

THE COURT:  Okay.

II-3

MR. JONES:  And -- and I'll just handle it now.

MR. PARMLEY:  That's fine.  There's no objection to that.

THE COURT:  All right.  Thank you.

MR. JONES:  Thank you.

(Pause.)

THE COURT:  You can bring the jurors in, and they can go into the jury room if they want.

(Proceedings recessed briefly.)

THE COURT:  Good morning.  It's nice to see you all here.  I wanted to give you a couple of additional instructions.  As I told you, you are the jury, and when you deliberate, it will be your duty to weigh and to evaluate all the evidence received in this case and in that process to decide the facts.  To the facts as you find them, you will apply the law as I give it to you whether you agree with the law or not.

You must decide the case solely on the evidence and the law before you, and I instruct you to perform these duties fairly and impartially.  I'm sure you can all do that.  As I remind you, the Defendant has pleaded not guilty to the charges and is presumed innocent unless and until the Government proves the Defendant guilty beyond a reasonable doubt.

In addition, the Defendant has the right to remain

II-4

silent and never has to prove innocence or present any evidence.

The evidence will consist of the sworn testimony of any witness, the exhibits that are received in evidence, and any facts to which the lawyers have agreed or stipulated. There was a stipulation that was read to you yesterday concerning some matters.

And then the following things are not evidence, and you may not consider them as evidence in deciding the facts of the case.

Statements and arguments of the attorneys, questions and objections of the attorneys, testimony that I instruct you to disregard, and anything you may see or hear when the Court is not in session, even if what you see or hear is done or said by any one of the parties or any one of the witnesses.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did.

Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which one can find another fact. You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes on distinction between the weight to be

II-5

given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

At the end of the case, there will be no written transcript for you to consult.  So, pay close attention to the evidence as it comes in.

And, so, Mr. Jones is handling another matter in State Court briefly.  They have a calendar system over there, and, so, he's -- he's given us permission to proceed with co-counsel, and then as soon as he takes care of that matter, then he will join us.

All right.  You can call your next witness.

MR. PARMLEY:  Thank you, your Honor.

Good morning.  The United States calls FBI Special Agent Nicholas Reed.

NICHOLAS REED - PLAINTIFF'S WITNESS - SWORN

THE CLERK:  Please state your full name and spell your first and last for the record.

THE WITNESS:  Nicholas Reed, N-I-C-H-O-L-A-S Reed, R-E-E-D.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. PARMLEY:

Q     Good morning.

A     Good morning.

Q     Could you please tell us what you do for a living, Agent

II-6

Reed?

A    I'm a special agent for the FBI.

Q    And how long have you been doing that?

A    Approximately six years.

Q    Can you briefly describe your experience as an agent?

A    First we start in Quantico for approximately five months as a new agent, training, Quantico, Virginia.  After that, there's about a year where we are -- have on-the-job training with a training agent who's a more senior agent that we're assigned to.  And after that, we work our own cases basically. We get -- we have other opportunities for specialized training.

Q    Would you mind pulling that mic just a little bit closer to you so everybody can hear.

A    Yeah.

Q    And you said you've been an agent for about six years, is that what you said?

A    Yeah.

Q    And where are you currently assigned?

A    Currently, I'm in the Chicago Field Office.

Q    And how long have you been in Chicago?

A    About eight months.

Q    And what's your assignment there?

A    I'm an agent on a counterintelligence squad.

Q    Prior to going to Chicago, where were you assigned?

II-7

A     The San Diego Division of the FBI.

Q     And what was your assignment in the San Diego Division?

A     I was also a special agent on a counterintelligence squad.

Q     Are you familiar with the case of United States versus Jinchao Wei?

A     I am, yes.

Q     Were you asked to assist in that case?

A     Yes, I was.

Q     What specifically were you asked to do?

A     I was the assistant team leader for the search of Mr. Wei's residence.

Q     Okay.  Let me direct your attention to August 2nd in 2023.  Was that the date of the search?

A     It was, yes.

        THE COURT:  And Mr. -- Mr. Jones is -- is now present.

        MR. PARMLEY:  Maybe after Mr. Jones is back.  Thank you.

        THE COURT:  Thank you.

BY MR. PARMLEY:

Q     Could you please tell me what that means to be a -- did you say assistant team lead on the search?

A     Yes.

Q     What does that involve and what is involved with the FBI

II-8

executing a search warrant on, say, in this case a residence?

A     Yes.  Once we get a search warrant, basically we make entry into the residence.  We make the residence safe.  Maybe you've seen it in movies.  Basically we clear the residence, make sure that there's no people in there, so it's safe for them and safe for us as well.

After that, we commence basically with search procedures.  Like our standard procedures are to take photographs during -- before the beginning of the search.  So, there are photographs during the entry where we take photographs of the outside of the residence, each room, all the different angles, before we start searching.

Then we collect evidence.  We catalogue that evidence, label it.  And at the end of the search, we leave an itemized list of the evidence which was seized from the residence, and we take finishing photographs.

Q     And do you take -- generally take photographs of items as to where they were seized while they were in place?

A     Yes.

Q     Okay.

A     Yeah.

Q      If that question made sense.  Yes.  Okay.  So, I want to direct your attention to that date, August 2nd of 2023, you were the assistant team leader?

A     Yes, I was.

II-9

Q     And what is that -- what's your role as the assistant team leader in executing a warrant?

A     It's to oversee the search.  We have different roles for people.  We have a photographer.  We have a sketcher who takes the sketch of the residence or the area that we're searching. So, it looks kind of like a blueprint, and you can see where each item which was seized was -- was seized from, which room, whether it was on a table typically or something like that.

Q     And before we get into the specifics of the search, approximately how many search warrants have you participated in in some capacity?

A     Well over a dozen, maybe between a dozen and 20.

Q     Okay.  Let's talk about where that search took place on August 2nd of 2023.  Where was that?

A     That was at Mr. Wei's residence at Retzer Hall.

Q     Is that Naval Base, San Diego, Retzer Hall, Unit 622?

A     Yes.

Q     3705 Norman Scott Road in San Diego?

A     Yes.

Q     What -- what are those premises generally?  What does it look like, just generally speaking?  Is it a single house?  Is it a -- what is it?

A     It looks like an apartment building.  It has units.

Q     And who lived in Unit 622?

A     Mr. Wei.

II-10

Q    And how did you know that?

A    Upon entry of the unit -- well, I knew from the search warrant, and upon entry of the unit, I believe Mr. Wei's roommate was there as well.  Their -- their unit was a -- like a suite style type unit where you have a common area with a kitchen and a livingroom and then two bedrooms on either side. Mr. Wei's roommate was there in his room, and the other room we attributed to Mr. Wei.

Q    And did you know where Mr. Wei was at the time you were doing the search?

A    I did, yeah.

Q    Where was he?

A    I believe he was in custody, was being arrested while on his way to work.

Q    And did you find documents indicating that the Defendant lived there?

A    We did, yes.

Q    Okay.  Let me show you -- if you could pull up that binder in front of you and look at Government's Exhibits 71 through 75.  Let me know when you've had a chance to review those.

A    Sure.  I can view it here on the screen.

Q    I'm sorry.  Yeah, just turn -- since we're introducing five of them at once just why don't you just flip through them for me.  I'd appreciate if you can -- maybe you have the wrong

II-11

volume.

A    I have the right one.   Yeah.

Q    If you'd look through 71 through 75 and let me know if recognize them.

A    I do, yes.

Q    What are those?

A    Those are photographs of the outside of Retzer Hall as well as the inside of Mr. Wei's unit and some of the items which were seized.

Q    Do those photographs fairly -- accurately depict what Retzer Hall looked like and what Mr. Wei's apartment looked like on the day of the search?

A    Yes.

        MR. PARMLEY:  I'd move to admit 71 through 75.

        THE COURT:  Any objection?

        MR. JONES:  No objection.

        THE COURT:  They're received.

        MR. PARMLEY:  Let's start with 71.  If we could publish that to the jury please.

BY MR. PARMLEY:

Q    What are we looking at in Exhibit 71?  You can see it on your screen now I think.

A    Yeah.  That's the outside of Retzer Hall.  That's -- typically, when we do a search, we start with entry photographs, and we will start all the way on the outside of

II-12

either the house or the building, whatever, and then we'll work our way in.

Q    Okay.  So, let's go to 72, please.  What am I looking at in 72?

A    That is the -- the door entering the unit.

Q    Okay.  And what are we looking at through the hallway? Is that that central room that you were talking about?

A    Yeah.  That's the -- the kitchen and the livingroom area.

Q    Okay.  Let's look at 73, please.  And what's that one?

A    That is Mr. Wei's room.

Q    That's the bedroom?

A    Yes.

Q    Okay.  And what about 74?

A    74 is the desk table area.

Q    I see some Post-It notes on it looks like a laptop computer.  Do you know what those are?

A    Yeah.  Typically, when we do a search or at least one of the ways I like to do it to get things organized is when we find an item, whoever finds that item will take a Post-It note, label that, and so we can keep track of each item as it's found, and we'll label those with numbers, and then each of those numbers will then be brought to the people who will then bag them, seal them, and label it.

Q    Okay.  Let's look at 75 then, please.  And is this --

II-13

what is this -- this a picture of?

A     Looks like inside the desk drawer.

Q     Are those labels that the FBI put on?

A     Yes.

Q     Okay.  So, just tell me generally what happened that day.  What happened the day of the search?

A     We made entry into the unit.  We cleared the unit for any persons, and then we basically take photographs.  We did a sketch of the unit.  We searched for items.  Any items that we believe fit the premise of the search warrant, we labeled, collected, and then basically leave our item sheet and we enter those -- we bring those back to the San Diego Field Office and enter them into evidence.

Q     And when you say the sheet, do you mean like an inventory sheet you leave?

A     Yes.  Yeah, an inventory sheet.

Q     Okay.  So, you -- did you -- was there a number of items seized at the time from the Defendant's apartment?

A     Yes.

Q     Let me show you a few of those.  Let me show you Government's Exhibits 100 through 105.  Go ahead and put that binder (indiscernible).

      Let's start with 100.  Can you tell me what that is?

A     This is a cellular telephone.

Q     Is that a phone that was seized from the Defendant's

II-14

room?

A    It is, yes.

Q    Is that a Samsung phone?

A    Yes.

Q    And how do you know that that's the phone that was seized from his residence?

A    I -- from my review of the documents from the day of the search and from my review of this item and my signature on it from a couple of days ago.

Q    So, you had a chance to review the evidence.  Does -- it matches all the numbers that were entered into it when it was taken from the apartment?

A    Yes.

Q    And then you reviewed that and put your initial on it?

A    Yes.

        MR. PARMLEY:  I'd move to admit 100, please.

        THE COURT:  Any objection?

        MR. JONES:  No objection.

        THE COURT:  It's received.

    (Pause.)

BY MR. PARMLEY:

Q    Let's go next to Government Exhibit 101.  What's that?

A    Exhibit 101 is a laptop computer.

Q    Was that seized from the Defendant's residence?

A    Yes, it was.

II-15

Q    And you know that for the same reasons you talked about with Exhibit 100?

A    Yes.

MR. PARMLEY:  I'd move to admit 101.

THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  It's received.

BY MR. PARMLEY:

Q    Is that an Asus laptop?

A    The -- I'm sorry.  101?

Q    Yes.  You can open it up if you need to.

(Pause.)

A    Yes, it is.

Q    Okay.  Thank you.  I appreciate that.  Now looking at Government's 102 in front of you, what's that?

A    This is another laptop, Apple MacBook.

Q    Was that also seized from the Defendant's residence?

A    Yes.

MR. PARMLEY:  I'd move to admit 102.

THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  It's received.

BY MR. PARMLEY:

Q    Looking at 103, what is that?

A    This is a hard drive.

II-16

Q     A portable hard drive?

A     Yes.

Q     And that was seized from the Defendant's residence, from his bedroom?

A     Yes.

          MR. PARMLEY:  Move to admit 103.

          THE COURT:  Any objection?

          MR. JONES:  No objection.

          THE COURT:  It's received.

BY MR. PARMLEY:

Q     104, could you look at 104, please.

A     Yes.

Q     What's 104?

A     A steno notebook.

Q     This is a notebook seized from the Defendant's residence?

A     Yes.

Q     From his bedroom?

A     Correct.

          MR. PARMLEY:  I'd move to admit 104.

          MR. JONES:  No objection.

          THE COURT:  It's received.

          MR. PARMLEY:  Now, if I could put on 104A through H on the screen for you to look at.

//

II-17

BY MR. PARMLEY:

Q   I'm just going to go through those quickly, A, B, C, D, E, F, G, and H.  Do you recognize those?

A     Yes.

Q     What are those?

A     Those are pages from inside of the notebook.

Q     It's photographs of pages from inside the notebook which has already been admitted as 104?

A     Yes.

        MR. PARMLEY:  All right.  Thank you.

        I'd move to admit 104A through H, please.

        THE COURT:  Any objection?

        MR. JONES:  No objection.

        THE COURT:  They're received.

        MR. PARMLEY:  Thank you.

BY MR. PARMLEY:

Q     Could you then look at 105 in front of you, please.

A     (Reviewing document.)

Q     Do you recognize that?

A     I do, yes.

Q     What is that?

A     It's a Best Buy receipt.

Q     And that was seized from the Defendant's bedroom?

A     Yes.

        MR. PARMLEY:  Move to admit 105.

II-18

THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  It's received.

BY MR. PARMLEY:

Q     Now show you Government's Exhibit 40.  Is that a thumb drive?

A     Yes.

MR. PARMLEY:  Your Honor, previous -- pursuant to the previous stipulation, the parties stipulated that Government's Exhibit 40 contains a true and accurate copy of Government's Exhibit 103, the hard drive that was just admitted.  So, I'd move to admit Government's Exhibit Number 40.

THE COURT:  Any objection?

MR. JONES:  Of course, no.

THE COURT:  Thank you.  It's received.

BY MR. PARMLEY:

Q     So, that's an image of the hard drive that you just -- was taken from his residence?

A     Yes.

MR. PARMLEY:  Okay.  Thank you.

I don't have any other questions.

THE COURT:  Thank you.

Cross?

MR. JONES:  No, your Honor.

II-19

THE COURT:  All right.  Thank you.  You may step down.  Is he excused?

MR. PARMLEY:  Yes, your Honor.

MR. BERTOLA:  The Government calls as its next witness FBI linguist Jayne Liu.

JAYNE LIU - PLAINTIFF'S WITNESS - SWORN

THE CLERK:  Please state your first and last name for the record and spell both.

THE WITNESS:  Yes.  First name is Jayne, J-A-Y-N-E. Last name is Liu, L-I-U.

THE CLERK:  Thank you.

THE WITNESS:  Thank you.

DIRECT EXAMINATION

BY MR. BERTOLA:

Q    Good morning, Ms. Liu.

A    Good morning.

Q    Where do you work?

A    I work for the Federal Bureau of Investigation, San Diego Field Office.

Q    What do you do there?

A    I am what is commonly known as a linguist.

Q    How long have you been an FBI linguist?

A    I have worked for the FBI since 2013.

Q    What are some of the duties that FBI linguists have?

A    Basically, anyone in the Bureau, when the need foreign

II-20

language assistance, they can reach out to us.  We translate. We interpret.  We provide support on the language front.

Q    What did you do before you were an FBI linguist?

A    I actually worked in the private sector in marketing and public relations.

Q    And you said you've been a linguist for about 12 years with the FBI?

A    Something like that, yes.

Q    Are there certain languages that you're certified to be an FBI linguist for?

A    I am certified in Chinese and specifically Mandarin.

Q    And when you say Chinese specifically Mandarin, for folks who are not familiar with the Chinese language, can you explain why you're specifying Mandarin as opposed to other languages within that family?

A    Yes.  Chinese is made up of -- spoken Chinese I should say, is made up of a number of dialects.  They vary from province to province.

So, centuries ago, it was established that an official language is necessary.  So, the language decided was Mandarin. So, for -- ever since then, for all Chinese people who have gone to school, they need to learn the common language, which is Mandarin.

Q    How did you learn Mandarin?

A    I was actually born in a Chinese speaking country.  So,

II-21

that is my first language.

Q    And then so  you -- so you learned it just growing up in the house?

A    I learned it by being in that society.  And then even after immigrating here to the United States, it's the language predominantly spoken in my home.

Q    Are there any other experience you've had other than just sort of your -- your mother tongue or family language being Mandarin that has contributed to your language abilities with Mandarin?

A    Yes.  I actually also have an academic background in Chinese that is my major when I studied in university, and also post-graduation, I sought out a way to improve my overall Chinese understanding by living abroad in Taipei.  I engaged several private tutors during that time, and I basically on my own developed a study program to learn how -- I should say to learn all the genres of the language.  So, starting from thousands of years ago, requiring learning what is now considered classical Chinese, which is slightly different from the modern language.  So, I lived in a Chinese speaking city, Taipei.  And I was there for around five years to really do a very comprehensive study of the language.  It was something that I was not able to do here in the United States, even if I went to a graduate program because I wanted to fulfill everything I wanted to learn about the language by doing that.

II-22

Q    You said that you studied Chinese in college?

A    Yes.

Q    Is your major in Chinese?

A    Yes.

Q    Did you study any other languages in college?

A    I went to a school dedicated to languages and linguistics.  So, we were also required to study a second foreign language.  So, my second foreign language was Russian.

Q    Other than English, Chinese and Russian, are there any other languages that you have --

A    Actually, a couple more --

Q    Let me -- let me ask the -- finish asking the question.

A    Sure.

Q    Other than Russian, Chinese, and English, are there any other languages that you have some experience either reading, speaking or writing?

A    Yes.  So, growing up here in San Diego, we were also required to study a foreign language in high school.  So, I studied Spanish for five years in high school, took the AP test senior year, passed.  So, I was able to also get some college credit with that.  And then in my 30's, I had an opportunity to also engage a private tutor and studied a little bit of French.

Q    So, is it -- is it fair to say that other than myself, who can barely speak English, it sounds like you have a lot of

II-23

experience learning, speaking, understanding multiple languages?

A     Yes.  I -- I think it's safe to say that I have a lifetime love of languages.

Q     Let's talk a little bit about how you become -- how someone becomes an FBI linguist.  Can you talk a little -- testify a little bit about how you in around 2013 joined the FBI and what the process was going through to get certified as a Chinese language linguist?

A     I'm going to keep it really simple and very general.  So, it all started when I went to a job fair that was the FBI looking for people who have foreign language skills.  So, I submitted an application and then was called into the field office multiple times to take different phases of language tests.  Generally, if you pass the first phase, then you advance to the second phase and so forth.

So, once I completed all the tests and the FBI decided that I could be certified in Chinese Mandarin, then my application went the same way as all FBI employees, so, going through the polygraph, going through the background investigation.  So, it really took a little bit of time.  I believe -- and I'm a little fuzzy on the time now because it was a while back, but it probably took something like 18 months before I set foot into the FBI office as an employee.

Q     You testified earlier -- you kind of used these two

II-24

words.  You said that you're certified to interpret and you're also certified to translate.  To me, those sort of sound like the same thing.  Do those words have particular meanings in -- in sort of the linguistic world?

A    Yes.  In general -- generally speaking, we all use the words translation, interpretation interchangeably.  But, to be very specific, you would be interpreting if it's spoken, and you would be translating if it's written text.

Q    Are you certified to be a full spectrum or Chinese language linguist who can provide translation and interpretation services?

A    Yes.  So, all of those phases of testings that I referred to earlier basically allowed the Bureau to say what work services I can provide.  So, to use your words, a full spectrum, yes.  So, I am able to do summaries.  I am able to do verbatims.  I am able to do interpretation.  So, a lot of different work services, and then since becoming an FBI employee, I've also achieved other work services that not all linguists can do.  I am also adjunct FBI faculty.  So, I also provide training in language related matters.

Q    After you get certified as a linguist, which for you was let's say about a decade ago, have you taken any steps to keep up on your language -- your Chinese language abilities?

A    Yes.  On a daily basis, I browse through at least four different news media in both English and in Chinese because

II-25

it's very important to keep up with the language.  Foreign langbuage is one of these tghings whether you are born using it or not, you -- if you don't use it, you lose it.  So, I do that on a daily basis.  I also watch Chinese language films, TV shows, thiungs likie that, because it's not only ijmportant to know business level language, but it is also important to keep up wioth sort of what is trending and what is the fad, what is being used by everyday people.

Q     Approximately how many hours every week do you spend either listening to Chinese, reading Chinese or speaking Chinese?

A     Basically -- I live with my mother, who prefers speaking Chinese.  So, my everyday conversation with her on all sorts of topics is done in Chinese.  And she watches a lot of programming in Chinese.  So, I -- it is always in the background of my home life.

And at work, obviously, I am engaged with either translation or interpretation of anything and everything in the Chinese language.

Q     Is it fair to say that you spend at least dozens of hours every week engaging, using, reading the Chinese language?

A     Yes.

Q     I want to talk a little bit about the FBI process for translating and interpreting.  Does the FBI have a -- a system

II-26

that uses when it provides interpreter or translation services related to an investigation?

A     Yes.  And I could speak a little to that because I am also the relief supervisor for the foreign team at the San Diego Field Office.

We have a management system that anyone in the office can submit a work request, and once that comes in, the supervisor, depending on what the work request is, will create tasks for the appropriate linguists.  And this system also tracks items that are translated.  So, once I receive a task, let's say for a document verbatim translation, a deadline is provided, and then my goal as a linguist is to always meet and exceed that deadline.  I complete it.  It gets' uploaded into the system.  The supervisor processes it and then sends the translation product to the requester.

Q     What happens after that?

A     And then obviously, if the requester has any questiolns and whatnot, you know, they can approach me, and also, when we know that the translation is not going to stay internally, then it -- the rule for language services is it always gets reviewed and perhaps edited by another linguist accredited with the same work services.  So, if it goes -- well, in our language, if it goes outside the Bureau, that product has been translated and reviewed by at least two linguists.  So, that's kind of generally the work process.

II-27

Q     Would a translation or intgerpretation that goes from the FBI to the Department of Justice be considered going outside of the Bureau?

A     Yes.

Q     And, so, we're going to talk about some or your -- some translations -- FBI translations and interpretations today. For each of the translations and interpretations are we going -- that we're going to talk about, have they gone through that two -- at least two linguist process?

A     Yes.

Q     So, every interpretation or translation we're going to talk about today has had at least two FBI certified Chinese language linguists review and confirm the accuracy of those translations and interpretations?

A     Correct.

Q      Are you familiar with the case United States versus Jinchao Wei?

A     I am.

Q     During the investigation of the Defendant, did you assist the agents in providing translation and interpretation services?

A     I did.

Q     Did you review a variety of pieces of evidence like audio, written documents, text messages?

A     I did.  And, since the amount of work required was

II-28

large, a lot of the work was initially done by other linguists in other offices, and then they come back to San Diego, and I reviewed most of these different translation products.

Q    Ballpark numbers, about how many hours would you say you spent reviewing Chinese language documents related to the investigation of Mr. Wei?

A    I would say hundreds if not in the thousands.

Q    Did your review of that Chinese language source material involve reviewing or listening to audio recordings of the Defendant's voice?

A    Repeatedly and regularly.

Q    Approximately how many hours have you spent listening to the Defendant, his voice, in an audio recording speaking Chinese?

A    Just like document and texts, probably hundreds if not in the thousands.

Q    Are you familiar enough with his voice that you can recognize his voice speaking Chinese?

A    Yes.

Q    And how -- how can you do that?  How -- how do you know if you were to hear an audio recording of his voice that it's his voice?

A    We have something called voice -- a note that we would use that is voice identified.  So, because I've listened to so many hours, like I said, hundreds, perhaps even thousands of

II-29

hours, I can recognize it, but also the requester usually kind of let us know, you know because they most likely have already gone through their review -- initial review.  So, they're able to put in their work request who the speakers are, for example, for a particular audio source.

Q    In Chinese, do Chinese speakers sometimes also have kind of idiosyncracies or certain ways they speak, just like people who speak English?

A    I think that that is true.

Q    So, in your review of some of the audio of the Defendant's voice, in addition to the context in which you reviewed those recordings and the content of those recordings, did you also become familiar with just the way that he spoke Chinese?

A    Yes.  Very much so.

Q    We're going to go through a -- a number of translations that you did, and we're not going to talk about the substance of them.  I'm really just going to -- another witness is going to do that.

But I want -- we're going to kind of bucket then.  So, in assisting the investigators by providing translation and intgerpretation services, you testified that you reviewed some audio, is that right?

A    Correct.

Q    Did -- did some of that audio involve phone calls?

II-30

A      Yes.

Q      Did you also review audio from a chat application called WeChat?

A      Yes.

Q      Were those what are sometimes referred to as voice to text messages?

A      Yes.

Q      And can you just describe for the jury, who might not be familiar what a -- what a voice to text message in WeChat is?

A      As you all may be able to imagine, typing in Chinese is a lot more difficult than typing in English.  So, a very common habit is for folks to just record a quick voice message as opposed to typing it out, and send it through that communication app, just like we would, for example, if we're using WhatsApp.  I believe that is a function that is available.  So, very very common in the WeChat application.

Q      Did you also review WeChat text messages involving the Defendant?

A      Yes.  So, just like all other communication apps, texting also is common.

Q      Did you review Telegram text messages involving the Defendant?

A      Yes.

Q      Did you review Apple iMessages messages involving the Defendant?

II-31

A    Yes.

Q    Did you review papers that the Defendant wrote?

A    Yes.

Q    Did you review documents from the iCloud account of someone named Andy Li?

A    Yes.

Q    And did you review a Web page from a website called Tieba?

A    Yes.  And that's actually pronounced Tieba.

Q    Thanks.  Okay.  So, let's first start with the room audio.  So, what's already been admitted via stipulation are Government's Exhibits 60 through 64, which are room audios, and those have already been admitted.

     Did you translate those five audio recordings from 2023?

A    (Reviewing document.)

Q    You won't be able to see it in the --

A    Oh, I was just going to say that it needs -- there's nothing in here, but would it be in the other binder or no?

        MR. BERTOLA:  Let me actually do it this way.  Government's Exhibit 60 through 64 were -- the parties don't dispute the foundation of those documents per the stipulation that was read yesterday.  So, at this point, the Government would seek to move Government's Exhibit 60 through 64 into evidence.

        THE COURT:  Any objection?

II-32

MR. JONES:  No objection.

THE COURT:  They're received.

MR. BERTOLA:  Your Honor, may I approach?

THE COURT:  You may.

BY MR. BERTOLA:

Q     Do you recognize this thumb drive?

A     Yes, I do.

Q     What is it?

A     It is a thumb drive containing Exhibits Number 60 to 64, and I reviewed them because I signed off -- I initialed the back of the thumb drive.

Q     And those are recordings that are of the Defendant's voice originally in Chinese?

A     Yes.

Q     And then I'd like you to look at what's been premarked in your binder Exhibits 125 through 129.

A     Okay.

Q     And just flip through those and tell me when you're ready.

A     Okay.  I have 125.

Q     Okay.  So, 125 through 129, do you recognize those?

A     125 -- yes.

Q     What are those?

A     These are I believe room recordings of conversations of WeChat telephone conversations.

II-33

Q     Are those translations into --

A     They are --

Q     -- English of the original Chinese?

A     Yes, they are translations.

Q     So, Government's Exhibits, what's been marked as 125 through 129 are English translations of the original Chinese which is Government's Exhibit 60 through 64?

A     Yes.

Q     Are Government -- are Exhibits 125 through 129 true and accurate English translations of the original Chinese language audio contained in Exhibits 60 through 64?

A     Yes.

          MR. BERTOLA:  The Government seeks to admit Exhibits 125 through 129.

          THE COURT:  Any objection?

          MR. JONES:  No objection.

          THE COURT:  They're received.

BY MR. BERTOLA:

Q     Okay.  You can put that to the side.  Did you also review a July 15, 2023 phone call between the Defendant and his mother, Mingli Wei?

A      Yes.

          MR. BERTOLA:  And pursuant to the parties' stipulation, that original phone call is premarked as Government's Exhibit 70, which is in the original Chinese.

II-34

At this point, the Government would seek to admit Exhibit 70 into evidence.

THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  It's received.

MR. BERTOLA:  May I approach?

(Pause.)

MR. BERTOLA:  May I approach?

THE COURT:  You may.

BY MR. BERTOLA:

Q    Ms. Liu, do you recognize what you've been handed as Government's Exhibit 70?

A    I do.

Q    Is this the original Chinese language phone call between the Defendant and his mother from July 15th, 2023?

A    Yes.

Q    And then if you would please turn to what's been marked as Government's Exhibit 130 in that binder.  Tell me what that is.

(Pause.)

A    130 is a verbatim translation of two timestamped portions of this particular audio.

Q    Is Government's Exhibit 30 a true and accurate English translation of those portions of the original Chinese language audio from Exhibit 70?

II-35

A      Yes, it is.

          MR. BERTOLA:  We move to admit Government's Exhibit 130.

          THE COURT:  Any objection?

          MR. JONES:  No objection.

          THE COURT:  It's received.

BY MR. BERTOLA:

Q      You also testified that you translated some voice to text voice messages that were found on Mr. Wei's WeChat account, is that right?

A      Yes.

          MR. BERTOLA:  Those voice messages were taken from Government's Exhibits 52 and 53 which have already been discussed in the stipulation.  Those are the phones -- or the phone that was imaged twice.

          So, at this point, the Government would seek to admit Exhibits 52 and 53 into evidence.

          MR. JONES:  No objection.

          THE COURT:  It's received -- they're received.

          MR. BERTOLA:  And then Government's Exhibit 122 is a subset of some of those audio messages that were taken from that -- that phone.

          May I approach?

          THE COURT:  You may.

II-36

BY MR. BERTOLA:

Q    Ms. Liu, do you recognize what's been marked as Government's Exhibit 122?

A    I do.

Q    And do you recognize it because your initials are on that thumb drive?

A    Yes.  Everything I review has my initials.  I know it's hard to see, but that's my scribble.

Q    And is Exhibit 122 a subset of certain voice messages from the Defendant's WeChat account that were seized pursuant to court authorization from the Defendant's phone?

A    I believe so.

Q    Okay.  And I'd like you to look in your binder at Government's Exhibit 121.

A    I have it.

Q    Okay.  Is Government's Exhibit 21 an English translation of those audio messages that are contained on 122?

A    Looks like both texts as well as audio messages.

MR. BERTOLA:  Okay.  So, the Government first would move to enter Government's Exhibit 122, which is that thumb drive, into evidence.

THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  It's received.

//

II-37

BY MR. BERTOLA:

Q    Is the English translation of the audio portion of Government's Exhibit 121 a true and accurate translation of the original Chinese audio from 122?

A    Yes.

MR. BERTOLA:  The Government seeks to admit Government Exhibit 121.

THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  It's received.

MR. BERTOLA:  Can you actually publish 121 Ms. White, real quick.  And if we could go to page two, please.

BY MR. BERTOLA:

Q    So, I just want to highlight -- Ms. Liu, you see -- can you see that on the screen?

A    I can.

Q    Okay.  You see now a portion of the translation a third -- the third row down and in black, it says Voice -- voice push to talk?

A    Yes.

Q    What does that mean?

A    Anything within the square brackets are what we call exegesis, and that just provides some additional information that's not part of the audio.  So, it's text that's set aside from the actual audio portion.

II-38

Q    So, in the translation is the text that's in red.  Are those the English translations of the push to talk portions of the WeChat conversation?

A    Yes.  That's the English of the audio source.

Q    And then are the translations that are in black text the translation of the original Chinese text in the WeChat?

A    Yes.

Q    So, basically it sounds like in WeChat, like in a lot of other apps, you can send people text messages, and you can also send them voice messages?

A    Yes.  And you can see that it -- it is easier to talk.  So, the audio portions are longer than the actual text portions.

        MR. BERTOLA:  Okay.  You can take that down, please, Ms. White.

BY MR. BERTOLA:

Q    During this investigation, did you translate some texts and voice WeChat messages between the Defendant and someone whose name in the WeChat conversation was Mr. Raph?

A    Yes.

Q    Do you happen to know who Mr. Raph is?

A    I do not.

Q    Okay.  And these -- these are messages that were -- the FBI agents gave to you and said that they had been taken from the Defendant's WeChat account?

II-39

A     And that's usually not so important to me.  I just look at the source material, and I translate what I see in the source material.

Q     Okay.  Is Exhibit -- it might be up there.  Is Exhibit 124B one of those audio messages?

A     124B?

THE COURT:  It's not in --

THE WITNESS:  I only have 124A and 124C.

(Pause.)

MR. BERTOLA:  Here we go.  So, that was the (indiscernible) -- that's been previously admitted.

BY MR. BERTOLA:

Q     Do you recognize 124B?  Are your initials on there?

A     I do, and they are.

Q     Okay.  And I'd like you to next flip in your binder to 123.  Do you recognize that?

A     I do.

Q     Is Exhibit 123 an English translation of the audio contained on Exhibit 124B?

A     Looks like it's both the text as well as the audio.  The items that are voice messages, again, has the black exegesis right in the beginning.

Q     Is Exhibit 123 a true and accurate English translation of certain texts and audio messages that were originally in Chinese, including the audio messages in 124B?

II-40

A     Yes.

        MR. BERTOLA:  We seek to admit Government's Exhibit 123.

        THE COURT:  Any objection?

        MR. JONES:  No objection.

        THE COURT:  It's received.

BY MR. BERTOLA:

Q     You also said you reviewed some Telegram messages that were originally in Chinese?

A     Yes.

Q     And is Exhibit 120 -- you can look through your binder if you'd like.

        THE COURT:  What number?

        MR. PARMLEY:  120, your Honor.

BY MR. BERTOLA:

Q     Is Exhibit 120 your English translation of certain Telegram messages?

A     Yes.

Q     Okay.  And does Exhibit 120 contain all of the Telegram messages that you translated?

A     I don't know for sure.

Q     Well, you can look through how many pages are in there.

A     Okay.  but I remember there were a lot of translations. So, most likely they are.

Q     Have you reviewed the documents in Exhibit 120 before,

II-41

those translations?

A    I have.

Q    Okay.  And are the English translations of Exhibit 120 a true and accurate translation of certain Telegram messages between the Defendant and someone named Andy Li that were provided to you?

A    Yes.

MR. BERTOLA:  Move to admit Government's Exhibit 120.

THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  They're received.

BY MR. BERTOLA:

Q    Okay.  We're almost done.  We talked about iMessages. Did you also translate iMessages between the Defendant and his mother during the course of this investigation?

A    Yes.

MR. BERTOLA:  And the parties have previously stipulated that certain items, including Government's Exhibits 33 and 34 were taken from the Defendant's iCloud account.  So, at this point, the Government would move to admit Government's Exhibit 33 and 34.

THE COURT:  Any objection?

MR. JONES:  No.

THE COURT:  They're received.

II-42

BY MR. BERTOLA:

Q    Okay.  And was there a -- if you could please turn to what's been marked as Government's Exhibit 131 in here.

A    I have it.

Q    Okay.  What is that?

A    It looks like text messages exchanged between Ms. Mingli Wei and Jinchao Wei.

Q    So, this is an exhibit that is an English translation of some of the messages in Chinese exchanged between the Defendant and his mother?

A    Yes.

Q    And is Government Exhibit 131 a true and accurate translation of the original Chinese language messages from February 2023 that you -- that were exchanged between the Defendant and his mother?

A    Yes.

        MR. BERTOLA:  Move to admit Government's Exhibit 131.

        MR. JONES:  No objection.

        THE COURT:  It's received.

BY MR. BERTOLA:

Q    Did you also translate some stand-alone papers that were originally written in Chinese?

A    Yes.

Q    I'd like you to just browse through in your binder

II-43

Government's Exhibit 139A through 144A.

MR. BERTOLA:  And, pursuant to the parties' stipulation, these are documents obtained from the Defendant's Google account.  So, at this point, we would move to admit Government's Exhibits 139A through 144A.

THE COURT:  Any objection?

MR. JONES:  Just one moment.

(Pause.)

MR. JONES:  Yeah, no objection.

THE COURT:  They're received.

BY MR. BERTOLA:

Q    I want you to look at -- we just admitted 139A through 144A, and I'd like you to just look now at 139 through 144 and tell me when you've had a chance to review those.

(Pause.)

A    I have completed my review.

Q    Are Government's Exhibits 139 through 144 true and accurate English translations of the original Chinese language 139 through -- 139A through 144A?

A    They are.

MR. BERTOLA:  Move to admit Government's Exhibit 139 through 144.

THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  They're received.

II-44

BY MR. BERTOLA:

Q    You also translated some documents and notes from the iCloud account of somebody else other than Mr. Wei, correct?

A    Yes.

Q    And if you could look through your binder through 132 and 138 and tell me when you've had a chance to review those.

(Pause.)

        THE COURT:  Could you give me the numbers?

        MR. BERTOLA:  It is 132 through 138, your Honor.

(Pause.)

        THE WITNESS:  I have completed my review.

        MR. BERTOLA:  Okay.  And pursuant to the parties' stipulation, Government's Exhibit 37 is a copy of the records from an iCloud account.  So, at this point, the Government would seek to admit Exhibit 37 into evidence, which is the iCloud account attributed to Mr. Li.

        THE COURT:  Any objection?

        MR. JONES:  No objection.

        THE COURT:  It's received.

BY MR. BERTOLA:

Q    Going back to 132 through 138, are Government's Exhibits 132 through 138 true and accurate English translations of the original Chinese language documents that you reviewed from that iCloud account?

A    Yes.

II-45

MR. BERTOLA:  Move to admit Government's Exhibits 132 through 138.

THE COURT:  Any objection.

MR. JONES:  No objection.

THE COURT:  They are received.

MR. BERTOLA:  Can you please publish 132 for the jury.

BY MR. BERTOLA:

Q    So, at the top of this, some of the -- you see where some of the text is in italics?

A    Yes.  A lot of the text is in italics.

Q    What does that mean?

A    When a FBI translation product contains italics, usually at the very beginning of the product, you use, as noted, italics always stands for English.

Q    So, in other words, from the -- if we're looking at an FBI translation, if the -- the translation text is in italics, that means that the original text that you're translating was in English?

A    That is correct.

Q    And then if you look at the -- what Ms. White has highlighted here at the top, it says Classic cases, and that's in regular text.  What does it mean if one of the translations is in regular text?

A    That means in the source material that originally was in

II-46

Chinese.

Q    So, for this translation and interpreting the font of the text, the fact that it's in regular text means the original material was in Chinese, and then the fact that it -- some of the text is in italics means the original was in English, is that correct?

A    That is correct.  Yes, that is correct.  So, this -- obviously, if you look at this page, this was a very easy translation task.

MR. BERTOLA:  Let's take that down, please.

BY MR. BERTOLA:

Q    All right.  Last thing, you said that -- and I'm going to mispronounce it, but you said that you also translated a screenshot of a Baidu website?

A    Correct.

Q    Okay.  And what is Baidu?

A    So, Baidu is also a -- a platform -- a social media platform in Chinese.

Q    I'd like you to look at what's been premarked as Government's Exhibit 145A in your binder, please.

(Pause.)

A    Did you say 125?

THE COURT:  145.

BY MR. BARRY:

Q    145A.

II-47

A      145.  I'm sorry.

            THE COURT:  145A.

            THE WITNESS:  Got it.

BY MR. BERTOLA:

Q      Okay.  What is this?

A      This looks like a web page from Baidu, and it's noted on the top left that this is Baidu.

Q      Do you recognize this web page?

A      I do.

            MR. BERTOLA:  Move to admit Government's Exhibit 145A.

            THE COURT:  Any objection?

            MR. JONES:  No objection.

            THE COURT:  It's received.

BY MR. BERTOLA:

Q      And then if you would please turn to Government's Exhibit 145.

A      Yes.

Q      What is that?

A      That is a summary translation, as stated, on top.

Q      A summary translation of what?

A      Of the web page.

Q      So, 145A?

A      Correct.

Q      Okay.  What's the difference between a summary

II-48

translation and a verbatim translation?

A    A verbatim translation is a mirror image of the source material.  A summary is exactly like what it says.  It's a summary of the highlights of the source material.

Q    Other than 145, have any of the other exhibits we've discussed today been summary translations?

A    I believe all the others we discussed were verbatim translations, audio or document.

Q    And that -- so, this is -- based on what we've talked about today, this 145, 145A is the only summary translation?

A    Yes.

Q    Is Government's Exhibit 145 a true and accurate summary translation of 145A?

A    Yes.

        MR. BERTOLA:  Move to admit Government's Exhibit 145.

        THE COURT:  Any objection?

        MR. JONES:  No objection.

        THE COURT:  It's received.

        MR. BERTOLA:  One -- one moment, please.

     (Pause.)

        MR. BERTOLA:  All right.  No further questions.

        THE COURT:  Thank you.

        Cross?

        MR. JONES:  Yes, your Honor.

II-49

CROSS EXAMINATION

BY MR. JONES:

Q     Good morning, Ms. Liu.

A     Good morning.

Q     So, you spoke on Mandarin being a distinct dialect of the Chinese language, correct?

A     Yes.

Q     And there's many different dialects in China, correct?

A     Correct.

Q     And does Mandarin itself have distinct dialects?

A     Mandarin itself does not.

Q     Is it spoken differently in different parts of China, in different countries based on accent and stuff like that?

A     There may be personal accents, but there is no difference in the language spoken.

Q     There's no regional accents?

A     There may be regional accents.

Q     Does slang differ by regions to your knowledge of Mandarin, by region?

A     The -- I should also explain that Mandarin in modern way is known as the common language.  So, it should be understood by everyone.

          THE COURT:  But can you answer his question?

BY MR. JONES:

Q     Yes.  Does -- by region, does slang differ with Mandarin

II-50

speaking regions, countries?  Does -- does the slang differ at all noticeably to your knowledge?

A    Not noticeably.

Q    To your knowledge?

A    To my knowledge.

Q    And you spoke about growing up in a Chinese speaking country, correct?

A    In a Chinese speaking household.

Q    Chinese speaking household?

A    Yes.

Q    So, what country did you grow up in?

A    Here in the United States.

Q    And you lived your whole live in the United States before you went and studied abroad in Taipei?

A    Not entirely.  I -- I also said that I was born -- and I was actually born in Taipei.  So, that's who --

Q    Taipei --

A    That's why it's my first language.

Q    Taipei is the capital of Taiwan, correct?

A    Yes.

Q    And Taiwan does not claim to be a part of Chinese, correct?

          MR. BERTOLA:  Objection.  Relevance.

          THE COURT:  Complicated.

          MR. JONES:  Understood, your Honor.

II-51

THE COURT:  I think -- I think maybe it would be best on 403, but then you could rephrase it.

MR. JONES:  It's okay, your Honor.  I don't need the question.

BY MR. JONES:

Q     So, to your knowledge, the Mandarin they speak in Taipei is the same as what they would speak in Mainland Chinese?

A     Yes.

Q     Can you recognize different accents in Mandarin by different regions?

A     Yes.

Q     Do you know what region Mr. Wei is from in Chinese by his accent?

A     I can tell he's from the north, and that's usually how we distinct -- distinguish, not necessarily by the actual province, northern, southern, that sort of thing.

Q     And what accent would they have in Taipei?

A     They would be -- since it's in the southern part of Chinese, it would be considered a southern accent.

Q     And that is the accent you grew up with in your household?

A     So, to clarify, I'm actually from a household of the Chinese Diascra (phonetic).  Both of my parents were born and raised in Mainland Chinese.  So, I don't have a Taiwanese accent.  I also have a Mainland Chinese accent.

II-52

Q    And what part of Mainland?  Would that be north as well?

A    Southern.  We're southerners.

Q    So, that southern accent from Mainland Chinese is different from the southern action (sic) in Taiwan?

A    Not particularly.

Q    And you listened to audio recordings of Mr. Wei, correct?

A    I'm sorry.  Could you repeat that?

Q    You listened to audio recordings of Mr. Wei?

A    Yes, I did.

Q    And you said you were able to recognize his voice?

A    Yes.

Q    And you also said that before you listened to the recordings, sometimes they would tell you it's Mr. Wei?

A    No.  I actually listened to a lot of audio without that knowledge.

Q    So, would you make the determination of whether it's Mr. Wei speaking as opposed to the other person involved in the conversation?

A    I can tell Mr. Wei's voice distinctly.

Q    Would you make the determination for FBI agents and people working on the case that that one is Mr. Wei speaking?

A    I'm never asked to make that determination.

Q    And if we can go back to the Mandarin language itself. It's safe to say English and Mandarin are vastly different

II-53

languages, correct?

A     Yes.

Q     In terms of conjugation, verbiage, et cetera?

A     Yes.

Q     Are there certain words or phrases in Mandarin that can't be exactly translated into English?

A     For the FBI, we don't translate word for word.  We translate by units of meaning.

Q     So, some translations into English aren't the exact carbon copy of the Mandarin source, correct?

A     Well, when we translate from a foreign language into English, we do have to follow English language conventions. So, I -- I cannot say anything is a carbon copy because that's not how languages work.

Q     Yes.  And some of the English language conventions aren't suitable to give an exact translation of the Chinese source, correct?

A     Could you repeat that?

Q     Because you said you have to translate the Chinese language into English by using English conventions, correct?

A     Correct.

Q     And those conventions aren't suitable to translate certain words and phrases in Mandarin, correct?

A     However, since the translation is -- the audience for that translation --

II-54

Q     I'm sorry.  I'm sorry.  So, you started wit, However.  So, is that saying yes to my question?

A     Well, I was trying to provide some linguistic context, and my train of thought was completely interrupted.  So --

Q     I apologize.  I was just --

A     If you could repeat your question, we'll -- I can answer again.

Q     I apologize.  So, you were talking about the English conventions, and that's what you had translating the Mandarin using the English conventions to translate into English.  So, I was saying is it true that the English conventions don't allow for certain words in Mandarin, certain phrases to be translated?

A     That is not true.  Like I said before, we translate units of meaning.  So, the meaning is completely carried across in the translation product.

Q     Now, in terms of -- is sarcasm present in the Mandarin language?

A     Yes, but in the -- in the right context.

Q     So, can certain words, say, a single word or phrase, can the meaning change drastically depending on the context?

A     Uh --

Q     In Mandarin?

A     Given the linguistics context, the meaning may or may not change.

II-55

Q    Is it --

A    So, I have to be -- I have to see the whole thing in this context.

Q    Yes, and --

A    I can't say the actual single word or the single phrase.

Q    And the context can depend on tone?

A    I would --

Q    Of the voice?

A    I will probably not use the word "tone" for Chinese because Chinese is a tonal language.  So, register tone in terms of -- is a little different than just tone.

Q    So -- so, a single word or single phrase, it can have different meanings depending on context, correct?

A    Possibly, yes.

Q    Possibly.  Okay.  Like tone isn't one of the contextual clues that can change that meaning because the way the Chinese language is spoken?

A    Are you referring to the pronunciation tone?

Q    Yes.  I'm saying in English, for example, you could say I'm dying, right, and that could mean you're literally dying or it could mean that you think something's very funny and you're saying, I'm dying from laughter, depending on the way you would say it, you know.  If you say it in kind of a drawn back way, then someone's like -- could think, Oh, they think something's funny.  If you say it, you know, with a regular

II-56

monotone voice, then someone would think you --

MR. BERTOLA:  Objection.  Counsel's testifying.

THE COURT:  Overruled.

BY MR. JONES:

Q    Then someone would think you're speaking literally.  Is that -- so, those -- that's what I mean by tonal change.  Is there a similar concept in Mandarin?

A    So, if I am translating from an audio source, I don't make that determination.  I translate what is actually being said.  It is -- it may be something that will come across in the translation, but that is not what I -- that's not how I translate.  I translate the meaning that is being conveyed.  I don't add context.

Q    Understood.  And I noticed in your translations you do -- you do put in the translations -- when they're laughing, you'll put chuckles or ha ha, correct?

A    Yes, because that was present in the audio.

Q    And, going back to what you said before that you don't add the contextual, that's the limit of what you would add as far as them telling a joke in the translations, correct?

A    Yes.  So, if the person literally, ha ha, then it would be translated ha ha.  But if the person is just sort of laughing, ha, ha, ha, ha, then it's going to be in an exegesis, and it says "laugh".

MR. JONES:  No further questions, your Honor.

II-57

THE COURT:  Okay.  Redirect?

MR. BERTOLA:  Briefly, your Honor.

REDIRECT EXAMINATION

BY MR. BERTOLA:

Q    Every translation that an interpretation that you admitted into evidence in this case was reviewed by at least two FBI certified linguists, is that accurate?

A    That is correct.

Q    And your testimony today is that the interpretations and translations that you provided are the most accurate based on the context and your very lengthy experience with the Chinese language?

A    That is correct.

MR. BERTOLA:  No further questions.

THE COURT:  Anything else?

(No audible response.)

THE COURT:  All right.  We'll take our morning recess at this time.  We'll be in recess for 15 minutes. Please remember the admonition that I gave to you earlier.

Oh, is the witness excused?

MR. BERTOLA:  Yes, your Honor.

THE COURT:  All right.  Thank you.

THE WITNESS:  Thank you.

(Jury exits courtroom.)

THE COURT:  We're outside the presence of the jury.

II-58

Both sides have submitted a standard instruction about translations that doesn't seem to fit this situation. So -- so, could you both go back and when we do the final instructions, make sure that we have an instruction that -- that is accurate.

And then, additionally, on the question about complicated, I attended a session in Taipei and was given a briefing by the State Department that officially the United States doesn't recognize Taiwan as a separate country.  So, I think the situation is very complicated, and I don't really think it was necessarily relevant and, if relevant at all, then it would be 403.  And I think the rest of your questions covered the subject matter that you wanted to cover.

MR. JONES:  Yes, your Honor.

THE COURT:  And that was mainly do you have accents from various ways or does slang have its own kind of use in language.  And I think that came across.

Anything further from the parties at this time?

MR. PARMLEY:  No, your Honor.

MR. JONES:  No, your Honor.

THE COURT:  Okay.  Thank you.

(Proceedings recessed briefly.)

THE COURT:  The next witness will be?

MR. PARMLEY:  Agent Wetterer, and I expect her to be on the stand a while.

II-59

THE COURT:  Okay.  Thank you.

(Pause.)

(Jury enters courtroom.)

THE COURT:  Welcome back.

You may proceed.

MR. PARMLEY:  Thank you, your Honor.  The United States calls FBI Special Agent Laura Wetterer.

LAURA WETTERER - PLAINTIFF'S WITNESS - SWORN

THE CLERK:  Please state your first and last name and spell them for the record.

THE WITNESS:  Laura Wetterer, L-A-U-R-A W-E-T-T-E-R-E-R.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. PARMLEY:

Q     Good morning.

A     Good morning.

Q     Could you please tell us where you're currently employed?

A     I am a special agent with the Federal Bureau of Investigation in the San Diego Field Office.

Q     And how long have you been with the FBI?

A     A little over about six and a half years.

Q     Can you -- before you joined the FBI, can you talk to me a little bit about your educational and employment experience?

II-60

A      Yeah.  So, after college, I went to law school, and then I practiced civil litigation in Chicago for about three years before I joined the bureau.  I also have a Master's in National Security Law.

Q      And you joined the FBI approximately six years ago, is that right?

A      Yes, in 2019.

Q      Okay.  Can you briefly describe your training as an agent and maybe special emphasis on counterintelligence issues?

A      Sure.  So, as you've heard from other witnesses, once you join the FBI as a special agent, we go to Quantico for the basic field training course.  It's about five months and we study tactical things but also classroom instruction on how to conduct investigations, different types of violations that you might work as an FBI special agent, including counterintelligence.

Then once we get to the field office, we are assigned to a squad and assigned to a training agent who walks you through kind of like your first initial investigations as your point of contract -- contact and provides you on-the-job training.  Kind of once you join the Bureau, also, you can participate in other specialized trainings put on by the Bureau and other government agencies.

So, in my case, when I started working

II-61

counterintelligence cases, I did counterintelligence investigations and operation trainings put on by both the FBI and other government agencies.

Q     So, when you joined the FBI after you finished your training in Quantico -- is it in Quantico?

A     It is.

Q     After you finished your training, where were you assigned to?

A     I was assigned to the San Diego Field Office.

Q     So, you've been here your entire career so far?

A     That's right.

Q     Were you originally assigned to a counterintelligence squad?

A     No.  So, when I first got to San Diego, I was assigned to a white collar squad.  So, we investigated financial crimes like securities fraud and investment fraud.

Q     When did you become a counterintelligence special agent?

A     About two years later.  So, around 2021, beginning of 2021.

Q     Can you tell me about any specific -- to the extent you can, any specific training you have done in the way of counter-espionage?

A     Sure.  So, the FBI provides trainings on how to conduct specifically counter-espionage investigations, how to -- there are some trainings that involve how to prosecute

II-62

counterintelligence cases, counter-espionage cases, how to investigate matters involving foreign governments.  And kind of, as I said, those trainings are put on by FBI, by the Department of Justice and also by other government agencies.

Q    And have you ever done presentations of your own relating to counter-espionage or counter-espionage cases?

A    I have.  I've done case presentations and trainings to newer agents on counterintelligence investigations.

Q    Are you familiar with the case of United States versus Jinchao Wei?

A    I am.

Q    And how are you familiar with that case?

A    I was one of the case agents on the investigation.

Q    And what exactly does a case agent do?

A    A case agent is -- and a case team are basically the primary investigators assigned to a case.  So, we are responsible for investigating an allegation of criminal activity to obtain legal process and do the work to determine whether or not that allegation is accurate.

Q    You said you investigate allegations in criminal activity?

A    Yes.

Q    Does that mean that you always -- do your investigations always conclude with a prosecution?

A    No, they do not.  There's a lot -- so, we get

II-63

allegations that someone has committed a crime regularly, and it's our job to figure out whether or not the case, and oftentimes it's not the case, and then we would close that investigation.

Q    Speaking of this case in particular, would it be fair to say that you obtained many different types of evidence at varying different times over the course of this investigation?

A    Yes, that's accurate.

Q    Different meanings I would take it as well?

A    Yes.

Q    Can you give me an example of that?

A    Sure.  So, we obtained a lot of different records in this case that I think we're going to talk about.  We used grand jury subpoenas which are basically requests that we send out to companies for business records.  We obtained search warrants in this investigation so we were able to image the Defendant's device.  We were able to search his iCloud account and his Google account and then eventually search his actual apartment where he was living.

Q    And is it also true to say -- fair to say that sometimes you did the same thing twice?  For example, searching the same thing twice?

A    Yes, we did.

Q    Can you give me an example of that and -- and explain to me why you would do that?

II-64

A     Yeah.  So, I think we had already talked about the phone image but also the Defendant's iCloud.  We executed a search warrant on the Defendant's iCloud account at of December 2022, early January 2023.  We reviewed the records in that iCloud account, and then we did a second search warrant around the time that we arrested the Defendant in late January -- or late July 2023.

And the reason we do that is because we believed that the criminal activity was ongoing.  And, so, we wanted to get additional evidence from the time period in between where we did the first search and the second search.

Q     So, something like a search warrant like that, that's a snapshot in time of what's in that account, is that correct?

A     That's right.

Q     Okay.  Is it fair to say that some of the techniques you used in this case were covert?

A     That is right.

Q     In other words, that the Defendant had no knowledge that anything happened, is that right?

A     Yes.

Q     Would the concerning part of that be, for example, when you search an iCloud account with a search warrant?

A     Yeah, that's right.

Q     So, Apple won't tell the customer under those circumstances that his account has been searched, is that

II-65

correct?

A     Yes.  So, we provide a court order to Apple that requests that they provide us the information in the account and also prohibits the company from notifying the -- the owner of that account that a search warrant has been served.

Q     And why would you do it that way?  What's the purpose of that?

A     So, there are a few purposes.  You know, when we are investigating someone, we're investigating these allegations of criminal activity, and we're trying to determine whether or not they're true.  And in order to do that, we need to make sure that the evidence in the case is preserved.

Particularly, this investigation, the co-conspirator in this case is an intelligence officer that's working for a foreign government.  And we operate under the assumption that they are sophisticated actors.  And, so, we are really careful to take steps that preserve evidence and obtain evidence and allow us to ascertain the extent of criminal activity without notifying both the Defendant and the foreign government that we are investigating them because they may take steps to delete evidence to conceal the nature and extent of their criminal activity.  And we want to make sure that we -- we get all of the evidence that we can.

Q     So, in addition to these covert investigative techniques, are there some that are more overt?

II-66

A    Yes.

Q    In other words, that people would be aware of?

A    Sure.

Q    Could you give me an example from this case?

A    Right.  So, when we arrested the Defendant, we took his phone and searched it.  He knew that we took his phone, and we also executed a search warrant at his residence, at his apartment, and anyone can see that obviously we're in his house.  So, he -- you know, people would know that we -- we conducted a search.

Q    Right.  Before we actually talk about what you found during this investigation, we need to introduce a few more pieces of evidence.  And then I promise we're going to talk about what you found.

So, let's start with Government's Exhibit 30.  It's in the binder in front of you.

A    Sure.

(Pause.)

Q    Do you recognize -- well, I'll give you a moment to get to it.

A    Okay.

Q    Do you recognize that?

A    I do.

Q    What is that?

A    These are records from T-Mobile that we obtained

II-67

pursuant to a grand jury subpoena.

MR. PARMLEY:  And, your Honor, pursuant to the stipulation, we'd move to admit Government's Exhibit 30.

THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  It's received.

BY MR. PARMLEY:

Q    And whose records are these?

A    These are records for the Defendant, Jinchao Wei.

MR. PARMLEY:  May we publish, your Honor?

THE COURT:  You may.

MR. PARMLEY:  Can we just zoom into the first page, top of the first page.

MR. BERTOLA:  John?

MR. PARMLEY:  We're waiting for a screen?

THE COURT:  Everybody's or just one?

JURORS:  (Indiscernible.)

THE COURT:  It's on now?

JUROR:  (Indiscernible.)

THE COURT:  Okay.

MR. PARMLEY:  Okay.

THE COURT:  Thanks.

MR. PARMLEY:  So could you zoom in on the -- let's say the top half of 30 -- the first page of 30, please -- actually the middle portion.  Sorry.  All right.

II-68

BY MR. PARMLEY:

Q     Who's the -- who's the -- who's the owner of this account?

A     Jinchao Wei.

Q     Does it give a phone number associated with that account?

A     It does, but his phone number is actually farther down on the page.

          MR. PARMLEY:  Can we go down farther on the page.

          THE WITNESS:  Under the subscriber details.

BY MR. PARMLEY:

Q     And where is the phone number on this?

A     So, it's in the -- at the bottom of the first paragraph starting with 262.

Q     So, is that how you figured out -- when or where you figured out that this was his phone number?

A     Yes.

Q     Okay.  And he's the subscriber of this phone?

A     He is.

Q     And did you learn at some point that this was an iPhone?

A     I did.

Q     Okay.  Let's look at Government's Exhibit 41.  I'm going to have to hand these to you.

          MR. PARMLEY:  May I approach, your Honor?

          THE COURT:  You may.

II-69

BY MR. PARMLEY:

Q    31 and 31 -- this disk is marked as 31 and 31A.  Do you recognize that?

A    I do.

Q    What is that?

A    This is a copy of records we obtained via grand jury subpoena from Pay Pal for the Defendant's Pay Pal account.

          MR. PARMLEY:  Move to admit 31 and 31A via the stipulation, your Honor.

          THE COURT:  No objection?

          MR. JONES:  No objection.

          THE COURT:  It's received -- those are received.

          MR. PARMLEY:  Could we put up --

BY MR. PARMLEY:

Q    Could you go in your binder and look at 31.1.

A    Yes.

Q    Is that one of the pages from the -- from the records that we just introduced?

A    It is.

          MR. PARMLEY:  Can we move to -- I'm just going to publish this.  I don't think we need to admit it separately.

BY MR. PARMLEY:

Q    This is part of 31, is that correct?

A    Yes.

          MR. PARMLEY:  Could we publish that, please?

II-70

THE COURT:  You may.

MR. PARMLEY:  Thank you.  That's really small type.
Is there a way to zoom in on that?  Okay.  Perfect.

BY MR. PARMLEY:

Q     And what does that indicate to you?

A     This indicates to me that the subscriber for this PayPal
account is Jinchao Wei.

Q     So, these are the Defendant's PayPal records you got
through a grand jury subpoena?

A     That's right.

Q     Could you look at your binder at Government's Exhibit
31C.

A     Yes.

Q     Do you recognize that?

A     I do.

Q     What is 31C?

A     This is a document that I created.  I reviewed the
Defendant's PayPal account transaction details, and I
separated out transactions that were pertinent in this case,
so the transactions that I believe he received from the
intelligence officer, and then I -- I put them into this
summary chart.

Q     So, let me ask you about that.  So, the PayPal records
on 31 and 31A, are they voluminous, were they small?

A     They were small.  They were not a -- there was not a lot

II-71

of transaction history outside of the payments that you see here.

Q    Okay.  And, so, this is a chart that you created for the purposes of testifying today to assist you in finding transactions that you believed were associated with Andy Li, the co-conspirator in this case?

A    That's right.

Q    And you concluded this from the evidence which has been previously admitted as Government's 31 and 31A?

A    Yes.

          MR. PARMLEY:  I'd move to admit 31C.

          THE COURT:  Any objection?

          MR. JONES:  No objection.

          THE COURT:  It's received.

          MR. PARMLEY:  We're not going to publish that now. We'll get back to -- we're going to get -- we're going to get to it.

BY MR. PARMLEY:

Q    So, let's look at 32.  That should be in front of you.

A    Yes.

Q    Do you recognize Government's Exhibit 32?

A    I do.

Q    And what's 32?

A    These are records we obtained, again, via grand jury subpoena from Navy Federal Credit Union for the Defendant's

II-72

bank account.

MR. PARMLEY:  And I'd move to admit 32 pursuant to the stipulation.

THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  They're received.

BY MR. PARMLEY:

Q    Can you look at 32D in front of you.

A    Yes.

Q    And what's 32D?

A    This is one page from the Defendant's transaction details and his bank account records.

Q    So, is this a subset of what was just admitted as Government's Exhibit 32?

A    Yes, that's right.

MR. PARMLEY:  I'd move to admit 32D, please.

THE COURT:  Any objection?

MR. JONES:  No.

THE COURT:  It's received.

BY MR. PARMLEY:

Q    Now, let's continue to talk about some evidence that you obtained that was not via grand jury subpoena, some of this digital evidence.

MR. PARMLEY:  May I approach again, your Honor?

THE COURT:  You may.

II-73

MR. PARMLEY:  Put a few items in front of you. Let's start with Government's Exhibit 33, which should be on top.

THE WITNESS:  Um-hmm.

BY MR. PARMLEY:

Q     Do you recognize Government's Exhibit 33?

A     I do.

Q     And is that -- do you recall what that is?

A     So, I reviewed this initially on the 28th.  Yeah, this is Exhibit 33.

Q     Is this an iCloud -- the first iCloud search you did of the Defendant?

A     Yes.

MR. PARMLEY:  And pursuant to the stipulation, we'd move to admit Government's Exhibit 33.

THE COURT:  Any objection?

MR. JONES:  No.

THE COURT:  It's received.

BY MR. PARMLEY:

Q     You reviewed this?

A     I did.

Q     And whose iCloud account is this?

A     The Defendant's.

Q     What generally is in an iCloud account?  What is it?

A     So, an iCloud account, depending on the settings that

II-74

you have picked, if you have an iPhone, it backs up your entire device.  And, so, it can have things on it like your text messages, like photographs that you've taken, documents that you've saved to your phone and, you know, records of, you know, phone calls or text messages.

Q    And what does that depend on?  Does that depend on what Apple does or what the user does?

A    What the user does.  So, there are like standard settings on what will back up to the iCloud.  A user can adjust those settings.  And, also, depending on how much storage space, right.  If you have a big phone, you have to pay for more iCloud storage to back up your device.

Q    So, this was a search pursuant to a search warrant of the Defendant's iCloud, is that correct?

A    That's right.

Q    Approximately when was this one done?

A    This was done in late December 2022 or early January 2023.

Q    And is it accurate to say pursuant to your earlier testimony that the defendant was not notified of this is that correct?

A    That's correct.

Q    Okay.  You should have Government's Exhibit 34 in front of you.

A    I do.

II-75

Q    Do you -- do you recognize Government's Exhibit 34?

A    I do.

Q    What's that?

A    This is a disk of responsive items from a second search warrant that we executed on the Defendant's iCloud account in -- I believe that would have been late July, early August 2023.

        MR. PARMLEY:  Move to admit Government's 34 pursuant to the stipulation in this case.

        THE COURT:  Any objection?

        MR. JONES:  No.

        THE COURT:  It's received.

BY MR. PARMLEY:

Q    That was the same process as you did for the first search of his iCloud?

A    Yes.

Q    And when did you say you -- you searched it the second time?

A    I think late July or early August 2023.

Q    And what was the purpose of the timing then for the second search?

A    So, that was right around the time that we arrested the Defendant, and we wanted to get his full iCloud account history up until the time of arrest.

Q    And could you repeat -- I think you explained it before,

II-76

but could you explain again why a second search of his iCloud account?

A    Sure.  So, you know, like I said before, we performed one search of the iCloud when we were, you know, investigating the Defendant.  We reviewed it.  We continued to employ other investigative methods, and we thought that criminal activity was ongoing.  And, so, we wanted to obtain the iCloud records from the time period between when we conducted the first search and when we arrested the Defendant to obtain additional evidence.

Q    I appreciate that.  How about Government's Exhibit 35.  Should be in front of you.

A    Um-hmm.

Q    And do you recognize that?

A    I do.

Q    And what's that?

A    This is -- I also reviewed this.  This is a copy of a search we did of the Defendant's Google account.

Q    Okay.  And is that --

         MR. PARMLEY:  We'd move to admit Government's Exhibit 35 pursuant to the stipulation.

         THE COURT:  Any objection?

         MR. JONES:  No objection.

         THE COURT:  It's received.

//

II-77

BY MR. PARMLEY:

Q    So, this was a search of whose Google account?

A    Sorry?

Q    Whose Google account was searched?

A    The Defendant's.

Q    And approximately when was that?

A    The same time period that we did the first iCloud search warrant.  So, late December 2022.

Q    And, again, the Defendant was not notified of this search I take it?

A    He was not.

Q    What is the difference between a Google account -- what kind of information could you get from a Google search warrant as opposed to an iCloud search warrant?  What's the difference?

A    So, it would be everything that's saved in your Google account.  So, the Defendant used Gmail for one of his email addresses.  So, it would generally back up all of your email history.

He also had something called a Google Drive where you can store pictures, papers, that kind of stuff.  Also, if you're signed into your Google account, it will save your Google search history and sometimes your location history if you're mapping things on Google Maps.

Q    Do you recall what the identifier was for this

II-78

particular account?

A    I do.

Q    And what was it?

A    It was Weijinchao06@gmail.com.

Q    And how did you know that that was the Defendant's account?

A    I know that from subscriber records that we obtained from Google and also through the content of what we, you know, reviewed in the account.  We were able to determine that it was him.

Q    Okay.  Let's look at Government's Exhibit 36, which should be in front of you.

A    Um-hmm.

Q    And what's that?

A    This is a copy of responsive items from a second search warrant we did of the Defendant's Google account, just like the iCloud at the time of his arrest.

        MR. PARMLEY:  All right.  So, pursuant to the stipulation, we would move to admit Government's Exhibit 36.

        THE COURT:  Any objection?

        MR. JONES:  No objection.

        THE COURT:  It's received.

BY MR. PARMLEY:

Q    And that was the same process as before?

A    Yes.

II-79

Q    For the same reasons you did a second search of the iCloud account?

A    That's right.

Q    And approximately around the same time frame, late July or early August of 2023?

A    Yes, that's correct.

Q    Okay.  And you searched his account twice for the same reason that you searched his iCloud account?

A    Yes.

Q    Okay.  During the course of the investigation, did you come across a person that for the purposes of our testimony we're going to call Andy Li?

A    I did.

Q    Who's Andy Li?

A    Andy Li is an intelligence officer who works for the Government of the People's Republic of China.

Q    And how do you know that?

A    I know that based on, you know, communications and evidence that I've reviewed in this matter relating to the Defendant and also to search warrant returns that we obtained of Andy Li's iCloud and Google account.

Q    And, so, you were able to locate some of his electronic accounts?

A    Yes.

Q    Is there any indication that Andy Li has ever been to

II-80

the United States?

A      No, not that I'm aware of.

Q      How and/or where would you get the electronic accounts of an intelligence officer from the Chinese government into an American courtroom?

A      So, Andy Li used Apple.  He used an iCloud account. Apple is a U.S. company, and more than that, the servers that contained Andy Li's iCloud account are located in the United States or were located in the United States at this time. And, so, it was -- they were subject to U.S. legal process. So, I could serve Apple and Google with search warrants for those accounts and receive the records back.

Q      Okay.  Do you have Government's Exhibit 37 in front of you?

A      I do.

Q      And what's that?

A      This is a copy of some of the items that we found in Andy Li's iCloud account.

Q      Pursuant to a search warrant?

A      Yes.

          MR. PARMLEY:  I'd move to admit Government's Exhibit 37 pursuant to the stipulation.

          THE COURT:  Any objection?

          MR. JONES:  No, your Honor.

          THE COURT:  It's received.

II-81

BY MR. PARMLEY:

Q     And what was -- do you recall what the identifier was associated with this account?

A     I believe it was a DSID, which was a number that I believe ended in 757.

Q     Okay.  Did you find documents indicating who owned this particular iCloud account?

A     I did.

Q     Okay.  And what did those documents indicate?

A     So, when we searched the iCloud and we used -- found subscriber information that indicated that someone named Andy Li used it, and we also found documents saved in this iCloud that identified Andy Li.

Q     Was one of the identifiers associated with this account Andyli_sh@163.com?

A     That's right.

Q     Let me show you Government's Exhibit 38.

A     Um-hmm.

Q     Do you recognize that?

A     I do.

Q     And what's that?

A     This is a copy of some of the items that we found in Andy Li's Google account.

Q     So, similar to a search of his iCloud account, how were you able to get information from a Chinese intelligence

II-82

officer's Google information?

A    So, the same thing.  Agents applied for a search warrant, and the Court granted a -- granted the search warrant, got a court order that we could serve on Google for the record that they held in the United States related to this account.

Q    And that's because it's an American company and it would respect service from a Federal Court?

A    That's correct.

MR. PARMLEY:  Okay.  Move to admit 38 pursuant to the stipulation.

THE COURT:  Any objection?

MR. JONES:  No objection, and, with anything subject to the stipulation, there's not going to be any objection.

THE COURT:  All right.

MR. JONES:  How about that?

THE COURT:  It's received.

MR. PARMLEY:  I appreciate that, Counsel.  Thank you.

BY MR. PARMLEY:

Q    And what -- do you recall the identifier associated with this account?

A    I believe it was Andy Leish was one of the identifiers, at gmail.com.

II-83

Q    Okay.  And did you find anything -- did you find Google searches, for example, in this account?

A    I did.

Q    Okay.  And were these digital searches of Andy Li's account done covertly or overtly?

A    Covertly.

Q    For the same reasons you talked about before?

A    That's right.

Q    Okay.  We've gone through documents now you obtained through search warrants and subpoenas, correct?

A    Yes.

Q    Google and Apple records?

A    Yes.

Q    Phone, bank and PayPal records?

A    Yes.

Q    And we've also heard testimony of the other evidence collected in this case including images of his phone on at least two occasions -- on two occasions, correct?

A    That's right.

Q    And a hard drive that was found in his apartment, correct?

A    That's right.

Q    And items seized from in his home when it was searched contemporaneously with him being arrested, correct?

A    Yes.

II-84

Q     Let's talk about a few additional items you gathered. Did you get court authorization to do some more electronic surveillance of the Defendant?

A     I did.

Q     What does that mean?

A     So, that means we got court authorization to monitor the Defendant's phone calls and also to install a microphone in his apartment.

Q     So, you were permitted to surreptitiously put a microphone in his apartment, again, without his knowledge?

A     That's right.

Q     Okay.  Government's Exhibits 60 through 64 which I believe have been previously admitted, are those copies of the audio recordings from his apartment?

A     Yes.

Q     Okay.  And are those copies from January 9th, 2023, January 31st, 2023, February 5th, 2023, March 4th, 2023, March 19th, 2023?

A     Yes, that's right.

Q     Okay.  And are those recordings from Naval Base, San Diego and Navy Gateway Inns and Suites Room 424?

A     Yes.

Q     And who lived at that location at that time?

A     The Defendant did.

Q     Did he live there on the day he was arrested?

II-85

A    He did not.

Q    When did he move?

A    I don't recall the exact date that he moved, but sometime I believe in the spring or summer he moved from -- of 2023, he moved from the Navy Gateway Inn and Suites to Retzer Hall where he lived when he was arrested.

Q    Was there a microphone ever installed in Retzer Hall?

A    No.

Q    And the translations of those documents have just been admitted through the FBI linguist as 125 through 129?

A    Yes, that's right.

Q    I want to show you something else, Government's Exhibit 106.  It might be in the second binder.

A    It is.

     (Pause.)

Q    Do you recognize that?

A    I do.

Q    What's that?

A    This is a photograph that was taken when we searched the Defendant's apartment when we installed the microphones.

Q    You were present when the microphone was installed?

A    I was.

Q    And were you able to see this in his -- in his apartment and photo was taken of it?

A    Yes.

II-86

Q    Is that a fair and accurate depiction of what was in his apartment at that time?

A    Yes.

MR. PARMLEY:  I'd move to admit 106.

MR. JONES:  No objection.

THE COURT:  It's received.

BY MR. PARMLEY:

Q    And, generally speaking, what is it?

A    It's a photograph of the Defendant's Certificate of Naturalization.

MR. PARMLEY:  Permission to publish that, your Honor.

THE COURT:  You may.

MR. PARMLEY:  And could you just zoom in on the date, Ms. White, at the bottom right when that naturalization took place.

BY MR. PARMLEY:

Q    And what's the date on that, Agent Wetterer?

A    May 18th, 2022.

Q    Okay.  You also received permission to record the Defendant's phone without his knowledge, correct?

A    Yes.

Q    And that's -- there's a phone call that's been previously admitted as Government's Exhibit 70, is that correct?

II-87

A     Yes.

Q     That phone number was 262-745-0679 that was intercepted?

A     That's right.

Q     And who's phone number was that?

A     That's the Defendant's phone number.

Q     And you knew that from his T-Mobile records?

A     Yes.

Q     And whose voice was on that phone call?

A     The Defendant's.

Q     And how do you know that?

A     I know that because I've listened to recordings of the Defendant.  I've spoken to him in person.  And, also, as we heard, our linguist who translated that phone call was familiar with the Defendant's voice.

Q     Okay.  Before we start going through the evidence chronologically that you collected, I want to ask you about some apps that you found on the Defendant's phone when he -- when it was searched.

      Can you tell me about something called WeChat?

A     Sure.  WeChat is a -- an encrypted messaging application so you can download it on your phone.  The company that owns WeChat is based in China, and you can send messages.  You can send voice memos.  You can talk on the phone all within that application.

Q     To make sure I understand correctly, you can use it it

II-88

sounds like almost like a phone?

A     Yeah.  You can use it exactly like a phone.  You just take those actions within the application.

Q     So, you can make a phone call to another WeChat user?

A     Yes.

Q     Send text messages?  Yes?

A     Yes.

Q     Send photographs and video?

A     Yes.

Q     Okay.  Did you search the Defendant's WeChat account?

A     We did not.

A     Because WeChat is a Chinese based company.  They don't respond to U.S. legal process, and there was no way for us to obtain that information from the company directly.

Q     Is it fair to say that the evidence you have that's been admitted in this case is only from the search of the Defendant's phone?  Related to WeChat?

A     Yes.  Oh, no.  I'm sorry.  No.

Q     It's not?  It's not correct?

A     No, it's now.  So, we obtained WeChat communications from the Defendant's phone and also from his iCloud.

Q     From his iCloud?

A     Yes.

Q     So, some of the data backed up to his iCloud from WeChat?

II-89

A    Yes.

Q    Okay.  A lot of phone calls?

A    No.

Q    Government's Exhibit 122, which has been previously admitted, those are push to talk audios from the WeChat account?

A    Yes.

Q    And the translations of those were -- those came from the Defendant's phone?

A    Yes.

Q    Okay.  And there's a push to talk between somebody that's labeled as Mr. Raph, and that's been previously admitted as 124B, is that correct?

A    That's right.

Q    And this also came from his phone?

A    Yes.

Q    In other words, all of those audio files came from the Defendant's phone?

A    Yes.

Q    Okay.  Let's look at -- briefly -- I think it's in -- I think it's in front of you, 124A and 124C.  Do you have those in front of you?

A    I do.

Q    Do you know what those are?

A    I do.

II-90

Q     What are those?

A     These are English translations of a portion of a message conversation between the Defendant and another Navy Sailor.

Q     Are these just cut and pastes from Government's Exhibit 123, which has previously been admitted as a translation from the FBI linguist?

A     Yes, that's right.

Q     Is this -- was it just done for presentation purposes?

A     It is.

          MR. PARMLEY:  I'd move to admit 124A and 124C, please.

          THE COURT:  Any objection?

          MR. JONES:  No objection.

          THE COURT:  They're received.

BY MR. PARMLEY:

Q     Let's talk about 120 and 121, which have been previously admitted.  Those are in the binder in front of you, is that correct?

A     That's right.

Q     Can you talk to me -- let's start with 120.  What -- that has been admitted through the linguist, but can you tell me more about what this is and the process that was used to create this?

A     Yes.  So, these are excerpts of Telegram messages between the Defendant and Andy Li that we obtained when he

II-91

searched his phone.  They're English translations of those messages because they originally were in Chinese, and essentially, we reviewed -- I reviewed all of the communications between the Defendant and Andy Li from the Telegram application, and I selected relevant portions to display to the jury during this case.

Q     So, there's more that were translated.  They're just not included in 120, is that correct?

A     That's right.

Q     And why did you make the decision to exclude those?

A     There were a lot of chats, and we just wanted to show ones that were particularly pertinent.

Q     Okay.  And was it from something called Telegram?

A     Yes.

Q     And what's the difference between Telegram and WeChat?

A     Telegram is just another encrypted messaging application.  Same thing, you can message, send pictures and videos and talk through the application that you download on your phone.

Q     And did you search his Telegram account?

A     We did not, for the same reason as WeChat.  Telegram is not a U.S. company, and so they don't respond to U.S. legal process, and we couldn't compel them to provide that information to us.

Q     Is it fair to say that both Telegram and WeChat are

encrypted applications?

A      Yes.

Q      And is it also fair to say that the evidence is going to be presented in this case from Telegram and WeChat came from his phone only, is that correct?

A      The Telegram messages only came from the Defendant's phone.

Q      Right.

A      Correct.

Q      You testified earlier that some of the material from WeChat was backed up onto his iCloud, correct?

A      Yes.

Q      Okay.  And looking at Government's Exhibit 121, and what's 121?

A      121 are excerpts of WeChat messages and push to talk communications between the Defendant and Andy.  Again, these messages were originally in Chinese.  These are English translations, and these are just portions of that conversation that we selected to show to the jury in this case.

Q      So, the same process you went through compiling the Telegram messages in 120, you did that for WeChat messages in 121?

A      That's right.

Q      And this -- all this information came from his phone or from his iCloud account?

II-93

A     Yes.

Q     And this was all translated by Ms. Liu, the linguist who just testified?

A     That's correct.

Q     So, these are all in English, and these have already been admitted, is that correct?

A     Yes.

Q     Okay.  Let's look at 131.  Do you have that in front of you?

A     I do.

Q     And that's been previously admitted I think.  Yes. That's been previously admitted.  What's that?  How is that different?

A     This is a portion of an iMessage conversation between the Defendant and his mother, Mingli Wei.  Again, these messages were originally in Chinese, and this is an English translation.

Q     Okay.  And these came from the Defendant's iCloud?

A     Yes, iCloud and phone.

Q     So, what's the difference between an iMessage and a WeChat and a Telegram?  What's an iMessage?

A     An iMessage is just when you use your iPhone to text or message between two phones.  It's just called an iMessage. And then the Telegram chats are within the Telegram application.  The WeChats are within the WeChat application.

II-94

Q     Let's go to something that's been previously admitted as Government's Exhibit 132 through 148.  These have been previously admitted after having been translated by the linguist.

            MR. PARMLEY:  Let's start with 132.  Could we publish that, please?

            THE COURT:  You may.

BY MR. PARMLEY:

Q     Can you refresh the jurors' memory as to where these came from?

A     Yes.  These came from a search of Andy Li's iCloud account.

Q     The Chinese intelligence officer?

A     That's right.

Q     Starting with 132, what are we looking at?  What is this?

A     So, this is a list of what -- so, this is a note that we found in just like the Notes folder of his iCloud.  So, if you save notes in your iPhone, it would back up to your iCloud, and this is a list of books and articles that have to do with, you know, other spies, other individuals who'd spied against the United States, how those individuals were caught and about how the CIA and the FBI works and the counterintelligence space.

Q     Any particular reason you can think of why a Chinese

II-95

intelligence officer would be collecting this information?

MR. JONES:  Objection.  Speculation.

THE COURT:  Sustained.

BY MR. PARMLEY:

Q    Based on your training and experience, do you have an opinion as to why an intelligence officer -- based on your training and experience in counterintelligence, as to why a Chinese intelligence officer would be collecting this information?

MR. JONES:  Same objection.

THE COURT:  Sustained.

BY MR. PARMLEY:

Q    Is it fair to say that these -- none of these cases are case studies involve the Chinese intelligence services?

A    No.  These are -- these are case studies of individuals who spied against the United States for a foreign government and how they got caught.

Q    Let's go to Government's Exhibit 133, please.  Is this -- what is -- where did this come from in his iCloud account?

A    This also came from the Notes folder in his iCloud account.

MR. PARMLEY:  Can you just zoom in on the top of that, top half of that maybe.

BY MR. PARMLEY:

Q    Do you have any idea what this information is?

II-96

A    So, these look like usernames and passwords for different, you know, Facebook -- like applications and websites, right, like Signal is another encrypted messaging application, a Facebook account, a VPN account, different accounts that were, you know, found in this Notes folder of the intelligence officer.

Q    Could we look at the bottom half of that page, please. Is this similar information, appears to be passwords and things of that nature?

A    Yes.

Q    And is that -- did it appear to be anything related to China?

A    I'm sorry.  Could you repeat the question?

Q    Sure.  Is there anything that appears to be Chinese related?  For example, do you know what a Baidu account is?

A    Yes.  So, Baidu is -- it's a Chinese platform.  It's kind of similar to Google.  So, it's social media, a search engine, kind of functions as the same -- similar concept, but it's a Chinese company.

Q    I also see a name towards the bottom where it says Li Jiz (phonetic) two stock accounts.  Are you familiar with that name?

A    I am.

Q    Okay.  We'll talk about that in a moment.  Could yo go to Government's Exhibit 134, please.

II-97

MR. PARMLEY:  Could you zoom in on the top half of that, please.

BY MR. PARMLEY:

Q     Where was this found in the -- excuse me -- where in the Li iCloud account?

A     In the Notes folder.

Q     Can you read that for me?

A     Sure.  It says:

"The art of speaking.  Is it possible to buy other U.S. Navy things?  Which U.S. Navy unit is your friend in?  I study maritime economic security.  I am not looking for physical objects."

Q     Do you have an understanding of what this note is referring to?

A     When I review it, it looks to me like a pitch that an intelligence officer might use to question someone that they are trying to recruit or someone in the U.S. Navy who they are trying to obtain information from.

Q     What do you mean by a pitch?

A     So, you know, when an intelligence officer would try to recruit someone, they essentially want to pitch them on what they are -- who they are, what they're doing, and why that person should provide them information.

Q     In your experience as a counterintelligence agent, have

II-98

you see individuals starting the pitch with, I work for the Chinese government in a spy agency?

A    No.

Q    And how do they typically start it based on your training and experience?

A    In my training and experience, generally intelligence officers will start with something with a little bit more kind of like mainstream appeal, a little bit more plausible deniability.  It will be a state-owned enterprise, something related to the Chinese government to essentially get their target to, you know, talk to them, to feel a little bit more comfortable communicating with them off the bat.

        MR. PARMLEY:  Thank you.

        Could you go to 135, please, and zoom in on the top half of that, please.

BY MR. PARMLEY:

Q    And could you read -- where did this come from?

A    This also came from Andy Li's iCloud Notes section.

Q    And would you mind reading what's listed there?

A        "Hello, may I take the liberty to ask you
        something?  We are engaged in U.S. China
        cross boarder risk hedging investments
        and are looking for partners in the
        United States.  After reading your
        answers and comments, I believe you may

II-99

be a good fit.  I am wondering if you would be interested in discussing this further."

Q     And what is "this" to your view?

A     It looks like the same thing, like a practice pitch that the intelligence officer might use to interact with someone he's trying to obtain information from.

Q     Is it fair to say that somebody like a Navy intelligence officer would try to cast a wide net to see if anybody would respond to something like this?

A     Absolutely, especially when intelligence officers are looking to recruit people online, it is common that they would talk to a lot of people and see how susceptible and how willing someone is to engage in a relationship with them.

MR. PARMLEY:  Okay.  And if you could go to 136, please.

BY MR. PARMLEY:

Q     And where did this come from?

A     Andy Li's iCloud.

Q     Is this also from the Notes folder?

A     It is.

Q     I'm sorry -- yes, the Notes folder, yes.

A     Yes.

MR. PARMLEY:  Could you -- can you zoom in on actually just all the texts, if you could just make it a

II-100

little bit bigger, starting with "steps".  Thank you.

BY MR. PARMLEY:

Q    Could you just read the first kind of blurb of text until you get to the identifiers?

A    Sure.

"Steps.  Registering email account, make it seem like a person's name, do not use one that has been previously, work is work.  You will not use it after you leave either.  Use a mobile phone number with the prefix 156 and register a new number using" -- you know, those identifiers.

Q    Okay.  What do you take that to mean?

A    These look like instructions for creating online accounts that are in a fictitious identity but that still look real.  When intelligence officers interact with their solicitors, it's good trade craft to use different accounts for different sources to segregate out communications with one person versus another person, so that if a relationship is discovered, it both conceals the true nature of the intelligence officer's identity, and it also prevents other assets of that same intelligence officer from being discovered.

Q    In the bottom portion of this, does that appear to be

II-101

identifiers associated with different Facebook accounts, Twitter accounts, mobile phones, et cetera?

A     Yes.

MR. PARMLEY:  Let's go to 137, please.  Could you zoom in on everything below the upper portion of it starting with the big blue bar.

BY MR. PARMLEY:

Q     Is this -- where was this found?

A     This was found in the documents folder of the -- of Andy Li's iCloud account.

Q     Is it fair to say this is a little bit unique, to find material of an intelligence officer at all?

A     Yes.  I would say in general it is very difficult to identify intelligence officers to obtain information about their true identities.  I mean, it -- it is a lot of work, and it's very difficult, and, you know, part of the job of an intelligence officer is to make sure that U.S. authorities don't obtain this information about them.

Q     And this photograph is associated -- what is this document, to the best of your knowledge?

A     So, it is what looks like a -- sort of like a registration page with a legal professional qualification management system that lists a bunch of bio data for an individual.

Q     And what is the -- if you could zoom in.  Where does it

II-102

indicate this person is from?

A    Shanghai.

Q    And what's the name given?

A    Li Zhi.

Q    And is the way -- do you know if that's the way -- is it last name first or first name last?

A    So, in Chinese nomenclature, the last name goes first. So, Li is the surname, and Zhi would be the first name.

Q    So, if we were speaking to that person in English, we would call him Zhi Li, but --

A    Yes.

Q    But it's listed as Li Zhi her?

A    That's right.

Q    So, that last name would be Li?

A    Yes.

Q    Okay.  This person, according to this document, received a Bachelor's Degree in Engineering from the Naval University of Engineering?

A    Yeah.  So, if you look at the bottom, it says, college, university, Naval University of Engineering, Bachelor's Degree in Engineering.

        MR. PARMLEY:  If you can go to the second page, please, in this document.

        THE WITNESS:  And I also just -- this is also a translation.  So, this document was found in his iCloud in

II-103

Chinese.

MR. PARMLEY:  Got it.  Can you zoom in on the top half of that, please, just all of the text.

(Pause.)

BY MR. PARMLEY:

Q    What's the occupation listed?

A    Active duty military.

Q    And looking at 138 briefly, does that appear to be part of the same subset of information that was in 137?

A    Yes.

Q    And did that also come from the documents folder?

A    It did.

Q    Did that also include a photograph?

A    Yes.

Q    Okay.  I want to talk about some manuals and some papers now.  Let's talk about papers found in the Defendant's Google account first.

MR. PARMLEY:  Can we pull up 139(a), which has been previously admitted.  Can we publish that, please.

BY MR. PARMLEY:

Q    What -- what is this, and where did this come from?

A    This is a paper written in Chinese that we found during a court authorized search of the Defendant's Google account.

Q    Okay.  And I want to talk about this a little bit later, but this was translated as --

II-104

MR. PARMLEY: Could we just publish -- well, let's just move on. Let's go to 140, please.

BY MR. PARMLEY:

Q   And 140 through 144 have been previously admitted, correct?

A   Yes.

Q   And where did these come from?

A   These came -- these are translations of papers that were found in the Defendant's hard drive.

Q   Okay. So, let me back up. So, the first document we just talked about, that was found where?

A   In the Defendant's Google account.

Q   Now, when you say his hard drive, are we talking -- what are we talking about?

A   So, when the FBI executed a search warrant on the Defendant's apartment at the time of his arrest, one of the things that we seized was an external hard drive. When we reviewed that external hard drive, we were able to find some papers that were written in Chinese and that have since been translated by our linguist.

Q   And that hard drive has been previously admitted as -- by Agent Reed as Government's Exhibit 103, is that right?

A   That's right.

Q   So, it's sitting up there on that desk in front of you. So, that's where these papers came from, is that 140 through

II-105

144 which have been previously admitted?

A     Yeah.  Those are the translations, yes.

Q     And the A is the original versions in Chinese?

A     Yes.

Q     Okay.  And that all came from?

A     The Defendant's hard drive.  That was found during a search of his apartment.

MR. PARMLEY:  Okay.  Now let's look at 145A, please.  If we could publish that.

BY MR. PARMLEY:

Q     What's 145A?

A     This is a screenshot of a web page for Baidu Tieba.

Q     And that's been previously admitted.  Who took that screenshot?

A     I did.

Q     And why did you take that screenshot?

A     When we were reviewing the contents of Andy Li's iCloud, there was a link to a website that he had favorited, and it opened up to this web page on Baidu Tieba.

Q     And are you familiar -- well, let's look at the translation, 145A I -- 145, excuse me.  And, having reviewed the translation, are you familiar what -- with what this Tieba website is?  Can you describe that for me?

A     Sure.  So, Tieba is kind of like the Chinese version of Reddit if you are familiar with that.  But, essentially, it's

II-106

an online discussion forum where users can post about topics and people can respond, and they're kind of organized by threads on different topics.

And, so, when I visited the website, that was favorited in Andy Li's iCloud.  It went to a certain forum on Tieba, a certain discussion forum where individuals were commenting and discussing things.

Q    So, if I understand your testimony correctly, the website that you went to to get the screenshot, that link came from Andy Li's iCloud?

A    It did.

Q    And you said it was a favorited website?

A    Yes.

Q    What do you mean by that?

A    So, kind of a bookmark, right.  Like you can bookmark different websites, and your iCloud will save them.

Q    And, so, you visited it?

A    I did.

Q    And what was the specific subsection of this Reddit-like website called Tieba?  What was the specific subsection that was bookmarked?

A    So, this was a discussion forum that focused on Chinese individuals who were in the United States Navy.

Q    So, Chinese speaking individuals in the U.S. Navy, it was a forum for them?

II-107

A      Yes.

Q      Let's look at 146 and 147 which I believe are in front of you in the notebook.  Do you have those in front of you?

A      I do.

Q      What are 146 and 147?

A      146 is something -- another page that I created.  When we performed a court authorized search of the Defendant's Google account, we were able to review his Google search history and some of his websites, like the websites that he visited, some of that activity.

So, I reviewed all of that activity, and I selected some pertinent searches and activity to put into this chart.

Q      So, this information came from the Google searches which were previously admitted as 35 and 36?

A      That's right.

Q      And these are searches that the Defendant did, and you put the date next to them?

A      I did.

Q      And these are just -- these are not all of the searches I take it?

A      No, they're not.

Q      These are just ones that you selected?

A      Yes, that's right.

        MR. PARMLEY:  Move 146 into evidence, please.

        THE COURT:  Any objection?

II-108

MR. JONES:  No objection.

THE COURT:  It's received.

BY MR. PARMLEY:

Q    And 147, can you look at that for me, please.

A    Yes.

Q    And what's 147?

A    147 is similar.  I created this document, but this time I reviewed the Google activity of Andy Li, and I selected pertinent searches and activity and put them into a chart.

Q    Okay.  So, in the same way that you searched the Defendant's Google account and found Google searches, you looked at Andy Li's searches through his Google search?

A    That's right.

Q    And are these all of his Google searches?

A    No, they're not.

Q    These are ones that you found were important or pertinent to this case?

A    That's right.

MR. PARMLEY:  Move to admit Government's 147.

THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  It's received.

MR. PARMLEY:  May I approach, your Honor?

THE COURT:  You may.

//

II-109

BY MR. PARMLEY:

Q      I'm going to show you 148.  Do you recognize that?

A      I do.

Q      What's 148?

A      This is a copy of a YouTube video that I recorded.

Q      Why did you record a video from YouTube?

A      When I was reviewing Andy Li's Google activity, I noticed -- well, actually, when I was reviewing -- I'm sorry. When I was reviewing the Defendant's Google activity, I noticed that he had visited a website, a YouTube site to watch a video.  And, so, I went to that URL, and I recorded the video that played there.

Q      Is that a fair and accurate copy of the video as it appeared when you visited the YouTube site?

A      That's right.

            MR. PARMLEY:  Okay.  I'd move to admit 148.

            THE COURT:  Any objection?

            MR. JONES:  No objection.

            THE COURT:  It's received.

BY MR. PARMLEY:

Q      We're going to play a portion of that later, but we're still not done.  So, let's look at 149.  Do you have that in front of you?

A      I do.

Q      What is 149?

II-110

A    149 is a photograph that was -- that we found when we did a court authorized search of the Defendant's iCloud account.

Q    This was one of the photos that was in his iCloud account?

A    That's right.

Q    Does that fairly and accurately depict what was essentially pulled from exhibits that have been previously admitted as Government's Exhibits 33 and 34?

A    Yes, that's right.

MR. PARMLEY:  Move to admit 149.

THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  It's received.

MR. PARMLEY:  Okay.  And we're going to publish that later.

BY MR. PARMLEY:

Q    One more.  You might have to come off the stand for a portion of this, Agent Wetter, but I've handed you what's been previously marked as Government's Exhibit 201 -- excuse me -- yes, 201.  Do you have that in front of you?  I think I handed it to you.

A    Yes, I do.

Q    And do you recognize that?

A    I do.

II-111

Q     And what's that?

A     This is a technical manual.  It's titled "USS ESSEX (LHD-2) Weapon Control Systems."

Q     And where did this come from?

A     This came from a search of the Defendant's iCloud account.

Q     Is that a fair and accurate basically document that was pulled straight from his iCloud account?

A     Yes, and I believe we also found this email backed up to the Defendant's hard drive.

Q     The hard drive that was found in his apartment?

A     Yes.

          MR. PARMLEY:  I'd move to admit 201, please.

          THE COURT:  It's received.  Any objection?

          MR. JONES:  No.

BY MR. PARMLEY:

Q     Okay.  Let's look at 202 through 265.  Those are all on that cart in front of you if you want to take your time --

A     Sure.

Q     -- just briefly look at those, I'd appreciate it.

A     (Reviewing exhibits.)  My math is correct.

Q     Okay.  And you've had a chance to review those before you came into court today?

A     Yes, I have.

Q     Okay.  What's Government's Exhibits 202 through 265?

II-112

A    These are technical manuals related to U.S. Navy ships and operations that we found during searches of the Defendant's Google account during searches of the Defendant's hard drive that I believe he provided to Andy and the People's Republic of China.

Q    So, all those documents in that cart were found on either his either hard drive that was in his apartment or his iCloud account or his Google account, I'm sorry?

A    Yes, that's right.

        MR. PARMLEY:  Okay.  I'd move to admit 202 through 265.

        MR. JONES:  No objection.

        THE COURT:  They're received.

BY MR. PARMLEY:

Q    All right.  We're going to shortly go through all this evidence in a chronological fashion.  We're almost there.

    From your testimony and the testimony of others, we've now looked at his phone, bank account, PayPal records, correct.

A    That's right.

Q    Google and iCloud accounts?

A    Yes.

Q    Andy Li's Google and iCloud accounts?

A    Yes.

Q    Searches of his phone on two occasions?

II-113

A    That's right.

Q    A search of his apartment?

A    Yes.

Q    Recordings from his apartment?

A    Yes.

Q    A recorded phone call?

A    Yes.

Q    A text message exchange with his mother?

A    Yes.

Q    And did you also -- well, we'll get to that in a minute. There was also some email that he sent from his Google account to his military email account -- or vice versa I should day?

A    Yes.  We also found emails that he had sent from his military email account to his personal Google account.

Q    Papers in Chinese?

A    Yes.

Q    Things found in his home?

A    A    That's right.

Q    And -- okay.  That's the evidence for the most part that was collected in this case, is that correct?

A    That's right.

Q    We're going to talk about that, but before we do that, I want to ask you about the investigation.

A    Okay.

Q    We're going to talk about those things in chronological

II-114

order.  Did you learn about the activity in this case in chronological order?

A     No, I did not.

Q     Tell me about that?

A     So, essentially when we, you know, opened this investigation, we didn't know what was happening.  We just had, you know, allegations of criminal activity.  And throughout the course of the investigation, we obtained different pieces of evidence, but essentially we found a lot of it after it happened.

So, for example, when we searched his phone in January 2023, we obtained communications that the Defendant had with the intelligence officer dating back to February of 2022.  But I didn't know -- I didn't -- I -- we obtained those communications from the search of his device.

Similarly, when we conducted search warrants, when we listened to phone calls, we obtained that evidence, you know, after the fact essentially.

Q     Why did it take you so long to figure this case out?

A     There are a few reasons why investigations can take a little bit of time.  I mean, I think the first reason in this case is just practical.  We can take certain steps based on the information that we have, and as we gain information, we can get additional legal process that allows us to conduct searches, to install a microphone, but that's a really time

II-115

intensive process.

Practically, I know yesterday we heard about obtaining the Defendant's -- first obtaining court authorization to search the Defendant's phone, then obtaining his PIN code and then conducting a surreptitious search of that phone. That takes time to put together. And even when we obtained the image of that device, its in Mandarin. And even when we get those communications translated, we have to take the items that we found on that device, take, for example, these technical manuals, and provide them to the experts who know what those manuals are and what they do.

So, practically, investigations take some time. I think in national security investigations in particular it is even sort of more difficult because it's not just about the case team in San Diego and the subject in San Diego.

We are dealing with the activities of a foreign government, and because we are doing that, it involves a lot of U.S. government equities and other investigations that we have to coordinate with. When we decide to disrupt activity, we have to be sure that our disruption is coordinated.

And, you know, I think also I know that in these types of cases, they're very serious allegations. This is a member of the United States military, and, you know, we are investigating him for espionage, and because not only in effect -- does it affect that military member, but it also

II-116

affects the United States' interactions with a foreign government.  We are very meticulous, and we are very careful to make sure that we are getting it right and to make sure that we're not rushing investigations.

So, I think that this investigation took place over about a year and a half, and that was for, you know, the reasons we discussed and also just making sure that we are -- you know, we're building the evidence.  We get court authorization to do discrete things.  So, you know, we have to kind of operate on that timeline as well.

Q    Is that one of the reasons, what you just discussed, why you didn't just arrest the Defendant when you searched his phone the first time?

A    Yes.

Q    Are you confident after having conducted the said investigation that you understand everything that the Defendant did, every piece of information he passed and every communication that he had with Andy Li?

A    No, I'm not confident.  I know that I don't know the full extent of the Defendant's relationship with Andy Li.

Q    Why not?

A    Because I can see it in the evidence that I did collect.

Q    What do you mean by that?

A    For example, in the WeChat records, we can see that the Defendant and Andy Li talk on the phone, but I don't know what

II-117

was said on that call because -- those calls because I didn't collect that information.

We referenced -- we see in their communications that they reference other communications that they have had that I don't know what they talked about. I -- we -- we just know that their relationship was more extensive than the evidence that we're able to collect just due to the nature of the investigation.

I would also say that when we searched the Defendant's phone device the second time, we saw that he had been deleting messages between himself and the intelligence officer. And, so, I know that there are communications that were deleted that I didn't get a chance to review.

Q    How would you know if something had been deleted?

A    Well, I know that because I see the intelligence officer instruct the Defendant to delete his messages, and then, you know, like when I open the Telegram application, I don't see any of the messages that I collected from the first -- first phone search. All of those had been deleted.

Q    Okay. Let's start going through the case then. We've already heard testimony that the Defendant joined the Navy in May 2021 and he got to San Diego in about February 2022 before joining the ESSEX the first week of March of 2022, correct?

A    Yes.

Q    Let's go to 2022, February. We already talked about the

II-118

Tieba website.

MR. PARMLEY:  Can we put that up, 125 please.
Thank you.  125A is fine.  Thank you.

BY MR. PARMLEY:

Q     We already talked about this website.  Do you have any evidence that the Defendant chatted with Andy Li on Tieba?

A     I do.

Q     Do you have any -- what's your evidence of that?

A     Well, I see -- I guess I see evidence of the Defendant and Andy discussing an interaction they had on Tieba.  When I visited this link and visited the Tieba website, I did not find that interaction.

Q     Is there any evidence that they deleted that interaction?

A     There is.

Q     What's that evidence?

A     The  -- Andy Li instructs the Defendant to delete their initial interaction on Tieba.

Q     Did they have a discussion of this on WeChat?

A     They do.

Q     Let's go to Government's Exhibit 121.  And can you remind the jury -- we've heard a lot of different types of evidence.  Can you remind the jury what Government's Exhibit 121 is, please?

A     Yes.  These are excerpts of WeChat communications

II-119

between the Defendant and Andy Li.

Q    Seized from his phone?

A    Yes.

Q    And they're organized roughly by dates?

A    They are.

Q    Starting with this first one, 121, what's the date of this?

A    February 14th, 2022.

Q    Could you read that for me, please?

A    Yes.  It says:

        "Andy -- this is Andy from Baidu Tieba."

    And then system message, Greetings from above, system message, you've added Andy as your WeChat contact.  Start chatting.

Q    What's your understanding of those system messages? Those were not communications between the parties, were they?

A    No.  So, because they're in italics, we know that they were originally in English in the source material.  And I think it's just a -- you know, a message sent by the WeChat application when they added each other as WeChat contacts.

Q    Okay.  And what's the next line?

A    The Defendant says:

        "Hello, ask me anything.  I can't be

        bothered to post on Baidu Tieba."

Q    And how does Andy Li respond to that?

II-120

A    "Ha ha.  I like your style," grin.  And I -- I believe that the grin in parentheses like that generally means it was an emoji.

Q    So, the translator is taking an emoji that looks like a grin and put grin in brackets, is that right?

A    Yes.

Q    Okay.  Let's go to 121.1, please  We saw this earlier. This particular page I believe we saw with the linguist. Could you explain to me -- we've got some different colors here.  Can you explain to me what the different colors mean on 121.1?

A    Sure.  So, the black -- the messages in black are text messages, so, actual written chats between the Defendant and Andy.  The content in red are push to talk messages.  So, as Jayne described, essentially the Defendant would record himself speaking and send a voice memo to Andy or vice versa. I guess in this case, Andy would send a voice memo to the Defendant.

And then the highlighted yellow squares indicate a record of a phone call that happened via the WeChat application.

THE COURT:  Can I just ask counsel, so, on my copy it says 121.

MR. PARMLEY:  Yeah, it should be -- yeah.  It's really the second page, the second page, your Honor, of 121.

II-121

THE COURT:  All right.  Thank you.

MR. PARMLEY:  Thank you.  I'm -- I'm apparently referring to it as 121.2 just for the purposes of --

THE COURT:  Second page.

MR. PARMLEY:  -- keeping track of the -- the way we're posting it, but these are all sequential pages of 121.

THE COURT:  All right.  Thank you.

MR. PARMLEY:  Thank you.  I appreciate it, your Honor.

BY MR. PARMLEY:

Q    So, this is 121.2, correct?  Is that what we're looking at?

A    Yes.

Q    Okay.  So, the red is audio push to talk, which is then translated the audio messages?

A    Yes.

Q    Now, what's the yellow?

A    So, the yellow is -- indicates a record of a call between those two users via -- using the WeChat application.

Q    Okay.  Let's just start going through this.  What -- what day did this happen?

A    February 12th, 2022.

Q    The -- the next day after they added each other as friends?

A    That's right.

II-122

Q    Okay.  And what's the fourth entry discussing?

A    So, it looks like another -- it says WeChat money transfer one Yuan, transfer received.  To collect the money, please click here to upgrade to the newest version.

Q    Appears to be a system -- a system message?

A    Yeah, I think so.

Q    And what's one Yuan?  Do you know how much that's worth?

A    Less than a dollar.  I'm not sure.

Q    And the Defendant replied with what?

A    "What's this?"

Q    And then there was a audio?

A    Yes.

Q    An audio from Andy?

A    Yes.

          MR. PARMLEY:  Okay.  We'd like to play that, your Honor.  It's got the rolling translation which has been previously admitted.  Let's go ahead and play that.

     (Audio played.)

BY MR. PARMLEY:

Q    What -- summarizing, what did Andy Li tell the Defendant?

A    He introduced himself to the Defendant.  He said he worked for the China ship building industry corporation, and he referenced that they had met on Baidu Tieba.

Q    Okay.  So, and that -- is that your indication that they

II-123

had previously met?  Is that why you came to that conclusion?

A    Yes, and I -- I think they -- it comes up again.

MR. PARMLEY:  Okay.  Could you pull back to 121.2, please, the second page of 121.

BY MR. PARMLEY:

Q    So, did the Defendant respond to that voice message?

A    He did.

Q    What did he say?

A    He said:

"I'm waiting for the ship to return these days, and there is nothing to do.   Let's talk by phone."

Q    So, he offers to talk to this individual by phone?

A    He does.

Q    And what does the yellow indicate, that they had a phone call?

A    It does.

Q    What were the durations of those phone calls?

A    The first one looks to be about 24 seconds, and the second one is about 24 minutes.

Q    What did they say?

A    I don't know.

Q    Why don't you know what they said in those phone calls?

A    Because the content of those calls wasn't collected by the WeChat application.

II-124

Q      If you had had a bug on his phone, would that have collected it?

A      You now, I'm not sure.  I'm not sure if it would collect call content in an application.  I'm not sure.

Q      At any point you never collected this -- any WeChat audio through a bug on his phone, is that correct?

A      No.  We were never agent to capture the content of any of the calls that -- that happened on WeChat.

Q      So, any time there's a call, we have no idea what was said?

A      Right.

Q      And this happened in February, and you did not -- and you found out about this when?

A      Oh, gosh.  I don't remember when exactly I found out about this, but certainly -- I mean, we had not even opened an investigation into Mr. Wei in February 2022.

Q      And the search warrant wasn't until the end of the year in 2022, is that correct?

A      Yes.  We didn't do a search warrant of his iCloud account until the end of 2022.

Q      Okay.  So, that's a 24-minute phone call.  We don't know what happened?

A      Right.

Q      So, what does Mr. Wei respond to after they have spoken for about 25 minutes?

II-125

A    He says:

          "Going forward, as long as I know the

          answer to your question, I'll tell you

          everything I know.

Q    There's another audio clip.  Is that -- also from that

day.  Is that from Andy Li?

A    Yes.

          MR. PARMLEY:  Could we play that, please.

     (Audio played.)

BY MR. PARMLEY:

Q    Andy Li says:

          "For the sake of security, you should

          delete this"?

A    Yes.

Q    How did the Defendant respond?  Let's look at 121.2

again.  I'm sorry, 121.3, this is the next page from the same

day?

A    Yes.

Q    And how did the Defendant respond?

A    He said:

          "Thank you for the reminder.  For the

          sake of security, I deleted my WeChat

          sessions, but I don't think they'd bother

          to look for me.  The Navy's internal

          management is full of problems."

II-126

Q     And this is also part of what you're referring to when you say you saw evidence that they had met on Tieba?

A     Yes.

Q     Okay.  Let's move to about a week later.  Around that time, did you collect information on February 22nd of 2022 that the Defendant spoke to somebody about his first interaction with Andy Li?

A     I did.

Q     What did you collect?

A     We collected a -- or I should say we found, when we did a search -- did those court authorized searches, a WeChat communication between the Defendant and another Navy Sailor where he discusses this interaction with Andy Li.

Q     Do you know who this Sailor was?

A     I do.

Q     And what was his name?

A     His name was Rafael Chang.

Q     Okay.  And that's been previously admitted as 124A, B and C, that -- their conversation?

A     Yes.

Q     And the translation is 123?

A     Yes.

Q     Let's look at 124A, please.  This is indicated as UM1 in this translation and UM2.  Do you know who UM1 and UM2 are in this translation of this WeChat call?

II-127

A    I -- I do.

Q    I'm sorry.  Is this a text message or a call?

A    These are text messages.

Q    Okay.

A    UM1 is the Defendant, and UM2 is Rafael Chang.

Q    And how do you know that?

A    I know that based on the information that we can see on the Defendant's phone.  I can tell which messages are sent from the user of that device and which messages are, you know, the other contact essentially.

Q    And the date on this is February 22nd of 2022?

A    Yes.

Q    Okay.  Can you read what the Defendant said to Rafael Chang?

A    The Defendant says:

        "One more thing, Brother.  I think I'm on
         the radar of a China intelligence
         organization.  Rolling on the floor
         laughing emoji."

Q    So, that would be an emoji there?

A    Yes.

Q    And what did Mr. Chang respond?

A    He said, "Ah, what do you mean?"

Q    And how did the Defendant continue the text message?

A    He said:

II-128

"Remember how I told you I used to post about working for the U.S. Navy on Baidu Tieba when I was loafing around?  There were people who wanted to add me on WeChat.  There was actually one person who was about to start boot camp that asked me what to do.  But there was another person who claimed to be a Navy enthusiast that added me.  He is extremely suspicious."

Q    After that text message, did the Defendant continue the conversation by leaving recorded voice note on WeChat?

A    Yes.  He sent voice memos to Rafael Chang.

MR. PARMLEY:  Can we play 124B, please.

(Audio played.)

BY MR. PARMLEY:

Q    What's your understanding of what the Defendant indicated he's being asked to do?

A    He was asked to provide information about the location of U.S. Navy ships on Naval Base, San Diego, and then the intelligence officer offered to pay him $500 for that information.

Q    And how did he describe this potential conduct?

A    He said that it was espionage.

Q    Did Rafael Chang respond to this voice mail?

II-129

A    He did.

Q    Let's go to 124C, I think.  Yeah.  What did Rafael Chang say?

A    He said:

        "You must delete him at once.  This is
        just too brazen.  It's very suspicious."

Q    And what did the Defendant respond?

A    He said, "Uh huh, very suspicious indeed."

Q    Let's go back to a few days later.  Sorry.  Let's go back a few days.  That was on the 22nd, correct?

A    Yes.

Q    February.

A    February 22nd.

Q    Let's go to 121, WeChat.  Let's go to the fourth page.  A few days before that, what did Andy say to the Defendant?

A    So, on February 18th, 2022, Andy says:

        "Do you use Telegram or Signal?  Let me
        send you something from there on how to
        send Excel files.  I don't really like to
        do it from here.  I believe there are 13
        piers where you're at and that vessels
        are grouped by piers, correct?  For the
        first send, it would be best to attach
        some photos as well as a video of the
        exterior of where you live.  I'm rather

II-130

curious.  I've never seen it before."

Q    So, this was right before he'd had that conversation with Mr. Chang?

A    Yes.

Q    Are you familiar with Telegram or Signal?

A    Yes.

Q    And we've already talked about Telegram.  Is -- is Signal similar?

A    Yes.  Signal is just another encrypted messaging application.

Q    And did you find any evidence that they switched to one of those applications?

A    Yes.  i found evidence that they began communicating on Telegram.

MR. PARMLEY:  Your Honor, if -- if this is a good place to break, I'm happy to do it.  If you want me to keep going, I'm happy to do that as well.

THE COURT:  Okay.  We'll break right now.  Thank you.

We'll take our lunch recess.  We'll be in recess until 1 p.m.  Please remember the admonition I gave to you earlier.

(Jury exits courtroom.)

MR. PARMLEY:  Did you say 1:30, your Honor, or 1 o'clock?

II-131

THE COURT:  1, 1 p.m.

MR. PARMLEY:  1 p.m., 1 p.m.

THE COURT:  Run a tight ship.

MR. PARMLEY:  I agree.

THE COURT:  We'll see you at 1 o'clock.

ALL:  Thank you, your Honor.

(Proceedings recessed to reconvene.)

II-132

AFTERNOON SESSION

--oOo--

(Call to order.)

THE COURT:  Our court librarian said that there was an article in the UT I believe about it.  So, at the end of the day, I'll caution them again.

MR. PARMLEY:  Okay.

THE COURT:  It's a pretty fair balance of the opening statements.

MR. PARMLEY:  We're going to go until 3, is that right, your Honor?

THE COURT:  Pardon me, till 3 or when the witness is finished.

(Jury enters courtroom.)

THE COURT:  Welcome back.  We're ready to continue.

I remind you you're still under oath.

AURA WETTERER - PLAINTIFF'S WITNESS - PREVIOUSLY SWORN

DIRECT EXAMINATION (RESUMED)

BY MR. PARMLEY:

Q    I want to go back just a tiny bit before we go forward. You've mentioned over the course of your testimony you called the individual involved in this case, the Defendant, Jinchao Wei, et cetera, is that correct?

A    That's right.

Q    And do you know what he looks like?

II-133

A       I do.

Q       And is he here in the courtroom today?

A       He is.

Q       And could you please identify him for the record, please?

A       Yes.  He's sitting over there in a white shirt and a black suit.

MR. PARMLEY:  Let the record reflect this witness has identified the Defendant in this case.

THE COURT:  Yes.

BY MR. PARMLEY:

Q       I also wanted to go back for just a moment.  Do you recall the conversation we just discussed right before we took a break where Andy Li told the Defendant that he was part of the Chinese ship building corporation? Do you recall that?

A       Yes.

Q       Do you know anything about that?

Q       So, minus the my research, the China Ship Building industry Corporation is a company that is state run in China, which means that it's -- it's run by the Chinese government.

Q       Okay.  Would that also be in your opinion -- strike that.

So, let's go -- I also had one thing I neglected to show on Government's Exhibit 137.  If you could go to 137, please, and go to the second page of that.

II-134

This is the document that was found in Andy Li's iCloud account, is that correct?

A    That's right.

Q    He lists his occupation in this, doesn't he?

A    Yes.  He lists it as occupation as active duty military and his work in it is listed as the People's Liberation Army.

Q    And he also gives his educational experience, is that correct?

A    He does.

Q    Which is what?

A    He got a Bachelor's Degree in Engineering from the Naval University of Engineering.

Q    Thank you.  I appreciate that.  Let's go back to where we were.  We were still in February of 2022 when we last left off, and the Defendant was -- and Andy Li were discussing using Telegram or Signal, is that correct?

A    That's right.

Q    Let's go to February 22nd, 2022.  It's up on the screen. It's the fifth page of Exhibit 121.  This is on WeChat?

A    It is.

Q    Is this the same day as the Defendant had that conversation with Rafael Chang, the Sailor, when he talked about this is espionage?

A    Yes.  This is the same day.

Q    Could you read what Mr. Wei, the Defendant in this case,

II-135

said during that first block of text, please.

A    Sure.  He says:

        "Hello.  I'm really sorry, Bro, but I

        can't take this job.  To tell you the

        truth, when I returned from leave this

        week, I got called into the office to see

        what I've been up to these last few days.

        I was asked if I'd been in contact with

        anyone in China.  The thing is I'm in the

        process of applying for my citizenship,

        and they are rigorous in their

        investigation.  If this kind of work was

        discovered, it may be considered

        espionage activity.  My apologies.  I'll

        take a look next month when I'm on the

        ship."

Q    So, the Defendant offered himself that this might be espionage activity?

A    He did, yes.

Q    And he indicates that he intended that needed to stop this, didn't he?

A    He did.

Q    And did he, in fact, stop?

A    He did not.

Q    The indication at the bottom -- well, let's continue.

II-136

What happened after that?  What did Andy Li say?

A    Andy says:

"Oh, don't worry about it.  No pressure.
Just finished working out.  Can we still
have a chat later?"

Q    And did they actually have a chat that day?

A    They did.

Q    And where is that indicated on this text?

A    In the highlighted line on the very bottom of this spreadsheet, it shows that the two had a phone call via the WeChat application that lasted approximately 16 minutes.

Q    And, again, do you know what was on that phone call?

A    I don't.

Q    For the same reasons as before?

A    Yes.

Q    Okay.  What happened the next day?  Let's go to the next page of this document, please.  This is continuing with the WeChat.

What did Andy Li say the very next day?

A    He says:

"Good afternoon.  When you're done
setting up Telegram, give me your number
so I can add you."

Q    In other words, right after the Defendant said, I can't do this anymore.  It might be considered espionage, they start

II-137

communicating in a different encrypted application?

A    That's right.

Q    And where -- is that indicated on this -- on text messages from this date?

A    It is.

Q    Can you explain that to me and show me where?

A    Sure.  So, the Defendant provides his phone number which is associated with his Telegraph account, and then Andy confirms that he added him using a Hong Kong phone number.

And then if you look at the photograph attachment that the Defendant sent to Andy --

MR. PARMLEY:  Could you zoom in on that bottom right portion?  Thank you.

THE WITNESS:  Sure.  So, this is a text message that he received from a Hong Kong phone number plus 852 is the Hong Kong country code.  And it says:

"Hey, I'm Andy and using Telegram to
chat.  Join me."

BY MR. PARMLEY:

Q    Okay.  Also, can we go back to the text on that.  It says in the fourth entry down where Andy says, I just added you, could you read that for me, please?

A    Sure.  He says:

"I just added you.  Take a look.  It's a
Hong Kong number, makes it easy to bypass

II-138

the firewall.  The VPN is not stable."

Q    Do you have any idea what that reference is to the firewall?

A    I do.

Q    And what's that?

A    So, China's government very strictly controls access to the open Internet, and here it's referred to as a firewall. So, in order to access the Internet outside of China, generally, users have to use a VPN and take steps to bypass that wall.

        MR. JONES:  Objection.  Speculation.  No foundation.

        THE COURT:  Can you --

        MR. PARMLEY:  Sure.

BY MR. PARMLEY:

Q    How do you know that?

A    I know that through my training and experience in working investigations like this one and also speaking to individuals who have been in the People's Republic of China who have lived there, worked there and tried to access open Internet.

Q    Thank you.  So, after this chat on WeChat saying, I can't do this job, they switched to Telegram.  Did they begin speaking on Telegram?

A    They did.

II-139

Q     Let's go to Government's 120, which has been previously admitted.  Those are the Telegram chats, is that correct?

A     They are.

Q     Is this the first -- first chat they had on February 23rd, 2022, that same day?

A     It is.  It's the -- yes, it's the first chat we saw.

Q     Could you just read that for us real quick?

A     Sure.  The Defendant says:

        "Don't know if I added you correctly."

Q     Okay.  So, this is them having their first conversation on Telegram?

A     Yes.

Q     Okay.  Let's go to the next page of this, please.  Is this the next day?

A     It is.

        MR. PARMLEY:  Just could you zoom in on that for me, Ms. White, please.  Thank you.

BY MR. PARMLEY:

Q     What did the Defendant say to Andy Li on that date?

A     He says:

        "I'm looking for bigger conflict because
         my military branch won't be at any risk.
         By that time my resume will look better
         if I put down war veteran on it."

Q     And the date on this is the 24th?

II-140

A     Yes.

Q     Were they talking back and forth between these two applications, at least initially, or were they just using one?

A     They continued to use both WeChat and Telegram.  And here -- and it's a little -- you see they talk on both applications kind of back and forth, yes.

Q     Okay.  So, let's go back to WeChat on that same day, on the 24th.  Let's go to the seventh page of WeChat 121.7.  This is the same -- same day as that Telegram app we just -- Telegram message we just saw?

A     Yes, it is.

Q     What is the discussion?  Could you just summarize what their discussion is on that day?

A     Yeah.  So, this took place on February 24th, 2022, and they talk about Russia and whether they would be dependent on China to finance this war.  On February 24th, 2022, Russia invaded Ukraine.  So, I think they were discussing that invasion.

Q     Now, I look -- when I look down to the second to the last entry, could you read that?

A     Yes.  Andy says:

          "Since you are in the military, do you
          also look forward to the conflict
          escalating?"

Q     Okay.  And is that kind of referenced later in that,

II-141

sorry, Telegram chat where he says "I can be a war veteran"?

A     Yes.

Q     Okay.  So, let's look at that last one.  What does that say, and can you explain that to me?

A     Sure.  So, Andy says:

      "When I send Twirl" --

      I mean, what that means is it's an emoji that kind of looks like a tornado, like a little twirl.  And he says:

      "When I send that emoji, from now on that
      means you should take a look at the other
      app we added a couple of days ago."

Q     And what is -- what is your understanding of what that other app is?

A     Telegram.

Q     In other words, if Andy Li sends a twirl emoji to the Defendant on WeChat --

A     Yes.

Q     -- they should look to the other app?

A     Yes.

Q     Okay.  Why didn't he just say, When I send you a -- go look for me on Telegram?

      MR. JONES:  Objection.  Speculation.

      THE COURT:  Sustained.

BY MR. PARMLEY:

Q     Okay.  Let's go to the next day -- sorry.  Let's go to a

II-142

few days later.  Let's go back to the Telegram chat.  This is February 26th.  This would be 120, page three, the third page of the Telegram messages.

So, we're on a couple of days after that.

MR. PARMLEY:  Could you zoom in on that, please, for me.

BY MR. PARMLEY:

Q    What was -- what did the Defendant ask -- excuse me. What did Andy Li ask the Defendant to do?  If you could read that portion, please.

A    Sure.  Andy says:

"How are you?  I suddenly remember you talked about the management problem in U.S. Navy logistics last time over the phone.  Can you casually write something with the content focused on the combat operation, training and logistics management of the U.S. Navy such as the strengths and weaknesses you notice.  As for the specific direction and content, we can talk further if you decide you're interested.  I'm willing to pay you for this -- for the article.  This is also one of the topics that I am studying."

Q    And what did the Defendant -- how did he respond?

II-143

A    He said:

     "I'll write it when I have time.  Don't
     worry about paying me."

Q    So, he denied -- initially denied the request for payment, is that correct?

A    Yes, he did.

Q    Did that change?

A    It did.

Q    Over the course of the investigation, did the Defendant begin taking money?

A    He did.

Q    Let's fast forward about a week or so, maybe a little bit longer, to March 7th of 2022, and I want to go back to WeChat, and I apologize to Ms. White.  We're going to be flipping back and forth through these.

     Let's go to the 7th of March, the eighth page of the WeChat.  What are we looking at here?

A    These are photographs that the Defendant sent to Andy through the WeChat application.

Q    Do you know what those are photos of?

     MR. PARMLEY:  Can you zoom into the bottom of -- the one on the bottom right please.

BY MR. PARMLEY:

Q    Do you know what that's a photograph of?

A    I do.  that is the USS ESSEX.

II-144

Q     How do you know that?

A     Because you can see the (LHD-2) on the side, and that's the designation for that particular war ship.

          MR. PARMLEY:  Ms. White, could you zoom into that portion of that, please, if you don't mind.

BY MR. PARMLEY:

Q     Is that where you're referring to that's on the screen right now?

A     Yes, that's right.

          MR. PARMLEY:  Okay.  Thank you.  Could you back out of that, please.

BY MR. PARMLEY:

Q     And did that -- were those the only two pictures sent that day?

A     I think he may have sent more.

Q     Let's go to the next page, please.  Are those additional photographs he sent?

A     Yes, they are.

          MR. PARMLEY:  Let's go to the next page, please. Let's look at that top right.  If you could zoom in on that top right photograph.

BY MR. PARMLEY:

Q     Is this from the same day?

A     It is.

Q     Do you know what that is?

II-145

A     That looks like the interior of the USS ESSEX.

Q     How do you know that?

A     I've been on the ship a few times, and it looks similar to what I saw when I was on the ship.

          MR. PARMLEY:  Let's go back, please.  Let's go to the next page.

BY MR. PARMLEY:

Q     These appear to be pictures of bathrooms, is that correct?

A     Yes.

          MR. PARMLEY:  Okay.  Let's go to the next page, please.

BY MR. PARMLEY:

Q     Another picture of a bathroom?

A     Yes.

Q     Of a toilet I should say.  Let's look at that last text that was sent.  Andy responded to these photographs?

A     He did.

Q     And what did he say?

A     He said:

          "Also, in the future send these photos
          and whatnot via Tele.  No need to use
          WeChat."

Q     And your understanding is Tele meant Telegram?

A     Yes.  So, you can see it's in italics.  So, it was

II-146

originally in English, and I think it's short for Telegram.

Q    In your training and experience as a counterintelligence agent, why would there be any reason to switch between communication platforms, if you know?

A    This would be an example of trade craft that's pretty common to intelligence officers, to ask their sources to communicate on multiple different platforms.  It enables them to, first of all, conceal the full extent of their relationship, and also should one method of communication be compromised by, say, the U.S. government, it wouldn't be the entire picture of their communications.  So, oftentimes they will ask their sources to communicate in different ways.

Q    So, Mr. Li asked the Defendant to start sending photographs on Telegram instead?

A    He did.

Q    And did he, in fact, do that?

A    He did.

        MR. PARMLEY:  Let's go to March 13th of -- the next page of Wechat, please.

        THE WITNESS:  Yes.

        MR. PARMLEY:  I'm sorry.  We're still -- that's backwards.  Keep going.  Yes, right there.  Thank you.

BY MR. PARMLEY:

Q    This is on the 13th?

A    It is.

II-147

Q     And what did the Defendant say?

A     He says:

          "I've sent you some pictures of my
          department's work environment via
          Telegram."

Q     And how did Andy respond?

A     He said, "Just saw them."

Q     And what else?

A     And he says:

          "When you're sending things -- when you
          send things via Telegram in the future,
          there's no need to remind me here.  I can
          see them on my Telegram."

          MR. PARMLEY:  All right.  Let's go to those
Telegram photos.  Let's go to March 13th.  This would be 120,
please, point four.

BY MR. PARMLEY:

Q     Are these the photographs that he was referencing that
he sent on Telegram?

A     Yes.

Q     So, looking at that top right photograph, just look at
that for a moment.  And then did the Defendant describe what
that was?

A     He did.

          MR. PARMLEY:  Can you back out so we can see the

II-148

description.

BY MR. PARMLEY:

Q     What did he say?

A     He says:

          "This is the main condenser.  It takes up

          a lot of space."

          MR. PARMLEY:  And could you zoom in on that next picture, please.

BY MR. PARMLEY:

Q     A similar picture?

A     Yes.

          MR. PARMLEY:  Can we go to the next page.

BY MR. PARMLEY:

Q     Are those more -- more photographs taken of the Engine Room?

A     That's what they appear to be, yes.

          MR. PARMLEY:  Look at the top right one, for example.  Okay.  Could you back out?

BY MR. PARMLEY:

Q     What was the Defendant's description of that?  I'm sorry.  Excuse me.  What did Andy Li respond to that?

A     Andy says:

          "Don't look it's 30 years old.  It's well

          maintained.  Objectively speaking, it's

          better than ours."

II-149

Q     Okay.  And there's two additional photos after that?

A     Yes.

Q     How did the Defendant describe the last photo?  What did he say?

A     The Defendant says:

          "This is the axel to turn the propellor.

          I don't know what it's called.  The

          bearing was made in 1996.  The axel --

          this axel is still leaking oil.  Once in

          a while we need to add the lubricant."

          MR. PARMLEY:  Okay.  Can we go to the next page, please.

BY MR. PARMLEY:

Q     Similar photos taken from the Engineering Department as far as you understand?

A     Yes, similar photos.

          MR. PARMLEY:  Okay.  Can we go to the next page, please.

BY MR. PARMLEY:

Q     Looking at the top two photos on the right, omitting for -- for the moment the picture of the toilet.  Could you look at --

          MR. PARMLEY:  Zoom in on those top two photos, please.

//

II-150

BY MR. PARMLEY:

Q     Do you know what that's a photograph from?

A     I do.

Q     What is that a photograph from?

A     This is a photo of one of the control rooms inside the USS ESSEX.

        MR. PARMLEY:  Okay.  If you could back out of that, please.

BY MR. PARMLEY:

Q     And the Defendant actually says that, doesn't he?  Can you read that, what he says?

A     Yes.  He says:

            "This is the control room to operate the
            ship wioth air conditioning.  Usually we
            take our breaks, gather or have meetings
            here."

Q     Okay.  Let's fast forward a little bit.  Let's go to April 14th.  This was in March of 2022.  Let's go to April 14th of 2022.  Besides chats between the two of them, you also looked at the Google searches.  We've talked about that, correct?

A     I did.

Q     And you created a chart summarizing their activity, correct?

A     I did.

II-151

MR. PARMLEY:  That's already been admitted.  Let's look at Government's Exhibit 146, please.  If you could put that up on the screen.  Could you zoom in on the April 14th portions of that please.

BY MR. PARMLEY:

Q     Okay.  Remind me again of what this chart shows?

A     So, this is a -- I reviewed the Defendant's Google search history and Google activity, and I selected specific searches and activities, pulled them out, and put them into this chart.

Q     And, so, on the 14th, those were the searches that you pulled out that were relevant?

A     Yes.

Q     And could you just read what those searches were?

A     Sure.  075 amphibious assault ship.  075 is amphibious assault ship.  075 versus Wasp, and he searched that a few times.  And then he visited a YouTube URL that was titled "Chinese type 075, is it equivalent to the American Wasp class?"

Q     Okay.  Do you know what a 075 amphibious assault ship is?

A     I do.

Q     And what's that?

A     That is the Chinese Navy's version of U.S. landing helicopter dock ship essentially.

II-152

Q    The same class?

A    Yes, it is.

Q    And did you recall the testimony of Captain Taylor yesterday that the Wasp was what the class of the ESSEX is?

A    Yes.

Q    Can you look at Government's Exhibit 23.  I think it's in your binder in front of you.  And do you recognize Government's Exhibit 23?

A    I do.

Q    And what's that?

A    This is a picture of a Chinese type 075 ship.

Q    The same ship that -- type of ship the Defendant was searching?

A    Yes.

Q    And that's a fair and accurate depiction of that type of ship?

A    I believe so, yes.

        MR. PARMLEY:  I'd move to admit 23, please.

        THE COURT:  Any objection?

        MR. JONES:  No objection.

        THE COURT:  It's received.

        MR. PARMLEY:  May we publish that to the jury, please.

        (Pause.)

//

II-153

BY MR. PARMLEY:

Q     That's a similar short flight deck as the Wasp, is that correct?

A     Yes.  It looks similar.

Q     This is an amphibious assault ship that is similar to the Wasp class, is that correct?

A     Yes.

Q     And it looked like in 176 --

        MR. PARMLEY:  I'm sorry.  Go back to 146.

BY MR. PARMLEY:

Q     And then you mentioned -- if you could look at the last entry on April 14th.  And you say he visited a YouTube site?

A     Yes.

Q     Is that the video that you previously entered into evidence as Government's Exhibit 148?

A     It is.  So, I visited that URL from this Google activity and then recorded a copy of the video that could be found at that link.

Q     Let's -- let's play the first minute of that video if you don't mind.

      (Video played.)

        MR. PARMLEY:  If you can pause it there, please. Thank you.

BY MR. PARMLEY:

Q     And does the video go on in the same way?

II-154

A     It does.

Q     And is that -- is it a comparison between the Chinese 075 and the Wasp class?

A     It is.

Q     And that's the Wasp class is the same class of ship that the Defendant was serving on?

A     Yes, that's right.

Q     And the searches that he was looking at were the differences between the two?

A     Yes.

BY MR. PARMLEY:

Q     Okay.  Let's go to a couple of days after that.  Let's go back to Telegram on April 16th of 2022.  This would be the ninth age of 120.  Did the Defendant send Andy Li a video via Telegram?

A     He did.

Q     And, so, I take it that Telegram can send both photos and videos?

A     Yes.

Q     Let's -- is that -- we're seeing that image on this particular slide, is that right?

A     Yes.

        MR. PARMLEY:  If you wouldn't mind, Ms. White, could you play that exhibit, please -- play that video, please.

II-155

(Video played.)

BY MR. PARMLEY:

Q    Okay.  Let's go back to the chat if you don't mind.
What did the Defendant say the second line down?

A    He says:

              "The ship actually passed the inspection.
              That means this old ship will be in
              service for at least 10 more years."

Q    And then he made the attachment of that video?

A    Yes.

Q    And did he comment on what that indicated, what that
video indicated?

A    He did.

Q    Could you read the next two entries, please.

A    Yes.  The Defendant says:

              "I recorded this when it was at full
              speed.  The ship can only go 22 knots
              according online information.  But I felt
              it -- I felt like it can go at least 25
              knots.  Can't believe a 40,000-ton ship
              can go that fast with only two boilers.
              I think it's possible that the operating
              pressure of our 1999 boilers is 600 PSI,
              and then they improved the boiler super
              heaters afterwards.  Our boilers can run

II-156

at 700 PSI now to heat the steam up to 480 degrees Celsius.  You can feel the ship shaking when it's going full speed."

Q    So, a discussion of the capabilities of the ESSEX?

A    Yes.

Q    Let's go to the next day, 120.10, the tenth page of Government's Exhibit 120.  Did they continue their conversation?

A    They do.

Q    Did they have a discussion about an F35B?

A    They do.

Q    Could you read starting with the second line down where Mr. Li talks about -- what he said about F35B?

A    Sure.  Andy says:

"Six F35B's are just not enough.  Don't know at most how many it can hold."

Q    And how did the Defendant respond?

A    He says F35B can take off vertically, and it does not require catapults.  Usually they can load two to three F35B's verus mostly helicopters.

Q    And do you know what the F35B is?

A    I do.

Q    And is that -- did we hear that in the testimony of Captain Taylor yesterday?

A    Yes, we did.

II-157

Q    And what -- what is that?

A    It is a type of fighter jet that can take off and land vertically rather than sort of like the catapulting you need a long runway to land and take off.

Q    And there's another video attached, is that correct?

A    Yes.

MR. PARMLEY:  Could we play that video, please.

BY MR. PARMLEY:

Q    This is a video that the Defendant attached to his Telegram account -- to the Telegram chat?

A    Yes.

MR. PARMLEY:  Okay.  Play that, please.

(Video played.)

MR. PARMLEY:  All right.  Thank you.  Could we go back to that chat, please.

BY MR. PARMLEY:

Q    Was there a discussion of payment?

A    There was.

MR. PARMLEY:  Okay.  Let's go back -- let's go -- looking at that page.  Could you just zoom in on the last five or six lines down, please.

BY MR. PARMLEY:

Q    Could you start with Andy saying "Okay".  Could you read that for me, please, what Andy Li said?

A    Yes.  Andy says:

II-158

"Okay.  I see.  Thanks for educating me on this.  Go to your things.  It's weekend.  You've got to rest.  Give me a PayPal account.  I want to ask you to write me some feature articles."

Q    And how did the Defendant respond?

A    He said:

"I don't have much time lately.  We'll see later."

Q    And did Andy indicate that he had funds ready to transfer?

A    Yes.  He says:

"Okay.  I have funds in Los Angeles.  It's easy to transfer money.  Take care."

Q    Let's go to a few days later, please, April 21st of 2022.  That would be 120.11, the eleventh page of 120.

Did they continue their conversation about the health of some of the ships in San Diego?

A    Yes.

Q    Can you read that, please?

A    Sure.  The Defendant says:

"LHD-6 has burnt down, and LDH-4 has an exploded pipe that can never be fixed.  LHA-7 is a new ship.  Whatever big ship left for use is my ship only."

II-159

Q    Do you know what LHD-6 was?  Do you know that that was?

A    Yes, I do.

Q    So, that's the designation for the USS BOHNAM RICHARD which was a U.S. Navy ship that caught on fire and was burned and was a complete loss is my understanding.

Q    And that was here in San Diego, is that right?

A    Yes, yes, that's right.

Q    Do you kinow what LHG-4 is?

A    LHG-4 I believe is the USS BOXER.

Q    Also stationed in San Diego?

A    That's right.

Q    So, he discussed which ships were available to sail and which ones weren't, which one had problems?

A    That's right.

Q    Could you start the sixth entry down, could you read that for me, please?

A    Yes.  The Defendant says:

        "Other than the carrier, my ship is the
        only big ship in San Diego that can be
        used."

Q    And did the Defendant -- sorry.  Did Andy Li ask what happened with this exploded pipe?

A    He did.

Q    And what was the response?

A    Yes.

II-160

Q      I'm sorry.  Why don't you start -- sorry to confuse the issue.  Can you just start with where Andy Li says "Why was the pipe exploded?"

A      Yes.

Q      Thank you.

A      So, Andy says:

               "Why was the pipe exploded?  So many
               nonstop problems.  How about 135 and 7."

Q      What was your understanding of what he meant by 135 and 7?

A      I think he meant designations for ships like LHD-1, LHD-3.

Q      Got it.  Okay.  Please continue.

A      And then he says -- the Defendant says:

               "I found out they -- there are all Arley
               Burke or Ticonderoga in the space plus a
               bunch of matural combat ships.  I heard
               it from the grapevine that one of the
               pipes in the boiler exploded and it was
               very difficult to big it.  A big -- and a
               big portion of the ships are at half
               disabled stage ready to retire."

Q      And then towards the bottom, if you could read that portion where Andy Li says, "LHD-1357 don't work anymore".  Could you read that for me, please?

II-161

A    Yes.  Andy says:

"LHD-1357 don't work anymore, right?  I think that ship is there too.  You know a lot about the ships.  Which ones are for sure ready to retire?"

Q    And what -- how did the Defendant respond?

A    He says:

"135 and 7 are at the port."'

Q    Okay.  This is on the 21st of April, is that correct?

A    That's right.

Q    Did they have any conversations that you're aware of that happened on the 27th of April of 2022?

A    No, I don't think so.

Q    Do you -- were you aware of what was happening in the Defendant's life on April 27th, 2022?

A    Yes, I am.

Q    What happened on that day?

A    He had his interview as part of his naturalization process.

Q    Okay.  Let's go to a few days after his naturalization interview on April 30th.  Let's go to 120.14, please.  I'm sorry.  Let's go back.  Let's go back to the 21st.

This is a continued conversation on the 21st?

A    Yes.

Q    This is about a week before his naturalization

II-162

interview?

A    Yes, that's right.

Q    It looks like the Defendant's sending some information in some kind of charts on the right, is that correct?

A    That's right.

        MR. PARMLEY:  Can you zoom in into the attachment that he sent on that top right, please.

BY MR. PARMLEY:

Q    Do you know what that indicates?

A    Yes.  So, these are lists of USS -- I'm sorry -- U.S. Navy vessels, and I believe it's the date of service or date of retirement.  I think he's -- he might say which one it is.

Q    Okay.  Let's go back.  And how did the Defendant describe them?

A    He says:

        "These eight have reached their service
        time and are ready to retire next year.
        The dates on the right are their service
        start dates."

Q    And then he's got some -- an additional chart to the right of that -- let's go to the bottom one.  What does he say at the bottom?

A    He says:

        "The Navy will scrap these 16 ships early
        because the maintenance cost is too high.

II-163

It's not worth it to keep them."

Q     So, again, describing the ability and he capabilities of the U.S. Navy?

A     Yes.

Q     Okay.  So, let's go to a few days after or three days after his naturalization interview, the 30th.  Could you go to 120.14, please.

Did, the Defendant have  discussion about his citizenship on that day?

A     He did.

Q     What did he say?

A     So, the Defendant tells Andy that he can be a citizen this month and that he takes the oath on May 18th, and then he says, "I went for the interview a few days ago."

Q     Okay.  Let's fast forward about a week to May 8th, please, 120.15.  Did they have a discussion about Fleet Week on that day?

A     They did.

Q     Did the Defendant -- excuse me.  Did Andy Li ask for information about Fleet Week?

A     Yes, he does.

Q     What did he ask the Defendant to do?

A     He asks him to send videos and pictures from Fleet Week so that he can compare them to the ones that he sees in Shanghai.

II-164

Q    And you recall Captain Taylor's testimony about Fleet Week, correct?

A    Yes.

Q    Okay.  How did the Defendant respond?  If you could look at the third line from the bottom, what did he say?

A    He says:

        "I'll take some pictures when I can."

Q    Did the Defendant actually send pictures from Fleet Week?

A    Yes, he did.

Q    Let's go to a couple of days later, please, 120.16.  Is that the 10th of May?

A    Yes.

Q    Are there some photographs and videos attached of what was happening in Fleet Week?

A    Yes.

Q    Looking at Government's Exhibit 26, the date of this is May 10th.  Government's Exhibit 26, that's no the poster in front of.  Actually, I think it's 26A in front of you.

A    Got it.

Q    Can you see that okay from where you are or do I need to turn it?

A    I can.

Q    Okay.  Where was the ship on May 10th of 2022 when this message was sent?

II-165

A     On May 10th, 2022, the USS ESSEX was at sea in the San Diego area.

Q     Okay.  Over the next few days, did the Defendant send additional photographs and video?

A     Yes, he did.

        MR. PARMLEY:  Let's play -- let's go to the next page.  Let's play that last video on the last page.  I think it's 120-5.

        (Video played.)

        MR. PARMLEY:  All right.  Thank you.

BY MR. PARMLEY:

Q     Let's go back to Telegram to the 14th.  So, that would be about the 18th page of Government's Exhibit 120.  Did they have a further discussion about citizenship on that day?

A     Yes, they do.

Q     Did Andy Li ask more questions about what the citizenship thing entailed?

A     He did.

Q     Okay.  Can you read that for me, please?

A     Sure.  Andy says:

            "Oh, yeah.  Do you need to prepare for
            the oath taking next Wednesday?  I" --

        MR. PARMLEY:  I'm sorry.  Just for a moment, could you zoom in on that and make it easier for my small font on this monitor.

II-166

THE WITNESS:  He says:

"Oh, yeah.  Do you need to prepare for the oath taking next Wednesday?  I don't know much about it.  Just curious.  Do you need to be in a suit or have a dinner celebration?"

BY MR. PARMLEY:

Q     And what did the Defendant respond?

A     He says:

"It's just to go through the motion and raise your right hand to take an oath. That's it."

Q     What did the -- Andy Li, if you look at that last indication, what did he ask the Defendant to do?

A     He asks him to send a Google Map location so that he can see where the ship is.

Q     And did the Defendant actually do that?

A     He did.

MR. PARMLEY:  Let's go to the next page, please. Can you zoom in on that attachment at the very top right, please.

BY MR. PARMLEY:

Q     What am I looking at?

A     This is a -- looks like a satellite image from Google Maps, and you can see kind of like the blue bubble where the

II-167

person is.

Q    So, it appears as if the Defendant sent Andy Li his location?

A    Yes.

Q    And based on the prior testimony, do you know where that is?

A    I believe that's Naval Base, San Diego.

Q    On the same day, did they discuss any issues of any design flaws with the ESSEX?

A    They do.

Q    And let's go back to that chat please.  If you could start reading --

MR. PARMLEY:  If you could zoom in on the text, please, Ms. White.

BY MR. PARMLEY:

Q    If you could start reading about -- where the Defendant talks about the reliability the amphibious, do you see that?

A    Yes.

Q    Could you read that for me, please?

A    Sure.  The Defendant says:

        "I'm thinking they are still testing the
        reliability of the amphibious.  That's
        why they don't want to build too many
        yet, so that it won't be like LCS,
        retired after less than 10 years of

II-168

service.  The design of the ship has a big flaw, causing the crack on the hull."

Q    And then does the Defendant begin to discuss the defensive weapons of the ESSEX?

A    He does.

Q    Can you read that for me, please?

A    He says:

"Okay.  The air defense on our ship now includes the phalanx close -- close-end machine guns and the RIM7 Sea Sparrow.  I think it has RM missiles too, but these are all close in air defense.  For a large ship like amphibious, it needs to be very close to the front line.  It is so very difficult for this kind of air defense to deal with anti-ship missiles."

Q    So, to be clear, the Defendant was discussing with Andy Li the defense capabilities of the USS ESSEX?

A    Yes, that's right.

Q    Do you know what happened on May 18th of 2022?

A    I do.

Q    What happened on the 18th of that day -- of that year?

A    The Defendant was naturalized and became a United States citizen.

Q    And did they discuss it -- did the two of them, Mr. Li

II-169

and the Defendant, discuss it?

A     Yes, they did.

          MR. PARMLEY:  Let's go back to WeChat if you don't mind, ma'am, to the 14th page, 121.4.  And is this the 18th? And then we'll go to the 19th.  So, if you could zoom in on the text, please?  Let's go back to the 18th.  If you could zoom in on the text please.

BY MR. PARMLEY:

Q     And it looks like, again, the first message is something in brackets.  Is that just -- is that a system message?

A     Yes, I think so.

Q     Can you read that for me, please?

A     It says:

          "WeChat money transfer.  Money transfer
          of 666  bucks received.  To collect the
          money, please click here to upgrade to
          the newest version."

Q     Do you know what -- do you know anything about the number 666 in Chinese?

A     I do.

Q     What do you know about that?

A     It's actually a lucky number in Chinese culture.  So -- and I will say -- say the "bucks" is a translation from Yuan. So, 666 Yuan would be about $90 I think.

Q     Based on you running it through --

II-170

A    Yes, based on research.

Q    Okay.

A    I'm not that good at math.

Q    What did he say after that, after he sent the money?

A    He -- Andy says:

        "Congratulations on your naturalization."

Q    And how did the Defendant respond?

A    He said, "Thanks, but you shouldn't have, Bro."

Q    And how did Andy respond to that?

A    He says:

        "Take it.  It was meant to be.  I'm happy
        for you, and you've taught me a lot.
        It's not much money, just enough for you
        to have a good meal after you take the
        oath today."

        MR. PARMLEY:  And could we go to the next page, please.

BY MR. PARMLEY:

Q    And they continue their conversation?

A    They do.

Q    And how did the Defendant respond?

A    He says:

        "Ha ha, you're too kind, Bro.  I've not
        done anything to deserve it."

Q    So, how does Andy respond to that?

II-171

A    He says:

        "All right.  Then do some research for me

            next time and you can receive something

            for your troubles."

Q    Did the Defendant talk about -- excuse me.  Did Mr. Li

ask what the naturalization ceremony was like?

A    Yes, he asks how it was.

Q    And how did the Defendant respond?

A    The Defendant says:

        "It was pretty perfunctory.  He just

            followed along and recited the oath.  The

            naturalization certificate was then

            handed out, and it was over after that."

Q    In fact, he said, I'll never have to go to the

Immigration Office ever again, didn't he?

A    Yes.

        MR. PARMLEY:  Let's look at Government's Exhibit

106, which has been previously admitted.

BY MR. PARMLEY:

Q    Is that the naturalization certificate that you saw in

his apartment?

A    Yes.

        MR. PARMLEY:  Can you zoom in onto that date for

me, Ms. White?

//

II-172

MR. PARMLEY:

Q      Is that May 18th of 2022?

A      Yes, it is.

Q      That's the day he became a citizen?

A      It is.

Q      Okay.  Let's go back to WeChat, please, Government's Exhibit 121.  Let's go to the 15th page, please.  I'm sorry. We already discussed this.  I apologize.

       Let's go to a little bit later that month, to May 25th. Where was the ESSEX in the week of May 25th of 2022?

A      On May 25th, it was in Los Angeles for L.A. Fleet Week.

Q      As testified to by Captain Taylor?

A      Yes.

Q      Okay.  And did the Defendant send any information about Fleet Week to Mr. Li?

A      I think this might be a --

Q      This could be the wrong one I have in front of you?

A      Yes.

       MR. PARMLEY:  Okay.  Let's go to -- okay.  Let's go on Telegram, please.  Thank you.  Ms. White, I need to go to Telegram.  Thank you, 120.20

BY MR. PARMLEY:

Q      Okay.  This is on June 1st?

A      This is on June 1st.

Q      But this is after Fleet Week had concluded?

II-173

A     Yes.

Q     And after Fleet Week had concluded, did the Defendant send some photographs and videos?

A     He did.

Q     Okay.  And do these appear to come from Fleet Week as far as you know?

A     Yes, as -- I mean, as far as I know, yes.

          MR. PARMLEY:  Okay.  Could you go to the next page, please.

BY MR. PARMLEY:

Q     And there was a video associated with that?

A     Yes.

Q     Let's move forward again to June 5th, about a week after he returned from Fleet Week.  And where is the ship after Fleet Week, according to Government's Exhibit 26?

A     On what -- on what date?

Q     June 5th.

A     On June 5th, the USS ESSEX was at Naval Base, San Diego.

Q     So, it had returned to -- to San Diego?

A     Yes, that's right.

          MR. PARMLEY:  Okay.  Let's go back to Telegram -- we're on Telegram.  Let's go to page 22, please.

BY MR. PARMLEY:

Q     Before I ask you about that, do you believe you have all of the communications?

II-174

A    No.  I know that I don't.

Q    Okay.  And I think you touched on that briefly, but why -- why don't you have access to all the communications, other than the ones you couldn't search for?

A    So, as we kind of discussed before, the applications don't -- didn't capture the content of some of the call records that we see.  Also, I know that the Defendant deleted communications between himself and Andy.  And then I think, you know the context of some of these conversations, it's just clear that we aren't seeing the whole -- the whole con -- the whole context and the whole communication.

Q    Would it be fair to say that June 5th was an important date in the investigation?

A    Yes.

Q    And why would you say that?

A    Because I believe that on June 5th, the Defendant sent technical manuals related to U.S. Navy warships to Andy.

Q    And what do you base that on?

A    I base that on the communications that we see in Telegram and WeChat and also records of payments that the Defendant received.

Q    What -- yeah, we'll look at those in a minute.  Let's start with these Telegram messages on June 5th.

How did -- how does the Defendant -- excuse me.  How does Mr. Li start this conversation?

II-175

MR. PARMLEY:  Could you zoom in on the text, please.

THE WITNESS:  Andy says:

"Yeah, you worked hard.  You need to go

to bed.  Give me five minutes, and I'll

get back to you.  Let me take a look."

BY MR. PARMLEY:

Q     And Mr. Wei says what?

A     "I'm not sleepy yet."

Q     And what did the -- what did Mr. Li say?

A     He says, "I saw it."

Q     Okay.  And then Defendant says okay.  And what does Andy Li say after that:

A     He says:

"Okay.  Go get some sleep if you are

tired.  Send me the rest later.  Just let

me know how many pages in total.  I will

verify that."

Q     At that point, did you have any idea how they were sending information back and forth?

A     No.

Q     And did you later learn that?

A     I did.

Q     Okay.  What does Mr. Li say about -- keep -- just keep going after the Defendant says okay.  What does he say?

II-176

A     Sure.  So, Andy says:

          "I will go to sleep in a little bit and

          wake up at about 7 in the morning.  At

          that time, I will download again."

Q     And they agree to get in touch five hours later?

A     Yes.

Q     And how does the Defendant act?  What does he -- what does he say next?

A     The Defendant says:

          "I sent everything over to you.  Don't

          know if they are helpful."

Q     Okay.  So, the next morning, how does Andy Li respond?

A     He says:

          "Morning.  I just got up.  I will take a

          look shortly.  Give me your PayPal

          account.  I'll contact you later."

Q     And does the Defendant provide his PayPal account?

A     He does.

Q     And how do you know that's his PayPal account?

A     Because of records that we received from PayPal.

Q     Did they continue their conversation the next day on Telegram about what had been said?

A     Yes.

          MR. PARMLEY:  Okay.  Can you go to the next page, please.  Can you zoom in on the text, please.

II-177

BY MR. PARMLEY:

Q     What does Andy Li say?

A     He says:

> "Today is Monday, and we started going
> back to work.  A little crazy.  After I
> download and read through them, I will
> contact you.  Thanks, Bro."

Q     And how does the Defendant respond?

A     He says, "You're welcome."

Q     Okay.  And what does Andy Li say after that?

A     He says:

> "Until this evening, I searched up the 30
> things you sent me.  Two-thirds of them
> can be found on the Internet.  It's okay.
> At least I got one-third of it that I can
> learn from."

Q     Okay.  So, from that you gleaned that the Defendant sent how many somethings?

A     So, based on Andy's communication, I think that the Defendant sent 30 items to him.

Q     And when he says found on the Internet, do you have an opinion as to what that means?

A     I assume that means that if you looked up these items, they would be potentially publically available on the Internet.

II-178

Q     So, someone might -- some of them might be open source?

A     Yes.

Q     And some of them probably not?

A     Yes.

Q     What does the Defendant say at the second to the last line?

A     The Defendant says:

              "Ha ha.  It looks like there is not much
              secret about my job."

Q     And does Andy agree with that?

A     No.  He says:

              "No.  You can always learn, only if you
              pay attention."

              MR. PARMLEY:  Can we look at what's been previously admitted -- I believe it's been previously admitted as Government's Exhibit 149.  It has been previously admitted. Can you remind the jury -- can we publish that.  Can you zoom in on the top part of that?

BY MR. PARMLEY:

Q     Can you remind the jury as to what this is?

A     Yes.  So, this is a photograph that we found during the court authorized search of the Defendant's iCloud account.  It looks like a picture of a Macbook computer screen.

Q     Did you have an opportunity to look at the information that's listed and try to figure out what it was?

II-179

A    Yes.  So, this looks like it's a picture of a folder called GLMMBIB.  And it lists about 30 technical manuals that are related to the operation of U.S. Navy vessels.

Q    And how do you know these are Navy technical manuals?

A    Because I found these manuals in this folder saved on the Defendant's hard drive.

Q    So, these exact manuals were found on the Defendant's hard drive?

A    Yes.

Q    Did you find evidence later that the Defendant sent technical manuals?

A    I did.

Q    And you found these on his property?

A    Yes.

Q    On the hard drive that was found in his apartment?

A    Yes.  Copies of these manuals were found in this folder on the hard drive that we found in his apartment.

Q    Did one of these manuals that's listed here -- I think it's the second from the top -- do you see that one?

A    Yes.

        MR. PARMLEY:  Can you zoom in on that one please for me if you can.

BY MR. PARMLEY:

Q    Can you read that second one from the top?

A    Yes.  NSTM220 Volume 2, Boiler Water and Feed Water

II-180

Chemistry.pdf.

Q      Is that the -- did that come from the -- the ESSEX?    I'm sorry.   Let me rephrase.   That's a manual for ESSEX class ships, is that correct?

A      Yes.

Q      And you know that how?

A      Because we located that manual and we reviewed the contents and also provided it to the Department of Defense to review.

Q      Has that been previously submitted and it's sitting in that cart as Government's Exhibit 206?

A      It is.

Q      And is that the subject of counsel of the indictment in this case?

A      Yes, it is.

          MR. PARMLEY:   Let's go back to Telegram if you don't mind, 120.24.   We're on June 7th.   Can you zoom in on that text, please.

BY MR. PARMLEY:

Q      The next day, what did Mr. Li tell the Defendant?

A      He says:

          "I deleted the previous IP and videos."

Q      Do you have any idea what that means?

A      I do.

Q      And how do you know that?

II-181

A    I know that from later communications between the Defendant and Andy where they discuss what this means and also other evidence we found in the case.

Q    Did the Defendant also discuss it when he was -- after his arrest?

A    Yes.

Q    So, what does it mean?

A    So, essentially, the way that the Defendant was providing these technical manuals to Andy was through a temporary website that they referred to as an IP.  So, they explained that how this would work is that Andy would send the Defendant a link to a website like a URL.  The Defendant would visit that website and scroll to the bottom, click in a space and be able to upload the documents.  He would then set a password that he would provide to Andy so that he could visit the website and actually download that material.

Q    And are we going to see evidence of those codes being passed from the Defendant to Andy Li in later chats?

A    Yes, that's right.

Q    Did you ever attempt to visit one of these websites?

A    I did.

Q    And what was -- what happened?

A    Nothing came up.  As you'll kind of see in his communications too, they are temporary.  So, those links would expire.  So, when I tried to visit one of the links, nothing

II-182

was available.  Nothing came up.

MR. PARMLEY:  Okay.  Let's go to the next day -- the next page.  Can you zoom in on that.

BY MR. PARMLEY:

Q    What does -- what does Mr. Li tell the Defendant?

A    He says:

"I will send you $5,000 tomorrow.  It can
be at your account probably the day after
tomorrow.  I'll talk to you about the
specifics tomorrow or the day after when
you have time."

Q    So, Mr. Li is paying the Defendant $5,000 for what he just sent?

A    Yes.

Q    And did the Defendant try to downplay it?

A    Yes.

Q    What did he say?

A    He says:

"Don't worry.  I didn't help you much."

Q    And how does Andy respond?

A    He says:

"No.  Don't -- I was worried you thought
I was a scammer.  Don't worry.  I will
keep my promise.  We'll meet up in
America or China in the future."

II-183

MR. PARMLEY:  Let's go to the next page, please. this is a couple of days later on June 10th.  Could you zoom in on that text, please.

BY MR. PARMLEY:

Q    What does Mr. Li say?

A    He says:

          "I'm about to send you $5,000 to the
          PayPal account you gave me."

Q    Please continue.

A         "Take a look when you get up.  It should
          be there already.  I had to split it into
          five payments because I could only send
          $1,000 each time.  I couldn't send too
          much at a time.  Let me know once you get
          everything."

     And then --

Q    Yeah.  Then what did he ask the Defendant to do?

A         "And then you write me a receipt in
          English, received $5,000 for consulting.
          Sign your name in English and date it.
          That's it.  Snap a picture, and send it
          to me."

Q    And did the Defendant agree to that?

A    He did.

Q    Did they have further conversations that it might take a

II-184

moment for the money to get through?

A     Yes.

Q     And you looked at the Defendant's PayPal records, didn't you?

A     Yes, I did.

Q     And you summarized those in Government's Exhibit 31C?

A     Yes.

          MR. PARMLEY:  Can we pull that up, please.  Can you go to the 10th?  Can you zoom in on the 10th of 31C, the transactions that are on the 10th?  Actually, could you include the 11th as well?  Thank you.

BY MR. PARMLEY:

Q     What do these PayPal records indicate?

A     So, it shows that on June 10th, 2022, the same day as those communications, he received three payments of $1,000, and on June 11th, he received two payments of $1,000.

Q     Were they from Andy Li?

A     They -- I believe they were from Andy Li, yes.

Q     Were they listed on the PayPal accounts as coming from Andy Li?

A     No.  The PayPal accounts that paid the Defendant were in different names.

Q     And can you, based on your training as a counterintelligence agent, as to why these would come from different names and different accounts?

II-185

A     Yes.  So, again, I this is an attempt to conceal the true identity of Andy Li and to provide some distance between the Defendant and a foreign intelligence service in case someone looked at these transactions, saw these transactions. It would be harder to figure out who the money ultimately came from.

Q     Is there another reason why somebody might ask somebody to write a receipt other than documenting it for the purposes of their employment or employer?

A     Yes.  So, Andy asked the Defendant to write receipts for the money that he received.  And, again, I think that is, you know, one reason that probably is is because it's a foreign intelligence service.  It's a government entity, and we all have administrative tasks that we have to do to kind of like account for our funding, but also in this context, I --

          MR. JONES:  Objection.  Lacks foundation. Speculation.

          THE COURT:  Foundation?

BY MR. PARMLEY:

Q     In your training and experience working cases involving counterintelligence in China, have you come across any circumstances where people were being paid using receipts?

A     Yes.

Q     And have you discussed these matters with other experts and people who have been arrested for this?

II-186

A     Yes.

Q     And in your opinion, based on speaking with other agents, speaking with people who've been arrested with this and reviewing the records of this case, other than the reason you just stated, that there's some government reason, do you have another reason as to why a foreign intelligence service might ask somebody to provide a receipt?

MR. JONES:  Objection.  Calls for hearsay and still insufficient foundation.

THE COURT:  Overruled.

THE WITNESS:  I think another reason that an intelligence officer would ask a source to write a receipt and sign it in his or her true name is to have leverage over that person.  Then they have evidence of the criminal activity that they have been conducting, and they can have that at their disposal if something comes up later where they need it.

BY MR. PARMLEY:

Q     Some leverage?

A     Yes.

Q     Okay.  Did you find this -- the receipt for this?

A     I did.

MR. PARMLEY:  Okay.  Can we go back to Telegram, please.  Let's go to 120.27.  Thank you.  Let's zoom in on the receipt.

//

II-187

BY MR. PARMLEY:

Q     Can you read that for me, please?

A     Yes.  It says:

      "Received $5,000 for consulting.  Signed Patrick
      Wei, June 11th, 2022."

Q     And the Defendant's name is Jinchao Wei, is that correct?

A     Yes.

Q     Is he also known as Patrick Wei?

A     Yes.

Q     How do you know that?

A     I know that because I've spoken to the Defendant in person and called him Patrick, and I also think that is -- some of the people who knew him called him Patrick.  It's just he went by Patrick.

Q     Okay.  And you found this receipt and other receipts for other payments as well?

A     Yes.

Q     Were some of those receipts found in his apartment?

A     Yes.

Q     Was this particular one?

A     No.  We didn't find this during the search of his apartment.

      MR. PARMLEY:  Okay.  Can you back out of that, please.

II-188

BY MR. PARMLEY:

Q     The Defendant responded to -- after he sent the receipt, what did he say?

A     He said:

        "Okay.  I got everything.  You have so

        many PayPal accounts.  Each one has a

        different name."

        MR. PARMLEY:  Let's go back to Government's Exhibit 31C, please.  That's your summary chart.  Could you zoom in on the 7th of July.

BY MR. PARMLEY:

Q     What did the Defendant do with that money?

A     He withdrew the $5,000 and put it in his Navy Federal Credit Union Bank account.

Q     Was that also reflected when you reviewed his Navy Federal Bank account records?

A     Yes, it was.

Q     So, he transferred the $5,000 from PayPal to his bank account at Navy Federal?

A     Yes.

        MR. PARMLEY:  Let's go back to the 13th.  Let's go to June 13th.  Let's go back to 120, the Telegram chats.  Can you zoom in on that text, please.

BY MR. PARMLEY:

Q     Did they have an audio call?

II-189

A     Yes.

Q     Appositely how long were those -- is it two audio calls?

A     It looks like two calls, yes.

Q     Approximately how long were those?

A     One looks like about 61 seconds, and the other looks like about 18, 19 minutes.

Q     And do you have any idea what was discussed in those calls?

A     No, I do not.

Q     What does Mr. Li say immediately after they finished that call?

A     He says:

          "Don't tell anyone about what's going on
          between us.  That's not good to you and
          me."

Q     And what does he ask the Defendant to do?

A     He says:

          "I suggest you deleting the posting on
          Baidu.  Don't leave any trace."

Q     And how did the Defendant respond to that?

A     He says:

          "Okay.  I definitely won't talk about
          things like this."

Q     And did you or other agents in the FBI look for that posting or original comments -- their original conversation on

II-190

Baidu Tieba?

A      Yes, we did look for them.

Q      Were you ever able to find it?

A      No.

Q      To your knowledge, did anybody ever find it?

A      No.

Q      You recall the Defendant's -- excuse me.  You recall Agent -- sorry.  You recall Captain Taylor's testimony about RIMPAC exercises, correct?

A      I do.

Q      And, according to Government's Exhibit 26, when was the ESSEX involved in RIMPAC?

A      The ESSEX left Naval Base, San Diego on Jun 14th, 2022 and then went to Pearl Harbor for the RIMPAC exercises from June 27th, 2022 through July 10th, 2022.

Q      And then the ESSEX made it way back to San Diego?

A      Yes.

          MR. PARMLEY:  Okay.  So, during this time frame -- let's look at the Telegram account.  So, the next page, please.  If you could zoom in on this.

BY MR. PARMLEY:

Q      What did Andy Li ask the Defendant to do?

A      He says essentially -- would you like me to read it --

Q      If you can read it, please.

A      Sure.  He says:

II-191

"Try to get your email address as early as possible.  That way you can easily put together anything that you think I can learn from or pictures of sorts of -- of other sorts that you take, and send them to me when you have time.  At the same time, you can write things down like a diary.  Jot down the things you see and hear on the way to Hawaii that you think are meaningful on your cell phone, note pad or pages.  Send them to me when you have Internet connection.  Once I get them, I will see if there's anything interesting or valuable.  I will give you feedback and work out how much I owe you when you come back in August."

Q    And this says when you have Internet.  Do you know what he as referencing?

A    Yes.

Q    What was he referencing?

A    I think that he's referencing the fact that when a -- a warship is out at sea, you aren't going to have Internet connection, and you probably only get that back when you're closer to shore.

Q    Did Andy Li then ask for more specific questions about

II-192

what he wanted?

A    Yes.  He ask the Defendant:

        "How many people do the Marines have,

        what unit, what kind of trainings.  All

        these are quite interesting.  You can

        write them down.  Take some pictures of

        the HUMMERS, planes or guns for me.  I

        like these."

        MR. PARMLEY:  Thank you.  Let's go to Government's Exhibit 147.

BY MR. PARMLEY:

Q    This is a few days after this.  This is the Andy Li searches, is that correct?

A    Yes.

Q    This is his Google searches?

A    It is.

        MR. PARMLEY:  Let's actually go to the top.  Let's go to February 14th.

BY MR. PARMLEY:

Q    Based on your review of Andy Li's Google account that you were able to obtain from the search warrant, what was he searching on February 14th of 2022?

A    He was searching LHD-2, which is the designation for the USS ESSEX.

Q    When did those two first interact?

II-193

A     I believe they met on the 14th of 2022, February 14th.

Q     The date of those searches?

A     Yes.

Q     So, the day they met, Andy Li was searching the designation for the ESSEX?

A     Yes.

Q     And then it looks like on March 8th, June 18th, and June 18th (sic) he searched it again, is that correct?

A     That's right.

        MR. PARMLEY:  Okay.  Let's go back to Telegram, please.  Let's go to 30.  Thank you.

BY MR. PARMLEY:

Q     What happened on July 7th?

A     The --

Q     Where was the ship?  I'm sorry.

A     I'm sorry.  The USS ESSEX was in -- around Pearl Harbor for RIMPAC, and the Defendant sends Andy photographs and videos.

Q     Presumably back at Pearl Harbor he had internet connection?

A     Yes.

Q     Okay.  Let's look at some of those pictures.  Are those, what I'm looking at on the screen, some of the pictures that were sent?

A     Yes, that's right.

II-194

MR. PARMLEY:  If you could zoom in on the top one, please.

BY MR. PARMLEY:

Q     Is that the ESSEX?

A     It is.  You can see the -- the big 2.

MR. PARMLEY:  Okay.  Can you go to the next page, please.

BY MR. PARMLEY:

Q     More photos were sent?

A     Yes.

MR. PARMLEY:  Let's go to the next page, please. Zoom on those bottom two.

BY MR. PARMLEY:

Q     What are those pictures of?  Do you know?

A     Those look like pictures of Hummers or of military vehicles I guess.

Q     Which Andy Li had asked him to send?

A     Yes.

MR. PARMLEY:  Okay.  If you could back out of that, please.  Let's go to the next page.

BY MR. PARMLEY:

Q     He sent a video?

A     He did.

MR. PARMLEY:   Can we play that video, please.

//

II-195

BY MR. PARMLEY:

Q     Well, before we do that, what does -- what does Mr. -- what does the Defendant say in the bottom?

A     He says, "Took a picture of the Hummers for you."

        MR. PARMLEY:  And let's just look at those photographs real quick.  If you could just zoom in on those two photographs.  Apologize, Ms. White.

BY MR. PARMLEY:

Q     Photograph of a Hummer on the bottom?

A     Yes.

        MR. PARMLEY:  Okay.  Let's look at that video, please, that's attached.

        (Video played.)

BY MR. PARMLEY:

Q     Okay.  Where was the ESSEX on July 7th?  That was at Pearl Harbor, is that right?

A     That's right.

Q     Where was it between July 11th and August 4th?

A     It was at sea for the RIMPAC exercises.

Q     So, for almost a month it was at these RIMPAC exercises?

A     Ye.

Q     And it's your understanding there's no Internet connection during that time?

A     Depending on where they are out at sea.

Q     Sure.  Let's talk about the day he came back from RIMPAC

II-196

exercises, August 4th.

A     Okay.

Q     Can you look at Government's Exhibit 120.34 the 34th page of 120.

A     Yes.

Q     Is that the day they came back?

A     It is.

        MR. PARMLEY:  Can you zoom in on the text for me, please.

BY MR. PARMLEY:

Q     What did the Defendant say?

A     He said:

            "We just returned to Hawaii.  A few days
            ago, a reduction gear oil pump broke
            down.  We were thinking about using the
            backup electric pump, but we needed
            approval from the Navy one-star Admiral.
            Ended up it took three days to get it.
            For three days, we had only one axel
            running on the ship."

Q     So, the Defendant provided Andy Li with information about the reduction gear on the ship?

A     Yes.

Q     And the difficulties they were having?

A     Yes.

II-197

Q    And what did Andy -- excuse me.  What did the Defendant say about RIMPAC?

A    Sorry?

Q    What did the Defendant say the day after about RIMPAC?

A    He said:

            "The RIMPAC was nothing.  We just cruised

            around near Hawaii and then took pictures

            with the other countries on the 28th.

            That's about it, just an image project."

Q    And did he also include some photographs?

A    He did.

        MR. PARMLEY:  Okay.  Can we back out and show some of those photographs, please.  Can you zoom in on -- sure. Thank you.

        THE WITNESS:  I think these are actually videos.

BY MR. PARMLEY:

Q    Those are videos embedded?  Okay.  Thank you.

A    Yes.

        MR. PARMLEY:  Go to the next page, please.

BY MR. PARMLEY:

Q    So, he sent two videos there, another video there, is that right?

A    Yes.

Q    More photographs?

A    Yes.

II-198

MR. PARMLEY:  Let's go to the next page, please. Let's go to the next page, please.  Can you play the eighth video, please.  I think you may have passed it.

BY MR. PARMLEY:

Q     This is one of the videos that was transmitted on that day?

A     Yes.

(Video played.)

BY MR. PARMLEY:

Q     It's a little difficult to see, but are there other ships out on the horizon that you can see?

A     Yes.  That's what it looks like.

Q     Okay.  Did they also discuss things on that day on WeChat?

A     They did.

MR. PARMLEY:  Let's go to WeChat, please, the 16th page of the WeChat, 121.16, please.

BY MR. PARMLEY:

Q     Let's look at that top thing in yellow.  Is that, again, one of those system messages?

A     It -- it looks like it, yes, with the brackets.

Q     It says Andy shares location?

A     Yes.

Q     And there's a string of numbers after it says location shared?

II-199

A     Yes.

Q     Do you know what that is?

A     I do.

Q     How do you know that?

A     So, it's a latitude and a longitude, and I know that because I put that latitude and longitude into Google Earth to see where it was.

Q     And where was it?

A     It was in Shanghai, kind of along the river.

Q     Okay.  So, Andy Li shared his location as being in Shanghai, China?

A     Yes.

Q     And he shared some photographs of Chinese ships?

A     He did.

        MR. PARMLEY:  Can we back out and see some of those.

BY MR. PARMLEY:

Q     This is an example?

A     Yes.

        MR. PARMLEY:  Okay.  Let's go to August -- excuse me -- to August 13th, about a week later, and August 14th. Where was the ship during August 13th and August 14th?

A     The ship was transiting back to San Diego and returned to San Diego from RIMPAC on the -- on August 14th, 2022.

Q     Did you find any evidence that on that date or around

II-200

that time, the Defendant emailed himself from his military email account?

A    I did.

Q    And did that come from a search of his Google account?

A    It did.

Q    Let's me show you Government's Exhibit 200.  I don't know if that's been admitted.  I apologize if it hasn't.

MR. PARMLEY:  Has this been admitted?

MR. BERTOLA:  No.

BY MR. PARMLEY:

Q    Do you know what 200 is?

A    I do.

Q    And what's that?

A    So, when we conducted a court authorized search of the Defendant's Google account, we found I believe about 14 emails that he had sent from his military email account, Jinchao.wei@lhd2.navy.mil to his personal gmail account.  And several of those attached PDF's of technical manuals related to U.S. Navy ships.  This is an example of -- this is one of the emails we found.

Q    So, is Government's Exhibit 200 an example of an example that was pulled from Government's Exhibit 35 and 36 that have been previously admitted?

A    Yes, that's right.

MR. PARMLEY:  Move to admit 200, please.

II-201

THE COURT:  Any objection?

MR. JONES:  No objection.

THE COURT:  It's received.

MR. PARMLEY:  So, could you publish that please and just zoom in on the top, the only portion of text.

BY MR. PARMLEY:

Q     So, can you explain to me what this is then?

A     Sure.  So, you see the from subject -- or the from line is from Jinchaowei@msn.  His email address is Jinchao.wei@lhd2.navy.mil.  So, that's his email account aboard the USS ESSEX.  And he sends the email to weijinchao06@gmail.com, which is his personal Google account.

The subject is tech, and he attaches three PDF's that I know from my review of those PDF's are technical manuals related to the operation of Navy ships.

Q     Three attachments on -- on this particular email?

A     That's right.

Q     There was more.  Approximately how many more?

A     I believe he sent about 28 technical manuals on August 14th.

Q     Through a number of emails?

A     Yes.

Q     So, just looking at this one, can we look at the second PDF that he sent, the one that starts with S9LHD-AD.

A     Yes.

II-202

Q     Do you know what that is?

A     I do.

Q     What's that?

A     That is the Propulsion Operating Guide for the USS ESSEX specifically.  It's over 100 pages, and it's a technical manual related to the propulsion system.

Q     Is that attached to this email then?

A     It was.

Q     And has that been previously admitted as Government's Exhibit 212?

A     Yes.

         MR. PARMLEY:  Let's look at that one.  If we could publish this.  Could we go to -- if we could publish this for the jury only, please.

     (Pause.)

         MR. PARMLEY:  It's.  Sorry for the jury.  We can do that in a minute.  It's fine for right now.  I'm going to do that with another exhibit.

BY MR. PARMLEY:

Q     Can you just read for me the distribution statement on this?

A     Sure.  This is the cover page of that Propulsion Operating Guide.

Q     Right.  And you say it was 100 plus pages long?

A     Yes.

II-203

Q    Okay.

A    It says:

"Distribution Statement D.  Distribution authorized to DOD and DOD contractors only to protect critical technology.  For date, use the approved date of this document.  Other U.S. requests shall be referred to the appropriate hull planning yard."

Q    And is there a warning associated with it?

A    There is.

Q    Can you read the warning, please?

A    "This document contains technical data whose expert is restricted by the Arms Export Control Act Title 22 U.S.C. Section 2751 or Executive Order 12470. Violations of these export laws are subject to severe criminal penalties."

Q    And there's a destruction notice as well?

A    Yes.

Q    Can you read that for me, please?

A    It says:

"Destroy by any method that will prevent disclosure of contents or reconstruction of this document."

II-204

Q     Is that the -- is this document the one that's charged in Count 5 of the indictment?

A     It is.

MR. PARMLEY:  Let's go to Telegram on that date, please.  Let's go to 120.38, the 38th page of these Telegram chats.  Can you zoom in on that, please.

BY MR. PARMLEY:

Q     So, this is the date those manuals were being emailed, is that correct?

A     That's correct.

Q     What did the Defendant say?

A     He says:

"We were supposed to be back on the 16th.
We arrived earlier than scheduled.  We
traveled at high speed all the way back.
How to use this link of yours?  I haven't
used it for a while and forgot.  I have
something useful.  It's about the ship
power structure of our ship."

Q     Do you know it means when he said, I forgot the link?

A     I do.

Q     What's that?

A     I think he's referring to the link to those temporary websites that he uses to pass these documents to Andy.

Q     He said that he had something useful about the ship

II-205

power structure?

A    Yes.

Q    And where was the ship on August 14th?

A    It was at -- it had just returned to Naval Base, San Diego.

        MR. PARMLEY:  Let's go to the next day, please. If you could read the first -- if you could zoom in on that.

BY MR. PARMLEY:

Q    If you could read the first three lines of that, please.

A    Sure.

Q    The first three entries.  Thank you.

A    Andy says:

        "You worked hard.  You almost sailed
        through the Pacific.  I have never gone
        that far.  I only went to the Taiwan
        Strait.  Let me know after you send it.
        You must have a lot to take care of after
        you come back.  Let me know when you have
        time, and we'll talk.  You set your own
        code."

Q    And what's your understanding of what Mr. Li meant by, You set your own code?

A    I think he's referring to the password that the Defendant had to set in order for him to actually retrieve the documents that he uploaded.

II-206

Q    After they'd been uploaded to this temporary website?

A    Yes.

Q    And we'll see evidence of those passwords later?

A    Yes.

Q    Okay.  And how does Mr. Li respond to presumably what's just been sent?

A    He says:

         "I read through your stuff.  Very

         professional.  I don't have any questions

         for now."

Q    Who's passing that day?

A    I believe the Defendant passed the technical manuals that he had emailed to himself from his military email account, including the Propulsion Operating Guide.

Q    And what do you base that on?

A    I base that on these conversations that we're seeing and also from information we obtained from a court authorized search of Andy Li's Google account.

Q    But you don't have any way -- were you ever able to watch the document being downloaded on one of these temporary websites?

A    No.

         MR. PARMLEY:  Okay.  Let's go to WeChat on the next day.  Let's go to 121.1A, please.  Can we zoom in on the text.

//

II-207

BY MR. PARMLEY:

Q     What is the Defendant sending?

A     He sends a series of numbers.

Q     And what's your understanding of what that is?

A     I think that's the password that Andy needed to enter into the website to be able to download what he had passed.

Q     What does Mr. Li say to that?

A     He says:

          "Received.  I'm out doing something

          today.  I'll look at it later."

Q     So, let's go back to Telegram chat on that same day. And let's read that.  We've got everything except the bottom line on that.  What did he say?

A     He said:

          "I read through your stuff.  Very

          professional.  I don't have any questions

          for now."

Q     And when I said he, who said that?

A     Andy.

Q     Now, we talked about Andy Li's Google searches.  Let's look at his Google searches for that day.

          MR. PARMLEY:  Can we go to Government's Exhibit 147.

BY MR. PARMLEY:

Q     So, when we talked about this before, on April -- excuse

II-208

me -- on February 14th is the day they met and they searched LSD-2, correct?

A     Yes.

Q     Yes.  Okay.  Let's look at the searches on August 15th. There's about six of them or so.  I want to look at the bottom one first.  Do you know what that is -- well, first of all, it was an image search?

A     Yes.

Q     What's the difference between an search and an image search, if you know?

A     I think it's just when you go to the Google search engine, you can search -- you know, click on your search bar or you can select the option to search.

Q     And what did he search for?

A     He searched for the citation and title of the Propulsion Operating Guide.

Q     The same one we just saw the Defendant emailed himself?

A     Yes.

Q     The same one that we just read the warnings and destruction notice on?

A     Yes.

Q     Okay.  What else does he search that day?

A     He searches Warrior of the Day and Warrior of the Day Navy.

Q     You've heard the testimony of Captain Taylor about this,

II-209

correct?

A     Yes.

         MR. PARMLEY:  Let's show Government's Exhibit 25. Can you zoom in on the date of that.

BY MR. PARMLEY:

Q     And what's the date of that?

A     July 19th, 2022.

Q     Do you have -- do you have any evidence that the Defendant emailed himself that picture on the same day he emailed the manuals?

A     Yes.  On the same day that he emailed himself all of those technical manuals, he also emailed himself this picture.

Q     Between August 22nd and August 26th, did your investigation show anything happening with the Defendant's money at that time?

A     Yes, it did.

Q     Let's go back to 32D, which has been previously admitted.  That was an excerpt I believe of the Defendant's Navy Federal records, is that correct?'

A     That is correct.

         MR. PARMLEY:  Can you just zoom in on the top half of that, please.

BY MR. PARMLEY:

Q     Looking at the top, do you see a $5,000 transaction?

A     I do.

II-210

Q     What do you know from that transaction?

A     So, you can see it looks like it went through on August 22nd, but on August 20th, there was a debit card transaction for $5,000 in National City, California.

Q     And you testified earlier the Defendant received $5,000 from Andy Li, correct?

A     Yes, I did.

Q     Do you have any evidence about what the Defendant did with that $5,000, what that -- what that reference -- what the debit card transaction was for?

A     Yes, I do.

Q     Let me show you what's been previously marked as Government's Exhibit 29.  I think it's in the binder.  Do you recognize Government's Exhibit 29?

A     Yes, I do.

Q     And what is that?

A     These are records that we obtained from the California Department of Motor Vehicles.

Q     These are certified records from a DMV?

A     Yes.

Q     Certified by a custodian of records?

A     Yes.

        MR. PARMLEY:  I'd move to admit Governments Exhibit 29.

        THE COURT:  Any objection?

II-211

MR. JONES:  No.

THE COURT:  They're received.

MR. PARMLEY:  Can we go to the ninth page of the document, please.

BY MR. PARMLEY:

Q     What is the ninth page of the document?

A     This is a vehicle transfer and reassignment form.

Q     Bill of sale basically?

A     Yes.

MR. PARMLEY:  Can you zoom into the top half of that -- top two-thirds of it.

BY MR. PARMLEY:

Q     Somebody purchase a vehicle on that date?

A     Yes.

Q     Who did?

A     The Defendant, Jinchao Wei, purchased a vehicle on August 20th, 2022 at National City Auto Center.

Q     And was that vehicle registered, according to those DMV records at that time?

A     Yes.

Q     Okay.  Let's fast forward a few more days to August 30th.  Did the Defendant -- excuse me.  Did Mr. Li send the Defendant another payment?

A     He did.

MR. PARMLEY:  Let's look -- go back to Government's

II-212

Exhibit 120, the 40th page of Telegram.  Can you zoom in on that, please.

BY MR. PARMLEY:

Q    What did Mr. Li say -- tell -- excuse me.  What did Mr. Li say to the Defendant?

A    He says:

        "I will send you $200 for September 1st.

        Once it's done, I will let you know to

        check it."

    And then he sends him a transaction ID.

Q    Do you know what that transaction ID is?

A    I do.

Q    What's that?

A    It's the PayPal transaction ID.

Q    And did the Defendant receive $200 through a PayPal that day?

A    He did.

Q    And did he send a receipt for that?

A    He did.

        MR. PARMLEY:  Let's look at the next page, please. Can you zoom in on the text and the receipt, please.

BY MR. PARMLEY:

Q    What does the Defendant say?

A    He says:

        "I saw it.  Thank you."

II-213

Q    And does Andy ask him to write a receipt?

A    He does.

MR. PARMLEY:  And can we zoom in on the receipt, please.

BY MR. PARMLEY:

Q    It's a little blurry, but can you make that out?

A    Yeah.  You can see the $200, and you can see that signature.

Q    Is that the Defendant's signature?

A    It is.

Q    Did the Defendant and Mr. Li have any conversations about Andy Li helping the Defendant with any relatives in China?

A    Yes, they did.

Q    Let's go back to WeChat if you don't mind, to 120.20. What's the date on that?

A    September 5th, 2022.

Q    Could you read that for me?

A    Yes.  Andy says:

"Ha ha ha, all nightie.  The mid autumn festival falls on September 10th this year, same as  Teacher's Day.  If there's ever anything in China you need me to take care of, just let me know straight away.  I'm happy to help.

II-214

Q    And how does the Defendant respond?

A    He says:

        "Sounds good.  Thanks, Bro."

Q    Let's fast forward a couple of days to the 7th.  On --

        MR. JONES:  Your Honor, I'm going to object to completeness.  I'd ask that the preceding page be included in the discussion.

        THE COURT:  Overruled at this time.  You may inquire during your cross.

BY MR. PARMLEY:

Q    Was there another discussion of payment on September 7th?

A    Yes.

Q    Could you zoom in on that text, please.

A    Yes.

Q    Okay.  What did that -- what did the -- what did Andy Li say to the Defendant?

A    He says:

        "Sent $1,000.  Wait an hour and check
        it."

Q    And did he also ask him to write a receipt?

A    He did.

Q    What did he ask him to write on the receipt?

A    Received $1,000 for the project in August.

Q    Do you have any idea what he meant by the project in

II-215

August?

A    I think he meant the technical manuals, including the Propulsion Operating Guide.

Q    That we just discussed?

A    Yes.

Q    Did PayPal records show a payment of $1,000 to the Defendant at that time?

A    Yes, they did.

Q    And was a receipt sent?

A    It was.

Q    Let's look at that receipt.  Could you read that for me, please?

A    It says:

        "Received $1,000 for the project in
        August.  Signed Patrick Wei."

Q    Let's go to the next page of Telegram, please.  So, the last page we were looking at was September 7th, is that right?

A    Yes.

Q    And this is about three weeks later on the 27th?

A    That's right.

Q    What does Mr. Li ask?

A    He says:

        "I thought about it.  First set up a plan
        or outline the plan for the video and
        text asking for a new IP and send that to

II-216

me.  Implement it if I don't have any revision.  In that case, we -- you won't waste your effort for nothing.  As for the content, include distinguishing features in terms of military operation, equipment, and logistics.

Q    And what did the -- how did the Defendant respond?

A    He said:

"I just read it.  I was working yesterday.  I probably can't write anything about logistics.  The logistics on our ship is nothing."

Q    So, what's -- what types of information was Andy Li asking for?

A    He was asking for information on the operation, logistics, and equipment of, you know, the U.S. Navy.

Q    And does he talk about more payment?

A    He does.

Q    What does Mr. Li say he's going to do?

A    He says he's going to send you -- him -- I am going to send you, the Defendant, $200 tomorrow.  I'll let you know when it's done.

Q    So, let's go a couple of days in the future to the 29th. And is there more discussion of the $200?

A    Yes.

II-217

Q    And did Mr. Li say that he sent it?

A    Yes.

Q    Was there another request for a receipt?

A    Yes.

Q    And did the Defendant send a receipt?

A    He did.

Q    Was there a later discussion of this project that they were talking about?

A    Yes.

Q    Okay.  Let's go to page 46 -- sorry.  Going back to 45, is that another example of a receipt that was sent?

A    Yes.  That's the receipt received $200 for work in October.

        MR. PARMLEY:  Okay.  Let's go to the next page, please, page 46.  Could you zoom in on that, please.

BY MR. PARMLEY:

Q    What's the date on this?

A    October 8th, 2022.

Q    Could you please read the first three entries?

A    Yes.  The Defendant says:

        "Okay.  I'm about done with the outline.

        I can only think of five topics.

        Honestly, at this time, I'm not too

        familiar with other topics.  I'll briefly

        write something and will take some good

II-218

pictures for the rest of the time."

Q    The Defendants says he'll be on duty tomorrow.  And then what does Andy Li say after that?

A    He says:

"It looks like it will expire tomorrow morning.  If so, I will send you a new one."

Q    What's your understanding of what would expire?

A    The temporary website.

Q    Is there evidence of a code being sent by WeChat on that day?

A    Yes.

MR. PARMLEY:  Let's go to 121.2.  Can you zoom in on that.

BY MR. PARMLEY:

Q    Is that another example of the Defendant sending Andy Li a code?

A    Yes.

MR. PARMLEY:  Let's go back to Telegram from that same day.  Zoom in again, please.

BY MR. PARMLEY:

Q    If you can look about the one, two, three, four, fifth entry down, was -- what does the Defendant say?

A    He says, "Sent."

Q    And how does Andy Li respond?

II-219

A    He says:

"First day back to work.  Super busy.  I

will talk to you later."

And then he says:

"I just read it.  Wait to hear from you.

You are so talented.  It's a pity that

you don't go to college.  I will support

you.  Don't worry."

Q    And did you find any evidence of what the Defendant said here?

A    I did.

MR. PARMLEY:  Okay.  Let me show you Government's Exhibit 139A.  If we could publish that to witness and the jury only, please.

THE COURT:  You may.

BY MR. PARMLEY:

Q    Where did you find -- this has been previously admitted. Where did you find this?

A    I found this during a court authorized search of the Defendant's Google account.

Q    Did you look at the meta data of this document?

A    I did.

Q    What exactly is meta data?

A    Meta data is information that word processing systems will save about a document.  So, like how many characters it

II-220

is, how many pages it is, and when it was edited last.

Q    So, it kind of creates that history of when it was saved and things like that?

A    Yes, it can.

Q    What did the meta data show in this document as to when it was created or modified?

A    It says that it was last -- I believe last modified on October 7th, 2022.

Q    Is that why you concluded that this was a document that was passed?

A    Yes.

Q    This document is in Chinese and it was translated, correct?

A    That's right.

Q    When does this -- how long is this document approximately?

A    I think it's about 10 pages.

        MR. PARMLEY:  Can we just scroll through it quickly.  Then we're going to go back to the English version. I'm sorry.  Go -- scroll through the Chinese version, please.

        (Pause.)

BY MR. PARMLEY:

Q    There's the schematics included in the paper?

A    Yes.

        MR. PARMLEY:  Let's go back; to that page we just

II-221

looked at.  For the record, it's 139, sixth page.  Yes, thank you.

BY MR. PARMLEY:

Q    Do you know what that's a picture of?  Do you know where that comes from?

A    I do.

Q    Where does that come from?

A    That comes from inside the USS ESSEX.  There are pictures of the ship throughout the ship, and it basically is a layout to help you figure out where you are and how to get to where you're going.  So, it's kind of like a map.  It's pretty -- to me it was very confusing to get around down there.  So --

MR. PARMLEY:  Go to the next page.  Is that the -- go to the end of the document, please.  Okay.  Let's go back one.

BY MR. PARMLEY:

Q    What is this?  What is -- do you know where this photo comes from?

A    I don't know exactly where it comes from, no.

Q    Do you know what it is referencing?

A    Yes.

Q    What is it referencing?

A    So, these -- this is a list of rooms, locations on the USS ESSEX.  So, you can see like the, you know, Command Master

II-222

Chief Stateroom, the CO's Stateroom.  It includes an internal phone number for each room and also what is listed as a tac number, and tac numbers are those physical locations of the rooms on the ship, so, kind of what you see on those maps. This is like a -- a room number and a key to where it is.

Q    So, for example, with this information, could a person learn specifically where the Chief Engineer's Stateroom is, for example?

A    Yes.

Q    And could find it specifically on the ship?

A    Yes.

Q    Or the Air Boss?

A    I'm sorry?

Q    Or the Air Boss stateroom?

A    Yes.

Q    The Commanding Officer?

A    Yes.

        MR. PARMLEY:  Okay.  Could we go to the next page, please.

BY MR. PARMLEY:

Q    Is that some more -- more information of the same vein?

A    Yeah, same thing, just it looks like different departments, so, rooms within the Engineering Department for example.

        MR. PARMLEY:  Okay.  Let's go back a few pages to

II-223

those diagrams that were included.  Keep going back, please.

BY MR. PARMLEY:

Q    Okay.  For example, this diagram on the fifth page, do you know where this came from?

A    I do.

Q    Where did this come from?

A    This came from a technical manual.  It's the Weapons Control Manual for the USS ESSEX.

Q    And that was previously admitted as Government's Exhibit 201, is that right?

A    Yes.

MR. PARMLEY:  Can we put 201 up on the screen, please.  Can you zoom in on that.

BY MR. PARMLEY:

Q    Does this have the same warnings and distribution statements as the other document?

A    Yes, it does.  Well, it's actually different.

Q    Similar?

A    Yes.

Q    Okay.  And it has a distribution statement?

A    It does.

Q    It has a warning statement?

A    Yes.

Q    And a destruction notice?

A    Yes.

II-224

Q    What does the warning state?  Could you read that?

A    It says:

          "Warning, this document contains

          technical data whose export is restricted

          by the Arms Export Control Act, Title 22

          U.S.C. Section 2751 or Executive Order

          1240.  Violations of these export laws

          are subject to severe criminal

          penalties."

Q    And approximately how many pages is this?

A    I think this is about 120.

Q    Okay.

A    Over 100.

          MR. PARMLEY:  Let's go back to Government's Exhibit 139, please.  Can you go to the third page for me, please.  Can you zoom in on that, please.

BY MR. PARMLEY:

Q    And, again, where does this graphic come from?

A    This comes from that Weapons Control Technical Manual.

Q    And what does this image depict?

A    These are locations of Sea Sparrow Surface Missiles, including the launcher control rooms.

Q    And the Weapons Control Manual, just to be clear, that was what's been charged in the indictment as Count 6?

A    Yes.

II-225

          MR. PARMLEY:    Let's go to the next page, please.
I'm sorry.  We're looking at the -- the English version.  Can
you go back, please.  Can you go to then English version?  I'm
sorry.  This is my fault.  Can you go to 139?
BY MR. PARMLEY:

Q     This is the English translation?

A     Yes.

Q     Where does that text come from?  Does that text come
from the Weapons Control Room or was that something that was
written by somebody else?

A     I don't think this comes from the Weapons Control
Manual.  That -- this particular photograph on this page is
not from the Weapons Control Manual.

Q     What about the text itself on this whole paper?

A     No.  I believe the Defendant wrote the text in the
paper.

Q     Okay.  And what do you base that on?

A     I -- I base that on the conversation that I had with the
Defendant about it.

Q     And the fact that it was in Chinese?

A     Yes.

Q     Okay.  Let's go to the next page.  Does this case
include the weaponry layout of the ESSEX?

A     It does.  It lists some open source information about
amphibious assault ships, and then it provides commentary on

II-226

the ESSEX specifically.

Q     In other words, that the open source information is incorrect?

A     Yes.

          MR. PARMLEY:  Okay.  Could we go to the next page.

BY MR. PARMLEY:

Q     Is this a -- and does this diagram indicate one where the Sea Sparrow launches are?

A     Yes.

Q     And a specific description of where they are?

A     Yes.

          MR. PARMLEY:  Can we go to the next page, please.

BY MR. PARMLEY:

Q     What does this generally depict?

A     This is a diagram of close end weapons systems location. So, again, it's locations of weapons groups and control stations for those weapon groups.

          MR. PARMLEY:  Can you go to the next page, please.

BY MR. PARMLEY:

Q     What is this a description of?

A     This is a diagram of the machine gun locations.

Q     Is there a description of the top written in Chinese about where the machine gun locations are?

A     Yes.

Q     And is there -- why don't you read -- one moment.  Let

II-227

me ask it this way.  Does it say for reasons unknown there are some differences?

A    Yes.

MR. PARMLEY:  Okay.  Let's go to the next page.

BY MR. PARMLEY:

Q    This is the one we've previously discussed?

A    Yes.

Q    And it talks about where people are living on the ship?

A    Yes.

Q    Can you just read the first sentence in English of what the Defendant wrote?

A    Yes.  It says:

"In this section, I will present the details of on board living conditions with the aid of graphics."

MR. PARMLEY:  Okay.  Let's go to the next page.

BY MR. PARMLEY:

Q    Does it have a discussion about damage control?

A    Yes.

Q    And the on board means of communication?

A    Yes.

MR. PARMLEY:  Let's go to the next page -- is that the final page?

BY MR. PARMLEY:

Q    And we get to the -- the things we already looked at,

II-228

the berthing rooms and the communications?

A     Yes.

          MR. PARMLEY:  Okay.  Let's go to the last page, please.

BY MR. PARMLEY:

Q     Is that an indication indicating that the telephone director was in the Engineering Department?

A     Yes.

          MR. PARMLEY:  Okay.  Next page.

BY MR. PARMLEY:

Q     The Logistics Department?

A     Yes.

          MR. PARMLEY:  Next page.  Is it the last page? Okay.  Thank you.  Okay.  If we could take that off the screen, please.

BY MR. PARMLEY:

Q     The next day, did the Defendant make another request on Telegram?

A     He did.

          MR. PARMLEY:  Can we go to 120.47, please and zoom in on that text.

          THE WITNESS:  Yes.  Andy says on October 9th, 2022:
          "Oh, yes, I've been studying the
          amphibious ship's lightning carrier
          combat concept and other amphibious

II-229

combat concepts lately.  If you find anything about these, you can share with me as well.  Thank you."

BY MR. PARMLEY:

Q    So, Andy expressed interest in this lightning carrier concept?

A    Yes, he did.

Q    And the Defendant agreed to work on it?

A    He did.

Q    Do you recall Captain Taylor's testimony about the lightning carrier concept?

A    I do.

Q    Do you recall what it was, just very briefly?

A    My understanding is that a lightning carrier concept is a way for multiple U.S. Navy ships to work together to deploy Marines at a high level.

Q    We can go with Captain Taylor's testimony.

A    Okay.  Thank you.

Q    Is the ESSEX, to your knowledge, capable of turning into a lightning carrier?

A    Yes.

MR. PARMLEY:  Let's look at his Navy Federal records in October of 2022.  Can we look at Government's Exhibit 32, which has been previously admitted.  I want to specifically look at the 52nd page.

II-230

Can you zoom in on that, please.

BY MR. PARMLEY:

Q     These are all his bank records from that time period, is that correct?

A     Yes.

Q     Looks like there's a almost $5,000 -- well, what's his beginning balance on September -- excuse me -- September 22nd?

A     On September 22nd, the beginning balance of his bank account is $16,379.28.

Q     And what is the -- there's an almost $5,000 transaction?

A     Yes.

Q     Do you know what that was for?

A     It says it was paid to Wells Fargo Auto Fee.

Q     And what's your understanding of that?

A     So, I would assume that's a car payment.

Q     Was he also paid again later in October of 2022?

A     He was.

Q     Let's go to 31C, please.  In October of 2022, was there a payment for how much?

A     Three hundred dollars.

Q     And did they have a further discussion about this?

A     They do.

MR. PARMLEY:  Okay.  Let's go to Telegram on that date, 120.48, please.  Could you zoom in on that.

//

II-231

BY MR. PARMLEY:

Q     What does Andy say?

A     He says:

          "I sent you $300 with extra $100 for my

          Thanksgiving wishes to you.  Maybe you

          can buy yourself or your mom something

          good to eat."

Q     Did he ask for a receipt again?

A     He did.  Sorry.  He said:

          "Send me a receipt when you have time.

          I'll give you the IP shortly."

Q     And is there the next entry that appears to be an Internet Protocol address?

A     Yes.

Q     What is your understanding of what that is?

A     So, that's an example of the link, the URL to one of those temporary websites.

Q     Is that one you tried to visit?

A     Actually, yes, it is.

Q     And did it work?

A     No.

Q     Do you have evidence that the Defendant visited that website?

A     I do.

Q     Where did you get that evidence from?

II-232

A     When we searched the Defendant's phone, we were also able to look at his Safari Web browsing history, and we can see the Defendant visiting some of these websites in that history.

Q     And does that include the website listed here?

A     Yes.

Q     Did the next day the Defendant, nevertheless, asked for help using the link?

A     He did.

Q     Let's go to the next day, please.  What does the Defendant say?

A     He says:

          "Sorry.  I forgot how to send to this
          link again."

Q     And did Mr. Li provide new instructions?

A     He did.  He says:

          "No worries.  After you open it, drag it
          down and click the blank one at the very
          bottom.  Then you can drag it down
          again."

Q     And did the Defendant again send the code?

A     He did.

Q     Okay.  In November of 2022 -- incidently, before we go any further, all of these Telegram and WeChat chats, can you remind the jury of where are all these coming from?

II-233

A       So, these came -- the Telegram chats we only found those on the Defendant's cell phone.

Q       So, from the search in December of 2022?

A       Yes.

Q       So, the search hasn't even happened yet?

A       The date in January.

Q       January of 2023?

A       Yes.  That search hasn't happened yet.

Q       Right.  So, all these communications you did not know about at this time?

A       We didn't --

Q       Let me rephrase it.  The evidence of these communications were only gathered after the search of his phone, correct?

A       Yes.  Yes.

Q       Okay.  Let's go to November of 2022.  Did the Defendant volunteer that he was taking some training?

A       He did.

Q       Let's go to the next page, please.  What did the Defendant say?

A       He said:

          "Big Brother Andy, how have you been
          lately?  I have a specialized
          firefighting training next Tuesday.  I'll
          take a look and see if there is any stuff

II-234

of substance.

Q    Can you go to the next page, please.  The Defendant --
did Mr. Li respond?

A    Yes.  He says:

"Sounds good.  That would be great."

Q    Did he further ask for a little more specifics as to
what he wanted?

A    He did.

MR. PARMLEY:  Let's go to the next page, please.
Can you zoom in on that.

BY MR. PARMLEY:

Q    What Did he say?

A    He says:

"If possible, write an 800 to 1,000
character piece on next week's activity.
Focus on, one, the basics, time,
location, participants, two, the
objections and functions served, three,
features not previously available, newly
added, four, scenarios that are a good
fit, five, any deficiencies that remain,
six, possible follow-on improvements as a
result of the activity and, seven, other
ideas and experiences you find worth
documenting.

II-235

          I was pleasantly surprised when I read
          your draft last time.  I thought your
          writing is very good.  In the future, at
          your convenience, it would be great if we
          could write similar pieces.  They don't
          have to be lengthy, around 1,000
          characters, no more than 2,0000 would be
          more than enough."

Q    What does he add after that?

A         "Of course, if there are originals, that
          would be even better."

Q    Why would an intelligence officer ask for originals
rather than somebody writing something about it?

A    Because that is -- when an intelligence officer gets
original documents, particularly from the U.S. government,
that's a source material that they know that the U.S.
government is relying on rather than information that a source
compiles themselves which could contain sort of like their
thoughts.  Original material would be the most accurate
material.

Q    Did you collect evidence showing that the Defendant ever
took this firefighter training?

A    Yes, he did.

Q    Is that included on his training jacket that Agent
Christian testified about?

II-236

A     Yes, that's right.

Q     Do you recall the date of that training?  If not, we can pull it up.

A     I'm sorry?

Q     Do you recall the date of that training?  If not, we can pull it up.

A     I don't recall specifically.

            MR. PARMLEY:  Can we go to Government's Exhibit 3, please.  Go to page 10 towards the top.

            THE WITNESS:  Yeah.

BY MR. PARMLEY:

Q     Is that indicated then?

A     Yes.  So, on November 15th, 2022, it is the General Shipboard Firefighting Training.

Q     Okay.  Did the Defendant thereafter mention is work on the training materials?

A     He did.

            MR. PARMLEY:  Let's go back to Telegram, please. Let's go to that 21st.  Thank you.  If you could zoom in on that.

BY MR. PARMLEY:

Q     What did the Defendant say?

A     He says:

            "I'm sorry.  I had duty yesterday and
            just saw this.  Uh-uh.  I will be sure to

II-237

be on the lookout.  I've been working on something about volunteer work lately. That's why I've only been able to write a little on the firefighting training materials.  I think I'll have a little more free time this week, and I'll try to finish the piece as soon as I can."

Q    And how does Mr. Li respond?

A    He says:

"Ha ha, right on. I look forwarded to being schooled.

Q    Was there more evidence of the Defendant being paid around that time?

A    Yes.

Q    According to Government's Exhibit 31C, how much was he paid in November?

A    In November, on November 25th, 2022, he was paid $400.

Q    Let me show you what's been previously admitted as Government's Exhibit 104D.  Do you recall where this came from?

A    Yes.  This came from the search of the Defendant's apartment on the day of his arrest.

MR. PARMLEY:  Can you zoom into that top portion, please.

//

II-238

BY MR. PARMLEY:

Q     What does it say there?

A     It says, "Received $400 for work in November," signed Patrick Weigh and dated November 24th, 2022.

Q     And that's indicated also in the PayPal records?

A     Yes.

Q     Did you find any indication that he was being paid at that point a monthly stipend?

A     Yes.

Q     And that's based on the PayPal materials?

A     Yes.  It -- it looked like he was getting paid monthly, yes.

Q     Why would an intelligence officer, in your opinion be paying a monthly payment to a source?

A     It's kind of like a -- a little bit like a salary.  It both keeps them on the hook because it's a continuing payment, and also it gives that incentive for the source to continue to provide better material so that they can get paid more money. And, also, it kind of creates that a little bit feeling like they owe you something.  Like, he's already paid you a monthly maintenance payment.  Now you need to provide something to him to make that worth it.

Q     So, a little bit of push and a little bit of pull?

A     Yep.

Q     Okay.  So, did you ever find any evidence that the

II-239

Defendant wrote a paper about his firefighter training?

A    I did.

Q    And where was that found?

A    That was found during the search of the Defendant's apartment on the hard drive that we found.

MR. PARMLEY:  Can you pull up Government's Exhibit 143A, please.

BY MR. PARMLEY:

Q    Is that the Chinese version?

A    It is.

MR. PARMLEY:  Could you pull up 1143.

BY MR. PARMLEY:

Q    Is that the English version?

A    Yes, this is the translation.

Q    An you just briefly describe what was in this paper?

A    It was kind of an overview of the training, specifically, the procedures that they learned on how to fight fires aboard as ship and also some of the equipment that they used to fight fires.

Q    And it's several pages long with some photographs?

A    Yes.

Q    If you could just scroll through it quickly.

So, let's go back for a moment.  So, this is an indication about the different roles that somebody might have in a firefighting role?

II-240

A    Yes.

Q    Repair party leader, plotter, phone talker, et cetera?

A    Yes.

Q    Okay.  Keep scrolling.  Keep scrolling, please.  Is this about the equipment that's used?

A    Yes.

Q    Okay.  One more page.  One more page.  Okay.  Thank you. Let's go to Telegram messages around that time, 120.54.  Is that the 25th of November of 2022?

A    It is.

Q    Could you read that starting from the top?

A    Sure.  The Defendant says:

        "Big Brother Andy, I have duty tomorrow,
        but I'm free this weekend.  When are you
        available to talk?"

Q    And how does Mr. Li respond?

A    He says:

        "Yeah.  By the way, I will be
        transferring funds to you today.  Think
        of it -- think of it as my way of
        spreading holiday cheer."

Q    And the Defendant thanks him, is that correct?

A    Yes.  He says:

        "Thanks.  I'm thankful for you this
        Thanksgiving."

II-241

Q    And how does Mr. Li respond to that?

A    He says:

"The transfer is already completed.

There are $400 this time around.

Consider it $200 -- consider $200 of it

as a December holiday greeting to you and

your mom.  Buy some presents and tasty

treats."

Q    And then there's another request for a receipt, is that correct?

A    Yes.  He says:

"When you have time, please make out a

receipt.  I will provide you a new IP."

Q    And they also talk about the firefighting training?

A    Yes.

Q    And what does the Defendant say?

A    He says he will write the receipt when he gets home later and, Let me also -- it looks like wear -- the report on the firefighting training from before you as well.

Q    And how does the Defendant -- excuse me.  How does Mr. Li respond?

A    He says:

"Sounds good. We can talk details over

the phone this weekend."

MR. PARMLEY:  Okay.  Let's go to the next day.  Can

II-242

you zoom in.

BY MR. PARMLEY:

Q    This is another indication that the Defendant has sent a code?

A    Yes.

Q    And what does he say after he sends the code?

A    He says, "It's been sent."

Q    Did the Defendant have any Google searches around that time?

A    Yes, he did.

Q    Can we go back to his Google searches, Government's Exhibit 146.  Can you look at the 30th.  Where it says search, that means a search?

A    Yes.  I think so, yes.

Q    That was a great question.  And visit -- you wrote the chart and visited a website actually means went to the website?

A    The description -- yes, the description of the activity is either like a search or a website that he's visited.

Q    Okay.  Where is the search -- the first search on November 28th -- excuse me -- November 30th of 2022?

A    It says Sailor, USS BOXER espionage.

Q    Okay.  And then he visited a website?

A    He did.

Q    About -- do you know what that website is about?

II-243

A      Yeah.  It was a link to a -- an -- actually a Department of Justice press release on a -- a Sailor that had been -- or I -- I guess I don't recall if it was a Sailor, someone who had been sentenced and -- and prosecuted for espionage.

Q      And there's two more searches about a BOXER Somalia leak?

A      Yes.

Q      Do you have any idea what that is referencing?

A      Not entirely.  There was a -- like a fuel leak that happened around the USS BOXER when they were out to sea and I think some oil got into the -- into the BOXER, into the water they were using, and it was not a pretty situation.  So, I think that might be what that's referring to.

Q      There was a fuel leaker on the BOXER that --

A      Yes.

Q      -- caused Sailors to get sick?

A      Yes, that's right.

Q      And is that -- where is the BOXER home ported?

A      The USS BOXER is home ported in San Diego.

Q      Okay.  On that same day, on November 30th, was that the day where you entered the Defendant's apartment to install the microphone?

A      Yes, that's right.

Q      Can you tell me about that?

A      Sure.  So, on the 30th at a time when we knew the

II-244

Defendant was working and so he wouldn't be home in his apartment, we had court authorization to enter his apartment, search it, and also install a microphone, a listening device. And, so, that's what we did.

Q    And Government's Exhibits 60 through 64 have been previously admitted as some of those calls, is that correct?

A    That's right.

Q    And 125 through 129 were previously admitted translations of those calls, correct?

A    Yes.

Q    And, just following the timeline here, what happened on December 13th, 2022 if you recall?

A    I'm sorry.  I'm --

Q    On December 13th.  So, you entered the -- you entered the -- the apartment to install a microphone on November 30th, is that correct?

A    Yes, that's right.

Q    And, just following the timeline, was there something that happened at the airport on December 13th?

A    Yes.  That's the -- that is when the Defendant was flying home to Wisconsin, and that's when we were able to obtain the PIN code to his cell phone.

Q    As testified to by Agent O'Brien in that video we watched, correct?

A    That's right.

II-245

Q    Okay.  So, did you ever find a receipt for December work?

A    Yes.

        MR. PARMLEY:  Okay.  Can we look at 104C, please.  Can you zoom in on the top?

BY MR. PARMLEY:

Q    And where -- where does 104C come from again?

A    This is a notebook that was found during a search of the Defendant's apartment.

Q    And is there another receipt that he sent back to Mr. Li?

A    Yes.

Q    And what does it say?

A    Received $40 for work in December, signed Patrick Wei.

Q    All right.  We made it through 2022.  We're now into January of 2023.  Was there a call recorded in the Defendant's apartment on June 9th, 2023?

A    There was.  So, we had this microphone installed in the Defendant's apartment, and we think that he put his cell phone on speaker phone.  And, so, we were able to record both sides of a phone call that he had.

Q    Do you have all of the Defendant's conversations?

A    Sorry?

Q    Do you have -- were you able to capture all the Defendant's conversations?

II-246

A    No.  Only able to record things that happened in his apartment.

Q    So, if he hadn't been on the speaker phone would you have been able to hear the other side of the call?

A    No, I don't think so.

Q    If he'd been having a conversation outside of his home, would you have been able to pick it up on the -- pick it up on the microphone?

A    No.

Q    So, is it fair to say  that if those two had spoken on a speaker phone in the apartment after January 9th of 2023, you should have been able to capture it?

A    Sorry.

Q    Sorry.  If -- if they were speaking on this speaker phone after the microphone was installed, you should have been able to capture it?

A    Yes.

        MR. PARMLEY:  Okay.  Let's play a clip from January 9th, 2023.

        MR. PARMLEY:

Q    And did you review his phone from January 9th of 2023? Is there also Telegram activity on that day?

A    Yes.

Q    Okay.  Let's look at clip one of Government's Exhibit 60.  And this is a call from January 9th of 2023, and these

II-247

translations are synched up to this audio?

A      Yes.

            MR. PARMLEY:  Okay.  Let's go ahead and play this.
This is about a minute and 22 seconds.

      (Video played.)

            MR. PARMLEY:  Sorry.  Can I pause it for a moment.

BY MR. PARMLEY:

Q     When you see "AL" on that, who is that referring to?

A     Andy Li.

Q     Okay.  And then -- the only person on the conversation
is who?

A     The Defendant.

            MR. PARMLEY:  Can we start that again.  I'm sorry.
Make things more difficult for Ms. White.

      (Video played.)

BY MR. PARMLEY:

Q     Did they have a discussion of payment?

A     Yes.

Q     What did Mr. Li say that he's going to be doing?

A     Transferring the Defendant money via PayPal.

Q     Every month?

A     Yes.

Q     Did he have a comment about the firefighting paper that
he had sent?

A     Yes.  He -- he did comment on that paper.

II-248

Q     And was he impressed with it?

A     Yes.

Q     Did he say that it was generic?

A     Yes.

Q     What did he ask the Defendant to look out for?

A     He wanted him to look out for good stuff.

Q     And did the Defendant agree to look out good stuff?

A     He did.

          MR. PARMLEY:  Let's go to the next clip from that, clip two.

     (Video playing.)

          MR. PARMLEY:  I want to stop here for a second.

BY MR. PARMLEY:

Q     Before I keep going, just to back up a little bit.  The Defendant said that he's taking an important test.  Do you know what is referencing?

A     Yes.  I believe that's referring to the exam that he had to take to -- or the test he had to take to advance up in the system.

Q     To get promoted?

A     Yes.

Q     Okay.  To E-5?

A     Yes.

Q     Where was the ship during January of 2023 when this call was made?

II-249

A     It was at BA Shipyards in San Diego, California.

Q     And was that -- was the ship at BA -- BAE Shipyards for the remaining of the case until the Defendant was arrested in August of 2023?

A     Yes, that's right.

          MR. PARMLEY:  Okay.  Can we keep playing that, please.

     (Video continues playing.)

          MR. PARMLEY:  And pause it again.

BY MR. PARMLEY:

Q     Do you know what that conversation was referencing?

A     So, essentially, when the USS ESSEX got put into BAE shipyards, it was put into dry dock because they were doing updates and maintenance to the ship.  So, it wasn't -- it was -- it was being worked on.  It wasn't, you know, going to be out.

Q     And Andy Li was asking how long it's going to take to get it repaired?

A     Yes.

          MR. PARMLEY:  Okay.  Keep going, please.

     (Video continues playing.)

BY MR. PARMLEY:

Q     Andy Li asked for blueprints, is that right?

A     Yes, he did.

Q     Any reason why an intelligence officer would ask for

II-250

blueprints?

A    I think it's back to asking for original source material, and obviously blueprints of a U.S. Navy vessel I think would be valuable to the Chinese military.

MR. PARMLEY:  Can you play the next clip, please.

(Video played.)

BY MR. PARMLEY:

Q    So, he asked to enter some things with his cell phone?

A    Yes.

Q    Blueprints?

A    Yes.

Q    And he also asked about a 3D printer?

A    He did.

MR. PARMLEY:  If you want to take a break.

THE COURT:  Okay.  We'll be in recess until 3:15.

MR. PARMLEY:  Thank you, your Honor.

THE COURT:  Please remember the admonition I gave you earlier.

(Jury exits courtroom.)

THE COURT:  We're outside the presence of the jury.

Refresh my recollection.  When we play a clip, the jury and we hear the Chinese version?

MR. PARMLEY:  Correct.

THE COURT:  But the English translation is being played.  Where on -- where in the record is the English

II-251

translation located?

MR. PARMLEY:  It's been admitted as a -- as a piece of paper.  It is in evidence.

THE COURT:  So, each one of these are admitted as a piece of paper?

MR. PARMLEY:  Correct.  So --

THE COURT:  And do you say what -- what exhibit number it is?

MR. PARMLEY:  I try to.  I could try to do a better job.  So, for example, when we talked about -- yeah, so 60 through 64 are these phone calls.

THE COURT:  Okay.  So, these are all --

MR. PARMLEY:  And 125 through 129 are these translations for these phone calls.

THE COURT:  So -- so, the 120 through 129 is where you would find the translations?

MR. PARMLEY:  Correct.

THE COURT:  Okay.  Thank you.

MR. PARMLEY:  No.  Thank you.

THE COURT:  All right.

MR. PARMLEY:  And, logistically, your Honor, just -- we're trying to figure out witnesses.  So, I think -- if I could just a moment to talk with counsel.

THE COURT:  Sure.

(Pause.)

II-252

MR. PARMLEY:  I think I have about -- I think I -- I have more time with this witness, and I don't know how long cross examination's going to be.

THE COURT:  Right.

MR. PARMLEY:  We're trying to line up another witness just in case.

THE COURT:  Okay.

MR. PARMLEY:  And hopefully they're here.  I'm not sure yet, but --

THE COURT:  Do you have any idea of how long your cross would be

MR. PARMLEY:  Five, ten minutes, probably.

THE COURT:  No.  I'm asking about cross.

MR. JONES:  Probably about an hour.

THE COURT:  Oh.

MR. JONES:  Thirty -- thirty minutes to an hour. I'm not totally sure.  If we did need to take another witness out of order, I have no problem.

MR. PARMLEY:  No.  We just wanted to make sure we had a witness ready to go, but it sounds like I think this will probably -- we'll probably finish with this witness today.

THE COURT:  Okay.

MR. PARMLEY:  The only other issue we have, your Honor, is we have two witnesses from out of town that were

II-253

scheduled to be here on Thursday day and Thursday night.  We thought -- this is moving faster than we thought it was going to.

THE COURT:  Welcome to my court.

MR. PARMLEY:  Exactly.  I appreciate your punctuality.  So, I've asked to rearrange it, but there's a possibility we might run out of witnesses on Thursday and have one of them who could testify Friday morning.

THE COURT:  You're trying to get them.  And then you would be done?

MR. PARMLEY:  Then we'd be done.  Yes, that would be the last witness.

THE COURT:  And then the -- then the Defense case will be fairly brief?

MR. JONES:  Maximum of two witnesses.

THE COURT:  Okay.  And, so, if we have down time, we could use that to go over the --

MR. PARMLEY:  Yes.

THE COURT:  -- jury instructions.  So, that means that I need the set of the jury instructions from you.

MR. PARMLEY:  We sent them to you this afternoon.

THE COURT:  Oh.

MR. PARMLEY:  I'm hoping for the best.  I hadn't -- we haven't had much time in between running back and forth, but I think I did it right.

II-254

THE COURT:  Okay.

MR. PARMLEY:  And I emailed to the chambers and to counsel.

MR. JONES:  I saw that.

MR. PARMLEY:  Yeah.

THE COURT:  And then just a heads up for the Defense.  You had cited a good faith defense and cited Model Instruction 5.7, but that is not 5.7.  And, so --

MR. JONES:  I'll double check.

THE COURT:  So, and then I would want to draw your attention to the cases that the Government cited.  One is from Hawaii, and it -- the Ninth Circuit approved the jury instructions in that case.  And that case is --

MR. BARRY:  United States versus Goadia, your Honor.

THE COURT:  Gowani (phonetic)?

MR. BARRY:  Gowadia, G-O-W-A-D-I-A.

THE COURT:  And you can also locate the actual jury -- not only the Ninth Circuit case but the actual jury instructions that were given in that case.

All right.

MR. PARMLEY:  All right.  Thank you.

THE COURT:  So, we'll be in recess until 3:15.

MR. PARMLEY:  Thank you.

(Proceedings recessed briefly.)

II-255

THE COURT: -- have a witness. Is there another witness that you have for tomorrow?

MR. PARMLEY: We have witnesses for tomorrow. We have at least --

THE COURT: Oh.

MR. PARMLEY: We have at least four witnesses ready for tomorrow.

THE COURT: Oh, okay.

MR. PARMLEY: Yes.

THE COURT: All right.

MR. PARMLEY: Maybe five.

THE COURT: Okay.

MR. PARMLEY: But not six. But they're much shorter witnesses. So --

THE COURT: All right. So, we'll be fine going tomorrow?

MR. PARMLEY: For sure.

THE COURT: Okay. And then the parties should be prepared to, if we have extra time, discuss the --

MR. PARMLEY: Have a --

THE COURT: -- jury instructions.

MR. PARMLEY: -- conference on instructions, yes.

THE COURT: And I did get your printout, which I'll review.

MR. PARMLEY: Hopefully it's right, your Honor.

II-256

THE COURT:  Okay.  Are we ready for the jury?

MR. PARMLEY:  Yes.

THE COURT:  We'll see if they're ready for us.

(Pause.)

MR. PARMLEY:  I'm sorry.  One thing we wanted to put on the record --

THE COURT:  Okay.

MR. PARMLEY:  -- before the jury came back in.  I apologize.  One of my colleagues noticed that there might be a juror who's having trouble staying awake.  And, so, if maybe the Court could give an admonition if anybody's having a hard time, just to raise their hand.

THE COURT:  Do we have any idea?

MR. PARMLEY:  Which -- do you now which one it was?

THE COURT:  I did not notice.

MR. PARMLEY:  I didn't notice it.  Number 9.

THE COURT:  All right.  Thank you.

MR. PARMLEY:  Thank you.

THE COURT:  Or if you do --

MR. PARMLEY:  Sleepy I would say, yes.

MR. JONES:  That's on you.

THE COURT:  Bring him some water.  At least it's not me.  We'll see how far -- how long we're going to go to.  It's probably going to be close to 5.

(Pause.)

II-257

THE CLERK:  Jurors entering.

(Jury enters courtroom.)

THE COURT:  Welcome back.  I remind you you're still under oath.  You may continue.

MR. PARMLEY:  Thank you  I appreciate that.

Where we last left off, we were listening to a phone call from a microphone in the Defendant's apartment on January 9th, 2023.  We had listened to a few clips.  This is Government's Exhibit 60, and the translations are Government's Exhibit 125 for this clip.

Can you play the fourth clip of that, please.

(Audio clip audio played.)

BY MR. PARMLEY:

Q    Was Mr. Li interested in this whole lightning carrier concept?

A    Yes, he was.

Q    Did the Defendant volunteer to look out for any changes being made to the flight deck?

A    Yes, he did.

MR. PARMLEY:  Okay.  Let's go to the next clip, please.

(Audio clip played.)

BY MR. PARMLEY:

Q    Is that a discussion of the lighting carrier concept?

A    Yes.

II-258

Q    And a 3D printer?

A    Yes.

Q    What does Andy Li ask the Defendant to do?

A    I mean, he asks him to keep an eye out for things that he thinks are interesting.

Q    He asked  him to be proactive, didn't he?

A    Yes.

Q    Was there a further discussion on Telegram a few days later?

A    There was.

          MR. PARMLEY:  Let's go to Government's Exhibit 120, the 56th page of the Telegram chats.  This is from January 12th of 2023.  Could you zoom in on that for me, please, the top half.

BY MR. PARMLEY:

Q    Is there further discussion of payment?

A    Yes.

Q    Could you just read that first entry, please?

A    Sure.  Andy says:

          "Let me transfer 400 backs to your own
          PayPal account first.  Should be in your
          account later today.  It's a friends and
          family transfer.  Give me a confirmation
          on the business transfer matter when you
          get a chance later.  Starting next month,

II-259

I'd only be able to do business transfers."

Q    And is there a further discussion of a receipt down below and then another entry of an IP address?

A    Yes.

Q    Can you look at the attachment in -- sorry.  The -- yeah, let's look at the first one.  What is that first attachment?

A    So, this is a -- it looks like a payment confirmation screen.  I mean, obviously, it's in Mandarin, but I can see the $400 and the email address associated with the Defendant's PayPal account.

Q    Okay.  What about the next link?  Do you have any idea what that is?

A    I do.

Q    What's that?

A    I think that this is an example of what that temporary website would look like when you open it.  And you can kind of see in the bottom a red circle.  I think that is Andy circling that blank space that he mentioned earlier, that the Defendant needed to click into to open and upload documents

            MR. PARMLEY:  Okay.  Can we back out of that.

BY MR. PARMLEY:

Q    In fact, there are some instructions below that, is that right?

II-260

A       Yes.

            MR. PARMLEY:   Can you zoom in on the bottom text, please.

BY MR. PARMLEY:

Q       What did Andy say?

A       Andy says:

                "Click on the blank space below, and

                you'll be able to exit."

Q       And the Defendant again sent a code that would be associated with that?

A       Yes.

Q       Was he paid that day?

A       He was.

Q       Do you have any evidence that the Defendant visited that link that was listed earlier in the chat that day?

A       Yes, I do.

Q       And where was that evidence found?

A       Again, when we searched the Defendant's phone, we were able to see some of his Safari Web Browsing history, and we could see that he visited that URL.

Q       And this on January 12th of 2023, when this chat is happening?

A       That's right.

Q       And is there anything else of significance happening in the case on the 12th?

II-261

A    Yes.  On January 12, 2023, we were able to covertly take that image of the Defendant's phone while he was working aboard the ESSEX.

Q    this is the testimony we head earlier from Agent Frank about getting access to the Defendant's phone?

A    Yes, that's right.

Q    So, everything from beforehand came from that particular seizure on that date?

A    Yes.

Q    Okay.  Was the Defendant paid in January?

A    He was.

Q    Do you know how much?

A    I'd have to review the records to see.

        MR. PARMLEY:  Let's look at 31C, please.

BY MR. PARMLEY:

Q    Can you look at January and February, please.  How much was he paid in January?

A    In January, he received a $400 payment.

Q    And how about in February?

A    He received two -- two payments, each for $200.

        MR. PARMLEY:  Let's go to an audio clip from January of 2023.  It's Clip 61 -- sorry -- Government's Exhibit 61, and I believe it's -- Government's Exhibit is the translation.

        Can you play the first clip of that, please.

II-262

(Audio clip played.)

MR. PARMLEY:  Can you pause that for me.

BY MR. PARMLEY:

Q    What, in essence, is Andy Li asking the Defendant to do?

A    To travel to China.

Q    And who would pay his expenses?

A    Andy would.

Q    Okay.  What was the Defendant's response to that?

A    He was concerned about the reporting requirements that the U.S. military has when Sailors travel overseas.

MR. PARMLEY:  All right.  Thank you.  Please continue.

(Audio clip played.)

BY MR. PARMLEY:

Q    Agent Wetterer, why would an intelligence officer want to meet with one of his sources in person?

A    This is just kind of another step in their recruitment cycle that we normally see.  I think that an in-person meeting between a source and his or her handler would allow them to talk completely offline.  There's no chance that anyone would be able to recreate that conversation.

It would also allow them to sort of advance that relationship.  And we see this pattern in a lot of recruitments, particularly with the PRC intelligence officers where you kind of start in that online more overt space and

II-263

gradually progress to more covert methods of communicating, and that can include in-person meetings.

Q    And Mr. Li offered to pay all of this expenses to come out?

A    He did.

MR. PARMLEY:  Okay.  Let's go to the next clip, please.

(Audio clip played.)

BY MR. PARMLEY:

Q    He's asking the Defendant to pursue a college degree?

A    Yes.

MR. PARMLEY:  Can you go to the next clip, please.

(Audio clip played.)

BY MR. PARMLEY:

Q    Defendant responds that he's considering it at least?

A    Yes.

Q    Would that -- your understanding, would that help him in promotion?

A    Yes.  That's what he says.

MR. PARMLEY:  Okay.  The next clip, please.

(Video clip played.)

BY MR. PARMLEY:

Q    Is this a further discussion of the Defendant's potential path to promotion?

A    Yes, that's right.

II-264

Q     Why would Andy Li, an intelligence officer, want the Defendant to go to college and promote through the Navy?

MR. JONES:  Objection.  Speculation.

THE COURT:  Sustained.

BY MR. PARMLEY:

Q     In your experience, do -- based on your experiences with counterintelligence officers having spoken to people who have recruited Chinese -- excuse me -- people who have been recruited by the Chinese intelligence service, would there be any advantage, in your opinion, to asking somebody to promote quickly or gain further education in a military career as far as the intelligence service officer's perspective?

A     Yes.  So, obviously, when you promote in the military, you're given more responsibility, and you're also given access to more sensitive information that would likely be more valuable to an intelligence officer.

So, we see intelligence officers encouraging their sources to get access to more information that they're interested in, and I think that's part of what we're seeing here.

MR. PARMLEY:  All right.  Let's go forward a month or -- a few weeks to another room audio.  This is Government's Exhibit 62, another intercepted communication between Defendant and Andy Li.  This is Government's Exhibit 62, and the translation is Government's Exhibit 127.  We're going to

II-265

play one clip at first.  It's a couple of minutes long.

BY MR. PARMLEY:

Q     Did they have a discussion about problems with the U SS BOXER?

A     They do.

        MR. PARMLEY:  Okay.  Let's listen to that.

     (Audio clip played.)

BY MR. PARMLEY:

Q     So, if I understood that exchange correctly, Defendant gave a detailed explanation as to why a U.S. Navy ship was out of commission?

A     Yes.

Q     They reference the number four.  Do you know what that was referencing?

A     I believe that's that designation that we talked about before, LHD--4.

Q     And what's the LHD-4?

A     The USS BOXER.

Q     Is that -- where is that home ported?

A     At San Diego.

        MR. PARMLEY:  Let's play the next clip, please.

     (Audio clip played.)

BY MR. PARMLEY:

Q     Defendant essentially says if the ships don't work, we can't transport Marines, correct?

II-266

A    Yes, that's right.

MR. PARMLEY:  Can we go to the next clip?

BY MR. PARMLEY:

Q    Is there a discussion about a rocket launcher on the flight deck?

A    Yes.

MR. PARMLEY:  Okay.  Let's play that.

(Audio clip played.)

BY MR. PARMLEY:

Q    And after the -- I'm sorry.  After the Defendant mentions about this rocket launcher being on the flight deck and out of commission, what did Andy Li ask for?

A    He asked the Defendant to write -- write something about all the changes and updates being made to the ship.

MR. PARMLEY:  Okay.  Let's go to the next clip. the file is a little bit shorter.

(Audio clip played.)

BY MR. PARMLEY:

Q    Is there further discussion of promotion here?

A    Yes.

Q    Does that have the same significance as to what you testified earlier?

A    Yes.

Q    There's a mention of going to Virginia.  Do you have any concept of what that means?

II-267

A     Well, there are other U.S. Navy bases in Virginia that house different U.S. Navy units.  And, so, that -- I believe that's what they were discussing, would be the Defendant attempting to get assigned to those spaces.

Q     And Andy Li asked him to stay in the Navy, didn't he?

A     Yes.

Q     And the Defendant, what did he say about what type of duty he wanted?

A     He did not want to have shore duty.  He wanted to be on a ship out at sea.

          MR. PARMLEY:  Okay.  Let's go to the next clip, please.

          (Audio clip played.)

BY MR. PARMLEY:

Q     More discussion of promotions, is that correct?

A     Yes.

Q     On that same day as that audio clip that phone call was recorded, was there also a text message after with the Defendant's mother?

A     There was, yes.

Q     Where did that come from?

A     That came from a search of the Defendant's iCloud and also the search of the Defendant's phone.

Q     And the translation of that has been previously admitted as Government's Exhibit 131?

II-268

A      Yes, that's right.

Q      The participants in that --

MR. PARMLEY:  Could you put up 131, please.  Just zoom in on the top third, please.

BY MR. PARMLEY:

Q      This is labeled "Ming Wei and Wei on the side, is that correct?

A      Yes.

Q      And what does this depict?  What does this exhibit depict?

A      So, this is a transaction of an iMessage conversation between the Defendant.  He is labeled as Wei in this chat, and his mother, who's name is Mingli Wei, and she's listed an Mingli there.

Q      How do you know that it's his mother on the other side of the chat?

A      I know because the number that he's communicating with during this chat was saved as Mom, and also the phone number associated with that contact card was listed in the Defendant's military paperwork as being the phone number for Mingli Wei, his mother.

Q      If you don't mind, we're going to review this.  It's basically a one-page compilation of that text exchange, is that right?

A      That's right.

II-269

Q    Let's just review that.  Could you read first what the Defendant's mother said to him on that day?

A    Sure.  So, he says:

        "Sent you $1,000 for your hard work.
        Received it -- let me know if you
        received it."

Q    And how did the Defendant respond?

A    He said "No need."

Q    And what did the Defendant's mother say?

A    She said:

        "I've already sent it via Zelle.  Check
        it so it won't disappear.

Q    Can you please continue.

A    Received.  And then the Defendant says:

        "How come you have money now?"

Q    And what did his mother say?

A    She says:

        "No worries.  I don't have money, but
        mine is worst to.  You're far -- you're
        away from home.  So, you need some money.
        I can afford to send you $1,000.

Q    And how does the Defendant respond to this gift of $1,000?

A    He says that he's got enough money.  So, there's no need for her to send it to him.

II-270

Q    Can you continue the conversation, please.

A    Sure.  His mother says:

         "Okay, baby.  Did you send it back?"

     And the Defendant says:

         "Sent it back or I may have delusion

         about the amount of money I have."

Q    And how does the Defendant's mother respond?

A    She says:

         "Okay.  My child is becoming so mature.

         How much money do you have now?"

Q    And he says what?

A    "I have $10,000."

Q    Can you go to the next part of the chat, please.  Did you --

         MR. PARMLEY:  Actually, could we zoom in a little bit bigger, just do the second third, please.  Thank you.

BY MR. PARMLEY:

Q    Can you continue?  He says "I have $10,000", and ho did she respond?

A    She says, "You're pretty rich.  Plus in your car, that's paid in full."

Q    Can we go down a couple of entries to where the Defendant talks about working for somebody, and you met the Chinese lady?

A    Yes.  The Defendant?  Oh, I'm sorry.

II-271

Q     Yeah, please read that, please.

A     The Defendant says:

          "Do you remember I once mentioned that I

          was in contact with a person who worked

          for the Chinese Navy?"

Q     And how does the Defendants mother respond?

A     She says:

          "Yes, I remember.  Why?  Got caught?"

Q     She asked that question?

A     Yes.

Q     And what does the Defendant say?

A     He says?:

          "$7,700 of my $10,000 was sent by him.

          No."

Q     She asks?

A     She asks the Defendant:

          "Why did he give you money?"

      And then she says:

          "You are considered an insider for him."

          MR. PARMLEY:  Can you zoom in the last portion of it, starting toward the end.

BY MR. PARMLEY:

Q     And how does the Defendant respond to that?

A     He says:

          "Of course, it's leaking secrets, but my

II-272

work is not the secret kind."

Q    Could you continue, please.

A    The Defendant's mother says, "Oh, not a big deal," and the Defendant responds:

"But I like to learn.  So, he can inquire about some stuff on the ship for me -- from me.  I'm not fond of the U.S. Navy anyway."

His mother says:

"That's okay.  Your ship ips so outdated. No big impact."

And the Defendant responds:

"The quality of life of different professions varies so much, but it's the company's money that he embezzles, not his own money."

Q    And how does his mother respond to that?

A    She says:

"One day, when you work your way up to become an officer, he'll be so proud to have a friend like you."

Q    And what did she say after that?

A    She says:

"Then it would be research, find widget."

Q    And how does the Defendant respond -- how does the

II-273

Defendant describe Andy Li?

A    The Defendant says he's probably a Cadra or something like that, doing research work at a state owned enterprise affiliated with the Navy.

Q    Okay.  Please continue.

A    Yes.  The Defendant's mother says:

          "You are doing quite well, making money
          by writing stuff, exactly the same as
          what I did in China in the past.  I
          thought so too."

Q    And how did the Defendant respond to that?

A    He says:

          "I didn't ask for any details, but he
          lives in Shanghai and converses like
          someone well educated.  Should be a
          public official.

Q    So, that's what he told his mother in this iMessage?

A    Yes.

Q    That was on February 5th?

A    It was.

Q    Let's go about a month later to March 4th.  Is there another room audio from that date?

A    Yes.  Our microphone in the Defendant's apartment captured another phone call between the Defendant and Andy.

II-274

MR. PARMLEY:  I want play one short clip from that. It's Government's Exhibit 63.  The translation's at 128.

(Audio clip played.)

BY MR. PARMLEY:

Q    This is a further discussion about pay, ma'am?

A    Yes.  He's talking about increasing the amount of those monthly payments.

MR. PARMLEY:  Okay.  Let's go to the next room audio from March 19th.  And by the room audio, that's previously admitted as Government's Exhibit 64.  The translation's at 129.

Could we play -- we're going to play two clips from this.  Can we play the first clip?  It's about a minute long.

(Audio clip played.)

BY MR. PARMLEY:

Q    It's a discussion about what types of things he could write about, is that correct?

A    Yes.

MR. PARMLEY:  Let's play one more clip from that, a shorter clip.  Clip two, please.

(Audio clip played.)

BY MR. PARMLEY:

Q    Mr. Li says he added 100.  Do you know what that means?

A    I think he's referring to adding $100 to that monthly maintenance payment.

II-275

Q    Any of the phone calls that were captured between the Defendant and Andy Li, was there ever any hesitation on the Defendant's part to cooperate with Andy Li?

A    I'm sorry.  Could you repeat the question?

Q    Sure.  On any of those calls that you listened to or viewed the translations of from calls intercepted from his apartment, was there ever any indication that the Defendant was hesitant to cooperate and assist Andy Li?

A    No, there was not.

Q    Okay.  Let's go back to 31C, which is the PayPal accounts.  Was he paid money in March?

A    He was.

Q    And how much money was he paid in March?

A    He was paid $300.

Q    Was the receipt for that found in his house?

A    Yes.

         MR. PARMLEY:  Can we show 104E, please.  Zoom in on the top.

BY MR. PARMLEY:

Q    Is that the receipt you were referencing?

A    Yes.

Q    Could you just read that for me please?

A    Sure.  It says

         "Received $300 in March for report.

         Signed Patrick Wei March 27th, '23."

II-276

Q    Can we go back to 31C, please.  Let's talk about payments in April and June

     Were there more payments in April and June?

A    Yes.

Q    What was the payments he received in April?

A    In April, he received another $300 payment.

Q    And how about in June?

A    And June 7th, 2023, he received a $1300 payment.

Q    Was a receipt found for that payment?

A    Yes.

Q    Was that found in a notebook at his house?

A    Yes.

Q    Let's look at 104 and -- 104F and 104G.  So, looking at 1074F, if you look at the top of that first, what does that show?

A    It looks like a crossed-out line that says "Received $1300 for a report in June".

Q    Okay.  What about 104G?

     (Pause.)

A    This says received $1300 for the report in May dated 6 June 2023 and signed Patrick Wei.

Q    Do you know what specifically that $1300 was for that that report was?

A    I don't.

Q    Why not?

II-277

Q    Because we did not capture the communications between the Defendant and Andy that -- where they spoke about what that report was.

Q    Going back to 124C -- sorry -- 31C, Excuse me, was money paid in July?

A    It was.

Q    Three hundred dollars"

A    Yes.

Q    Did you recover some additional Telegram chats from the Defendant's phone when he was arrested?

A    I did.

Q    So, that was the second search of his phone?

A    It was.

Q    Before -- do you have any Telegram chats between January 23rd of 2023 and July 27th of 2023?

A    I don't believe so.

Q    Tell me about them?

A    So, when we searched the Defendant's phone at the time of the arrest, the Telegram messages that we had seen from the first phone image were Gone.  They had been deleted.  And we can actually -- essentially, what we did see is about a week's worth of communications on Telegram between the Defendant and Andy Li that week before his arrest.  And he is instructed to delete his -- his chat history.

Q    Did you find a few other chats in July?

II-278

A    We did.  So, we found about a week's worth of chats back and forth between the Defendant, and we see that instruction to delete the messages.  So, we looked at the phone image and tried to find to see if we could recover some of his deleted messages, and we were able to recover about a month's worth of chats, only from Andy to the Defendant that had been deleted. We weren't able to recover any of the Defendant's responses.

Q    Okay.  So, let's look at a couple of those.  Let's go to 120.58, please.

Is this one of those indications where it's all you have is one side of the conversation?

A    Yes, that's right.

Q    And what does Andy say that he's going to do?

A    Andy says he already transferred $300 by PayPal Friends and Family.  He asked the Defendant to check his account and send a receipt once you've received it.  "I will send you a link later for the receipt.  You can send it after you've finished your shift.  There's no rush.  Remember to buy the cell phone and the computer this month.  I will send you more money.  Starting next month, I will add $20 to $30 each month for you to buy Red Bull.

Q    So, we -- I mean, we've heard -- I don't now how many we've read -- dozens of messages of Telegram between February 2022 to approximately January of 2023, correct?

A    Yes.

II-279

Q    And, so, when we're looking at this, this is really the first pertinent message that you're getting since the -- since the phone was searched the second time?

A    Yes.  We just didn't recover any additional Telegram chats from the image of his phone.

Q    And it looks like there was as request.  Do you see that request?  What is he saying, remember to buy what?

A    The cell phone in the computer this month.

Q    You recall Agent Reed's testimony, correct?

A    I do.

Q    Was there a computer found in his apartment?

A    We seized two computes from the Defendant's apartment.

Q    And what were those two computers?

A    One -- one is a MacBook, and one was an Asus laptop.

Q    Did you also find a different phone?

A    We also found a Samsung phone at his apartment.

Q    No, this is iPhone user I see.

A    It was with him when he arrested him.

Q    Okay.  So, this was his second phone at his family's apartment?

A    Yes.

Q    Did you evidence that the Defendant got reimbursed for those?

A    I did.

Q    What's the advantage of getting one of your sources a

II-280

totally different computer and a totally different cell phone?

A    It's just another way to conceal the nature of that relationship.  If you had a different phone that's  not connected to any of your true information, it is very hard for any law enforcement agencies or any other people figure that out.  It would be completely separate.  It would be a way for you to write things and transmit things with a layer of security and anonymity between you at your true identity and your relationship with an intelligence officer.,

Q    All right.  We're gong to show that receipt in a bit, but let's go to a  chat from a few days later from July 14th.

        Can you pull that up?

A    This is another example of what looks like  one-sided chat

A    Yes.

Q    What does Andy Li say?

A    He says "Received".

Q    I'm going to stop you though.  Do you have any idea what he received?

A    No.

Q    Okay.  And keep going.

Q    He says, "Clear our chat history on your end promptly." And then he says "Sounds good."  My thinking is that you could use this card to end things now, and it would make this easy when you're out and about  No need for WiFi.  I could send you

II-281

money for the phone bell every three months.

As for deleting massages, I'm not sue if you're supposed to make multiple selections in this chat box and then delete only yours or go back to chats with all of your contacts and delete mine directly without my end being affected,.

Q    Regardless, you didn't find any of the Defendant's chats, correct?

A    We did not find the Defendant's responses to these chats, no.

Q    During that time frame, the Defendant's phone calls were being recorded by court order.  Is that correct

A    Yes.

Q    Was there a call captured?

A    There was.

Q    A person calling.  Who's the -- who's the -- who's the person the Defendant was speaking with?

A    The Defendant was speaking on the phone with his mother.

Q    Was that on July 15th of 2023?

A    Yes.

Q    Has that been previously known as Exhibit 770 with a translation and Government's Exhibit 1307?

Yes, that's right.

MR. PARMLEY:  Okay.  Could we play the first -- I'm going to play a few clips from that call.  Let's play the

II-282

first clip.

        (Audio clip played.)

BY MR. PARMLEY:

Q     She asked if he was still in contact with the person in China?

A     She did.

Q     And they discussed that computer and cell phone that was purchased for him?

A     Yes.

Q     She admonished him not to get caught, correct?

A     She did.

        MR. PARMLEY:  Let's play the next clip, please. It's about a minute long.

        (Audio clip played.)

BY MR. PARMLEY:

Q     Is there a discussion about this temporary website, encrypted website used to send information?

A     Yes.

        MR. PARMLEY:  Could we play the next clip, please, clip three.

        (Audio clip played.)

BY MR. PARMLEY:

Q     Did they have a conversation about how he met Mr. Li?

A     Yes.

        MR. PARMLEY:  Can we play that clip, please.

II-283

(Audio clip played.)

BY MR. PARMLEY:

Q    He said that he got good money for the computer, is that right?

A    Yes.

MR. PARMLEY:  I think the next clip is what I mentioned (indiscernible).  Can you pull it up, please.

(Audio clip played.)

BY MR. PARMLEY:

Q    And that meeting was corroborated by your investigation, is that correct?

A    Yes.

MR. PARMLEY:  Now, let's play one last clip from this, clip 6, please.

(Audio clip plays.)

MR. PARMLEY:  All right.  Thank you.

BY MR. PARMLEY:

Q    Was there another one-sided chat on July 26th of 2023?

A    Yes.

MR. PARMLEY:  Could we show that, please, Government's Exhibit 120, page 60.

BY MR. PARMLEY:

Q    Again, we're only seeing one side of this conversation?

A    That's right.

Q    Could you just read the first section, please?

II-284

A     Sure.  Andy says:

            "I could send you a link right away.  How

            much is it all together.  I could

            transfer you the money today, and you

            could go ahead and send me the receipt

            later.  Please include a breakdown of te

            costs on your receipt, like the cost of

            the computer, the cost of the computer

            (sic), the cost of the SIM card and other

            items followed by the grand total.

Q     And then there's more -- another website IP address past
is that correct?

A     That's right.

Q     And after the IP is addressed, what does Mr. Li asked
him to do?

A     Andy says:

            "Delete the above chat history on your

            end promptly."

Q     And then there's no discussion of this payment?

A     Yes.

Q     No request for a receipt?

A     Yes.

Q     Was there a payment to the Defendant's PayPal account
around that time?

A     There was.

II-285

MR. PARMLEY:  Can we put up 31C again.

BY MR. PARMLEY:

Q     We looked at July 27th.  This is what, about a week before he was arrested?

A     Yes.

Q     Okay. What -- and what did he get in PayPal on July 26?

A     On July 26, he received $ 2377.59.

Q     And did you find any evidence of a receipt for that?

A     I did.

Q     Could you look at Government's Exhibit -- well, where did you find it?

A     We found this, again, in the notebook that we found when we searched the Defendant's apartment.

Q     Did you see it on a Telegram chat like you'd seen all these other previous receipts?

Q     No, we didn't see it on the Telegram chat.

Q     Because you didn't have his side?

A     Right.

Q     Okay.  Can we show 104H, please.  Was that found in his apartment?

A     Yes.

Q     It's the first entry?

A     It says ASUS, and then it looks like --

Q     Do I need to show -- what is Galaxy?  Do you now what Galaxy references?

II-286

A     That's a Galaxy, a Samsung Galaxy cell phone.

Q     And he asks, so, it looks like he purchased some anti-reflective gas and maybe some kind of case, is that right?

A     That's right.

Q     He said a total is due for $2377.50, is that right?

A     Yes.

Q     And that's -- is that how much he was paid?

A     Yes.

Q     Was there ever a discussion about a pay increase a few days before he was arrested on July 30th of 2023?

A     Yes.

          MR. PARMLEY:  Can we go to 120.61, please.  Can you zoom in on that.

BY MR. PARMLEY:

Q     Do we have both sides of this chat?

A     We did.

Q     And why is that?

A     For whatever reason, they were able to obtain both sides of the conversation for about a week prior to his arrest.  I'm not sure if that's because the Defendant hadn't deleted those messages yet or whether there was some sort of auto delete that hadn't happened yet but these messages were on his phone.

Q     Okay.  What does Mr. Li say in third entry down?

A     He say=s:

II-287

"All right.  I'll give you $339 a month from now no, $30 for energy drinks and $9 for the cell phone.  For what it's worth, I like the numbers 3 and 9."

Q    And looking at that first entry, could you read that first entry?

A    Sure.  Andy says:

"How much do you pay a month for that card not in you real name?  I need to include it for you."

Q    What is -- what is he talking about when he says card not in your name or not in your real name?

A    I -- I'm not -- I don't know for sure, but I think that he is referring to the cell phone plan that he would have set up not in his true name.

Q    For the new phone?

A    Yes.

Q    For the Samsung?

A    Yes.

Q    So, it was about two days before his arrest at this point?

A    That's right.

Q    Okay.  So, let's go to August 1st and August 2nd.  Were the discussions about changing how they communicated?

A    Yes.

II-288

MR. PARMLEY:  Okay.  Can you pull up August 1st, please.

BY MR. PARMLEY:

Q     Can you read that for me?

A     Yes.  Andy says:

          "Register for another Telegram with your
          newly purchased cell phone and SIM card.
          Going forward, I'll talk to you over
          there when things come up."

Q     And does the Defendant agree to do that?

A     Yes.

Q     And then there's -- is there further discussion of payment?

A     Yes.

Q     Can you just read that, please?

A     Andy says:

          "By the way, I may give you July's fees
          in the next few days.  I can also give it
          to you all together month if it turns out
          to be too much trouble.  Also, I probably
          won't be able to provide you the link
          until tomorrow.  Let me look at your
          material.  If it's good, I'll pay you
          extra next month.

Q     Do you have any idea if there's anything past then or

II-289

what it was?

A    I don't know specifically.  I know that we -- when we searched the Defendant's apartment and when we searched his hard drive, we found other papers that were written in Chinese, but I don't know what he sent to Andy.

Q    Okay.  What would a new Telegram account accomplish combined with a new cell phone and a new SIM card?

A    Just another way of security and another way of anonymity.

Q    Okay.  Let's go to the day of his arrest, August 2nd.

        MR. PARMLEY:  Can you pull up the chat on that date.

BY MR. PARMLEY:

Q    Is there another link to a temporary website sent?

A    Yes.

Q    What does Mr. Wei say?

A    The Defendant says:

        "I'm sending via this link this time

        around.  Then going forward I will send

        from the Telegram account I registered

        using my Samsung cell phone."

Q    In other words, he's switching methods of communication?

A    Yes.

Q    And the Defendant provides a code again?

A    He does.

II-290

Q    And then does Andy again at the bottom discuss payment?

A    He does.

Q    And what does he say?

A    He says:

        "Go take a look.  I transferred 339
        bucks.  Send me your receipt when you
        have a moment.  Then delete all of the
        above chat history.  I'll get in touch
        via your new account."

Q    And was he paid on that day, the day his arrest?

A    Right.  He was paid on the day of his arrest, yes.

        MR. PARMLEY:  Can you pull that up on Government's Exhibit 31C, please.

BY MR. PARMLEY:

Q    And how much was he paid on August 2nd?L

A    Three hundred and thirty-nine dollars.

Q    To your knowledge, from the PayPal transactions, how much was the Defendant paid over the course of the investigation?

A    Twelve thousand eight hundred and sixteen dollars and 59 cents.

Q    Let's talk about the arrest now.  My throat's a little dry.  Give me a moment.

        Were you involved -- let's talk about -- was that on August 2nd of 2023?

II-291

A      Yes, the Defendant was arrested on August 2nd, 2023.

Q      Were you involved in that?

A      I was.

Q      Can you tell me about that, please.

A      Sure.  We knew that the Defendant had to report to work pretty early in the morning.  We knew his work schedule based on our communications with his supervisors and his management.  And then we wanted to -- we -- our plan, along with our NCIS co-case agent was to arrest him outside of work when he was about to walk into the security gates of that BAE Shipyards.

Q      That's what I was going to ask, where was work at the time?

A      Yeah.  So, he was still working on the USS ESSEX, which was at BAE Shipyards in dry docks.

Q      So, that was your plan.  So, what happened?

A      So, that's what happened.  So, on the morning of August 2nd, myself, Special Agent Rebekah Frank and NCIS Special Agent Chris Christian waited for the Defendant to exit a bus that brought him to right outside of the BAE Shipyards.  We saw him get off the bus.  We approached him, identified ourselves and placed him under arrest.

Q      Was he cooperative?

A      Yes.

Q      And what did you do next?

A      We transported him to NCIS offices on Naval Base, San

II-292

Diego.

Q    So, approximately how far from where you arrested him?

A    I think it was pretty close.  It was less than a 10-minute drive.

Q    What did you do next?

A    Next we placed Mr. Wei into a room.  We got him something to drink.  I think we got him some food, and then we went to talk to him.

Q    And did you -- prior to that, did you observe somebody search the Defendant?

A    I did.

Q    And was his cell phone taken from him at that time?

A    Yes.

Q    And that's been previously admitted as Government's Exhibit 51?

A    That's right.

Q    And then you searched that again?

A    Yes.

Q    Okay.  And that's what's been previously admitted as Government's Exhibit 53?

A    That's right.

Q    Okay.  And was there something happening that day simultaneously with his arrest?

A    Yes.  So, once we arrested the Defendant, a team of FBI agents and NCIS agents went to the Defendant's apartment to

II-293

execute that search warrant that we had talked about.

Q    And we heard about that testimony today?

A    Yes.

Q    Okay.  But you were not present for that?

A    No, I was not.

Q    Did you immediately after you -- you said you gave him some food.  So, about -- approximately how long until you began interviewing him, from the time you arrested him?

A    I can't specifically recall, but it was probably an hour or so, an hour or two.

Q    You arrested him about what time?

A    About 6 a.m.

Q    And do you recall about what time you started the interview?

A    I think we started interviewing him around 8.

Q    Okay.  Was that video -- was that -- was that --

        THE COURT:  A.m.

        THE WITNESS:  A.m., yes.

        MR. PARMLEY:  Thank you, your Honor.

BY MR. PARMLEY:

Q    Was that interview recorded?

A    It was.

        MR. PARMLEY:  May I approach, your Honor?

        THE COURT:  You may.

//

II-294

BY MR. PARMLEY:

Q    Let me show you what's been previously marked for identification Government's Exhibit 190.  Do you know what that is?

A    I do.

Q    What's that?

A    This is a copy of the interview recording.

Q    And how do you know?

A    I know that because I reviewed this thumb drive.  My initials are on it, and it's a copy of the recording.

Q    You had an opportunity to review it?

A    I did.

Q    IS that a fair and accurate description of what happened on the events of that day in this interview?

A    Yes.

          MR. PARMLEY:  I'd move to admit 190, please.

          THE COURT:  Any objection?

          MR. JONES:  No objection.

          THE COURT:  It's received.

BY MR. PARMLEY:

Q    And, for the record, 190A is a -- is a transcript of that?

A    Yes.

          MR. PARMLEY:  And that's not going to be admitted into evidence but will -- will be played simultaneously for

II-295

aiding the jury.

Let's start playing the video.  Let's start with Club Zero.  I don't know why it's called Club Zero, but let's start with that.

(Video played.)

MR. PARMLEY:  Could you pause it, please.

BY MR. PARMLEY:

Q    Can you just tell me what I'm looking at first?

A    Sure.  So, you can see that's me on the right and the Defendant on the left.  So, there's one camera image of the Defendant from the side, and then kind of in that upper right-hand corner, you can see sort of a bird's-eye view.  I'm in the middle in a gray hoody.  The Defendant is in a black T-shirt, and Agent Christian is in the foreground, also kind of wearing gray.

Q    So, two cameras capturing the same image?

A    Yes.

Q    Just from different angles?

A    That's right.

Q    It says August 2nd, but it also says 3:56 p.m.  Is that accurate?

A    No, it's not.

Q    Do you know why?

A    No.  The camera that recorded it, the -- the timestamp was wrong.

II-296

Q    Okay.  So, what time do you believe this began?

A    I believe this was right around 8 a.m.

Q    There's a water bottle on the table.  Where did that come from?

A    Either myself or Special Agent Christian provided the water bottle to the Defendant.

Q    Approximately how long did you speak with the Defendant?

A    So, we spoke to him -- probably the full time that we were speaking to him was a couple of hours I would say over the course of the day, but we took breaks throughout the time that we talked to him.  So, he was there for a longer period of time.

Q    What was the purpose of taking breaks?

A    We wanted to make sure that -- first of all, that we just, you know, gave him breaks.  We wanted to make sure that we had an opportunity to speak with the agents no the search team to kind of, you know, get a status and -- and make sure that we asked him all the questions that we wanted to ask him.

Q    Okay.  Did you read him his Miranda rights, and did he agree to give a statement?

A    Yes.

        MR. PARMLEY:  Okay.  Let's watch that clip.  Let's play Club Zero, please.

     (Video played.)

//

II-297

BY MR. PARMLEY:

Q    So, you did mention the time it sounds like on this?

A    Yes.

Q    Okay.  About 8 o'clock?

A    That's right.

Q    And then what happened next?

A    We began to speak to the Defendant

Q    Did you ask him some biographical questions first?

A    Yeah.

Q    Did that include a question about a citizenship and security level of the U.S. Navy?

A    Yes, it did.

MR. PARMLEY:  Let's play clip one.  It's very short.

(Video clip played.)

BY MR. PARMLEY:

Q    So, additional biographical information was collected at that time?

A    Yes, that's right.

Q    Did you tell him why he had been arrested?

A    No, I did not.

Q    Why not?

A    Because one of the goals of the interview was to learn from the Defendant what had happened.  And, so, I wanted to know his impressions and his -- his -- what he thought and his

II-298

explanation of what happened rather than me telling him information and then him tailoring an answer to what he thinks that I already know.

Q    So, what did you just ask him, Why do you think you're here?

A    Yes.

Q    And did he give some answers to that?

A    He did.

Q    Can you briefly summarize what he said?

A    He gave various answers.  I think he said that he might have taken like a -- a wrench home from work.  He talked about some interactions that he had with a girl on the Internet, and then he said he -- hue basically didn't know why he was here.

Q    So, nothing of any consequence?

A    No.

Q    Okay.  What did you ask him about next?  Did you ask him about speaking to anybody in China?

A    Yes.  We started asking him about his foreign contacts.

Q    And what did he say?

A    He listed I think a friend from high school that was still in China and potentially some family members that he was no longer in touch with.

Q    And did you ask him at that point if those were the only people in China that he was speaking with?

A    Yes.

II-299

Q    Okay.  Did he respond?

A    He did.

          MR. PARMLEY:  Let's play that clip.  Clip 3, please.

     (Video clip played.)

BY MR. PARMLEY:

Q    And did you confront him with that?

A    I'm sorry?

Q    Did you confront him with that answer?

A    Yes.

          MR. PARMLEY:  Let's play Clip 4, please.

     (Video clip played.)

BY MR. PARMLEY:

Q    He said that he gave you all the people he spoke to?

A    Yes.

Q    Did he ever volunteer the name Andy?

A    No.

Q    Did he ever volunteer that he was speaking extensively with somebody named Andy?

A    He did not.

Q    Did he ever volunteer that he'd been paid by somebody named Andy?

A    No.

Q    Did you finally confront him with the name Andy?

A    Yes, I did.

II-300

MR. PARMLEY:  Let's watch that please.  It's a longer clip.  It's about five minutes.  Clip 5, please.

(Video clip played.)

BY MR. PARMLEY:

Q     So, he told you, "We talk a little bit"?

A     Yes.

Q     He said, We talked about the quality of the food?

A     Yes.

Q     He said he didn't anything too specific?

A     Yes.

Q     Did he ever volunteer that Andy had paid him multiple times?

A     No.

Q     Did he ever volunteer that he had written the ports for him?

A     No.

Q     Did he ever volunteer that he'd sent him thousands of pages of documents?

A     No.

Q     "Did he ever tell you that he'd sent him photographs or videos?

A     No.

Q     Did he ever volunteer to you that he had talked about the -- the health of the ship he was on and other ships?

A     No.

II-301

Q     Were you satisfied with the explanation you'd been given?

A     I was not.

Q     Did you confront him again?

A     I did.

        MR. PARMLEY:  Okay.  Let's play the next clip, please.

        (Video clip played.)

BY MR. PARMLEY:

Q     And then the same types of answers?

A     Yes.

Q     Did you ask him again?

A     I did.

        MR. PARMLEY:  Okay.  Keep going, please.  Play Clip 7.

        (Video clip continues.)

BY MR. PARMLEY:

Q     Again, he's asked why he was in trouble for just talking to Andy?

A     Yes.

Q     And he just said that he was sending him daily stuff?

A     Yes.

Q      Did he volunteer at that point that he'd sent technical manuals to Andy?

A     He did not.

II-302

Q     Important papers for Andy?

A     No.

Q     Sent Andy photos and video?

A     No.

Q     Received more than $12,000 from him?

A     No.

Q     You said he was texting.  Did you ask him more details about they communicated and what they talked about?

A     Yes, we did.

        MR. PARMLEY:  Okay.  Let's play the next clip, Clip 8, please.

        (Video clip played.)

BY MR. PARMLEY:

Q     When you mentioned how he spoke with Andy, and then he said that he was texting with him, correct?

A     Yes, that's right.

Q     Did he ever mention that they spoke to each using an encrypted application as a phone?

A     He did not at that point, no.

        MR. PARMLEY:  Let's play the next clip, Clip 9, please.

        (Video clip played.)

BY MR. PARMLEY:

Q     When he was discussing computers and cell  phones, did he volunteer the new computer and cell pone that had just been

II-303

paid for by Andy that were discovered in his room when he --
at the time of his arrest?

A    No, he did not.

Q    After he couldn't explain why somebody in China would
care about his computer speed, did you confront him again?

A    Yes.

        MR. PARMLEY:  Let's play Clip 190.  this is a
longer clip.  It's about 11 minutes.

        (Video clip played.)

BY MR. PARMLEY:

Q    He mentioned he only sent things through Telegram, Chat.
Do you have any evidence that he ever sent any manuals through
a Telegram chat or a WeChat chat?

A    No.  I didn't see that in my review of the evidence.

Q    Did he volunteer at that point that he'd been paying
through some kind of encrypted website, requiring a person to
enter a code that later disappeared?

A    He did not volunteer that that's how he passed
information.

        MR. PARMLEY:  All right.  Can you keep playing it,
please.

        (Video clip continues.)

BY MR. PARMLEY:

Q    Agent Wetterer, let me ask you this question. Before he
launched into that explanation, why didn't you just tell him

II-304

you even received -- sent many manuals and had been paid money, correct?

A    Yes.

Q    Why didn't you just tell him that?

A    Because I didn't know the full extent of what he had sent, and I wanted him to tell me what he had sent.  You know, I think one of the things that we were trying to figure out is the full extent of what he passed so that we could do a kind of damage assessment and we could figure out, you know, what he had sent explicitly.  And I think that had I confronted him with specific manuals off the at, then he might have only talked about the manuals that he knew that I knew about rather than volunteering the full extent of what he had passed.

Q    Is it true that you still don't have a full understanding?

A    That's true.

Q    Is it fair to say that during the course of this conversation, the Defendant only volunteered information after he was being confronted with specifics?

A    Yes, I think that's fair.

Q    He mentioned MTS subchapters.  Do you know what those are?

A    I do.

Q    What are those?

A    They -- it stands for Naval Ship Technical Manuals, and

II-305

they are technical manuals that talk about the different systems aboard certain classes of Navy ships and how they operate and how to maintain them.

Q    He then -- he then suggested that he only sent things that were publicly available online, correct?

A    Yes.

Q    And then he said they were sensitive but not -- nothing sensitive or classified?

A    That's right.

Q    And did you search for some of these manuals online to see if you could find them?

A    I did.

Q    And what did you find?

A    I searched all of the main ones that I thought he had passed to see if I could find them online, and I could find some of them online.

Q    Approximately how many?

A    I would say about -- I know at least 20'ish, around 20'ish of the manuals.

Q    And, so, 40'ish or more of it you could not find?

A    Yes.

Q    Okay.  And his explanation as to why he was sending publicly available information to the Defendant was what?

A    I don't think he did explain why he was sending publicly available information.

II-306

Q    Did he admit at that point that he had been paid?

A    No.

Q    Did he ever mention sending the Propulsion Guide?

A    He did not.

Q    Did he ever mention sending the Weapons Control System data?

A    No, he did not.

Q    Did he mention sending any photographs and videos?

A    No.

Q    He said that he only sent things related to engineering, didn't he?

A    Yes.

Q    Did he ever mention the Weapons Control Manual was only available in Surface Warfare Officers' file on the share drive of the ship?

A    He did not.

Q    Then you asked him how he sent the manuals, correct?

A    Yes.

        MR. PARMLEY:  Okay.  Can you play the next clip.

        (Video clip played.)

BY MR. PARMLEY:

Q    And he talks about that website that he'd previously discussed, is that correct?

A    Yes that's right.

Q    And then did you ask him -- at some  point, did you ask

II-307

him what his understanding of who Andy was?

A    I did.

MR. PARMLEY:  Okay.  Let's play that clip, Clip 12, please.  And I have misspoke earlier when I said Clip 19.  I meant Clip 10.  We're now on Clip 12.

(Video clip played.)

BY MR. PARMLEY:

Q    He finally admits to being paid, correct?

A    Yes.

Q    Was that only after being asked?

A    Yes.

Q    And only after a pause?

A    Yes.

Q    He said that he didn't keep track of money?

A    That's what he said, yes.

Q    And that he's only sending him basic knowledge?

A    Yes.

Q    And he said that he first time he'd been paid is $300?

A    That's right.

Q    About a half a year earlier?

A    Yes.

Q    Was that true?

A    No.

Q    When was the first time he was paid?

A    He was first paid by Andy Li as a congratulations for

II-308

his naturalization.  The first time he received money for providing Andy with technical manuals was in June of 2022 where he received $5,000.

MR. PARMLEY:  Let's pull that out, Government's 31C, please.

BY MR. PARMLEY:

Q    Is that what you're referencing?

A    Yes.

Q    And that was via PayPal?

A    Yes.

Q    And when was the first time you had evidence that they spoke?

A    February of 2022.

Q    So, within four months that they began speaking, he'd been paid $5,000?

A    That's right.

Q    He didn't mention that, did he?

A    No.

Q    Did you continue to ask him about what he had sent?

A    Yes, I did.

MR. PARMLEY:  Okay.  Let's play Clip 13, please.

(Video clip played.)

BY MR. PARMLEY:

Q    So, at that point he admitted to you that he had sent unclassified and yet sensitive materials, is that right?

II-309

A       That's right.

Q       And when you asked him if he had sent anything else, what did he say?

A       He -- he kept referencing the technical manuals.

Q       He said he hadn't sent anything else?

A       Yes.

Q       Did he eventually admit to writing something, but was that only after you confronted him?

A       That's right.

Q       And you asked him -- did you ask him how he sent the manual and -- and how he was paid?

A       Yes.

        MR. PARMLEY:  Okay.  Let's play that clip, Clip 190, please.  14, I'm sorry, Clip 14.

    (Video clip played.)

        MR. PARMLEY:  And can you play the next clip, Clip 15, please.

    (Video clip played.)

BY MR. PARMLEY:

Q       That first clip we just watched, you reference a paper that he had sent the previous day?

A       Yes.

Q       Do you know what that was?

A       I don't.

Q       You asked him what else he sent.  Did he ever volunteer

II-310

that he sent photos and videos?

A      No.

Q      But he did admit that he was being paid through PayPal, correct?

A      He did, yes.

Q      Did you ask him what he bought with that money?

A      I did.

MR. PARMLEY:  Let's play Clip 16.

(Video clip played.)

BY MR. PARMLEY:

Q      Did you discuss the cell phone and the computer?

A      Yes.

Q      You asked him if he was using the same Telegram to communicate with this new cell phone.  What did he say?

A      He said he was.

Q      And if that accurate?

A      Well, he hadn't started communicating with him yet.  As far as we could tell, he was still using Telegram no his personal cell phone.

Q      But he was asked to set up a new Telegram account, wasn't he?

A      That's right.

Q      And he was paying for a second cell phone plan out of his own pocket for a Samsung Phone to communicate with Andy Li?

II-311

A     That's what he said.

Q     And you know that a -- a phone and a laptop were found in his apartment, correct?

A     Yes, that's right.

Q     And that's Exhibits 100 and 101?

A     Yes.

Q     Did he ever mention the car that he purchased?

A     He did not.

Q     He didn't mention the $5,000 he paid to National City Auto to buy a car?

A     No.

Q     And then he said -- he started to inquire whether or not Andy Li was actually for the Government, didn't he?

A     Yes.

Q     Okay.  Did he ever admit that he had done something wrong?

A     Yes'ish, yes.

Q     Sort of?

A     Sort of.

        MR. PARMLEY:  Let's play Clip 17.

     (Video clip played.)

BY MR. PARMLEY:

Q     He's sure to characterize it as unclassified, wasn't he?

A     Yes.

Q     Did you ask him about his original -- original testimony

II-312

when we played this conversation with Rafael Chann this person that he contacted immediately after he was conducted by Andy Li on Tieba.  Did you ask him about that?

A     Yes.

Q     Okay.  Let's go to that.  You asked him about his comment to a friend that he was on the radar of a Chinese intelligence organization?

A     Yes, I did.

          MR. PARMLEY:  Okay.  Let's ask -- let's share that, Clip 18, please.

          (Video clip played.)

BY MR. PARMLEY:

Q     He said he was joking when he said that to his friend?

A     Yes.

Q     And shortly after this joke, he was in direct and frequent contact with Andy Li?

A     Yes.

Q     Would it be fair to characterize this interrogation or this interview as one step forward two steps back or two steps forward, two steps back?

A     Yes.  It was -- yes.

Q     And why would you say that?

A     Because I felt like every time we made a little progress and we got a little more honest about his activity, he would minimize the things that he had done and -- and the knowledge

II-313

of what he did.

Q     Okay.  Did you play him some audio that was taken from his WeChat?

A     I did.

Q     What was the purpose of playing him that audio?

A     I was hoping that by playing some of the evidence that we collected, it might help him at this point in the interview realize that now is an opportunity to be completely honest with agents about what happened.

Q     Were you also trying to confirm that it was his voice and Andy Li's voice on the clips?

A     Yes, that too.

        MR. PARMLEY:  Can we play Clips 19 and 20, please.

     (Video clips played.)

BY MR. PARMLEY:

Q     Did you confront him at that point again directly with the fact that he had been spying?

A     Yes.

Q     Did he answer?

A     He did.

        MR. PARMLEY:  Can we play Clip 21.

     (Video clip played.){

BY MR. PARMLEY:

Q     He said he felt like it was spying?

A     Yes.

II-314

Q    And then he said "I was joking around"?

A    Yes.

Q    But then he finally admitted again that he knew that Andy Li works for the government?

A    Yes.

MR. PARMLEY:  Your Honor, I've got about 15 more minutes with this witness or so.  Would this be a good time to conclude?

THE COURT:  Sure.

MR. PARMLEY:  Okay.  I appreciate that.

THE COURT:  Do you need to take a break?

MR. PARMLEY:  Yes.

THE COURT:  Okay.  We're going to be -- stop for the evening.  Let me just remind you about your conduct as jurors.  Keep an open mind throughout the trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must discuss this case based on -- only on the evidence received in the case and my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty.

Thus, until the end of the case or unless I tell you otherwise, do not communicate with anyone in any way, and

II-315

do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.  This restriction includes discussing the case in person, in writing, by phone, tablet or computer, or on any other means via email, via text messaging or any Internet chatroom, blog, website or application, including but not limited to Facebook, YouTube Twitter, Instagram, LinkedIn, Snapchat, TikTok or any other forms of social media.

This restriction also apples to communicating with your fellow jurors until I give you the case for deliberation and it applies to communicating with everybody else, including your family members, your employer, the media or press and the people involved in the trial, although you may notify your family and your employer that you have been seated as a juror in this case and how long you expect the trial to last.

But if you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter. In addition, report any contact to the Court.

Because you will receive all the evidence and legal instruction you properly may consider to return a verdict, do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it, although we don't know that there will be news reports about this case. And if there are, I'll provide you what I have at the end of

II-316

the case after your deliberations are finished.

Do not do any research such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation or in any other way try to learn about the case on your own.   Do not visit or view any place discussed in the case, and do not use the Internet or any other resource to search for or view any place or vessel or anything else discussed in the trial.

Do not do any research about this case, the law, or the people involved, including the parties, the witnesses or the lawyers until you have been excused as jurors.

If you happen to read or hear anything touching this case in the media, turn away and report it to me through my courtroom deputy as soon as possible.

These rules protect each party's right to have this case decided only on the evidence that has been presented here in court.

Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process.  If you do any research or investigation outside of the courtroom or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process.

Each of the parties is entitled to a fair trial by

II-317

an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial.

Remember, you have taken an oath to follow the rules, and it is important that you follow these rules. A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. And you don't want to do that.

If any juror is exposed to any outside information, please notify the Court immediately.

So, we'll see you tomorrow at 9 o'clock.

(Jury exits courtroom.)

THE COURT: We're outside the presence of the jury. So you think you have about 15 minutes left with this witness, and then you have about an hour more or less of cross examination?

MR. JONES: I think that's accurate.

THE COURT: And then you have four more witnesses?

MR. PARMLEY: Tomorrow we have four witnesses.

THE COURT: Okay.

MR. PARMLEY: That might (indiscernible).

THE COURT: And are we trying to --

MR. PARMLEY: We're trying to --

THE COURT: We're trying to get all the witnesses

II-318

here.

MR. PARMLEY:  Yes.

THE COURT:  One of your jury instructions is from the Chimack (phonetic) case about technical data being subject to expert control, and then in that instruction it requests me to instruct the jury that information contained in a bowl, water, feeder, technical manual for LHD amphibious assault ships, the propulsion operating guide for LHD amphibious assault ships and the Weapons Control System Manual for the LHD amphibious assault ships is required for design, development, production, manufacture, assembly, operation, testing or modification of defense articles.

How will I know that that is not publicly available information?

MR. BARRY:  You'll know that based on the testimony of Catherine Hamilton.  She'll be the second to the last witness.

THE COURT:  So, she'll -- she'll go through that and say that this is not available?

MR. BARRY:  Correct.  And the reason why that that instruction is in there, because it -- there's a separation of powers issue there that she'll sort of briefly talk about.

THE COURT:  Okay.  And then on one of your instructions about Counts 4, 5 and 6, one of your -- the first element says, First, on the dates alleged in the indictment,

II-319

the Defendant exported or caused to be exported technical data related to a defense article, and then in the CFR, I would propose to add "for which a license or written approval was required" and let it be in it to track the CFR from the United States, and then we could add "to the People's Republic of China".  But I think if you look at the CFR, it says all that's required is that it's exported from the United States, the technical data for which a license or written approval was required.  And I'm assuming that she will cover that information as well.

MR. BARRY:  So, is the question you're proposing adding that "for which a license is written approval is required" --

THE COURT:  Yes.  And -- and to track the language exported from the United States, the technical data for which a license or written approval was required, and then I don't mind saying to the People's Republic of China.

MR. BARRY:  Okay.  I think in terms of the specific text, I just want to make sure that there's not an issue with the CFR and what would be in the instruction.  But, certainly, Ms. Hamilton, part of her testimony will cover why the material is -- the fact that the State Department concluded the material is on the U.S. Munitions List, what it means if somethings's on the U.S. Munitions List that a license was required for that material to go to China, and that the

II-320

Defendant did not have a license.

THE COURT:  Okay.  So, the CFR is -- you can look at this -- 22 CFR 1271.  It also says a license or written -- or other written approval.  Maybe she knows about that.

MR. BARRY:  Yeah.  She'll both, sort of what that means in terms of a license versus written authorization or written approval.

THE COURT:  Okay.  Thank you.

And then you may step down.

THE WITNESS:  Thank you.

THE COURT:  I would ask on one of the proposals was the -- was the Government was saying the parties have agreed as to testimony of certain witnesses.

MR. PARMLEY:  Well, that would be -- that was related to the foundational, like a Google --

THE COURT:  It --

MR. PARMLEY:  -- custodian of records would have testified.

THE COURT:  The stipulation --

MR. PARMLEY:  The stipulation covers it.  So --

THE COURT:  Do you think we need it?

MR. PARMLEY:  I think there's another agreement -- instruction on stipulations I think it will cover.

THE COURT:  The parties have agreed to certain facts that have --

II-321

MR. PARMLEY:  I think that --

THE COURT:  -- stated to you, don't you Think that one applies better?

MR. PARMLEY:  I agree that covers it.

MR. JONES:  Agreed.

THE COURT:  And then on that -- the transcript issue about the Mandarin language, we've heard sound recordings -- so, I mean, can you look at the ones that you have and one of the ones that the Government wants is the accuracy of the transcript is disputed in the case.  I --

MR. PARMLEY:  She was cross examining.  I think that's why --

THE COURT:  Wouldn't we just delete that and then whether a -- and then delete that sentence that says whether a transcript is an accurate translation in whole or in part is for you to decide.  You can consider the testimony presented to you regarding how and by whom the transcript was made.  You may consider the knowledge, training and experience.

So, I'm just saying about this dispute, other than -- I think that it's -- I don't know.

MR. PARMLEY:  I think that came from the (indiscernible).  I think it's (indiscernible).  I don't have any objection to moving -- removing that.  It does seem a little bit repetitive, but I will leave it to defense counsel for his --

II-322

THE COURT:  There was another one where both sides wanted the standard one that says, We heard sound recordings and a transcript was provided to the jurors.  But you didn't do that.

MR. PARMLEY:  No.  It was --

THE COURT:  So, that --

MR. PARMLEY:  We provided it to go through a rolling transcript I guess is what we said.

THE COURT:  I know, but I think we need to modify that instruction.

MR. PARMLEY:  I'm fine with that.

THE COURT:  So, take -- take a look at all of them.

MR. JONES:  Yeah, and I know that there's -- there was like three or four model instructions related to translations, interpretations.  It seems like some of them are -- would be appropriate to kind of combine them or like you saw and heard videos and recordings.

THE COURT:  So, what you should do, Because it looks like we're going to be discussing the instructions sooner rather than later, is come up with some language.

MR. JONES:  Sure.  I -- I'll send over my proposal.

THE COURT:  And then --

MR. PARMLEY:  We'll try to work something out, your Honor.

THE COURT:  Okay.  Then the Defense wanted the

II-323

informant law enforcement officials who engage in stealth and deception.  Do you really want that?

MR. JONES:  No.  I -- I didn't include it all.  I don't need that one, yeah.

THE COURT:  His testimony, don't you think we wouldn't need that one?

MR. JONES:  Yeah.

THE COURT:  Okay.  And then dual testimony.  So, can the Government look at their proposed dual role testimony --

MR. JONES:  Back to dual expert testimony, yeah, I --

THE COURT:  I think we do have that with some of the agents who --

MR. JONES:  We do have that with Agent Wetterer.

THE COURT:  And then the Defense also asked for knowingly, but it's willfully, and are there any -- like the last count, is that knowingly?  So, can you take a look at that one.  I'm describing the ones that I've come across so that we're prepared to discuss it.

MR. JONES:  Okay.

THE COURT:  Okay.  Anything further?

MR. BARRY:  Not from the Government, your Honor.

MR. PARMLEY:  I don't think so.

MR. JONES:  No, your Honor.

II-324

THE COURT:  Thank you.  We're in recess.

(Proceedings recessed.)

II-325

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/Jordan Keilty                    3/3/2026
Transcriber                         Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.